Mark A. Sandberg, Esq.
SANDBERG, WUESTENFELD & COREY, PC
701 West 8th Avenue, Suite 1100
Anchorage, AK 99501
Tel:    907-276-6363
Fax:    907-276-3528

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT ANCHORAGE

ALLSTATE INSURANCE COMPANIES,  )
                                )
              Plaintiff,         )
                                )
        v.                       )
                                )
CHARLES HERRON,                  )
                                ) Case No. 3:04-0043 CV (TMB)
              Defendant.         )
_____)

**MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

# I. INTRODUCTION

Allstate Insurance Company (Allstate) filed this declaratory relief action against Charles Herron (Herron), a person insured by Allstate. Allstate asked this Court to determine that Allstate did nothing wrong in its handling of a claim brought by Mary Kenick (Kenick) against Herron arising out of an automobile accident.

On April 2, 2004, Herron assigned all his rights against Allstate (and Kathy Berry, an Allstate adjuster) to Kenick. A lawsuit was then filed in Alaska state court by Kenick (Herron's assignee) alleging that Allstate and Berry were guilty of negligent and bad faith claim handling. The state court case is still pending and all issues presented in this case, plus additional issues and parties not before this Court, are squarely presented in that court.

This motion requests that this Court:

A. Declare that Herron possessed viable claims against Allstate on April 2, 2004: and

B. Declare that Herron's claims against Allstate are properly assignable under Alaska law; and

C. Declare that Herron's claims were properly assigned by Herron to Kenick on April 2, 2004; and

D. Decline to adjudicate any further issues.

On July 13, 2004, Judge Singleton phrased the issue in this case as: "Allstate seeks a determination that the assignment was a nullity, i.e., that Herron had no viable claim to assign."

(Docket No. 20, pg. 3). Herron now asks this Court to declare that Herron did have viable claims that were properly assigned and then leave determination of the merits of those claims for the state court lawsuit.

The facts relating to Herron's original automobile accident are straight forward. Herron caused an accident on September 14, 2002 when driving while intoxicated near Bethel Alaska. The accident seriously injured Herron's 15 year old passenger, Angelina Trailov (Trailov). Trailov was treated at Y-K Hospital in Bethel and then medivaced to Anchorage suffering, among other things, a fractured skull. A neuropsychologist eventually diagnosed brain damage. It was quickly obvious that Trailov's injuries were serious.

Allstate was informed of the accident by Sept. 16, 2002 and assessed Herron's negligence at 100 % by Sept. 21, 2002. Within two days, Allstate was assessing its own underinsured motorist (UIM) exposure, above and beyond Herron's liability limits. Allstate owed Trailov UIM benefits if Herron's liability insurance was not big enough to pay Trailov's damages, since Trailov was a passenger in a car insured by Allstate when she was injured.

The Allstate policy had $100,000/$300,000 liability limits; $100,000/$300,000 UM/UIM limits; and $25,000 per person medical payments limits. Each claimant[1] potentially could recover $100,000 of liability coverage, $100,000 of UIM coverage and $25,000 med pay coverage. Allstate had the exclusive right to defend and settle any claim against Herron. The insurance contract also requiring Herron to cooperate with Allstate and not admit liability or agree to any settlement without Allstate's approval.

---

[1] Kenick presented two claims against Herron. As Trailov's mother, Kenick would be the person authorized to present Trailov's claim. But Kenick also had her own claim for negligent infliction of emotional distress (NIED) based upon seeing her seriously injured daughter.

Over the next eight (8) months, Allstate and Berry, an Allstate adjuster, dramatically mishandled the claims against Herron. Allstate ignored Alaska regulatory requirements. Allstate ignored its own claim handling procedures. Allstate ignored obligations placed upon all insurers by Alaska case law. Allstate ignored normal good faith claims handling practice. After failing to timely investigate or evaluate the claims against Herron, Allstate failed to accept a policy limits settlement offer to settle Trailov's claims before a deadline lapsed on May 16, 2003.

After the deadline lapsed, and after Kenick sued him, Herron entered into a settlement on April 2, 2004. The settlement provided that Herron would agree to a consent judgment and an assignment of Herron's claims against Allstate to Kenick, for herself and her injured minor daughter (Trailov). In return, Herron received a covenant not to execute against his personal property. With the approval of a Superior Court in Bethel sitting in Probate, suit was brought by Kenick/Trailov against Allstate and Berry in the Alaska Superior Court.[2]

Allstate had meanwhile had filed, but not served, this declaratory relief action against Herron. Allstate eventually served the suit after the assignment to Kenick/Trailov had occurred. Allstate asked for a declaration that it made a good faith attempt to settle and was not obligated to Herron beyond the amount of the insurance contract. Subsequently, Allstate amended and asked for a declaration that Herron breached his obligation to cooperate by consenting to judgment and destroyed his right to be protected by the insurance policy. A motion for summary judgment brought by Allstate was denied. (Docket No. 79).

---

[2] Berry is a party to the state court action but Allstate did not name Berry as a party to this lawsuit, presumably because her presence would destroy diversity. The state case asserts claims against Berry for negligent adjusting, a theory recognized in C.P. v Allstate Ins. Co, 996 P.2d. 1216 (Alaska 2000). Those claims are not before this Court and will go forward in state court no matter what this Court decides about Allstate or its legal liabilities. (Docket No. 79, at pg. 13).

This motion asks the Court to declare that Herron had a viable claim against Allstate on April 2, 2004, that such claims are assignable under Alaska law, that the assignment properly transferred the claim to Kenick and that Allstate's liability for the assigned claims should be determined in the pending state court lawsuit where all issues involving all interested parties, including Berry, are presented.

## II.  PROCEDURAL HISTORY

Allstate's original complaint and its first amended complaint ask the court to find that it attempted to settle in good faith and was not liable for any consent judgment beyond the amount of its policy. Allstate's original complaint was filed March 2, 2004 (Docket No.1) but was not served.

Herron assigned all his claims on April 2, 2004. An Amended Complaint was filed on May 20, 2004 (Docket No. 12) and answered on June 16, 2004 (Docket No. 15). Neither Allstate's original complaint nor the first amended complaint discusses Herron's claims for negligent adjusting against either Allstate or Berry. Neither requests any declaratory relief regarding Herron's negligence claims  and Berry is not named as a party in this Court, although Kenick, Herron's assignee, has sued Berry in state court.

In his Order of July 12, 2004 accepting discretionary declaratory relief jurisdiction of this matter, Judge Singleton addressed the factors set forth in Government Employees Ins. Co. v. Dizol, 133 F. 2d 1220 (9th Cir. 1998).[3] The court went on to find this action suitable for declaratory relief because: "Allstate seeks a determination that the assignment was a nullity, i.e., that Herron had no viable claim to assign." (Docket No. 20, pg. 3).

---

[3] Herron contested both subject matter jurisdiction and discretionary jurisdiction to grant declaratory relief. This motion is not intended as a waiver of those previous positions.

This is an issue upon which we now seek summary judgment. Herron asks the Court to determine that he had viable claims against Allstate on April 2. 2004, that the claims were assignable under Alaska law, and that they have been properly assigned. There is no reason for this case to reach any further issues, since all other issues are before the Superior Court.

While the Order of July 12, 2004 mentioned that Herron had "assigned his rights to Trailov and Kenick", the order (in footnote 2) only mentioned "breach of contract" issues. Under Alaska law, Herron also had claims for negligent adjusting by Allstate's and its claims personnel. Continental v. Bayless and Roberts, 628 P.2d 281 (Ak. 1980) and C.P. v. Allstate Ins. Co., 996 P.2d 1216 (Ak. 2000). These claims were also assigned to Trailov and Kenick.

The court noted that if Allstate breached its contractual duties, Herron was excused from his contractual duty to cooperate and was free to settle with Trailov/Kenick. The court mentioned that summary judgment might be possible upon uncontested facts. (See Fn. 2 to Docket No. 20.) Subsequently, Allstate amended its complaint for the second time, adding allegations that Herron breached the insurance contract by consenting to a judgment. It again sought broad relief that it was not liable beyond the amount of its policy, or alternatively, that Herron had breached the insurance contract by entering into a consent judgment so that it was not liable under the insurance contract.

Before discovery had begun in this matter, Allstate moved for summary judgment. Allstate asked the court to declare that Allstate had acted in good faith in attempting to settle the matter and had not breached the contractual covenant of good faith and fair dealing, otherwise known as committing "bad faith".

On May 14, 2005 Judge Singleton denied Allstate's motion for summary judgment. That ruling, all by itself, should be enough to demonstrate that Herron had viable claims against

Allstate to assign to Kenick. If Judge Singleton could not rule as a matter of law that Allstate had fulfilled its duties to Herron then, by definition, Herron had a viable claim against Allstate. To use Judge Singleton's phrase from the July 12, 2004 order, the assignment was not a nullity. The merits of the assigned claims remain to be determined in state court.

The May 14, 2005 order does not mention Allstate's and Berry's liability due to negligent breach of duties of due care. Instead, the Court noted that neither Berry nor the negligence claims are before this court. (Docket 79, pg. 9).

### III.  HERRON'S CLAIMS ARE ASSIGNABLE

Legal claims by their very nature are inchoate "things in action" that arise out of breaches of legal duties, but which have not been liquidated or finalized by a judgment. A party does not need to obtain a final judgment before making an assignment of a claim.

Alaska recognizes that legal claims are items of personal property that may be assigned or executed upon, just as other intangible items of personal property such as property titles. AS 01.10.060(a)(9) states that a "thing in action" is "personal property" for the purposes of the laws of Alaska.

A "thing in action" is a "chose in action." See,  Bergen v. F/V St. Patrick, 686 F. Supp. 786 (Ak. U.S.D. 1988) (citing Black's Law Dictionary ). A "chose in action" is the right to bring an action to recover a debt, money, of thing." Black's Law Dictionary (8th  2004).

An assignment of legal rights is an effective legal transfer of those rights unless the assignment is inoperative on the grounds of public policy. The rules of enforceability of contracts in general applies to assignments. See, McKnight v. Rice, Hoppner, et al, 678 P.2d 1330, 1334 (Ak. 1984). The general rule in Alaska is that only claims for personal injuries, such

as wrongful death claim or bodily injury, may not be assigned. This is to avoid champery. <u>Deal v. Kearny</u>, 851 P.2d 1353 (Ak. 1993).

A cause of action for economic damages arising out of a breach of legal obligations to an insured is assignable by the insured. See <u>Andersen v. Edwards</u>, 625 P.2d 282, 290 (Ak. 1981); <u>Bergen v. F/V St. Patrick, supra.</u> Numerous cases in Alaska allow an assignee to pursue assigned claims after a settlement. That assignment may be part of a covenant settlement wherein the insured assigns his rights in return for a covenant not to execute. <u>C. P. v. Allstate Ins. Co.</u>, 996 P.2d 1216 (Ak. 2000); <u>Great Divide Ins. Co. v. Carpenter,</u> 79 P.3d 599 (Ak. 2003).

On April 2, 2004 Herron assigned all his rights to make claims against Allstate and Berry in return for a covenant not to execute. Allstate's assertions in this case are not really an attack on the assignment. The claims are clearly assignable under well established Alaska law. Instead, Allstate argues that Herron had no claims (or choses in action) to assign.

Under Alaska law, Herron had several legal claims that were assignable. Judge Singleton's ruling on Allstate's motion for summary judgment demonstrates that Herron had viable claims.

Of course, Allstate is entitled to assert defenses against the assigned claims. But those defenses should be asserted against Herron's assignees in Alaska Superior Court. Those claimed defenses have nothing to do with the validity of the assignment. On April 2, 2004 Herron had "viable claims" or "viable choses in action" and Herron assigned them.

## IV.    THE FACTUAL RECORD SHOWS THAT HERRON HAD VIABLE CLAIMS AGAINST ALLSTATE AND BERRY TO ASSIGN TO KENICK

### A. INTRODUCTION

The fact that Judge Singleton could not rule as a matter of law that Allstate breached no duties owed to Herron means, by definition, that Herron had viable claims that he could assign. However, since this Court is new to this complex case, we will demonstrate the factual basis upon which Herron unquestionably had claims he could assign to Kenick. The claims handling facts are set forth in the claims file excerpts (Exhibit 1), as well as in claims personnel depositions (Exhibits 2,5,8, and 9). That also requires a brief discussion of Alaska statutory, regulatory and case law regarding the obligations of a liability insurer.

### B. STATUTORY AND REGULATORY REQUIREMENTS

The Alaska Unfair Claims Settlement Practices Act and the regulations implementing it impose mandatory standards upon insurers like Allstate. While a breach is not negligence per se, it is evidence of negligence. <u>Ace v. Aetna Life</u> <u>Ins. Co.,</u> 139 F.3d 1241, 1247, fn.18, 19 (9th Cir. 1998).

The Unfair Claims Practices and Acts regulations were adopted in 1989 under the authority of Alaska's Unfair Claims Settlement Practices Act. AS 21.36.125. That act was later amended to prohibit not only bad faith practices, but also bad faith acts. AS 21.36.125(3) requires an insurer to adopt reasonable standards for prompt investigation of claims. AS 21.36.125(6) requires an insurer adjuster attempt in good faith to make a prompt and equitable settlement of claims in which liability is reasonably clear. (Exhibit 3).

The Unfair Claims Practices Regulations mandate at 3 AAC 26.030 that any person involved in the investigation, adjustment, negotiation, or settlement of a claim must document

each action taken on a claim in sufficient detail that relevant events, dates, and participating persons can be identified.

Alaska's Unfair Claims Practices Regulations require that an adjuster handling a third-party liability claim (such as Berry):

1) within 10 working days of notice of the claim acknowledge the claim in writing and identify the adjuster handling the claim;

2) within 15 working days respond to communications from a third-party claimant or his attorney where a response is reasonably expected;

3) promptly provide necessary claims forms, such as medical records authorizations;

4) complete the investigation of a third-party liability claim within 30 working days or notify the claimant in writing of the reasons why additional time is needed;

5) disclose any first party coverage such as UIM coverage or medical payments coverage ( See 3 AAC 26.040 (b)(1)-(b)(3) and 3 AAC 26.050, 3 AAC 26.060(1). Exhibit 4.)

An adjuster handling a first-party medical payments claim (here Scott    Millar) was required by the regulations to:

1) within 10 working days of notice of the claim, acknowledge the claim in writing and identify the adjuster handling the claim;

2) within 15 working days respond to communications from a first-party claimant or his attorney where a response is reasonably expected;

3 ) promptly provide necessary claims forms, such as medical records authorizations;

4) complete the investigation of a first party medical payments claim within 30 working days or notify the claimant in writing of the reasons why additional time is needed;

5) while the investigation remains incomplete provide written notice every 45 working days after the initial notification;

6) disclose any first-party coverage such as UIM coverage or medical payments coverage (3 AAC 26.040(a)(1)-(a)(3); 3 AAC 26.050; 3 AAC 26.060(1), 3 AAC 26.070(a)(1). Exhibit 4.)

### C. ALLSTATE'S COMPUTERIZED CLAIM DEVELOPMENT SYSTEM (CDS)

When considering the Allstate claims record described below, it is important to note that the Allstate computerized Claims Development System (CDS) includes among its functions (or screens) a claims log and communication system. By inputting a claim number, the adjuster as well as claim supervisors can look at an ongoing claim, document activities and deadlines, report, and communicate without leaving their desks. Of great importance for this case is a CDS feature called a "Notify" that lights a message on the computer of the person to whom it was sent indicating a message is waiting. (C. Elkins Depo. pg. 18-20, 37-42, Exhibit 2).

Although Kathy Berry's supervisor Craig Elkins (Elkins) was supervising as many as 750 claims, the CDS system allowed him to track claims activities, communicate with the adjusters, and supervise such an enormous number of claims (C. Elkins Depo. Pg. 18-20, 37-38, 39-42, Exhibit 2). Other CDS screens were used to guide adjusters with task lists, to summarize medicals, or perform a claim evaluation with the Colossus system prior to seeking authority to settle a claim. Colossus is a program that provides a settlement range after an adjuster inputs claims facts.

In the CDS entries, liability coverage was designated as AA and medical payments coverage as CC. Trailov was identified as 04. Tracy Faulkner (another passenger) was identified as 05; Kenick was identified as 07. An entry of AA04 would indicate Trailov's liability claim; CC04 was Trailov's med pay claim; AA07 was Kenick's liability claim.

11

Allstate claims personnel designations in the CDS entries are:

Renee Vanzant—DPH3 and SRV.

Karen Petersen – DMON and AKP

Craig Elkins ---- DJIF and SKE

Kathy Berry ---- DHTT and AKB

Scott Millar ----  JC4N and SSM

Each entry in the CDS log identifies the Desk of the adjuster assigned to the claim, in this instance AKB (Berry). Each entry indicates the sender of each message next to: "Stmt Empl Name". For instance, "Craig J  Elkins" in Exhibit 1 (100042). Adjusters who sent and received messages are indicated by identifiers at the bottom of the CDS log. For instance, in Exhibit. 1 (100042) at the bottom of the entry, it indicates:  " ***Only employee DJIF can update the statement you have selected." This means Craig Elkins (DJIF) sent the message. Just above such entry the message indicates: " Notify used on 5/6/03, sent to DHTT." This means the message was sent to Kathy Berry (DHTT).

The CDS system is Allstate's primary documentation tool, communication tool, and claims guidance tool. It is designed to provide immediate claims activity reporting and immediate access to activities on a claim. The entries and <u>absence of entries</u> in the CDS diary, when compared with Alaska's legal requirements for fair claims handling, demonstrate Allstate's astonishing negligence and bad faith claims handling.

### D. CLAIMS HANDLING CHRONOLOGY

<u>1. September 14, 2003 To Dec. 30, 2002</u>

<u>Sept. 14, 2002</u>. Herron was insured by Allstate under a policy with liability limits of $100,000/$300,000; medical payments coverage of $25,000 per person including passengers;

and UM/UIM coverage of $100,000/$300,000. On this day, Herron seriously injured 15 year old

passenger Angelina Trailov near Bethel, Alaska while driving intoxicated. Another passenger,

Tracy Faulkner suffered minor injuries.

Sept. 16, 2002.  CDS—Allstate is informed of the accident and Herron's driving while

intoxicated (DWI). It is informed that Angelina had a skull fracture, fluid in her lungs and that

she had been evacuated to Anchorage Regional Hospital to be transferred later to Alaska Native

Hospital . Exh. 1 (100076, 100002-4).

Sept. 18, 2002. CDS—Allstate immediately investigates its exposure to a UIM claim.

This was referred to in the claims file as the "waiver issue". Exh 1. (100008). Of course, an

insurer is only liable for a UIM claim if the insured's damages are bigger than the liability

coverage. Alstate investigates the Herron policy's UM/UIM offer documents pursuant to a

mandatory Allstate UM/UIM procedure that required investigation if Allstate had a UIM

exposure. Allstate had previously been involved in the Dayton v. Allstate class action before

Judge Holland in U.S District Court on this "failure to offer UM/UIM" issue involving AS

21.89.020 and its UM/UIM offer and "waiver" provisions. (Karen Petersen Depo. pg. 51-52.

Exhibit 5 and Allstate MCO Process Compliance Memo of May 8, 2001, Exhibit 6. The "FTO

Log" refers to the "Failure To Offer" Log).

In the Dayton settlement,  Allstate agreed to pay an additional $100,000 (the Dayton

"Bump")  to each UM/UIM insured who had received a policy limit from a policy in relation to

which UM/UIM limits up to $1,000,000/$2,000,000 had not been offered or "waived". Thus,

Allstate was concerned with a possibility of paying not only the underlying UIM coverage of

$100,000 but possibly an additional $100,000 to any UIM claimant. Hence, Allstate had a policy

regarding investigating the FTO issue in every case that could be bigger than the available liability insurance, and Trailov's injuries presented just such a case.

Sept. 21, 2002. CDS—Allstate adjuster Rene Vanzant, assesses Herron's liability at 100 % and enters into the claims log. Exh.1. (100080-81). From Sept. 21, 2002 forward, Allstate was dealing with a claim in which the liability investigation was already done and in which it had demonstrated a concern that the damages of Trailov were bigger than Herron's liability coverage. ( Elkins Depo. pg. 46, Exhibit 2. K. Petersen Depo. pg. 51-52, Exhibit 5).

Sept. 25, 2002. CDS report by Vanzant regarding a letter from the Angstman Law Office in Bethel. The liability investigation was again designated as completed. $25,000 reserve on liability claim set. Because Trailov and Kenick were now represented by a lawyer, the claim was re-assigned from Vanzant to Berry. See Exhibit 1 (100013, 100240). Berry was a member of Allstate's "Represented Unit" that adjusted claims where lawyers were involved.  (Berry Depo. Pg. 7, Exhibit 8).

Sept. 26, 2002. Berry is sent a CDS "Notify" by her superior Karen Petersen (DMON) telling her to do two things – (1) "determine the extent of 04 injuries" (Angelina Trailov was 04), and (2) warn Herron that his policy did not cover punitive damages. Berry is also told that medical payments coverage (CC) is available for Trailov. Petersen also advises Berry to review the liability reserves, since the reserve (the amount estimated as necessary to pay the claim) was only set at $25,000. (Exhibit 1 (100014)).

Oct.1, 2002. CDS—Allstate recognizes Trailov (as a passenger in an Allstate insured car) is entitled to medical payments insurance benefits under Herron's policy and assigns Scott Millar (designated SSM and JC4N) to investigate and adjust that first-party claim. As Herron's

passenger, Trailov had $25,000 of Allstate medical payments insurance. (Exhibit 1 (100001); S. Millar Depo. pg. 50, Exhibit 9).

Oct. 8, 2002. The legal requirement that Berry notify Angstman Law Office of her name, address, phone, and liability claim number within ten working days lapses. Berry and Allstate ignore this legal requirement. 3 AAC 26.040.

Oct. 16, 2002. The legal requirement that Millar notify Trailov or her lawyer of his name, address, phone, and med pay claim number for her medical payments claim lapses. 3 AAC 26.040. Millar doesn't announce his presence or the existance of these insurance benefits until May 12, 2003, seven months later. Millar never discloses the medical payments coverage as required by 3 AAC 26.060(1) and never sends any medical release forms or claims forms as required by 3 AAC 26.040. (S. Millar, pg. 50-54, Exhibit 9). Millar and Allstate ignore all these legal requirements.

Oct. 18, 2002. Berry reviews adverse facts in file on driver's liability, Trailov's skull fracture, and fluid in lungs. Berry notes she has no medical records and orders the police report. Berry reports faxing a letter to Angstman Law Office to announce her presence. Exhibit 1. (100016, 100205). She does not disclose the medical payments coverage pointed out to her by Karen Petersen on Sept. 26, 2002, nor does she disclose that Trailov is insured for UIM coverage. She was required to disclose both by 3AAC 26.060(1) (Exhibit 4).

Nov. 5, 2002. The legal requirement that Allstate investigate the liability claim within thirty working days or provide notification of the need for more time with reasons lapses. This was ignored throughout the claim by Berry, Elkins and Allstate. 3 AAC 26.050 (Exhibit 4).

Nov. 7, 2002. Elkins asks Berry whether she sent letter and medical authorization to Trailov's attorney. (Exhibit 1 (100019)).

Nov. 14, 2002. The legal requirement that Millar investigate Trailov's entitlement to medical pay benefits within thirty working days or provide notification of the need for more time, including stating the reasons, lapses. This was ignored throughout the claim by Millar, Elkins and Allstate, as was the legal requirement that Millar  continue to advise every 45 days thereafter. 3 AAC 26.050, 3AAC 26.070 (Exhibit 4).

Nov. 14, 2002. CDS. Millar is assigned as the med pay adjuster on Tracy Faulkner.(Exhibit 1) (100022)).

Nov. 14, 2002.  Seven weeks after assignment, Berry sends CDS to Elkins reporting that today she sent the first medical authorization form. Berry had not sent out the one referred to in the Oct. 18, 2002 fax and now corrected this. Berry also raises reserves on Trailov claim to $75,000 that were questioned by Karen Petersen on Sept. 26, 2002. (Exhibit 1) (100020-21)). The liability policy limit for any one person is $112,500 ($100,000 plus limited Rule. 82 attorney fees coverage).

Nov. 25, 2002. Berry promptly receives the signed medical release from the Angstman Law Office. (Exhibit 1) (100264)). Sixty days after Berry was assigned the claim, Berry got a signed medical release. Berry then waited almost another 60 days to use it.

Nov. 29, 2002. Millar's 10-day legal requirement to notify Tracy Faulkner of his existence on Faulkner's possible med pay claim lapses. Millar, Elkins and Allstate ignore the deadline. 3 AAC 26.040 (Exhibit 4).

Dec. 10, 2002. Angstman Law Office informs Berry by letter that Trailov was going to be examined by a neuropsychologist. (Exhibit 1) (100203)). Berry never asked for the name of the neuropsychologist. Berry never asked for teh neuropsychologist's report, even though she knew that a neuropsychologist diagnoses brain injuries. (K. Berry Depo. pg.  60-61, (Exhibit 8)).

16

Dec. 30, 2002. Millar's 30 day legal requirement to investigate or notify of more time needed on Tracy Faulkner's medical payments claim lapses. Millar never sends medical authorizations, never reveals his presence, and never tells Faulkner she is entitled to $25,000 in medical payments coverage as Herron's passenger. Millar, Elkin and Allstate ignore the deadline and ignore Millar's failure to disclose the medical payments coverage to Faulkner's parents. 3 AAC 26.050, 3 AAC 26.060(1) (Exhibit 4).

## 2. Jan. 17, 2003- April 14, 2003

Jan. 17, 2003. CDS file note by Berry. Four (4) months after notice of a claim and two (2) months after she has a release, Berry finally makes Allstate's first request for medical records, but only from Y-K Hospital in Bethel. Although the medivac flight, Alaska Regional Hospital and Alaska Native Medical Center are in the Sept. 16, 2002 claim log entries, Berry does not seek these records. (Exhibit 1 (10003-4)).Berry now also requests a specific medical records release form required by Alaska Native Medical Center. (Exhibit 1) (100031)). Berry knew of the need for a specific ANMC release, as she had handled other claims involving ANMC, but delayed four (4) months before asking for it.  (Berry Depo. 34-35 (Exhibit 8)).

Feb. 10, 2003. Allstate receives the signed ANMC release from the Angstman Law Office. (Exhibit 1) (100261, 100263)). Berry did not use it until five weeks later, after policy limits demands were made for Trailov and Kenick.

Feb. 18, 2003. Five months after the accident, Allstate and Berry receive a letter dated Feb. 14, 2003 from the Angstman Law Office containing a policy limits demand to settle the claims of Trailov, as well as a seperate policy limits demand for the NIED claim of Kenick. She

had witnessed her daughter's injuries at the Bethel Y-K Hospital, and who had accompanied her daughter on the medivac plane and to the hospitals in Anchorage. The letter enclosed medical records and bills of over $34,000. It states that Angelina suffered a traumatic brain injury. This initial demand letter did not have a deadline stated by which the demands would lapse or expire. (Exhibit 1 (100197-198)). Berry does not report receiving the letter in the CDS, nor does she send a "Notify" to Elkins who kept a Demand Log in order to track demand deadlines. Elkins tried to enter demands into the log the day they were received. Elkins testified he should have seen the Feb. 14, 2003 demand within the week it was received. (Elkins Depo. pg. 31-32; 84-86 (Exhibit 2)). Berry only had settlement authority of $20,000 and needed a superior to authorize settlement over that amount. (Berry Depo. 83, 89, (Exhibit 8)).

Feb. 18, 2003. As a result of the brain damage allegation, Allstate's mandatory "Serious Injury" Referral procedure required Berry to send a "Home Office Referral" to the Allstate headquarters within 14 days of Feb. 18, 2003. This involves summarizing the claim for the Home Office claims staff. (Exhibit 7). Berry did not record this deadline in the CDS system, nor did she send a "Notify" to Elkins. (Exhibit 2).

March 2, 2003. The Serious Injury Referral procedure's mandatory fourteen-day deadline lapses.

March 3, 2003. Two weeks after receipt, Berry finally notified Elkins of the policy limits demands by delivering the demand letter with a Demand cover sheet. (Elkins Depo. pg 84-86, (Exhibit 2)).

March 3, 2003. CDS. Having received notice of the demand, Elkins immediately recognizes a Serious Injury claim. By a CDS "Notify", Elkins directs Berry to send a Serious Injury Home Office Referral to Allstate headquarters. Elkins advises Berry to raise the reserves

on Trailov's claim. (Exhibit 1 (100032)). <u>Elkins also entered the demand into the Allstate</u>

<u>Demand Log as having no certain date for a response</u> . (Elkins Depo. pg. 113-114. (Exhibit 2);

Demand Log (Exhibit 1) (100200)). From the invocation of the Allstate mandatory Serious

Injury Referral procedure and its 14-day deadline, both Berry and Elkins recognized  (no later

than March 3, 2003) that Trailov's claim was serious and needed to be evaluated swiftly. Berry

knew how serious this Home Office referral procedure was and knew she was expected to

comply with the 14-day deadline. (Elkins Depo. pg. 93-94, (Exhibit 2)).

<u>March 3, 2003</u>. The fourteen day deadline for Home Office referral  finally begins

running (it should have begun not later than February 18, 2003). Because of this deadline, review

of the claim should have been "tickled" by Elkins for fourteen days, or March 17, 2003, but

Elkins made a mistake and instead tickled review for sixty days. (Elkins Depo. pg. 95-96,

(Exhibit 2)).

<u>March 17, 2003</u>. By letter, Berry acknowledges the Feb. 14, 2003 demand letter. Berry

asks for school records on Trailov and for medical records on Kenick. (Exhibit 1 (100195)).

<u>March 17, 2003</u>. The Serious Injury Home Office Referral deadline passes. Elkins did not

have it on his "suspense" calendar and Berry overlooked it. (Elkins depo. pg 93-94, (Exhibit 2)).

Berry stated she did not know why she did not comply with Allstate's own deadline . Berry did

not tickle it for a particular time and says she just forgot. (Berry Depo. pg. 51, 54-55, (Exhibit

8)).

<u>March 17-18, 2003</u>. Six months after Allstate received notice that Trailov was treated at

Alaska Native Medical Center, Berry finally requests ANMC records. Berry did not notify

Elkins that she was finally requesting ANMC records for the first time. (Exhibit 1) (100033-34)).

At this time, Allstate's file showed the medical bills provided by the Angstman Law Office totaled over $35,000. (Exhibit 1) (100598, 100095).

March 18, 2003. Berry also notifies Herron by letter of the settlement demands and informs him he had no coverage for punitive damages. Despite well established Alaska case law requiring insurers to issue an "excess letter" advising their insureds when the possibility exists that a claim will be bigger than the policy limits that exist to protect them, Allstate never sent Herron an excess letter. Berry did represent to Herron that:

> "Once all the necessary documentation has been provided to us, we will make every effort to conclude this matter promptly within the limits of this policy and achieve a full and final release for you." (Exhibit 12).

This letter was not an "excess letter" to warn Herron of excess exposure over the policy limits, but only was to warn of the exposure to uninsured punitive damages. Allstate never sent an excess letter. Berry never "felt" like this was an excess case. She would only send one where there was a "high probability" of an excess claim. (Berry Depo. pg. 57- 58, (Exhibit 8)). As acknowledged by Peterson, Berry's superior and the highest ranking person in Allstate's Anchorage claim office, an excess letter should go to the insured if a claim "could exceed the limits of the policy" or if the claim "may exceed the value of the policy." (Petersen Depo. pg. 31 (Exhibit 5)).

March 26, 2003. Herron's lawyer, James Valcarce (Valcarce), sends a letter to Allstate and Berry demanding that Allstate settle the matter within Herron's policy limits. Berry does not report receipt of the letter in the CDS system, nor does she report that Herron has an attorney Although Berry did advise Elkins by the CDS system of her March 18, 2003 letter to Herron, Berry does not advise Elkins that she had received a letter from Valcarce that demanded Allstate settle within policy limits.  (Exhibit 1) (100033-44), (Berry Depo. pg. 73-74, (Exhibit 8)).

March 26, 2003. Berry receives ANMC medical records and bills (100597 Exhibit 1).

Allstate has over $35,000 in medical bills, including notices of medical liens, from Alaska

Regional Hospital from Angstman Law Office and ANMC. Berry never requested Alaska

Regional records but these were provided Feb. 18, 2003 by Angstman Law Office. With the

exception of  few Y-K records provided on April 14, 2003 by Angstman Law Office regarding

Trailov's treatment after returning to Bethel, Allstate has all the medical records it will ever

possess.

April 7, 2003. CDS. By a Notify to Elkins, Med pay adjuster Millar requests authority to

pay the $25,000 on Trailov. Millar says he is gathering records for Elkins' review, though he had

gathered none. Elkins responds by CDS to forward the file. (Exhibit 1 (100035-36)).


### 3. April 14, 2003 To May 16, 2003


April 14, 2003. Allstate receives a letter dated April 10, 2003 from the Angstman Law

Office setting a deadline of May 16, 2003 for expiration of the policy limits demands. (Exhibit

13).  Incredibly, Berry does not record in the CDS system that she received a letter setting a

deadline. Berry does not know if she calendared the deadline. Berry did not inform Herron's

lawyer of the deadline. Berry did not inform Elkins of the May 16, 2003 deadline, by means of a

CDS "Notify" message or otherwise. (See claims notes in (Exhibit 1, 100036-44, 100188-189),

Berry Depo. pg. 75-77, 81,101, Exhibit 8 and Elkins Depo. pg. 113-115, Exhibit 2). Attached to

the letter of April 10, 2003 was the last medical record regarding  Trailov that Allstate would

receive. (Berry Depo. pg. 80-81, Exhibit 8).

April 14, 2003. An important consequence of Berry's silence was that the Allstate Demand Log was not updated to reflect that there was now a settlement deadline of May 16, 2003. According to the Demand Log, and as far as Elkins knew, the demand was still an "open demand" with no deadline. (Elkins Depo. pg. 113-115, Exhibit 2). Elkins had authority sufficient to authorize a policy limits settlement up to the liability limits of the Herron policy -- $112,500. (Elkins Depo. pg. 35, Exhibit 2), but Elkins did not know there was a deadline

May 2, 2003. CDS. Millar sends Notify message to Elkins re the "gathered records" on Trailov med pay claim. (Exhibit 1 (100037)).

May 2, 2003. CDS. Elkins contacts Berry by Notify regarding the status of Kenick's liability claim (AA07). Elkins copies her with a message to Scott Millar authorizing payment of $25,000 med pay. Berry makes no effort to tell Elkins of the May 16, 2003 settlement deadline. (Exhibit 1 (100037-40)).

May 2, 2003. CDS. Millar sends Notify to Elkins that he has closed the med pay coverage for Tracy Faulkner. Millar did so without telling the Faulkners that Allstate provided Tracey insurance coverage and might owe med pay benefits, without disclosing it to the Y-K Hospital, without seeking records from Y-K Hospital, and without payment to Y-K Hospital which had a lien as a matter of federal law. (Exhibit 1 (100038)).

May 6, 2003. CDS. Elkins finally sends Notify message asking Berry for the status of the Serious Injury Referral on Trailov that Elkins requested on March 3, 2003. (Exhibit 1 (100039-42)). Elkins testified that he had made a mistake by not setting a diary for fourteen days for checking that Home Office Referral actually happened. Apparently, Elkins mistakenly set his diary for 60 days instead of 14 days. (Elkins Depo. pg. 93-96, Exhibit 2). Berry again makes no attempt to tell Elkins of the looming May 16, 2003 settlement deadline.

<u>May 9, 2003</u>. With one week until the settlement deadline , Berry finally responds to the April 14, 2003 letter from the Angstman Law Office by sending a letter acknowledging the May 16, 2003 deadline and Allstate's intent to comply with that deadline as to Trailov's settlement demand. (Exhibit 1 (100187), Berry Depo. pg. 81-82, Exhibit 8). In that letter Berry stated that:

> " We are in the process of completing our evaluation of Angelina Trailov's claim and anticipate responding to your demand <u>by your May 16, 2003 deadline.</u>" (Emphasis added)

Between April 14, 2003 and May 9, 2003 Berry claimed to have reviewed the file, but even that is undocumented. There is no indication in the file that she evaluated Trailov's claim between April 13, 2003 and May 9, 2003. <u>In fact there is no documentation in the file that Berry performed any evaluation of Trailov's claim at any time prior to May 9, 2003</u>. (Berry Depo. Pg 76-79, 82, Exhibit 8).

Berry did not send a copy to Herron's attorney, Valcarce. (Berry Depo. pg. 101, Exhibit 8). Berry did not record in the CDS system that on May 9, 2003 she responded to Angstman's April 14, 2003 deadline letter. Berry again did not inform Elkins of the deadline or of her letter. (Berry Depo. pg. 77, Exhibit 8; Exhibit 1.(100035-44) ). Elkins had no recollection of the May 16, 2003 deadline and, according to Allstate's file, he was not told about it. If Elkins was aware of the settlement deadline, it would have been entered on the Demand Log. (Exhibit 2, Elkins Depo. pg. 113-115). But Elkins did not change the Allstate Demand Log entry. His information on that Demand Log showed him there was no time limit on the demand. (Exhibit 1.(Demand Log)).

<u>May 9, 2003—May 16, 2003</u>. Although Berry had given assurances she would comply with the May 16, 2003 settlement deadline and that she was evaluating Trailov's claim, there is no entry in the file indicating Berry did anything on Angelina's claim between May 9, 2003 and May 16, 2003. (Elkins Depo.pg. 118 Exhibit 2 and Exhibit 1 (100042-44)). As May 16, 2003

approached, neither Herron's personal attorney or Berry's immediate supervisor were aware of the deadline. Berry never sought authority to settle either Trailov's claim, though both Elkins and Petersen had sufficient authority to authorize settlement.

May 12, 2003. Having had no previous contact with the Angstman Law Office, "out of the blue" Millar sends $25,000 of med payments coverage for Trailov to Michelle Powers (Powers) of the Angstman office. (Exhibit 1 (100084-85))

May 16, 2003. At 2:19 P.M., Berry sent a draft of the long overdue Home Office Referral to Petersen by e-mail. The Referral indicates it is being sent because the claims arising out of the accident exceed the Anchorage office authority limits. Those limits were $150,000. Petersen had authority to offer up to $150,000 on any single claim. (Depo. pg. 42, 90-91 Exhibit 5). The reserves for Trailov are shown as the full policy limit of $112,500 ($100,000 plus Rule. 82). The Home Office Referral draft made no mention of the May 16, 2003 settlement deadline. (Exhibit 1 (703080-81)).

In spite of the looming deadline that would cause the policy limits demands to lapse that day, and in spite of the fact that Petersen could authorize a settlement for the full liability limit of $112,500, Berry did not disclose the deadline to Petersen, nor to her immediate superior Elkins, nor to Allstate's Home Office. Petersen cannot recall any sense of urgency and saw no reference to a deadline in the e-mail. (Petersen Depo. pg. 40-42, 89-93 (Exhibit 5)).

May 16, 2003. After being in contact with Petersen, Berry faxed a letter to the Angstman Law Office indicating that Allstate had not completed its evaluation of Trailov's claim as expected, that Allstate would be done by the end of the month, and that Berry hoped to respond to the demand before that. Berry requested more information on Kenick's claim. (Exhibit 1 (100181)). Berry did not ask for an extension of time. Berry did not call the Angstman Law

24

<u>Office.</u> (Berry Depo. pg.98-99, (Exhibit 8)). Berry did not advise Herron or his attorney Valcarce, that Allstate intended to let the deadline lapse. Berry made no effort to correct the representation she made in her May 9, 2003 letter that Allstate would respond before the settlement deadline. (Berry Depo. pg.100-101, (Exhibit 8)).

There is no evidence in Allstate's file that Berry had made any effort to evaluate Trailov's claim or Kenick's claim. Berry may have evaluated Trailov's claim by the end of May, but she could not remember. (Berry Depo. pg. 58-59, (Exhibit 8)).

    <u>May 16, 2003 Summary</u>. The May 16, 2003 settlement deadline was allowed to come and go without any CDS system entry or CDS message by Berry to any other Allstate employee that the deadline existed or that it was being allowed to lapse. The deadline was allowed to lapse without any effort by Berry to evaluate Trailov's claim. Valcarce, Elkins, Petersen, and the Allstate Home Office were entirely unaware that a deadline existed, let alone that Berry was allowing it to lapse. As far as Herron knew, according to Berry's May 9, 2003 letter, the settlement deadline would be met. No extension was sought. All of Allstate's internal safeguards on "Serious Claims" and settlement demands were ignored.

<u>4. May 19, 2003 To May 30, 2003</u>

    <u>May 19-20, 2003</u>. Berry sent several drafts of the Home Office Referral to Petersen for review. (Exhibit 1 (70377-78)). Berry makes no reference to the May 16, 2003 deadline that has now lapsed.

    <u>May 20, 2003</u>. Berry sent an e-mail with the Home Office Referral to the Allstate Home Office. Berry makes no mention of a May 16, 2003 deadline. (Exhibit 1 (70376))

<u>May 28, 2003</u>. CDS. Berry speaks with attorney Valcarce, who informs Berry that Herron pled no contest to DWI. Valcarce says Trailov's claim is worth policy limits. Berry does not tell Valcarce of the lapsed May 16, 2003 settlement deadline. (Exhibit 1 (100046)).

<u>May 29, 2003</u>. CDS. Notify from Petersen to Berry. Petersen given file by Allstate Evaluation Consultant Lori Barra (Barra) May 29, 2003 or perhaps on May 28, 2003. Petersen is able to evaluate the claims in one or two days. Petersen says that the Trailov claim is worth the full liability limits ($112,500) plus the UIM limits ($112,500). Petersen tells Barra and Berry to open the UIM coverage for Trailov. (Exhibit 1 (100048-52)). Petersen gives Berry authority to settle Traiov's claims for $112,500. According to Petersen, if she had been given the file in December of 2002 or some time earlier and it had the same information, she could have evaluated it in a day or two.(Petersen Depo. pg. 82-86; 98-99, (Exhibit 5)).

<u>May 30, 2003</u>. Allstate receives a letter from Trailov/Kenick attorney Doug Johnson that no settlement offers will be accepted. (Exhibit 1 (100175-177))

<u>May 30, 2003</u>. Berry sends Powers a letter offering "$112,500 as a full and final settlement of Ms. Trailov's bodily injury claim." Berry offers "$10,000 inclusive as full and final settlement NIED claim" to Kenick. There is no mention that the "full and final" offer is limited to the liability coverage for either Trailov or Kenick. There is no mention of UIM coverage in spite of Petersen's CDS message evaluating Trailov's injury claim as worth both the liability coverage and the UIM coverage or a total of $225,000. (Exhibit 1 (100079)).

<u>July 3, 2003</u>. Suit is filed in Bethel Superior Court against Herron.

### V. UNDER ALASKA LAW, HERRON HAD VIABLE CLAIMS AGAINST ALLSTATE

26

## A. AN INSURER'S LEGAL OBLIGATIONS

The fiduciary relationship in every insurance contract gives rise to an implied covenant of good faith and fair dealing. Insurers and their adjusters have a duty to carefully and diligently investigate, evaluate, and adjust claims, so as to avoid interfering with the insured's rights under the policy and they are liable in tort if they do not. O.K. Lumber Co. v. Providence Washington Ins. Co., 759 P.2d 523, 525 (Ak. 1988); C. P. v. Allstate, 794 P.2d 936 (Ak. 1990); Loyal Order of Moose v. International Fidelity Ins. Co., 797 P.2d 622 (Ak. 1990); Nicholson v. State Farm, 777 P.2d 1152 (Ak. 1989).

An insurer owes a duty of good faith and fair dealing that includes a duty to give equal consideration to the interests of the insured. Crisci v. Security Ins. Co., 426 P.2d 173 (Cal. 1967); Nicholson v. State Farm, supra; Egan v. Mutual of Omaha, 598 P.2d 452 (Calif. 1979) (cited in Nicholson).

An insurer is required to inform its insured of the status of the case, all settlement offers, and of the possibility of an excess recovery by the injured claimant so that the insured can protect his own interests. See O.K. Lumber Co. v. Providence Washington Ins., supra; Central Const. Co. v. Home Indemn. Co., 794 P.2d 595, 599-600 (Ak. 1990); Jackson v. American Equity Ins. Co., 90 P.3d 136,142 (Ak.2004). Allstate claims supervisor Petersen acknowledged an excess letter should be sent to the insured any time there is possible excess exposure. (Petersen Depo. pg. 31-32, Exhibit 5).

An insurer has the duty to provide a conflict free defense of a claim by advising the insured when a conflict of interest arises. Lloyds v. Fulton, 2 P.3d 1199, 2000 (Ak. 2000).

When a plaintiff makes a policy limits demand, the insurer is under a duty to tender maximum policy limits to settle a plaintiff's demand when there is a substantial likelihood of an

excess verdict against the insured. Schultz v. Travelers Indem. Co., 754 P.2d 265, 266-267 (Ak. 1988).

When there is a substantial likelihood of an excess verdict, an insurer has an affirmative duty to determine the amount of a money judgment which might be rendered against the insured and to tender in settlement that portion of the projected money judgment which it contracted to pay. Bohna v. Hughes Thorsness, et al, 828 P.2d 745, 768 (Ak. 1992).

Breach of the covenant of good faith and fair dealing is a material breach of the insurer's obligations. A material breach of the insurer's contractual obligations exposes the insurer to a claim of bad faith and may expose it to liability for any excess judgment (bigger than the policy limits) against its insured. Washington Ins. Guaranty Ass'n v. Ramsey, 922 P.2d 237 (Ak. 1996); Great Divide Ins. Co. v. Carpenter, supra; Jackson v. American Equity Ins. Co., 90 P.3d 144 (Ak. 2004).

Breach of a fiduciary duty is a material breach of the insurer's obligations, unless it had no adverse impact upon the relationship between the insurer and the insured. An insurer has a fiduciary duty to provide a conflict free defense. Lloyds v. Fulton, 2 P.3d. 1199, 1209 (Ak. 2000); Great Divide v. Carpenter, 79 P.3d 599, 610.

The insurer may be sued for damages, including an excess judgment, for any material breach of these duties. This cause of action is assignable. O.K. Lumber v. Providence Washington, supra at 525; Carpenter v. Great Divide Ins. Co., 79 P.2d 599, 608 (Ak.2003). A material breach of any of the insurer's obligations excuses the insured from complying with the insured's duty of cooperation under the insurance contract. See, Great American Ins. Co., v. Carpenter, 79 P.3d 599, 609-610 (Ak. 2000).

28

**B.  ALLSTATE BREACHED ITS DUTY TO INVESTIGATE AND EVALUATE THE KENICK/TRAILOV CLAIMS AGAINST HERRON**

Breaches of the Alaska's requirements for claims handling found in Alaska in 3 AAC 26.010 et. seq. and AS 21.36.125 are evidence of bad faith. See <u>Ace v. Aetna Life</u> <u>Ins. Co.,</u> 139 F.3d 1241, 1247 at fn.18, 19 (9th Cir. 1998).

Berry and Allstate ignored the legal requirements to contact Trailov's attorney within 10 working days and to complete the investigation within 30 days or give notice of the need for more time and the reasons. <u>3 AAC 26.040, 3AAC 26.050</u> (Exhibit 4). Berry and Allstate ignored the legal requirement to promptly provide necessary claims forms and assistance. <u>3 AAC 26.040</u>. Berry waited for two months to send out the first medical records release. When it was returned, Berry did not use it for two more months. Berry sent out the second, specific ANMC release four months after notice of the claim. When that was returned, Berry did not use it for two more months.

Allstate and Berry made no effort to investigate the injuries and damages of Trailov or Kenick beyond belatedly requesting medical records. Allstate never spoke to any of Trailov's physicians in Bethel or Anchorage. Allstate never attempted to investigate the neuropsychogical examination of Trailov that occurred in December of 2002, even though it had a release. Allstate did not even ask for the name of the neuropsychologist. Allstate did not request the report from the Angstman Law Office. (Berry Depo. pg. 60-62, Exhibit 8). Allstate did not request an interview of either Kenick or Trailov. Allstate did not request an Independent Medical Exam of Trailov or Kenick. Allstate made no attempt to determine what Kenick had observed of her daughter's condition after the crash in the Y-K Hospital or what she saw on the medivac flight. Allstate made no attempt to determine what Kenick had observed of Trailov's condition once she

got back home including any changes in her neuropsychological state as far as headaches, balance, memory, personality, etc.

Although after six months Allstate secured the medical records of Trailov, there is no indication in the file, prior to May 29, 2003 that anyone examined or evaluated those medical records beyond adding up the total of approximately $39,000. The first and only evaluation documented in Allstate's claim file was done by Petersen after the settlement deadline of May 16, 2003. Allstate never sought the opinion of Valcarce as to the value of either claim or indeed any information from him prior to the lapse of that deadline.

During the entire period of eight months from Sept. 16, 2003 to May 16, 2003 Allstate and Berry did not evaluate the damages suffered by either Trailov or Kenick. Despite the fourteen day deadline for "Serious Injury" Referrals, nobody evaluated the Trailov claim. Despite Berry's representation on May 9, 2003 that she was in the process of evaluating Trailov's claim, no evaluation took place. Despite the March 18, 2003 written assurance to Herron that every effort would be made to settle the claims within policy limits, no effort was made before the deadline. (Berry Depo. 76-79,102, (Exhibit 8); Elkins Depo. pg. 118 (Exhibit 2)).

Berry was instructed on Sept. 26, 2002 to determine Trailov's damages. Herron's liability had already been determined to be 100 %. Allstate was worried at the outset that Trailov's claim was bigger than the liability limits and was concerned about its own UIM exposure. Allstate had two adjusters who were to investigate Trailov's medical injuries and records. Yet neither Millar nor Berry secured most of the medical records until mid-March. Millar never secured any. Millar violated every section of the Unfair Claims regulations regarding notification of his existence, providing necessary claims forms, completing his investigation within 30 days or notification of

additional needed time with reasons, and subsequent 45 day notices. 3AAC 26.040, 3 AAC 26.050, 3 AAC 26.070, (Exhibit 4).

Petersen evaluated the claims within one or two days when finally asked to do so. Allstate received the last medical record by no later than April 14, 2003. Had Petersen been asked between April 14, 2003 and May 16, 2003, she could easily have evaluated the claims before the deadline lapsed. Petersen had no doubt that she would have reached the same evaluation with the same documents if they had been provided earlier. (Petersen Depo. pg. 81-82, (Exhibit 5)).

However, Berry never told her superiors about the May 16, 2003 deadline. Berry never entered it in the CDS. Berry never told Petersen, although they were in contact on the day the settlement deadline lapsed. (Petersen Dep. Pg. 40-42; 89-93, (Exhibit 5); Elkins Depo. pg. 113-115, (Exhibit 2)).

The evidence is overwhelming that Allstate breached its duty to promptly and carefully investigate and evaluate the damages of Trailov and Kenick.

### C. BREACH OF DUTY TO ADVISE OF STATUS

Allstate and Berry failed to properly advise Herron and his lawyer. Valcarce was never told of the May 16, 2003 deadline and was never told Allstate was going to let the deadline lapse. (Berry Depo. pg. 75-77,101, Exhibit 8). Herron lost the opportunity to have his lawyer advise him and was robbed of any opportunity to settle the case himself. Valcarce could have insisted an evaluation take place before the deadline passed.

Berry misrepresented the facts, saying that she was "in the process of evaluating" when she was not. Berry assured Herron that she would respond by the May 16, 2003 and never corrected this misstatement.

31

## D. BREACH OF DUTY TO SEND EXCESS LETTER

Allstate never advised Herron or Valcarce of Herron's possible exposure to an excess judgment. In deposition testimony both Berry and Elkins concur that the March 18, 2003 letter to Herron was not an "excess letter", thus resolving any question of fact on this issue. (Elkins Depo.pg. 83, (Exhibit 2); Berry Depo. pg 57, 127, (Exhibit 8)).

The standard in Alaska is to advise an insured if excess  exposure to him is "possible". O.K. Lumber Co. v. Providence Washington Ins., supra; Central Const. Co. v. Home Indemn. Co., 794 P.2d 595, 599-600 (Ak. 1990); Jackson v. American Equity Ins. Co., 90 P.3d 136,142 (Ak.2004). Petersen recognized this. (Petersen Depo. pg. 31-31, (Exhibit 5)). Yet Berry would only advise of excess exposure if there was a virtual certainty or "high probability". (Berry Depo. pg. 57-58, (Exhibit 8)).

Allstate recognized possible excess exposure by Sept. 18, 2002 when it began securing UIM documentation pursuant to a mandatory UIM procedure. A UIM claim is only possible if the claim may exceed the liability limits. An excess letter should have been sent then.

On March 3, 2003 and again on May 6, 2003 Elkins informed Berry that she was required to complete the "Serious Injury" Home Office Referral. The May 16, 2003 Home Office Referral that Berry finally drafted is absolutely clear evidence of Allstate's and Berry's knowledge that there was excess exposure. That document e-mailed to Petersen on May 16, 2003 noted that a reserve of the policy limits had been set ($112,500) and the referral reason was that the value of these claims exceeded office authority. (Exhibit 1) (703080-81)). The Anchorage office authority was $150,000. (Petersen Depo. pg. 40-41; 90-91, (Exhibit 5)).

Despite all this, Allstate never sent Herron an excess letter. It is hard to imagine a clearer breach of this duty.

### E. BREACH OF DUTY TO TENDER LIMITS

A UIM investigation had been undertaken by Sept. 18, 2002. Herron's liability was determined to be 100 % by Sept. 21, 2002. (Exhibit 1 (100008; 100080-81)). The policy limits demands were received by Feb. 18, 2003.

By March 3, 2003 Elkins identified Trailov's injuries as requiring a "Serious Injury" referral to the Allstate Home Office. By March 17, 2003 Allstate had listed over $35,000 of medical expense. Exhibit 1 (100032; 100095). On March 26, 2003 Valcarce warned Berry and Allstate that a policy limits settlement would protect Herron from an adverse judgment or a judgment that included punitive damages. By April 14, 2003 Allstate had received the April 10, 2003 deadline letter along with the last medical records it would receive before the May 16, 2003 deadline. (Berry Depo. Pg. 80, (Exhibit 8)).

On May 6, 2003 Elkins again raised the "Serious Injury" referral flag. On May 9, 2003 Berry represented that she would respond by the deadline of May 16, 2003. Exhibit. 1 (100042, 100187). On May 16, 2003 Berry and Allstate set the reserves for Trailov's claim at $112,500. The May 16, 2003 Home Office Referral noted on its face that it was being sent because the claim exceeded the Anchorage office settlement authority which was $150,000. Berry was in contact with the person in the office who had that authority, Karen Petersen to whom she sent the Home Office Referral draft early in the afternoon of May 16, 2003. (Exhibit 1 (703079-81)).

Instead of tendering policy limits, Berry sent a letter stating that she was going to respond to the policy limits offers by the end of the month. (Exhibit 1 (100181)).

An insurer receiving a policy limits demand owes a duty to evaluate the claim and, if a substantial likelihood of an excess judgment exists, to tender policy limits. Jackson v. American Equity Ins. Co., 90 P.3d 136 (Ak.2004). Allstate breached this duty.

Without regard to whether it ever receives a demand, an insurer owes a duty to tender policy limits when it objectively should recognize that a substantial likelihood of an excess judgment exists. Bohna v. Hughes, Thorsness, et al, 828 P.2d 745, 768 (Ak. 1992). Allstate breached this duty.

### F. BREACH OF DUTY TO PROVIDE CONFLICT FREE DEFENSE

Allstate breached the duty of loyalty it owed to Herron. Instead of being concerned with protecting Herron, Allstate was concerned with concealing its own exposure to the first-party UIM claim and the first-party medical payments claim. Both Berry and Millar failed repeatedly to disclose the medical payments coverage. Berry never did disclose the UIM coverage. Claims supervisor Elkins simply ignored the Unfair Claims regulations, as did Berry and Millar.

The reason is clearly shown by what happened to Tracy Faulkner's claim. Though Allstate knew she had been to the Y-K Hospital, Millar also did not disclose the medical payments coverage to Faulkner, her parents or the Y-K Hospital. Instead, Millar closed Faulkner's medical payments coverage without disclosing it and without reimbursing the Y-K Hospital. (Exhibit 1 (100020-21; 100038)).

Allstate was attempting to do the same thing with Trailov. Since she was an Alaska Native, Allstate tried to get away with paying nothing out of the $25,000 med pay. It was only on May 12, 2003 that Millar and Elkins realized this was not going to work and the $25,000 suddenly was sent to Trailov's attorney. This was done without any previous disclosure, without any previous attempt to send a medical release, and without any investigation by Millar.

Berry continued this subterfuge in the belated May 30, 2003 letter. This letter offers a full and final settlement of Trailov's bodily injury claim as well Kenick's bodily injury claim with no reference to UIM coverage or any exception to a full extinguishment of all their claims. (Exhibit

34

1 (100179)). Berry admitted she never disclosed the UIM claim to the Angstman Law Office. (Berry Depo. pg. 115-116, (Exhibit 8)).

Herron was entitled to an adjuster whose only concern was to protect him. Instead, he got two adjusters and a supervisor whose chief concern was to conceal first-party coverages. Allstate had no problem with wholesale violations of the Unfair Claims regulations to protect its own interest.

## G.  CLAIMS FOR ALLSTATE'S NEGLIGENCE

In Alaska, a claim can be made against an insurer for breach of its duties of due care in investigating a claim, advising the insured, and settling a claim that exposed the insured to a judgment in excess of the policy limits. In the seminal case of Continental Ins. Co. v. Bayless and Roberts, 608 P.2d 281(Ak. 1980), the court addressed a similar situation where an adjuster and an insurer had negligently failed to protect an insured from an excess judgment and the insured proceeded to enter a consent judgment in order to protect itself.

In Continental, the jury failed to find the insurer breached the contractual covenant of good faith and fair dealing (i.e. bad faith), but did find that Continental acted negligently and was therefore liable for the entirety of a judgment in excess of the policy limits. Continental, supra at 293. Continental urged the court to require a bad faith breach of its obligations as a prerequisite to an insurer's liability for an excess judgment. The Alaska Supreme Court rejected Continental's argument and held that an insurer who acts negligently and fails to protect an insured from an excess judgment may be held liable for an excess judgment regardless of bad faith. The court stated:

"[A]n insurer, defending an action against the insured, is bound to exercise that degree of care which a man of ordinary prudence would exercise in the management of his own affairs,

and if the insurer fails to meet that standard it is liable to the insured for the excess of the judgment over the policy limits, irrespective of fraud or bad faith. *That is to say, an insurer undertaking a defense must exercise not only good faith, but also ordinary care and reasonable diligence and caution".* (Emphasis added)

In <u>Continental</u>, <u>supra</u> at 293, the court went on to define the scope of the insurer's duty of due care:

"It has more than a duty of due care of an ordinary man unskilled in litigation; it must exercise more than mere good faith. *It is a professional which advertises by all medial of mass communication its skill in the investigation, settlement, and litigation of liability cases.* It asks the individual, who is an amateur in these matters but who would be deeply concerned over a case in which he is personally interested, to substitute its skill for his, its judgment for his judgment, and its conduct for his own acts. It then becomes chargeable with a greater duty even as the brain surgeon must exercise greater knowledge, judgment, and skill in a brain operation than would a general practitioner of medicine. It is not an extraordinary degree of care but the care that is required under these particular circumstances. *It must use skill diligently and adequately to investigate a case, it must use skill in negotiation,* it must use skilled trial counsel and not the lowest priced member of the bar and that individual, so selected by it, may bind the insurer by his derelictions. It is not a comfortable spot for a liability insurer to occupy, but it seeks the business on the basis of its skill. *Even as an attorney, abstractor, accountant, or physician may be liable if he fails to use the degree of skill in the handling of a professional matter that one is entitled to expect of one possessing like training and abilities, so must the insurer accept legal duties commensurate with its responsibilities.* "(Emphasis added)

Allstate's claims handling reflects anything but skill, diligence, and competence. In a period of eight months Allstate was unable to complete a damages investigation. Liability was determined by Sept. 21, 2002 and by Sept. 26, 2003 Berry was told to determine damages, but never did so. The Unfair Claims regulations on that mandated a timely investigation and prompt provision of necessary claim forms such as medical releases were ignored.

When Allstate finally obtained the first medical release, it was not used for two months. Allstate waited four months to obtain an ANMC release, then did not use it for two months. The neuropsychology exam was ignored. No interviews or IME's were requested. Serious Injury Referral deadlines was twice ignored and twice these referrals were not sent. Elkins mistakenly

diaried the deadline for May instead of March. Elkins failed to follow up on the mandatory referral.

From the time Berry received the policy limits demands on Feb. 14, 2003 until the end, Berry did not enter critical information in the CDS. Valcarce's letter of March 26, 2003 was ignored and no response was sent. Valcarce's presence was not noted in the CDS. Nor was Valcarce's letter noted in the CDS.

Berry did not enter the Serious Injury deadlines into the CDS log. Berry did not enter the May 16, 2003 deadline into the CDS. Berry never informed her superiors Elkins or Petersen of the deadline. Berry never informed Valcarce of the deadline.

Allstate received  Power's letter with the settlement deadline on April 14, 2003 and then Berry did nothing to evaluate the claim between April 14, 2003 and the deadline of May 16, 2003. Berry did not seek settlement authority above her limit of $20,000.

Berry did not inform Valcarce or anyone else that she intended to let the May 16, 2003 deadline lapse. Berry made no attempt to seek an extension of the deadline. Berry just assumed that, unless. Power objected, her failure to respond by the deadline would be acceptable. (Berry Depo. pg. 98-100, (Exhibit 8)).

Continental has remained the law of Alaska ever since 1980. There is no question that the Allstate was incredibly incompetent and negligent. Herron had the legal right to bring a claim against Allstate for failure to use due care in relation to its investigation and its handling of settlement offers so as to protect Herron from exposure to an excess judgment.

**VI. THE COURT SHOULD DECLINE TO DECLARE MORE THAN THE ASSIGNABILITY ISSUES**

Herron clearly had viable claims against Allstate and Berry under Alaska law. Those claims are assignable in Alaska. Herron validly assigned them on April 2, 2004. That is all this Court needs to decide.

Allstate would prefer to try the negligence and bad faith claims in this declaratory relief action, instead of Alaska state court. But this Court's jurisdiction is defined by the Court's own discretion, not by the breadth of Allstate's desires.  A "District Court is authorized, in the sound exercise of its discretion, to stay or dismiss an action before trial or even after all arguments have drawn to a close; in the declaratory-judgment context the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration."

> Wright & Miller, <u>Federal Practice and Procedure</u>, Sect. 2760, <u>citing</u> (among other cases), <u>NRDC v EPA</u>, 966 F.2d 1292, 1299 ( 9th. Cir. 1992).

The declaratory judgment format was never intended to allow a tort defendant like Allstate to obtain a declaration of non-liability. In <u>Friedman v Geller</u>, 925 F. Supp. 611, 614 (E.D. Wis. 1996), the Court faced a lawyer who sued his own client seeking a federal forum to declare that the lawyer had not committed malpractice. The Court said:

> " A declaratory judgment action is not a tool to compel potential negligent plaintiffs to litigate their claims at a time and in a forum chosen by the alleged tortfeasors.[citation omitted]. It is inappropriate to use the declaratory judgment statute in what would otherwise be a run-of-the-mill negligence action. Malpractice presents no special issues, and the only court to reach the issue ruled that an action for a declaration of non-liability of malpractice was an inappropriate use of a declaratory judgment statute. [citation omitted]. Friedman has no unique facts which distinguish this case from an ordinary negligence case. Friedman argues that the threat of a suit will damage his reputation and make it harder for him to obtain insurance. Therefore, he concludes, this case differs from Cunningham where the damages did not depend on the timing of the tort action. Friedman is comparing apples to oranges. In a declaratory judgment action, the court is concerned with whether the defendant in the declaratory judgment can increase his damages by waiting to file his own suit, not the damage suffered by the plaintiff (the party seeking the declaration of non-liability) because of the threat of the suit."

There is no uniquely federal interest in wading through the facts outlined at length in this memorandum to decide whether Allstate was negligent or committed bad faith. Allstate's damages will not get worse if it is forced to litigate in state court. This whole declaratory relief action is merely an effort to force Herron (or his assignee) to litigate their claims in a place and at a time of Allstate's choosing.

The state forum is far superior for resolving questions beyond just assignability of the claims against Allstate. In <u>Centennial Life Ins. Co. v Poston</u>, 88 F.3d 255, 258 (4th Cir. 1996) the court confronted a similar situation. In deciding whether a state forum was superior, the Court said:

> "One factor, however, is particularly salient here: the state court case contains a defendant and a number of issues not present in the federal action. The Postons [state court plaintiffs] have asserted a claims against Centennial insurance agent Jack Gottlieb, based on his representations about the insurance policy and an alleged negligent failure to procure the insurance requested. Thus, although issuance of a declaratory judgment would settle part of the controversy between the Postons and Centennial Life, it certainly would not settle the entire matter. The state litigation, on the other hand, could resolve all issues...."

> "The same is true here. Berry is a party to the state case. Negligence claims against Berry are presented there but are not presented here. Herron's assignee Kenick is a party to the state lawsuit but not this one. The amount of damages owed by Allstate and Berry is at issue in state court, but it is not at issue here. The state forum is a place that "could resolve all the issues."

## VII. CONCLUSION

Herron respectfully requests that this Court enter judgment declaring that Herron possessed viable claims against Allstate on April 2, 2004, that such claims are assignable under Alaska law, and that Herron properly assigned them. The Court should decline to make any further rulings in light of the superiority of the existing state forum to fully adjudicate all other issues as to all other parties.

/ Mark A. Sandberg
701 W 8th Avenue, Ste. 1100
Anchorage, Alaska 99501
Phone: (907) 276-6363
Fax: (907) 276-3528
E-Mail: msandberg@aol.com
ABA: 7510084

CERTIFICATE OF SERVICE

I hereby certify that on this ___
day of April 2006 a copy of the
foregoing was served
electronically and
by regular U.S. Mail on:


Mark Wilkerson
Wilkerson & Associates
310 K Street, Suite 405
Anchorage, Alaska  99501


s/Mark A. Sandberg