IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

ALLSTATE INSURANCE COMPANIES,

    Plaintiff,

vs.

CHARLES HERRON,

    Defendant.

NO: A04-0043 CV (JKS)



RECEIVED
SANDBERG, WUESTENFELD & COREY
OCT 13 2005
ATTY._____ L. ASST_____
APPROVED FILE_____

COPY

HAND DELIVERED 10:55

DEPOSITION OF CRAIG ELKINS

Friday, September 30, 2005, 9:10 a.m.

Anchorage, Alaska



RECEIVED
JAN 13 2006

## Alaska Stenotype Reporters
511 West Ninth Avenue
Anchorage AK 99501-3520
*Serving Alaska Since 1953*

Rick D. McWilliams, RPR, Ret.
Fred M. Getty, RPR, Ret.

Telephone 907.276.1680
Email AkSteno@aol.com
Fax 907.276.3016



Page 1

Page 17

1  tickler system that says review files monthly,
2  quarterly, annually?
3  A.    The company's introduced a new -- recently
4  introduced a system that will mechanically -- or
5  through our system bring up claim files on specific
6  intervals to be reviewed. That's a recent enhancement
7  to our computer systems, to our resource base.
8  Q.    So in 2002 and 2003, was there a system to
9  regularly bring out files to the supervisor for
10 review?
11 A.    Not -- not in that method, no.
12 Q.    In some other method?
13 A.    Yeah. If I had it set on a follow-up, it
14 would come up on one of my task follow-up lists.
15 Q.    What does that mean, if I had it set
16 up on -- or set on follow-up?
17 A.    I diaried something to look for 90 days out,
18 100 days how.
19 Q.    How did you diary something, on the computer
20 or just write it on a calendar or on a note card?
21 A.    Some cases I may use a calendar. Some cases
22 I may use a computer task to-do. Some of our other
23 lists that come out are more in a 30, 60, 90-day type
24 for the unrepresented group to where we're really
25 active in the front-end type claim.

Page 18

1      MR. SANDBERG: Let's go off record for a
2  second.
3      (Brief recess.)
4      MR. SANDBERG: Let's mark this 15.
5      (Exhibit 15 was marked.)
6  BY MR. SANDBERG:
7  Q.    Do you recognize the documents that we've
8  just marked as Exhibit number 15?
9  A.    They appear to incorporate the Casualty
10 Development System.
11 Q.    What is the Casualty Development System?
12 A.    CDS. It's a reporting system within our
13 computer database.
14 Q.    And is this the new system you just
15 described to me or is it something else?
16 A.    The -- what I mentioned earlier is an
17 enhancement that overlays on this here, our current
18 CDS.
19 Q.    I see. So how long has the CDS program been
20 around, to your knowledge, if you know?
21 A.    Yes. I don't recall a specific date on
22 that, when it went live.
23 Q.    Has it been around at least since 2002?
24 A.    Yes.
25 Q.    So the file that we're looking at here, the

Page 19

1  one that I have given you the claims diary for, is
2  that, in fact, in this CDS format?
3  A.    Right. That would be under the different
4  IDs with -- where the adjuster would put their log
5  notes and diary their activity.
6  Q.    Can you explain to me when I look at that
7  log how come the entries start as though we're taking
8  a statement?
9  A.    Let's see.
10 Q.    It's not what each adjuster enters. It
11 appears to be the standard format.
12 A.    Okay. I'm not sure if I know what you're --
13 Q.    Well, let's see. Take a look at page -- at
14 page 13, if you would. Thirteen and 14 are together.
15 A.    Okay.
16 Q.    Actually, at the top of 14, it says "Desk:
17 AKB," which I believe is Kathy Berry. And then it
18 says "Involved Person Statement," "1 of 1." I'm just
19 wondering why it prints that out all the time, if you
20 know.
21 A.    That's the way the computer screen's
22 formatted on the -- for it. Under the "Statement
23 Types," there's different headers you can put in there
24 to identify different entries.
25 Q.    But it doesn't really mean we're taking a

Page 20

1  statement from an involved person every time that
2  prints out?
3  A.    No, no. It's the method to capture what
4  claim activity for a specific item claimant.
5  Q.    Now, if you go back to Exhibit number 15 and
6  look at page three --
7  A.    Fifteen?
8  Q.    Fifteen. I'm sorry. The one with the blue
9  sticker on it.
10 A.    All right.
11 Q.    It says there are "Summary screens available
12 for review and use by evaluation consultant." Let me
13 take that in smaller parts. Do the words "evaluation
14 consultant" describe an FPL or is that describing
15 something else?
16 A.    The evaluation consultant is another
17 position within the company.
18 Q.    And a lady named Lori Barra is an EC?
19 A.    That's correct.
20 Q.    And what is the summary screen within the
21 system, if you know, that the evaluation consultant
22 has for review and use?
23 A.    Let's see. They may -- may be under CDS 08
24 item claimant identifier for a summary screen in which
25 a claim representative would put a summary in their

Page 29

1  Q.    Is it required that the EC be involved to
2  formulate a counteroffer?
3  A.    On the counteroffer?
4  Q.    That's right. In other words, if we wanted
5  to follow my little loop around, you get a demand. It
6  comes to the claim rep. The claim rep consults with
7  you. The EC may or may not be involved initially to
8  evaluate the demand. But suppose you want then to
9  make an offer, do we have to get the EC involved?
10 A.    Yes. That's -- yes, you would.
11 Q.    Okay. Anybody else?
12 A.    Well, depending on the case, you may get the
13 FPE involved or seek some advice from elsewhere.
14 Q.    And that would be Ms. Petersen in your
15 office?
16 A.    Yes.
17 Q.    Does whether the demand is or is not a
18 policy limits demand make any difference in the
19 scenario you've just described to me?
20 A.    As to involving the EC?
21 Q.    Yes. How many people are involved. I'm
22 just trying to understand the process.
23 A.    If the -- one example, if a demand comes in
24 with no supporting documentation for the demand and no
25 time limit on it, we'd respond that we need the

Page 30

1  supports in order to properly evaluate and respond to
2  the demand, example such as that.
3  Q.    And you'd expect a claim rep to write that
4  letter, correct?
5  A.    Yes.
6  Q.    Would the demand still come to your
7  attention?
8  A.    In that case, yes.
9  Q.    Anybody else's?
10 A.    I don't believe so.
11 Q.    If a letter -- if a demand letter comes in
12 with a deadline attached, are those calendared?
13 A.    They are.
14 Q.    How?
15 A.    The claim representative calendars for
16 response on those. Attempts to meet that or get an
17 extension.
18 Q.    And under the present system, how does that
19 happen? How does it get calendared?
20 A.    The -- we have a demand log, which we log
21 that in and whether or not there's a response date due
22 on it or not.
23 Q.    Is the demand log computerized?
24 A.    Yes.
25 Q.    So there's a -- if the -- does the Anchorage

Page 31

1  office maintain a central computerized demand log for
2  all files? I'm just trying to understand how it's
3  organized.
4  A.    Yes. And FPE would have access to that if
5  they wished or -- yes.
6  Q.    Okay. And what -- now in 2002, what was the
7  system like for calendering demands with deadlines
8  attached?
9  A.    Right. The 2002, I don't recall if it was
10 computerized or a manual log.
11 Q.    But there was a demand log maintained within
12 the office?
13 A.    I believe so, yes.
14 Q.    And -- well, let's -- without regard to when
15 the transition was, how did the prior -- the manual
16 log work? Was there a book somewhere, a thing
17 somewhere? How did things get entered on it and who
18 did it?
19 A.    Right. The -- it was a spreadsheet. And it
20 would come in. And at that point in time, I believe I
21 was writing in the claim number, the item claimant,
22 the claim representative, whether or not it was a time
23 limit demand or facial demand, whatever.
24 Q.    Okay. And then did someone on your staff
25 then calendar those demands for you under this manual

Page 32

1  system? In other words, how did you know other than
2  looking at the demand log every day which demands were
3  expiring?
4  A.    Yes.
5        No. There would not have been in my -- I
6  did not have a support person doing that for me.
7  Q.    Did the office?
8  A.    I don't recall. I don't -- I don't recall
9  if we did or not.
10 Q.    As the supervisor, was the expiration of
11 demands called to your attention under the previous
12 system somehow by a tickler, by a note, by anything?
13 A.    I would try and look to see what the status
14 was, if we'd responded in time and got an extension or
15 communicated with the attorney.
16 Q.    Was it part of your job to review the demand
17 log periodically then?
18 A.    Yes.
19 Q.    So once a week, once a day? How often?
20 A.    Once a day, no. Perhaps once a week.
21 Q.    So at least once a week, you should know
22 what demands are expiring within the claims being
23 handled by the people you're supervising.
24 A.    Yes.
25 Q.    And the system you're just describing, would

Page 33

1  it have -- I mean, once a week -- let me back up a
2  little. Withdraw that.
3       At least once a week would you have known
4  what demands were expiring within the claims being
5  handled by the people you were supervising in 2002 and
6  2003?
7  A.    Assuming I was looking at the log, I would
8  have.
9  Q.    Okay. Let's take our break, because I think
10 we're going to shift gears from generic to discussing
11 this claim soon.
12      Oh, yes. Last question -- I'm sorry --
13 before we go. What is your present settlement
14 authority?
15 A.    Recently changed the settlement authority.
16 And I'm not just certain what it is at this point
17 here.
18 Q.    What was it before the recent change?
19 A.    I believe on gross file may have been
20 300,000.
21 Q.    And how much -- what was your settlement
22 authority in 2002?
23 A.    That may have been -- I would need to go
24 back and look at my -- the daily table or the log back
25 then.

Page 34

1  Q.    I believe Ms. Petersen told us that in 2002
2  and 2003, the office authority was 150. Does that
3  sound right?
4  A.    Well, there's --
5       MR. WILKERSON: Per person or per gross
6  file? I think he distinguishes those.
7  BY MR. SANDBERG:
8  Q.    I'm sorry.
9  A.    There's per person and gross file authority.
10 Q.    Gross file would be the PD, the U,
11 everything for one event?
12 A.    Under an A coverage, it's 150 individual,
13 300 aggregate.
14 Q.    And that be would be the office limit?
15      MR. MESTAS: Or was?
16 BY MR. SANDBERG:
17 Q.    I'm confusing you, because I'm confused.
18 What is the present office authority for a single BI
19 claim?
20 A.    I believe it's 150.
21 Q.    And what is your personal present authority
22 for a single BI claim?
23 A.    I'll need to recheck. I know we've recently
24 been doing some changes on those.
25 Q.    In 2002 and 2003, what was the office

Page 35

1  authority for a single BI claim?
2  A.    I believe 150.
3  Q.    And in 2002 and 2003, what was your personal
4  authority for a single BI claim?
5  A.    For a single, I don't believe it would have
6  been more than 150, I think. But I would need to go
7  back and look at that document.
8  Q.    Do you believe that in the spring of 2003,
9  you had authority to go to 150 on a single BI claim?
10 A.    I would need to relook back then to see what
11 the authority level was. I just don't recall.
12 Q.    Do you know if in the spring of 2003 you
13 had -- you possessed a hundred twelve five of
14 authority on a single BI claim?
15 A.    I believe, yes. Yes.
16 Q.    And if we wanted to find out, what would we
17 look at?
18 A.    The name of the list, I don't have it on the
19 top of my head. There's a daily list that comes out
20 with the different authority levels for the -- all the
21 different claim representatives and agents within the
22 market.
23 Q.    Okay. And your personnel file would
24 certainly identify your authority levels over time?
25 A.    If not that, the computerized list would.

Page 36

1       MR. SANDBERG: Okay. Let's take our first
2  break. I promised it three times. Let's really do
3  it.
4       (Brief recess.)
5  BY MR. SANDBERG:
6  Q.    Okay. Back on record. Now, Mr. Elkins, I'd
7  like to shift gears from discussing the things, the
8  generic things we've been discussing to discussing our
9  file and how it was handled in 2002, 2003. And I
10 believe I've already shown you essentially what is a
11 portion of the claim file that's in front of you.
12      And as we move through this, what I'd like
13 to do is we'll refer to Bates numbers inside that
14 document. And then we'll pick up, if necessary, if
15 there's any gaps or anything that you need to consult
16 anything, I think we can do it. We have a second
17 round of production here. And then we have a third
18 sitting across the table from you. And if you need
19 to, don't hesitate to tell me, if you want to see
20 what's in a gap or in a space.
21      Now, in 2002, you were still an FPL?
22 A.    Yes.
23 Q.    Okay. As an FPL in 2002, how many claims
24 would you have been supervising?
25 A.    Could have been anywhere from 750 claims,

Page 37

1  perhaps.
2  Q.  Would that include unrepresented and
3  represented claims?
4  A.  Well, then in addition, some medical pending
5  claims also. So that number would probably be
6  enhanced.
7  Q.  Is that the number that would be open at any
8  given time --
9  A.  Yes.
10 Q.  -- typically? And then within the 750,
11 roughly, can you break out how many would be within
12 the represented unit?
13 A.  I could.
14 Q.  What would it be?
15 A.  Oh, I could go back and find that.
16 Q.  I mean, as we sit here, can you ballpark it
17 for me?
18 A.  Could be between two to 300 pending claims.
19 Q.  Looking at the accident involving Charles
20 Herron, who is my client -- I represent Mr. Herron.
21 Looking at the accident involving Mr. Herron in the
22 file you have in front of you, it appears you were the
23 supervisor on this file from its inception, correct?
24 A.  Appears I was, yes.
25 Q.  Okay. I see you on the file within two days

Page 38

1  of the accident.
2  A.  Yes, or thereabouts.
3  Q.  In any event, very soon after the accident,
4  correct?
5  A.  Yes.
6  Q.  Would you take a look at three and four? Do
7  you have your copy of that? I'll tell you what. I'm
8  sorry. Let's go off record for a second. I have
9  another complete copy of that exhibit. We'll use this
10 one. Never mind.
11     (Brief pause.)
12 BY MR. SANDBERG:
13 Q.  Back on record. First of all, this claim
14 involved an accident in Bethel. Does the fact it
15 happened in Bethel have any significance in terms of
16 claims handling?
17 A.  Well, we're always concerned with a Bethel
18 venue.
19 Q.  Bethel is a dangerous place for handling
20 accident cases, isn't it?
21 A.  I think any case we want to be aware of
22 and --
23 Q.  But would you agree with me that Bethel is a
24 dangerous or high dollar venue?
25 A.  Appears to be a unique market in Bethel.

Page 39

1  Q.  Unique because many big awards come out of
2  Bethel?
3  A.  That may be.
4  Q.  Well, you are aware of that, aren't you,
5  sir?
6  A.  They tend -- that is true, yes.
7  Q.  Okay. Now, let's see. On three and four,
8  we're looking at an entry from Renee VanZant where it
9  appears within -- by September the 16th, she's already
10 identified the fact that Ms. Trailov had a skull
11 fracture and fluid in her lungs, correct?
12 A.  Right. She had a scratch on the arm and,
13 right, a minor skull fracture.
14 Q.  And fluid in her lungs?
15 A.  Uh-huh.
16 Q.  And she's been medevaced to the Alaska
17 Regional?
18 A.  Yes.
19 Q.  Okay. But to be transferred to the Alaska
20 Native Hospital, correct?
21 A.  Correct.
22 Q.  And then the next day, which is at six, I
23 believe, we see a note from you saying forward --
24 actually, at the top of five, it says notify used on
25 and then sent to DJ1F. Is DJ1F you?

Page 40

1  A.  That would be the -- yes.
2  Q.  Okay. And then the following day, we see an
3  entry by you that says forward this file to me for
4  review today, correct?
5  A.  Yes.
6  Q.  Okay. What does "notify used" mean?
7  A.  That's the date the electronic message was
8  sent from Renee to myself.
9  Q.  So Renee is sending you this previous
10 message, is that what that means?
11 A.  The one on six?
12 Q.  Yes. Or the one on five. I'm sorry.
13 A.  Right. Up there, yes.
14 Q.  And your response is forward this file to me
15 for review today?
16     MR. WILKERSON: That's on six.
17     THE WITNESS: That's on -- yes.
18 BY MR. SANDBERG:
19 Q.  When you -- when a notify is sent to you,
20 what do you get? I mean, do you get the whole
21 computer diary as it exists at that time or what
22 happens? What does it mean to say notify used?
23 A.  On our computer, Allstate system, on the
24 screen I work in within the CDS compartment, there's a
25 light that will highlight a line that says you have a

Page 41

1  notice pending or someone has sent you a computerized
2  e-mail. And that's the notify.
3  Q.     So you would not automatically then have
4  received any portion of the file at that point. All
5  you get is something telling you you have a notify
6  pending.
7  A.     Right. I go in. It says claim number and
8  who from. Then I click on it. And it can take me
9  into the claim diary.
10 Q.     And then the next day, at page eight, it
11 appears you were providing instructions to Renee?
12 A.     Yes.
13 Q.     And so the sequence has been she's sent you
14 the notify, you've received the file for review and
15 now you're providing her instructions?
16 A.     Yes.
17 Q.     And the instructions include something
18 saying follow up on matrix requirement. What's that
19 mean?
20 A.     Well, that would be securing a police
21 report, interviewing the involved party.
22 Q.     Is Renee working from a matrix?
23 A.     From a matrix? It's a task list of things
24 that she's supposed to be doing. And so I'm just
25 telling her to make sure she followed those.

Page 42

1  Q.     I see. And that would include normally
2  investigating liability, assembling medical records,
3  the normal things involved in processing an auto
4  claim?
5  A.     Yes.
6  Q.     Which is still at this point unrepresented,
7  which is why Renee is there, correct?
8  A.     She got that on an unrepresented desk.
9  Q.     Renee, I think we've established before, is
10 part of the unrepresented unit.
11 A.     Yes.
12 Q.     And then the next thing it says is secure
13 certified dec and agent application waiver issue.
14 What is the waiver issue?
15 A.     This is a -- was a company requirement or
16 task that I secure the selection/rejection form or
17 ensure the insured had an opportunity on the UM/UIM
18 endorsements.
19 Q.     Did this relate to what I'm going to call
20 failure to offer litigation?
21 A.     That may have stemmed out as a by-product of
22 that, yes.
23 Q.     And so you -- I believe Ms. Petersen told us
24 there was a memo that came out regarding this waiver
25 issue. Is that correct, to your knowledge?

Page 43

1  A.     There was a task request that we identify
2  and look for those claim files.
3  Q.     Okay. Was it in every claim file?
4  A.     The ones that I was tasked to look at were
5  more the objective injuries in the insured's car, as a
6  passenger. And that's what I was doing here.
7  Q.     But it would be -- I mean, was it in cases
8  where there was potentially U exposure?
9  A.     It was in all -- essentially, I was spot
10 checking and tasking on these type of cases here where
11 we had an injured party in an insured auto. And as
12 part of my job was to go in and request to the claim
13 representative just to ensure that was on file.
14 Q.     Okay. But if there was no realistic U
15 exposure, would you still have made this request?
16 A.     In my spot checks, I was tasked to do that.
17 Q.     In every file where a passenger was injured?
18 A.     The -- on this type of file here, I was
19 asking for this type of request on my spot checks of
20 the claim reps.
21 Q.     Okay. But by this date, had you determined
22 there was at least potentially a U exposure?
23 A.     No, not with the information I had on hand
24 here.
25 Q.     We knew we had an injured person who had

Page 44

1  been medevaced, correct? And we had a claim in
2  Bethel. So have you -- were you able to determine at
3  least that there was potentially a claim that could
4  get to the U level?
5  A.     At this point in time, I hadn't formulated
6  any -- any thoughts on that line.
7  Q.     Well, suppose nobody had been injured at
8  all, you wouldn't have made this request, would you?
9  A.     If no one would have been injured, Renee
10 would not have got this claim file.
11 Q.     Okay. Suppose we had nothing but minor
12 injuries, would you have made this request, if
13 everybody said we feel fine, but might go to the
14 chiropractor?
15 A.     Yeah. At that point in time, I was being
16 asked to in my spot checks ask for that documentation.
17 Q.     Was there -- how were you being asked? Was
18 there a memo, a guideline, a directive? Who was
19 telling you and what were they telling you?
20 A.     It was in a memo. And trying to recall the
21 exact verbiage on it. But the bottom line, that was
22 part of my job accountability was to look at that and
23 request the claim rep to follow up and report back on
24 it.
25        MR. SANDBERG: And Mr. Wilkerson, I don't

**Page 45**

1  suppose we have that memo that Ms. Petersen talked
2  about yesterday.
3       MR. WILKERSON: I don't. I can try and get
4  it.
5       MR. SANDBERG: Maybe at the next break, if
6  it's available. That would be great. Because then we
7  wouldn't need to ask Mr. Elkins to guess so much about
8  what it says.
9       MR. WILKERSON: I'll try.
10 BY MR. SANDBERG:
11 Q.   In any event, you were complying with a
12 directive that had come to you to obtain this
13 information in certain types of cases?
14 A.   Yes.
15 Q.   Okay. Now, go to page 81, if you would. If
16 you look at way up there, there's an entry that says
17 ID O1 percent neg entered as. And it goes on from
18 there. Can you translate that entry for me?
19 A.   Yes. Renee had entered in a computerized
20 field 100 percent negligence as to the insured.
21 Q.   That would be Charles Herron, my client?
22 A.   That would be the insured driver, yes.
23 Q.   And the date on that is 9/25. So is it safe
24 to say that by 9/25 the liability investigation was
25 over?

**Page 46**

1  A.   She entered that in on 9/25 based on the
2  report of the accident, the car hitting a light pole.
3  Q.   And so --
4  A.   And she also requested a police report at
5  that point.
6  Q.   If you go back to 80, we can actually see on
7  9/21, we have the date that it appears Renee actually
8  entered -- made the entry.
9  A.   Let's see.
10 Q.   If you look at 9/21.
11 A.   Yes. It appears that.
12 Q.   So by either 9/21 or 9/25, was the liability
13 investigation effectively concluded?
14 A.   Based on the initial report that had come in
15 with the insured driver losing control into the pole,
16 there was reasonable assumption that responsible for
17 the accident.
18 Q.   And so was there any more liability
19 investigation after this? I mean, this is the end of
20 it, isn't it? At this point, we move on to a damages
21 investigation?
22 A.   It appears based on what I'm seeing at that
23 point in time, she did not go any further on the
24 liability.
25 Q.   Now return, if you would, to -- or go -- I'm

**Page 47**

1  sorry -- farther back to page 240.
2  A.   Okay.
3  Q.   What are we looking at at page 240?
4  A.   Page 240 was Renee's transfer assignment to
5  the represented unit.
6  Q.   And it's signed by Mr. Davis?
7  A.   By Gary Davis, yes.
8  Q.   Do you know why this would have come to
9  Mr. Davis instead of you?
10 A.   The -- at that point in time, I may have
11 been out of the office that day. Gary may have been a
12 backup and assigned the claim file to the represented
13 adjuster.
14 Q.   Okay. Because at least this is the only
15 time I see Mr. Davis in the file. So let me ask, what
16 was Mr. Davis' job in September 2002, if you know?
17 A.   He was transitioning roles, I believe, to
18 personal line manager at that point. We had another
19 manager retiring.
20 Q.   And on this form, we see it says liability
21 investigation complete and the box yes is checked.
22 A.   That it is.
23 Q.   Now, I'm going to ask you to flip back to
24 page 14.
25 A.   Okay.

**Page 48**

1  Q.   At page 14 on 9/26, we see an entry made by
2  Karen Petersen.
3  A.   Yes.
4  Q.   And it is assigning this claim to Kathy
5  Berry, it appears.
6  A.   Okay.
7  Q.   Does that -- I mean, I'm not testifying.
8  I'm trying to ask a question of you. Does that seem
9  right?
10 A.   Right. It looks like Karen was in the claim
11 file and gave Kathy the -- transferred over.
12 Q.   Do you know why Ms. Petersen enters the
13 claim file at this point?
14 A.   It appears Gary may have transferred the
15 file to her to get some review on it prior to going to
16 Kathy.
17 Q.   Would it be customary for a file to be
18 referred to Ms. Petersen when it's transferred out of
19 the unrepresented unit?
20 A.   At one point, it would have been.
21 Q.   Do you know if it was at this point?
22 A.   I need to look at our staffing chart back in
23 2002. We had some personnel changes and -- with Gary
24 retiring and some other activity.
25 Q.   Kathy told me that she was an FPE at this --

Page 81

1  March letter?
2      MR. WILKERSON: I'm telling you -- I don't
3  have the date. I'm describing the letter.
4      MR. SANDBERG: Let's take a look at that.
5  Because I don't want to be unfair to the witness. If
6  an excess letter went out, let's look at it.
7      193, I believe is what Mr. Wilkerson may be
8  talking about. Take a second, Mr. Elkins, and read
9  that letter, if you would. You might want to share it
10 with your counsel.
11     MR. WILKERSON: Are you done reading it?
12 Okay. He's read it.
13     MR. SANDBERG: Now, I realize this isn't
14 your deposition, Mark. But is this the letter you're
15 talking about?
16     MR. WILKERSON: It looks like it. I'm not
17 saying there's not something else, but I think that's
18 the one I recall.
19 BY MR. SANDBERG:
20 Q.   Okay. Mr. Elkins, have you read that letter
21 now?
22 A.   I've reviewed it.
23 Q.   Is that an excess letter?
24 A.   Appears to address the punitive and
25 exemplary damages.

Page 82

1  Q.   Right. The subject line says punitive
2  damages exclusion, correct?
3  A.   Uh-huh.
4  Q.   And you told me Allstate has a form excess
5  letter?
6  A.   I believe we may have had one.
7  Q.   And this isn't it, is it?
8  A.   I'll need to see if we have -- are using
9  another one in addition to this.
10 Q.   Okay. I'm sorry. Earlier, you told me you
11 believed Allstate had a form excess letter, correct?
12 A.   In the context of some of our hard coverage
13 damages, yes.
14 Q.   And "in the context of some of our hard
15 coverage damages," what's that mean?
16 A.   Well, in our property damage liability
17 limits.
18 Q.   Okay. But you've got -- let's return to
19 what an excess letter is. An excess letter is a
20 letter that you write to the insured to say, hey,
21 look, you've only got X dollars of liability coverage
22 and this claim may well exceed that, correct? And
23 advising them to take whatever precautions they
24 believe are necessary in order to protect themselves
25 as the insureds, correct?

Page 83

1  A.   That would --
2  Q.   That's what an excess letter is, right?
3  A.   Would incorporate the excess letter
4  language, yes.
5  Q.   You've written excess letters, haven't you?
6  A.   Personally?
7  Q.   Yes.
8  A.   Personally, I haven't.
9  Q.   Well, You've had them in files that you
10 supervised certainly plenty of times, haven't you?
11 A.   Yes.
12 Q.   Now, this isn't an excess letter, is it?
13 This is a letter advising my client that there's a
14 punitive damages exclusion.
15 A.   Right. Yes.
16 Q.   Okay. So now returning to my question of a
17 moment ago, would you agree with me that whatever the
18 standard, at some point in this sequence of adjusting
19 this claim, an excess letter should have gone out?
20 A.   I don't know if the claim value had been
21 evaluated in excess of the facial limit.
22 Q.   Well, you don't need to wait until the claim
23 value gets evaluated to send out an excess letter, do
24 you? Isn't it the fact that the plaintiff may claim
25 more money what triggers an excess letter?

Page 84

1  A.   You're always attempting to settle that
2  within your insured's limits.
3  Q.   But suppose the Angstman law firm sent a
4  demand for a million dollars. You'd send out a letter
5  saying million dollars is more coverage than you got,
6  Mr. Herron, wouldn't you?
7  A.   They would be notified of what the demand
8  would have been.
9  Q.   And they'd be notified that the demand
10 exceeded the policy limits, correct?
11 A.   They would have.
12 Q.   And that would happen whether you'd
13 evaluated the claim or not, right?
14 A.   I'm not -- that is true.
15 Q.   So returning to my question, would you agree
16 with me that an excess letter should have gone out
17 somewhere in the sequence of adjusting this claim?
18 A.   I don't know.
19 Q.   Would you take a look at 197 in the claim
20 file?
21 A.   Okay.
22 Q.   Have you seen this exhibit before?
23 A.   I believe I have, yes.
24 Q.   It's a demand letter from the Angstman Law
25 Office to Kathy Berry about Angelina Trailov, correct?

Page 85

1  A.    It is.
2  Q.    It's dated February 14th, 2003, correct?
3  A.    It's dated February 14th, 2003, yes.
4  Q.    And it appears to have been received by
5  Allstate on February 18th, 2003?
6  A.    Yes.
7  Q.    At page 199, we can see this is the policy
8  limits demand, correct?
9  A.    Yes.
10 Q.    Actually, there's several policy limits
11 demands, actually. There's one on behalf of Angelina
12 and one on behalf of her mother, correct, because her
13 mother was bringing an NIED claim?
14 A.    Okay. Yes.
15 Q.    Okay. We talked about a demand log. Should
16 this demand have been logged in?
17 A.    It should have been, yes.
18 Q.    And so at page 200, we see something called
19 demand.
20 A.    Okay.
21 Q.    Is that -- what's that?
22 A.    That is the cover sheet that is placed on
23 top of the claim file when a demand comes in.
24 Q.    Okay. Is it also somehow transmitted so
25 that demands end up in the log?

Page 86

1  A.    Yes. I believe Kathy referred that to me
2  for review.
3  Q.    It says 3/3/03 AKB. That's Kathy Berry?
4  A.    Yes.
5  Q.    So on March the 3rd is when she refers it to
6  you? Is that what that means up there?
7  A.    That was, yes.
8  Q.    And then we saw you went back on March the
9  3rd, as I recall, correct? We saw you in the claim
10 file on March the 3rd, correct?
11 A.    I believe I was, correct.
12 Q.    Does it comply with Allstate practice and
13 procedure to go from February 18th to March the 3rd
14 with a policy limits demand before notifying one's
15 supervisor?
16 A.    I would have liked to have seen that sooner.
17 Q.    Is there a normal practice or procedure?
18 A.    I try to log those in when we receive them.
19 Q.    So would you normally have expected the
20 demand -- the policy limits demand like this to have
21 been called to your attention within a day or two of
22 receipt?
23 A.    At least within the week, yes.
24 Q.    Look at 203, if you would. That's a couple
25 of further pages back.

Page 87

1  A.    Okay.
2        (Discussion off the record.)
3  BY MR. SANDBERG:
4  Q.    203 in the claim file is a letter to Kathy
5  from Michele Power back in December of 2002, correct?
6  A.    Yes.
7  Q.    And it's received in December of 2002,
8  December 11th, by Allstate?
9  A.    Yes.
10 Q.    And it's notifying Ms. Berry that Angelina
11 Trailov will be examined by a neuropsychologist on
12 December 14th, 2002 -- December 17th, 2002?
13 A.    Okay.
14 Q.    Would you as her supervisor expect Ms. Berry
15 to follow up and attain records -- first of all,
16 determine whether or not that actually happened and
17 secondly, to obtain records if it did?
18 A.    I would.
19       MR. SANDBERG: Let's return then to the
20 claim log and look at 32, which I believe I may have
21 made an unredacted copy of. So we'll mark that,
22 actually.
23       (Exhibit 18 was marked.)
24 BY MR. SANDBERG:
25 Q.    Exhibit 18 appears to be an unredacted copy

Page 88

1  of a portion of the claims diary, correct?
2  A.    Yes, it is.
3  Q.    Now, the first entry at the top is from you.
4  And it's dated 3/3/2003, correct?
5  A.    Yes.
6  Q.    And as we've previously seen, the file had
7  come to your attention on that day, right?
8  A.    Yes.
9  Q.    Now, it says Kathy, thank you for demand
10 review on the 2/18/03 notice. What's a demand review?
11 A.    She had noticed me the demand had come in.
12 Q.    Is there any kind of a review -- I mean, is
13 a demand review a thing? Is it a form? Does she fill
14 out something evaluating a demand?
15 A.    No. It was -- that cover sheet there,
16 the --
17 Q.    Page 200 that we looked at before?
18 A.    I believe so, yes.
19 Q.    Okay. So this demand review that we're
20 discussing here is page 200 of the claim -- of the
21 claim file?
22 A.    Well, the demand would have been attached to
23 it.
24 Q.    Okay. That's what I was -- that would be my
25 next question is what's she do? Does she bring you

Craig Elkins                        Deposition                     September 30, 2005

Page 93

1   A.    It's a 14-day.
2   Q.    Okay. Now, on March the 3rd, 2003, you are
3   instructing Kathy to send the file to home office
4   referral on mandatory referral, correct?
5   A.    Let's see. That's on Exhibit --
6         MR. WILKERSON: Eighteen.
7   BY MR. SANDBERG:
8   Q.    Eighteen.
9   A.    Okay. Just had that.
10        MR. WILKERSON: It's a long piece of paper.
11        THE WITNESS: Yeah. I did instruct her to
12  do that.
13  BY MR. SANDBERG:
14  Q.    So your expectation on March the 3rd would
15  be that Kathy do that within 14 days, correct?
16  A.    I would have liked to have had her sent that
17  out, yes.
18  Q.    Kathy had sent out other files for mandatory
19  referral before, hadn't she?
20  A.    She's been good about getting those out,
21  yes.
22  Q.    But I mean, she'd run through this process
23  previously, correct?
24  A.    Yes.
25  Q.    When you said send the file for home office

Page 94

1   referral, she would know what that meant, wouldn't
2   she?
3   A.    She would.
4   Q.    She would know what the procedure was,
5   correct?
6   A.    Yes.
7   Q.    And she'd know that that was supposed to
8   happen within 14 days, wouldn't she?
9   A.    That would be the requested timeline, yes.
10  Q.    And as her supervisor, you'd expect that she
11  was going to do it within 14 days, wouldn't you?
12  A.    I would have liked to have seen that, yes.
13  Q.    And you would expect her to follow the
14  guidelines, as her supervisor, wouldn't you?
15  A.    As far as getting the referral out, yes.
16  Q.    In this case, the home office referral
17  actually didn't happen until the middle of May.
18  A.    Referral went out in May.
19  Q.    Have you ever asked Kathy why the referral
20  didn't go out for two and a half months after you told
21  her to do it?
22  A.    She didn't do it. I didn't have it on my
23  suspense to follow up that it get done. And came up
24  on a tickler and she had apparently overlooked it.
25  Q.    Okay. And let me return to my question and

Page 95

1   make sure that we're tracking. Have you ever asked
2   Kathy why she didn't do it for two and a half months?
3   A.    I'm trying to recall the specific
4   conversation, but I'm just not recalling the specific
5   conversation as to that.
6   Q.    Do you believe you asked Kathy? You're a
7   supervisor, right?
8   A.    As of that time period, I don't recall what
9   the conversation was relative to the home office
10  referral, other than it didn't go out in the time
11  period that I would have liked to have had it gone
12  out.
13  Q.    Well, do you ever recall receiving an
14  explanation from Kathy about why it took two and a
15  half months?
16  A.    I know -- I know we talked about it. I just
17  don't recall what the specific explanation was.
18  Q.    When a file is sent -- I'm sorry. When you
19  identify a file for mandatory home office referral, do
20  you tickle the file?
21  A.    I try to. I set my suspense not to 14-day,
22  but apparently had a 60-day follow-up on it.
23  Q.    And 60 days would still take you to early
24  May, correct?
25  A.    Yes.

Page 96

1   Q.    Okay. So do we see you in the file again
2   following up on this home office referral in early
3   May?
4   A.    I believe, yes, just about at 60 days.
5   Q.    All right. So your belief is that you
6   tickled this item for 60-day action. And then we'll
7   see you in the file again in about 60 days on this
8   issue; is that correct?
9   A.    Can you restate that again, please?
10  Q.    Yes. Is it your belief, as we sit here
11  today, that you tickled this item for 60 days?
12  A.    Apparently, when I set my suspense, I set it
13  not to 14, but 60 days out.
14  Q.    Should it have been set for 14?
15  A.    I must have made a mistake and hit 60
16  instead of 14.
17  Q.    Well, would you agree with me it should have
18  been 14?
19  A.    I would have liked to have been in that file
20  14 days after that diary entry, yes.
21  Q.    Should you have been in that file 14 days
22  after that diary entry as the supervisor on this file?
23  A.    I should have been, yes.
24  Q.    What are your responsibilities as the
25  supervisor once a claim gets designated for home

27 (Pages 93 to 96)

### Page 113

1  read that letter.
2  A.    Okay.
3  Q.    Okay? This is a letter dated May the 9th,
4  2003. I believe we may have already marked it as
5  Exhibit number 12, if I'm guessing right. It's an
6  exhibit, as well. But it's a letter from Kathy Berry
7  to Michele Power, dated May 9th, 2003, correct?
8  A.    It's attention Michele Power, yes.
9  Q.    Okay. And it says, "Thank you for your
10 letter dated April 10..." Then it goes on to say "We
11 are in the process of completing our evaluation of
12 Angelina Trailov's claim and anticipate responding to
13 your demand by your May 16th, 2003 deadline."
14       First of all, have I read that sentence
15 correctly?
16 A.    "We are in the process of completing our
17 evaluation of Angelina's Trailov's claim," yes.
18 Q.    Okay. Was the fact that there was a
19 May 16th, 2003 deadline brought to your attention?
20 A.    I don't recall.
21 Q.    Do you see any evidence in the claims diary
22 that the fact there was a May 16, 2003 deadline was
23 brought to your attention?
24 A.    No.
25 Q.    Do you have any independent or other

### Page 114

1  recollection that the May 16th, 2003 deadline was
2  brought to your attention?
3  A.    On May 9th, no.
4  Q.    Or any other time before May 16th, 2003.
5  A.    May -- as May -- May 16th is -- what letter
6  does that refer to? No, no.
7  Q.    You discussed for me demand log and how that
8  was maintained. If there was a May 16th, 2003
9  deadline on a demand, should you -- should that have
10 been brought to your attention at least once a week?
11 A.    That I should have reviewed.
12 Q.    But it should have been -- that's right.
13 You told me that you reviewed the demand deadline --
14 or the demand log. I'm sorry.
15 A.    I think initially there was no time demand
16 on the first letter.
17 Q.    Right. That's right.
18 A.    I don't know if I -- I don't recall if I saw
19 the subsequent demand letter come in or not with the
20 time limit.
21 Q.    Well, if everything is working the way it's
22 supposed to be working and there is a May 16th, 2003
23 deadline, that fact should somehow be entered in the
24 demand log, correct?
25 A.    If I was aware of it, yes.

### Page 115

1  Q.    Who actually makes entries in the demand
2  log? Would it be you or Kathy?
3  A.    Well, that would have been me.
4  Q.    So if you didn't know about a demand, a
5  May 16th, 2003 deadline, obviously then you couldn't
6  enter it into the demand log, correct?
7  A.    I don't recall the May 16th deadline.
8  Q.    And if we go by the file at least, we have
9  no reason to believe you were actually told anything
10 about a May 16th, 2003 deadline, do we?
11 A.    From the claim file, no.
12 Q.    At the bottom of this exhibit at 187, we see
13 it goes to Margaret Herron and Charles Herron,
14 correct? We see cc's to them?
15 A.    Okay.
16 Q.    Mr. Valcarce was representing Charles
17 Herron. We can see that. If we need to, we can look
18 at 191. He's representing Mr. Herron for at least
19 several months by this point. If we assume there was
20 a lawyer for Mr. Herron, should this have been copied
21 to that lawyer?
22 A.    If we were copying Charles Herron, we should
23 have copied his lawyer instead.
24 Q.    Can you tell me why this letter would go to
25 Charles Herron instead of his lawyer?

### Page 116

1  A.    You'll have to ask Kathy on that. I don't
2  know her thought process.
3  Q.    That's fine. Just if you know. You don't
4  have to know.
5        (Discussion off the record.)
6  BY MR. SANDBERG:
7  Q.    Take a look at 181, if you would. 181 is a
8  letter from Kathy Berry to Michele Power, dated
9  May 16th, 2003, correct?
10 A.    Yes.
11 Q.    Okay. Now, in the previous letter, we saw
12 reference to responding to your demand by your
13 May 16th, 2003 deadline. Other than this letter, are
14 you aware of any other response?
15 A.    From Angstman Law Office?
16 Q.    To Angstman Law Office in response -- in
17 other words, the last letter says we "anticipate
18 responding to your demand by your May 16, 2003
19 deadline." I mean, I read that sentence again. I'll
20 read the whole thing. It says "We are in the process
21 of completing our evaluation of Angelina Trailov's
22 claim and anticipate responding to your demand by your
23 May 16, 2003 deadline." Okay?
24       And then if you look at the claim log, which
25 is going to be back at -- back in the 40s, is there

Page 117

1  any indication that Kathy Berry actually did anything
2  between May 9th, 2003 and May 16th, 2003?
3  A.   In the CDS log?
4  Q.   That's right. Take a look at it wherever it
5  is upfront. It should be in the 40s.
6  A.   The log here may not reflect what she would
7  physically be doing on her desk.
8  Q.   Okay. But a person handling a claim like
9  this should be documenting their actions to the claim
10 file, right?
11 A.   They should.
12 Q.   That's right. I mean, both Allstate's
13 guidelines and the Alaska regulations require that,
14 don't they?
15 A.   Yes.
16 Q.   Okay. And so when we look to see what
17 Kathy documented to the claim file during the
18 week between May 9th, 2003 and May 16th, 2003,
19 we don't see that Kathy actually did anything, do
20 we?
21 A.   What document do we have on the letters that
22 went out to the providers? Was there any --
23 Q.   Yes. You want to look at -- the letters to
24 the providers were at 95.
25      MR. MESTAS: Start 81.

Page 118

1  BY MR. SANDBERG:
2  Q.   Starting at 81.
3  A.   I'm just refreshing. So the dates in
4  question again that you're referring to?
5  Q.   Yes. Between May the 9th when Kathy writes
6  and says we're in the process of completing our
7  evaluation --
8  A.   And May 16.
9  Q.   -- and anticipate responding to your demand
10 by your May 16, 2003 deadline and May 16th, there's no
11 evidence in the claim file that Kathy Berry actually
12 did anything, is there?
13 A.   Typically, if she would have been reviewing
14 the medical records, she wouldn't have documented that
15 as such. That would be work product on her desk. And
16 I believe in here she's stating her evaluation wasn't
17 complete.
18 Q.   But in the claim file between May 9th and
19 May 16th, 2003, there's no indication in the claim
20 file that Kathy Berry actually did anything, is there?
21 A.   If -- memorialized, no.
22 Q.   Do you independently know that Kathy Berry
23 did anything between May 9th and May 16th, 2003?
24 A.   I couldn't answer that for Kathy.
25 Q.   Okay. And so on May the 9th, 2003, we've

Page 119

1  got Kathy has in her possession a policy limits demand
2  for Angelina Trailov to settle Angelina Trailov's
3  claim, correct?
4  A.   Okay. On what date?
5  Q.   On May the 9th.
6  A.   Okay.
7  Q.   We can see that at page 187. We can tell
8  that -- because on May the 9th, she says we're in the
9  process of completing our evaluation and will respond
10 to your demand.
11 A.   Okay.
12 Q.   So on May 9th, she's got a demand, right?
13 Correct?
14 A.   Appears to be she does, right.
15 Q.   And she's got a deadline of May 16th.
16 That's what she says. If she's complying with
17 Allstate practices and procedures, should she do
18 nothing for the next week?
19 A.   I can't say what she was doing during that
20 time period.
21 Q.   I'm asking what should she be doing during
22 that time period.
23 A.   Well, one would think with the information
24 at hand, moving that forward.
25 Q.   A policy limits demand in a case that might

Page 120

1  be bigger than the policy limits is a fairly serious,
2  thing, isn't it?
3  A.   Yes.
4  Q.   It should be handled very carefully,
5  correct? It should be -- Allstate should be
6  handling -- Allstate should be responding carefully
7  when it is in possession of a policy limits demand in
8  a case that may exceed the limits, correct?
9  A.   Appears there was communication between
10 Kathy and the Angstman Law Office via fax material
11 during that time period.
12 Q.   I'm not asking you to tell me Kathy wasn't
13 careful. I'm asking whether you agree that Allstate
14 should be careful in responding to a policy limits
15 demand.
16 A.   In any policy limits demand, yes.
17 Q.   Okay. And when Allstate says it will -- it
18 is working to complete its evaluation prior to a
19 deadline, should Allstate be careful to make sure that
20 actually happens?
21 A.   Yes.
22      MR. SANDBERG: Let's come forward then,
23 because we're actually nearing the end here. It is
24 1:00 o'clock and I told you we'd finish around 1:00.
25      Look at 48 and 49. And I think I have a

33 (Pages 117 to 120)