IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

ALLSTATE INSURANCE COMPANIES,

    Plaintiff,

vs.

CHARLES HERRON,

    Defendant.

NO: A04-0043 CV (JKS)



RECEIVED
SANDBERG, WUESTENFELD & COREY
OCT 13 2005
ATTY_____ L. ASST_____
APPROVED FILE _____

DEPOSITION OF KAREN PETERSEN

Thursday, September 29, 2005, 11:46 a.m.  HAND DELIVERED 10:55

Anchorage, Alaska



RECEIVED
JAN 13 2006

**Alaska Stenotype Reporters**
511 West Ninth Avenue
Anchorage AK 99501-3520
*Serving Alaska Since 1953*

Rick D. McWilliams, RPR, Ret.
Fred M. Getty, RPR, Ret.



Telephone 907.276.1680
Email AkSteno@aol.com
Fax 907.276.3016

Page 1

Page 29

1  That's what this is indicating.
2  Q.    I see. And so Renee VanZant would retain
3  responsibility for the unrepresented portion of the
4  claim?
5  A.    If there were other individuals injured that
6  were unrepresented, yes.
7       MR. SANDBERG: Okay. Then the next thing
8  you're saying to Kathy is "Need to determine extent of
9  04 injuries."
10      Then I can actually show you, I think -- I'm
11 sorry. Let's mark that before I pass it to her,
12 because it's not out of that book.
13      MR. WILKERSON: Be nine.
14      MR. SANDBERG: This will be nine.
15      (Exhibit 9 was marked.)
16 BY MR. SANDBERG:
17 Q.    So at this point, you're telling Kathy she
18 needs to determine the extent of Angela Trailov's
19 injuries, correct?
20 A.    Yes.
21 Q.    And what sort of -- I mean, what were you
22 contemplating Kathy would do in order to determine the
23 extent of Angelina Trailov's injuries?
24 A.    She would investigate the file. And first,
25 she would need to review the file and then conduct

Page 30

1  whatever investigation was needed.
2  Q.    The next thing it says is "Review reserves.
3  Currently at 25K." I believe the initial reserve was
4  established by Mr. Davis at 25K. Is 25,000, is
5  that -- I know some companies have a reserving policy
6  where a particular number means something, like $100
7  means the file's open. Does $25,000 mean anything
8  in --
9  A.    First, you said Mr. Davis set the reserve.
10 Q.    I believe that's correct.
11 A.    I don't know that that's correct.
12 Q.    I could be wrong about that, but I thought
13 he did. We can go back and look if it's --
14 A.    The prior adjuster would have anticipated a
15 value at or below that amount.
16 Q.    Okay. But there's nothing about the $25,000
17 that tells you anything in particular. I mean, it
18 doesn't, for example, tell you this is potentially a
19 serious claim, but we don't have any medical yet or
20 something like that?
21 A.    No.
22 Q.    Okay. Then it says "Limits 100/300." That
23 would be the auto liability limit?
24 A.    Yes.
25 Q.    And then it says "Plus CC coverage

Page 31

1  available." That's med pay?
2  A.    Med pay.
3  Q.    And then it says "Need letter to insured
4  driver," slash, "owner re no cover for punitives."
5  Then it says "Allegations of driver drinking."
6       Why would the file need a letter to the
7  insured driver? What are you telling her there?
8  A.    In my cursory review of the file, I
9  apparently picked up that there were allegations of
10 drinking. And we had a policy change somewhere in
11 this area where punitives were an excluded item. So
12 I'm asking her to notify the insured of that.
13 Q.    Does Allstate somewhere in the processes or
14 procedures have guidelines for when an excess letter
15 should go out?
16 A.    There are guidelines. I can't tell you
17 specifically where they're at.
18 Q.    As we sit here, you do know what an excess
19 letter is?
20 A.    Yes.
21 Q.    And what is it?
22 A.    That would be notifying our insured of the
23 potential that the value of the claim could exceed the
24 limits of the policy.
25 Q.    Okay. At this point, the letter you are

Page 32

1  contemplating here was not an excess letter, correct?
2  A.    Correct.
3  Q.    Okay. You were just contemplating that
4  Kathy notify the insured that there was an exclusion
5  for punitive damages should they be awarded.
6  A.    Correct.
7  Q.    Are you familiar with the Allstate policy or
8  procedure for when an excess letter is to go out?
9  A.    Yes.
10 Q.    And would it be generally when there is a
11 possibility of an excess judgment?
12 A.    When we anticipate that the value of the
13 claim exceeds the limits of the policy.
14 Q.    May exceed the value or does exceed the
15 value?
16 A.    May exceed the value.
17      MR. WILKERSON: Mark, can we take a break to
18 plug her meter?
19      MR. SANDBERG: Absolutely. I'm sorry. I
20 promised you. It's 12:30. Wasn't paying attention to
21 the time.
22      (Brief recess.)
23 BY MR. SANDBERG:
24 Q.    Let's continue, if we may. Back on record.
25      Ms. Petersen, when we went off record, we

Page 37

1  entry for Mr. Davis on -- yes, we've got -- it's
2  number 240 in our claim manual. And it is -- yes,
3  Bates stamped 240. And it appears to be a transfer
4  sheet.
5     MR. WILKERSON: Should be right there.
6  She's got it, 240.
7  BY MR. SANDBERG:
8  Q.  Is that Mr. Davis' signature?
9  A.  Yes, that's his signature.
10 Q.  And it shows that, AA 04 25. That's the
11 $25,000 liability reserve that we were discussing
12 before?
13 A.  Uh-huh, correct.
14 Q.  And CC 04, there's no reserve?
15 A.  Correct.
16 Q.  Are med pay claims reserved?
17 A.  No.
18 Q.  Do you know why not?
19 A.  They're a standard reserve. There isn't any
20 case reserve that you have to set for the med pay
21 claims.
22 Q.  Within -- let's see. At the time you first
23 came to this file on September 26th, it had already
24 been determined that this was a 100 percent liability
25 claim, correct?

Page 38

1  A.  That I don't know.
2  Q.  Okay. Well, if you have the guide in front
3  of you, you can take a look. Look at 80 and 81.
4  A.  Okay.
5  Q.  Now, we can see that on September the 16th,
6  Renee VanZant entered -- I'm sorry -- September 21st,
7  Renee VanZant entered something saying -- well,
8  there's a bunch of stuff there that I don't
9  understand. And then it says entered as 100 percent
10 by ID, et cetera, which I believe is Ms. VanZant?
11 A.  Yes.
12 Q.  But maybe -- can you translate that line for
13 me?
14 A.  That would indicate that she entered 100
15 percent negligence on the part of our insured.
16 Q.  Now, are there Allstate guidelines anywhere
17 in any form that would tell us how long it ought to
18 take to adjust a file that has been determined to be a
19 100 percent liability claim?
20 A.  In terms of injuries?
21 Q.  Yes.
22 A.  No. I don't believe you would find a
23 specific time frame because all claims are different.
24 Q.  Well, within the claim regs we were
25 discussing, there's 30 days for an investigation and

Page 39

1  then there's -- it's either to be concluded or there's
2  notification procedure, correct --
3  A.  Yes.
4  Q.  -- of what else is needed? Does Allstate
5  have something analogous where an investigation is to
6  be concluded within a certain date 30, 60, 90 days or
7  something is to happen, either notification or
8  something to go to the file?
9  A.  I don't believe there's a set time frame.
10 Q.  If we wanted to find out, what would we look
11 at?
12 A.  My first reference would be the CCPR Manual.
13 Q.  And would there be a second reference?
14 A.  That would be the first location I would
15 look to.
16 Q.  Based upon your experience, do you have an
17 opinion as to how long it should take to adjust a
18 claim in which liability has been determined to be 100
19 percent?
20    MR. WILKERSON: Objection. She's not here
21 as an expert, but as a fact witness. I object to her
22 being asked or answering hypothetical questions that
23 are for expert witnesses.
24 BY MR. SANDBERG:
25 Q.  He didn't say don't answer it.

Page 40

1  A.  There isn't a specific time frame, because
2  each claim differs. You need to gather the
3  information that's pertinent to that particular claim
4  so that you can evaluate it. And there are all
5  different types of factors that might change the time
6  frame of that.
7  Q.  On September 26th, when you transfer the
8  file to Kathy Berry, did you contemplate she would
9  send out a medical records authorization to get this
10 information?
11 A.  Yes.
12 Q.  And how soon should one of those go out?
13 A.  She should send that to the attorney as soon
14 as possible.
15 Q.  Does Allstate have guidelines for how
16 promptly that should happen?
17 A.  No.
18 Q.  You had directed her to write the letter
19 regarding punitive damages, correct?
20 A.  Correct.
21 Q.  How soon did you contemplate that should
22 happen?
23 A.  I had anticipated she would send it out
24 right away, but it's her discretion to send it or not.
25 Q.  Are there -- you mean not to send it at all?

Page 41

1  A.    Depending on her anticipation of what might
2  happen with the file.
3  Q.    What's that mean?
4  A.    When I looked at the file, I saw that it was
5  a punitive exclusion policy. I saw that there were
6  allegations of DUI. So I brought that to Kathy's
7  attention. If Kathy didn't feel it was imperative to
8  send that letter at that point in time, she has that
9  discretion.
10 Q.    Were you evaluating Kathy at this point?
11 A.    No.
12 Q.    Who would have been evaluating Kathy at this
13 point?
14 A.    Craig Elkins.
15 Q.    Would Mr. Elkins have been evaluating Kathy
16 in part based upon whether or not she had complied
17 with your directives?
18 A.    You'd have to ask Mr. Elkins.
19 Q.    Would complying with instructions be part of
20 the evaluation you were describing before about
21 compliance with Allstate processes?
22 A.    That's a difficult answer specifically yes
23 or no. Because if Craig also didn't feel that that
24 letter was necessary at that point in time, he
25 wouldn't expect her to comply with it.

Page 42

1  Q.    Do you know what, if anything, Kathy Berry
2  did in response to this direction from you?
3  A.    No, I don't know.
4  Q.    Are there home office referral processes
5  where a claim has a punitive exposure?
6  A.    No.
7  Q.    Or practices, procedures, whatever word we
8  should be looking for?
9  A.    No. I don't believe that punitive exposure
10 is part of the home office guidelines.
11 Q.    Okay. What kind of claims do get home
12 office referral?
13 A.    Serious injury claims, claims that appear to
14 be excess exposure, claims that would exceed our
15 office authorization.
16 Q.    And what was the authorization in the fall
17 of 2002?
18 A.    For the office?
19 Q.    Yes.
20 A.    150,000 per individual injury.
21 Q.    And the home office referral guidelines are
22 a written thing?
23 A.    Yes.
24 Q.    They exist somewhere in the Anchorage
25 office?

Page 43

1  A.    They would be in the Claims Policies and
2  Procedures -- Policy, Practices and Procedures Manual.
3  Q.    And that's the one --
4  A.    CPPP, yes.
5  Q.    That's what we looked at as Exhibit number 3
6  previously?
7  A.    Correct.
8  Q.    That was a portion of that? And if we look
9  at the last page of that document, we see that
10 "Casualty files are to be" returned -- or "referred
11 from the Market Claim Office to Home Office within 14
12 days after the file qualifies for referral," correct?
13 A.    That's what this paper says.
14 Q.    Do you know whether that would have been the
15 standard in the fall of 2002?
16 A.    I can't tell you for certain yes or no.
17 Q.    Do you have a reason to believe it was
18 different than 14 days in the fall of 2002?
19 A.    No.
20 Q.    And whose job is it to make the
21 determination of when a file qualifies for referral?
22 A.    The claim representative.
23 Q.    So in this case, it would be Kathy Berry?
24 A.    Yes.
25 Q.    And that would be part of your job --

Page 44

1  A.    Yes.
2  Q.    -- would be to determine whether or not a
3  claim was -- or whether a claim qualified for home
4  office referral?
5  A.    Yes.
6  Q.    And Kathy was being supervised, I believe
7  you told me, by Mr. Elkins at this point?
8  A.    Yes.
9  Q.    What would Kathy's job title have been in
10 the fall of 2002?
11 A.    She was a claim representative. I don't
12 know what level of claim representative.
13 Q.    She was part of the represented claim unit?
14 A.    Yes.
15 Q.    I asked you some -- let's see. Before we
16 move on out of these initial areas where we just were
17 looking at Mr. Davis and then your entry the following
18 day in this not reserving the med pay, I asked you
19 some questions earlier about med pay. And you told me
20 there are med pay claim standards, correct?
21 A.    I believe there are med -- there's a med pay
22 CCPR book out there.
23 Q.    Do you know what, if anything, it says about
24 timeliness?
25 A.    No, I don't.

Page 49

1  A.   Uh-huh.
2  Q.   -- that we're seeing. And you can see the
3  whole thing from your station or wherever you're
4  accessing it?
5  A.   Yes.
6  Q.   I mean, there are no limitations on your
7  ability to access it?
8  A.   No.
9  Q.   So, for example, if you wanted to know
10 whether Kathy was following your instructions that
11 you'd supplied on the 26th, you presumably could have
12 determined that from here?
13 A.   I would probably pull the physical file.
14 This entry can come from something as simple as me
15 wanting to review coverages that were opened on the
16 file.
17 Q.   And would that include the U coverage in
18 this case?
19 A.   There's nothing here to indicate what I was
20 looking at, specifically.
21 Q.   Take a look at page 008, if you would.
22 A.   Of the diary notes?
23 Q.   Yes.
24 A.   So it would be Bates stamped what?
25 Q.   Eight.

Page 50

1       MR. WILKERSON: She's there.
2       THE WITNESS: Okay.
3  BY MR. SANDBERG:
4  Q.   And I'll represent that you don't have
5  anything personally to do with this entry, but I just
6  want to ask you if you can explain some of it to me.
7  If you -- this is an entry from Craig Elkins to Renee
8  containing a series of observations and instructions.
9  And we come down here to follow up on matrix
10 requirements. Do you know what that means?
11 A.   The matrix requirements would be part of the
12 CCPR guidelines. If you have a certain type of claim,
13 you're expected to do certain activities on the file,
14 such as take recorded interviews, obtain estimates.
15 Q.   Obtain medical records, would that be one of
16 those on the matrix?
17 A.   That could be one of those on the matrix.
18 Q.   And medical bills as well?
19 A.   The matrix, I believe, refers to medical
20 records.
21 Q.   Would medical records include bills for that
22 purpose, then?
23 A.   It could.
24 Q.   The next thing here, it says -- and I'm
25 sorry. If I wanted to see the matrix requirements for

Page 51

1  an Allstate claim handler, I would find them in the
2  CCPR?
3  A.   Yeah.
4  Q.   I'm getting better.
5  A.   You got it.
6  Q.   Now, the next thing I see here is it says
7  secure certified dec sheet and agent application,
8  dash, waiver issue. Do you know what that means?
9  A.   That would mean Craig wanted her to get the
10 initial application and obtain a selection/rejection
11 form if it existed.
12 Q.   And the waiver issue relating to waiver --
13 A.   Selection/rejection of UM/UIM.
14 Q.   Of UM/UIM. What would have -- if you know,
15 what was the practice or procedure relating to when
16 the certified declarations page -- and I'm sorry. Let
17 me leave declarations out of this.
18      What, if you know, was the Allstate
19 procedure as to when the agent application would be
20 obtained? In other words, what's this all about?
21 A.   I can't speak to Craig's procedure here.
22 Q.   Was there a standard office procedure?
23 A.   There is a procedure if you have a UM/UIM
24 exposure, to obtain that. Craig probably operated on
25 that premise or his own premise.

Page 52

1  Q.   So would that indicate, then, that someone
2  had determined that there was a U -- a U or UIM
3  exposure by this time?
4  A.   No.
5  Q.   So what was the procedure?
6  A.   It simply indicates that Craig wanted her to
7  collect that information. It doesn't tell me why he
8  asked for that.
9  Q.   But are you aware of any reason someone
10 would want to collect that information if there was no
11 U exposure?
12 A.   You have an injured passenger in our
13 insured's vehicle. Craig asks for information -- as
14 much information as he can get upfront, in most cases.
15 But I can't tell you his reasoning in this case.
16 Q.   Was there any kind of a written policy or
17 procedure for when the application would be obtained,
18 to your knowledge?
19 A.   There is a written memo to obtain it in the
20 case of an uninsured motorist or underinsured motorist
21 claim, yes.
22 Q.   When there's a potential exposure?
23 A.   When there is exposure.
24 Q.   Okay. And who -- or where would we find
25 that memo? What's it called and where does it come

Page 81

1  Q.  So somewhere there should be an 09-PF8
2  screen with Lori's thought process on it?
3  A.  Yes.
4  Q.  Then it says, "Please note there are several
5  lien notices. The ANS lien has been recorded in
6  court. We need to assure this is paid with liability
7  settlement." How come?
8  A.  Because they had recorded a lien against the
9  liability settlement.
10 Q.  Would -- in an instance like this, would
11 Allstate effectively subrogate? In other words, would
12 Allstate reduce the payout to Angelina Trailov on the
13 liability side based upon the fact she'd already
14 gotten $25,000 in med pay?
15 A.  There would be an offset for that 25,000.
16 Q.  And is that, in fact, what happened, do you
17 know?
18 A.  I don't know.
19 Q.  But there should be an offset subtracting
20 the 25 -- recovering the $25,000 --
21 A.  No.
22 Q.  -- out of the --
23 A.  No, no. It's not a recovery process.
24 Q.  Just another -- just a reduction in damages,
25 in other words, a credit for the 25 that already was

Page 82

1  paid.
2  A.  A credit for the 25,000 that was already
3  paid under the med pay.
4  Q.  But an insured like Angelina Trailov would
5  collect both the med pay and the 112,000 if her claim
6  was worth it.
7  A.  Correct.
8  Q.  Okay. And so the reason we need to assure
9  this is paid with the liability settlement was simply
10 to make sure that Allstate didn't end up with a
11 problem where it had to pay more, again because it
12 knew about the recorded lien?
13 A.  To properly protect our insured, we know
14 we've got this recorded lien out there. So my notice
15 is put here so that this is part of the resolution of
16 the claim. If ANS needs to be named on the final
17 check, then that's what happens. But typically,
18 there's a discussion with plaintiff counsel.
19 Q.  Okay. Now, it says "Attorney has
20 demanded pol lim." Is that policy limits for 04?
21 A.  Yes.
22 Q.  So the attorney has demanded policy limits
23 for Angelina Trailov.
24 A.  Correct.
25 Q.  And it says "and for NIED claim for her

Page 83

1  mother." Then go to the next line. It says, "I agree
2  04 would probably receive the 100K liability limits in
3  Bethel venue, likely the 100K SU limits also."
4      The 100K SU limits would be the UIM
5  coverage?
6  A.  Yes.
7  Q.  So you agreed that Angelina Trailov would
8  probably receive the $100,000 in liability limits in
9  Bethel, plus likely the $100,000 in UIM coverage as
10 well.
11 A.  I agreed that she would likely receive the
12 100K liability limits. And then I'm indicating it's
13 likely she would also receive the UIM limits also.
14 That's not part of my agreement with anyone, that
15 second portion.
16 Q.  Okay. I see. So someone had asked you
17 whether or not you agreed that she would get the
18 100,000 liability limits in Bethel. And you said yes,
19 she'd also get the UIM limits probably, too.
20 A.  That's how I interpret what I wrote.
21 Q.  Okay. How long did it take you to come to
22 this conclusion?
23 A.  After I reviewed the file.
24 Q.  Yes.
25 A.  At the time that I reviewed the file, I came

Page 84

1  to this conclusion.
2  Q.  Okay. Would that be something that happened
3  on May 29th, 2003?
4  A.  Probably May 29th or May 28th. I can't tell
5  you what day I would have reviewed the file. But it
6  was probably right in that time frame.
7  Q.  Okay. So within a day or two, at least, of
8  reviewing the file, you were able to come to this
9  conclusion?
10 A.  Yes.
11 Q.  Do you know whether you were reviewing any
12 medical records that Allstate hadn't had since at
13 least the first of May?
14 A.  That I don't know.
15 Q.  Do you know if you were reviewing any
16 medical records that Allstate hadn't had since
17 March 23rd?
18 A.  I don't know.
19 Q.  If you had been asked back in March to
20 review the medical records, are you aware of any
21 reason you couldn't have come to the same conclusion
22 then?
23 A.  I don't know what was in the file at that
24 point.
25 Q.  Well, if we assume that it was -- after

Page 85

1 March 26th, 2003 it was the same records, are you
2 aware of any reason you couldn't have come to this
3 conclusion then?
4 A.   I don't know. I -- I only know the file
5 that I looked at at this point in time led me to this
6 conclusion.
7 Q.   And this conclusion was based upon your
8 review of the medical information that was available
9 to you?
10 A.   Of all of the file documents that were
11 available to me.
12 Q.   And on a 100 percent liability claim, other
13 than the medical information, do you know what else
14 you looked at?
15 A.   I would have looked at the liability aspects
16 of the file. I would have looked at any contribution
17 aspects. I would have looked at the medical
18 information that was available.
19 Q.   And this has been -- as we've seen, I think,
20 this has been determined as 100 percent liability file
21 for Mr. Herron within a week of the accident or ten
22 days, right?
23 A.   There was a determination in the file, yes.
24 Q.   Okay. And so that determination had been
25 made. And there was no possibility for contribution

Page 86

1 noted in the file, was there?
2 A.   I don't know that.
3 Q.   If the records that you reviewed had
4 been obtained, say, by December of 2002, is there
5 any reason you couldn't have come to this conclusion
6 then?
7 A.   That -- if everything was the same as it was
8 on this specific date, May 29th, 2003 --
9 Q.   Yes.
10 A.   -- I likely would have come to the same
11 conclusion. I don't know what existed on the date
12 that you're saying.
13 Q.   Okay. In any event, so -- yes, that's
14 really my question, is if you had seen this same
15 information earlier, you would presumably have come to
16 the same conclusion earlier, correct?
17 A.   Presumably.
18 Q.   Okay. In one or two days, presumably.
19 A.   Of reviewing the information, yes.
20 Q.   Okay. Let's continue with this analysis
21 then. It says I do not -- it says I suggest we
22 discuss case value and NIED claim with local counsel
23 prior to making recommendation to home office.
24     On May 29th, this case had been referred to
25 the home office, correct?

Page 87

1 A.   I believe it had previously been referred.
2 Q.   We can actually look up the date, if you
3 want. But it's -- hum.
4     (Discussion off the record.)
5 BY MR. SANDBERG:
6 Q.   In any event, when a case becomes a home
7 office referral, does Allstate still possess authority
8 to settle it?
9 A.   Yes, but we have limitations.
10     MR. SANDBERG: Let's mark this next.
11     (Brief pause.)
12     MR. SANDBERG: We're back on record. What
13 exhibit number did we mark that as, 11?
14     THE REPORTER: Eleven.
15 BY MR. SANDBERG:
16 Q.   Exhibit 11, I believe, is a collection of
17 items relating to the home office referral. And so
18 rather than me discussing it so generically, let's go
19 through, if we may. The first is an e-mail from Kathy
20 Berry to you regarding a new home office referral.
21     MR. WILKERSON: Mark, you may want to mark a
22 different one. I think the one that's been marked
23 seems to have maybe Dennis' notes on it. I don't
24 think you want that probably.
25     MR. SANDBERG: I'll trade you.

Page 88

1     MR. WILKERSON: I have no objection if you
2 mark mine. I don't think mine has writing on it.
3     MR. MESTAS: That's a better one, anyway.
4     (Exhibit 11 was marked.)
5 BY MR. SANDBERG:
6 Q.   Now, the first page is an e-mail from Kathy
7 Berry to you?
8 A.   Yes.
9 Q.   And it says "Here is a new referral on a
10 Bethel claim."
11 A.   Yes.
12 Q.   Is this the home office referral when it
13 says "New H.O. referral"?
14 A.   This would be the home office referral that
15 she's sending to me to review before it's forwarded.
16 Q.   And she's writing to you on May the 16th?
17 A.   Yes.
18 Q.   And why would she write this to you? I
19 mean, where are you in this process?
20 A.   Because she's supposed to forward it to me
21 for review before it's sent to home office.
22 Q.   Okay. So that would be part of your job --
23 A.   Yes.
24 Q.   -- would be to review the submission before
25 it went?

Page 89

1  A.     Right.
2         MR. SANDBERG: Okay.
3         (Discussion off the record.)
4  BY MR. SANDBERG:
5  Q.     And why you rather than Mr. Elkins?
6  A.     If -- I'm the one that's supposed to review
7  these. If I'm not available, she would send it to
8  Craig.
9         MR. SANDBERG: Okay. And then the next --
10        (Discussion off the record.)
11 BY MR. SANDBERG:
12 Q.     Were you told that the -- that there was an
13 existing policy limits offer with a deadline of
14 May 16th?
15 A.     I don't know if I was told that. I don't
16 know if there's reference to it. I don't immediately
17 see anything that indicates that.
18 Q.     Do you recall any particular sense of
19 urgency on this referral?
20 A.     No.
21        MR. SANDBERG: Would you take a look
22 at -- actually, we're going to mark it as
23 Exhibit 12.
24        (Exhibit 12 was marked.)
25        THE WITNESS: Okay.

Page 90

1  BY MR. SANDBERG:
2  Q.     Exhibit 12 is a letter from Ms. Berry to
3  Mr. Angstman's law office. And it says "We are in the
4  process of completing our evaluation of Angelina
5  Trailov's claim and anticipate responding to your
6  demand by your May 16th, 2003 deadline." This is what
7  the middle paragraph says.
8         Did Kathy Berry tell you there was a
9  May 16th, 2003 deadline?
10 A.     I don't recall.
11 Q.     Do you see any discussion in this e-mail
12 about a May 16th, 2003 deadline?
13 A.     No.
14        MR. WILKERSON: For the record, I'll object
15 to the characterization.
16        MR. SANDBERG: Of what?
17        MR. WILKERSON: It's an incomplete record.
18 This is presenting the witness with an incomplete
19 record and asking her to assume that it's the record.
20        MR. SANDBERG: You mean Exhibit 11?
21        MR. WILKERSON: Twelve.
22 BY MR. SANDBERG:
23 Q.     At the end of May 2003 -- or actually, I'm
24 sorry. On May 16th, 2003, what, if anything, did you
25 know about the May 16th, 2003 deadline?

Page 91

1  A.     I didn't know anything other than I'm
2  reading a home office referral that Kathy sent. Or I
3  read it shortly after May 16th. Obviously, Kathy sent
4  me the referral on the 16th of May.
5  Q.     Now, if Kathy sent you the referral on the
6  16th of May, was there any way, in fact, she could
7  have responded to the demand by the May 16th, 2003
8  deadline?
9  A.     I don't know.
10 Q.     Is there -- could you get a one-day
11 turnaround on a home office referral?
12 A.     The home office referral doesn't necessarily
13 go hand in hand with the demand. So I'm not quite
14 following what you're asking.
15 Q.     Okay. You told me that authority is
16 different than reserves, correct?
17 A.     Correct.
18 Q.     And is there a place we can go to see how
19 much authority Kathy had at any given point?
20 A.     Our office would have had 150,000 authority
21 before we would have to ask home office to give beyond
22 that.
23 Q.     And Kathy would have had 150,000?
24 A.     No, I would have.
25 Q.     So if Kathy wanted 150 -- if Kathy wanted a

Page 92

1  hundred twelve five, would she come to you for
2  authority?
3  A.     At that point in time, yes.
4  Q.     And so prior to May 16th, 2003, had Kathy
5  asked you for a hundred twelve five authority?
6  A.     Not that I'm aware of.
7  Q.     Do you see anything in the file? Take your
8  time and look at that --
9  A.     In the exhibits that have been given to me,
10 no, I don't see anything.
11 Q.     And as far as you're aware, you knew nothing
12 about a May 16th, 2003 deadline on May 16th?
13 A.     I don't believe that was -- that that was in
14 my knowledge, no.
15 Q.     You told me when there's a home office
16 referral there, the local office still possesses
17 authority with limitations, I believe was your word.
18 Can you explain that to me?
19 A.     Up to the $150,000 value.
20 Q.     You still possess that even when there's a
21 home office authority?
22 A.     Yes.
23 Q.     I mean home office referral?
24 A.     Referral.
25 Q.     So on May the 16th if Kathy Berry had come

Page 93

1  to you and said, hey, I got a May 16th deadline on
2  this, can I have a hundred twelve five, assuming she
3  could satisfy you that the file justified it, you
4  could have given her that authority that day?
5  A.     Assuming that the file justified it, I had
6  that authorization, yes.
7  Q.     So why was this a home office referral then?
8  What were you going to get from the home office?
9  A.     The home office referral was to advise them
10 of the serious nature of the claim. And I believe
11 she'll say the specifics, damages exceed office
12 authority.
13 Q.     So this says that reason for referral is
14 that the damages exceed $150,000?
15 A.     That would be the assumption on that. So
16 any possibility that it might exceed the office
17 authority would prompt this.
18 Q.     If we look at page 322 -- I'm sorry -- 522.
19 I ought to put on these little dime store cheaters
20 that I'm reduced to wearing these days. There's an
21 e-mail from Kathy Berry to Joe Grazulis that says
22 "This is a referral coming to you because the claim
23 occurred in Bethel, AK."
24        Is there something about Bethel, AK that
25 would cause a home office referral?

Page 94

1  A.     Again, we discussed venue and values being
2  higher in that area, but that's supposition.
3  Q.     But it wasn't that every claim from Bethel
4  got a home office referral.
5  A.     No.
6  Q.     On this home office referral form, can you
7  tell what day it was created?
8  A.     I don't see a date on here.
9  Q.     Down at the bottom, it says 11/16/04 on the
10 bottom --
11 A.     That's the form. I don't --
12 Q.     I was going to say --
13 A.     That's part of the format.
14 Q.     That would appear on this when it was blank?
15 A.     Yes. I believe that's the case.
16 Q.     Okay. Because, in fact, at this point --
17 A.     It postdates.
18 Q.     -- November 16th, 04 is sometime off in the
19 future, correct?
20 A.     Yeah.
21 Q.     Can we explain that one?
22 A.     This is a template. And it appears
23 someone's got it set up with a footer of home office
24 referral 11/16/04. It doesn't make sense.
25 Q.     Okay. In any event, can you tell what day

Page 95

1  this referral form was generated?
2  A.     Not from the referral form, no.
3  Q.     Would it have been created before the e-mail
4  to you? In other words, would it have accompanied
5  this e-mail that says "Hi, Karen. Here is a new
6  referral on a Bethel claim"?
7  A.     There would have been a referral attached to
8  this e-mail. Is it the exact same referral? I can't
9  specifically state that. There isn't anything that
10 would identify that that's the case.
11 Q.     Can you look at page 32 of our claim manual,
12 the one sitting there?
13 A.     Okay.
14 Q.     Looking at page 32, it appears Mr. Elkins
15 told Ms. Berry to prepare and send home office
16 referral on mandatory referral back on March the 3rd.
17 Do you know -- what, if anything, do you know about
18 why Kathy didn't do that for two months?
19 A.     I don't know.
20 Q.     What would it take to be a mandatory home
21 office referral, just exceed office authority?
22 A.     Not necessarily. Serious injuries. There
23 are a number of potential categories.
24 Q.     By looking at this, can we tell that
25 Mr. Elkins has determined by May the 3rd that the

Page 96

1  value exceeds the office authority?
2  A.     We can't tell that.
3  Q.     Because what other possibilities are there?
4  A.     Could just be the serious injury. I don't
5  see the entire portion of his documentation here. It
6  is redacted.
7  Q.     Okay. I think we've finally come to one
8  then. Let's take a second and see what he had to
9  say.
10 A.     Okay. So he's noticing -- he's noting that
11 there's an alleged brain damage. And the thought
12 process would be potentially serious injury is
13 probably why he wanted it referred. But I don't know
14 specifically what Craig's intent was here.
15 Q.     Does Allstate have guidelines of what
16 constitutes a mandatory home office referral?
17 A.     Yes.
18 Q.     Did Kathy Berry comply with Allstate
19 practices or procedures by taking from May 3rd to --
20 March 3rd to May 16th to prepare the home office
21 referral after being directed by Mr. Elkins?
22 A.     I can't answer that specifically. I didn't
23 have access to the medical records. Craig is saying
24 there's an alleged brain damage. One of the
25 categories is serious injury. I don't know what

Page 97

1 records she had, whether she had additional
2 conversation with Mr. Elkins or not.
3  Q.    Okay. But here it says, please prepare and
4 send home office referral on mandatory referral. And
5 that entry is on March the 3rd, correct?
6  A.    Correct.
7  Q.    And when she actually initiates the process
8 by sending it to you, it's May the 16th, correct?
9  A.    Correct.
10 Q.    Does taking from March the 3rd to May the
11 16th to follow Mr. Elkins' direction to prepare the --
12 let's see. Rather than guessing, let's go back to the
13 one we had, which is Exhibit number 3, the last page.
14       These timeliness guidelines say "When a new
15 claim file qualifies for referral, there must be no
16 delay," et cetera. Then it goes on to say, "Casualty
17 files are to be referred from the Market Claim Office
18 to Home Office within 14 days after the file qualifies
19 for referral."
20 A.    Correct.
21 Q.    So does taking two months plus comply with
22 this standard?
23 A.    Two months is obviously a lot longer than 14
24 days. No. But I don't know what happened in the
25 interim, if there was any other discussion.

Page 98

1  Q.    When the authority to settle this claim --
2 to settle the Trailov claim was finally granted, where
3 did the authority come from? Did it come from you or
4 did it come from the home office?
5  A.    I believe I gave authority to settle the
6 liability portion of the claim.
7  Q.    And looking at the claim diary, can you tell
8 when you did that?
9  A.    That would have been part of this 5/29/03.
10 Q.    Does -- let's see.
11 A.    I don't have the balance of the file to
12 reflect if home office sent an authorization, but this
13 would be within my authorization to extend that.
14 Q.    But do you know if you did, in fact -- if
15 you were the source of the authority to settle or if
16 the home office was?
17 A.    I don't know that by looking at this
18 information, no, not specifically.
19 Q.    Should we be able to tell somewhere from the
20 claim file?
21 A.    There may be an e-mail from the home office.
22 But at this point in time, I had agreed the liability
23 limits on 04 were there.
24 Q.    Were there, meaning Kathy Berry had
25 authority?

Page 99

1  A.    Right. But I clearly requested that she
2 make a recommendation to home office.
3  Q.    Did Kathy Berry possess authority on
4 May 29th, 2003 to offer a hundred twelve five?
5  A.    It's not clear in my notes and I don't
6 recall specifically our conversation. I did ask her
7 to make a recommendation to home office and have --
8 and for Lori to put information in the screens.
9  Q.    The granting of authority should be
10 documented in the claim file somewhere, shouldn't it?
11 A.    Yes.
12 Q.    That would be a mandatory thing to document,
13 correct, the amount of authority granted to an
14 adjuster to settle a claim, at least if it's in excess
15 of that person's everyday walking around authority?
16 A.    Right.
17 Q.    Okay. Well, take just a second then and
18 review the entries around May 29th. And just tell me
19 if you can figure out where Kathy got authority.
20 A.    Well, I clearly agreed on offering the
21 amount. Is there an e-mail from home office at all at
22 that point in time?
23 Q.    I don't know. I think that's it. Those are
24 the only e-mails we've got.
25 A.    Do we have the evaluation consultant

Page 100

1 screens?
2  Q.    In other words, the screen of Lori's
3 evaluation?
4  A.    Yes.
5  Q.    I have never seen that. The only -- I have
6 seen one single entry referring to Lori.
7  A.    I don't see that offhand.
8        MR. WILKERSON: What's he looking for,
9 the --
10       THE WITNESS: Lori's entry.
11       MR. WILKERSON: Can you direct her to Lori's
12 entry?
13 BY MR. SANDBERG:
14 Q.    Yes. I'm sorry. I need to go grab it. Oh,
15 here it is, right here.
16 A.    That's my entry. Do you have her entry
17 marked somewhere? That's my entry that you routed me
18 to.
19 Q.    No, then I may not have any. Because that's
20 where I found Lori in the file. We have Colussus
21 assessment. Is that what that would refer to?
22 A.    No.
23       It would be entirely supposition on my part
24 as to what happened at this point in time. I can
25 clearly tell you, I made an entry here that I agreed