ORIGINAL

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ALASKA

3

4    ALLSTATE INSURANCE COMPANIES,

5          Plaintiff,

6    vs.

7    CHARLES HERRON,

8          Defendant.
     _____)

9
     NO: A04-0043 CV (JKS)
10

11

12

13

14              DEPOSITION OF KATHY BERRY

15              Volume I -- Pages 1-68

16    Friday, September 30, 2005, 2:08 p.m.

17              Anchorage, Alaska

18

19

20          **Alaska Stenotype Reporters**
               511 West Ninth Avenue
21             Anchorage AK 99501-3520
              *Serving Alaska Since 1953*
22

                                    Telephone 907.276.1680
                                    Email AkSteno@aol.com
23   Rick D. McWilliams, RPR, Ret.       Fax 907.276.8016
     Fred M. Getty, RPR, Ret.
24

25                                      EXHIBIT 8

                                             1

         ALASKA STENOTYPE REPORTERS   907 276-1680

COPY

ORIGINAL

RECEIVED
JAN 1 3 2006

1    exactly.

2    Q.        Okay.  What unit are you in?

3    A.        I'm in what would be called the represented

4    unit.

5    Q.        So that when a claim has a lawyer attached

6    to it, it comes to you?

7    A.        Correct.

8    Q.        And are you in some particular line of

9    claims?  I mean, property, Workers' Comp?

10    A.        No, just bodily injury, auto accidents, for

11    the most part.

12    Q.        Okay.  If I asked you today how many open

13    claims are pending that are your responsibility, how

14    many -- what would you tell me?

15    A.        I would say about 120 at my desk.

16    Q.        If I asked you that question for 2002 or

17    2003?

18    A.        My guess would be about the same.

19    Q.        Okay.  If we may, let's start with our

20    folder in front of you.

21    A.        Okay.

22    Q.        Take a look at page 240.

23    A.        Okay.

24    Q.        What are we looking at?

25    A.        This is a transfer sheet.  This gets placed

7

1   concerning the Y-K Hospital with this?

2   A.          I don't know what came with this.

3   Q.          In any event, from the claim file -- well,

4   let me back up a little bit.  Allstate would want to

5   assemble its own medical records in any event,

6   wouldn't it?

7   A.          Again, sometimes that's the case and

8   sometimes it's not.

9   Q.          And when is it and when is it not?  What's

10  the difference?

11  A.          Well, there are those plaintiffs' attorneys

12  who won't provide us the authorization to get those

13  records.  So in those cases, we're obviously dependent

14  on them to provide them to us.

15  Q.          And in this instance, though, you had

16  received one from the Angstman law firm, correct?

17  A.          Right.

18  Q.          Okay.  And so in this instance, then, you

19  would normally expect to assemble your own medical

20  records, correct?

21  A.          Right.

22  Q.          And so do we see -- other than sending the

23  one letter to the Y-K Hospital on January 17th, 2003,

24  do we see -- or when do we next see you doing anything

25  to assemble medical records?

34

1           Well, let's see.

2   A.      It looks like it's March 18th, 2003.

3   Q.      Okay.  I want to stay with the track just a

4   little more on back in January.  On January 17th,

5   2003, take a look at 202 -- I'm sorry -- number 202?

6   A.      Okay.

7   Q.      We can see you write to Michele and send her

8   a copy of a special ANMC release.

9   A.      Yes.

10  Q.      And then at 262, we can see it's come back.

11  Actually, take a look at 261 also.

12  A.      Right.  Okay.

13  Q.      It says -- so on February 6th, 2003, the

14  Angstman law firm sent you a copy of the ANMC release,

15  correct?

16  A.      Correct.

17  Q.      Okay.  And then if we look at 263, it

18  appears that was received by Allstate on February

19  10th, 2003?

20  A.      Logically, it would appear that way.

21  Q.      You have handled other claims involving --

22  I'm sorry.  Have you.  Have you handled other claims

23  involving the Alaska Native Medical Center over the

24  years?

25  A.      Yes.

35

1   Q.        So basically, what he's thanking you for is

2   simply a copy of the demand letter?

3   A.        Right.

4   Q.        And it says "Please prepare and send HO

5   referral on mandatory referral" given allegation of

6   brain damage.  What's HO referral?

7   A.        Home office referral.

8   Q.        And what's a manditory referral?

9   A.        There's certain injuries that they require

10   that they were sent on.

11   Q.        When a claim has been identified as a HO

12   referral file, how promptly is the referral supposed

13   to happen?

14   A.        It's supposed to go out in 14 days.

15   Q.        So if you were following your instructions

16   from Mr. Elkins, there would have been a referral by

17   March the 17th, 2003?

18   A.        Right.

19   Q.        Did you do that?

20   A.        I did not do it at that time.

21   Q.        Why not?

22   A.        I don't know.

23   Q.        It continues, "Also suggest you raise your

24   reserve on 04."  That would be Ms. Trailov?

25   A.        Right.

1   Q.        That's not a document or a thing?

2   A.        No.

3   Q.        Below, it says "Sent to:  DHTT."  Is that

4   you?

5   A.        Yes.

6   Q.        Now, we've already seen that you -- well,

7   first of all -- I'm sorry -- when you received this

8   instruction, did you tickle the file for 14 days so

9   that you'd know it was time to send the referral?

10   A.        I don't believe I did.

11   Q.        Would you normally do that?

12   A.        Not necessarily.

13   Q.        You did return to the file 14 days later,

14   correct?  We've seen that previously.

15   A.        Fifteen days later, yes.

16   Q.        Take a look at 83.  If you look at the top

17   of 83, we see a system-generated letter to the Medical

18   Records Department of Alaska N, whatever that is --

19   A.        Uh-huh.

20   Q.        -- dated 3/17.

21   A.        Yes.

22   Q.        So you did return to the file 14 days later?

23   A.        Right.

24   Q.        Did you -- on March the 17th, 2003, did you

25   realize you had not sent the home office referral?

54

1  A.          I don't know.

2  Q.          At any time between March 17th -- I'm sorry.

3  At any time between March 3rd, 2003 and May the 16th,

4  2003, did you remember that you had not sent the home

5  office referral?

6  A.          I don't know.

7  Q.          Had you tickled the home office -- the

8  instruction to prepare a home office referral for any

9  particular time?

10 A.          No.

11 Q.          So as far as you know when we sit here

12 today, you just forgot?

13 A.          I would believe so.

14            MR. SANDBERG:  It's 4:00 o'clock, Mark.

15 Let's take our last break for the day.

16            (Brief recess.)

17 BY MR. SANDBERG:

18 Q.          Back on record, if we may.  Okay.  Kathy, on

19 3/18 --

20            MR. WILKERSON:  Date or number?

21 BY MR. SANDBERG:

22 Q.          I'm sorry.  3/18/03, March 18th, 2003, you

23 wrote a letter.  I don't know where that is in the

24 claim file.  193, Mr. Mestas says.

25            MR. WILKERSON:  She's there.

1  sending out excess letters?

2  A.        I don't know if Allstate has a form.

3  Q.        Do you have a form for sending excess

4  letters?

5  A.        I have one that I normally use, yes.

6  Q.        This isn't it, is it?

7  A.        No.

8  Q.        At any time in your handling of this claim,

9  did you ever send Charles Herron an excess letter?

10  A.        No.

11  Q.        Why not?

12  A.        Because I never felt like this claim was in

13  excess of the policy.

14  Q.        You never felt that there was an exposure to

15  Mr. Herron in excess of the policy limits?

16  A.        No.

17  Q.        As of February 18th, 2003, Allstate was in

18  receipt of a demand for the policy limits, correct?

19  A.        Right.

20  Q.        Do you believe an excess letter should have

21  gone out at that time?

22  A.        No.

23  Q.        When is it appropriate to send an excess

24  letter, in your opinion?

25  A.        In a case where, for instance, someone has

ALASKA STENOTYPE REPORTERS   907 276-1680

1    $200,000 in medical bills, multiple broken bones

2    within -- you know, 200,000 in bills of maybe within

3    ten days of the accident or something like that

4    where -- and the person maybe has a $50,000 policy.

5    Q.         So is it your normal practice that you would

6    only send an excess letter where it is clear that the

7    case is in excess of the policy limits?

8    A.         I would say if there's a high probability

9    it's in excess of policy limits.

10   Q.         So your normal practice is you would send

11   out an excess letter when it becomes evident to you or

12   to Allstate that the claim is highly probably -- or

13   there's a high probability the claim is in excess of

14   the policy limits?

15   A.         Right.

16   Q.         And otherwise, you would not.

17   A.         Right.

18   Q.         In any event, returning to this particular

19   file, I believe you told me you didn't think this was

20   an excess claim.

21   A.         Right.

22   Q.         And as of March the 18th, 2003, had you

23   evaluated the claim?

24   A.         No.

25   Q.         As of May the 16th, 2003, had you evaluated

1    the claim?

2    A.        I had read through the claim, yes.

3    Q.        Do we see you documenting anything about

4    value -- or I'm sorry -- documenting an evaluation to

5    the claim file at any point here?

6    A.        No.

7    Q.        Ever?

8    A.        Possibly towards the end of May, but I don't

9    remember.

10   Q.        On May -- on March the 18th, 2003, would you

11   have had the claim file physically in order to write

12   this letter to Mr. Herron?

13   A.        Yes.

14   Q.        So on March the 18th, 2003, did it come to

15   your attention that this was supposed to be a home

16   office referral?

17   A.        Well, Craig, I believe, had already put in a

18   CDS entry stating that.

19   Q.        Okay.  And so on March the 18th, 2003 -- all

20   I'm asking is, did the fact you were supposed to have

21   been sending in a home office referral on this file

22   come to your attention on March the 18th?

23   A.        I don't know.

24        MR. SANDBERG:  Off record.

25        (Telephonic interruption.)