1   BY MR. SANDBERG:

2   Q.        On March the 18th, 2003, would you have
3   reviewed the screens we've been looking at prior to
4   writing this letter to Mr. Herron?

5   A.        Probably.

6   Q.        So if you had reviewed them, presumably you
7   would have seen the instructions from Mr. Elkins to
8   make the home office referral?

9   A.        If I reviewed them, yes.

10  Q.        But as we sit here today, you just don't
11  know one way or the other?

12  A.        Right.

13  Q.        Go to 203, if you would.  203, we're looking
14  at a letter to you from Ms. Power --

15  A.        Yes.

16  Q.        -- dated December the 10th, 2002 and
17  received December 11th, 2002?

18  A.        Right.

19  Q.        And it says that Angelina Trailov will be
20  examined by a neuropsychologist on December 17th,
21  2002?

22  A.        Right.

23  Q.        Did you ever make an effort to determine
24  whether that happened?

25  A.        I don't believe I asked her about that, no.

1  Q.         Did you ever make an effort to obtain those
2  records?
3  A.         We didn't know who he was, he or she.
4  Q.         Either by correspondence or by picking up
5  the phone, did you ever ask Michele Power who the
6  neuropsychologist was?
7  A.         I don't believe so.
8  Q.         Why not?
9  A.         I don't know.
10 Q.         This letter, presumably, would have been in
11 the file had you reviewed it any time after
12 December 11th, 2002.
13 A.         Right.
14 Q.         So what, if anything, can we determine
15 whether you actually reviewed the physical file after
16 December 11th, 2002 from that?
17 A.         Just one moment. I'm looking for something.
18 Q.         Sure. Take your time.
19 A.         I would have looked at the physical file
20 before I sent the letter of March 18th, because I knew
21 which records we had and which ones we didn't have.
22 Q.         And if you looked at the physical file on
23 March 18th, 2003, this letter would have been in
24 there, correct?
25 A.         Right.

1  Q.          And can we assume then you just didn't see
2  this letter because this isn't listed in your items
3  that you have or don't have?
4  A.          I don't know why it wasn't addressed.  I
5  don't believe Michele Power's demand letter mentioned
6  that she went to see a neuropsychologist.  So I -- if
7  it had been in the demand letter -- at least what I'm
8  seeing, it's not in here -- it would have been more
9  likely I would have asked about it.
10 Q.          The instruction to make the mandatory home
11 office referral related to allegations of brain
12 damage?
13 A.          Right.
14 Q.          And a neuropsychologist is one place a
15 person goes for an evaluation of whether or not there
16 has been brain damage, correct?
17 A.          Correct.
18 Q.          I have one other question -- I'm sorry --
19 about that.  In Exhibit 203, it says please provide me
20 with a copy of Charles Herron's insurance policy at
21 your earliest convenience.
22 A.          Right.
23 Q.          Did you do that?
24 A.          I believe I did that in January.  Yes.  See
25 202.

Page 69

IN THE UNITED STATES DISTRICT COURT

FOR THE STATE OF ALASKA

ALLSTATE INSURANCE COMPANIES,   )
                                )
            Plaintiff,          )
                                )
    vs.                         )
                                )
CHARLES HERRON,                 )
                                )
            Defendant.          )
_____)
Case No. A04-0043 CV (JKS)

DEPOSITION OF KATHY BERRY

Volume II, Pages 69 - 143
Tuesday, March 14, 2006
1:35 P.M.

Taken by Counsel for Defendant
at
SANDBERG, WUESTENFELD & COREY
701 West Eighth Avenue, Suite 1100
Anchorage, Alaska



ORIGINAL COPY

RECEIVED MAR 29 2006

Page 72

1  ANCHORAGE, ALASKA; TUESDAY, MARCH 14, 2006
2              1:35 P.M.
3               -o0o-
4            KATHY BERRY,
5     deponent herein, being sworn on oath,
6     was examined and testified as follows:
7          CONTINUED EXAMINATION
8  BY MR. SANDBERG:
9     Q   Ms. Berry, when we ended your prior
10 deposition because we were out of time for that day,
11 we were at March 26, 2003, in terms of our chronology
12 of the claim handling.
13        And just to give you a sort of preview of
14 coming attractions, the way I plan to ask questions
15 today is to pick up essentially at that point, walk
16 the story to the end, and then visit some of the
17 documents that have been produced since the time of
18 your deposition. So we may get out of sequence at the
19 end of your deposition, but it'll be because I'm
20 trying to clean up. You know, rather than going back
21 and sticking them in now, we'll just put all of those
22 at the end.
23    A   Okay.
24    Q   So what I would like to do is hand out --
25 let's go off record for a second and talk about how we

Page 73

1  deal with the exhibits.
2        (Off the record.)
3        MR. SANDBERG: Back on record.
4  BY MR. SANDBERG:
5     Q   In the documents I'm handing you here, this
6  set, would you look at Mr. Valcarce's letter of March
7  26, 2003. It's the second page, and I believe it
8  should be 191.
9     A   Right.
10    Q   Now, this is where I believe we left off the
11 last time, was March the 26th. So as of March the
12 26th, you knew that Mr. Valcarce was Charles Herron's
13 attorney, correct, or whenever this letter -- I'm
14 sorry. Let me back up.
15       Can we find receipt of the Valcarce letter in
16 the claim log?
17       MR. MESTAS: What's the number?
18       MR. SANDBERG: The document is 191.
19    A   I don't see that it was -- a mention of it
20 was put into CDS.
21 BY MR. SANDBERG:
22    Q   Okay. Since it is in the claim file, do you
23 have any reason to believe that you did not receive
24 it?
25    A   No.

Page 74

1     Q   When you would receive a letter from someone
2  like Mr. Valcarce, who indicates that he is counsel
3  for an insured, what would be your normal practice for
4  noting that in the file?
5     A   Sometimes I would put it into CDS. It's kind
6  of an unusual circumstance, though.
7     Q   As we sit here today, is there any reason you
8  can recall why this letter was not noted?
9     A   I don't necessarily note every piece of
10 correspondence that I get.
11    Q   Was Mr. Valcarce's announcement that he was
12 Charles Herron's lawyer noted in the claim file some
13 other way?
14    A   I think that -- I think it was noted early
15 on, because he was the criminal attorney; I think his
16 name might have been in there earlier on. But was it
17 added into any kind of list or anything? No.
18    Q   Is it safe to say that shortly after March
19 26th, 2003, Allstate was aware that Mr. Valcarce was
20 the personal counsel for Mr. Herron?
21    A   Yeah. Well, since he puts "I write in
22 response to your letter to my client," I would assume
23 that from that, yes.
24    Q   And looking at that letter, which appears at
25 191, it appears to have been faxed from Hedland

Page 75

1  Brennan Heideman & Cooke to Allstate, correct?
2     A   It looks that way, yes.
3     Q   The next letter I'd like you to take a look
4  at, then, is Bates 188, which is next in your packet,
5  I hope.
6     A   Yes.
7     Q   And can you identify this exhibit for me.
8     A   It looks like a letter from Michele Power to
9  me.
10    Q   Can we find receipt of this letter documented
11 in the log somewhere?
12       MR. MESTAS: What number is that one?
13       MR. SANDBERG: 188.
14    A   I don't think it's documented.
15 BY MR. SANDBERG:
16    Q   On the second page of that letter, it states,
17 "If your review of the files suggests otherwise";
18 that's where I'm going now, and I'd like you to focus
19 on the sentence that says: "While the offer dated
20 February 14, 2002 remains open, it will be revoked on
21 May 16, 2003 and a complaint will be filed unless
22 there is some discussion regarding prefiling
23 resolution."
24       First of all, have I correctly read that
25 sentence?

Page 76

1   A   Yes.
2   Q   What, if anything, did you do in response to
3   receipt of this letter?
4   A   I don't recall.
5   Q   It appears on page 188 that the letter was
6   received on April 4th, if I'm reading this correctly.
7       MR. MESTAS: April 14th probably.
8   BY MR. SANDBERG:
9   Q   I'm sorry, April 14th.
10  A   Uh-huh, yes.
11  Q   It looks like the one has kind of slid down,
12  but it couldn't have been April 4th, could it,
13  obviously. It must be April 14th.
14  A   Uh-huh.
15  Q   Okay. In any event, is any response to this
16  letter documented in the claim log?
17  A   Well, I think I responded to that letter on
18  May 9th.
19  Q   Okay. How about between April 14th and May
20  9th is any response to this letter documented in the
21  claim log?
22  A   No.
23  Q   As we sit here today, can you recall anything
24  that you did between April 14th and May 9th in
25  response to this letter?

Page 77

1   A   I believe I reviewed the file.
2   Q   And is that documented in the claim log?
3   A   No.
4   Q   During your last deposition, we saw, when the
5   February 14th demand letter arrived, that you routed
6   the letter and some other paper through Mr. Elkins.
7   Do you recall that discussion?
8   A   Yes.
9   Q   Okay. When this letter arrived, did you
10  route this letter through Mr. Elkins?
11  A   I don't think that I did.
12  Q   Did you tell Mr. Elkins that the open demand
13  would be revoked on May 16th, 2003 unless certain
14  things happened?
15  A   I don't recall any discussions with him.
16  Q   Are you at all familiar with the demand log
17  that Mr. Elkins kept for open demands?
18  A   I know there is one.
19  Q   Did you have any responsibility for
20  generating the demand log?
21  A   No.
22  Q   Did you have any responsibility for altering
23  or amending the demand log when circumstances changed?
24  A   Do you mean actually typing it into the
25  computer or whatever, the manual or whatever it was?

Page 78

1   Q   Yes.
2   A   No.
3   Q   In the ordinary course of events, would you
4   have notified Mr. Elkins when you received a letter
5   like this one that in any way modified an open demand?
6   A   Generally, probably not.
7   Q   As we sit here today, is there a reason that
8   you did not tell Mr. Elkins that this letter was
9   received?
10  A   I think because he was already aware of the
11  demand itself.
12  Q   Okay. When this letter was received, did you
13  evaluate Angelina's claim?
14  A   I would say that I did, yes.
15  Q   And can we find that documented in the claim
16  file?
17  A   No.
18  Q   Do you have a specific recollection of
19  documenting Angelina's claim?
20  A   Do you mean reviewing it?
21  Q   I'm sorry, I didn't mean documenting it, I
22  meant of evaluating her claim.
23  A   Well, I know that I did, because then I
24  passed it on to Lori Barra.
25  Q   That was in the second half of May?

Page 79

1   A   I believe it was probably right around that
2   May 9th date.
3   Q   Okay. Well, let's stay on our chronology, if
4   we may, because I confuse easily.
5       Between April 14th, 2003 and May 9th, 2003,
6   is there any documentation in the claim file that you
7   evaluated Angelina's claim?
8   A   No.
9   Q   Between April 14th, 2003 and May 9th, 2003,
10  do you have a specific recollection that you did in
11  fact evaluate Angelina's claim?
12  A   I don't have a specific recollection. I can
13  only assume that I did.
14  Q   When the letter of April 10th arrived, we're,
15  what -- October, November, December, January,
16  February, March, April -- seven months post-accident?
17  A   September to April, yeah.
18  Q   And I forget when you were assigned the
19  claim, but it was about December?
20  A   No. I believe I got it at the end of
21  September, maybe.
22  Q   Okay. So you had been on the claim at least
23  six months by the time this letter arrived?
24  A   Yes.
25  Q   And I believe we previously established that

Page 80

1 the file didn't contain evidence medical records were
2 received later than March 26th, 2003, correct?
3    A    Well, I would change that now, because her
4 letter says "see enclosed medical records," this
5 letter of April 10th. So apparently there were some
6 type of other medical records enclosed with it.
7    Q    And where are you reading from?
8    A    At the top of 189.
9    Q    Oh, okay. As we sit here today, do you have
10 any idea of what medical records were in fact
11 enclosed?
12   A    No.
13   Q    If we went back to the claim file, should we
14 see whatever it was that was attached?
15   A    Possibly, but I would guess not, because
16 generally it's the letter that's date stamped and not
17 each individual record.
18   Q    In any event, let me modify my question to
19 April 14th, then.
20        To the best of your knowledge, did Allstate
21 receive any medical records regarding Angelina Trailov
22 after April 14th, 2003?
23   A    Not to my knowledge.
24   Q    So by April 14th, 2003, you had all the
25 medical records available that you were ever going to

Page 81

1 have available prior to the time an offer was
2 extended, correct?
3    A    "Ever" is a strong word. I don't know,
4 because I probably had no way of knowing that there
5 could be something else out there.
6    Q    That's probably a poor question, then. All I
7 meant is: Allstate did make an evaluation and a
8 decision to make an offer in May, correct?
9    A    Right.
10   Q    And all I wanted to establish is that
11 Allstate did not receive additional medical records
12 between April 14th and the time the decision to make
13 an offer was made, to your knowledge.
14   A    To my knowledge, no.
15   Q    Did you calendar this May 16th date?
16   A    I don't know.
17   Q    Did you understand the May 16th, 2003 date to
18 be a deadline?
19   A    I knew they wanted a response by then, but
20 she said, "unless there's some discussion otherwise."
21   Q    You did in fact call the May 16th date a
22 deadline, correct?
23   A    Correct.
24   Q    And if we take a look at the next page here,
25 we can see that, at 187. Can you identify 187 for me?

Page 82

1    A    It's a letter from me to Michele Power, dated
2 May 9th, 2003.
3    Q    And the second paragraph states: "We are in
4 the process of completing our evaluation of Angelina
5 Trailov's claim and anticipate responding to your
6 demand by your May 16th, 2003 deadline."
7         First of all, have I read that correctly?
8    A    Yes.
9    Q    So on May 9th, 2003, you understood that as a
10 deadline?
11   A    For lack of a better word, I used that word.
12   Q    What had Allstate actually done prior to May
13 9th, 2003 to evaluate Angelina Trailov's claim?
14   A    In some specific timeframe or during the
15 entire life of the claim?
16   Q    Well, what do you mean when you say "we are
17 in the process of completing our evaluation"?
18   A    At that point, I believe that I had gone
19 through the file, record by record and bill by bill,
20 and was passing it on to Lori Barra to see what she
21 thought the value of it was.
22   Q    And do we find that process documented in the
23 claim log?
24   A    No.
25   Q    What does passing it on to Lori Barra mean?

Page 83

1    A    Giving it to her for her review, to see what
2 her opinion was on it. I don't have the authority
3 to -- I think my authority was $20,000. So I would
4 need more authority to settle for anything over that.
5    Q    Did Lori have policy limits authority at
6 least for this case?
7    A    I don't know. I think she did, but I can't
8 say that for sure.
9    Q    Did Lori have authority to offer 112.5 in May
10 2003, to your knowledge?
11   A    Again, I think so, but I can't say that for
12 sure.
13   Q    And should the process of passing it on to
14 Lori be documented somehow in the claim file?
15   A    Generally it would be documented on a
16 specific screen when I would request authority. In
17 this case, I didn't feel like the case was worth
18 policy limits, but I wanted someone else to look at
19 it, to see if they thought it was.
20   Q    Okay. I'm just trying to understand, how
21 does the request get made?
22   A    Well, under normal circumstances, I would
23 finish the work I had to do on the file, log it into a
24 book that she had, put it in her in-box, and then in
25 one of our screens put in my authority request.

Page 96

1  Lori look at it before May 16th, 2003?
2     A  From what I remember, yes.
3     Q  Can you point me to any place in the claim
4  file that I should be able to find that if that's
5  true?
6     A  I did not document it in the claim file.
7        MR. SANDBERG:  Let's go off record for a
8  second.
9        (Off the record.)
10       MR. SANDBERG:  Back on record.
11 BY MR. SANDBERG:
12    Q  I just want to make sure that I understand,
13 and then I'll stop flogging this horse.  But are you
14 aware of any reason we have not discussed so far that
15 Allstate could not have completed its evaluation of
16 Angelina's claim and been ready to respond to the
17 demand by May 16th, 2003?
18    A  I think we have discussed all of it.
19    Q  Okay.  Turn to the next document in our list,
20 then.
21    A  In this [indicating]?
22    Q  Yes.  It should be 181, and it's a letter
23 dated May 16th, 2003 from you to the Angstman Law
24 office, correct?
25    A  Correct.

Page 97

1     Q  I'm sorry, I need you to flip back one page.
2  I meant to ask you something about that last exhibit,
3  and I forgot.
4     A  Okay.
5     Q  When I look at the bottom of it, I see that
6  it was sent to Margaret Herron and to Charles Herron,
7  correct?
8     A  Right.
9        MR. MESTAS:  What number are we talking
10 about?
11       MR. SANDBERG:  187.
12 BY MR. SANDBERG:
13    Q  Do you know why it was not sent to
14 Mr. Valcarce?
15    A  Probably just an error on my part.  I rarely
16 have anybody that has an attorney, and I generally
17 copy them with all these kinds of letters.
18    Q  So certainly if on May 9th, 2003 you had
19 remembered that Mr. Valcarce was Charles's attorney,
20 you would have sent him a copy?
21    A  Yes.
22    Q  Looking at the cc's here, from that we can
23 assume that you simply forgot?
24    A  Yes.
25    Q  Now let's go to 181, if we may, which is the

Page 98

1  letter I was about to ask you about, which is dated
2  May 16th, 2003.  It's from you to the Angstman Law
3  Office.  The second paragraph says:  "With regard to
4  Angelina's claim, unfortunately our evaluation is not
5  completed today as expected.  Obviously, this is a
6  claim that needs a thorough review, and the policy
7  limits that you have demanded comprise a significant
8  amount of money.  Our evaluation will be completed by
9  the end of the month, and I am hoping to respond to
10 your demand sooner than that."
11       The previous week, you had referred to May
12 16, 2003 as a deadline, correct?
13    A  Yes.
14    Q  Did you contact Ms. Power to ask her if she
15 would grant you an extension?
16    A  Did I ask her for an extension, is that the
17 question?
18    Q  Yes.  That's a better question than mine.
19 Did you ask her for an extension?
20    A  No.
21    Q  Why not?
22    A  Because generally, again, her letter says
23 unless there's further discussion.  And I thought if
24 she -- I would say I had one other time, one time
25 ever, when I sent a letter that said we'll have it

Page 99

1  done by this time, you know, if you have any
2  questions, let me know, where a person said, no,
3  that's not okay.
4        And so since her letter says it's open for
5  further discussion, that's -- I assumed she would
6  contact me if she was not happy with that.
7     Q  Do you actually recall thinking what you just
8  said, or is that simply what you surmise now?
9     A  Well, it was sort of standard procedure.  I
10 just would normally send a letter and say, We should
11 have it to you by this time.  And again, I guess that
12 if they didn't want that or were unhappy or said, I
13 need this in two days, then they would contact me.
14 But that only happened one time before.
15    Q  The week before, you had referred to May 16th
16 as a deadline, correct?
17    A  Right.
18    Q  And then May 16th rolled around and you wrote
19 this letter, correct?
20    A  Right.
21    Q  Is there any reason we haven't talked about
22 yet that you didn't pick up the phone and call Michele
23 and ask her for an extension?
24    A  I wanted it in writing is why it's in a
25 letter form.  Do I have any other reason for not

Page 100

1  calling her? No.
2  Q  Before May 16th, 2003, did you talk to
3  Mr. Valcarce about the value of Angelina's claim in
4  Bethel?
5  A  I don't believe I did.
6  Q  Allstate was aware that Mr. Valcarce was
7  Mr. Herron's lawyer, correct?
8  A  Yes.
9  Q  And Allstate was aware that Mr. Valcarce
10 lived in Bethel, correct?
11 A  Yes.
12 Q  So is there a reason you can think of, as we
13 sit here today, that Allstate didn't contact
14 Mr. Valcarce to solicit input regarding the value of
15 this claim in Bethel?
16 A  I think that we had a pretty good idea of how
17 to evaluate claims in Bethel, and I don't really see
18 that it was something we needed to do in this case.
19 Q  Anything else? I mean, if not, we'll move
20 on, because I want to make sure I understand.
21 A  No.
22    MR. WILKERSON: I just want to make sure your
23 question, I think, Mark, was focused on prior to May
24 16th.
25    MR. SANDBERG: That's right, prior to May

Page 101

1  16th, 2003.
2  BY MR. SANDBERG:
3  Q  Once again on this letter of May 16th, 2003,
4  this doesn't go to Mr. Valcarce either, correct?
5  A  Right.
6  Q  So should we assume this is a mistake once
7  again?
8  A  Yes.
9  Q  Had you told Mr. Valcarce ever about the May
10 16th, 2003 deadline?
11 A  I don't believe so.
12 Q  Had you told Mr. Valcarce, prior to May 16th,
13 2003, that Allstate was not in a position to respond
14 to that deadline?
15 A  No.
16 Q  In the ordinary course of events, would you
17 expect that Allstate should be able to evaluate a
18 bodily injury claim within a month of the last receipt
19 of documents?
20 A  Possibly.
21 Q  If it wanted to?
22 A  Well, I think there are a lot of factors that
23 go into that.
24 Q  Such as?
25 A  Such as: Are people there to evaluate the

Page 102

1  claims. Some claims obviously take quite some time to
2  evaluate. Are there discussions about it, as in this
3  case where it's not clear cut, and maybe there will
4  have to be some discussions about that.
5  Q  And I'm glad you reminded me, because I
6  should have asked you. Do you have any reason to
7  believe you were gone for a significant part of the
8  time between April 14th and May 16th, 2003?
9  A  I don't think so. I don't recall being gone
10 then.
11 Q  The home office referral sheet that we looked
12 at a while ago dated May 16th, 2003, is that the same
13 home office referral that Mr. Elkins had directed you
14 to do several months before?
15 A  Yes.
16 Q  As we sit here today, is there any reason you
17 can tell me why it took you several months to actually
18 make the home office referral?
19 A  No, I don't know why.
20 Q  Allstate's guidelines provide that that
21 should be done within 14 days, correct?
22 A  Right.
23 Q  Were there potential consequences of not
24 following the 14-day home office referral procedure?
25 A  No, I don't think so. I don't know of them.

Page 103

1  Q  Well, let me ask that differently.
2     Had you been trained that home office
3  referrals were to be made within 14 days when the
4  referral was mandatory?
5  A  Yes.
6  Q  Okay. Were you trained that there would be
7  potential consequences of not following that
8  procedure, either for you or for anybody else?
9  A  None that I -- specific consequences? None
10 that I know of.
11 Q  If we flip your little book there, we come to
12 180, which brings us to May 20th, 2003, and this is an
13 e-mail from Mr. Grazulis to you?
14 A  Yes.
15    MR. WILKERSON: For the record, this appears
16 to mirror 703522, which is in the packet that
17 Mr. Mestas gave you.
18    MR. SANDBERG: Okay.
19 BY MR. SANDBERG:
20 Q  Looking at about the middle of this, it says:
21 "I will refrain from comment until the MCO is in a
22 position to make a value recommendation."
23    First of all, have I read that correctly?
24 A  Yes.
25 Q  Can we, from that, infer that as of May 20th,

Page 112

1  Q  Okay. But --
2  A  I know I wasn't at the office at 7:00 that
3  night.
4  Q  That's what I was going to ask. You don't
5  have to be able to explain this, I was just wondering
6  whether you could explain why it says 7:09 p.m. on
7  this, and that's your best guess?
8  A  Yes.
9  Q  Okay. When mail was opened, like this letter
10 from Mr. Johnson, what was the process at the
11 Anchorage MCO for getting letters from the mailroom to
12 your attention?
13 A  It would go from the receptionist, who does
14 the mail, and then we have a bank of mailboxes out in
15 a hallway area. And it would be put into my mailbox.
16 Q  Okay. And would the receptionist do that
17 every day?
18 A  I think so.
19 Q  So if Mr. Johnson's letter was received on
20 May the 30th, can we assume that it would have hit
21 your mailbox on May the 30th?
22 A  I don't know that we can assume that. Our
23 mail goes out at 3 -- or we have to have it to the
24 person who does the postage and stuff by 3, and it
25 gets picked up sometime after that. So I don't know

Page 113

1  if it would come up to me that day or not.
2  Q  Okay. Well, looking at the next page in our
3  sequence, No. 177, we see an envelope from
4  Mr. Johnson's law firm, showing a May 30th, 2003
5  received stamp, correct?
6  A  Right.
7  Q  So if that letter was received at Allstate on
8  Tudor Road on May the 30th, 2003, should it have hit
9  your mailbox that day?
10 A  I don't know if it would have hit my mailbox
11 that day or the next workday. I don't know what the
12 timeframe is from what they get date stamped to when
13 they come to our mailbox.
14 Q  In any event, would this letter -- would a
15 letter like Mr. Johnson's get routed to someone else
16 in between the receptionist and your mailbox?
17 A  I know that Craig looks at some of the mail
18 now, but I don't know that he was at this time. I
19 don't know that answer.
20 Q  Is there any way, you're aware of, that we
21 can tell whether or not Allstate had Mr. Johnson's
22 letter prior to 4:12 p.m. on May 30th, 2003?
23 A  No.
24 Q  Would you agree that from the received stamp
25 on the envelope and the received stamp on the letter,

Page 114

1  that Allstate had Mr. Johnson's letter on May 30th,
2  2003?
3  A  Yes.
4  Q  And whether or not Allstate had Mr. Johnson's
5  letter before 4:12 depends on when the mail showed up
6  that day?
7  A  And when someone worked the mail.
8  Q  In any event, your recollection is that you
9  had not seen Mr. Johnson's letter before you sent your
10 letter to Ms. Power, correct?
11 A  Right.
12 Q  From who did you receive authority to make
13 the offer that's set out on May 30th, 2003?
14 A  I don't know. I don't know if that was Lori
15 or Karen.
16 Q  Is this a form letter?
17 A  The one that I sent out?
18 Q  Right.
19    MR. WILKERSON: 178?
20    MR. SANDBERG: 178, I'm sorry.
21 A  No, it's not a form letter. It's the style I
22 generally use, but it's not a form letter.
23 BY MR. SANDBERG:
24 Q  Right. I mean, somewhere I've been provided
25 with a series of stock Allstate letters used for

Page 115

1  various purposes. This is not one of them, correct?
2  A  No. It's not a fill-in-the-blank type of
3  letter.
4  Q  The second paragraph says: "At this time we
5  are prepared to offer the $100,000 face value of the
6  Herron's auto policy, plus Rule 82 attorney fees of
7  $12,500, for a total of $112,500 as full and final
8  settlement of Ms. Trailov's bodily injury claim."
9     First of all, have I correctly read that
10 sentence?
11 A  Yes.
12 Q  Does full and final settlement of
13 Ms. Trailov's bodily injury claim include her ability
14 to make a UIM claim?
15 A  No.
16 Q  Does this letter say that somewhere?
17 A  It says "of her bodily injury claim," but no,
18 it doesn't address her UIM claim.
19 Q  Is her UIM claim not for bodily injury?
20 A  It is. But in my mind, it's a different
21 thing. It would say, if I was saying that, I would
22 say "and her underinsured motorist claim."
23 Q  Well, let me ask the converse. Does this
24 letter somewhere say that Angelina Trailov could still
25 bring a UIM claim?

Page 116

1   A   No.
2   Q   Or that Allstate had consented to Angelina
3   Trailov settling and pursuing UIM?
4   A   No.
5   Q   As of May 30th, 2003, had you opened a U
6   claim?
7   A   I apparently did not, looking back on it.
8   Q   On May 30th, 2003, if this had been accepted,
9   was it your intention to hunker down and see if they
10  ever made a U claim?
11  A   I assumed they would make a U claim if they
12  took this money. I assumed they would take the money
13  in the first place.
14  Q   Can you point me to any piece of
15  correspondence or any conversation between you and
16  Michele Power on or before May 30th, 2003 that refers
17  to UIM benefits?
18  A   No.
19  Q   To continue down our stack of documents here,
20  then, if you would, we come to 173.
21  A   Okay.
22  Q   This is a letter from you to Mr. Herron?
23  A   Right.
24  Q   And it says: "Enclosed is a copy of a letter
25  we have received from the Law Offices of Dennis M.

Page 117

1   Mestas and our response to it."
2       And then do we see the response to it as the
3   next document there, 170?
4   A   Yes.
5   Q   Okay. So what Mr. Herron would have received
6   is 173 plus 170?
7   A   Yes. And a copy of the letter from
8   Mr. Mestas's office.
9   Q   Okay. Once again we don't see Mr. Valcarce
10  among the people being copied, do we?
11  A   Right.
12  Q   Why not?
13  A   I think I just did not have it in my brain
14  that the insured was represented.
15  Q   Would you, once again, agree that that was a
16  mistake?
17  A   Yes.
18  Q   And the same question for 170, since we don't
19  see Mr. Valcarce carbon-copied on that as well?
20  A   Right.
21  Q   And then at 174 we're looking at another
22  letter from you to Michele Power, correct?
23  A   Yes.
24  Q   June 4th, 2003, asking whether Mr. Johnson is
25  in fact co-counsel?

Page 118

1   A   Yes.
2   Q   And did Ms. Power give you a response?
3   A   I believe that she did, but I don't see it
4   here.
5   Q   You're right and you're right. She did and
6   it's not here.
7   A   Thank you.
8   Q   The next thing that is here is a letter from
9   Mr. Wilkerson's office on June 18th, 2003?
10  A   Yes.
11  Q   Did you hire Mr. Wilkerson's office?
12  A   I called Mark about the case, yeah.
13  Q   And is that documented in the claim file?
14  A   I don't see it in what I have here, but this
15  ends on 6/4/03.
16      MR. WILKERSON: I'll represent to you, Mark,
17  it would have been redacted as attorney-client.
18      MR. SANDBERG: Okay.
19  BY MR. SANDBERG:
20  Q   Did you hire the Wilkerson law firm?
21  A   Allstate did.
22  Q   And whose lawyer did Allstate hire the
23  Wilkerson law firm to be?
24  A   I don't know that there was a discussion
25  about whose lawyer he was going to be. I don't

Page 119

1   remember.
2   Q   Was he to be the lawyer for Mr. Herron or was
3   he to be the lawyer for Allstate?
4   A   I don't know the conversation. I remember I
5   called Mark to --
6       MR. WILKERSON: Don't reveal conversations we
7   had.
8       THE WITNESS: Thank you.
9   BY MR. SANDBERG:
10  Q   As we sit here today, can you tell me whose
11  lawyer Allstate hired Mr. Wilkerson to represent?
12  A   I can't. I don't know.
13  Q   I think I cabollixed that question because
14  it's getting late in the day.
15      As you sit here today, can you tell me who
16  Mr. Wilkerson was hired to represent, is what I should
17  have asked.
18  A   I don't recall the conversation about that.
19  Q   After Mr. Wilkerson was hired, can you
20  describe for me generally what your involvement with
21  Angelina's claim was? I mean, we're kind of coming to
22  the end here, so maybe you can just summarize for me
23  what happened after Mr. Wilkerson was hired.
24  A   Mr. Valcarce called me and he was going to be
25  CHI counsel for Mr. Herron, I believe.

15 (Pages 116 to 119)

Page 124

1  it, which is, once again, amount high, 112.5, and
2  amount 112.5 low?
3     A   No.
4     Q   That would be Lori?
5     A   Probably.
6     Q   And then if there are comments, we don't
7  appear to have them?
8     A   They're on the next page.
9     Q   Oh, okay. Got it.
10        So are these your comments that we're looking
11 at?
12    A   No. These are Lori's comments.
13    Q   Starting near the top, I'd kind of like you
14 to translate for me, if we may.
15    A   Okay.
16    Q   First of all, ALB, would that be Lori Barra?
17    A   Yes.
18    Q   And 7:41 p.m., can we assume that's probably
19 Chicago time?
20    A   I'm guessing. I can't say for sure.
21    Q   Okay. Now, that's roughly the same time as
22 the fax on May 30th that we saw, correct, where it
23 said 7-something as well?
24    A   Yeah. I think it said 7:09.
25    Q   Okay. In any event, here it says: "Reviewed

Page 125

1  file for authority"?
2     A   Uh-huh, right.
3     Q   And then: "Routed file to FPE to review." I
4  knew once, but I've forgotten. What's an FPE?
5     A   I think it's a front-line performance expert,
6  maybe.
7     Q   Do you know who is the FPE?
8     A   That would be Karen Petersen.
9     Q   And then it says: "Based on FPE 5/29
10 comments," which I think we can find -- can we find
11 the FPE 529 comments in the claim log?
12    A   I think so.
13    Q   Okay. So based on Karen's comments in the
14 claim log, authority of 112.5 was granted on AA04.
15 And 04 is Angelina, correct?
16    A   Right.
17    Q   So can we tell from this, is Lori actually
18 the person who granted the 112.5 authority?
19    A   I would say that she is.
20    Q   And can we tell from this, as to this and
21 Karen Petersen's prior entry, when Lori first got
22 involved in the evaluation process?
23    A   We can't tell from this.
24    Q   Do we have any way in the claim file to tell
25 whether it was before May 29th, 2003?

Page 126

1     A   No. I don't think so, no.
2     Q   Looking about three-fourths of the way down
3  here, it says: "At this point, claimant's attorney
4  has not given notice of intent to pursue a UIM."
5         Do you know whether or not that's information
6  that Lori received from you?
7     A   I don't know.
8     Q   Is there any other way you can think of that
9  Lori would have learned that except from you?
10    A   Well, she read the claim file.
11    Q   Okay. So she could have simply come to her
12 own conclusion that nobody had asked for a UIM yet?
13    A   Yes.
14    Q   That there was nothing in the claim file
15 regarding UIM?
16    A   Yes.
17    Q   And then the final part down there, it says:
18 "Attempted to access PF8."
19        What's a PF8?
20    A   I'm not sure if she's talking about this
21 screen. I'm not sure.
22    Q   Okay. And then it says: "Unable to without
23 entering value into the SU."
24        SU, I believe, is the U coverage?
25    A   Right.

Page 127

1     Q   "As the SU was opened subsequent to the
2  5/30/03 review of the AA claim."
3         The AA claim is the bodily injury claim?
4     A   Yes.
5     Q   "Therefore, entered zero at this time only to
6  access."
7         Let's keep going through these documents, if
8  we may, Kathy, in the time I have left with you.
9         4618 is something that's been produced to us
10 since your prior deposition. Can you tell me what it
11 is?
12    A   It looks like an excess letter.
13    Q   Is this a form that you use for sending out
14 excess letters?
15    A   It looks like it. The typeface is different,
16 and that's throwing me off a little bit. But yeah, it
17 does.
18    Q   Okay. And in Angelina Trailov's claim, did
19 you ever send Mr. Herron an excess letter like this --
20 I'm sorry. Strike the "like this." Did you ever send
21 Mr. Herron an excess letter?
22    A   I don't think so.
23    Q   Let's continue, then, if we may. 4624 is
24 what, if you can tell me?
25    A   If I can tell. I don't know. It's one of