Mark E. Wilkerson, Esq.
Wilkerson Hozubin
310 K Street, Suite 405
Phone: 907 276-5297
Fax: 907 276-5291
E-mail: mark@wilkersonlaw.net
AK Bar #8310157

Attorneys for Plaintiff Allstate

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALLSTATE INSURANCE COMPANIES, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| CHARLES HERRON, | ) |
| | ) |
| Defendant. | ) |
| _____ | )Case No. A04-0043 CV (TMB) |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT APPLYING THE NONECONOMIC DAGAGES CAP OF AS 09.17.010(b)

Allstate requests an order limiting Angelina Trailov's non-economic damages from the motor vehicle accident pursuant to AS 09.17.010(b)'s $400,000 cap because she did not suffer a severe permanent physical injury. Trailov has had three neuropsychological examinations and none of them conclude that her neuropsychological deficit from the accident is severe. That evidence, and her deposition testimony, prove that reasonable persons could not differ in their judgment that she did not suffer a severe permanent mental or physical impairment. There are no genuine issues of material fact. Allstate is entitled to judgment as a matter of law.

## Standard of Review

Alaska Civil Rule 56(c) provides,

Judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.

## Noneconomic Damages Cap – AS 09.17.010(b)

AS 09.17.010 governs the limits of noneconomic damages that can be awarded at trial in Alaska.[1]

Sec. 09.17.010 Noneconomic damages.

(a)     In an action to recover damages for personal injury or wrongful death, all damage claims for noneconomic losses shall be limited to compensation for pain, suffering, inconvenience, physical impairment, disfigurement, loss of enjoyment of life, loss of consortium, and other nonpecuniary damage.

(b)     Except as provided under (c) of this section, the damages awarded by a court or a jury under (a) of this section for all claims, including a loss of consortium claim, arising out of a single injury or death may not exceed $400,000 or the injured person's life expectancy in years multiplied by $8,000, whichever is greater.

(c)     In an action for personal injury, the damages awarded by a court or jury that are described under (b) of this section may not exceed $1,000,000 or the person's life expectancy in years multiplied by $25,000, whichever is greater, when the damages are awarded for severe permanent physical impairment or severe disfigurement.

---

[1] The Alaska Supreme Court held AS 09.17.010 facially constitutional in Evans v. State, 56 P.3d 1046 (Alaska 2002).

    (d)  Multiple injuries sustained by one person as a
        result of a single incident shall be treated as a
        single injury for purposes of this section.

Bethel v. Peters[2] addressed whether the trial court properly submitted the issue of severe disfigurement to the jury to determine if Peters could recover more than $400,000 in compensation for noneconomic damages. Peters fell in the shower area of Bethel's senior center and suffered multiple fractures to her right leg. The parties agreed that the surgeries required to repair Peters' leg left her with significant permanent scarring that was disfiguring. Bethel argued, however, that Peters' disfigurement was not severe enough to submit the question to the jury. The Supreme Court ruled,

> The superior court must make a threshold determination
> of severe disfigurement before submitting the issue to
> the jury. The court should withhold the issue from the
> jury if no reasonable juror could find that the
> plaintiff suffered from severe disfigurement;
> otherwise the question should go to the jury. . . . We
> will reverse the court's decision to send the question
> of severe disfigurement to the jury only if we possess
> a definite and firm conviction that no reasonable
> juror could think the Peters' injury was a severe
> disfigurement.

The Alaska Supreme Court guides this court to utilize its gatekeeper function when the severity of an injury is at issue.[3] The court must make the determination, without presenting the

---

[2] 97 P.3d 822 (Alaska 2004)
[3] See State v. Johnson, 2 P.3d 56, 64 (Alaska 2000) (approving the trial court's removal of the question of severity from the jury in a physical impairment case where reasonable jurors could not differ).

question to the trier of fact, when it finds that reasonable persons could not differ in their judgment.

### **Background**

On September 14, 2002, Angelina Trailov was the passenger in an automobile driven by Charles Herron when Herron was involved in a single car accident in Bethel, Alaska. As a result of the accident Trailov suffered an un-displaced left-rib fracture, a partially collapsed lung, and a left-sided basilar skull fracture. She was initially treated at the Yukon-Kuskokwim Health Corporation in Bethel; then transferred within a few hours to Alaska Regional Hospital in Anchorage. After five days at the Alaska Regional Hospital she was transferred again to the Alaska Native Medical Center in Anchorage for an additional three days of treatment until she was discharged to the care of her family.

A treating physician, Dr. Thomas Gordon, and two neuropsychologists, Dr. Paul Craig and Dr. Richard Perrillo, have evaluated Trailov's neurological injuries. Their three opinions vary in detail, but all three agree that Trailov does not have a severe brain injury or a severe neurological deficit.

Dr. Gordon consulted on Trailov on November 5, 2002, at the Alaska Native Medical Center, two months after the accident.[4] Trailov related to Dr. Gordon that initially she had some dizziness, headaches, back pain, and visual blurriness, but

---

[4] Dr. Gordon's assessment is attached as Exhibit A.

those symptoms resolved. She also related initial short-term memory loss that resolved. Trailov said that she was back in school and doing fine. Trailov denied present back pain, headaches, and incoordination; but her mother said that she was sometimes "wobbly" [Ex A, p 1] at the end of the day. Dr. Gordon's assessment is that,

> The patient had a head injury with fracture of the temporal bone and cerebrospinal fluid leak into her left ear canal. She has made a good recovery. Her neurological examination is normal. [Ex A, p 2]

Trailov's attorney thereafter scheduled an examination with Dr. Paul Craig for December 17, 2002.  Dr. Craig's neuropsychological examination was comprehensive.[5] He took an oral history from Trailov and her mother concerning the objective injuries Trailov suffered in the accident and their description of intellectual and emotional changes Trailov experienced after the accident.  He reviewed Trailov's medical records for a more detailed understanding of the physical injuries that could affect changes to her brain functions.  He administered a number of standardized tests to assess Trailov's neuropsychological functioning.[6] Dr. Craig observed that Trailov

---

[5] Dr. Craig's assessment is attached as Exhibit B.
[6] Tests administered by Dr. Craig included:
    Hiscock Digit-Memory Test: Victoria Revision
    Wechsler Intelligence Scale for Children – III
    Peabody Picture Vocabulary Test – III
    Sensory-Perception Examination
    Lateral Dominance Examination
    Finger Tapping Test
    Lafayette Grooved Pegboard Test
    Hooper Visual Organization Test
    Benton Visual Form Discrimination Test

may tend to minimize difficulties to a slight degree which, considered with the results of tests that screened for good effort and lack of malingering, led him to conclude that her test results allow a reasonable estimate of her current neuropsychological functioning.

Dr. Craig found that Trailov's performance on the tests to assess intellectual functioning showed a "pattern of intellectual strengths and weaknesses [that] was <u>not</u> suggestive of any particular decline in intellectual functioning." [Ex B, p 7] He concluded that "there is <u>not</u> a pattern of test performances on intellectual testing <u>suggestive of any notable change</u> in intellectual functioning thought to be associated with a traumatic brain injury." [Ex B, p 8]

Dr. Craig found that Trailov performed motor tests in a normal and satisfactory manner. He found her visual-motor integration intact, normal, and generally within normal limits and concluded "The findings were not suggestive on any significant visual-motor integration limitations." [Ex B, p 8]

---

Bender-Gestalt Test
Controlled Oral Word Association Test
Boston Naming Test
Aphasia Screening Test
California Verbal Learning Test – Children's Version
Wide Range Assessment of Memory and Learning
Wechsler Memory Scale – Figural Recall
Trails A and B
Tactual Performance Test
Porteus Mazes Test
Wisconsin Card-Sorting Test
Children's Category Test
Wechsler Individual Achievement Test - II

Dr. Craig found that Trailov performed low-average and below expected levels on some of the language tests. On other language tests she performed fairly normally and without difficulties. Dr. Craig did not know if her weak results were "related to a mild dysnomia . . . [or were] a reflection of cultural and linguistic bias inherent in the Boston Naming Test."[7] [Ex B, p 8] He concluded, "She does not appear to suffer from a primary disorder, although her ability to name objects on the Boston Naming Test was found to be limited, as discussed above." [Ex B, p 8]

When Dr. Craig tested Trailov's memory her results were in the average range, demonstrating good ability, and were fairly normal. He noted, "There were a few areas of mild limitation, but nothing suggestive of the type of difficulties that might be expected in the context of residual impairment associated with a traumatic brain injury." [Ex B, p 8] Dr. Craig concluded that these mild limitations were "suggestive of some problems with incidental memory when she is not primed to process information for purposes of storage and subsequent retrieval. In the everyday setting, the patient may have more subtle memory problems than would be suggested on objective testing, given these weak incidental recall performances." [Ex B, pp 8-9]

---

[7] Trailov is an Alaskan Native who grew up in Bethel, Alaska.

The tests for problem-solving and executive functions showed Trailov to be within normal limits, with excellence in novel tactual problem-solving skills. Dr. Craig concluded, "These performances suggest that the patient's higher-level problem-solving abilities are relatively intact." [Ex B, p 9]

The tests assessing Trailov's academic abilities showed that "she does not appear to suffer from a learning disability in any domain. Her academic skills were fairly normal." [Ex B, p 9]

Based on all of his testing, summarized above, Dr Craig offered his diagnostic impression of Trailov,

> Although the clinical interview suggested that post-traumatic amnesia may have been five or more days in duration, in fact, she probably only suffered from two or three days of post-traumatic amnesia. Nevertheless, this is sufficiently long to qualify for a diagnosis of a moderate traumatic brain injury. She suffered from some respiratory distress, but further review of the medical records reduces the likelihood that she suffered from an acute anoxic injury. CT scan was normal, ruling out macroscopic brain injury. Her compromised mental status and length of post-traumatic amnesia point toward microscopic axonal injury associated with a closed head injury. The patient has enjoyed an excellent recovery, but is thought to have some very subtle persisting higher cortical dysfunction consequent to her injury. [Ex B, pp 9-10; Emphasis added.]

In his Summary and Recommendations, Dr. Craig made the following observations,

> The patient's report of deficits following this injury is relatively minimal. She does admit to being somewhat more irritable, but does not report any changes in her thinking. She had some problems with

balance, and also has had some nystagmus [involuntary and repetitive rapid eye movement] when she is tired. Many of these symptoms have been improving over time.

* * *

Given the recency of the injury and given her relatively good neuropsychological performances across a broad array of measures administered, her prognosis appears to be excellent. Her overall level of neurocognitive recovery appears to be good. However, there is evidence of some subtle incidental memory limitations. . . . Some of these weaknesses may be long-standing (e.g. her self-report of being weak in math). Some of her subtle weaknesses may be acquired.

* * *

Overall, it is anticipated that this patient will continue to recover nicely from her brain injury and other trauma.

* * *

On a more-probable-than-not basis, the patient will not develop any further problems consequent to this head injury. [Ex B, p 10; Emphasis added.]

Dr. Craig then offered a few cautionary caveats that did not change his assessment that Trailov suffered a moderate brain injury with minimal neuropsychological effects. He concluded,

Thank you for requesting my opinion regarding this patient. On a positive note, she is enjoying an excellent recovery. At the same time, the significance of her injury should not be minimized, given her good recovery. Finally, it may be worthwhile to consider a reevaluation in approximately one year, to determine the extent to which further improvement in neurocognitive functioning is evidenced. Assuming significant improvement occurs during the coming year, this will provide further support for the notion that she has suffered from a moderate traumatic brain injury with measurable neurocognitive limitations evidenced. [Ex B, p 11]

9

Trailov had a clinical neuropsychological and clinical psychological examination performed by Dr. Richard Perrillo on February 3 & 4, 2004, fourteen months later.[8] Dr. Perrillo's evaluation report may be more difficult for a layman to follow than the two previous reports, but his conclusions are mercifully succinct and unambiguous:

> All the available evidence including all the objective test data indicates a moderate neuropsychological functioning disorder.
>
> * * *
>
> Apportionment of the above due to the onset of Organic Brain Syndrome following 02' [sic] accident resulting in Mild Traumatic Brain Injury taking into account all available records and alternative explanations. [Ex C, p 18]

Unless Dr. Perrillo's report is read with the attention it deserves, and his conclusions are temporarily forgotten, it can create the suspicion that Trailov's brain injury may be more than mild and that her resultant neurological deficiencies are more than moderate.

Like Dr. Craig's examination, Dr. Perrillo's neuropsychological examination was comprehensive. He too took an oral history from Trailov concerning the objective injuries she suffered in the accident and her description of intellectual and emotional changes she experienced after the accident. He reviewed Trailov's medical records for a more detailed

---

[8] Dr. Perrillo's assessment is attached as Exhibit C.

understanding of her physical injuries that could have bearing on effect changes to her brain functions. He administered a number of standard tests to assess Trailov's neuropsychological functioning.[9]

Dr. Perrillo, like Dr. Craig, concluded that Trailov was not a malingerer and that her level of attention to the tests provided an adequate basis for his conclusions about her brain injury and mental abilities,

> Ms. Trailov's approach to the testing generally indicated maximum effort with a minimization and denial of current symptoms and syndromes or the minimization of psychological issues and distress and the absence of any motivation for any secondary gains. [Ex C, p 9]

In the Referral Source/Reason section of his report Dr. Perrillo concluded that Trailov's medical records, "cannot rule out microscopic lesions, shearing, axonal and neuronal damage or brain damage[.]" and that, "Accordingly, by definition, her head

---

[9] Tests administered by Dr. Perrillo included:

Minnesota Multiphasic Personality Inventory-II
Personality Assessment Inventory
Wechsler Abbreviated Intelligence Scale
The North American Adult Reading Test
Test of Memory Malingering (TOMM)
Victoria Symptom Inventory
Comprehensive Trails Making Test
Finger Tapping Test
Grip Strength Test
Wechsler Adult Intelligence Test - Digit Symbol subtest
Wechsler Adult Intelligence Test - Symbol Search subtest
Wechsler Memory Scale-III
California Verbal Learning Test-II
Digit Span Test, Forward and Backwards
Adaptive Digit Ordering Test
Wisconsin Card Sorting Test
The Categories Test
Stroop Test
Controlled Word Association Test
Department of Defense Automated Neuropsychological Assessment Matrix
    (ANAM)
Continuous Performance (CPT)

11

injury is considered to be moderate possibly resulting in profound consequences." [Ex C, p 2]

In the History, According to Patient section of his report Dr. Perrillo concluded, "Obviously considerable loss of consciousness and altered states are related to the severity of the injury. Therefore, by definition, Ms. Trailov's brain injury is considered to be Moderate/Severe." [Ex C, p 3]  As mentioned above and discussed in detail below, Dr. Perrillo's review of Trailov's test results caused him to consider that her brain injury might be moderate and conclude that, in fact, it was mild.

Dr. Perrillo notes that Trailov experiences headaches at least twice a week and that she reported mild psychological changes,

> On a psychological level Ms. Trailov reported generally some mild mood or temperament changes since the time of her accident. She noted mild depression, which has now improved to premorbid levels. On the other hand she and others experience her as being more irritable, angry and less patient. These changes in her temperament have stayed the same with no improvement noted. [Ex C, p 4]

In the Educational Background/Work History section of his report Dr. Perrillo reports that Trailov's grades declined after the accident but, "There has been improvement since and she now receives grades of As and Bs."[10] [Ex C, p 6]

---

[10] In the Pre-morbid Intellectual Functioning section of his report Dr. Perrillo concluded that Trailov's intellectual functioning was normal prior to the accident.

In the Clinical and Neuropsychological Testing/Objective Results section of his report Dr. Perrillo concluded about Trailov's neuropsychological status, "Most of the objective neuropsychological test results (and medical records) indicate that Ms. Trailov is suffering from Mild/Moderate Traumatic Brain Injury and Post Concussion Headache Syndrome." [Ex C, p 9]  Dr. Perrillo then identifies the test results that support his conclusion that Trailov has a mild/moderate brain injury. Dr. Perrillo further concludes from the test results, "It is no coincidence Ms. Trailov fits the pattern of Traumatic Brain Injury group, a pattern that most closely fits the moderate/severe brain damage group." [Ex C, p 10] Within that pattern, of course, Dr. Perrillo ultimately found that Trailov fit into the moderate group; and when all testing was considered he concluded that her traumatic brain injury is, in fact, mild.

Dr. Perrillo's assessment of the effect that Trailov's traumatic brain injury has on her neurological functioning is that she is moderately compromised,

> Ms. Trailov's objective neuropsychological testing results (some of which are highlighted above) appears to be at extreme odds with her expected cognitive functioning based upon her premorbid estimates indicating cognitive dysfunction or organic brain damage. These much diminished performance levels are far from her premorbid estimates in the 50% to 70% range and represents moderate compromise for this individual. In addition the types of impairments that are currently evidenced by neuropsychological testing

would predict a checkered work and educational
history. However, further improvements and brain
resolution may occur, although the window of
opportunity is beginning to narrow. That is, Angelina
is beyond the window of predicted recovery, which
makes her diagnosis permanent. [Ex C, p 11]

In other words, Dr. Perrillo believes that Trailov has a

permanent, moderate neuropsychological dysfunction that may

improve but will never completely resolve.

In the Psychological Status section of his report, Dr.

Perrillo concluded that Trailov's psychological/emotional states

had probably changed from pre-accident states as a result of the

accident. The test results may be less conclusive in this area

of assessment as evidenced by Dr. Perrillo's increased use of

the word "may" in this section of his report. Dr. Perrillo

concludes this section with his prognosis for Trailov's

psychological/emotional state,

As noted above the prognosis for her
psychological/emotional state with the feelings of
reactive anxiety, depression and stress is guarded as
cognitive limitations may cause additional stress
especially in an [sic] competitive environment. The
need for psychological intervention is suggested. Ms.
Trailov needs to be in treatment with Clinical and
Neuropsychologist/Psychiatrist to help her cope with
the increasing frustration, irritability, anxiety, and
depression, which may result from struggling with her
vocational and educational options. [Ex C, p 13]

Dr. Perrillo summarizes his finds concerning Trailov as

follows,

Overall Ms. Trailov's profile is remarkable for her
mild to moderate impairments in oral verbal fluency,
cognitive flexibility, loss of dominant side advantage

in gross motor ability, working memory, and attention, and flat auditory verbal learning. In an otherwise average intellect these impairments reflect cognitive changes due to traumatic brain injury sustained after the 02' [sic] accident. Cognitive limitations as specified above may make it increasingly more difficult for Angelina to adequately perform any educational and job related duties. The change in her is now one of capacity rather than motivation. [Ex C, p 13]

Dr. Perrillo's report also addresses the implications of his findings for Trailov. None of the implications change Dr. Perrillo's findings that Trailov has a mild traumatic brain injury that has resulted in a moderate neuropsychological functioning disorder.

Dr. Perrillo uses the words "serious" and "fatal" several times in discussing implications of Trailov's injuries. Dr. Perrillo believes that Trailov "is extremely vulnerable to additional head injuries perhaps with fatal consequences," [Ex C, p 13] and should receive neuropsychological monitoring, if she injures her head again, to reduce the risk. Dr. Perrillo also discusses the effect of "serious cognitive impairments" on a person's resistance to alcohol and drug abuse and on their anxiety and frustration level. Trailov, with moderate cognitive impairment, will be at a somewhat lower risk.

Dr. Perrillo's prognosis is,

Guarded. Considering Ms. Trailov's young age, her prognosis may be more promising than would otherwise be the case. However, continuing complaints and deficits over the next year will diminish the probability that she will recover or obtain previous

levels of functioning consistent with her previous
ability. [Ex C, p 16]

Note that Dr. Perrillo concluded, "the probability that she
will recover [and] obtain previous levels of functioning
consistent with her previous ability." [Ex C, p 16] Consistent
with that prognosis Dr. Perrillo's entire summary in the
Ecological Validity (Interference with work, normal life
activities and enjoyment) is one word: "Moderate." [Ex C, p 16]

Trailov was deposed on February 21, 2006,[11] four years post-
accident.  Trailov's last medical treatment related to the
accident was in 2003, one year post-accident. [Ex D, p 14]
Trailov testified that she had no treatment scheduled, and she
would not schedule any unless her condition changed. [Ex D, p
18, ll. 7-15; p 12, ll. 20-22]

Trailov's back continued to bother her once or twice a week
with a strong, dull ache. [Ex D, p 12, ll. 3-12] She has no
treatment scheduled and no intent to schedule any unless it
worsens. [Ex D, p 12, ll. 20-24]

Trailov continues to have difficulty with her breathing -
when she is running. [Ex D, p 13, ll. 10-14] Otherwise, her
breathing is fine. She currently runs one and one-half to three
miles, three to five times a week.  [Ex D, p 13, ll. 11-17]

Trailov thinks she has become nearsighted since the
accident.  She had her eyes tested, but did not get the glasses

---

[11] Trailov's deposition is attached as Exhibit D.

prescribed. [Ex D, p 31, ll. 9-13] She intends to make another appointment to get her vision checked and get new glasses. [Ex D, p 27, ll. 8-9]

Trailov now has headaches one to two times a week. [Ex D, p 22, l. 19 – p 29, l. 7] Tylenol helps with the headaches and sometimes makes them go away. [Ex D, p 32, ll. 9-13]

Trailov had even less to report concerning her treatment of her neurological deficits. She testified that she had never sought counseling or assistance with her memory problems. [Ex D, p 16, ll. 20-22] When asked why not she said that there wasn't much available in Bethel. [Ex D, p 16, ll. 23-24] She testified that she intends to seek help in Anchorage if her memory continues to bother her [Ex D, p 16, l. 24 – p 17, l. 2], but that she does not have any treatment scheduled at the time and is not sure if she is going to schedule any. [Ex D, p 18, ll. 7-15]

Trailov graduated from high school and is now attending classes at the University of Alaska Anchorage (UAA). [Ex D, p 5, ll. 4-9] She is studying French, Western Civilization, Biology, and Abnormal Psychology. [Ex D, p 5, ll. 10-13] Trailov had only been at college for five weeks when her deposition was taken; [Ex D, p 5, ll. 20-22] she found the classes and tests more difficult than in high school and found it is harder to stay

17

motivated toward her studies than in high school. [Ex D, p 5, ll. 14-19, p 18. ll. 6-24]

Trailov was asked about any effects she noticed as a result of her brain injury during the first three months after the accident. She testified that the first thing she noted was a lot of memory problems. [Ex D, p 14, ll. 17-22] She testified that she had short-term memory problems, which required her to write down homework assignments and keep a lot of notes. [Ex D, p 14, l. 23 – p 15, l. 7] She also testified that she had long-term memory problems; she cannot recall some stories her mother has told her or remember some things from her childhood. [Ex D, p 15, ll. 11-23] Trailov testified that her memory has not improved since the accident. [Ex D, p 16, ll. 15-17] Trailov also testified that she became less social after the accident and that she is more introverted now. [Ex D, p 15, l. 24 – p 16, l. 12]

Trailov did not notice any other effects from her injury during the first three months after the accident.[12] [Ex D, p 16, ll. 13-14] In response to a question about whether she believed her brain injury would affect her ability to earn a living, Trailov summarized the effects of the accident on her,

> It's harder for me to concentrate and to remember things. It's hard for me to stay motivated. And these are things that I think would – would affect my

---

[12] There is no allegation that Trailov suffered any disfigurement in the accident.

working. I'm not always as sociable and I have some
irritability problems sometimes.

[Ex D, p 22, l. 25 – p 23, l. 10]

### Discussion

Dr. Gordon's neurological evaluation found Trailov normal.
Dr. Craig's evaluation found Trailov has a moderate brain injury
with mild neurological effects. Dr. Perrillo's evaluation found
Trailov has a mild brain injury with moderate neurological
effects. No doctor found that Trailov's brain injury or the
resultant neurological deficiencies she experienced are severe.

All three assessments are confirmed by Trailov's deposition
testimony. In response to questions about her current physical
and mental condition she confirmed that her injuries are having
only a mild affect on her life. Her testimony proves that her
physical and mental injuries from the accident, regardless of
their severity immediately following the accident, are now not
serious.

No reasonable person could conclude from the facts that a
person who successfully completed high school and is now
attending college has a severe neuropsychological deficit -
particularly when three different experts confirm this obvious
conclusion. To rule otherwise would debase the notion of
severity and make the distinction between sections (b) and (c)
of AS 09.17.010 meaningless. The legislature's intent in
allowing additional noneconomic damages for persons with severe

19

permanent impairment was to accommodate persons with extraordinary needs. Trailov does not have that level of need.

## Conclusion

There are no genuine issues of material facts in dispute. For purposes of this motion it is conceded that Trailov's brain injury and resulting neuropsychological functioning disorder are permanent. There is no dispute, however, that her brain injury is not serious and there is no dispute that her brain dysfunction is not serious. The damages cap in AS 09.17.010(b) applies to this case because the enhanced cap in subsection (c) is only available "when the damages are awarded for severe permanent physical impairment or severe disfigurement." Angelina Trailov's injuries are, fortunately, not severe. Therefore, Allstate requests an order that the court will apply the normal damages cap in AS 09.17.010(b) to any award of noneconomic damages to Trailov.

DATED this 2nd day of June, 2006.

WILKERSON HOZUBIN
Attorneys for Plaintiff


By:s/Mark E. Wilkerson
Mark E. Wilkerson
310 K Street, Suite 405
Phone: 907 276-5297
Fax: 907 276-5291
E-mail: mark@wilkersonlaw.net
Attorneys for Plaintiff Allstate
AK Bar No. 8310157


CERTIFICATE OF SERVICE

I hereby certify that on the
2nd day of June, 2006, a true and correct
copy of the foregoing document was
electronically served on the
following counsel/parties of record:

Mark A. Sandberg, Esq.
Sandberg, Wuestenfeld & Corey
701 West 8th Avenue, Suite 1100
Anchorage, AK  99501

WILKERSON HOZUBIN

By:    /s/Mark Wilkerson


1000/788/plead/Dec Act/MSJ mem-damag