Rebecca J. Hozubin
Wilkerson Hozubin
310 K Street, Suite 405
Phone: 907 276-5297
Fax: 907 276-5291
E-mail: rebecca@wilkersonlaw.net
AK Bar #9806016

Attorneys for Plaintiff Allstate

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALLSTATE INSURANCE COMPANIES, )<br>)<br>　　　　Plaintiffs,　　)<br>)<br>　vs.　　　　　　　　　　　)<br>)<br>CHARLES HERRON,　　　　　　)<br>)<br>　　　　Defendant.　　　)<br>_____) | Case No. A04-0043 CV (TMB) |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT DISMISSING MARY KENICK'S NIED CLAIM**

Allstate moves for an order confirming that Mary Kenick had no cognizable claim for negligent infliction of emotional distress ("NIED") against Charles Herron, such that Allstate was under no contractual obligation to accept Kenick's demand for policy limits with respect to that NIED claim, because the undisputed facts demonstrate Kenick did not suffer <u>severe</u> emotional shock or injury from an immediate and contemporaneous sensory observation of her daughter's injury. Herron has asserted that Allstate's handling of Kenick's NIED claim was negligent and breached the contract of insurance. This motion

asks the court to rule that Kenick did not have a legally compensable NIED claim under the requirements of Alaska law. Therefore, there could be no "mishandling" of the investigation and resolution of that claim. In the alternative, this motion asks the court to rule that Allstate had no contractual obligation to have accepted Kenick's demand for full liability policy limits in connection with her NIED claim.

I.    **STANDARD OF REVIEW**

Alaska Civil Rule 56(c) provides as follows:

> Judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.

"The moving party bears the initial burden of proving, through admissible evidence, the absence of genuine factual disputes and its entitlement to judgment as a matter of law."[1]  Here, there are no disputed issues of material fact. Kenick did not observe her daughter's accident and Kenick did not suffer <u>severe</u> emotional distress when she <u>first</u> observed her daughter in the hospital after the accident.

---

[1] <u>Preblich v. Zorea</u>, 996 P.2d 730, 733 (Alaska 2000).

2

**II.  THE LAW DOES NOT SUPPORT AN NIED CLAIM BY KENICK**

Generally, damages for negligent infliction of emotional distress are not awarded unless the claimant suffered physical consequences.[2]

> The reasons for the majority rule are, at least, three.  One is that emotional disturbance which is not so severe or serious as to have physical consequences is likely to be "so temporary, so evanescent and so relatively harmless" that the task of compensation for it would unduly burden defendant and the court.  The second is that, in the absence of the guarantee of genuineness provided by resulting bodily harm, such emotional distress can be too easily feigned or imagined. The third is that where the defendant's conduct has been merely negligent, without any element of intent to harm, his fault is not so great that he should be required to make good a purely mental disturbance.[3]

The Alaska Supreme Court recognizes two limited exceptions to the physical injury requirement where "special circumstances surrounding the claim for emotional damages serve as a sufficient guarantee that the claim is neither false nor insubstantial."[4]

One exception to the physical injury requirement is the preexisting duty exception.[5]  Under this exception, the plaintiff must prove that defendants owed plaintiff a duty of care before

---

[2] Kallstrom v. U.S., 43 P.3d 162, 165 (Alaska 2002); Wilson v. United States, 190 F.3d 959, 961 (9th Cir. 1999), *citing* Hancock v. Northcutt, 808 P.2d 251, 257 (Alaska 1991).
[3] Chizmar v. Mackie, 896 P.2d 196, 201-02 (Alaska 1995) [quoting Payton v. Abbot Labs, 437 N.E.2d 171, 178-79 (Mass. 1982)].
[4] Id. at 202.
[5] Id. at 203; Wilson at 962.

3

a defendant can be held liable for damages for NIED.[6] This duty is demonstrated with proof of a contractual or fiduciary relationship between the parties.[7] This exception to the physical injury requirement is <u>not</u> applicable to this case.

Kenick can recover for an NIED claim if she can demonstrate that her claim fits all of the categories of the bystander exception. This exception was first adopted in Alaska in <u>Tommy's Elbow Room, Inc. v. Kavorkian</u>.[8] If the risk of harm to the NIED claimant is reasonably foreseeable, then the claim will be allowed.[9]

> A resolution of the question of whether a plaintiff can assert a claim for NIED is essentially an inquiry into whether the defendant should reasonably foresee the injury to the plaintiff and thus owes the plaintiff a duty of care . . .. <u>The existence and extent of a duty of care are questions of law for the court to determine</u>.[10]

In <u>Kavorkian</u>, Alaska adopted the following <u>Dillon v. Legg</u>[11] test for foreseeability:

> (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether

---

[6] <u>Id</u>.
[7] <u>Id</u>.
[8] 727 P.2d 1038 (Alaska 1986).
[9] <u>Id</u>.
[10] <u>Beck v. State</u>, 837 P.2d 105, 109 (Alaska 1992) (emphasis added).
[11] 441 P.2d 912, 920 (CA 1068).

4

>   Plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.[12]

The following year, the Alaska Supreme Court again addressed the validity of bystander NIED claims in Mattingly v. Sheldon Jackson College.[13] The Court further limited the bystander exception by refining the contemporaneous requirement – if the NIED claimant had sufficient time to steel herself prior to seeing the injury to the loved one, then she does not have a cognizable claim. The court reinforced the requirement that the shock experienced by the claimant must be severe.[14] Thus, Kenick's emotional distress must be severe to satisfy the reasonable foreseeability test.

The following cases address the severity of emotional distress required to support a NIED claim; a threshold issue to be decided by the trial court.[15] The cases cited are Alaska cases and/or cases relied upon by the Alaska Supreme Court when it adopted the bystander exception in Kavorkian. A comparison of the resulting emotional distress described in these cases with the emotional harm Kenick alleges highlights the striking differences in severity. The court should make the "gate

---

[12] Kavorkian, 727 P.2d at 1041, *quoting* Dillon v. Legg, 441 P.2d 912, 920 (CA 1968); *see also* Kallstrom v. U.S., 43 P.3d 162, 165 (Alaska 2002).
[13] 743 P.2d 356 (Alaska 1987).
[14] Id. at 366.
[15] Beck, at 109.

5

keeping" determination and find Kenick's emotional reaction was not severe enough to satisfy the foreseeability test needed to support an NIED claim.

In Dziokonski v. Babineau,[16] Dziokonski went to the school bus stop shortly after her daughter was struck while crossing the road. She saw her daughter lying injured on the ground.[17] Dziokonski "suffered physical and emotional shock, distress and anguish . . . and died while she was a passenger in the ambulance that was driving her daughter to the hospital."[18]

In Portee v. Jaffee,[19] Portee's seven-year-old son became trapped between an elevator's outer door and the wall of the elevator shaft. The elevator dragged her son up to the third floor. She watched her son suffer for four and one-half hours as police tried to free him. She watched him die while still trapped.[20] After her son's death, Portee became severely depressed and seriously self-destructive, attempted suicide, was hospitalized, and required extensive counseling and psychotherapy.[21]

---

[16] 380 N.E.2d 1295 (Mass. 1978).
[17] Dziononski, at 1296.
[18] Id.
[19] 417 A.2d 521 (NJ 1980).
[20] Portee, at 91-2.
[21] Id.

In General Motors Corporation v. Grizzle,[22] Grizzle was following a few minutes behind the pick-up truck in which her husband, daughter, and stepdaughter were driving. She came upon the accident in which her husband and daughter were killed. She could clearly see the results of the accident.[23] Grizzle began screaming and fainted, hitting her head on the road.[24]

These are the cases the Alaska Supreme Court cited to demonstrate the requisite severity of the ensuing emotional distress to a NIED claimant necessary to support a bystander claim. The clear impression left by the facts of these cases is that the parents suffered severe, demonstrable emotional distress.

Another very significant point to note is that in cases that do not discuss the physical or emotional trauma experienced by the NIED claimant, when an NIED claim is allowed, the parent was physically present at the scene of the accident, or actually witnessed the accident:

In Kavorkian, Fred Brantingham watched the paramedics having difficulty extracting, and almost dropping, his unconscious daughter from her wrecked car. She had a tube coming out of her mouth, one paramedic was holding her head by the hair, and another was lifting her body from the other side

---

[22] 642 S.W.2d 837 (Texas 1982).
[23] Grizzle, at 843.
[24] Id.

7

of the car.  He was physically present with her in the hospital when she died several hours later.[25]

In Dillon v. Legg,[26] Dillon watched as her infant daughter was struck and killed by a car as she crossed a road.

In Ochoa v. Superior Court,[27] Ochoa found her son in the juvenile hall infirmary convulsing, hallucinating, vomiting, coughing up blood, and running a temperature of 105 degrees.  Ochoa tried unsuccessfully for several hours to get care for her son from the juvenile authorities.  They refused and eventually insisted that she leave.  Her son died before she could see him again.

In Nazaroff v. Superior Court,[28] Nazaroff was searching for her three-year-old son when she heard a neighbor scream "It's Danny!"  She ran to her neighbor's swimming pool and saw her unconscious son being pulled from the pool.  She watched others perform mouth-to-mouth resuscitation and heart thumping efforts to revive her son as he turned blue.  Her son did not regain consciousness and died three days later.

In Mercado v. Transport of New Jersey,[29] Mercado arrived within minutes of a bus striking her eight-year-old son.  She

---

[25] Kavorkian, at 1040.
[26] 441 P.2d 912 (CA 1968).
[27] 703 P.2d 1 (CA 1985).
[28] 80 Cal.App.3d 553, 145 Cal.Rptr. 657 (1978).
[29] 422 A.2d 800 (NJ 1980).

saw him severely injured and laying unconscious in the street. He died an hour and twenty minutes later.

Kenick was not at the accident.[30] She found out about it when one of Trailov's friends, Alicia Cox, came to her home and woke her up.[31] Alicia told Kenick that her daughter, Trailov, had been in an accident and was at the hospital. Kenick was "startled."[32]

Kenick also testified about her activities before she left for the hospital to see her daughter: she dressed, woke her husband, woke her uncle, asked her uncle to "watch the boys because they were still sleeping," and went to the hospital.[33]

Kenick lived about a ten-minute drive from the hospital.[34] She testified that, upon her arrival at the hospital, "I went through the secured door. She [Trailov] was screaming and I could hear her as soon as I got into the emergency area."[35] Then Kenick saw her daughter and "[s]he was in the emergency. She was on the bed. There was I think four nurses that were trying

---

[30] Deposition of M. Kenick at p. 11, line 22 – p. 12, line 2. A copy of Kenick's deposition transcript is attached as Exhibit 1.
[31] Exhibit 1 at p. 12, line 18 – p. 13, line 3.
[32] Id. at p. 13, lines 18-21.
[33] Id. at p. 14, line 15 – p. 15, lines 4, 21-23. Kenick was sleeping in her daughter's room so that she would know when she got home. Id. at p. 13, lines 10-17.
[34] Id. at p. 15, lines 12-14.
[35] Id. at p.16, lines 1-6.

to restrain her."[36]  Within ten minutes of Kenick's arrival at the hospital, the nurses had sedated Trailov.[37]

Kenick then spoke with the treating physician who told her "they were trying to determine whether they needed to Medivac her."  Because there was blood coming out of Trailov's ear, the doctor suspected a basal fracture.[38]  The doctor did not tell Kenick what a basal fracture was.  No other hospital staff spoke with Kenick about her daughter's injury.[39]

The decision to Medivac Trailov was made within half an hour of Kenick's arrival at the hospital.[40]  Kenick then went home to pack clothing for Trailov and herself and returned to the hospital to wait for the Medivac flight to arrive from Anchorage.[41]  Kenick testified that she was "hysterical" and when asked what that meant she stated: "I was crying.  I couldn't think straight."[42]  She also said she was in "shock" when she was in the Medivac plane.  She defined shock as "disbelief."[43]  Kenick never required any medical care or attention during this

---

[36] Id. at p.16, lines 18-21.
[37] Id. at p. 17, lines 3-6.
[38] Id. at p. 17, lines 11-14.
[39] Id. at p. 17, lines 22-24.
[40] Id. at p. 17, lines 17-21.
[41] Id. at p.18, line 7-17.
[42] Id. at p. 19, lines 3-5.
[43] Id. at p. 20, lines 16-17.

time, nor any other time either while her daughter was being treated or after.[44]

None of this information provides the necessary support for an NIED claim. It is only the severe emotional distress that will support the claim, if at all.[45]

When Kenick learned that her daughter had an unspecified injury, before she saw her in the hospital, she had time to steel herself emotionally before her initial sensory and contemporaneous observation. When Alicia Cox woke Kenick up, she told her nothing about Trailov's injury. Kenick could tell, however, from the expression on Alicia's face and the tone of her voice that the injury to Trailov might be serious. However, while Kenick was still at home and/or traveling to the hospital, she obviously had not yet experienced any sensory and contemporaneous observation of injury to her daughter that could affect her emotions. Her emotions were affected by her observation of Alicia, but this observation is insufficient to support a NIED claim. In fact, when Alicia told her that Trailov had been in an accident and was in emergency, this allowed Kenick the opportunity to steel her emotions prior to seeing her daughter. By the time she arrived at the hospital

---

[44] Id. at 18, line 23 - p. 19, line 2; p. 20, lines 18-22.
[45] Kavorkian, 727 P.2d at 1041.

and had her first contemporaneous sensory observation of her daughter, she had already steeled her emotions.

What Kenick saw when she first observed her daughter at the hospital was that she was very vocal and not unconscious. Her second observation was that her daughter required four nurses to restrain her, indicating she was not paralyzed. No one told Kenick that her daughter's condition was life threatening.[46] Rather, all she was told was that there was the <u>possibility</u> of a <u>potentially</u> serious injury.

Kenick continued to function well even after she learned that her daughter was injured. She went to the hospital, listened to and remembered what the doctors said, and then went home and packed for her daughter and herself. None of that evidence establishes severe emotional distress. Kenick had had time to steel herself before her initial observation of her daughter and, when she did see her daughter, she was conscious and active and the doctor told her only that she was concerned about the possibility of serious injury.

Kenick maintained her composure and was able to deal with the tasks at hand. She did not suffer what is classified as severe emotional shock tantamount to "neuroses, psychoses, chronic depression, phobia," but instead suffered at most

---

[46] <u>Id</u>. at p. 19, lines 15-17.

"temporary fright."[47]  There are no genuine issues of material fact in this case.

The safeguard against expanding NIED recovery to every parent for every injury to his or her child is the court-monitored requirement that resulting emotional distress be severe.  Every parent will naturally be concerned about an injury to his or her child, limitations need to be enforced.

The undisputed facts here prove only that Kenick was concerned and upset when she saw her daughter in the hospital (where she was receiving medical attention), not that Kenick was severely emotionally distressed.  The facts are undisputed and Allstate is entitled to judgment as a matter of law: Kenick does not have a cognizable claim for NIED.

### III. THERE WAS NO REASONABLE BASIS FOR ALLSTATE TO PAY KENICK POLICY LIMITS FOR HER NIED CLAIM

In the event the court does not dismiss Kenick's NIED claim because it is not cognizable, Allstate asks the court to rule that there was no reasonable basis for Allstate to have paid Kenick policy limits for her NIED claim on or before May 16, 2003.  In support of his claim that Allstate committed a total breach of the contract prior to his own breach, Herron argues

---

[47] Chizmar, 896 P.2d at 204-05 (emphasis added), *quoting* Rodrigues v. State, 472 P.2d 509, 520 (Hawaii 1970) and Lejeune v. Rayne Branch Hosp., 556 So.2d 559, 570 (LA. 1990)(citations omitted).

that Allstate should have paid Kenick policy limits by May 16, 2003. Herron's position is entirely unreasonable.

"When a plaintiff makes a policy limits demand, the covenant of good faith and fair dealing places a duty on an insurer to tender maximum policy limits to settle a plaintiff's demand when there is a substantial likelihood of an excess verdict against the insured."[48] What does "substantial likelihood of an excess verdict" mean? "Substantial likelihood of an excess verdict" means a "great risk of recovery beyond the policy limits."[49] This is a fact-based analysis in which the trier must ascertain (1) the reasonable value of the claim, and (2) whether there was a substantial risk of an excess verdict. Neither may appropriately be decided on a motion for summary judgment.

Review of the record demonstrates that at no time prior to or on May 16, 2003, was there any duty for Allstate to tender a liability policy limit to Kenick for her NIED claim. There was no substantial risk of excess verdict.

Kenick did not assert an NIED claim until February 14, 2003, received by Allstate on February 18, 2003.[50] In that

---

[48] Jackson v. American Equity Ins. Co., 90 P.3d 136, 142 (Alaska 2004), citing Schultz v. Travelers Indem. Co., 754 P.2d 265, 266-67 (Alaska 1988).
[49] Jackson, 90 P.3d at 142, quoting Crisci v. Sec. Ins. Co., 426 P.2d 173, 176 (Cal. 1967).
[50] Exhibit 2, Doc. Nos. 702939-941.

demand Power alleges the NIED claim, but provides no support for the claim itself.[51]

On March 17, 2003, Berry asks Power to substantiate Kenick's claim:  "[H]as Ms. Kenick received any medical treatment related to her NIED claim?  If so, please provide those records."[52]

On April 10, 2003, Power responds by again reiterating the claim for NIED and stating that Kenick, as a result of her emotional distress, now earns $13,000 less a year.[53]  She also alleges,

> Long time friends of Ms. Kenick will testify to the changes which have occurred as a result of the September 14, 2002 incident.  To date, Ms. Kenick has not sought counseling, however, she has started to attend church and may seek counseling should her personality changes persist.[54]

Power does not state what those personality changes are, nor does she provide a list of persons to be interviewed about these personality changes.  Power does not provide the name of the church Kenick is now attending.  Finally, she provides zero support for Kenick's allegations of a decrease in income.

---

[51] Id.  Again, "Exhibit 3" is referenced in this letter, but there is no record in Power's file or documents in Allstate's file that states precisely what was encompassed in "Exhibit 3." However, it can be presumed it was nothing to do with the NIED claim based on later letters from Berry to Power.
[52] Exhibit 3, Doc. No. 702936.
[53] Exhibit 4, Doc Nos. 702929-930.  She claims she had to take a lesser paying job to decrease her stress levels.
[54] Id.

15

On May 9, 2003, Berry once more asks Kenick to provide some sort of support for this NIED claim:

> With regard to Mary Kenick's claim, we do need some type of documentation that her job change resulted from the effects of Angelina's injury and that she is earning less money at her new job. Please provide any documentation that will support Ms. Kenick's claim for negligent infliction of emotional distress.[55]

Power does not respond until May 16, 2003, at which point she supplies one pay stub for May 9, 2003, and one from February 9, 2003 through February 22, 2003.[56] The May 9, 2003 pay stub does not reflect the pay period on it. It is unclear if this is for one, two, three, or more weeks of work. The pay stub simply does not provide this information. Power does allege an $18,000/year wage loss, but does not state how long Kenick perceives that her loss will last into the future. Additionally, once more, there is no information on the church she is attending, the alleged witnesses to her change in personality, or information about her alleged changes in personality. There is simply no information.

Allstate cannot reasonably have been expected to pay Kenick $112,500 for her NIED liability claim based on the foregoing information. Based on the information presented to Allstate by May 16, 2003 for Kenick's NIED claim, there is no substantial

---

[55] Exhibit 5, Doc. No. 702928.
[56] Exhibit 6, Doc Nos. 702924-702927. While her letter is dated May 15, it was not faxed until May 16, 2003 at 11:27 am.

likelihood of an excess verdict. In fact, there is no support for the claim.

As such, Allstate respectfully requests that the court rule that there was no contractual obligation for Allstate to have paid $100,000 plus add-ons (the liability limit) to Kenick for her NIED claim on or before May 16, 2003, and that the court dismiss all allegations against Allstate for breach of the contract or the covenant of good faith and fair dealing based on Allstate's investigation and/or adjustment of Kenick's claim for NIED.

## IV. CONCLUSION

The NIED bystander exception was adopted in Alaska to provide recovery for severe emotional distress for the contemporaneous sensory observation of severe injury to a close family member. Kenick's claim for NIED does not satisfy Alaska's standard and must therefore be dismissed. The court should exercise its "gate keeping" function to insure that the requirements for severity of emotional distress required to support a NIED claim are maintained. Absent the court's vigilance, virtually any parent's claim for emotional upset upon seeing an injured child becomes a compensable claim for NIED.

For the foregoing reasons, Allstate respectfully requests that the court confirm by its order that Kenick had no

cognizable claim under Alaska law for negligent infliction of emotional distress.

In the alternative, Allstate asks that the court rule that Allstate had no contractual obligation to have paid $100,000 plus add-ons (the liability limit) to Kenick for her NIED claim on or before May 16, 2003.

DATED this 15th day of June, 2006.

> WILKERSON HOZUBIN
> Attorneys for Plaintiff
>
> By: s/Rebecca J. Hozubin
> Rebecca J. Hozubin
> 310 K Street, Suite 405
> Phone: 907 276-5297
> Fax: 907 276-5291
> E-mail: rebecca@wilkersonlaw.net
> Attorneys for Plaintiff Allstate
> AK Bar No. 9806016

CERTIFICATE OF SERVICE

I hereby certify that on the
15th day of June, 2006, a true and correct
copy of the foregoing document was
electronically served on the
following counsel/parties of record:

Mark A. Sandberg, Esq.
Sandberg, Wuestenfeld & Corey
701 West 8th Avenue, Suite 1100
Anchorage, AK  99501

WILKERSON HOZUBIN

By:    /s/Rebecca J. Hozubin
1000/788/plead/Dec Act/MSJ NIED- FINAL