Rebecca J. Hozubin, Esq.
Wilkerson Hozubin
310 K Street, Suite 405
Phone: 907 276-5297
Fax: 907 276-5291
E-mail: Rebecca@Wilkersonlaw.net
AK Bar # 9806016

Attorneys for Plaintiff Allstate

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALLSTATE INSURANCE COMPANIES, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| CHARLES HERRON, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | Case No. A04-0043 CV (TMB) |

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

Herron's motion is nothing more than an untimely motion to reconsider the court's July 12, 2004 Order[1] and October 29, 2004 Order[2] denying Herron's motions to decline jurisdiction because those motions unsuccessfully argued, among other things, that Herron had valid claims to assign.  Herron now submits his third attempt at the same motion and he readily admits this by characterizing his request for a ruling that he had a viable

_____

[1] Docket 20.
[2] Docket 34.

claim which he assigned so that this court may decline any further rulings in this case.

This court made it plain in its two prior Orders addressing the same argument for rejecting jurisdiction by Herron, that: 1) this is a dispute between Herron and Allstate and the question is, did Allstate act in such a way as to totally breach the insurance contract, which would excuse Herron's undisputed breach by confessing and assigning? 2) This court properly has and will maintain jurisdiction over this matter until the above question is resolved. 3) This case is governed by the plain law in Alaska as set forth by <u>Jackson</u>,[3] <u>Sauer</u>,[4] and <u>C.P.</u>.[5] And, 4) Trailov and Kenick are not parties here and only the validity and reasonableness of Herron's assignment is at issue.

Further, Herron's latest motion presents no new evidence that would overcome the questions of fact the court found when it denied Allstate's Motion for Summary Judgment.[6] These questions of fact include, but are not limited to: (1) whether not sending Herron an excess letter is evidence of bad faith;[7] (2) whether Allstate acted in good faith in making its settlement offer;[8] and, (3) did the length of time Allstate took

---

[3] <u>Jackson v. Am. Equity Ins. Co.</u>, 90 P.3d 136 (Alaska 2004).
[4] <u>Sauer v. Home Indem. Co.</u>, 841 P.2d 176 (Alaska 1992).
[5] <u>C.P. v. Allstate Ins. Co.</u>, 996 P.2d 1216 (Alaska 2000).
[6] Docket 79.
[7] Docket 79 at 8, n.6.
[8] Docket 79 at 8.

in investigating the matter constitute bad faith?[9]  These are
questions of material fact appropriate for the trier of fact,
not for summary judgment.

Clearly, there should be no summary judgment in favor of
Herron.  Herron's argument that because Allstate did not get
summary judgment warrants summary judgment in favor of Herron is
nonsense.  This court previously found that questions of fact
exist as to whether Allstate engaged in a total breach.  This
does not lead to summary judgment for Herron, but rather
underscores that questions of fact remain.

The question for the court now, since the undisputed facts
have been better fleshed out, is whether immaterial, non-
prejudicial, technical alleged breaches could, in the mind of a
reasonable fact finder, amount to total breach by Allstate.  On
this point, reasonable minds could not differ.  As two experts
retained by Allstate concluded, there was no material breach,
much less a total breach.  And, in fact, there was no negligence
by any individual adjuster.  As a matter of law, Allstate met
the standard set forth by the court.  Thus, Herron is not
entitled to summary judgment.  While it is Allstate's position
that it is beyond dispute that it met the standards set forth by
Jackson[10] in that it timely tendered policy limits to Trailov,

---

[9] Docket 79 at 9.
[10] Jackson v. Am. Equity Ins. Co., 90 P.3d 136 (Alaska 2004).

this court has held that there are factual issues that require a trial.

## II.  STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if there is no genuine dispute as to material facts and if the moving party is entitled to judgment as a matter of law.  The moving party has the burden of showing that there is no genuine dispute as to material fact.[11] The moving party need not present evidence; it need only point out the lack of any genuine dispute as to material fact.[12] Once the moving party has met this burden, the non-moving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[13]  All evidence presented by the non-movant must be believed for purposes of summary judgment, and all justifiable inferences must be drawn in favor of the non-movant.[14] However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact finder to resolve the parties' differing versions of the truth at trial.[15]

---

[11] Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).
[12] Id. at 323-325.
[13] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).
[14] Id. at 255.
[15] Id. at 248-49.

4

The facts clearly demonstrate that Herron had no viable claim against Allstate at any point prior to his April 2, 2004 breach of the insurance contract via confession of judgment and assignment.  There are disputed issues of material fact and Herron is not entitled to judgment as a matter of law.  The court should deny his motion.

**III. HERRON'S CHRONOLOGY OF EVENTS IS INACCURATE AND MISLEADING.**

A careful review of Herron's chronology of events demonstrates that his recitation of the facts is substantially inaccurate.[16]  What follows are the undisputed facts supported directly with admissible evidence attached hereto.

<u>September 14, 2002</u>

On September 14, 2002, Angelina Trailov was a passenger in a pickup truck driven by Charles Herron when Herron was involved

---

[16] For example, on September 21, 2002, Herron claims that Allstate already "demonstrated a concern that the damages of Trailov were bigger than Herron's liability coverage."  Herron's Motion at 14.  There simply is no evidence of this.  Reserves were set at $25,000 and there was absolutely no discussion or concern of an excess liability claim.  Next, Herron argues that the requirement that Allstate complete its investigation in 30 days or notify Power as to the reasons why the investigation is not complete is violated on November 5, 2002. Herron's Motion at 15.  This disregards Berry's October 18, 2002 letter to Power requesting a release and names of providers or medical records and bills; clearly the investigation was not complete and Berry stated why.  Herron also alleges Power's February 14, 2003 letter to Berry enclosed medical records and bills evidencing over $34,000 in charges.  Herron's Motion at 17-18.  The evidence demonstrates bills received by Allstate and stamped received on March 17, 2003 were not attached to the February 14, 2003 letter. And the examples just continue.

in a single-car accident in Bethel, Alaska.  At the time, Herron was an insured under his parents' Allstate policy, Policy No. 020469309 ("the policy").[17]  The policy provides for $100,000 per person/$300,000 per accident bodily injury liability coverage and underinsured motorist coverage.[18]  The policy also requires Herron to cooperate with Allstate in evaluating, defending, and settling any claims.[19]

**September 16, 2002**

Herron recognizes that Allstate was informed of the automobile accident that occurred two days prior.  What also happened that day was that Allstate contacted the insured and disclosed all coverage available for all the parties.[20]  In particular, Vanzant informed Margaret Herron[21] of the amount of coverage available, what types of coverages were available, and who would be covered.[22]  She informed her that Charles and his passengers would all be covered under the medical payments

---

[17] Exhibit 1.
[18] <u>Id</u>.
[19] <u>Id</u>.
[20] Exhibit 2 and Exhibit 3, Affidavit of Renee Vanzant.
[21] At this point, it was not possible for Allstate to speak with Charles Herron, as he was represented by attorney Jim Valcarce within two days of the accident due to pending criminal charges. Exhibit 4.  Therefore, Allstate spoke with his mother, the named insured under the policy.  This was normal conduct in this case, as Charles Herron's parents remained actively involved in their son's cases, both criminal and civil.
[22] Exhibit 3.

provision of the policy.[23]  During this conversation, Margaret Herron told Vanzant that she was in communication with Kenick and would provide her with this information.[24]

### September 17, 2002

Renee Vanzant of Allstate went to the hospital where Trailov was being treated and left her business card for Kenick to call her to discuss the claim and available coverages.[25] Kenick never called Renee Vanzant to learn about the available coverages firsthand.

### September 18, 2002

Herron claims Allstate undertook a UIM investigation at this point.  However, there was no UIM investigation at this point.  There was instead a "company requirement or task that [Craig Elkins] secure the selection/rejection form or ensure the insured had an opportunity on the UM/UIM endorsements."[26]

    Q.    Okay.  Was it in every claim file?

    A.    The ones that I was tasked to look at were more
          the objective injuries in the insured's car, as a
          passenger.  And that's what I am doing here.

    Q.    But it would be – I mean, was it in cases where
          there was potentially U exposure?

    A.    It was in all – essentially, I was spot checking
          and tasking on these type of cases here where we
          had an injured party in an insured auto.  And as

---

[23] Id.
[24] Id.
[25] Exhibit 5, Deposition of Vanzant at 20-21.
[26] Exhibit 6, Deposition of Craig Elkins at 42, lines 15-18.

> part of my job [sic] was to go in and request to
> the claim representative just to ensure that was
> on file.

Q.    Okay.  But if there was no realistic U exposure,
      would you still have made this request?

A.    In my spot checks, I was tasked to do that.

Q.    In every file where a passenger was injured?

A.    The – on this type of file here, I was asking for
      this type of request in my spot checks of the
      claims reps.

Q.    Okay.  But by this date, had you determined there
      was at least potentially a U exposure?

A.    No, not with the information I had on hand here.[27]

Elkins' request that the selection/rejection form be secured was
a task to be accomplished in cases in which a passenger was
injured in an insured auto.  It was a "spot check."  It was not
an investigation of "every case that could be bigger than the
available liability insurance" as claimed by Herron.

### September 19, 2002

Michelle Power, attorney for Trailov and Kenick, sent a
letter to Jim Valcarce, then criminal attorney for Herron,
requesting that the letter be sent to the Herrons' insurer.[28]
This was despite the card that was left for Kenick by Vanzant at
the hospital two days prior.[29]  The letter stated that Power
represented "Mary Kenick on behalf of her minor child, Angelina

---

[27] *Id*. at 43, lines 3-24.
[28] Exhibit 7.
[29] Exhibit 5, Deposition of Vanzant at 20-21.

Trailov." There was no mention that Power was representing Kenick for her claim of NIED. In fact, there was no mention of any injuries to Kenick at all in the letter.

### September 21, 2002

Vanzant lists Herron as 100% liable for the accident. This resolves the liability investigation, but does not resolve the damages investigation which was nowhere near conclusion.

> Q.   So by either 9/21 or 9/25, was the liability investigation effectively concluded?
>
> A.   Based on the initial report that had come in with the insured driver losing control into the pole, there was reasonable assumption that [sic] responsible for the accident.
>
> Q.   And so was there any more liability investigation after this? I mean, this is the end of it isn't it? At this point, we move on to the damages investigation?
>
> A.   It appears based on what I am seeing at that point in time, she does not go any further on liability.[30]

The record fails to support Herron's argument that at this point Allstate "had demonstrated a concern that the damages of Trailov were bigger than Herron's liability coverage." At this point, Allstate had no medical records, no medical bills, and there was no evidence that the claim was more than the liability limits.

---

[30] Exhibit 6, Deposition of Craig Elkins at 46, lines 12-24.

Further, by September 25, 2002, Allstate had only set reserves at $25,000, one quarter of the liability limits.[31]

### September 23, 2002

Four days after having received Power's letter of representation and requesting that it be forwarded to Allstate, Valcarce mails it to Robert Herron, Herron's father.[32]

### September 25, 2002

Despite Herron's representations that Allstate was doing little to nothing in this file, there was much activity he fails to recognize. Allstate requested the accident report from the Bethel Police Department by letter.[33] Allstate also sent letters to Margaret Herron and Charles Herron.[34] This was a letter of introduction by Renee Vanzant advising the insureds that Allstate is working on the claim.[35] Robert Herron, Herron's father, then faxed this letter to Valcarce on October 7, 2002.[36] That same afternoon, Valcarce faxed the same letter to Michele Power.[37]

---

[31] Exhibit 8.
[32] Exhibit 9.
[33] Exhibit 10.
[34] Exhibit 11.
[35] Exhibit 12.
[36] Id.
[37] Exhibit 13. In this exhibit, the fax header is from Hedland, Brennan, Heideman & Cooke at the top of the page, date stamped 10/7/03 at 13:37. This document came from Power's file that was produced pursuant to subpoena at her deposition.

Also on this date, the insured (it is unclear if it was Margaret Herron or her husband) called and left a message with Allstate that Trailov had an attorney.[38]  Lastly, on this date, Allstate requested a certified declarations page.[39]

### September 26, 2002

Karen Petersen requests that Kathy Berry send a letter to Herron advising him that the policy does not cover punitive damages.  This was not done until later in the case.

    Q.    What would – why didn't you send one at this point when Ms. Petersen instructed you to do it?

    A.    Well, I think at this point, we don't have the police report, we don't know if punitives are being alleged.[40]

    ...

    Q.    So when the police report was received on October 30, 2002, did you send out the letter regarding punitive exposure?

    A.    No.

    Q.    Why not?

    A.    Well at this point, I don't know that this is a policy limits claim.  I feel like we can settle it within the policy, punitive or no, reach a resolution.[41]

    ...

    Q.    When you receive an instruction from someone like Ms. Petersen that says "need letter to insured," is there any kind of guideline or standard for how promptly you should be sending that letter?

---

[38] Exhibit 14.
[39] Exhibit 15.
[40] Exhibit 16, Deposition of Kathy Berry at 13, lines 15-19.
[41] Exhibit 16, Deposition of Kathy Berry at 14, lines 16-24.

A.    No.[42]

Thus, at this stage there is no requirement that a letter regarding punitive damages be sent.

### October 4, 2002

Kenick signs a "Lien Against Proceeds of Recovery/ Reimbursement Agreement" for her health insurer in which she reveals that she is pursuing a claim with Allstate and that Renee R. Vanzant is the adjuster on the file.[43]  This information likely came from the business card Vanzant left at the hospital for Kenick when she tried to meet with her on September 17, 2002.  The other source of this information could have been when Margaret Herron called Kenick to report the coverages available, as she said she would on September 16, 2002.  This could not have come from Vanzant's letter to Margaret Herron dated September 25, 2002, because that letter was not faxed by Robert Herron to Valcarce until October 7, and subsequently faxed to Power on that same date.

### October 8, 2002

Herron alleges this is the date by which Berry had to comply with the requirement that she reveal herself as the adjuster (10 business days).  The file was transferred to Berry on 9/25/02 or 9/26/02 which would make this requirement fall on

---

[42] Id., Deposition of Kathy Berry at 15, lines 4-8.
[43] Exhibit 17.

10/9/02 or 10/10/02.  However, Power and Kenick both already

knew the claim number, knew Vanzant was involved in the file,

knew how to contact Vanzant and could have easily been

transferred to Berry if they contacted Allstate at any time,

which they did not.

Berry faxes and sends her letter to Power advising that she

is the adjuster on the file on October 18, 2002.[44]

### October 18, 2002

On October 18, 2002, Berry sends a letter to Power

identifying an ongoing investigation and requesting more

information and that a release be signed:

> Please provide me with a complete description of the
> injuries sustained by your client in this accident.
> Please include the names and addresses of your
> client's treating physicians.  Please advise if your
> client is still receiving treatment for the injuries
> sustained in this accident.
>
> I am enclosing a Medical and Wage Authorization form.
> Please have it signed by your client and return it to
> me so that I can secure medical records and other
> information needed to properly evaluate this claim.
> If requested, I will provide you with copies of all
> reports acquired through use of this authorization.
> If you do not intend on providing this authorization,
> please forward all medical bills and medical reports
> as you receive them.  This will assist me in my
> organization of the claim.  We will review all medical
> bills to ensure that the charges incurred are
> reasonable and that the treatment, service, and
> products rendered are necessary.
>
> I am hopeful that through our joint efforts, we will
> be able to bring this manner (sic) to a prompt

---

[44] Exhibit 18.

resolution. I look forward to working with you toward that goal.[45]

### October 30, 2002

Allstate finally receives a copy of the police report it requested 35 days earlier.[46]

### November 5, 2002

Herron alleges that the requirement that Allstate finish the investigation within 30 days was violated as of this date. However, the letter to Power on October 18, 2002 negates this allegation.  The October 18, 2002 letter clearly identifies an ongoing investigation with Berry's request for more information and that a release be signed.[47]

3 AAC 26.050(b) provides that the 30-day deadline is not applicable if the "investigation cannot reasonably be completed using due diligence."  In this case, on this date, Allstate has yet to receive any medical records or bills from claimant, has not yet received any notification of a negligent infliction of emotional distress claim being made by Kenick, and received the police report only five days earlier.  It is readily apparent from Berry's October 18, 2002 letter that the investigation is ongoing and much more information is necessary before it can be

---

[45] Id.
[46] Exhibit 19.
[47] Exhibit 18.

14

completed.  There was no violation of any regulation on this date.

### November 7, 2002

On this date, Elkins asks Berry if she sent the letter and medical authorization to Power.[48]  Berry confirms the letter did go out to Power on October 18, 2002, as discussed above. Because of her review and response to Elkins on November 14, 2002, Berry realizes the authorization was not enclosed, and promptly sends one out.[49]  Berry never received any notification from Power that the authorization was not enclosed with her letter, despite the letter being sent 27 days earlier and the letter clearly stating that an authorization was enclosed. Further, Berry never had any direct contact from Power at all during this time.

Also on this day, Dr. Werner and Dr. Stephens of the Alaska Native Medical Center submit their bills for treatment to Kenick's health insurer.[50]  These same bills were not received by Allstate until March 17, 2003.[51]  As of this date, Power has not supplied Allstate or Berry with any of Trailov's medical bills or records.

---

[48] Exhibit 20.
[49] Exhibit 21.
[50] Exhibit 22.
[51] Id.

### November 8, 2002

The Alaska Native Medical Center sends its bill to Power and to Kenick's health insurer for Trailov's medical treatment from September 16, 2002 and the days following.[52]  This same bill was not received by Allstate until March 17, 2003.  As of this date, Power still had not supplied Allstate or Berry with any of Trailov's medical bills or records, nor had she identified Kenick's claim for NIED.

### November 11, 2002

Denali Anesthesia submits its bill to Mary Kenick for services rendered to Trailov.[53]  This same bill was not received by Allstate until March 17, 2003.  The bill indicates it had been sent to Kenick earlier on October 15, 2002 and on October 16, 2002.  As of this date, Power had not supplied Allstate or Berry with any of Trailov's medical bills or records, nor directly contacted Berry.

### November 13, 2002

Dr. Kiesling of the Alaska Native Medical Center submits his bill for treatment for September 14, 2002.[54]  This same bill was not received by Allstate until March 17, 2003.  As of this date, Power still had not supplied Allstate or Berry with any of

---

[52] Id.
[53] Id.
[54] Id.

Trailov's medical bills or records, despite Berry's October 18, 2002 request for the same.

### November 14, 2002

On this day, Berry double checks the reserves on this file and increases the reserves based on the venue of the claim, not the value of the claim.[55]  What is even more important is that the reserves were set at this point at $75,000, almost $40,000 below the policy limits.  Berry did not believe this was a policy limits case at that time.

Finally, on this day, the Alaska Native Medical Center submits its bill to Power and to Kenick's health insurer for treatment from September 14, 2002.[56]  This bill was not received by Allstate until March 17, 2003.  As of this date, Power still had not supplied Allstate or Berry with any of Trailov's medical bills or records.

### November 25, 2002

Allstate receives the signed medical release back from Trailov.  The release is signed by Kenick on behalf of Trailov and lists a social security number that is not Trailov's.[57]  Travilov's is ████████ , as listed on all of her medical records, and the release states ████████ .

---

[55] Exhibit 21.
[56] Exhibit 22.
[57] Exhibit 23.

Further, Power fails to provide any of the information requested by Berry in her October 18, 2002 letter identifying an ongoing investigation:

> Please provide me with a complete description of the injuries sustained by your client in this accident. Please include the names and addresses of your client's treating physicians. Please advise if your client is still receiving treatment for the injuries sustained in this accident.[58]

Also on this date, the Alaska Native Tribal Health Consortium (Alaska Native Medical Center) first records its medical lien for Angelina Trailov for $10,416.23.[59] This was approximately two and a half months after the accident. Further, at this point, Power had not yet provided Allstate with any medical records, bills, names of medical care providers or any other information.

## December 9, 2002

Kenick's health insurer sends her a letter stating:

> Our records show the patient has primary insurance for these services through an automobile insurance company. As a secondary payor, we need a copy of the front and back of the "Explanation of Benefits" (EOB) for the charges above. An EOB is the form you receive from the auto carrier showing how they paid the claim. If the claim was denied or benefits have been exhausted, we will need a letter from the auto carrier to confirm that benefits were not paid. We will then be able to determine what portion of the remaining balance we can pay.[60]

---

[58] Exhibit 18.
[59] Exhibit 24.
[60] Exhibit 22.

This letter is not received by Allstate until March 17, 2003.

On December 10, 2002, Power sends a letter to Berry stating:

> Please be advised that Angelina Trailov will be examined by a neuropsychologist on December 17, 2002. Thereafter we anticipate making an offer to settle this matter. To that end, please provide me with a copy of Charles Herron's insurance policy at your earliest convenience. I look forward to hearing from you.[61]

This letter was received by Allstate on December 11, 2002.[62] The letter fails to provide the name of the neuoropsychologist. Further, as of this date, Power still had not responded to Berry's October 18, 2002 request for further information and had not provided Allstate or Berry with any medical records or medical bills.[63]

### December 17, 2002

Alaska Imaging Associates submits its bill to Kenick for Trailov's treatment from September 14-16, 2002.[64] This bill was not received by Allstate until March 17, 2003, and Berry until March 18, 2003. As of this date, Power still has not supplied Allstate or Berry with any of Trailov's medical bills, records, or the names of any of the health care providers.

---

[61] Exhibit 25.
[62] Id.
[63] Exhibit 18.
[64] Exhibit 22.

## December 30, 2002

Despite Power's representation that a demand would be forthcoming following the December 17, 2002, neuropsychological examination, here it is two weeks later with no demand, no medical records, and no medical bills.  This is the same amount of time as between Berry's request for additional time to complete her review of Trailov's and Kenick's demands, and the date the offers were made to resolve the cases.  Noticeably, Power did not send the demand letter until six weeks later, on February 14, 2003.

## January 17, 2003

One month after Trailov had her appointment with the neuropsychologist, Power still has not made her demand despite her representations that it would be forthcoming shortly after the examination.  Further, Power has yet to provide any medical records or bills despite the fact that we know at least the medical bills were being directed to Power and Kenick in November.

Berry sends a letter to Power advising her of the status of the investigation, requesting a specific release for medical records as ANMC requires its own release to be used, and enclosing "the certified declarations page detailing the

coverages."[65]  At this precise moment, Power, Kenick and Trailov should all have been aware of all of the coverages that existed under the policy, including medical payments coverage, UIM coverage, and the amount of liability coverage.[66]  Power admits that she did not know of medical payments coverage prior to March 2003, despite having the declarations page listing the medical payments coverage in January 2003.[67]  Further, she was unaware that medical payments coverage was separate from liability coverage at that time.[68]

### February 6, 2003

On this date, Power sends the ANMC release back to Berry with a brief note referencing only the release that Kenick had signed 10 days prior.[69]  The release was received by Allstate four days later, on February 10, 2003.  Power still does not respond to Berry's October 18, 2002 request for information about injuries or medical care providers.  Finally, Power does not give any indication when her demand promised in her December 10, 2002 letter would be provided.

---

[65] Exhibits 1 and 26.
[66] Id.
[67] Exhibit 27, Deposition of Michelle Power at 17-18.
[68] Exhibit 27, Deposition of Michelle Power at 25.
[69] Exhibit 28.

**February 14, 2003**

On this day, Power finally fulfills her representation that a demand was forthcoming, made two months prior.[70]  The demand was received by Allstate on February 18, 2003.  This letter actually contained two demands, one for Trailov and one for Kenick.  This was the first time Power revealed to Allstate that she would be making a demand for negligent infliction of emotional distress for Kenick.  This was the first time Power revealed the extent of the injuries Trailov was claiming.  This was the first time Power revealed the amount of the medical expenses involved.  Since the accident in September 2002, this was the very first substantive communication by Power to Allstate.

Despite the communication being the most substantive to date, it was far from complete.[71]  The letter enclosed certain documents, but it did not enclose all of the medical records, all of the medical bills, the neuropsychological report by this still-unnamed doctor, or any evidence of lost income for Kenick

---

[70] Exhibit 29.

[71] Herron claims that the February 14, 2003 "letter enclosed medical records and bills of over $34,000."  This statement is entirely unsupported.  The letter reflects that it enclosed Exhibits 1-3 but does not list the contents of those exhibits. A review of Power's file that she produced as part of her deposition reveals the letter in correspondence without the exhibits, and there appear to be no documents in her file labeled Exhibits 1-3.  There is no evidence of what was produced with this letter.  Herron's statement is entirely speculative.

related to her claim for negligent infliction of emotional distress.[72]  In short, the communication was woefully lacking in tangible evidence of the injuries and claims.

Finally, while the letter set forth Trailov's and Kenick's demands, it did not provide a deadline for Allstate's response.[73]

## March 3, 2003

Even without full documentation of this alleged brain injury with potential cognitive issues, on March 3, 2003 Craig Elkins, after having reviewed the demand letter from Power,

---

[72] There is evidence that the February 14, 2003 (Exhibit 29), demand letter did not contain all of the medical records, bills, or evidence of Kenick's lost income.  Throughout the file, the medical bills in Allstate's possession are stamped received on March 17, 2003.  *See* Exhibit 22.  Further on March 17, 2003, Berry requested additional information from Power, in particular medical records that were not enclosed with the February 14 demand.  Exhibit 30.  This was confirmed by Berry in her deposition:

> Q.  On February 18th, 2003, what else did you need in order to evaluate Angelina Trailov's claim?
> A.  Well, apparently according to my letter of March 17th, we didn't have all the records from Y-K Regional Hospital ...[T]here were records from when she transferred from Alaska Regional back that we didn't have at that time.  We had no information about Mary Kenick's NIED claim.

Exhibit 16, Deposition of Kathy Berry at 41-42.
[73] Id.

takes her representations on faith and suggests raising the reserves on Trailov's claim.[74]

That same day, Berry follows up on Power's demand, and requests medical records from Alaska Native Medical Center.[75] These records were not enclosed in Power's February 14 demand.[76]

### March 17, 2003

On this date, Allstate receives a number of Trailov's medical bills.[77] At the same time, Berry requests additional documentation that would support Trailov's claim and Kenick's new claim for NIED:

> The information you sent did not include records for treatment following Ms. Trailov's transfer from Alaska Regional Hospital to Alaska Native Medical Center, so we have requested those records. Also, the records we received from Y-K Regional Hospital in January only included treatment on the date of the accident. If Ms. Tailov has received any accident related medical treatment there since that date, please let me know so we can request those, too.

> Please advise as to whether or not Ms. Trailov is claiming this injury negatively affected her schoolwork and, if so, please provide transcripts from her prior two years of school as well as for this school year for comparison.

---

[74] Exhibit 31.  Reserves are set by the adjuster on the file, and are within the discretion of the adjuster to set.  If, after a file review, an adjuster feels raising the reserves is appropriate, the adjuster may do so. If the adjuster feels a raise in the reserves is not necessary, one is not made. Exhibit 6, Deposition of Craig Elkins at 61-62.
[75] Exhibit 32.
[76] Exhibit 16, Deposition of Kathy Berry at 41-42.
[77] Exhibit 22.

Last, has Ms. Kenick received any medical treatment related to her NIED claim?  If so, please provide those records. [78]

That same day, Berry requests all of Trailov's records and bills from ANMC, as she does not possess a complete set of them.[79]

### March 18, 2003

On March 18, 2003, Berry sends a separate letter to ANMC requesting all of the billing records for Trailov.[80]  Berry then sends a letter to Herron enclosing the demand, requesting information about the status of the DWI charge, advising him of coverage and defense, and finally advising him that punitive damages are not covered under the policy.[81]

That same day, Berry opens a claim for Kenick and set the reserves at $5,000.[82]  She reviews the reserves for Trailov and believes that based on the information she possessed at that time, $75,000 was still enough.[83]  Thus, Herron's argument that this was not an excess letter was accurate.  The reserves on this case were set well within the policy limits, and Berry did not believe there was excess exposure for Herron.  There was no indication in the record that there was excess exposure.

---

[78] Exhibit 30.  This letter was faxed and mailed to Power.
[79] Exhibit 32.
[80] Exhibit 22 at page 12.
[81] Exhibit 33.
[82] Exhibit 34.
[83] Id.

Further, the demands for settlement were within the policy limits.

### March 26, 2003

Valcarce writes to Berry confirming that Herron pled not guilty to the DWI charge, and was still pending trial.[84]  This directly contradicts Power's February 14 demand wherein she states that Herron was already convicted of the charge.[85]  Valcarce acknowledges receipt of the settlement demand from Power and that any punitive damages would not be covered.  Valcarce then "insists" that Allstate settle the case within the policy limits.  He does not demand that the policy limits offers be accepted.  He does not agree that the claims are worth policy limits.  He does not state that he believes there is a substantial likelihood that his client faces excess exposure.

On this same day, Allstate receives Berry's request for records from ANMC back, stamped "REQUESTS FOR INFORMATION TAKE 3-5 BUSINESS DAYS TO BE PROCESSED."[86]  It is unclear if the medical records accompanied this document or arrived at a later date.[87]  Herron's argument that, "With the exception of few Y-K records provided on April 14, 2003 by Angstman Law Office regarding Trailov's treatment after returning to Bethel,

---

[84] Exhibit 35.
[85] Exhibit 29.
[86] Exhibit 32.
[87] Exhibit 16, Deposition of Kathy Berry at 47.

Allstate has all the medical records it will ever possess," is just plain false.  As of this date, Power still has not provided the neuropsychological report, or even the name of the neuropsychologist referenced in her December 10, 2002 letter, despite Berry's request for a list of providers in October 2002.

### April 10, 2003

Power sends Berry a letter and for the first time articulates the damages Kenick is alleging under the NIED claim.[88]  The letter is received by Allstate on April 14, 2003. Unfortunately, Power fails to provide any evidence of this lost income Kenick is claiming. Power does state, "Long time friends of Ms. Kenick will testify to the changes which have occurred as a result of the September 14, 2002, (sic) incident."  However, Power does not provide any names or contact information for Allstate to verify Kenick's alleged change in personality.

Power further relates that the impact of Trailov's head injury may not be known for years, but again does not enclose any neuropsychological records from December 2002, or even the name of the neuropsychologist.  At the same time, Power admits that any damages from a head injury are not reflected in Trailov's high school transcript, but again, does not enclose the same.  Next, Power alleges that Trailov had continuing back pain, and does enclose the additional records from Y-K Delta

---

[88] Exhibit 36.

Regional Hospital that Berry had requested 23 days before on March 17, 2003.  Finally, Power asks Berry to respond to the policy limits demands by May 16, "unless there is some discussion regarding pre-filing resolution."[89]  Power states that "Ms. Kenick is anxious to resolve both claims and I cannot let this case languish."  Power does not provide any explanation for her almost month-long delay in providing the Y-K records and the unsubstantiated information regarding Kenick's alleged lost income she attributes to the NIED claim.  Power provides no explanation as to why she let the case languish in her office for all of this time.

### May 9, 2003

Berry sends Power a letter acknowledging receipt of the April 10, 2003 letter and the additional medical records it conveyed.[90]  Berry, continuing pre-litigation discussions, states: "We are in the process of completing our evaluation of Angelina Trailov's claim and anticipate responding to your demand by your May 16, 2003 deadline."  This would certainly qualify as "some discussion regarding pre-filing resolution."

Further, Berry requests documentation to support Kenick's claim for lost income and "any documentation that will support

---

[89] Id.  By the time the letter was received by Allstate, April 14, 2003, Berry had 30 days to respond.  This was virtually the same amount of time it took Power to respond to Berry's request for further information in March 2003.
[90] Exhibit 37.

Ms. Kenick's claim for negligent infliction of emotional distress." This request is based on Power's April 10, 2003 letter confirming that Kenick has not sought counseling "to date" but that she may seek counseling. To date, Power provided no evidence to support either the lost income or the NIED claim despite Berry's request for the same on March 17, 2003, 52 days prior. But according to Herron, there was no languishing on Power's part.

### May 16, 2003

Power finally responds, but only partially, to Berry's request for more information.[91] Power provides pay stubs from Kenick's old job and new job showing a decrease in salary, but nothing to support why she changed jobs other than Power's representations. Despite the fact that Power knows her deadline for the settlement offer is this day, her letter and enclosures dated May 15, 2003 are not faxed to Allstate until May 16, 2003 at 11:27 am! Power provides no other documentation, and fails to state whether Kenick began the counseling as referenced in Power's April 10, 2003 letter.

Because of Power's delays in providing information and allowing the file to languish in her office, Berry has no choice other than to request an additional two weeks worth of time to complete the review of this matter and obtain settlement

---

[91] Exhibit 38.

authority.[92]  Within three hours of receiving Power's inadequate additional information, Berry faxes Power and tells her she requires additional confirmation from Power of Kenick's claim for lost income, and whether treatment records exist for Kenick's claim for NIED.[93]  She further informs Power that she has not completed the review of Trailov's claim and intends to have it completed by the end of the month, and hopefully sooner.

There was no response or objection to Allstate's letter that fifteen additional days were needed to respond to Trailov's demand.  There was no phone call, no letter, and no facsimile from Trailov and Kenick that they did not consider Allstate's continuing correspondence discussions in furtherance of pre-litigation resolution of their claims as satisfying the requirements of their April 10, 2003 letter.[94]

### **May 30, 2003**

On May 30, 2003, within the timeframe Allstate stated that it would complete its evaluation, Allstate faxed a full policy limits settlement offer to Trailov.[95]  Allstate also made a $10,000 offer to Kenick, noting that it still did not have the requested documentation to fully evaluate Kenick's claim with

---

[92] Exhibit 39.
[93] Id.
[94] Silence from Trailov and Kenick was normal throughout the course of this matter.  Many times they would not respond, or it would take a lengthy period of time for them to respond.
[95] Exhibit 40.

regard to changing employment, and that Allstate would reevaluate this claim if documentation was provided.[96]  On the same day, unbeknownst to Allstate, Power faxed the letter to Douglas G. Johnson, "Faxed 5/30 to D.J."[97]  It is beyond dispute that Allstate was engaged in active "discussions regarding pre-litigation resolution."

Late on May 30, 2003 or the following week, Allstate received a letter dated May 29, 2003, from attorney Douglas G. Johnson with the Law Offices of Dennis M. Mestas, P.C., purporting to be co-counsel for Trailov and Kenick and retained to file suit against Herron and suggesting that the policy limits offers of February 14, 2003 lapsed on May 16, 2003.[98] Prior to this letter, Allstate had never received any notification from Trailov or Kenick, or their attorney, Michelle Power, that Dennis Mestas was authorized to act on their behalf. At all times, Allstate had been dealing with Power of Myron Angstman's office as Trailov's and Kenick's representative pursuant to the letters of representation sent to Herron and Allstate in September 2002.[99]

---

[96] Id.
[97] Exhibit 41.
[98] Exhibit 42.
[99] See e.g., Exhibit 7.

Berry did not receive this letter before she sent her letter to Power.[100]  Berry had no knowledge that Johnson was involved in the case, and had received no information from Power regarding the same.[101]  Berry made every effort to bring the case to resolution, but to no avail.[102]

### June 4, 2003

Berry sends letters to Mestas/Johnson and Power, and also sends copies of the letters to Herron and requests contact.[103]

### June 10, 2003

Valcarce telephones Berry and tells her he believes Kenick and Trailov may try and hold Trailov's claim hostage to try to obtain a higher settlement for Kenick's NIED claim.[104]  Valcarce tells Berry that he believes plaintiff has a poor case because they never set a timeline for acceptance or rejection of their offers.[105]

**V.    HERRON HAS NO VALID CLAIMS TO ASSIGN; HERRON CLEARLY BREACHED THE DUTY TO COOPERATE IN DEFENSE OF CLAIMS**

Herron argues that because Judge Singleton denied Allstate's Motion for Summary Judgment, the converse is true - that this court must grant his.  This argument fails in many respects.  First, it fails to demonstrate that Herron has any

---

[100] Exhibit 43, Deposition of K. Berry at 110.
[101] Exhibit 27, Deposition of M. Power at 32-33.
[102] Exhibit 44.
[103] Exhibit 45 and 46.
[104] Exhibit 47.
[105] Id.

cognizable claims to be assigned.  Second, it ignores the fact
that the court already concluded that there were disputed issues
of material fact preventing resolution by summary judgment.
Finally, it ignores the law specifically cited by the court:
"Under Alaska law, determinations of whether an insurer is
acting in good faith is normally a factual issue, making summary
judgment improper."[106]

The policy contains an express assistance and cooperation
clause which mandates cooperation in settlements and lawsuits.[107]
The policy further expressly provides that Allstate cannot be
obligated for actions an insured person takes except as
specified in the policy.[108]  The policy also provides that no
insured person may sue Allstate unless there is full compliance
with all of the policy terms.[109]  In addition to these express
provisions, as recently confirmed by the Alaska Supreme Court in
Jackson, there is implied in every insurance contract the
covenant of good faith and fair dealing, which precludes Herron
from taking action that would injure Allstate's rights.[110]  By
confessing judgment and assigning any claims, Herron breached

---

[106] Docket 79 at 7, *citing* Jackson v. Am. Equity Ins. Co., 90
P.3d 136, 141-44 (Alaska 2004); Grace v. Ins. Co. of N. America,
944 P.2d 460, 467-68 (Alaska 1997); and State Farm Mut. Auto
Ins. Co. v. Weiford, 831 P.2d 1264, 1267-69 (Alaska 1992).
[107] Exhibit 1, at pages 35 and 36.
[108] Id.
[109] Id. at page 36.
[110] Jackson v. Am. Equity Ins. Co., 90 P.3d 136, 141 (Alaska
2004).

his express and implied contractual obligations.  Herron took matters into his own hands, depriving Allstate of the contractual right to manage the litigation.

Herron further misdirects this court with his recitation of the law.  Not all of the duties that flow from the contract flow from the insurer to the insured.  The insured also has a number of duties under the contract and the insured's actions are also subject to the covenant of good faith and fair dealing in every insurance contract.

> The covenant of good faith and fair dealing is implicit within every insurance contract; it requires "that neither party will do anything which will injure the right of the other to receive the benefits of the agreement."[111]

This is not a case where the insurer refused to defend the insured.  Herron was being defended by an attorney of his own choosing and a lawyer that had represented him since the day of the accident, September 14, 2002, James Valcarce.  Herron will argue that he was not provided with a full defense because Allstate would not provide him assurances that if there was an excess verdict Allstate would pay the entire amount of the verdict regardless of the policy limits.

---

[111] Jackson, *quoting* Guin v. Ha, 591 P.2d 1281, 1291 (Alaska 1979).

As a matter of law, Allstate had no obligation to provide Herron with an assurance letter or promise to pay any judgment against him in excess of the policy limits.

> [T]he covenant of good faith does not broadly require an insurer to give its insured pre-trial assurances that it will cover an excess judgment against the insured if the insurer fails to accept a plaintiff's policy limits demand.  [This] theory would translate into a general duty to issue a pre-trial waiver of policy limits, and there is no such broad duty.[112]

"The insured defendant . . . both fulfills his contractual duty and protects his own interest by cooperating fully with his insurer."[113]  "'Ordinarily, an insured's breach of [a] cooperation clause relieves a prejudiced insurer of liability under the policy.'"[114]  Confessing judgment constitutes such a breach.  When Herron confessed judgment, he breached his duty to cooperate.  He breached the contract of insurance without reason because Allstate fulfilled all of its obligations.

In _Grace_, the Court held that the insured, Bell Helmets, breached its duty to cooperate with its insurer, INA, by failing to obtain the insurer's consent before confessing liability in

---

[112] _Jackson v. American Equity Ins. Co._, 90 P.3d 136, 141 (Alaska April 2, 2004)

[113] _Guin_, 591 P.2d at 1290.

[114] _Grace v. Insurance Co. of North America_, 944 P.2d 460, 464 (Alaska 1997) (quoting _Arizona Property & Cas. Ins. Guar. Fund v. Helme_, 735 P.2d 451, 458-59 (1987)).

return for a covenant not to execute.[115]   The Court concluded

that Bell's conduct voided coverage.

> Bell's settlement not only confessed liability on
> INA's behalf, but also resulted in the entry of a
> judgment which would require INA to pay the maximum
> amount possible under its policy.   INA did not consent
> to this settlement.   The settlement violated INA's
> cooperation clause.   Moreover, that breach prejudiced
> INA by exposing it to a judgment in excess of
> $17,000,000.   As a result, Bell's breach voids INA's
> coverage, unless INA's misconduct justified Bell's
> breach.[116]

As the insured did in _Grace_, Herron breached his

obligations to Allstate by confessing judgment and assigning

claims against Allstate.   On April 2, 2004, _after_ Allstate had

specifically asked Herron not to do so and _after_ this action had

been filed to declare the rights and obligations of the parties,

Herron signed a confession of judgment in favor of Trailov and

Kenick in the amount of $1,937,500, an amount well in excess of

the policy limits.[117]   At the same time, Herron also assigned any

claims he may have had against Allstate to Kenick in return for

a covenant from her and Trailov not to execute the confessed

judgment against his assets.[118]   Herron's actions were a clear

breach of his obligations under the policy.   This is undisputed.

---

[115] _Id_. at 464.
[116] _Id_.   _See also_, _Great Divide Ins. Co. v. Carpenter ex rel. Reed_, 79 P.3d 599, 610 (Alaska 2003) (acknowledging an insured's confession of judgment may breach the cooperation clause).
[117] Exhibit 48.
[118] _Id_.

Herron's breach also materially prejudiced Allstate.  The confessed judgment vastly exceeds the policy limits for bodily injury coverage under the policy.[119]  There are no genuine issues of material fact regarding the prejudicial effects of Herron's confession of judgment and assignment of claims.

> The purpose of a cooperation clause is to protect the insurer in its defense of suits by obligating the insured not to intentionally and deliberately take any action which would substantially affect adversely the insurer's defense, settlement, or other handling of the claim.[120]

Herron's confession of judgment completely stripped Allstate of its ability to defend, settle, or otherwise handle the underlying civil action, thus materially prejudicing Allstate by denying it the ability to take any further action.  Herron's assignment of claims resulted in a third lawsuit; this time directly against Allstate and its adjuster Kathy Berry, which Allstate must now expend additional time and money to defend.[121]  Additionally, while it is well established in Alaska law that an insured's breach of his contractual obligations is excused by a prior material breach of the contract by the insurer, Herron's

---

[119] *See* Grace v. Ins. Co. of N. America, 944 P.2d 460, 464 (Alaska 1997).
[120] American Policyholder's Ins. Co. v. Baker, 119 N.H. 958, (N.H. 1979).
[121]  The first lawsuit is the personal injury action brought by Trailov and Kenick against Herron. The second lawsuit is this declaratory judgment action.  This third lawsuit is the most recent action Kenick brought against Allstate and Berry based on the assignment from Herron that is currently stayed in Bethel pending the outcome of this action.

breach in this matter is not excused by Allstate's prior actions.[122]  Allstate fulfilled its contractual obligations to Herron and acted in good faith by timely attempting to settle Trailov's claims for policy limits and Kenick's claims within policy limits; and specifically by complying with Kenick's and Trailov's deadline for "some discussion regarding pre-litigation resolution."[123]

    A.   <u>Allstate Properly Investigated and Evaluated This Claim</u>.[124]

On October 18, 2002, Berry sent a letter to Power identifying herself as the adjuster on this matter, advising of the ongoing investigation, requesting more information, and asking that a release be signed:

> Please provide me with a complete description of the injuries sustained by your client in this accident. Please include the names and addresses of your client's treating physicians.  Please advise if your client is still receiving treatment for the injuries sustained in this accident.
>
> I am enclosing a Medical and Wage Authorization form. Please have it signed by your client and return it to me so that I can secure medical records and other information needed to properly evaluate this claim. If requested, I will provide you with copies of all reports acquired through use of this authorization. If you do not intend on providing this authorization, please forward all medical bills and medical reports as you receive them.  This will assist me in my organization of the claim.  We will review all medical bills to ensure that the charges incurred are

---

[122] *See* <u>Grace</u>, 944 P.2d at 464-65 (Alaska 1997) (citing cases).
[123] Exhibit 36.

reasonable and that the treatment, service, and products rendered are necessary.

I am hopeful that through our joint efforts, we will be able to bring this manner (sic) to a prompt resolution. I look forward to working with you toward that goal.[125]

Plaintiff argues that there was a delay in Berry identifying herself as an adjuster on this file.  Even if there was an alleged delay in identifying herself, what was the harm? On September 16, 2002, Vanzant of Allstate informed Margaret Herron of the available coverages under the policy, and Mrs. Herron said that she would pass the information along to Kenick. On September 17, 2002, Vanzant attempted to call Kenick, but could not reach her.  She then went to the hospital to speak with Kenick, who was not there.  Vanzant was not allowed to speak to Trailov because she was a minor.  As such, Vanzant left her business card with the claim number on it at the nurses' station.  The nurses confirmed that they would provide the same to Kenick.  Kenick never called Vanzant.  Instead, Kenick retained Power on September 19, 2002, and then used the information Vanzant provided to fill out a form for her health

---

[124] Herron once again relies on the actions of Scott Millar, the Allstate adjuster assigned to Trailov's medical payments claim, to further allege a failure to investigate.  However, as discussed in a separate motion, Millar was the medical payment adjuster.  Medical payments is Trailov's first-party claim, and Herron has no standing to try to bootstrap Trailov's medical payments allegations onto his claim.
[125] Exhibit 18.

insurer on October 4, 2002.  Neither Power nor Kenick ever
called Allstate despite Vanzant's attempts to contact Kenick.

Herron may argue that the delay in resolving the case was
the harm if the notification of the file transfer to Berry was
delayed a few days.  The delay on Power's and Kenick's side was
even lengthier.  Despite being sent medical bills and records in
October and November 2002, Power did not supply the medical
records to Allstate until February 2003.  Power further did not
supply the medical bills until March 17, 2003.  Some of these
bills were already *five* months old.  Power *never* responded to
Berry's October 18, 2002 request for a list of medical care
providers.  After Berry's October 18, 2002 letter, Power did not
send a letter to Berry until almost two months later, December
10, 2002, wherein she stated that Trailov would be going to a
neuropsychologist, without providing the name of whom, and
finally, that a settlement demand would be forthcoming.  There
was no further substantive contact from Power until the February
14, 2003 letter, 66 days from the last contact.

Power then delayed for almost a month in providing the Y-K
records and the unsubstantiated information regarding Kenick's
alleged lost income she attributes to the NIED claim.  Finally,
and most importantly, she waited until mid-morning on the date
of the alleged deadline, May 16, 2003, to provide copies of
Kenick's paycheck stubs to Allstate.

Any argument by Herron that a possible minor delay in Berry announcing herself as the new adjuster on the file is overshadowed by Power allowing the case to languish and not responding to Allstate's numerous requests for information in a timely fashion. Further, it is abundantly clear that the investigation could not have been completed in the month of October, as neither Kenick nor Power provided any information to Allstate about Trailov's claim, and Power never revealed Kenick's claim for NIED until February 2003. Throughout the investigation, Berry kept Power informed about the information she needed and made the appropriate requests.

Herron next argues that Berry violated 3 AAC 26.040 by waiting two months to send out a release. Berry sent a letter to Power requesting either all of the medical records and bills, or for Kenick to sign a medical release for Trailov and provide Berry with the names and locations of the medical care providers. Berry inadvertently left the release out of the fax, even though it was referenced. Power never informed Berry of the mistake in not enclosing the release. Power never sent any medical records or bills as requested by Berry.[126] When Berry realized her mistake, she promptly faxed the medical records

---

[126] If Kenick and Power were in such a hurry to resolve the claim, when they realized there was no release with the letter, they could have chosen to comply with the alternative request and provide the bills and records. Instead, they remained silent.

release to Power.   Power returned the release, but <u>never</u>

provided a list of the medical care providers as requested.

Herron is quick to condemn Allstate for not moving forward

fast enough but he ignores Power's and Kenick's lackadaisical

attitude, lengthy delays in responding to requests for

information or providing information, not providing the names of

treating physicians, hiding the name of the neuropsychologist

Trailov was seeing in December 2002, not providing all of the

medical records or bills in their possession, and finally

providing no evidentiary support for their broad allegations of

damages.   While Allstate's investigation and adjusting of this

claim may not have been picture perfect, Allstate worked hard to

gather the necessary information, evaluate the claim, and bring

the matter to resolution.   Allstate did not breach any duties

to investigate these claims.

B.   <u>Allstate Appropriately Kept Its Insured Advised</u>.

On March 18, 2003, Berry sent a letter to Herron, which was

provided to Valcarce, that advised Herron of the settlement

demand and informed him that Allstate did not have enough

information to evaluate the claim yet.[127]   Such further necessary

information included medical records from Y-K, additional

---

[127] Exhibit 33.

42

medical bills, and any evidentiary support for Kenick's NIED claim.[128]

Eight days later, Valcarce responded and asked Allstate to settle the claims within policy limits, and confirmed that Power had misrepresented the status of Herron's criminal charges in her February 14, 2003 letter.[129]

As for Herron's allegations that he was never informed of the May 16, 2003 alleged "deadline" and the possibility that Allstate might not be done with its evaluation by then, those allegations are flat out false.  On May 9, 2003, Berry sent a letter to Power stating, "We are in the process of completing our evaluation of Angelina Trailov's claim and anticipate responding to your demand by your May 16, 2003 deadline."[130]  A copy of this letter was sent to Herron by Berry.  Berry further requested evidence to substantiate Kenick's claim for lost income relating to her NIED claim.[131]

C. <u>There Was No Substantial Likelihood of An Excess Verdict</u>.

Herron tries to make hay with the fact that Allstate never sent him an "excess" letter, a letter stating that there is a

---

[128] Only the day before had Allstate received the first medical bills in the case and they were not complete.
[129] Power stated that Herron had been convicted, when he had not and was still pleading not guilty.
[130] Exhibit 37.
[131] <u>Id</u>.

risk that a judgment would be more than his policy limits and he would be liable for that amount above the insurance limits.

"When a plaintiff makes a policy limits demand, the covenant of good faith and fair dealing places a duty on an insurer to tender maximum policy limits to settle a plaintiff's demand when there is a substantial likelihood of an excess verdict against the insured."[132]  What does "substantial likelihood of an excess verdict" mean?  Herron argues that it means merely "possible."[133]  Herron is wrong.  "Substantial likelihood of an excess verdict" means a "great risk of recovery beyond the policy limits."[134]  This is a fact-based analysis in which the trier must ascertain (1) the reasonable value of the claim, and (2) whether there was a substantial risk of an excess verdict.  Neither may appropriately be decided on a motion for summary judgment.

Review of the record demonstrates that at no time prior to May 30, 2003 was there any risk of recovery beyond the policy limits.  When Allstate was first notified of Trailov's claim and her injuries, reserves were set at $25,000.[135]  At that point in time, Allstate had no medical records and no medical bills.

---

[132] <u>Jackson v. American Equity Ins. Co.</u>, 90 P.3d 136, 142 (Alaska 2004), *citing* <u>Schultz v. Travelers Indem. Co.</u>, 754 P.2d 265, 266-67 (Alaska 1988).
[133] *See* Herron's Motion for Summary Judgment at 32.
[134] <u>Jackson</u>, 90 P.3d at 142, *quoting* <u>Crisci v. Sec. Ins. Co.</u>, 426 P.2d 173, 176 (Cal. 1967).
[135] Exhibit 2.

Allstate knew only that Trailov was being treated in Anchorage.[136]  Approximately one month later, Allstate learned Trailov may have suffered a basal skull fracture and fluid in her lung as a result of the accident.  Based on this information and the venue itself, Allstate raised the reserves on Trailov's claim to $75,000.[137]  At this point, Allstate still did not have any medical records and bills.

When Power sent her February 14, 2003 demand, she requested the following:

> Based on the above, Mary Kenick authorized me to make a policy limits demand plus attorney's fees, costs and interest on behalf of her daughter's claim and a policy limits demand plus attorney's fees, costs and interest to settle her claim.  Please convey this to your client and advise of his response.[138]

Power did not allege damages in excess of the policy limits. Based on the information available as of the date of the settlement demand, there was no substantial likelihood of an excess verdict.  Allstate did not have all of the medical records.  No bills were received by Allstate until March 17, 2003, and even then it was not all of the bills.  Allstate had no documentation supporting Kenick's claim for NIED.  One cannot conclude that there was any substantial likelihood of an excess verdict at that time.

---

[136] Id.
[137] Exhibit 21.
[138] Exhibit 29.

45

On March 18, 2003, one month after Allstate received the initial settlement demand letter, and one day after it received a portion of the medical bills, the reserves were reviewed once more.  It was determined that based on the information in its possession to date that the reserves were fine at $75,000.[139]  Allstate continued its process of gathering the missing medical records and bills that Power, Kenick and Trailov failed to provide despite their own receipt of the same several months prior.

Berry then sent a letter to Herron advising him that Allstate did "not have enough information to complete our evaluation of this claim," and further advising him that punitive damages were not covered under the policy.  The letter was not an excess letter because such a letter was not necessary.[140]  Berry "never felt like this claim was in excess of the policy," and therefore did not send an excess letter.[141]  In fact, Berry clearly testified that it is appropriate to send an excess letter when "there's a high probability it's in excess of policy limits."[142]

On April 10, 2003, Power sent another letter to Allstate placing the May 16, 2003 deadline on the policy limits offers to

---

[139] Exhibit 34.
[140] Exhibit 16, Deposition of Kathy Berry at 57.
[141] Id. at 57.
[142] Id. at 58.

settle "unless there is some discussion regarding pre-filing resolution."[143]   In that letter, neither Trailov nor Kenick ever alleged any damages in excess of the policy limits.  They continued to maintain that they would settle for the policy limits.  There still was no threat of excess exposure.  Further, at this point, Kenick had provided zero evidence of her claim of lost income she alleged resulted from her NIED damages.[144]  Even when Kenick did respond and attempt to support her claim, the evidence she produced was woefully inadequate.[145]  When the evaluation was complete, the reserves for Trailov were set at $112,500, the policy limit because Allstate was going to accept the policy limits demand from Trailov.[146]

Kenick's claim was evaluated, and at that point in time it was not clear it was even a valid NIED claim.[147]  Lacking any further information from Kenick or Power, the claim was valued at $10,000, and the same was counter-offered for settlement.[148]  There was no substantial likelihood of an excess verdict.

Additionally, there was never a substantial likelihood of excess exposure because Trailov's claim was not that large.  She incurred about $34,000 in medical bills.  Allstate's medical

---

[143] Exhibit 36.
[144] Exhibit 37.
[145] Exhibit 38.
[146] Exhibit 49.
[147] Exhibit 50.
[148] Exhibit 51.

payments coverage paid for at least $25,000 of those bills.[149]
This left Trailov with about $11,000 in medical bills –
certainly this is not an amount that would threaten to reach a
policy limit judgment.[150]

Herron also once more tries to hang his hat on the argument
that Allstate opened a UIM investigation in September 2002, and
therefore an excess letter should have been sent at that time.
As previously noted, no UIM investigation was opened in
September 2002. There was instead a "company requirement or
task that [Craig Elkins] secure the selection/rejection form or
ensure the insured had an opportunity on the UM/UIM
endorsements."[151]

> Q. Okay. Was it in every claim file?
>
> A. The ones that I was tasked to look at were more
>    the objective injuries in the insured's car, as a
>    passenger. And that's what I am doing here.
>
> Q. But it would be – I mean, was it in cases where
>    there was potentially U exposure?
>
> A. It was in all – essentially, I was spot checking
>    and tasking on these type of cases here where we
>    had an injured party in an insured auto. And as
>    part of my job [sic] was to go in and request to
>    the claim representative just to ensure that was
>    on file.
>
> Q. Okay. But if there was no realistic U exposure,
>    would you still have made this request?

---

[149] Exhibit 52. More if Power had negotiated the liens as she
should have.
[150] Exhibit 22.
[151] Exhibit 6, Deposition of Craig Elkins at 42, lines 15-18.

A.    In my spot checks, I was tasked to do that.

Q.    In every file where a passenger was injured?

A.    The – on this type of file here, I was asking for this type of request in my spot checks of the claims reps.

Q.    Okay.  But by this date, had you determined there was at least potentially a U exposure?

A.    No, not with the information I had on hand here.[152]

Elkins' request that the selection/rejection form be secured was a task to be accomplished in cases in which a passenger was injured in an insured auto.  It was a "spot check."  It was not an investigation into UIM coverage for Trailov.

Finally, Herron's expert argues that Allstate did not inform Herron he might be liable for AS 09.60.070 attorney fees.  Such fees are punitive in nature and therefore Berry's letter was sufficient.  On March 25, 1991, the House Committee on Health, Education and Social Services discussed changes to HB 100 that included the following:

> Jay Frank, Lobbyist for State Farm, Allstate and Progressive Insurance Companies, offered comments from the prospective people who participate in the civil justice system. He said that to the extent that HB 100 was attempting to mitigate victims being victimized again by the system was an extremely good idea.  Mr. Frank expressed some concerns by the insurance industry with the section that dealt with the recovery

---

[152] Id., Deposition of Craig Elkins, at 43, lines 3-24.

of triple damages from the offender.  He remarked that
as HB 100 is written, the perpetrator of the crime is
not punished by the triple damages provision if that
person is insured, because the financial contribution
was going to be made by the insurer.  He said there
should be a limitation on the recovery from the
insurer limit to the person's actual compensatory
damages.  Mr. Frank noted that the same comment would
hold true with respect to the attorney's fees.  Mr.
Frank commented, "Let's make the insurer responsible
for what they are required to provide by law right
now, but the extent that HB 100 wants to be punitive,
wants to punish the perpetrator above and beyond that,
lets not require the insurance industry to bear that
cost."

Further, at that point in time, Herron was represented by
Valcarce.  It would have been inappropriate and highly unusual
for Valcarce not to inform his client of this risk in
considering a plea agreement.

There was no excess letter sent because there was no
substantial likelihood of an excess verdict.

D.    <u>Allstate Tendered Limits to Trailov, There Was No
      Breach</u>.

Importantly, Trailov and Kenick did <u>not</u> demand that
Allstate accept their offers by May 16, 2003.  On the contrary,
Trailov and Kenick stated they would revoke their offers <u>only if</u>
Allstate did not continue discussions aimed at resolution of
their claims.[153]   This is a crucial fact recognized by

_____

[153] Exhibit 36.

Allstate's experts although not Herron's.[154]  This was an invitation to continue discussion, not a "drop-dead" deadline.[155]

Allstate continued its discussions with Trailov and Kenick to resolve their claims.  On May 9, 2003, Allstate informed Trailov and Kenick that it was in the process of evaluating Trailov's claims for settlement and anticipated that its evaluation would be complete by May 16, 2003.[156]  "We are in the process of completing our evaluation of Angelina Trailov's claim and anticipate responding to your demand by your May 16, 2003 deadline." [157]

As to Kenick's claims, Allstate did not have enough information to fully evaluate her damages claims and requested additional documentation of her loss of income claim due to changing employment.[158]  "With regard to Mary Kenick's claim, we do need some type of documentation that her job change resulted from the effects of Angelina's injury and that she is earning less money at her new job."[159]  Allstate also again requested additional documentation regarding Kenick's negligent infliction of emotional distress claim.[160]

---

[154] *See* Charles Bean's and Robert A. Lohr's reports, Exhibits 53 and 54, respectively.
[155] Id.
[156] Exhibit 37.
[157] Id.
[158] Id.
[159] Id.
[160] Id.

On May 16, 2003, Allstate again informed Trailov and Kenick of the status of their claims and again requested additional information to support Kenick's claim, at all times working toward pre-litigation resolution of their claims.[161]  Allstate also informed Trailov and Kenick that it needed an additional 15 days, until the end of May, to complete its evaluation and respond to their settlement demands due to the complexity of Trailov's claims and injuries.[162]  Trailov had earlier acknowledged the complexities of her injuries, noting that the impact of her moderately traumatic brain injury was not obvious and may not be known for years.[163]

Trailov and Kenick did not object or respond to Allstate's letter.  In fact, as of May 16, 2003, Kenick was still providing documentation of her claims.[164]

At no time did Trailov or Kenick inform Allstate that they did not consider the correspondence between themselves and Allstate "discussion regarding pre-litigation resolution of their claims."  At all relevant times, Allstate kept the

---

[161] Exhibit 39.

[162] Id.

[163] Exhibit 36.

[164] Exhibit 38.   Herron will undoubtedly argue that Allstate was no longer receiving any information about Trailov at that point in time and therefore could have settled Trailov's claim on May 16, 2003.  There is no guarantee Trailov and Kenick would have been willing to settle one claim without the other.  In fact, Herron's own attorney admitted that he believed Trailov was not willing to settle her claim in hopes of bolstering Kenick's claim.  Exhibit 47.

dialogue and discussions open with information flowing in both directions.  Allstate continued to keep Trailov and Kenick informed of the status of its evaluation of their claims, including asking for and receiving additional information to support their claims.

Allstate undisputedly fulfilled the condition precedent to keeping the February 14, 2003 offers open by discussing resolution of the claims.  The facts are undisputed.  As a matter of law, the deadline did not lapse prior to Allstate's May 30, 2003 response.

> Allstate did not breach its contractual obligations. Its May 30, 2003 offer to pay policy limits to Ms. Trailov for her liability claim and its separate offer of $10,000 to Ms. Kenick for her NIED claim were made in good faith, following a thorough investigation of the claims.  No deadline for an offer to settle the claims was breached because no deadline to settle had been missed by the time of Allstate's offer to settle.
>
> In my opinion, the exchange of letters between Allstate and Ms. Power clearly met Ms. Power's requirement for 'some discussion regarding pre-filing resolution' in a timely manner.  Information directly relevant to the claims was exchanged to advance the understanding of the value of claims.[165]

Separately, and in the alternative, Allstate substantially complied with the deadline by responding with policy limits authority within 14 days, and within the timeframe Allstate had promised to respond.[166]  The May 16, 2003 "deadline" was

---

[165] Exhibit 54, Expert Report of Robert A. Lohr at 500044.
[166] Exhibit 40.

arbitrary in any event.  There was no reason, or at least no reason communicated to Allstate, that Trailov and Kenick had to have a response to their policy limits demands by May 16, 2003.[167]  The statute of limitations to file a civil action based on a September 14, 2002 injury had over a year left to run.[168] There were no impending financial crises.  There was no impending surgery or medical treatment.  In fact, Kenick had just provided Allstate with pay stubs on May 16, 2003 to support her claim for loss of income due to changing jobs.[169]

The material facts are a written exchange of settlement discussions: the underlying claimants' original attorney's February 14, 2003 policy limits demand; her April 10, 2003 reiteration of that demand with a qualified deadline ("offer...will be revoked unless there is some discussion regarding pre-filing resolution"); the parties' continued discussions regarding pre-filing resolution of the claim, including Allstate's May 16, 2003 request for two additional weeks; and finally, Allstate's tender of full policy limits to claimant Trailov and an offer to claimant Kenick within those two weeks.  Judge Singleton already ruled that that there was a question of fact as to whether there was a breach or if Allstate

---

[167] Exhibit 55, Deposition of M. Kenick at _____.
[168] *See* AS 09.10.070(a).
[169] Exhibit 38.

was in good faith with its May 30, 2003 tender letter.[170]  Herron

does not and cannot cite to any new facts that would change this

ruling, because there are no facts that rebut this exchange of

written letters.  There was a question of fact on May 14, 2005,

and there remains a question of fact now.

    E.    <u>Herron's Unsupported Accusation of Racial
Discrimination</u>.

    Herron next tries to sway this court with outrageous,

defamatory accusations at pages 34-35 of his Motion.  He accuses

Allstate of trying to get out of paying the medical payments

coverage to Trailov because she is Native.  This is not only

inflammatory and outrageous, but it is flat out false.[171]  Power,

Kenick and Trailov never submitted any medical bills to Allstate

until March 17, 2003, and at that point they did not provide the

complete bills.  This is despite the fact that many of these

bills had been in Kenick's possession for several months.

Allstate then tendered the full medical payments coverage,

$25,000, to Power to distribute to medical care providers as

Kenick and Trailov wanted.  Additionally, Power had the policy

declarations in January 2003 which revealed the medical payments

coverage, yet never made a request for it.  Further, Vanzant

explained the coverages to Margaret Herron, who told her that

---

[170] Docket 79 at 8.
[171] There is zero evidence that these inflammatory statements are
true.

she was in contact with Kenick and would pass along the medical payments information. This occurred on September 16, 2002.[172] Finally, these accusations are completely unrelated to Herron's own claims against Allstate. Once again, Herron fails to focus on the third-party claim, but instead inappropriately directs the court to Trailov's and the other passenger Faulkner's first-party claims for medical payments and underinsured motorist coverage.[173]

    F.   <u>Herron Possesses No Valid Claim for Negligence</u>.

Herron claims that the investigation should have been accomplished sooner. He argues that, because liability was determined in September 2003 the damages should have been investigated and resolved shortly thereafter. In effect, what Herron is suggesting is that Allstate should have just paid policy limits regardless of the value of the claims.[174]

Allstate promptly undertook its investigation. Berry sent Power a letter and a release to obtain medical records. Berry asked Power to provide her with a list of medical care

---

[172] And, it is clear the information was flowing between the Herrons and Kenick vis-à-vis their attorneys. When Margaret Herron received Allstate's September 2002 letter, Robert Herron immediately faxed it to Valcarce, who then faxed it to Power, Kenick's attorney.

[173] Allstate refers the court to its Motion for Rule of Law, and incorporates that herein.

[174] Herron forgets that Kenick never even asserted a claim until February 14, 2003, and therefore her claim never could have been resolved before then.

providers.  Power never did.  Power told Berry she was sending Trailov to a neuropyschologist for an examination, but never revealed the name of the doctor let alone the report to Allstate.  Power demanded policy limits for Trailov on February 14, 2003 without deadline.  On that same day Power demanded policy limits for Kenick as well.  This was the first time Power had ever mentioned a claim for Kenick.  Along with the demand, Power alleged to have attached some documents in support of Trailov's claim.  There is no evidence that those documents were actually enclosed.  Also at that time, Power provided zero documentary support for Kenick's claim.

When Allstate brought this to Power's attention, she supplied additional medical records and bills never previously disclosed, despite being in Power's and Kenick's possession.[175] At the same time, Power provided further allegations of Kenick's NIED, but once again failed to provide any evidentiary or documentary support.  It was not until late in the morning of May 16, 2003 that Kenick finally provided pay stubs from Kenick's job, showing that she was earning less at that particular moment in her new job than in her old job.

Allstate undertook its investigation and tendered policy limits to Trailov by May 30, 2003, the deadline by which it said

---

[175] At the same time Allstate was requesting the missing records from the medical care providers as well.

it would.  At that same time Allstate offered to settle Kenick's

NIED claim for $10,000.  This was based on what little

information it possessed about the claim, despite Berry's

repeated requests to Power for further information to support

Kenick's claim.  Allstate incorporates all prior arguments in

this opposition in support of the fact that frankly, there was

just no negligence.

> In my review of Allstate's claim file and depositions,
> I did not detect substantive violation of the
> regulations or the act.  I found one occasion where
> Allstate was one week late in communicating the name
> and contact information for the new adjuster, Kathy
> Berry, assigned to the third-party liability claim.
> In any case the average time to respond to letters
> relate to the claims communications was under 14
> working days, under the regulatory specification of 15
> working days.  It is simply not credible to argue that
> prejudice occurred when Ms. Power had the name and
> contact information for Ms. Vanzant and Ms. Power had
> established such a relaxed approach to handling the
> claim.[176]

Mr. Lohr continued: "Specifically, Allstate's handling of

coverage under Policy #020469309 was reasonable.  Allstate did

not place its interests ahead of those of its insured."[177]

Herron then suggests that any technical violation of a

regulation constitutes negligence, without consideration for

---

[176] Exhibit 54, Expert report of Robert A. Lohr at 500046-47.
[177] Id. at 500049.

whether it is material.  Allstate's experts disagree - technical minor violations do not constitute negligence.[178]

There was no negligence.  Herron is not entitled to summary judgment.

## VI.  Conclusion

What is not in dispute is that Herron breached his express and implied contractual obligations under the insurance policy by confessing judgment for an amount well in excess of the bodily injury coverage policy limits and assigning rights against Allstate.  Herron's breach materially prejudiced Allstate's ability to defend, settle, or otherwise manage Trailov's and Kenick's claims and was not excused by any prior conduct on Allstate's part.  What is disputed is whether Allstate "committed a total breach of the contract."  Allstate respectfully requests that this court deny Herron's third motion on this topic.

DATED this 16th day of June 2006.

WILKERSON HOZUBIN

By: s/Rebecca J. Hozubin
310 K Street, Suite 405
Phone: 907 276-5297
Fax: 907 276-5291
E-mail: Rebecca@Wilkersonlaw.net
Attorneys for Plaintiff Allstate
AK Bar No. 9806016

---

[178] *See* Expert reports of Chuck Bean and Robert A. Lohr, Exhibits 53 and 54.

CERTIFICATE OF SERVICE
I hereby certify that on the
16th day of June, 2006, I
mailed a true and correct copy
of the foregoing document was
electronically served on the
following counsel/parties of record:

Mark A. Sandberg, Esq.
Sandberg, Wuestenfeld & Corey
701 West 8th Avenue, Suite 1100
Anchorage, AK  99501


WILKERSON HOZUBIN

By: s/Rebecca J. Hozubin
1000/788/plead/Dec Act/Opp MSJ-Final