IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


ALLSTATE INSURANCE COMPANIES,

      Plaintiff,

vs.

CHARLES HERRON,

      Defendant.

_____)

NO: A04-0043 CV (JKS)




DEPOSITION OF KATHY BERRY

Volume I -- Pages 1-68

Friday, September 30, 2005, 2:18 p.m.

Anchorage, Alaska






## Alaska Stenotype Reporters
### 511 West Ninth Avenue
### Anchorage AK 99501-3520
### Serving Alaska Since 1953

Telephone 907.276.1680
Email AkSteno@aol.com
Fax 907.276.8016

Rick D. McWilliams, RPR, Ret.
Fred M. Getty, RPR, Ret.

Page 1

EXHIBIT 16

```
 1                    A-P-P-E-A-R-A-N-C-E-S

 2

 3      For Plaintiff:        WILKERSON, HOZUBIN & BURKE
                              BY:  MARK E. WILKERSON
 4                            310 K Street
                              Suite 405
 5                            Anchorage, AK  99501

 6      For Defendant:        SANDBERG, WUESTENFELD & COREY
                              BY:  MARK A. SANDBERG
 7                            701 West Eight Avenue
                              Suite 1100
 8                            Anchorage, AK  99501

 9      Also present:         Dennis Mestas

10      Reported By:          Susan Campbell
                              Certified Shorthand Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

Kathy Berry                          Deposition                    September 30, 2005

```
 1                    I N D E X

 2     EXAMINATION BY:                        PAGE

 3         Mr. Sandberg                          5

 4

 5     (No exhibits marked.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

Kathy Berry                          Deposition                          September 30, 2005

---

Page 5

1    Anchorage, AK, Friday, September 30, 2005, 2:18 p.m.
2                    KATHY BERRY,
3          called as a witness on behalf of the
4          Defendant, having been duly sworn upon
5          oath by Susan Campbell, Notary Public,
6          was examined and testified as follows:
7                    EXAMINATION
8    BY MR. SANDBERG:
9    Q.    Would you state your name, please?
10   A.    It's Kathy Berry.
11   Q.    Where do you work, Ms. Berry?
12   A.    At Allstate Insurance Company.
13   Q.    What's your job?
14   A.    I'm a staff claims service adjuster.
15   Q.    How long have you worked for Allstate?
16   A.    Almost 18 years.
17   Q.    During those 18 years, can you give me a
18   brief history of what your jobs have been?
19   A.    Uh-huh. For about the first three years, I
20   was a personal lines claim representative. For about
21   seven years, I did medical payments. And the rest of
22   the time has been doing bodily injury claims.
23   Q.    Okay. That would be what, eight years,
24   roughly?
25   A.    I think it's about -- I think it's eight

Page 6

1    years.
2    Q.    Okay. What's your educational background?
3    A.    I have a degree in business.
4    Q.    From?
5    A.    Gustavus Adolphus College.
6    Q.    And then do you have other work experience
7    before Allstate?
8    A.    I worked at a publishing company and I
9    worked at Credit Bureau of Alaska.
10   Q.    Do you have any experience adjusting
11   insurance claims other than at Allstate?
12   A.    No.
13   Q.    In terms of your job -- I'm sorry -- what
14   was the title again?
15   A.    Staff claims service adjuster.
16   Q.    Staff claims service adjuster.
17   A.    Uh-huh.
18   Q.    In the Anchorage office of the Allstate
19   claims department, how many people would have that
20   title?
21   A.    I don't know.
22   Q.    I got to meet Karen Petersen yesterday. And
23   she told me there were 49, I think, people in the
24   claims department.
25   A.    Somewhere around that number. I don't know

Page 7

1    exactly.
2    Q.    Okay. What unit are you in?
3    A.    I'm in what would be called the represented
4    unit.
5    Q.    So that when a claim has a lawyer attached
6    to it, it comes to you?
7    A.    Correct.
8    Q.    And are you in some particular line of
9    claims? I mean, property, Workers' Comp?
10   A.    No, just bodily injury, auto accidents, for
11   the most part.
12   Q.    Okay. If I asked you today how many open
13   claims are pending that are your responsibility, how
14   many -- what would you tell me?
15   A.    I would say about 120 at my desk.
16   Q.    If I asked you that question for 2002 or
17   2003?
18   A.    My guess would be about the same.
19   Q.    Okay. If we may, let's start with our
20   folder in front of you.
21   A.    Okay.
22   Q.    Take a look at page 240.
23   A.    Okay.
24   Q.    What are we looking at?
25   A.    This is a transfer sheet. This gets placed

Page 8

1    on the pile -- on the file by -- file, pile -- by the
2    adjuster who is transferring the claim to another
3    adjuster.
4    Q.    Okay. And in this instance, then, who would
5    that be? Who's doing the transferring?
6    A.    It does not say on here who it is.
7    Q.    It's signed by Gary Davis?
8    A.    Right.
9    Q.    Who's Mr. Davis?
10   A.    He was a manager in our office.
11   Q.    Was he -- he was a unit manager at some
12   level --
13   A.    Yes.
14   Q.    -- or an FPL as they are now, I believe?
15   A.    Right.
16   Q.    Okay. Was he -- was Mr. Davis in 2002 the
17   FPL to whom you would have been reporting?
18   A.    No.
19   Q.    That would normally be Mr. Elkins, correct?
20   A.    Right.
21   Q.    And so other than maybe Mr. Elkins wasn't
22   around, do you know any reason this file went to
23   Mr. Davis?
24   A.    No.
25   Q.    In any event, what we see here is the file

Kathy Berry                                   Deposition                        September 30, 2005

---

**Page 9**

1   being transferred to you, correct?
2   A.      To our unit, but yeah.  Then I see it's
3   circled AKB.  So yes, that identifiers me.
4   Q.      It says transferred to AKB.
5   A.      Right.
6   Q.      That's you, right?
7   A.      Right.
8   Q.      Up at the top of that, it says liability
9   investigation complete, and it says yes, correct?
10  A.      Yes.
11  Q.      Okay.  So let me back up a little bit.  I
12  represent Mr. Herron, Charles Herron.
13  A.      Right.
14  Q.      Okay.  From September 25th onward, did you
15  do any further liability investigation concerning
16  Mr. Herron's auto accident?
17  A.      We obtained the police report.
18  Q.      Okay.  And we'll come to that because I do
19  want to stay roughly chronological.  But anything else
20  you can think of in terms of liability investigation?
21  A.      No.
22  Q.      It was pretty much done by this point?
23  Liability had been determined to be 100 percent?
24  A.      Well, I would say it's pretty much done
25  other than determining if Angelina Trailov had

---

**Page 10**

1   comparative negligence.
2   Q.      For what?
3   A.      Not wearing a seatbelt, assumption of risk.
4   Q.      Not wearing a seatbelt would certainly be
5   comparative or potentially comparative?
6   A.      Potentially.
7   Q.      Do you know, was that investigated in this
8   case?
9   A.      I believe the police report says she was not
10  wearing a seatbelt, but I -- I couldn't say that for
11  sure.
12  Q.      Was that ever followed up on one way or the
13  other past the police report?
14  A.      No.
15  Q.      And then assumption of the risk, what would
16  that be?
17  A.      That she knew Mr. Herron had been drinking
18  and she got into the vehicle with him.
19  Q.      And was that ever followed up on this file?
20  Was there other ever investigation regarding that
21  potential defense?
22  A.      No.
23  Q.      So let's see.  If we look actually slightly
24  back before the file arrived at your desk, take a look
25  at 80 and 81.

---

**Page 11**

1   A.      Okay.
2   Q.      Looking at 80, it appears that on September
3   21st, 2002, Renee VanZant had determined negligence at
4   100 percent by my client.
5   A.      That's what she entered into the system,
6   yes.
7   Q.      Okay.  Did you ever in the course of your
8   handling the claim ever enter anything different into
9   the system?
10  A.      No.
11  Q.      Let's see.  Taking a look then at page 14 of
12  our exhibit -- I'm going to actually ask you to look
13  at Exhibit number 9, because it's an unredacted copy
14  of 14, 15 and 16.
15  A.      Okay.
16  Q.      Looking at number 14 to begin with, we see
17  an entry made by Karen Petersen, correct?
18  A.      Right.
19  Q.      Who's Ms. Petersen?
20  A.      She is what -- her title is Frontline
21  Performance Expert.
22  Q.      Or FPE --
23  A.      FPE.
24  Q.      -- if I spoke acronym?
25  A.      Right.

---

**Page 12**

1   Q.      And Ms. Petersen appears to be giving you
2   some instructions here?
3   A.      Right.
4   Q.      Would you normally receive instructions from
5   Ms. Petersen?
6   A.      Sometimes I do.
7   Q.      Okay.  I'm just trying to understand.  I
8   mean, the day before we saw Mr. Davis and now we see
9   Ms. Petersen.  Does this tell us maybe Mr. Elkins just
10  wasn't around or would you normally expect to receive
11  your instructions from Ms. Petersen?
12  A.      I don't know why they're from her.
13  Q.      In any event, she says, "Kathy, New
14  transfer, may need to split file back if contact
15  needed with other passengers."  Splitting the file
16  back would refer to having the unrepresented unit
17  handle a portion of it?
18  A.      Right.
19  Q.      And why would that happen?  I mean, if
20  contact needed with other passengers.  I just want to
21  understand what the normal practice is of splitting a
22  file.  If those people needed to be contacted, Renee
23  would do it?
24  A.      Right.
25  Q.      And then it says "need to determine extent

Kathy Berry                              Deposition                         September 30, 2005

Page 13

1    of 04 injuries."  04 is Angelina Trailov?
2    A.      Right.
3    Q.      And "Review reserves, currently at 25,000."
4    And then it says "Limits 100/300.  Plus CC coverage
5    available."  CC is the med pay?
6    A.      Right.
7    Q.      Then it says "Need letter to insured
8    driver/owner re no coverage for punitives," paren,
9    "(allegations of driver drinking)."  Did you send a
10   letter to Mr. Herron regarding no coverage for
11   punitives?
12   A.      I did later on in the file.
13   Q.      About six months later?
14   A.      I believe it was, in March.
15   Q.      What would -- why didn't you send one at
16   this point when Ms. Petersen instructed you to do it?
17   A.      Well, I think at this point, we don't have
18   the police report.  We don't know if punitives are
19   being alleged.
20   Q.      Okay.  The police report, it appears, was
21   obtained, correct?
22   A.      Right.
23   Q.      And once upon a time, I knew when that
24   happened.  Take a look at 157.
25   A.      Okay.

Page 14

1    Q.      Page 157, we have a letter to Allstate from
2    the Bethel Police Department transmitting the report,
3    correct?
4    A.      Right.
5    Q.      And it appears to have been received
6    October 30th, 2002 by Allstate?
7    A.      Right.
8    Q.      And if we look at a few pages later, we can
9    see Mr. Herron being charged with assault, correct?
10   A.      Right.
11   Q.      And we can also see that he had a BA of
12   .146, I believe.  That appears at the bottom of 160.
13   A.      Okay.
14   Q.      Data Master, by the way, is two words, it
15   turns out.
16          So when the police report was received on
17   October 30th, 2002, did you send out the letter
18   regarding punitive exposure?
19   A.      No.
20   Q.      Why not?
21   A.      Well, at this point, I don't know that this
22   is a policy limits claim.  I feel like we can settle
23   it within the policy, punitives or no, reach a
24   resolution.
25   Q.      Having read the Bethel P.D. crime report,

Page 15

1    you'd certainly agree with me there's at least a
2    potential punitive exposure.
3    A.      Yes.
4    Q.      When you receive an instruction from someone
5    like Ms. Petersen that says "need letter to insured,"
6    is there any kind of a guideline or standard for how
7    promptly you should be sending that letter?
8    A.      No.
9    Q.      Let's stay with our chronology then.  Then
10   go to 16, if you would, which is actually on our
11   Exhibit 9.  Okay.  Here we're now looking at -- at 16
12   we're looking at an entry by -- made by you, correct?
13   A.      Yes.
14   Q.      Okay.  And under "Injuries," it says,
15   "Claimant 04 apparently has skull fracture and fluid
16   in lungs.  We have received no records or bills yet."
17   First of all, have I read that correctly?
18   A.      Yes.
19   Q.      Claimant 04 was Angelina Trailov?
20   A.      Yes.
21   Q.      By October the 18th, 2002, Allstate was
22   aware that the Angstman law firm represented Angelina
23   Trailov, correct?  We can go back and look at that --
24   A.      Yeah.
25   Q.      -- if you'd like.

Page 16

1    A.      I would assume so, since I got this new
2    transfer.  I would say that's correct.
3    Q.      It wouldn't have been transferred to you
4    unless there was a lawyer somewhere, correct?
5    A.      Right, right.
6    Q.      Actually, take a look at 13 in there, page
7    13.  You can tell when it happened.
8    A.      Okay.
9    Q.      Okay?  So if we look at page 13, we can tell
10   that Allstate was aware on what -- was aware of the
11   Angstman's law firm representation by September 25th,
12   2002, correct?
13   A.      Right.
14   Q.      Okay.  So on October the 18th, 2002 when you
15   said "We have received no records or bills yet," had
16   you sent a medical authorization to the Angstman law
17   firm yet?
18   A.      No.
19   Q.      So where did you expect you were going to
20   receive records or bills from?
21   A.      Sometimes they're mailed directly to our
22   office.
23   Q.      From?
24   A.      Might be the provider.  Might be the
25   attorney.

7 (Pages 13 to 16)

Kathy Berry                          Deposition                    September 30, 2005

Page 17

1   Q.      When a claim is transferred to you as a
2   person in the represented unit, do you have a
3   normal -- as an adjuster in the represented claims
4   unit, do you have a normal practice for sending out
5   medical authorization forms?
6   A.      Yes.
7   Q.      And what is that?
8   A.      Well, the normal practice is -- there are
9   two different ways we can do it. One would be that I
10  would send out a letter saying I now have the file and
11  enclose that. Or we also have claim processors that
12  sometimes we transfer a file to them, and they would
13  send that out.
14  Q.      Okay. Either way, should some Allstate
15  staff person send the claimant attorney a medical
16  release?
17  A.      Yes.
18  Q.      I mean, you want to assemble your own
19  medicals, right?
20  A.      Yes.
21  Q.      You don't want to risk being high graded by
22  some plaintiff lawyer.
23  A.      Many plaintiff lawyers don't ever return
24  them signed in any case.
25  Q.      But in any event, would you agree with me

Page 18

1   that some Allstate employee should be sending a
2   medical authorization to a claimant attorney?
3   A.      Yes. We even send them to attorneys'
4   offices where we know they are not going to respond.
5   Q.      On this file, did the Angstman law firm ever
6   refuse to respond to any request for a release?
7   A.      Not that I recall.
8   Q.      There were several requests for releases
9   made, and they were always returned, weren't they?
10  A.      Yes.
11  Q.      So if things had gone as you would expect in
12  the ordinary course of events, how soon within the
13  time the file was assigned to you should we have seen
14  a medical authorization going to the Angstman law
15  firm?
16  A.      Probably within maybe two to three weeks.
17  Q.      Okay. Did that happen in this case?
18  A.      No. I apparently failed to enclose it with
19  my fax.
20  Q.      You're reading from somewhere else other
21  than what I'm looking at. But -- what fax are you
22  referring to?
23  A.      I believe I faxed the letter of October 18th
24  to their office.
25  Q.      Okay. And, in fact, I believe that in

Page 19

1   November if we -- take a look at page 21. Is that
2   what you were just telling me about, where it says
3   "Letter in file to plaintiff attorney was faxed
4   10/18/02 but hard copy was not sent, apparently
5   because I was going to enclose MAWA"?
6   A.      Yes.
7   Q.      And MAWA refers to medical authorization?
8   A.      Medical and wage authorization.
9   Q.      So what we're looking at on page 21 is an
10  entry made by you on November the 14th, 2002?
11  A.      Right.
12  Q.      So as of November the 14th, 2002, you're
13  telling the file that you had intended to send one
14  back in October, but hadn't, so you're sending one
15  now?
16  A.      Yes.
17  Q.      Okay. If we look at Exhibit number 9, it
18  also says certified -- it says "Cert dec is in file."
19  That means a certified declarations page is in the
20  file?
21  A.      Yes.
22  Q.      And what is the purpose of having a
23  certified declarations page in the file?
24  A.      To make sure that the coverages that are
25  showing on the computer screen are the coverages that

Page 20

1   are -- that that's correct.
2   Q.      Okay. If we look back to October the 1st,
3   2002, page -- actually, I guess it's -- take a look at
4   page one of that claim diary.
5   A.      Okay.
6   Q.      We can see that the med pay adjustment was
7   assigned to Scott Millar on 10/1/02?
8   A.      Yes.
9   Q.      Okay. When there's a med pay exposure and
10  the med pay adjuster, how, if at all, did you normally
11  work with that person on your end of the claim?
12  A.      Usually, we each have our own job to do.
13  We're very careful about any kind of intermingling.
14  Because many plaintiffs' attorneys don't want the med
15  pay adjuster and the BI adjuster to talk to each
16  other. Some don't care. But we're very careful about
17  that.
18  Q.      So let's talk about that ordinary course of
19  events then. If Scott's handling a med pay
20  adjustment, you would not normally have access to
21  whatever medical records or bills he's compiling
22  absent a plaintiff lawyer saying sure, go ahead?
23  A.      Right. If I had a medical authorization,
24  even then I would be a little leery about doing it.
25  Q.      I was going to say, if you had a medial

8 (Pages 17 to 20)

Kathy Berry                        Deposition                    September 30, 2005

| Page 21 |
|---|
| 1  authorization, would you walk over to Scott and say I |
| 2  got an authorization, give me the records? |
| 3  A.    Right.  You could do that. |
| 4  Q.    Would you normally do that? |
| 5  A.    I would normally ask the attorney if that |
| 6  was okay. |
| 7  Q.    So in this case, for instance, if you wanted |
| 8  to see records that Scott had been compiling, you |
| 9  would have asked the Angstman law firm if that was |
| 10 okay? |
| 11 A.    Right. |
| 12 Q.    Let's talk about the flowing the other |
| 13 direction.  If you had been compiling medical bills |
| 14 and records, does Scott normally come and look at your |
| 15 file? |
| 16 A.    No.  It would be the same situation. |
| 17 Q.    Okay.  In the time you were handling the |
| 18 Trailov claim against Charles Herron, did you ever |
| 19 examine anything that Scott had compiled? |
| 20 A.    I don't remember -- no, I don't remember |
| 21 anything like that. |
| 22 Q.    Okay.  To the best of my knowledge, Scott |
| 23 never did compile anything.  Do you know one way or |
| 24 the other? |
| 25 A.    I don't know. |

| Page 22 |
|---|
| 1  Q.    Did Scott come examine what you had compiled |
| 2  on Angelina Trailov? |
| 3  A.    Not that I recall. |
| 4  Q.    You may not know the answer to this.  But in |
| 5  May of 2003 when Scott paid the med pay, what bills or |
| 6  records was he looking at? |
| 7  A.    I don't know. |
| 8  Q.    Take a look at page eight of the claim log, |
| 9  if you would.  It's an entry before you were involved. |
| 10 But it's from Craig to Renee VanZant, dated |
| 11 September 18th, '02. |
| 12 A.    Okay. |
| 13 Q.    Is that what you're looking at? |
| 14 A.    Yes. |
| 15 Q.    And it says secure report follow-up on -- or |
| 16 secure police report.  And then it says follow up on |
| 17 matrix requirements.  Do you know what "matrix |
| 18 requirements" means? |
| 19 A.    Yes. |
| 20 Q.    What's it mean? |
| 21 A.    The company has what they call a matrix |
| 22 for -- there's one for property claims and there's one |
| 23 for bodily injury claims.  And it's things like take a |
| 24 recorded statement from the insured driver, take a |
| 25 recorded statement from the claimant, obtain a medical |

| Page 23 |
|---|
| 1  and wage authorization, things like that. |
| 2  Q.    So it's like a list of tasks that are |
| 3  supposed to be happening? |
| 4  A.    Right. |
| 5  Q.    And is there also a time that these tasks |
| 6  are supposed to be happening? |
| 7  A.    No. |
| 8  Q.    Does -- do you have a matrix in the |
| 9  represented unit? |
| 10 A.    Yes. |
| 11 Q.    Is it the same one that Renee VanZant might |
| 12 have, if you know? |
| 13 A.    I think it is. |
| 14 Q.    Then looking a little farther down, it says |
| 15 Renee is also to secure the agent application, quote, |
| 16 "waiver issue." |
| 17 A.    Uh-huh. |
| 18 Q.    Do you know what waiver issue means? |
| 19 A.    It would be the uninsured motorists, |
| 20 underinsured motorists. |
| 21 Q.    Rejection/selection form? |
| 22 A.    Uh-huh. |
| 23 Q.    And do you know why those were being secured |
| 24 in the fall of 2002? |
| 25 A.    No. |

| Page 24 |
|---|
| 1  Q.    Do you know that they were routinely being |
| 2  secured in the fall of 2002? |
| 3  A.    No. |
| 4  Q.    Taking a look at page 19 then, at page 19, |
| 5  we're looking at instructions from Craig to you, dated |
| 6  November 7th, 2002? |
| 7  A.    Yes. |
| 8  Q.    And it says Kathy, please review that letter |
| 9  to 04 attorney did go out and doc same.  Do you know |
| 10 what letter that would refer to? |
| 11 A.    I believe it's the letter of 10/18. |
| 12 Q.    And it says "and doc same."  Does that mean |
| 13 document it to the file? |
| 14 A.    That's how I would interpret it. |
| 15 Q.    And so did that, in fact, happen?  Did |
| 16 the -- did you check to see that the letter of 10/18 |
| 17 did go out and was documented to the file? |
| 18 A.    I would say that I did, because of my later |
| 19 entry. |
| 20 Q.    Look at 81 and 82, if you would. |
| 21 A.    Okay. |
| 22 Q.    What are we looking at at 81 and 82? |
| 23 A.    This would actually be entries into the |
| 24 diary, the claim diary. |
| 25 Q.    And it reflects the letters going from |

Alaska Stenotype Reporters

Kathy Berry                          Deposition                  September 30, 2005

| Page 25 | Page 27 |
|---|---|

**Page 25**

1  Allstate to various persons?
2  A.      It reflects letters going that are
3  system-generated.
4  Q.      Okay. So if a letter is not
5  system-generated, we won't see it?
6  A.      Right.
7  Q.      Okay. So, for example, I don't see anything
8  here for 10/18. Do you?
9  A.      No.
10 Q.      So we can at least assume that you --
11 whatever you sent on 10/18 was not a system-generated
12 letter?
13 A.      Right.
14 Q.      Okay. Now, if we go to 206, if we may --
15 A.      Okay.
16 Q.      -- we're looking at the letter that you
17 actually did send on October 18th?
18 A.      Yes.
19 Q.      Okay. And this is the letter that says I'm
20 enclosing a medical and wage authorization form,
21 correct?
22 A.      Correct.
23 Q.      And this is the one that was faxed, but the
24 medical and wage authorization form didn't actually
25 accompany it?

**Page 27**

1  Q.      Okay. I'm just trying to track when this
2  medical and wage authorization form was actually
3  returned. And --
4        MR. WILKERSON: I'm sorry. Mark, what date
5  did you say? I think it's November 25.
6  BY MR. SANDBERG:
7  Q.      I'm sorry. It is November 25th, 2002. It
8  appears it's been received by the Allstate claims
9  department, correct?
10 A.      Yes.
11 Q.      So as best we can tell from the file, did
12 the Angstman law firm return the authorization that
13 you had sent them a week or so earlier before the end
14 of November?
15 A.      I don't know.
16 Q.      Well, where would you look in the file if
17 you wanted to know? How about, let's take a look then
18 at 264?
19 A.      Uh-huh.
20 Q.      At 264, we're looking at the actual signed
21 medical authorization, correct?
22 A.      Yes.
23 Q.      And it also has a stamp of November 25th,
24 2002?
25 A.      Yes.

**Page 26**

1  A.      Right, apparently.
2  Q.      Okay. As far as you know sitting here
3  today, did a medical and wage authorization form
4  accompany this letter to the Angstman Law Office?
5  A.      I do not believe it did.
6  Q.      And the letter we're looking at here is not
7  a form letter?
8  A.      Right. Well, it's not a system-generated
9  letter.
10 Q.      Okay. Is there a difference?
11 A.      It's my form letter.
12 Q.      Okay. Look at 266, if you would.
13 A.      Okay. Does this --
14 Q.      266, we see the same letter again?
15 A.      Well, I'm not finding 266. I'm finding 265
16 and 267.
17 Q.      Okay. You're right. I've got 266 here.
18 266, we have a copy of a letter from the Angstman Law
19 Office back to Allstate Insurance Company?
20 A.      Okay.
21 Q.      It's actually the envelope.
22 A.      Okay.
23 Q.      And it appears to have been received
24 November the 25th, 2002?
25 A.      Yes.

**Page 28**

1  Q.      So now we can tell the authorization had
2  been signed and returned in ten days or so to
3  Allstate?
4  A.      Yes.
5  Q.      Okay. So now that you have the
6  authorization on November 25th, 2002, do you use it?
7  A.      I would have to look through the file to see
8  when we requested records.
9  Q.      Please do. Maybe the log we had of letters
10 going out, although those are only system-generated, I
11 guess. Take a look and tell me when you actually used
12 it.
13       MR. WILKERSON: Go off record while she
14 looks.
15       MR. SANDBERG: Sure.
16       (Brief pause.)
17 BY MR. SANDBERG:
18 Q.      Back on record. So now we saw the release
19 go out to the Angstman law firm and come back on
20 November the 25th, 2002. Can you tell me when you
21 used it?
22 A.      I know that I used it on January 17th, 2003.
23 Q.      Where can you tell that?
24 A.      A letter -- I mean 201.
25 Q.      201?

10 (Pages 25 to 28)

Kathy Berry                    Deposition                    September 30, 2005

---

Page 29

1   A.    Uh-huh. And I would presume I used it
2   earlier than that. Because at that time, I also sent
3   an ANMC medical authorization to Michele Power.
4         MR. WILKERSON: Tell him what number you're
5   looking at.
6         THE WITNESS: Oh, sorry. Thirty-one.
7   BY MR. SANDBERG:
8   Q.    Okay. Looking at the claim diary that was
9   at the beginning of that, if you sent out a release,
10  should we see that documented in the file?
11  A.    It's not -- again, if it's not a
12  system-generated letter, it would not.
13  Q.    No. That was back in 80 and 81. But if you
14  just take a look at the beginning at one where we're
15  looking at normal entries of what people are doing --
16  A.    Uh-huh.
17  Q.    -- if you sent out a release, should we see
18  that documented in the file?
19  A.    Normally.
20  Q.    Okay. And so take a look at the entries
21  between November 25th and January 17th and tell me if
22  you can find one that shows a release going out.
23  A.    No. There's no entry.
24  Q.    Okay. So in terms of documentation to the
25  claim file, can you point me to any time you used the

Page 30

1   release that you received on November the 25th prior
2   to January 17th, 2003?
3   A.    I don't think there's anything documented in
4   the claim file.
5   Q.    In terms of Allstate practices and
6   procedures as an adjuster, you're supposed to be
7   documenting the claim file as you go along, correct?
8   A.    Right.
9   Q.    And certainly, in terms of what the Unfair
10  Claims regs require, you should be documenting the
11  claims file as you go along, correct?
12  A.    Right.
13  Q.    And as an Allstate adjuster, you would
14  normally be expected to comply with both Allstate
15  procedures and the Unfair Claims regulations, correct?
16  A.    Right.
17  Q.    So if you used the release, we should see it
18  in there, shouldn't we?
19  A.    If it was documented.
20  Q.    Well, it should be documented, shouldn't it?
21  A.    I would normally document it.
22  Q.    Okay.
23  A.    I will also add that I believe the attorney
24  sent us some records maybe from Alaska Regional
25  Hospital. That's just going off of memory.

Page 31

1         Can we take a break?
2         MR. SANDBERG: Yes, yes, any time.
3         (Brief recess.)
4   BY MR. SANDBERG:
5   Q.    Let's go back on record. When we went off
6   record, we had been looking at 201, which is your
7   letter of January 17th, 2003. Okay?
8   A.    Okay.
9   Q.    Okay. That letter is addressed to the Y-K
10  Delta Regional Hospital?
11  A.    Uh-huh.
12  Q.    And you're seeking records concerning
13  Angelina, correct?
14  A.    Correct.
15  Q.    Did you send a similar letter to the Alaska
16  Native Medical Center on that day?
17  A.    I don't know.
18  Q.    Take a look at the file once again and see
19  if you can find one.
20  A.    There's not a letter in this file, at least,
21  that shows that.
22  Q.    Did you send a letter to any other health
23  care provider other than the Y-K Regional Hospital on
24  January 17th, 2003?
25  A.    Not according to this file, no.

Page 32

1   Q.    Take a look back at one and two, page one
2   and two of our claim file.
3   A.    Okay.
4   Q.    If you look at one, on 9/16, it says
5   claimant admitted to Alaska Native, but will have
6   medevac and Prov Hosp bills.
7   A.    Uh-huh.
8   Q.    Did you send a release to Providence
9   Hospital?
10  A.    That entry is by -- actually by Scott Millar
11  or by --
12  Q.    Right.
13  A.    It looks like it's by Scott Millar.
14  Q.    I understand. You were not on the claim
15  yet.
16  A.    Right. No.
17  Q.    Allstate was certainly aware that
18  Ms. Trailov had been medevaced, correct, to Anchorage?
19  A.    Uh-huh.
20  Q.    And then if we look down at two, we've
21  got -- it says medevaced to Alaska Regional or Alaska
22  Reg.
23  A.    Uh-huh.
24  Q.    Did you send a copy of a release to Alaska
25  Regional?

Kathy Berry                         Deposition                    September 30, 2005

| Page 33 | Page 35 |
|---|---|
| 1  A.    No. But I believe Michele Power sent those | 1       Well, let's see. |
| 2  records to us. | 2  A.    It looks like it's March 18th, 2003. |
| 3  Q.    Okay. The Alaska Regional -- Alaska | 3  Q.    Okay. I want to stay with the track just a |
| 4  Regional Hospital is here in Anchorage, correct? | 4  little more on back in January. On January 17th, |
| 5  A.    Right. | 5  2003, take a look at 202 -- I'm sorry -- number 202? |
| 6  Q.    Did you send the release to any Anchorage | 6  A.    Okay. |
| 7  health care provider? | 7  Q.    We can see you write to Michele and send her |
| 8  A.    No, not according to what's here. | 8  a copy of a special ANMC release. |
| 9  Q.    And when Michele Power sent those records to | 9  A.    Yes. |
| 10 you, it was as an attachment to the demand letter? | 10 Q.    And then at 262, we can see it's come back. |
| 11 A.    I believe she sent some earlier than that, | 11 Actually, take a look at 261 also. |
| 12 but I could be wrong. | 12 A.    Right. Okay. |
| 13 Q.    Well, take a look at the claim log and see | 13 Q.    It says -- so on February 6th, 2003, the |
| 14 if you can tell me when that happened then. | 14 Angstman law firm sent you a copy of the ANMC release, |
| 15 A.    I wouldn't necessarily log in when some | 15 correct? |
| 16 records were received, because I'd still be needing | 16 A.    Correct. |
| 17 other records. | 17 Q.    Okay. And then if we look at 263, it |
| 18 Q.    Okay. Take a look at 197 and 198. 197 | 18 appears that was received by Allstate on February |
| 19 we're looking at the first page of a demand letter, | 19 10th, 2003? |
| 20 dated February 14th, 2003 addressed to you? | 20 A.    Logically, it would appear that way. |
| 21 A.    Yes. | 21 Q.    You have handled other claims involving -- |
| 22 Q.    Okay. Did the -- let's see. It says -- for | 22 I'm sorry. Have you. Have you handled other claims |
| 23 example, the second paragraph, it says rushed her to | 23 involving the Alaska Native Medical Center over the |
| 24 Yukon-Kuskokwim Delta Regional Hospital. And then it | 24 years? |
| 25 says see Exhibit 2. So were they sending you records | 25 A.    Yes. |

| Page 34 | Page 36 |
|---|---|
| 1  concerning the Y-K Hospital with this? | 1  Q.    So were you aware that they would require |
| 2  A.    I don't know what came with this. | 2  their own release form? |
| 3  Q.    In any event, from the claim file -- well, | 3  A.    That was -- there was a time period where |
| 4  let me back up a little bit. Allstate would want to | 4  that became an issue for most providers. It was -- I |
| 5  assemble its own medical records in any event, | 5  don't know when HIPAA went into effect. But it was -- |
| 6  wouldn't it? | 6  there were multiple providers who were then either |
| 7  A.    Again, sometimes that's the case and | 7  requiring their own or saying it's too old, it's over |
| 8  sometimes it's not. | 8  three months, it's too old, it's over six months, it's |
| 9  Q.    And when is it and when is it not? What's | 9  too old, it's over a year. Everyone had their own |
| 10 the difference? | 10 thing going on for a while. And so it was kind of in |
| 11 A.    Well, there are those plaintiffs' attorneys | 11 flux. |
| 12 who won't provide us the authorization to get those | 12 Q.    In January of '03, were you aware that the |
| 13 records. So in those cases, we're obviously dependent | 13 Alaska Native Medical hospital would require its own |
| 14 on them to provide them to us. | 14 release? |
| 15 Q.    And in this instance, though, you had | 15 A.    I believe that's when I sent it to Michele |
| 16 received one from the Angstman law firm, correct? | 16 Power on January 17th. |
| 17 A.    Right. | 17 Q.    Right. |
| 18 Q.    Okay. And so in this instance, then, you | 18 A.    So I was aware then, yeah. |
| 19 would normally expect to assemble your own medical | 19 Q.    Okay. I mean, you must have known it by |
| 20 records, correct? | 20 January 17th, correct? |
| 21 A.    Right. | 21 A.    Right. |
| 22 Q.    And so do we see -- other than sending the | 22 Q.    Okay. And we saw nothing in the file before |
| 23 one letter to the Y-K Hospital on January 17th, 2003, | 23 January 17th where you tried to use the Allstate |
| 24 do we see -- or when do we next see you doing anything | 24 release to get those records, did we? |
| 25 to assemble medical records? | 25 A.    No. |

12 (Pages 33 to 36)

Kathy Berry                          Deposition                          September 30, 2005

---

Page 37

1   Q.      So on January -- at least by January 17th,
2   you must have been -- you must have already known that
3   the Native Medical Center would require a different
4   release than the standard Allstate medical release,
5   correct?
6   A.      Right.
7   Q.      When did you use the release that was
8   returned on February 10th, 2003?
9   A.      It appears that would be on March 18th.
10  Uh-huh, March 18th.
11  Q.      As we sit here today, do you know why it
12  took a month and a week between the time Allstate
13  received it and the time it went out?
14  A.      No.
15  Q.      If things had happened in the ordinary
16  course of events, how long would you have expected it
17  to take from the time a release like that was received
18  at Allstate to the time it went out?
19  A.      There's not really a set timeline.
20  Q.      Is a week and a month normal?
21  A.      I don't know.
22  Q.      A little while ago, we looked at the demand
23  letter, 197.
24  A.      Okay.
25  Q.      When a demand letter is received at

---

Page 38

1   Allstate, does anything happen in terms of it being
2   logged or calendared or anything?
3   A.      It does now.
4   Q.      Okay. What happens now?
5   A.      I get the demand letter in, attach a sheet
6   to it that says "Demand" on it. It's green. Give it
7   to Craig.
8   Q.      And how about in February of 2003, what
9   happened?
10  A.      I don't remember.
11  Q.      Was there a standard procedure in 2003?
12  A.      I don't remember.
13  Q.      Did Craig maintain a demand log in 2003?
14  A.      I don't know.
15  Q.      Did the Allstate Anchorage office maintain a
16  demand log in 2003?
17  A.      I don't know.
18  Q.      At 200, what are we looking at?
19  A.      It's a copy of the green demand sheet.
20  Q.      Okay. And so if I was looking at the
21  original of this, it would be green?
22  A.      Yes.
23  Q.      And it says "Demand" on it in great big
24  letters.
25  A.      Yes.

---

Page 39

1   Q.      What is this?
2   A.      It's the sheet I would put on top of the
3   demand letter before I gave it to Craig.
4   Q.      Okay. And is that the same procedure that
5   you described you'd do today?
6   A.      Yes.
7   Q.      Okay. So we can see that in February of
8   2003, you took the demand -- you would take a demand
9   and you would put a green sheet on top of it and give
10  it to Craig?
11  A.      Yes.
12  Q.      And we can see your initials at the top. Is
13  that your writing?
14  A.      No.
15  Q.      Oh. Where it says 3-3-03 AKB, that's not
16  your writing?
17  A.      No.
18  Q.      How about the parts underneath, are those
19  your writing?
20  A.      Which parts?
21  Q.      2/18/03, none, limits demand?
22  A.      Yes.
23  Q.      Then I can't even read what -- oh, AA 04,
24  yes. That means liability coverage for 04. Is that
25  your writing?

---

Page 40

1   A.      No.
2   Q.      But at least the other portions there, the
3   2/18/03, the response due, none, and limits demand,
4   those are your writing?
5   A.      Yes.
6   Q.      And you would have put this sheet on top of
7   the demand letter and taken it to Craig?
8   A.      Yes.
9   Q.      And then if this claim was being handled in
10  the ordinary course of events, what was supposed to
11  happen next in terms of dealing with the demand or
12  responding to it?
13  A.      Normally, I would look at the file, see if
14  we had everything that we needed to respond to the
15  demand, evaluate the claim. And either evaluate it or
16  send a letter to the attorney telling them what we
17  didn't have.
18  Q.      Do you maintain a tickle system of any kind?
19  A.      I do.
20  Q.      Describe to me how your tickle system works
21  today.
22  A.      I have an Excel spreadsheet that I enter the
23  demands into and who they are, who the attorney is,
24  what the demand is for, what the timeline is.
25  Q.      Did you maintain that same system in

---

13 (Pages 37 to 40)

Kathy Berry                          Deposition                          September 30, 2005

| Page 41 | Page 43 |
|---|---|

**Page 41**

1  February 2003?
2  A.      I don't remember.
3  Q.      Did you maintain any system in February
4  2003?
5  A.      I don't remember.
6  Q.      Do you have a tickle system for things
7  besides demands?
8  A.      I set Outlook reminders, but not similar to
9  that, no.
10 Q.      For example, do you have anything to remind
11 you simply to look at a file periodically?
12 A.      I would put that in Outlook as a task.
13 Q.      And on a file like Angelina Trailov's case,
14 do you have a routine amount of time that you would
15 set to be tickled, in other words, that we need to
16 diary this claim for X number of days?
17 A.      It would vary from claim to claim.
18 Q.      Okay.  How about when you -- on a claim like
19 Angelina's when you got in this demand, was it --
20 would it -- a limits demand, would it be tickled?
21 A.      Uh-huh.
22 Q.      Okay.  For what?
23 A.      Once I'd sent the letter out, I think I
24 tickled it for, say, 30 days to see -- because I asked
25 Michele Power for some information.

**Page 42**

1  Q.      And when you say that you tickled it for
2  30 days after you sent a letter to Michele Power, is
3  that -- let's see if we can find that, just to make
4  sure we're all on the same page here.  Take a look at
5  page 195.
6  A.      Okay.
7  Q.      Is that the letter you were referring to?
8  A.      Yes.
9  Q.      And that letter went March the 17th, 2003?
10 A.      Right.
11 Q.      So the first response to the demand came
12 about 30 days after it was received?
13 A.      Correct.
14 Q.      And you believe that the file would have
15 been tickled for 30 days from the time you sent out
16 this letter to Michele Power that we're looking at in
17 195?
18 A.      I believe so.
19 Q.      Now, the policy limits demand was received
20 on February 18th, 2003, if we look at 197, correct?
21 A.      Yes.
22 Q.      On February 18th, 2003, what else did you
23 still need in order to evaluate Angelina Trailov's
24 claim?
25 A.      Well, apparently, according to my letter of

**Page 43**

1  March 17th, we didn't have all the records from Y-K
2  Regional Hospital.  What happened with Angelina, from
3  what I recall, is that she went to ANMC, she then was
4  transferred over to Alaska Regional and she went back
5  to ANMC.  So there were records from when she
6  transferred from Alaska Regional back that we didn't
7  have at that time.  We had no information about Mary
8  Kenick's NIED claim.
9  Q.      Right.  But let's stick with Angelina, if we
10 can.
11 A.      Okay.
12 Q.      And that's -- what else did you need -- on
13 February 18th, 2003 the policy limits demand letter
14 comes in, correct?
15 A.      Yes.
16 Q.      What does Allstate need in order to complete
17 its evaluation as of that date?
18 A.      Further records from ANMC, possibly further
19 records from Y-K Regional Hospital, if they existed,
20 school records, because there was some indication they
21 were going to maybe make a claim that she wasn't
22 performing well in school.
23 Q.      Were school records ever obtained at any
24 point in the adjustment of this claim?
25 A.      They were.

**Page 44**

1  Q.      When?
2  A.      They were received from Michele Power, I
3  believe.  But I don't know when.
4  Q.      Leaving aside the school records, at least,
5  the remaining medical records you needed on
6  February 18th were records from the Regional Hospital
7  and ANMC?
8  A.      And if there were any additional from Y-K
9  Regional Hospital.
10 Q.      Okay.  So beginning on February 18th, 2003,
11 what did you do to assemble those records?
12 A.      On March 18th, requested records for
13 treatment after 9/16/02 from ANMC and requested an
14 itemized bill from ANMC for CT scans.
15 Q.      Okay.  And you did that on March 17th, 2003?
16 A.      March 18th, 2003.
17         MR. WILKERSON:  Tell him what page number
18 you're looking at.
19         THE WITNESS:  Oh, I'm sorry.  Thirty-four.
20 BY MR. SANDBERG:
21 Q.      Okay.  So exactly one month after the demand
22 came in, you requested records from ANMC is what this
23 shows?
24 A.      Right.
25 Q.      Okay.  As we sit here today, do you know why

14 (Pages 41 to 44)

Kathy Berry                          Deposition                    September 30, 2005

Page 45

1  it took a month from the time that the demand came in
2  to request those records?
3  A.    Well, between working other people's files,
4  who are also important, and reviewing this file to see
5  what I had, it takes time.
6  Q.    Okay. As we sit here today, do you have a
7  specific recollection of why it took a month or is
8  that simply what you would assume?
9  A.    That's what I would assume.
10 Q.    Okay. How about the Alaska Regional
11 records, did you -- that you said you still needed
12 when the demand came in, what did you do to get them?
13 A.    I believe I had those records, but I'm
14 speculating on that. What I interpret from what I
15 wrote here was that I needed the records from when she
16 went from Alaska Regional back to ANMC.
17        MR. WILKERSON: Tell him the document you're
18 looking at.
19        THE WITNESS: Oh, 195.
20 I will remember that before the day is out.
21        MR. WILKERSON: That's okay.
22        MR. SANDBERG: It's okay. I could ask.
23 Q.    So looking at 195, we're looking at your
24 letter of March 17th, 2003 to Michele Power. And it
25 says the information you sent did not include records

Page 46

1  for treatment following Ms. Trailov's transfer from
2  Alaska Regional to Alaska Native Medical Center so we
3  have requested those records. So does it appear that
4  as of March 17th, 2003, you had Alaska Regional
5  Hospital records?
6  A.    I would gather that, yes.
7  Q.    Were they sent to you by the Angstman law
8  firm?
9  A.    I believe they were.
10 Q.    Okay. And then you say you've requested the
11 records from the Native Medical Center.
12 A.    Right.
13 Q.    Then you're still looking at the possibility
14 you might need some more from the Y-K Regional
15 Hospital?
16 A.    Right. I didn't know she had treated there
17 after the accident.
18 Q.    Okay. Now, taking a look at 597, if you
19 would --
20 A.    Okay.
21 Q.    -- at 597, we're looking at your -- what
22 begins to be your request to the Alaska Native Medical
23 Center, dated March 17th, correct?
24 A.    Right.
25 Q.    And then we can see that they received it on

Page 47

1  March 19th, 2003.
2  A.    Right.
3  Q.    And then we can see that you got back the
4  response on March 26, 2003 at the bottom. That's the
5  claim department stamp, right?
6  A.    Right. But I don't know if we got records
7  or if we got a letter back that said requests for
8  information take three to five business days to be
9  processed.
10 Q.    Well, taking a look then back at the front
11 of the claim file at the claim log, do you see --
12 after March 26th, 2003, do you see any indication that
13 any more medical records came in to Allstate?
14 A.    Are you talking about Allstate or are you
15 talking about my part of the file? Because there are
16 entries by Scott Millar.
17 Q.    Scott didn't get any medical records.
18 A.    It's not documented that other records came
19 in.
20 Q.    Okay. So at least as far as the file is
21 documented, it appears that the assembling of records
22 was completed by March -- of medical records was
23 completed by March 26th, 2003, correct?
24 A.    I would not agree with that.
25 Q.    Okay. What records came in -- what medical

Page 48

1  records came in after March 26th, 2003?
2  A.    I don't know. But I don't think we can use
3  that date based on this document from ANMC.
4  Q.    Take a look at -- in the area of 550 and
5  also at the log and see if you can find any indication
6  that Alaska Native Medical Center records were
7  received after March the 23rd -- I mean, 26th, '03.
8  A.    I don't have a 550.
9  Q.    Okay. Well, how about 551, then, just in
10 that area?
11        MR. WILKERSON: There's 550. It's just out
12 of order.
13        THE WITNESS: Oh, it's out of order.
14        There isn't documentation as to when those
15 records came in.
16 BY MR. SANDBERG:
17 Q.    The records we're looking at here beginning
18 at 549, do you have any reason to believe they came in
19 after March the 26th, 2003?
20 A.    Well, looking at record -- looking at 268 --
21 see, I remembered -- that's printed on March 24th. So
22 they may have been printing records. I don't know
23 when they got them out to us. But it's, you know --
24 Q.    The document we were looking at before at
25 597 shows received March 26th, 2003?

15 (Pages 45 to 48)

Kathy Berry                           Deposition                    September 30, 2005

Page 49

1   A.    Uh-huh.
2   Q.    Then if we read the claim file upward from
3   there, which is going to be the decreasing numbers,
4   what we're looking at are the ANMC records, aren't we?
5   A.    Yes. But I can't say that -- because this
6   says March 26th, 2003 received and it's got a note
7   that says requests for information take three to five
8   business days to be processed, I can't say if the
9   records came with this or not.
10  Q.    Are you able to point me to anyplace in the
11  claim file that shows ANMC records arriving after
12  March 26th, 2003?
13  A.    Not that I can point to.
14  Q.    Are you able to point me anywhere in the
15  claim file that shows Alaska Regional records arriving
16  after March 26th, 2003?
17  A.    No.
18  Q.    Are you able to point me anywhere in the
19  file that shows Y-K Hospital records arriving after
20  March 26th, 2003?
21  A.    No.
22  Q.    Are you able to point me to anywhere in the
23  file that shows medical records from any provider
24  arriving after March 26, 2003?
25  A.    No.

Page 50

1   Q.    Okay. Let's return to our chronology a
2   little earlier then. Go to 32. Actually, go to 18,
3   because this is another one of those redacted -- I'm
4   sorry. Exhibit 18. Because this is another one of
5   those redacted documents that we copied out.
6   A.    Okay, okay.
7   Q.    Page 32 of that is an entry dated March the
8   3rd, 2003 --
9   A.    Right.
10  Q.    -- from Mr. Elkins to you, correct?
11  A.    Right.
12  Q.    And he is providing you directions for claim
13  handling.
14  A.    Right.
15  Q.    It says "Thank you for the demand review on
16  the 10/18/03 (sic) notice." What's a demand review?
17        MR. WILKERSON: Just for the record, I think
18  it's 2/18.
19  BY MR. SANDBERG:
20  Q.    Yes. It's getting late in the day. I'm
21  losing it. The 2/18/03 notice.
22  A.    It would be the demand letter.
23  Q.    Okay. It's not some special form you fill
24  out or a review that you do of the letter?
25  A.    No.

Page 51

1   Q.    So basically, what he's thanking you for is
2   simply a copy of the demand letter?
3   A.    Right.
4   Q.    And it says "Please prepare and send HO
5   referral on mandatory referral" given allegation of
6   brain damage. What's HO referral?
7   A.    Home office referral.
8   Q.    And what's a mandatory referral?
9   A.    There's certain injuries that they require
10  that they were sent on.
11  Q.    When a claim has been identified as a HO
12  referral file, how promptly is the referral supposed
13  to happen?
14  A.    It's supposed to go out in 14 days.
15  Q.    So if you were following your instructions
16  from Mr. Elkins, there would have been a referral by
17  March the 17th, 2003?
18  A.    Right.
19  Q.    Did you do that?
20  A.    I did not do it at that time.
21  Q.    Why not?
22  A.    I don't know.
23  Q.    It continues, "Also suggest you raise your
24  reserve on 04." That would be Ms. Trailov?
25  A.    Right.

Page 52

1   Q.    The reserve at this point was 75,000, I
2   believe?
3   A.    Right.
4   Q.    And Mr. Elkins is suggesting that you raise
5   the reserve?
6   A.    Right.
7   Q.    Then it says "Update EIP 04." What's an
8   EIP?
9   A.    EIP means eligible injured party.
10  Q.    Okay. What's that mean? Eligible for what?
11  A.    It's how the system identifies an injured
12  person.
13  Q.    Okay. So it says "Update EIP 04 on" --
14  well, I'll tell you what, translates that line for me,
15  if you would be so kind.
16  A.    What that means is update eligible injured
17  party 04 -- would be Angelina -- on the Hub -- there's
18  a system in the computer called the Casualty Hub. And
19  that's where identifying information on an injured
20  person is stored -- so NBRS, medical bill review
21  system, can be activated.
22  Q.    The medical bill review system, is that
23  Colussus or is that some other thing?
24  A.    No. It's where all of the medical bills go
25  in for review. It's not Colussus.

16 (Pages 49 to 52)

Kathy Berry                           Deposition                     September 30, 2005

Page 53

1  Q.      Okay. And review by whom for what?
2  A.      Depends on who's working the file.
3  Q.      Okay. But I mean, I'm just trying to
4  understand what Mr. Elkins is telling you here.
5  A.      Uh-huh.
6  Q.      Why would he be giving you this instruction,
7  if you know?
8  A.      Sometimes you can't access NBRS, the medical
9  bill review system, if there's an item of information
10 missing. It can't function or something. So you can
11 update that and then medical bills can be entered into
12 the system, reviewed, whatever it is you're going to
13 do with them.
14 Q.      So he's telling you to update the
15 information on Angelina so this medical bill review
16 system can be activated?
17 A.      Right.
18 Q.      Then it says "Let me know on referral and
19 your handling plan."
20 A.      Uh-huh.
21 Q.      The referral is what he was talking about
22 here, the home office referral?
23 A.      Right.
24 Q.      And what's a handling plan?
25 A.      You would have to ask Craig that.

Page 54

1  Q.      That's not a document or a thing?
2  A.      No.
3  Q.      Below, it says "Sent to: DHTT." Is that
4  you?
5  A.      Yes.
6  Q.      Now, we've already seen that you -- well,
7  first of all -- I'm sorry -- when you received this
8  instruction, did you tickle the file for 14 days so
9  that you'd know it was time to send the referral?
10 A.      I don't believe I did.
11 Q.      Would you normally do that?
12 A.      Not necessarily.
13 Q.      You did return to the file 14 days later,
14 correct? We've seen that previously.
15 A.      Fifteen days later, yes.
16 Q.      Take a look at 83. If you look at the top
17 of 83, we see a system-generated letter to the Medical
18 Records Department of Alaska N, whatever that is --
19 A.      Uh-huh.
20 Q.      -- dated 3/17.
21 A.      Yes.
22 Q.      So you did return to the file 14 days later?
23 A.      Right.
24 Q.      Did you -- on March the 17th, 2003, did you
25 realize you had not sent the home office referral?

Page 55

1  A.      I don't know.
2  Q.      At any time between March 17th -- I'm sorry.
3  At any time between March 3rd, 2003 and May the 16th,
4  2003, did you remember that you had not sent the home
5  office referral?
6  A.      I don't know.
7  Q.      Had you tickled the home office -- the
8  instruction to prepare a home office referral for any
9  particular time?
10 A.      No.
11 Q.      So as far as you know when we sit here
12 today, you just forgot?
13 A.      I would believe so.
14         MR. SANDBERG: It's 4:00 o'clock, Mark.
15 Let's take our last break for the day.
16         (Brief recess.)
17 BY MR. SANDBERG:
18 Q.      Back on record, if we may. Okay. Kathy, on
19 3/18 --
20         MR. WILKERSON: Date or number?
21 BY MR. SANDBERG:
22 Q.      I'm sorry. 3/18/03, March 18th, 2003, you
23 wrote a letter. I don't know where that is in the
24 claim file. 193, Mr. Mestas says.
25         MR. WILKERSON: She's there.

Page 56

1          THE WITNESS: Okay.
2  BY MR. SANDBERG:
3  Q.      So we can see you wrote a letter to
4  Mr. Herron on March the 18th, 2003?
5  A.      Right.
6  Q.      And this was -- the subject, it says is
7  punitive damages exclusion?
8  A.      Yes.
9  Q.      Is this the letter that Karen Petersen had
10 instructed be written back in September?
11 A.      Yes.
12 Q.      Did something happened that triggered you
13 that now was the right time to send it?
14 A.      We had received the demand which I believe
15 alleged punitive damages.
16 Q.      Okay. So this was issued in response to the
17 demand?
18 A.      It accompanied the demand, a copy of the
19 demand to Mr. Herron.
20 Q.      If I asked you what is an excess letter,
21 what would you say?
22 A.      I would say it's a letter advising the
23 insured that the claimant might have damages in excess
24 of their -- the limits of their policy.
25 Q.      Does Allstate have a form that is used for

17 (Pages 53 to 56)

Kathy Berry                          Deposition                          September 30, 2005

Page 57

1   sending out excess letters?
2   A.      I don't know if Allstate has a form.
3   Q.      Do you have a form for sending excess
4   letters?
5   A.      I have one that I normally use, yes.
6   Q.      This isn't it, is it?
7   A.      No.
8   Q.      At any time in your handling of this claim,
9   did you ever send Charles Herron an excess letter?
10  A.      No.
11  Q.      Why not?
12  A.      Because I never felt like this claim was in
13  excess of the policy.
14  Q.      You never felt that there was an exposure to
15  Mr. Herron in excess of the policy limits?
16  A.      No.
17  Q.      As of February 18th, 2003, Allstate was in
18  receipt of a demand for the policy limits, correct?
19  A.      Right.
20  Q.      Do you believe an excess letter should have
21  gone out at that time?
22  A.      No.
23  Q.      When is it appropriate to send an excess
24  letter, in your opinion?
25  A.      In a case where, for instance, someone has

Page 58

1   $200,000 in medical bills, multiple broken bones
2   within -- you know, 200,000 in bills of maybe within
3   ten days of the accident or something like that
4   where -- and the person maybe has a $50,000 policy.
5   Q.      So is it your normal practice that you would
6   only send an excess letter where it is clear that the
7   case is in excess of the policy limits?
8   A.      I would say if there's a high probability
9   it's in excess of policy limits.
10  Q.      So your normal practice is you would send
11  out an excess letter when it becomes evident to you or
12  to Allstate that the claim is highly probably -- or
13  there's a high probability the claim is in excess of
14  the policy limits?
15  A.      Right.
16  Q.      And otherwise, you would not.
17  A.      Right.
18  Q.      In any event, returning to this particular
19  file, I believe you told me you didn't think this was
20  an excess claim.
21  A.      Right.
22  Q.      And as of March the 18th, 2003, had you
23  evaluated the claim?
24  A.      No.
25  Q.      As of May the 16th, 2003, had you evaluated

Page 59

1   the claim?
2   A.      I had read through the claim, yes.
3   Q.      Do we see you documenting anything about
4   value -- or I'm sorry -- documenting an evaluation to
5   the claim file at any point here?
6   A.      No.
7   Q.      Ever?
8   A.      Possibly towards the end of May, but I don't
9   remember.
10  Q.      On May -- on March the 18th, 2003, would you
11  have had the claim file physically in order to write
12  this letter to Mr. Herron?
13  A.      Yes.
14  Q.      So on March the 18th, 2003, did it come to
15  your attention that this was supposed to be a home
16  office referral?
17  A.      Well, Craig, I believe, had already put in a
18  CDS entry stating that.
19  Q.      Okay. And so on March the 18th, 2003 -- all
20  I'm asking is, did the fact you were supposed to have
21  been sending in a home office referral on this file
22  come to your attention on March the 18th?
23  A.      I don't know.
24          MR. SANDBERG: Off record.
25          (Telephonic interruption.)

Page 60

1   BY MR. SANDBERG:
2   Q.      On March the 18th, 2003, would you have
3   reviewed the screens we've been looking at prior to
4   writing this letter to Mr. Herron?
5   A.      Probably.
6   Q.      So if you had reviewed them, presumably you
7   would have seen the instructions from Mr. Elkins to
8   make the home office referral?
9   A.      If I reviewed them, yes.
10  Q.      But as we sit here today, you just don't
11  know one way or the other?
12  A.      Right.
13  Q.      Go to 203, if you would. 203, we're looking
14  at a letter to you from Ms. Power --
15  A.      Yes.
16  Q.      -- dated December the 10th, 2002 and
17  received December 11th, 2002?
18  A.      Right.
19  Q.      And it says that Angelina Trailov will be
20  examined by a neuropsychologist on December 17th,
21  2002?
22  A.      Right.
23  Q.      Did you ever make an effort to determine
24  whether that happened?
25  A.      I don't believe I asked her about that, no.

18 (Pages 57 to 60)

Kathy Berry                        Deposition                    September 30, 2005

Page 61

1  Q.    Did you ever make an effort to obtain those
2  records?
3  A.    We didn't know who he was, he or she.
4  Q.    Either by correspondence or by picking up
5  the phone, did you ever ask Michele Power who the
6  neuropsychologist was?
7  A.    I don't believe so.
8  Q.    Why not?
9  A.    I don't know.
10 Q.    This letter, presumably, would have been in
11 the file had you reviewed it any time after
12 December 11th, 2002.
13 A.    Right.
14 Q.    So what, if anything, can we determine
15 whether you actually reviewed the physical file after
16 December 11th, 2002 from that?
17 A.    Just one moment. I'm looking for something.
18 Q.    Sure. Take your time.
19 A.    I would have looked at the physical file
20 before I sent the letter of March 18th, because I knew
21 which records we had and which ones we didn't have.
22 Q.    And if you looked at the physical file on
23 March 18th, 2003, this letter would have been in
24 there, correct?
25 A.    Right.

Page 62

1  Q.    And can we assume then you just didn't see
2  this letter because this isn't listed in your items
3  that you have or don't have.
4  A.    I don't know why it wasn't addressed. I
5  don't believe Michele Power's demand letter mentioned
6  that she went to see a neuropsychologist. So I -- if
7  it had been in the demand letter -- at least what I'm
8  seeing, it's not in here -- it would have been more
9  likely I would have asked about it.
10 Q.    The instruction to make the mandatory home
11 office referral related to allegations of brain
12 damage?
13 A.    Right.
14 Q.    And a neuropsychologist is one place a
15 person goes for an evaluation of whether or not there
16 has been brain damage, correct?
17 A.    Correct.
18 Q.    I have one other question -- I'm sorry --
19 about that. In Exhibit 203, it says please provide me
20 with a copy of Charles Herron's insurance policy at
21 your earliest convenience.
22 A.    Right.
23 Q.    Did you do that?
24 A.    I believe I did that in January. Yes. See
25 202.

Page 63

1  Q.    Okay. This is the letter that we looked at
2  earlier. And it says down here -- it says I have also
3  enclosed a copy of the certified declarations page.
4  Is that what we're referring to?
5  A.    Right.
6  Q.    And that happened in January 17th, 2003?
7  A.    Right.
8  Q.    And you believe that is the response to this
9  letter of December 10th asking for a copy of the
10 policy?
11 A.    Right.
12 Q.    Look at 191, if you would. 191 is a letter
13 from Mr. Valcarce to you dated March 26th, 2003?
14 A.    Right.
15 Q.    And it says he's essentially demanding that
16 Allstate settle the case within the policy limits?
17 A.    Right.
18 Q.    I don't see -- oh, I see why. I was going
19 to say, I didn't see a received stamp on it. But this
20 one was faxed, wasn't it? We can see that at the top
21 of page 191?
22 A.    Yeah. Looks like it.
23 Q.    So by March 26th, 2003, we have
24 Mr. Valcarce's letter insisting that the claim be
25 settled within the policy limits was at the Allstate

Page 64

1  claim office, at least?
2  A.    Right.
3  Q.    Whether or not you got it that day, it did
4  arrive, it appears, that day. Was the fact that
5  this -- the arrival of this letter from my client's
6  lawyer, was this logged into the -- was that logged in
7  or was the letter just put in the file?
8  A.    Logged in where?
9  Q.    In the claim diary that we're looking at.
10 A.    No.
11 Q.    As far as we can tell from the claim file,
12 was anything at all done in response to Mr. Valcarce's
13 letter?
14 A.    By meaning of a --
15 Q.    By Allstate.
16 A.    What do you mean by in response?
17 Q.    Well, his letter arrives on March 26th,
18 2003, correct?
19 A.    Right.
20 Q.    And what I'm wondering is, did Allstate
21 claim department do anything in response to this
22 letter, as far as we can tell?
23 A.    Do you mean do anything differently than we
24 would have otherwise?
25 Q.    Do anything, period. Can we tell you even

19 (Pages 61 to 64)

Alaska Stenotype Reporters

Kathy Berry                                    Deposition                              September 30, 2005

Page 65

1    looked at it?
2    A.      I don't think the letter in itself required
3    a response.  And we were continuing to get the
4    records.
5    Q.      Is there any way looking at this claim file
6    that we can tell that you even read this letter from
7    Mr. Valcarce?
8    A.      Not by any documentation in the claim file.
9    Q.      And did -- was any response at all sent to
10   Mr. Valcarce?
11   A.      I believe there was not.
12   Q.      What, if anything, is the significance of a
13   letter like Mr. Valcarce sent on behalf of an Allstate
14   insured insisting that the claim be settled within the
15   available coverage?
16   A.      Well, every claim that we have, we want to
17   settle within the available coverage.
18   Q.      Right.  So does the fact that Mr. Valcarce
19   writes and insists that this one be settled within the
20   available coverage, is that significant one way or the
21   other?
22   A.      It's duly noted and it's what we were
23   planning to do anyway.  So its significance is that
24   it's duly noted.
25   Q.      Well, you've got -- on March 26th, 2003,

Page 66

1    Allstate has the opportunity to settle within the
2    policy limits on Angelina, correct?
3    A.      Right.
4    Q.      And did you just tell me that's what
5    Allstate intended to do on March 26th, 2003?
6    A.      We always intend to settle within the
7    available limits.
8            MR. SANDBERG:  So was the intention to
9    settle Angelina's claim within the available limits
10   documented somewhere in this claim file?  I mean, had
11   the determination -- well, that's --
12           Let me withdraw that.  And instead, say it
13   is 4:30.  So perhaps we should stop for the day, if
14   that's okay.
15           MR. WILKERSON:  We're off.
16           MR. SANDBERG:  Off record.
17               (Whereupon, the deposition was
18               adjourned at 4:29 p.m.)
19
20
21
22
23
24
25

20 (Pages 65 to 66)

Alaska Stenotype Reporters

1                    REPORTER'S CERTIFICATE

2

3            I, Susan Campbell, Certified Shorthand

4    Reporter, hereby certify:

5            That I am a Certified Shorthand Reporter and

6    Notary Public for the State of Alaska; that the

7    foregoing proceedings were taken by me in stenographic

8    shorthand and thereafter transcribed by me; that the

9    transcript constitutes a full, true and correct record

10   of said proceedings taken on the date and the time

11   indicated there.  Further, that I am a disinterested

12   person to said action.

13           IN WITNESS WHEREOF, I have hereunto

14   subscribed my hand and affixed my official seal this

15   12th day of October 2005.

16

17

18        OFFICIAL SEAL

19        STATE OF ALASKA
          NOTARY PUBLIC
          SUSAN CAMPBELL              SUSAN CAMPBELL, CSR
20                                 NOTARY PUBLIC, State of Alaska

21

22

23   My Commission Expires April 26, 2008.

24

25

                                                              67

             ALASKA STENOTYPE REPORTERS    907 276-1680

1                      WITNESS CERTIFICATE

2    WITNESS: Kathy Berry    Taken: October 30, 2005

3    Case: Allstate vs. Herron

4    I hereby certify that I have read the foregoing
     deposition and accept it as true and correct, with the
5    exceptions:

6    ==================================================================

     Page  Line                          Description
7    ==================================================================

8    52   20    NBRS should be MBRS

9    53    8       "        "    "     "

10   _____ _____  _____

11   _____ _____  _____

12   _____ _____  _____

13   _____ _____  _____

14   _____ _____  _____

15   _____ _____  _____

16   _____ _____  _____

17   _____ _____  _____

18   _____ _____  _____

19   Reason for these changes:

20   _____

21   _____

22   _____

23   10/25/05      Kathryn Berry
     Date Read     Witness Signature
24

25   (Use additional paper to note corrections as needed,
     dating and signing each one.)

                                                         68

          ALASKA STENOTYPE REPORTERS    907 276-1680