```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF ALASKA
 3    ALLSTATE INSURANCE COMPANIES,    )
                                       )
 4                   Plaintiffs,       )
                                       )
 5    v.                               )
                                       )
 6    CHARLES HERRON,                  )
                                       )
 7                   Defendant.        )
      _____)
 8    Case No. A04-0043 Civil
 9           VIDEOTAPED DEPOSITION OF MICHELE L. POWER
10                    February 13, 2006
11    APPEARANCES:
12        FOR THE PLAINTIFF:         MR. MARK E. WILKERSON
                                     Wilkerson, Hozubin & Burke
13                                   Attorneys at Law
                                     310 K Street, Suite 405
14                                   Anchorage, Alaska  99501
                                     907-276-5297
15
          FOR THE DEFENDANT:        MR. MARK A. SANDBERG
16                                   Sandberg, Wuestenfeld &
                                     Corey
17                                   Attorneys at Law
                                     701 West Eighth Avenue
18                                   Suite 1100
                                     Anchorage, Alaska  99501
19                                   907-276-6363
20        FOR MS. POWER:            MR. DENNIS M. MESTAS
                                     Attorney at Law
21                                   745 West Fourth Avenue
                                     Suite 306
22                                   Anchorage, Alaska  99501
                                     907-277-9496
23
24
25
```

COPY

COPY

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

EXHIBIT 27

Page 2

1                          TABLE OF CONTENTS

2          Direct Examination by Mr. Wilkerson              3

3     EXHIBITS MARKED:

4      1 - Letter to Ms. Berry from Ms. Power, 4/10/03      35

5      2 - Letter to Ms. Power from Ms. Berry, 5/9/03       41

6      3 - Letter to Ms. Berry from Ms. Power, 5/15/03      42

7      4 - Letter to Ms. Power from Ms. Berry, 5/16/03      44

8      5 - Letter to Ms. Power from Ms. Berry, 5/30/03      49

9      6 - Proof of fax being sent                          59

10     7 - Letter to Ms. Berry from Mr. Johnson, 5/29/03    62

11     8 - Letter to Mr. Valcarce from Ms. Power, 11/18/03  68

12     9 - Letter to Ms. Power from Ms. Berry, 1/17/03      69

13     10 - File                                            71

14

15

16

17

18

19

20

21

22

23

24

25

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax     907-243-1473

jpk@gci.net
sahile@gci.net

MICHELE L. POWER
Vol. 1

2/13/2006

ALLSTATE INS. v. HERRON
A04-0043 Civil

Page 3

```
 1              P R O C E E D I N G S

 2          (Anchorage, Alaska - 2/13/2006)

 3       REPORTER:  My name is Salena Hile.  I'm a court reporter

 4   with Computer Matrix whose business address is 310 K Street,

 5   Suite 200, Anchorage, Alaska.  This is the first tape in the

 6   videotape deposition of Michele Power.  We're at the YK Delta

 7   Regional Hospital, west wing conference room in Bethel, Alaska.

 8   This is in the United States district court for the district of

 9   Alaska, Allstate Insurance Company, plaintiffs, versus, Charles

10   Herron, defendant.  The case number is A04-0043 CV.

11   Counselors, please identify yourselves for the record and who

12   you represent starting with the plaintiff's attorney, please.

13       MR. WILKERSON:  I'm Mark Wilkerson.  I represent Allstate.

14       MR. SANDBERG:  And I'm Mark Sandberg and I represent

15   Mr. Herron.

16       MR. MESTAS:  Dennis Mestas here representing Ms. Power.

17       REPORTER:  All right.  Thank you.  Ms. Power, can you

18   please raise your right hand.

19       (Oath administered)

20       MS. POWER:  I do.

21                      MICHELE L. POWER

22   having first been duly sworn under oath, testified as follows

23   on:

24                    DIRECT EXAMINATION

25       REPORTER:  Thank you.  Please state your full name for the
```

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax     907-243-1473

jpk@gci.net
sahile@gci.net

Page 4

1    record and spell your last name.

2    A    Michele Leslie Power, last name P, as in Paul, O-W-E-R.

3    Q    And a business mailing address?

4    A    Post Office Box 1809, Bethel, Alaska, 99559.

5         REPORTER:  And a daytime telephone or a message phone?

6    A    907-543-4700.

7         REPORTER:  All right, thank you.  Okay, and counselors if

8    there's no stipulations, Mark, you can begin.

9         MR. WILKERSON:  Thank you.

10   BY MR. WILKERSON:

11   Q    Ms. Power, you were good enough to -- to bring at least

12        some documents, maybe all documents, responsive to the

13        subpoena that was issued.  Could you first tell me did you

14        bring or attempt to bring everything that was listed in

15        that subpoena?

16   A    Yes, and let me look to see what you had specifically

17        asked for here.  I've got it.

18   Q    Okay.

19   A    I brought the entire file and did not bring however

20        attorney/client communications and work product.

21   Q    Okay.  Can you -- just so I'm clear, could you.....

22        MR. MESTAS:  And -- and work product.

23   A    Oh, I'm sorry, and work product.  That's what I said.

24        MR. WILKERSON:  Yeah, she said that.

25        MR. MESTAS:  Okay, I didn't hear that.

Page 5

```
 1   Q    Could you define for me what you mean by work

 2        product?  What is it that you withheld for work

 3        product?

 4   A    Documents that I prepared -- not documents but notes from

 5        attorney/client communications where I listed out what she

 6        told me specifically about her injuries, what Mary Kenick

 7        told me about her daughter's injuries, those kinds of

 8        things, communications within -- between lawyers, Myron

 9        and I, or any kind of notes that related to something that

10        he and I had discussed that had to do with our actual

11        strategies of the case.

12        MR. MESTAS:  And communications with my office as well.

13   A    Yes.

14   Q    All right.  Could you please by category describe for me

15        what -- what is contained within the file that you

16        brought?

17   A    Yes.  I have three files and two of the files relate

18        to the -- to the case against Charles Herron.  This

19        case should relate to the Allstate case.  So it's

20        divided up.  This was the initial case against

21        Charles Herron.

22   Q    All right.

23   A    This is against Allstate.  This is the Charles Herron

24        -- let's see, let me be sure I'm correct there --

25        yeah.  Well, actually it's Mary Kenick as -- as NIED
```

Page 6

```
 1        and Angela Trailov against Allstate and Kathy Berry.

 2        This is the case prior to this case.

 3   Q    I got it.

 4   A    If that makes sense.

 5   Q    All right.  And what else?  There are other things in that

 6        box.

 7   A    Okay.  In the box we have Rule 26 disclosures.  We have

 8        defendant's answers to plaintiff's first set of request

 9        for production.  Plaintiff's first response to production

10        requests.  Medical discovery.  This is kind of -- that

11        should be medical records and it -- I think it's pretty

12        well divided out as to what it is.  But it's discovery

13        documents.  This is the petition for approval of minor

14        settlement.  And the final folder is our settlement brief.

15        Well, not the brief, but actually what we prepared for

16        settlement to present to Judge Hanson when he was.....

17   Q    The mediation?

18   A    The media -- at the settlement conference.  And then this

19        is a packet of pictures that we've gotten enlarged of the

20        accident.  And then I think that's it.  Mid -- inside here

21        we have correspondence.  Each file is divided into a

22        section for correspondence, a section for -- should be, I

23        mean I can't guarantee that the -- that the filing clerk

24        has it totally in the right areas.  But this should be

25        general pleadings.  This should be orders.  This should be
```

Page 7

```
 1          motions.  Kind of general stuff here.  And then some kind
 2          -- some kind of general discovery on the -- the last clip.
 3     Q    All right.  Did you prepare any sort of privileged log
 4          identifying the documents that you withheld from the
 5          files?
 6     A    I did not.
 7     Q    Can you quantify for me the number of documents, even
 8          approximately, that -- that were withheld?
 9     A    Oh, boy, I -- I couldn't at this point.  I mean I can
10          certainly do that after today.  But I would say out of the
11          -- now are we talking about up to what date?  I mean we're
12          talking about the Charles Herron lawsuit, correct, up
13          through, what, June 1st of 2003; is that what we're
14          talking about?
15     Q    Well, up -- up until after the confession of judgment.
16     A    Okay.  And what date was that?  Do you know the date of
17          that?
18     Q    I think I.....
19     A    I mean that would.....
20     Q    Pretty close to it, I think.
21     A    I'd have to -- I -- yeah, I guess my answer is I wouldn't
22          even want to guess.  I -- I don't know.  I -- I could
23          prepare a privileged log.
24     Q    I've got 9th of April 2004 as the -- the date.....
25     A    Okay.
```

Page 8

1   Q   .....on the confession of judgment document I have in

2       front of me.

3   A   Yeah, and I -- I wouldn't know.  I -- you know, I've got

4       several documents, many documents.  I took notes.  When

5       Mary would call me I took notes, when I visited with Gina,

6       and I have no idea.  But I can certainly do that.

7   Q   All right, thank you.  In what form are -- are your

8       notes  handwritten notes, computer.....

9   A   Both.

10  Q   .....generated notes?

11  A   Both.

12  Q   All right.  Can you break half, half, any.....

13  A   Oh, golly.....

14  Q   .....breakdown on that?

15  A   .....you know, I -- I hate to speculate.  I would rather

16      just do it for you and give it to you.

17  Q   All right.  Do you still represent Ms. Trailov and Ms.

18      Kenick?

19  A   I do.

20  Q   Does anyone else besides you represent them?

21      MR. MESTAS:  I represent them.

22  Q   All right.  Anyone besides Mr. Mestas and your office.....

23  A   No.

24  Q   ....still represent them?

25  A   No.  Are you asking -- are you -- is this related to

MICHELE L. POWER                    2/13/2006                  ALLSTATE INS. v. HERRON
Vol. 1                                                                    A04-0043 Civil

Page 9

```
 1         Angstman Law Office?

 2    Q    Yeah, I'm trying to sort out whether Mr. Angstman or his

 3         office still has some sort of interest in the case or

 4         involvement in the case?

 5    A    Well, he may have an interest in the case.  He does not

 6         have involvement in the case.  A financial interest in the

 7         case, if that's your question.

 8    Q    That is my question.  So he has a financial interest in

 9         the case but he is no longer acting as active counsel for

10         the two of them?

11    A    Correct.

12    Q    So now it is you, your office, and Mr. Mestas'

13         office?

14    A    Correct.

15    Q    All right.  What did you review prior to your depo

16         today?

17    A    I reviewed what we have in front of us.  I went -- I --

18         what I have here is a file of my correspondence that was

19         between myself and -- and Allstate.  I reviewed that.

20         Briefly went through these files and briefly went through

21         that.  It's -- it's a lot of paperwork but I -- I -- I

22         guess to say that I glanced through each one.  I did that.

23    Q    Okay.  The notebook that you just referenced, is that

24         correspondence that you -- was that -- strike that.  Was

25         that maintained that way in your normal file maintenance?
```

Page 10

```
 1   A    No.

 2   Q    I take it the white notebook is copies of

 3        correspondence that you pulled from the normally

 4        maintained file and put in a notebook?

 5   A    This is not copies and you may take this with you.

 6        Some of these are originals.

 7   Q    Okay.

 8   A    Okay.

 9   Q    So they have been pulled from the normal file and

10        placed in that notebook?

11   A    Right, so that I could see them, yes.

12   Q    I see, all right.  And if we were to put them back,

13        or endeavor to put them back in the -- in the normal

14        file maintenance, it would simply be by date?

15   A    Correct.

16        MR. WILKERSON:     Okay.  All right.  And just so we're

17   clear, the court reporter will take custody of that box of

18   documents.  Ms. Power was good enough to tell me that next to

19   the complex in which her office is located is.....

20   A    A UPS Store.

21        MR. WILKERSON:  .....a UPS that has some good copying

22   equipment and we'll try to get it back to her as soon as we

23   can.  But it is going to be placed in your custody, Madam Court

24   Reporter.

25        REPORTER:  All right.
```

Page 11

```
 1   Q    All right.  Did you meet with anyone in preparation
 2        for your deposition?
 3   A    I picked up Mr. Mestas and Mr. Sandberg.  We spent some
 4        time in my -- in my office this morning talking.
 5   Q    Okay.  And what did you talk about?
 6   A    Weather, we talked about flights; we talked about the
 7        changes in Bethel.  We did talk about what we're going to
 8        bring today and I think generally what was anticipated
 9        from the deposition.
10   Q    When did you meet with them?
11   A    This morning.
12   Q    What time?
13   A    Let's see, I picked them up about 7:30.  We had coffee and
14        -- and Mr. Sandberg had a muffin.  So we spent about --
15        about an hour there.  And then we spent about, gosh, a
16        couple hours maybe in my office talking about general
17        things as well as talking about what we anticipated from
18        the deposition.
19   Q    All right.  Anyone else?
20   A    No.
21   Q    I do have some documents that I think you will find -- I
22        brought copies for you but I think.....
23   A    Okay.
24   Q    .....you've probably got them maybe better organized than
25        I do in your white notebook, that I'm going to ask you
```

Page 12

1    some questions about.  But before I do that I wanted to

2    cover some general topics.  First let's start with the way

3    that your office records the receipt of mail, phone or

4    fax.  And when I say your office, I'm really referring to

5    the times pertinent, which I think at the time you were

6    with -- at the Angstman Law Office.

7  A  Correct.

8  Q  All right.  Let's start with one of those.  Let's start

9    with fax.....

10 A  Okay.

11 Q  .....the fax machine, does your fax machine have a process

12   by which you code things into it so it keeps track of

13   times and dates when faxes either go out or arrive?

14 A  And I'll do my best here because that would be a

15   secretarial function and we've had -- at the time of this

16   happening at least one fax machine, possibly two.  And

17   that's -- that's a possibility.  We had a little trouble

18   with faxes over the last three or four years.  So I'm

19   going to say.....

20 Q  I want to narrow it to -- to around the time of May of

21   '03.

22 A  Okay.  There should have been one fax machine at that

23   time.  Whether it was coded to -- it -- it should have

24   been coded so that outgoing had the date and time.  I

25   didn't personally do it but it -- I -- I had -- was

MICHELE L. POWER                        2/13/2006              ALLSTATE INS. v. HERRON
Vol. 1                                                                A04-0043 Civil

Page 13

```
 1      assuming that it had been done.  Okay.  And then in terms

 2      of receipt, I think that the top of the fax shows a date

 3      and time and who it's from.  And it would print that out.

 4      In terms of whether we had a receipt, we did not have the

 5      practice of keeping the -- the machine's printout.  I

 6      since then now keep all of those but at that time we

 7      didn't.  And I don't think that the file has any of those.

 8      I think that -- I don't think it kicked it out

 9      specifically.  I think you could ask for it to do that.

10      But I don't think that it did it specifically.  And I know

11      some machines now do that automatically.

12      MR. MESTAS:  You mean a transmittal?

13   A  Yes.  Yeah, a confirmation that it actually had gone

14      through.  Rather than just hearing a beep you get

15      something.

16   Q  Where is the fax machine that was at Mr. Angstman's office

17      in May of '03 now?  Do you have it or is it still at his

18      office?

19   A  Oh, I don't have it.  Yeah, it's -- it -- if it still

20      exists, it's there.  And I say that because I don't know

21      that for sure.

22   Q  I understand.  But you -- you don't have it, that.....

23   A  I don't have it.....

24   Q  .....that we do know?

25   A  .....no.
```

Page 14

```
 1    Q    Anything about a stamp, a receipt stamp process or

 2         procedure?

 3    A    When things went out the secretaries were supposed to

 4         stamp it with something that said faxed.  And they would

 5         put the date on it, did not put a time on it.  In terms of

 6         things coming in that came by fax, no, there was no

 7         indication.  There was no -- no process that we'd set up.

 8    Q    All right.  How about for mail?

 9    A    Mail we had at the time -- let's see, gosh, when I left

10         Angstman Law Office there was a stamp, a hand stamp,

11         mechanism that would say Angstman Law Office and the date

12         on it when it was received.  Whether we had that at that

13         time, I don't know for sure.  And it was not something

14         that got used consistently.  It depended on who opened the

15         mail.

16    Q    All right.  Finally, telephone.

17    A    Telephone logs, there was no real telephone log.  It was

18         up to me to bill telephone calls that I made.  We had a

19         very busy office.  The phone rang all the -- all the time.

20         And so there were calls that came in that didn't

21         necessarily get logged.  I tried to log all that I could

22         but in a day's time, you know, when I'd been at my office

23         eight or nine hours and I look at my bill time and it's

24         five hours, I know that there's some of that day that I

25         don't have.  So that happened.  In terms of outgoing --
```

Page 15

```
 1         incoming, if -- if there was a message taken, then that

 2         would have been logged into a little message book.

 3    Q    Let me ask you to pause there, with respect to the -- the

 4         phone call message book, would those messages still be

 5         available or were they incorporated into the file at some

 6         point?

 7    A    They never were and they never are.  I mean that was not

 8         our practice.  Those could exist.

 9    Q    Again, those would be at Mr. Angstman's.....

10    A    At Angstman Law Office.

11    Q    .....office?

12    A    Uh-huh.  (Affirmative)

13    Q    Is that something that you think you have the capability

14         of retrieving, at least phone messages that make reference

15         to individuals involved or lawyers involved in this case?

16    A    I could certainly make a request that I have an

17         opportunity to look through and retrieve those.

18    Q    Okay.  Will you do that, please?

19    A    I will if -- if you might jot a note down for me to -- to

20         do so.

21         MR. MESTAS:  And these are telephone messages that you're

22    looking for?

23         MR. WILKERSON:  Yeah, she indicates that tel -- incoming

24    telephone messages, some of them, were captured and -- and put

25    in a telephone log book.  That's what we're looking for.
```

MICHELE L. POWER
Vol. 1

2/13/2006

ALLSTATE INS. v. HERRON
A04-0043 Civil

Page 16

1    Q    Now you mentioned that you kept track or endeavored to

2         keep track of -- of phone calls that you were making or

3         both.....

4    A    Both.

5    Q    .....that you made and received?

6    A    Both.

7    Q    And is this in the form of keeping track of your time?

8    A    We did not have -- we didn't have Abacus or any of the

9         programs for billing.  Each of us kind of created our own

10        system.  And at that time it was just an Excel spreadsheet

11        that -- that I would log it in and Sue Angstman is the

12        bookkeeper and we would turn those in to her.  They may

13        still be in existence.  I don't know.

14   Q    You anticipated my question accurately I think.  I take it

15        those are not incorporated within your file?

16   A    Correct.

17   Q    Those are also maintained, you believe, by the Angstman

18        law firm and what is the best description of what we would

19        ask or what you would ask to -- to retrieve them?

20   A    Timesheets, that's what we called them, for lack of.....

21   Q    Michele Power's timesheets?

22   A    Uh-huh.  (Affirmative)

23   Q    Okay.  Were those -- do you know whether those were

24        organized by month or by some time period?

25   A    By month and, you know, I'm not sure what her system was

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax   907-243-1473

jpk@gci.net
sahile@gci.net

Page 17

```
 1        other than that we would give them to her.  She would go

 2        through and -- and -- for hourly clients get the billing.

 3    Q   And how about for non-hourly clients?

 4    A   She did record hours as well for -- for non-billable

 5        clients.

 6    Q   So if we were to narrow the field for her to certain

 7        months, that would hopefully make it easier for her to

 8        retrieve those?

 9    A   Yes.....

10    Q   Okay.

11    A   .....I would think.

12    Q   I want to ask you about the med pay payment.  Do you know

13        what I'm referring to?

14    A   I do now.

15    Q   Did you have communications with a man by the name of

16        Scott Millar from Allstate?

17    A   Yeah, in the spring of -- May '03 I had a phone call from

18        him, I believe, and then a letter indicating that med pay

19        was available.

20    Q   Okay.  Did you know prior to that whether or not med pay

21        was available?

22    A   No, I did not.

23    Q   You didn't have any idea?

24    A   I did not have any idea.

25    Q   So when Mr. Millar called you that was, I take it, good
```

2/13/2006

Page 18

```
 1          news; you found out there was some additional coverage for

 2          your clients?

 3     A    Yes.

 4     Q    Had you made any inquiry prior to that phone call in the

 5          spring of '03 about that?

 6     A    No.

 7     Q    Had you seen the declarations page for the coverages

 8          involved in the accident?

 9     A    I may have.  I don't recall specifically.  I don't

10          know whether I even remember seeing it in the files I

11          went through.

12     Q    Had you spoken -- you were retained quite soon after this

13          accident to represent Ms. Trailov and -- and perhaps even

14          her mother at that time.....

15     A    Correct.

16     Q    .....right?  And you communicated quite promptly to Mr.

17          Valcarce's office indicating so, that you were

18          representing them?

19     A    Correct.

20     Q    Did you at any time after that speak with Mr. Valcarce

21          about what coverages might or might not be available to

22          take care of your client?

23     A    There weren't a whole lot of communications between

24          Angstman Law Office and Mr. Valcarce's office.  That was

25          by practice.  And so, no, there were no verbal
```

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

Page 19

1      communications.  Everything that you see basically is --

2      is on paper.

3   Q  I take it that there was a lack of cordial relations,

4      shall we say, that.....

5   A  At that time I think that's fair to say.

6   Q  Okay.  So this was not a situation where, for whatever

7      historical reasons, you couldn't just pick up the phone

8      and say, hey -- hey, Jim, and ask him a question like,

9      hey, is there med pay coverage for my clients; they were

10     passengers in this car?

11  A  Well, true.  I -- I -- correct.

12  Q  And how about by writing, could you have asked a similar

13     question to that of Mr. Valcarce in writing?

14  A  Had I -- I known it -- I think the question you want to

15     know is whether or not I knew whether med pay was

16     something that my client had coming to her and the answer

17     to that is, no, I didn't.  And had I -- had I known, I

18     would have included it in a letter.  I would have asked

19     for it.  It was never offered.  It was never brought up.

20  Q  When you say include it in a letter, ask for it, of

21     Valcarce or of Allstate or both?

22  A  Well, both.

23  Q  Okay.  When Mr. Millar communicated with you was he in any

24     way rude or impolite?

25  A  No.

Page 20

1   Q   And when you found out there was med pay coverage -- I

2       take it you found out there was $25,000 worth of med pay

3       coverage?

4   A   Correct.

5   Q   And did you and Mr. Millar discuss how you preferred

6       to have the med pay coverage paid?

7   A   In terms of directly to my client or to the insurance

8       company, I presume I did.  I have no independent memory of

9       that.  A check came so we must have.

10  Q   Yeah, that's what I'm getting at.  They could have written

11      checks to individual doctors or treatment centers or they

12      could give the check to you and allow you to then

13      negotiate as you saw fit to get as many of her medical

14      bills paid with the 25,000 as possible; I take it it's the

15      latter that occurred?

16  A   No.  Honestly I have no memory of how that happened.

17  Q   Do you recall negotiating any of the medical payment

18      claims or liens downward by saying, look, this is how

19      much med pay coverage we've got; you should reduce

20      the amount of your bill, any memory of doing that

21      with any of the healthcare providers?

22  A   I have no memory of doing that at this point.  You know,

23      I'm -- and in going through the file I don't believe I saw

24      communications indicating that -- that we talked to them

25      about that.  So I don't believe so but I -- I don't -- I

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

MICHELE L. POWER
Vol. 1

2/13/2006

ALLSTATE INS. v. HERRON
A04-0043 Civil

Page 21

1       don't honestly remember one way or another.

2    Q   Is that something that you do as a part of your practice,

3        negotiate with med pay providers to try to maximize the --

4        the medical benefits or other benefits you might have?

5    A   Depending on the case.  Typically if -- and only at

6        settlement, only when the money's coming and then we try

7        to work out any of the healthcare liens.

8    Q   And it is common practice that they will reduce their lien

9        somewhat?

10   A   Somewhat.

11   Q   Okay.  And different ones are different, right?

12   A   That's right.  Some don't.  Some don't at all but some do.

13   Q   Okay.  And you just don't remember what you did here.....

14   A   No, and I -- and I.....

15   Q   .....with respect to the med pay benefits?

16   A   Right, I don't.  And I -- I think partly because there was

17       never really -- that was the first time I heard anything

18       about med pay.  It was -- it was in May, as I recall, and

19       it certainly didn't cover all of her expenses.  So beyond

20       that I don't recall.

21   Q   Would the file reflect what you did with the $25,000 in

22       med pay, how it was distributed to whom?

23   A   No, my file probably would not.  But the bookkeeper's

24       books may.

25   Q   And now we're back to the Angstman Law Office's

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

MICHELE L. POWER
Vol. 1

2/13/2006

ALLSTATE INS. v. HERRON
A04-0043 Civil

Page 22

```
 1        bookkeeper?

 2   A    Correct.

 3   Q    What is it that we should note or what -- what is it

 4        we would be asking for to try to retrieve that

 5        information?

 6   A    Checks paid on behalf of Mary Kenick and/or Angelina

 7        Trailov to health -- to healthcare providers in May of

 8        2003 or June of 2003.

 9   Q    And you expect it would be near that timeframe because

10        that's when you.....

11   A    I would think.

12   Q    .....received the money?

13   A    I would think.

14   Q    Would any fee, attorney's fee, have been taken out of

15        the med pay benefits?

16   A    I don't believe so.

17   Q    Is that something we should be able to confirm from

18        the bookkeeping records?  I mean.....

19   A    The bookkeep -- yes, the bookkeeping records.....

20   Q    .....if 25,000 got spent paying doctors, then we would

21        know there was no fee, right?

22   A    Correct.

23   Q    Okay.  Did you discuss the med pay situation with your

24        clients?

25   A    I'm sure that I did.
```

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

MICHELE L. POWER                          2/13/2006                    ALLSTATE INS. v. HERRON
Vol. 1                                                                  A04-0043 Civil

Page 23

```
 1    Q    In other words, I got -- I got a phone call; there's

 2         $25,000 in med pay; I'm going to get a check this week?

 3    A    I'm sure that I did.  Mary Kenick, mother of Angelina, had

 4         been receiving bills from -- from her healthcare insurance

 5         provider and I think also from perhaps the -- the

 6         healthcare providers themselves and it would have been a

 7         great relief to her.  So I'm sure that -- that I would

 8         have communicated that to her.

 9    Q    All right.  And are you aware of any bad thing that

10         happened to either of your clients as a result of the

11         timing of the 25,000 in med pay benefits?  In other words

12         did a creditor do something to their credit scores?  Did a

13         hospital refuse to provide treatment, anything like that;

14         anything that you would consider prejudiced to them?

15    A    Well, I would say that there were bills unpaid and, you

16         know, I -- there may have been one problem with credit

17         related to this.  And I don't have a specific memory of it

18         but I do know that -- that it was very distressful for

19         Mary Kenick to have these bills.  She brought them in and

20         she would be concerned about it and why -- why are these

21         not being paid and -- and what's going to happen with the

22         case and -- and I believe that there may have been a

23         credit report generated because of one of them.  And that

24         is -- this is awhile ago and.....

25    Q    Would that be in the file?
```