Page 46

```
 1        that is how that -- this felt, I got to tell you.  That is

 2        how this felt.

 3    Q   Did you call her?

 4    A   No, I did not call her.

 5    Q   Did you write her a letter or send her a fax.....

 6    A   No.

 7    Q   .....as you had done.....

 8    A   No.

 9    Q   .....earlier that same day?

10    A   No.  Nor did she ask for any kind of extension.  She

11        didn't ask.  She didn't say may I have an extension; I

12        don't want to miss this very important deadline that you

13        provided after all these months.  I don't -- I don't want

14        to miss that deadline.  Can I have an extension?  She

15        didn't call.  She didn't ask.  She just blew me off.

16    Q   And if she had?

17    A   I might have given it.

18    Q   So I take it it's the -- it's the tone of the letter.....

19    A   No.

20    Q   .....it's the lack of.....

21    A   No.

22    Q   .....saying, please, give me an extension?

23    A   It's not the tone of this letter.  It's the tone of the

24        file.  This is what happened from the very beginning to

25        where we ended up on May 16th.
```

MICHELE L. POWER                    2/13/2006                    ALLSTATE INS. v. HERRON
Vol. 1                                                           A04-0043 Civil

Page 47

1   Q    So you didn't interpret this as a request.....

2   A    No, I did not.

3   Q    .....for additional time?

4   A    No.

5   Q    You didn't -- when -- when it says if you've got any

6        questions about this additional time it's going to

7        take, this additional two weeks, you didn't take that

8        as inviting a response from you?

9   A    No, not at that point.

10  Q    And in any event you did not call, write or fax to

11       say.....

12  A    To remind them that they missed the deadline that she

13       already knows about, no, I didn't.

14  Q    Or to say, you know, unfortunately your evaluation is not

15       completed; you can't have any more time?

16  A    No.  Nor did -- nor did I believe I owed it to her, not at

17       that point.  She was very aware of the deadline.  She just

18       didn't take it seriously apparently.

19  Q    And so was it before or after this letter that you

20       communicated with Mr. Johnson?

21  A    Let's see, 5:41, May 16th, you know, I -- honestly I don't

22       know.  It may have been after.  I was there late, which

23       was typically my practice.  I don't think I -- you know, I

24       don't know.  I'm -- I'm going to guess it was after but I

25       don't know.

Computer Matrix, LLC                Phone - 907-243-0668              jpk@gci.net
310 K Street, Suite 200             Fax    907-243-1473              sahile@gci.net

MICHELE L. POWER
Vol. 1

2/13/2006

ALLSTATE INS. v. HERRON
A04-0043 Civil

Page 48

```
 1   Q    Did you send a copy of this by fax or any of -- any other

 2        fashion to Mr. Johnson to discuss it with him?

 3        MR. MESTAS:  Excuse me, I didn't hear that, Mark.  I was

 4   looking at the fax time there.

 5        MR. WILKERSON:  The question was did she send a copy of

 6   this by fax to Mr. Johnson.

 7   A    At some point I did.  I don't know that I sent it that

 8        day.  I mean I -- I wanted him to have everything we had.

 9        I'm not certain how soon he got it.

10   Q    Your practice you mentioned was to work late.  What was

11        your normal practice at that time in terms of hours that

12        you worked?

13   A    I got there at 8:30.  I usually stayed there through lunch

14        and I left anywhere from 6:00 to 7:00.

15   Q    All right.  By the way, were you experiencing any trouble

16        with your fax machine at that point in time, long delays

17        in faxes getting through or anything like that?

18   A    Well, you know, I -- I do know that we had trouble with

19        faxes -- fax machines rather and we probably went through

20        two or three between 2000 and 2005 when I left.  I

21        couldn't tell you if this was specifically one of those

22        times.  It could have been.  And I don't know the reason.

23        I'm not a tech person.  And it was really a secretarial

24        issue but we had -- occasionally had problems.

25   Q    This letter of May 16th, I take it you did not
```

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

Page 49

```
 1        interpret this letter as being some discussion

 2        regarding pre-filing resolution either?

 3   A    I did not.

 4   Q    All right.

 5                              (Deposition Exhibit 5 marked)

 6   Q    I have copies of this one for you.  This is Exhibit 5.  Do

 7        you recognize that letter?

 8   A    I do.  Let me just find it in my file here, just to line

 9        up things here.  Okay.  Okay.

10   Q    And this is a letter from Ms. Berry at Allstate?

11   A    It is.

12   Q    And aside from the date of the letter, it is offering

13        the policy plus Rule 82's for Angelina, correct?

14   A    Correct.

15   Q    Anything wrong with that offer other than the timing of

16        it?

17   A    Well, it didn't mention anything about UIM coverage,

18        whether or not there was any.  And nor had there been any

19        discussions prior to this.  I now am aware that they were

20        available but she didn't say it at that time.

21   Q    Was -- is it your understanding that people settled the

22        UIM cases at the same time as they settled BI cases?

23   A    At that time I wouldn't have -- I wouldn't have

24        known.

25   Q    How about now?
```

MICHELE L. POWER                    2/13/2006                    ALLSTATE INS. v. HERRON
Vol. 1                                                          A04-0043 Civil

Page 50

```
 1    A    I don't know that I do now.  I mean I -- I think that it's

 2         -- that I know -- you know, my understanding of -- of

 3         insurance law I think is limited.  I think that's fair to

 4         say.

 5    Q    Okay.  Are you aware of whether UIM coverage is triggered

 6         only upon exhaustion of the underlying BI limits?

 7    A    I am.  I am aware of that.

 8    Q    So.....

 9    A    But whether or not they -- whether or not that means you

10         can't discuss it, you know, at the time that you're --

11         you're making an offer.

12    Q    But you were critical because it did not.  The question I

13         have is did -- is it your understanding that you're

14         required to discuss it to make a valid bodily injury

15         liability offer?

16    A    Whether that.....

17    Q    You're somehow required to discuss UI coverage?

18    A    I think it's fair to say that this is my understanding,

19         that from the very beginning this case was never taken

20         seriously by Allstate.  And perhaps -- and I don't know

21         why.  I mean I have my -- I suppose I have my opinion as

22         to why.  But it was never taken seriously.  And here

23         again, this is 14 days past the deadline, which was --

24         which I -- I provided the policy limits offer.  I made a

25         deadline and there was no question that Allstate knew that
```

Page 51

```
 1          there was a deadline.  There was a subsequent letter that
 2          indicated that they did know it.  She labeled it a May
 3          16th deadline.  And then blew it off, asking for more
 4          information, then 14 days later this letter comes and all
 5          of a sudden they offer this.  And then even now, there's
 6          no mention of UIM coverage.  There -- there's never
 7          anywhere throughout this, there's med pay available or
 8          there's this or that.  It was always did I know, did I
 9          know these things existed, and was I going to ask for
10          them; I guess is how I view it.  And so here again it's
11          just -- it's just the same thing.
12     Q    Had you received a copy of the dec page?
13     A    I don't know whether I did or not.  I think you asked that
14          question and I -- I'm -- I don't honestly know whether we
15          did or didn't.
16     Q    In January?
17     A    If -- if you know that I did, I -- show me.  I don't
18          know that I did.  I don't recall.
19     Q    Do you know what is contained in the dec page?
20     A    I do.
21     Q    Would it list for example.....
22     A    Generally speaking.
23     Q    Would it list for example whether there's med pay coverage
24          and in what amount?
25     A    It may.
```

Computer Matrix, LLC
310 K Street, Suite 200
Phone - 907-243-0668
Fax    907-243-1473
jpk@gci.net
sahile@gci.net

Page 52

1   Q   And UI coverage and what amount?

2   A   It may.

3   Q   So if you had received that, then you would have been

4       aware?

5   A   Should have been but I'm not saying that I was aware.

6       That's what I'm telling you.

7   Q   But if you'd been provided that, as -- as a lawyer you

8       would still expect this letter to say something about UI

9       coverage?

10  A   For there to be discussion, yeah, because this person

11      is an insurance expert.  This person knows insurance,

12      knows what's available on that policy.

13  Q   Do you think that this person that you're talking about

14      has a law degree?

15  A   Well, I hope she knows more about insurance than I do.

16  Q   You do?

17  A   I do.

18  Q   Did you know anything at all about her level of

19      education or training?

20  A   Well, Allstate puts her out in this position as an

21      adjuster.

22  Q   Right.

23  A   And presumably trains her to understand what's on a dec

24      sheet and what's available and -- and what should be

25      offered to someone like Angelina Trailov and Mary Kenick.

Page 53

```
 1        I presume that.

 2   Q    All right.  So I take it it's your testimony that you had

 3        no idea of whether there was any U coverage available to

 4        your clients.....

 5   A    That's fair to.....

 6   Q    .....at this point in time, in -- in May of 2003.....

 7   A    When -- at this point in time, I think that's fair to say.

 8   Q    And if you had received the dec page, you had not

 9        understood it?

10   A    Apparently.  I mean I can't explain it.  Let's put it that

11        way.  I don't know that I got it.  I mean you're telling

12        -- are you telling me that I got it?

13   Q    I am telling you you got it.

14   A    Okay.

15   Q    I don't know exactly the date though.

16   A    Okay.

17   Q    All right.  Back to this, my question I believe was other

18        than the date, with respect to the paragraph making the

19        policy limits offer for Angelina Trailov, was there

20        anything inadequate about that offer?

21   A    I think there should have been a discussion about UIM

22        coverage, yes.

23   Q    All right.  Other than that?

24   A    Oh, other than that.  No, not that I -- not that I.....

25   Q    All right.
```

MICHELE L. POWER                    2/13/2006              ALLSTATE INS. v. HERRON
Vol. 1                                                      A04-0043 Civil

Page 54

```
 1   A   .....can see at this point.

 2   Q   And.....

 3   A   Well, let me back up.

 4   Q   Sorry.

 5   A   Let me back up, I'm sorry.  Ten thou -- are we talking

 6       about the whole letter or just that paragraph?

 7   Q   At -- at this point I'm trying to talk about just the

 8       portion.....

 9   A   Okay.

10   Q   .....of the letter dealing with Angelina Trailov.  So it

11       might be that paragraph and the next one.

12   A   Okay.

13   Q   Well, actually the next two.

14   A   Other than the date and the fact that they didn't offer

15       UIM coverage, yeah, I have nothing else that.....

16   Q   All right.

17   A   .....bothered -- that I'm.....

18   Q   And then.....

19   A   .....claiming was improper.

20   Q   Okay.  And then the last paragraph has to do with Ms.

21       Kenick and it's an offer of $10,000.

22   A   Correct, which was grossly undervalued so.....

23   Q   So I take it other than the date, are you critical of that

24       paragraph because it's just inadequate amount?

25   A   Yes.
```

Page 55

1   Q   And are you critical of that paragraph because it

2       doesn't discuss UIM coverage?

3   A   Yes.

4   Q   When did you read this letter first?

5   A   When did I read it, 7:09, is that a p.m., 7:09 p.m.?

6       Well, I guess my response is I don't recall.

7   Q   Would your timesheets reflect?

8   A   It may.

9   Q   I mean I will represent to you that the -- the fax was

10      sent shortly after 4:00 p.m. but this appears to indicate

11      that it was received -- it didn't get through your fax

12      machine until 7:09.

13  A   But isn't that RightFax's time?  That's not our timesheet.

14  Q   I don't know.

15  A   Okay.  I'm presuming it came at 7:09, based -- based

16      on this and then -- then I don't recall if I saw it

17      that night or not.

18  Q   You don't know when it was sent; you can only talk to when

19      this appears to say it was received?  That's why I asked

20      about the fax machines.....

21  A   Oh, okay.

22  Q   .....earlier.  Whether you were having problems with delay

23      because it appeared to take hours for the fax to get

24      there.

25  A   You asked me about faxes and, you know, I -- I can't

MICHELE L. POWER                    2/13/2006                    ALLSTATE INS. v. HERRON
Vol. 1                                                          A04-0043 Civil

Page 56

```
 1          really speak to that.  I -- all I can say is that it looks

 2          like it came from RightFax on Feb -- on May 30th at 7:09.

 3          And I don't know -- and that's what it appears to me.

 4     Q    All right..

 5     A    And I don't know whether I saw it that night or the

 6          next day.  I couldn't tell you at this point.

 7     Q    What is RightFax?

 8     A    I presume that's where it came from.  Isn't that the

 9          -- the header for where it comes from?  I've got

10          another May 16th -- RightFax is not us.  When things

11          come, they come -- that's the header that indicates

12          who it's from.

13     Q    Can you find your copy of this letter?

14          MR. SANDBERG:  Which letter, Mark?

15          MR. MESTAS:  The original?

16          MR. WILKERSON:  If possible, yes, the May 30, 2003, letter

17     from Kathy Berry to her.

18          MR. MESTAS:  The faxed.....

19     A    The faxed copy?

20          MR. WILKERSON:  Yes.

21          MR. MESTAS:  Faxed original?

22          MR. WILKERSON:  Right.

23          MR. MESTAS:  Okay.

24          MR. WILKERSON:  That's right.

25     A    Let's see, I'm just trying to think whether it would still
```

MICHELE L. POWER                    2/13/2006                    ALLSTATE INS. v. HERRON
Vol. 1                                                            A04-0043 Civil

Page 57

```
 1          be in here or not.  I'm not sure.  This might be the

 2          original right there.

 3          MR. MESTAS:  It looks like it is.

 4    A     Yeah, I'm -- I'm thinking that's probably it.

 5          MR. MESTAS:  She's got one here, Mark, that appears to

 6    have.....

 7          MR. WILKERSON:  Okay.  Just give me a minute and I'll see

 8    if -- what I've got here.

 9          MR. MESTAS:  It looks like an original.

10    A     And just -- I found another letter in here that has the

11          header for Allstate on the top.  So whoever sent that,

12          sent it from Right -- RightFax.  That's -- that's the

13          sender's logo, not ours.

14          MR.  MESTAS:  Here's one May 16th.  It has the same thing

15    on it.

16    A     Yeah.

17    Q     But your understanding is that's not something that your

18          office fax machine generates?  You think it's.....

19    A     No.

20    Q     .....something.....

21    A     No, it is not.

22          MR. SANDBERG:  Actually you can tell then, Mark, if you

23    look at some of the things that her client forwarded.

24          MR. WILKERSON:  We can go off for a minute while I'm

25    hunting for this.
```

Computer Matrix, LLC                 Phone - 907-243-0668              jpk@gci.net
310 K Street, Suite 200              Fax    907-243-1473              sahile@gci.net

MICHELE L. POWER                    2/13/2006                    ALLSTATE INS. v. HERRON
Vol. 1                                                                    A04-0043 Civil

Page 58

```
 1        (Off record)

 2        (On record)

 3   Q    I'm just going to show you this just because I'm trying to

 4        sort this out with you.....

 5   A    Okay.

 6   Q    .....that's what I was referring to.

 7        MR. MESTAS:  But can.....

 8   Q    That is not from your file and put it.....

 9        MR. SANDBERG:  Yeah, I'm sorry, Mark, what are we looking

10   at here?

11        MR. MESTAS:  Is this an exhibit?

12        MR. WILKERSON:  Well, I can make it one.

13        MR. SANDBERG:  Well.....

14        MR. WILKERSON:  It's the only copy I've got.

15   Q    What I'm trying to do is -- this was the document that

16        shows the efforts to send that fax and what it shows in my

17        reading is it says 4:12, May 30, 2003, it's trying to send

18        this fax.  And then it shows.....

19        MR. MESTAS:  What time zone?

20   Q    I don't know and perhaps that's an answer but I -- I don't

21        know.  Then what it shows down there is that it was

22        successfully sent.  And it shows that time at 7:09 p.m.

23        and 38 seconds, which seems to correspond with what was in

24        your file.  So that's what I'm trying to sort out.  That's

25        why I asked.....
```

Page 59

```
 1   A     If we had.....

 2   Q     .....the questions about if you had a fax machine.....

 3   A     Okay.

 4   Q     .....issue.

 5   A     And one.....

 6         MR. SANDBERG:  And you -- is that posting Bloomington time

 7   maybe?

 8         MR. WILKERSON:  I don't believe so but.....

 9         MR. SANDBERG:  Or Northglenn I mean.

10         MR. WILKERSON:  I will mark it as an exhibit and then

11   we'll all have it and we will see if we can sort that out.

12                                  (Deposition Exhibit 6 marked)

13         MR. SANDBERG:  Northbrook.

14   A     Occasionally we have.....

15         MR. SANDBERG:  Now when they said Northbrook time.....

16   A     .....a briefing that we're filing that's extensive

17         elsewhere.  We do a lot of fax filed briefing, of briefs,

18         and it's possible that something was going out and it

19         couldn't get through until 7:09.

20   Q     Okay.

21         MR. WILKERSON:  We're going to take a short bathroom

22   break, please.

23         (Off record)

24         (On record)

25   A     Could I go back and -- and modify my answer on the May
```

Page 60

```
 1      30th?

 2  Q   May 30th letter from Kathy Berry?

 3      MR. MESTAS:  What letter is that exhibit?

 4      MR. WILKERSON:  Exhibit 5.

 5  A   That is Exhibit 5.

 6  Q   Shoot.

 7  A   You asked if I had anything wrong with the -- the second

 8      full paragraph there and we were talking about UIM

 9      coverage and -- and whether or not they should have said

10      anything about it.  It does say there as full and final

11      settlement of Ms. Trailov's body injury claim, as if

12      that's it.

13  Q   You don't understand what a bodily injury claim is versus

14      an uninsured motorist claim?

15  A   So -- apparently not.  So you're saying that that -- that

16      if -- that was not full and final settlement of all the --

17      of Mr. -- of Ms. Trailov's claim; you're saying that there

18      would have been more?

19  Q   Sure.

20      MR. SANDBERG:  Well, wait, I've got to object at some

21  point.

22      MR. WILKERSON:  She asked me a question.

23      MR. SANDBERG:  I know, I -- but I only get the opportunity

24  to object.  I can't tell anybody what to do.  I object to your

25  testimony.
```

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax   907-243-1473

jpk@gci.net
sahile@gci.net

Page 61

```
 1   A    Again.....

 2        MR. MESTAS:   Unless you're sworn in first.

 3   A    Okay.  Well, I have a problem with it saying it's full and

 4        final settlement of Ms. Trailov's body injury claim

 5        because it suggests that that's it.  Okay.

 6   Q    Now do you see in the caption of the letter where it says

 7        claim number and then it says our insured?

 8   A    I do.

 9   Q    And it says your clients?

10   A    I do.

11   Q    Okay.  So is it clear to you that this is talking

12        about settlement of a case on behalf of their

13        insured, Mr. Herron, as opposed to some settlement

14        for first-party benefits?  Is that clear to you?

15   A    You know, I'm -- I -- it's clear that I'm not an expert in

16        the insurance coverage.  I mean that's got to be

17        abundantly clear.  You asked me if I had anything wrong --

18        if I had any dispute or found anything wrong in the second

19        paragraph, and I do because it suggests full and final

20        settlement of Ms. Trailov's bodily injury claim.  And

21        that's my answer.  And, you know, I'm certainly not going

22        to represent that I understand insurance coverage.  Okay.

23   Q    Did you discuss this letter with Mr. Angstman; do you have

24        any recollection of that?

25   A    No.
```

Page 62

```
 1    Q    Asking him for an interpretation of.....

 2    A    No.

 3    Q    .....for example, what paragraph two meant?

 4    A    No.

 5    Q    Did you discuss it with anybody?

 6    A    I doubt it.

 7    Q    And when you did discuss this with Mr. Johnson what was

 8         the nature of your discussion about this letter?

 9         MR. MESTAS:  Object, work product, instruct the witness

10    not to answer.

11                              (Deposition Exhibit 7 marked)

12         REPORTER:  That's Exhibit 7.

13    Q    Exhibit 7, this is a letter from Mr. Johnson, correct?

14    A    Correct.

15    Q    Do you have a copy of that in your file?

16    A    Not in this -- well, let me look here.  Let's see here.

17         MR. SANDBERG:  I'm sure she does because I have it with an

18    MP stamp on it.

19         MR. WILKERSON:  MP12?

20         MR. SANDBERG:  Yeah.

21    A    I do.  I do have it, yeah.

22    Q    Can I look at your copy, please?  And the reason I'm

23         asking, and I'm not trying to be discourteous, there's a

24         fax line on this one and it's cut off of my copy.  Okay.

25         Did you get this by fax?
```

MICHELE L. POWER
Vol. 1

2/13/2006

ALLSTATE INS. v. HERRON
A04-0043 Civil

Page 63

1  A  It appears so.

2  Q  And can you tell whether that's something from Mr. Mestas'

3     office?  Is that -- or it doesn't identify like yours says

4     Angstman from that time?  But in any case it indicates

5     that it was sent?

6  A  It does.

7  Q  On what date?

8  A  May 29th, 2003.

9  Q  And that is the date that it purports to have been written

10     as well?

11  A  Correct.

12  Q  Okay.  Did you have input into this letter that Mr.

13     Johnson wrote?

14  A  Probably.  To the extent that I did, I don't recall.  But

15     probably.

16  Q  You don't -- well, I'll just represent to you this was not

17     faxed to Allstate.  It was just mailed to Allstate.

18  A  Okay.

19  Q  Were you aware of how it was transmitted to Allstate?

20  A  No.

21  Q  You didn't.....

22  A  Not that I recall.

23  Q  You did not yourself fax it or mail it or otherwise

24     transmit it to Allstate?

25  A  Not that I recall.

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax   907-243-1473

jpk@gci.net
sahile@gci.net

Page 64

```
 1   Q   And I think you've already answered this but you did

 2       not as of this date or any date prior disclose to

 3       Allstate that you had co-counsel in the name of Mr.

 4       Johnson?

 5   A   Correct.

 6   Q   Do you recall whether -- I asked you if you had input

 7       and you weren't sure.  Did you approve this letter;

 8       were you asked to approve it?

 9   A   I don't recall.

10   Q   And you have no knowledge as to why it was not faxed to

11       Allstate?

12   A   No, I don't.

13   Q   I just have a few sort of almost random perhaps

14       seeming but I want to track through some documents

15       and ask you a few follow up questions.

16   A   Okay.

17   Q   So I apologize if they're skipping about.  I'll try and

18       identify where I am.  Why did you contact Mr. Johnson's

19       office?  What is it that drew you to con -- make that

20       contact?

21   A   To know what to do after we made a policy limits offer.

22       We knew that the case was worth well over 100,000.  And we

23       knew that there was some rami -- there was some

24       ramifications to the defendant, Charles Herron, because of

25       the policy limits offer and Allstate's refusal to pay
```

MICHELE L. POWER                     2/13/2006                    ALLSTATE INS. v. HERRON
Vol. 1                                                            A04-0043 Civil

Page 65

```
 1         policy limits.  And I clearly needed some direction on

 2         what to do next.

 3    Q    What is it that made you select that office to contact as

 4         opposed to say Mark Sandberg's office or some other

 5         office?

 6    A    I believe that was Myron's recommendation.

 7    Q    So you do have some recollection of Myron being involved

 8         in that process?

 9    A    Oh, yeah, some recollection.  I -- I don't know -- I mean

10         he was -- our office was a small office.  We had lots and

11         lots of things going on all at one time.  He had things

12         going on in his office but I -- you know, I'm sure that it

13         was his recommendation that we call Mr. Mestas' office and

14         then perhaps specifically Doug.  I don't recall whether it

15         was.....

16    Q    Okay.  There's reference in -- this is a letter from Mr.

17         Mestas' office dated September 11, 2003, and it's to Mr.

18         Valcarce.  And I just had one question about page three of

19         five, I believe.

20         MR. MESTAS:  Wait -- wait a minute here so we can --

21    what's the date?

22         MR. WILKERSON:  It's.....

23         MR. MESTAS:  If we've got it, may not have it.

24         MR. WILKERSON:  .....September 11, '03, and it's five

25    pages.
```

MICHELE L. POWER
Vol. 1

2/13/2006

ALLSTATE INS. v. HERRON
A04-0043 Civil

Page 66

```
 1   A   I don't think I have it either.  Oh, maybe we -- it may

 2       not have been -- it may be in here just because it's not

 3       between.....

 4   Q   What -- I'll just represent to you that the letter

 5       indicates -- it says only after this letter and two weeks

 6       after the.....

 7       MR. MESTAS:  Well, wait a minute, Mark, let's.....

 8       MR. SANDBERG:  I'm sorry.....

 9       MR. MESTAS:  We need to find a copy here for us to look

10   at.

11       MR. WILKERSON:  You can look at this one, if you want.

12       MR. SANDBERG:  Please.

13   Q   Let me just see if my notes -- anything I care about.  No,

14       it's this paragraph.

15       MR. WILKERSON:  May I proceed, Mr. Mestas?

16       MR. MESTAS:  Yeah, just a second here to see if I can -- I

17   thought maybe we could find it here in her file.

18       MR. SANDBERG:  I've got it.

19       MR. MESTAS:  You got it, okay.

20   Q   Let me just ask you do you -- do you remember seeing this

21       letter?  I believe it indicates it's cc'd to you at the

22       end but.....

23   A   Well, let me say that I suspect that I -- I saw it.  I

24       don't -- I haven't reviewed it recently so it's been two

25       and a half years.  But I'm certain that I -- I reviewed it
```

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

MICHELE L. POWER                    2/13/2006                    ALLSTATE INS. v. HERRON
Vol. 1                                                          A04-0043 Civil

Page 67

```
 1        if it came -- if it was courtesy copied to me.

 2    Q   On page four of the letter, the third paragraph, it makes

 3        reference to Allstate's letter being backdated.  My

 4        question is do you have any information to suggest that

 5        Allstate's letter was backdated?  And this is the letter

 6        of May 30 that we just finished discussing that was --

 7        that was faxed.

 8    A   Ask your question again, if you would, please.

 9    Q   Okay.  Well, I'm talking about the May 30 letter from Ms.

10        Berry to your office that we just discussed moments ago.

11        It was faxed.  We were trying to discern whether there was

12        a gap in the fax, whether it was a time zone thing.  You

13        got the letter in your head.....

14    A   Yes.

15    Q   .....you with me?  Okay.  Do you have any information to

16        suggest that the -- that letter was backdated?

17    A   No.  Could I have my letter back, the -- is that the May

18        30th letter right there in front of you with a red fax on

19        it?

20    Q   It is.

21    A   And I'll put it in here.....

22    Q   Good.....

23    A   .....and then you'll get this.

24    Q   Good for you, I appreciate that.  The next letter I wanted

25        to ask you about.....
```

Page 68

1        MR. WILKERSON:  We can mark this one as the next exhibit.

2                                 (Deposition Exhibit 8 marked)

3    Q   Exhibit 8, is that a letter you authored?

4    A   It is with -- with assistance.

5    Q   Yeah, that was my question.  Who assisted you in that?

6    A   Doug Burke.

7    Q   Who's Doug Burke?

8    A   He's someone that -- he's an individual that was

9        referred to us as having experience in insurance bad

10       faith and I relied on him occasionally.

11   Q   When did you first rely on him with respect to this

12       matter?

13   A   I'm guessing it was on or about this date.  Probably

14       sometime -- somewhere in this timeframe probably.

15   Q   Who referred -- referred you to Mr. Burke?

16   A   It may have been Myron.  It may have been through Doug's

17       office.  I.....

18   Q   Doug Johnson?

19   A   Doug Johnson's office.  I don't recall which of the two.

20   Q   Did your client approve this letter, either one of them?

21   A   No.  In terms of approve, you know, I think that I always

22       advised my clients what was happening but to have her read

23       it specifically.....

24   Q   Yeah, that was my question, the letter itself.

25   A   No, not specifically.  But the -- the -- the essence of

MICHELE L. POWER
Vol. 1

2/13/2006

ALLSTATE INS. v. HERRON
A04-0043 Civil

Page 69

1     it, she would have discussed it with me.

2                                (Deposition Exhibit 9 marked)

3     Q    Exhibit 9, do you recognize that letter?

4     MR. SANDBERG:  What's the date of this one, Mark?

5     MR. WILKERSON:  Jan 17, '03, 1/17.

6     A    Yes.  I'll let you look at that and I'll look at mine.

7          Yes.

8     Q    Does the letter indicate that you were being sent a

9          certified declarations page detailing the coverages?

10    A    It does.

11    Q    Do you now recall having received said declarations page

12         detailing the coverages?

13    A    I do not but I won't dispute that that's what it says and

14         I -- I know if it -- I -- to this day, no, I don't.

15    MR. MESTAS:  You can look for yourself, Mark, but I don't

16    believe that it's in there, in her file.  I don't recall seeing

17    it in there.

18    Q    Let me ask you this then, if you received a letter like

19         this indicating that it's enclosing a copy of the

20         certified declarations page detailing the coverage and the

21         attachment wasn't there, wouldn't you have followed up and

22         -- with a letter or a phone call and said, hey, you didn't

23         send me the attachment?

24    A    You know, I guess you have to understand our office.  We

25         had -- you know, when I say we have a very -- we all have

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

Page 70

```
 1        busy offices.  But my client load was about 60 clients

 2        personally and I also assisted Myron with his clients.

 3        And then we had -- then Bruce had his 60 and I don't know

 4        how many Sean had.  There were -- there's a lot going on

 5        in a day.  And I don't know exactly what happened here.

 6        But I can look through here and I see the first thing that

 7        I need to do is get medical releases.  Let's see, thank

 8        you for the medical releases.  We also need records.

 9        Please have Mary Kenick sign the enclosed form.  So that

10        would have been something that I would want to do

11        immediately.  And I don't recall seeing a dec sheet.  I

12        don't recall seeing one recently.  You know, if -- if --

13        that was why I asked you if I had one because I don't

14        really know.  I -- I don't recall.  And would I have asked

15        for it, not necessarily.  And not because it's not

16        important but more because of the reality of my day.

17   Q    Have you considered the reality of, for example, say Kathy

18        Berry's day?

19        MR. SANDBERG:  I object to the form.

20   A    Well, I'll let her speak for herself.

21        MR. WILKERSON:  I think I'm done.  I would like to take a

22        couple minutes just to take a look at my notes and then I will

23        formally complete.

24        MR. SANDBERG:  Okay.

25        MR. WILKERSON:  If you've got questions, feel free but I
```

Page 71

1      -- I don't think I have much.

2          (Off record)

3          (On record)

4          MR. WILKERSON:  I think I'm done.  Just a reminder that

5      you were going to try and get a privileged log and I would

6      appreciate that.  And I think Mr. Mestas made notes of the

7      other items that we were going to try to retrieve from Mr.

8      Angstman's office.  And I'll just ask that counsel keep me

9      apprised of how we're doing on that.

10         MR. SANDBERG:  And I have no questions.

11         REPORTER:  Mr. Mestas?

12         MR. MESTAS:  No, I'm not a questioner.

13         REPORTER:  Okay, that concludes the videotape deposition

14     of Ms. Power.  The time is 3:10 p.m.  Today is February 13th,

15     2006.

16         (Off record)

17                        (END OF PROCEEDINGS)

18                            (Deposition Exhibit 10 marked)

19

20

21

22

23

24

25

Page 72

1                      C E R T I F I C A T E

2      UNITED STATES OF AMERICA          )

                                         ) ss

3      STATE OF ALASKA                   )

4          I, Joseph P. Kolasinski, Notary Public in and for the

5      state of Alaska, residing in Anchorage in said state, do hereby

6      certify that the deponent in the foregoing matter was duly

7      sworn to testify to the truth, and nothing but the truth;

8          That said testimony was taken at the time and place

9      therein stated;

10         That the testimony of said witness was recorded

11     electronically and thereafter transcribed under my direction

12     and reduced to print;

13         That the foregoing is a full, complete, and true record of

14     said testimony.

15         I further certify that I am not a relative, nor employee,

16     nor attorney, nor of counsel of any of the parties to the

17     foregoing matter, nor in any way interested in the outcome of

18     the matter therein named.

19         IN WITNESS WHEREOF I have hereunto set my hand and affixed

20     my seal this 25th day of February 2006.

21

22

                        _____
                        Joseph P. Kolasinski, Notary Public

23                      in and for the State of Alaska.

                        My Commission Expires:  03/12/2008

24

25

Page 73

```
 1                    WITNESS CERTIFICATE

 2     RE:            ALLSTATE v.HERRON
       CASE NUMBER:   A04-0043 Civil
 3     DEPOSITION OF: Michele L. Power
       DATE TAKEN:    February 3, 2006
 4
           I hereby certify that I have read the foregoing deposition
 5     and accept it as true and correct, with the following
       exceptions:
 6
       Page    Line                    Description
 7
 8     _____
 9     _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____
20     _____
21     _____
22     _____
       If additional paper is needed, please sign and date each sheet.
23
24                    _____

                      MICHELE L. POWER            DATE
25
```