Page 69

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE STATE OF ALASKA

3
ALLSTATE INSURANCE
4   COMPANIES,                     )
                                   )
5              Plaintiff,          )          COPY
                                   )
6       vs.                        )
                                   )
7   CHARLES HERRON,                )
                                   )
8              Defendant.          )
    _____)
9   Case No. A04-0043 CV (JKS)

10

11

12              DEPOSITION OF KATHY BERRY

13

14              Volume II, Pages 69 - 143
                Tuesday, March 14, 2006
15                   1:35 P.M.

16           Taken by Counsel for Defendant
                        at
17         SANDBERG, WUESTENFELD & COREY
           701 West Eighth Avenue, Suite 1100
                  Anchorage, Alaska
18

19

20

21

22

23

24

25

EXHIBIT 43

ALLSTATE v. HERRON

KATHY BERRY - VOLUME II
3/14/2006

Page 70

```
 1                      A-P-P-E-A-R-A-N-C-E-S

 2

      For Plaintiff:
 3       Mark E. Wilkerson
         WILKERSON HOZUBIN
 4       310 K Street, Suite 405
         Anchorage, Alaska 99501
 5       907/276-5297

 6

      For Defendant:
 7       Mark A. Sandberg
         SANDBERG, WUESTENFELD & COREY
 8       701 West Eighth Avenue, Suite 1100
         Anchorage, Alaska 99501
 9       907/276-6363

10

      Also Present:
11       Dennis M. Mestas

12

      Court Reporter:
13       Lisa L. Shaffer
         PACIFIC RIM REPORTING
14       711 M Street, Suite 4
         Anchorage, Alaska 99501

15

16

17

18

19

20

21

22

23

24

25
```

ALLSTATE v. HERRON

KATHY BERRY - VOLUME II
3/14/2006

Page 71

1                                    I-N-D-E-X

2

EXAMINATION BY                                                    PAGE

3

   Mr. Sandberg                                                     72

4

5

6

EXHIBITS

7

   (NONE MARKED)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ALLSTATE v. HERRON

Page 72

1  ANCHORAGE, ALASKA; TUESDAY, MARCH 14, 2006
2              1:35 P.M.
3              -o0o-
4           KATHY BERRY,
5       deponent herein, being sworn on oath,
6       was examined and testified as follows:
7           CONTINUED EXAMINATION
8  BY MR. SANDBERG:
9      Q   Ms. Berry, when we ended your prior
10 deposition because we were out of time for that day,
11 we were at March 26, 2003, in terms of our chronology
12 of the claim handling.
13          And just to give you a sort of preview of
14 coming attractions, the way I plan to ask questions
15 today is to pick up essentially at that point, walk
16 the story to the end, and then visit some of the
17 documents that have been produced since the time of
18 your deposition. So we may get out of sequence at the
19 end of your deposition, but it'll be because I'm
20 trying to clean up. You know, rather than going back
21 and sticking them in now, we'll just put all of those
22 at the end.
23     A   Okay.
24     Q   So what I would like to do is hand out --
25 let's go off record for a second and talk about how we

Page 73

1  deal with the exhibits.
2          (Off the record.)
3          MR. SANDBERG:  Back on record.
4  BY MR. SANDBERG:
5      Q   In the documents I'm handing you here, this
6  set, would you look at Mr. Valcarce's letter of March
7  26, 2003. It's the second page, and I believe it
8  should be 191.
9      A   Right.
10     Q   Now, this is where I believe we left off the
11 last time, was March the 26th. So as of March the
12 26th, you knew that Mr. Valcarce was Charles Herron's
13 attorney, correct, or whenever this letter -- I'm
14 sorry. Let me back up.
15          Can we find receipt of the Valcarce letter in
16 the claim log?
17          MR. MESTAS:  What's the number?
18          MR. SANDBERG:  The document is 191.
19     A   I don't see that it was -- a mention of it
20 was put into CDS.
21 BY MR. SANDBERG:
22     Q   Okay. Since it is in the claim file, do you
23 have any reason to believe that you did not receive
24 it?
25     A   No.

Page 74

1      Q   When you would receive a letter from someone
2  like Mr. Valcarce, who indicates that he is counsel
3  for an insured, what would be your normal practice for
4  noting that in the file?
5      A   Sometimes I would put it into CDS. It's kind
6  of an unusual circumstance, though.
7      Q   As we sit here today, is there any reason you
8  can recall why this letter was not noted?
9      A   I don't necessarily note every piece of
10 correspondence that I get.
11     Q   Was Mr. Valcarce's announcement that he was
12 Charles Herron's lawyer noted in the claim file some
13 other way?
14     A   I think that -- I think it was noted early
15 on, because he was the criminal attorney; I think his
16 name might have been in there earlier on. But was it
17 added into any kind of list or anything? No.
18     Q   Is it safe to say that shortly after March
19 26th, 2003, Allstate was aware that Mr. Valcarce was
20 the personal counsel for Mr. Herron?
21     A   Yeah. Well, since he puts "I write in
22 response to your letter to my client," I would assume
23 that from that, yes.
24     Q   And looking at that letter, which appears at
25 191, it appears to have been faxed from Hedland

Page 75

1  Brennan Heideman & Cooke to Allstate, correct?
2      A   It looks that way, yes.
3      Q   The next letter I'd like you to take a look
4  at, then, is Bates 188, which is next in your packet,
5  I hope.
6      A   Yes.
7      Q   And can you identify this exhibit for me.
8      A   It looks like a letter from Michele Power to
9  me.
10     Q   Can we find receipt of this letter documented
11 in the log somewhere?
12          MR. MESTAS:  What number is that one?
13          MR. SANDBERG:  188.
14     A   I don't think it's documented.
15 BY MR. SANDBERG:
16     Q   On the second page of that letter, it states,
17 "If your review of the files suggests otherwise";
18 that's where I'm going now, and I'd like you to focus
19 on the sentence that says: "While the offer dated
20 February 14, 2002 remains open, it will be revoked on
21 May 16, 2003 and a complaint will be filed unless
22 there is some discussion regarding prefiling
23 resolution."
24          First of all, have I correctly read that
25 sentence?

4 (Pages 72 to 75)

ALLSTATE v. HERRON

Page 76

1   A   Yes.
2   Q   What, if anything, did you do in response to
3   receipt of this letter?
4   A   I don't recall.
5   Q   It appears on page 188 that the letter was
6   received on April 4th, if I'm reading this correctly.
7   MR. MESTAS: April 14th probably.
8   BY MR. SANDBERG:
9   Q   I'm sorry, April 14th.
10  A   Uh-huh, yes.
11  Q   It looks like the one has kind of slid down,
12  but it couldn't have been April 4th, could it,
13  obviously.  It must be April 14th.
14  A   Uh-huh.
15  Q   Okay.  In any event, is any response to this
16  letter documented in the claim log?
17  A   Well, I think I responded to that letter on
18  May 9th.
19  Q   Okay.  How about between April 14th and May
20  9th is any response to this letter documented in the
21  claim log?
22  A   No.
23  Q   As we sit here today, can you recall anything
24  that you did between April 14th and May 9th in
25  response to this letter?

Page 77

1   A   I believe I reviewed the file.
2   Q   And is that documented in the claim log?
3   A   No.
4   Q   During your last deposition, we saw, when the
5   February 14th demand letter arrived, that you routed
6   the letter and some other paper through Mr. Elkins.
7   Do you recall that discussion?
8   A   Yes.
9   Q   Okay.  When this letter arrived, did you
10  route this letter through Mr. Elkins?
11  A   I don't think that I did.
12  Q   Did you tell Mr. Elkins that the open demand
13  would be revoked on May 16th, 2003 unless certain
14  things happened?
15  A   I don't recall any discussions with him.
16  Q   Are you at all familiar with the demand log
17  that Mr. Elkins kept for open demands?
18  A   I know there is one.
19  Q   Did you have any responsibility for
20  generating the demand log?
21  A   No.
22  Q   Did you have any responsibility for altering
23  or amending the demand log when circumstances changed?
24  A   Do you mean actually typing it into the
25  computer or whatever, the manual or whatever it was?

Page 78

1   Q   Yes.
2   A   No.
3   Q   In the ordinary course of events, would you
4   have notified Mr. Elkins when you received a letter
5   like this one that in any way modified an open demand?
6   A   Generally, probably not.
7   Q   As we sit here today, is there a reason that
8   you did not tell Mr. Elkins that this letter was
9   received?
10  A   I think because he was already aware of the
11  demand itself.
12  Q   Okay.  When this letter was received, did you
13  evaluate Angelina's claim?
14  A   I would say that I did, yes.
15  Q   And can we find that documented in the claim
16  file?
17  A   No.
18  Q   Do you have a specific recollection of
19  documenting Angelina's claim?
20  A   Do you mean reviewing it?
21  Q   I'm sorry, I didn't mean documenting it, I
22  meant of evaluating her claim.
23  A   Well, I know that I did, because then I
24  passed it on to Lori Barra.
25  Q   That was in the second half of May?

Page 79

1   A   I believe it was probably right around that
2   May 9th date.
3   Q   Okay.  Well, let's stay on our chronology, if
4   we may, because I confuse easily.
5   Between April 14th, 2003 and May 9th, 2003,
6   is there any documentation in the claim file that you
7   evaluated Angelina's claim?
8   A   No.
9   Q   Between April 14th, 2003 and May 9th, 2003,
10  do you have a specific recollection that you did in
11  fact evaluate Angelina's claim?
12  A   I don't have a specific recollection.  I can
13  only assume that I did.
14  Q   When the letter of April 10th arrived, we're,
15  what -- October, November, December, January,
16  February, March, April -- seven months post-accident?
17  A   September to April, yeah.
18  Q   And I forget when you were assigned the
19  claim, but it was about December?
20  A   No.  I believe I got it at the end of
21  September, maybe.
22  Q   Okay.  So you had been on the claim at least
23  six months by the time this letter arrived?
24  A   Yes.
25  Q   And I believe we previously established that

5 (Pages 76 to 79)

ALLSTATE v. HERRON

Page 80

1   the file didn't contain evidence medical records were
2   received later than March 26th, 2003, correct?
3       A   Well, I would change that now, because her
4   letter says "see enclosed medical records," this
5   letter of April 10th.  So apparently there were some
6   type of other medical records enclosed with it.
7       Q   And where are you reading from?
8       A   At the top of 189.
9       Q   Oh, okay.  As we sit here today, do you have
10  any idea of what medical records were in fact
11  enclosed?
12      A   No.
13      Q   If we went back to the claim file, should we
14  see whatever it was that was attached?
15      A   Possibly, but I would guess not, because
16  generally it's the letter that's date stamped and not
17  each individual record.
18      Q   In any event, let me modify my question to
19  April 14th, then.
20          To the best of your knowledge, did Allstate
21  receive any medical records regarding Angelina Trailov
22  after April 14th, 2003?
23      A   Not to my knowledge.
24      Q   So by April 14th, 2003, you had all the
25  medical records available that you were ever going to

Page 81

1   have available prior to the time an offer was
2   extended, correct?
3       A   "Ever" is a strong word.  I don't know,
4   because I probably had no way of knowing that there
5   could be something else out there.
6       Q   That's probably a poor question, then.  All I
7   meant is:  Allstate did make an evaluation and a
8   decision to make an offer in May, correct?
9       A   Right.
10      Q   And all I wanted to establish is that
11  Allstate did not receive additional medical records
12  between April 14th and the time the decision to make
13  an offer was made, to your knowledge.
14      A   To my knowledge, no.
15      Q   Did you calendar this May 16th date?
16      A   I don't know.
17      Q   Did you understand the May 16th, 2003 date to
18  be a deadline?
19      A   I knew they wanted a response by then, but
20  she said, "unless there's some discussion otherwise."
21      Q   You did in fact call the May 16th date a
22  deadline, correct?
23      A   Correct.
24      Q   And if we take a look at the next page here,
25  we can see that, at 187.  Can you identify 187 for me?

Page 82

1       A   It's a letter from me to Michele Power, dated
2   May 9th, 2003.
3       Q   And the second paragraph states:  "We are in
4   the process of completing our evaluation of Angelina
5   Trailov's claim and anticipate responding to your
6   demand by your May 16th, 2003 deadline."
7           First of all, have I read that correctly?
8       A   Yes.
9       Q   So on May 9th, 2003, you understood that as a
10  deadline?
11      A   For lack of a better word, I used that word.
12      Q   What had Allstate actually done prior to May
13  9th, 2003 to evaluate Angelina Trailov's claim?
14      A   In some specific timeframe or during the
15  entire life of the claim?
16      Q   Well, what do you mean when you say "we are
17  in the process of completing our evaluation"?
18      A   At that point, I believe that I had gone
19  through the file, record by record and bill by bill,
20  and was passing it on to Lori Barra to see what she
21  thought the value of it was.
22      Q   And do we find that process documented in the
23  claim log?
24      A   No.
25      Q   What does passing it on to Lori Barra mean?

Page 83

1       A   Giving it to her for her review, to see what
2   her opinion was on it.  I don't have the authority
3   to -- I think my authority was $20,000.  So I would
4   need more authority to settle for anything over that.
5       Q   Did Lori have policy limits authority at
6   least for this case?
7       A   I don't know.  I think she did, but I can't
8   say that for sure.
9       Q   Did Lori have authority to offer 112.5 in May
10  2003, to your knowledge?
11      A   Again, I think so, but I can't say that for
12  sure.
13      Q   And should the process of passing it on to
14  Lori be documented somehow in the claim file?
15      A   Generally it would be documented on a
16  specific screen when I would request authority.  In
17  this case, I didn't feel like the case was worth
18  policy limits, but I wanted someone else to look at
19  it, to see if they thought it was.
20      Q   Okay.  I'm just trying to understand, how
21  does the request get made?
22      A   Well, under normal circumstances, I would
23  finish the work I had to do on the file, log it into a
24  book that she had, put it in her in-box, and then in
25  one of our screens put in my authority request.

Page 84

1  Q  Okay. Let's take that in smaller bites.
2     You would finish your evaluation of the case?
3  A  Right.
4  Q  And at that point I assume you would be
5  prepared to make some kind of a recommendation?
6  A  Right.
7  Q  And then what would you do?
8  A  Then I would log it in. She has a log of
9  files that come to her, and an in-box for those. But
10 before I did that, the last thing I would would be
11 to put an authority request in one of our screens, and
12 it would have the date and the amount of authority I
13 was requesting.
14 Q  Okay. And if this claim was handled in that
15 fashion, should we be able to track it in the claim
16 log?
17 A  Not in the claim log. There would be a
18 different screen.
19 Q  Okay. And what is that screen?
20 A  It's Screen No. 9, but I don't know what it's
21 called.
22 Q  In any event, can you tell from the claim log
23 when you would have made a request that Lori look at
24 this case or this claim?
25 A  Not from the claim log, no.

Page 85

1  Q  Did you complete your evaluation of
2  Angelina's claim prior to May 16th, 2003?
3  A  Yes.
4  Q  And did that process leave tracks in the
5  claim file?
6  A  I don't think so.
7  Q  If we wanted to know when you completed your
8  evaluation, how would we know?
9  A  You would really only know by when I gave it
10 to Lori to look at.
11    MR. SANDBERG: Let's go off record for a
12 second.
13    (Off the record.)
14    MR. SANDBERG: Back on record.
15 BY MR. SANDBERG:
16 Q  We have varied slightly from the procedure I
17 told you about at the beginning of this deposition,
18 but we're still looking at things that were produced
19 in the course of this lawsuit and which bear a Bates
20 number at the bottom. Each of the Bates numbers
21 begins with the number seven and then has a four-digit
22 number at the end that I'm going to refer to them by.
23    So the first one here is 3525. Can you tell
24 me what 3525 is?
25 A  It's an e-mail from me to Karen Petersen

Page 86

1  regarding a new home office referral.
2  Q  Okay. So this was part of the process of --
3  which we have not yet come to in our chronology -- but
4  of making the home office referral, correct?
5  A  Right.
6  Q  And why would you be sending this to Karen
7  Petersen, since she was in the Anchorage MCO?
8  A  Because she reviews them. I send them to her
9  to review before I send them on to home office.
10 Q  Okay. Then let's look at the next page,
11 which is 3526. Can you tell me what this is?
12 A  It is the home office referral.
13 Q  And it's from you?
14 A  Right.
15 Q  To Joe Grazulis?
16 A  Yes.
17 Q  Working our way down -- well, first of all,
18 does this document bear a date?
19 A  It does not.
20 Q  Okay. And I'm guessing that the circles on
21 this page and the next page were made by --
22    MR. MESTAS: I put those there.
23    MR. SANDBERG: I was just going to say, were
24 made by Mr. Mestas.
25    MR. WILKERSON: Mine doesn't have any

Page 87

1  circles.
2     MR. SANDBERG: I'm sorry. I apologize.
3  Yours doesn't have any circles.
4  BY MR. SANDBERG:
5  Q  Okay. So can we assume that this document
6  was created at least by May 16th, 2003?
7  A  Yes.
8  Q  And it lists the reserves at 112.5?
9  A  Yes.
10 Q  Do you know who set that reserve?
11 A  It would most likely have been me.
12 Q  So by May 16th, 2003 Allstate had reserved
13 Angelina's claim at the full policy limit?
14 A  Right.
15 Q  I must have asked that question wrong.
16    MR. MESTAS: No.
17 BY MR. SANDBERG:
18 Q  But let me make sure that I have not confused
19 myself once again.
20    The home office referral template would
21 predate May 16th, 2003; I believe you agreed?
22 A  Right.
23 Q  Okay. It certainly wouldn't have been
24 created later than May 16th, 2003, correct?
25 A  Right.

7 (Pages 84 to 87)

ALLSTATE v. HERRON

KATHY BERRY - VOLUME II
3/14/2006

Page 88

1    Q    And can we then conclude that Allstate had
2    bumped the reserve on Angelina Trailov's claim to the
3    full policy limit on or before May 16th, 2003?
4    A    Yes.
5    Q    A moment ago I think you told me you didn't
6    believe this was a policy limits case.
7    A    Right.
8    Q    So why did you reserve it at 112.5?
9    A    Because the reserves are set for what the
10   potential of the case could be. And I didn't think it
11   was worth policy limits, but I didn't know that
12   someone else might not think that.
13   Q    Well, I realize that the zen of setting
14   reserves is probably something we could discuss for
15   more time than we have, but generally what is
16   Allstate's policy regarding setting reserves?
17   A    Well, you would take the information that you
18   have and set it for, again, what the potential of the
19   case might be.
20   Q    For what the potential is or what you
21   actually expect to pay?
22   A    I would say -- that's a good question,
23   because it is true that -- I don't even know how to
24   put it. I mean, it's how the -- what the case might
25   be evaluated at, based on the information we have. It

Page 89

1    might not ever go that high, reserves might go back
2    down again. Who knows. But based on the information
3    there is, could it settle for 112.5? Perhaps.
4    Q    Okay. And for purposes of this question, I'm
5    leaving out allocated loss expense, which I understand
6    is a totally different matter: I'm only talking about
7    reserving the BI claim.
8    A    Right.
9    Q    And does the fact that the BI claim was
10   reserved at 112.5 by May 16th, 2003 mean that Allstate
11   had concluded that the policy limits would probably be
12   paid?
13   A    I wouldn't say probably. I would say
14   possibly.
15   Q    And can we quantify that somehow? I mean,
16   are we at the range of anything's possible, or --
17   A    Well, again, people might have differing
18   opinions. And I thought that, while I did not believe
19   it was policy limits, maybe the office would decide
20   that that's what they wanted to pay for this case.
21   Q    I asked you a question about your authority
22   earlier, and I believe you told me it was $20,000?
23   A    Yes.
24   Q    Of course, setting reserves does not
25   establish authority, correct?

Page 90

1    A    Right.
2    Q    So by May 16th, 2003 there was not, in fact,
3    a 112.5 on the file to be used as authority, correct?
4    A    Right.
5    Q    Okay. And now I don't know exactly what the
6    right words are, but were there limits to your ability
7    to establish reserves?
8    A    No.
9    Q    So you were able to reserve for the entire
10   policy limit, you just didn't have authority to pay
11   it?
12   A    Right.
13   Q    On the second page, there's a sentence that
14   says: "A neurological consult on November 5th, 2002
15   was normal."
16        Do you know what that refers to?
17   A    This is really off the top of my head, but I
18   think she saw a neurologist named Tom Gordon, and I
19   think he works at ANMC. And so apparently there was a
20   record that these things, that she had no more
21   short-term memory loss and she was doing fine in
22   school.
23   Q    As we sit here today, do you know whether you
24   had reviewed Dr. Craig's report by May 16th, 2003?
25   A    I don't believe I had Dr. Craig's report. I

Page 91

1    don't believe we even knew she saw Dr. Craig, in fact.
2    Q    Well, we can revisit your last deposition and
3    the December stuff, but I believe there is a letter
4    informing you that she was going to see Dr. Craig.
5    A    The letter says she's going to see a
6    neuropsychologist. His name is not mentioned in that
7    February 14th letter or in that December letter.
8    Q    You've obviously been doing your homework.
9        As we sit here today, do you have a
10   recollection as to whether, on May 16th, 2003, you
11   knew Dr. Craig existed?
12   A    I knew he existed, but in relation to this
13   case, I don't, no.
14   THE WITNESS: Can I ask what that sound is?
15   MR. SANDBERG: It's the wind.
16   THE WITNESS: I'm not used to being up so
17   high.
18   MR. SANDBERG: That window is cracked. I can
19   close it, if you would like.
20   THE WITNESS: No. It doesn't bother me. I
21   just couldn't figure out what it was.
22   BY MR. SANDBERG:
23   Q    In May of 2003, did you know Michele Power?
24   A    No. Well, obviously I knew of her, but I did
25   not know her.

8 (Pages 88 to 91)

ALLSTATE v. HERRON

KATHY BERRY - VOLUME II
3/14/2006

Page 92

1    Q    In May of 2003, to the best of your
2  knowledge, had you ever met Michele Power?
3    A    No.
4    Q    In May 2003, to the best of your
5  recollection, had you ever had any prior dealings with
6  Michele Power?
7    A    Not that I recall, no.
8    Q    In May 2003 had you had prior dealings with
9  the Angstman Law Firm?
10    A    I think so, but I don't recall any specifics.
11    Q    Would you know Myron Angstman if he walked
12  through the door?
13    A    No.
14    Q    In May 2003 did you have prior experience
15  with cases in Bethel?
16    A    Yes.
17    Q    In May 2003 had you had cases go to trial in
18  Bethel?
19    A    No.
20    Q    In May 2003 would you have had an opinion as
21  to whether or not Bethel was a dangerous place to try
22  a lawsuit?
23    A    I would have had an opinion.
24    Q    And what opinion would you have had?
25    A    I would have said maybe, maybe not. I had

Page 93

1  settled cases for less than policy limits in Bethel.
2    Q    Okay. And "maybe, maybe not" based upon what
3  sorts of things?
4    A    Do you mean the particular factors that might
5  determine the value of a case in Bethel?
6    Q    That's right. I'm just trying to understand
7  what you knew about Bethel in 2003.
8    A    In some cases, it was subsistence issues. In
9  some cases, it was long-term residents of Bethel
10  making claims against people who had not lived there
11  as long.
12    Q    Would the fact that a plaintiff was or was
13  not part Native have figured into your evaluation of
14  the dangerousness of the claim in 2003?
15    A    That might depend on whether or not the
16  insured was Native or part Native.
17    Q    Okay. How? I mean, just explain to me,
18  because I just want to understand what sorts of things
19  would have gone into your evaluation about a claim in
20  Bethel in 2003.
21    A    It was my understanding that Mr. Herron was a
22  long-term member of the community, apparently a
23  respected kid and son of a respected person there, is
24  everything that I knew. I had no reason to believe he
25  wasn't. It's a small town. I grew up in a small town

Page 94

1  and I know how they work. And it makes a difference
2  if you're an insider or an outsider, sometimes.
3    Q    On May 16th, 2003 did you possess any
4  authority, beyond your normal personal $20,000 limit,
5  to settle Angelina Trailov's claim?
6    A    No.
7    Q    On May 16th, 2003, to the best of your
8  recollection, had you requested additional authority
9  to settlement Angelina's claim?
10    A    I did not formally request it.
11    Q    On or before May 16th, 2003?
12    A    Correct.
13    Q    As we sit here today, is there some reason
14  that the evaluation of Angelina Trailov's claim could
15  not have been completed by May 16th, 2003?
16    A    Some reason over the whole course of the
17  claim?
18    Q    Well, I just would like to know if there was
19  some reason that Allstate could not have evaluated
20  Angelina Trailov's claim prior to May 16th, 2003.
21    A    Okay. Well, it looks like we had at least
22  got some additional records on April 10th -- or April
23  14th, probably.
24    Q    April 14th, you're correct.
25    A    I would have needed time to review that. I

Page 95

1  had other files I was dealing with. Not that much
2  different than it taking six months for me to complete
3  my deposition in this case: there are other things
4  going on, and I needed to have someone else look at
5  it.
6    Q    Other than whatever accompanied the letter on
7  April 10th, which was received on the 14th, did
8  Allstate receive any additional documents between
9  April 14th and May 16th, 2003?
10    A    I don't know.
11    Q    Are any additional documents -- is receipt of
12  any additional documents noted in the claim log?
13    A    No. I don't believe so.
14    Q    If you had wanted to complete the evaluation
15  and respond to the demand by May 16th, 2003, was there
16  a reason you were unable to do that?
17    A    I did not have the authority by May 16th.
18    Q    Right. Okay. Was there a reason you could
19  not have requested authority before May 16th, 2003?
20    A    Well, I didn't make a formal request, but I
21  wanted Lori to look at it, again, because I wanted
22  someone else's opinion and I didn't have that
23  authority to settle it certainly for policy limits or
24  anything above $20,000.
25    Q    Do you believe you actually requested that

9 (Pages 92 to 95)

ALLSTATE v. HERRON

KATHY BERRY - VOLUME II
3/14/2006

Page 96

1  Lori look at it before May 16th, 2003?
2      A   From what I remember, yes.
3      Q   Can you point me to any place in the claim
4  file that I should be able to find that if that's
5  true?
6      A   I did not document it in the claim file.
7          MR. SANDBERG:  Let's go off record for a
8  second.
9          (Off the record.)
10         MR. SANDBERG:  Back on record.
11 BY MR. SANDBERG:
12     Q   I just want to make sure that I understand,
13 and then I'll stop flogging this horse.  But are you
14 aware of any reason we have not discussed so far that
15 Allstate could not have completed its evaluation of
16 Angelina's claim and been ready to respond to the
17 demand by May 16th, 2003?
18     A   I think we have discussed all of it.
19     Q   Okay.  Turn to the next document in our list,
20 then.
21     A   In this [indicating]?
22     Q   Yes.  It should be 181, and it's a letter
23 dated May 16th, 2003 from you to the Angstman Law
24 office, correct?
25     A   Correct.

Page 97

1      Q   I'm sorry, I need you to flip back one page.
2  I meant to ask you something about that last exhibit,
3  and I forgot.
4      A   Okay.
5      Q   When I look at the bottom of it, I see that
6  it was sent to Margaret Herron and to Charles Herron,
7  correct?
8      A   Right.
9          MR. MESTAS:  What number are we talking
10 about?
11         MR. SANDBERG:  187.
12 BY MR. SANDBERG:
13     Q   Do you know why it was not sent to
14 Mr. Valcarce?
15     A   Probably just an error on my part.  I rarely
16 have anybody that has an attorney, and I generally
17 copy them with all these kinds of letters.
18     Q   So certainly if on May 9th, 2003 you had
19 remembered that Mr. Valcarce was Charles's attorney,
20 you would have sent him a copy?
21     A   Yes.
22     Q   Looking at the cc's here, from that we can
23 assume that you simply forgot?
24     A   Yes.
25     Q   Now let's go to 181, if we may, which is the

Page 98

1  letter I was about to ask you about, which is dated
2  May 16th, 2003.  It's from you to the Angstman Law
3  Office.  The second paragraph says: "With regard to
4  Angelina's claim, unfortunately our evaluation is not
5  completed today as expected.  Obviously, this is a
6  claim that needs a thorough review, and the policy
7  limits that you have demanded comprise a significant
8  amount of money.  Our evaluation will be completed by
9  the end of the month, and I am hoping to respond to
10 your demand sooner than that."
11         The previous week, you had referred to May
12 16, 2003 as a deadline, correct?
13     A   Yes.
14     Q   Did you contact Ms. Power to ask her if she
15 would grant you an extension?
16     A   Did I ask her for an extension, is that the
17 question?
18     Q   Yes.  That's a better question than mine.
19 Did you ask her for an extension?
20     A   No.
21     Q   Why not?
22     A   Because generally, again, her letter says
23 unless there's further discussion.  And I thought if
24 she -- I would say I had one other time, one time
25 ever, when I sent a letter that said we'll have it

Page 99

1  done by this time, you know, if you have any
2  questions, let me know, where a person said, no,
3  that's not okay.
4          And so since her letter says it's open for
5  further discussion, that's -- I assumed she would
6  contact me if she was not happy with that.
7      Q   Do you actually recall thinking what you just
8  said, or is that simply what you surmise now?
9      A   Well, it was sort of standard procedure.  I
10 just would normally send a letter and say, We should
11 have it to you by this time.  And again, I guess that
12 if they didn't want that or were unhappy or said, I
13 need this in two days, then they would contact me.
14 But that only happened one time before.
15     Q   The week before, you had referred to May 16th
16 as a deadline, correct?
17     A   Right.
18     Q   And then May 16th rolled around and you wrote
19 this letter, correct?
20     A   Right.
21     Q   Is there any reason we haven't talked about
22 yet that you didn't pick up the phone and call Michele
23 and ask her for an extension?
24     A   I wanted it in writing is why it's in a
25 letter form.  Do I have any other reason for not

10 (Pages 96 to 99)

Page 100

1   calling her?  No.
2       Q    Before May 16th, 2003, did you talk to
3   Mr. Valcarce about the value of Angelina's claim in
4   Bethel?
5       A    I don't believe I did.
6       Q    Allstate was aware that Mr. Valcarce was
7   Mr. Herron's lawyer, correct?
8       A    Yes.
9       Q    And Allstate was aware that Mr. Valcarce
10  lived in Bethel, correct?
11      A    Yes.
12      Q    So is there a reason you can think of, as we
13  sit here today, that Allstate didn't contact
14  Mr. Valcarce to solicit input regarding the value of
15  this claim in Bethel?
16      A    I think that we had a pretty good idea of how
17  to evaluate claims in Bethel, and I don't really see
18  that it was something we needed to do in this case.
19      Q    Anything else?  I mean, if not, we'll move
20  on, because I want to make sure I understand.
21      A    No.
22           MR. WILKERSON:  I just want to make sure your
23  question, I think, Mark, was focused on prior to May
24  16th.
25           MR. SANDBERG:  That's right, prior to May

Page 101

1   16th, 2003.
2   BY MR. SANDBERG:
3       Q    Once again on this letter of May 16th, 2003,
4   this doesn't go to Mr. Valcarce either, correct?
5       A    Right.
6       Q    So should we assume this is a mistake once
7   again?
8       A    Yes.
9       Q    Had you told Mr. Valcarce ever about the May
10  16th, 2003 deadline?
11      A    I don't believe so.
12      Q    Had you told Mr. Valcarce, prior to May 16th,
13  2003, that Allstate was not in a position to respond
14  to that deadline?
15      A    No.
16      Q    In the ordinary course of events, would you
17  expect that Allstate should be able to evaluate a
18  bodily injury claim within a month of the last receipt
19  of documents?
20      A    Possibly.
21      Q    If it wanted to?
22      A    Well, I think there are a lot of factors that
23  go into that.
24      Q    Such as?
25      A    Such as: Are people there to evaluate the

Page 102

1   claims.  Some claims obviously take quite some time to
2   evaluate.  Are there discussions about it, as in this
3   case where it's not clear cut, and maybe there will
4   have to be some discussions about that.
5       Q    And I'm glad you reminded me, because I
6   should have asked you.  Do you have any reason to
7   believe you were gone for a significant part of the
8   time between April 14th and May 16th, 2003?
9       A    I don't think so.  I don't recall being gone
10  then.
11      Q    The home office referral sheet that we looked
12  at a while ago dated May 16th, 2003, is that the same
13  home office referral that Mr. Elkins had directed you
14  to do several months before?
15      A    Yes.
16      Q    As we sit here today, is there any reason you
17  can tell me why it took you several months to actually
18  make the home office referral?
19      A    No, I don't know why.
20      Q    Allstate's guidelines provide that that
21  should be done within 14 days, correct?
22      A    Right.
23      Q    Were there potential consequences of not
24  following the 14-day home office referral procedure?
25      A    No, I don't think so.  I don't know of them.

Page 103

1       Q    Well, let me ask that differently.
2            Had you been trained that home office
3   referrals were to be made within 14 days when the
4   referral was mandatory?
5       A    Yes.
6       Q    Okay.  Were you trained that there would be
7   potential consequences of not following that
8   procedure, either for you or for anybody else?
9       A    None that I -- specific consequences?  None
10  that I know of.
11      Q    If we flip your little book there, we come to
12  180, which brings us to May 20th, 2003, and this is an
13  e-mail from Mr. Grazulis to you?
14      A    Yes.
15           MR. WILKERSON:  For the record, this appears
16  to mirror 703522, which is in the packet that
17  Mr. Mestas gave you.
18           MR. SANDBERG:  Okay.
19  BY MR. SANDBERG:
20      Q    Looking at about the middle of this, it says:
21  "I will refrain from comment until the MCO is in a
22  position to make a value recommendation."
23           First of all, have I read that correctly?
24      A    Yes.
25      Q    Can we, from that, infer that as of May 20th,

11 (Pages 100 to 103)

Page 104

1  2003 the MCO had not made a value recommendation?
2  **A    I would not infer that from that.**
3  Q    Is it your understanding -- well, first of
4  all, the MCO, I think you told me, is the market
5  claims office?
6  **A    Right.**
7  Q    Which essentially means the Anchorage claims
8  office?
9  **A    Right.**
10  Q    So then can you explain to me -- and I
11  realize perhaps I should ask Mr. Grazulis, but can you
12  explain to me what that means?
13  **A    No.**
14  Q    As we sit here, is it your belief that the
15  MCO had in fact made a value recommendation as of May
16  20th, 2003?
17  **A    I don't believe that's the case.**
18  Q    Now I'm confusing myself. What don't you
19  believe is the case?
20  **A    I don't believe the MCO had made a value**
21  **recommendation by May 20th.**
22  Q    Okay. Because the next question would be,
23  where would I find it, if that had happened.
24      MR. SANDBERG: We've been at it about an hour
25  and ten minutes. I think we can take five.

Page 105

1      (Off the record.)
2      MR. SANDBERG: Back on record.
3  BY MR. SANDBERG:
4  Q    Would you look at the claim log and go to
5  page 46.
6  **A    Okay.**
7  Q    At page 46 we see what appears to be an entry
8  by you?
9  **A    Yes.**
10  Q    Dated May the 28th, 2003?
11  **A    Yes.**
12  Q    And you're describing a telephone
13  conversation with Mr. Valcarce?
14  **A    Right.**
15  Q    Okay. Had he initiated this? In other
16  words, this looks to me like you returned his call.
17  **A    Right.**
18  Q    So he had called you first?
19  **A    It appears that way.**
20  Q    In any event, on the 28th you did speak with
21  Mr. Valcarce?
22  **A    Yes.**
23  Q    What, if anything, did you tell Mr. Valcarce
24  about the fact that there had been a May 16th
25  deadline?

Page 106

1  **A    I don't know if we discussed that.**
2  Q    What, if anything, did you tell Mr. Valcarce
3  about where Allstate stood in its evaluation of
4  Angelina Trailov's claim?
5  **A    I told him that the file is being reviewed**
6  **for authority and that we are to respond to the**
7  **plaintiff's attorney by the end of the month.**
8  Q    And that would be as outlined in your letter
9  of May 16th, 2003?
10  **A    Right.**
11  Q    What did Mr. Valcarce tell you about
12  Angelina's claim?
13  **A    Well, according to this, he told me that he**
14  **felt her case was worth the limits.**
15  Q    What, if anything, did Allstate do with that
16  information?
17  **A    Well, offered the limits in two days.**
18  Q    Did Mr. Valcarce's opinion have anything to
19  do with that?
20  **A    I don't think so.**
21  Q    Looking at page 48, we're looking at an entry
22  once again made by you?
23  **A    No. This was made by Karen Petersen.**
24  Q    Okay, I'm sorry. I'm looking at page 48.
25  Starting at the top, it says "Desk: AKB," but that's

Page 107

1  not the person who makes the entry, is it?
2  **A    That's where it was printed off of.**
3  Q    Right. And actually I'm remembering now. It
4  was explained to me, when we did these depositions
5  before, that under Allstate's format, if want to know
6  who actually made it, we should look at the statement
7  EMPL name?
8  **A    I assume that's employee, yeah.**
9  Q    Okay. So if we look at where it says "STMT
10  EMPL name," and then it says Karen Petersen, that's
11  what tells us that this is Ms. Petersen's work,
12  correct?
13  **A    Right.**
14  Q    And so she's writing to you?
15  **A    Right.**
16  Q    Okay. And it says: Need "to open SU."
17  That's the UIM coverage?
18  **A    Right.**
19  Q    Then it says: "04 had over 39K meds" and
20  goes on from there.
21      Then can you read -- can you translate for me
22  the line that begins "request"?
23  **A    Let's see --**
24  Q    In other words, what would that line have
25  meant to you?

12 (Pages 104 to 107)

Page 108

1    A    It would mean request autho from home
2    office --
3    Q    I'm sorry, translate it for me. Would that
4    mean "request authority"?
5    A    Yes.
6    Q    Okay. In other words, I want to know what
7    Karen's telling you here.
8    A    Okay. I think this may have been directed at
9    Lori, this part of it, because the EC recommendations
10   in the 09-PF8 screen would be something she would do.
11       MR. WILKERSON:  "She" being Lori.
12       THE WITNESS:  Yes.
13   BY MR. SANDBERG:
14   Q    Okay. So your understanding of what that
15   line means is that Lori should request authority from
16   home office with -- what's EC?
17   A    Evaluation consultant.
18   Q    And that would be: Lori is an evaluation
19   consultant?
20   A    Yes.
21   Q    "With EC recommendations in 09-PFB screen."
22   I believe you told me that an 09 screen is where we
23   would see evaluations?
24   A    A request for authority. And that's not PFB,
25   that's PF8.

Page 109

1    Q    I'm sorry. 09-PF8 screen.
2        So what part of Karen's directions, if
3    anything, would pertain to you?
4    A    Probably the "need to open SU."
5    Q    You would be the one who would do that?
6    A    Yes.
7    Q    Okay.
8    A    And the part where it says: "The ANS lien
9    has been recorded in court. We need to assure this is
10   paid with liability settlement."
11   Q    That would be directed to you?
12   A    Yes.
13   Q    If you were to settle the case, she's telling
14   you to make sure that happens?
15   A    Right.
16   Q    Staying with our chronology, then, let's look
17   at the next document, which is No. 175, a letter to
18   you from Mr. Johnson?
19   A    Yes.
20   Q    And this appears to have been received on May
21   the 30th, 2003?
22   A    Right.
23   Q    Is there any way for us to know when you
24   first saw this letter?
25   A    Documentationwise?

Page 110

1    Q    Yeah. In other words, anywhere in the claim
2    file.
3    A    No.
4    Q    For example, is there any way in the claim
5    file we can tell whether or not you had seen
6    Mr. Johnson's letter before sending out the letter
7    which appears at 178, which is next in our sequence?
8    A    There's nothing documented.
9    Q    As we sit here today, do you have a
10   recollection of whether you had seen Mr. Johnson's
11   letter before sending out the letter to Michele Power?
12   A    I did not see it before sending that letter
13   out.
14   Q    Now, if we keep going in our sequence, No.
15   179 is what?
16   A    A fax confirmation sheet.
17   Q    And it's dated May the 30th, 2003?
18   A    Right.
19   Q    And it says 4:12 p.m.?
20   A    Right.
21   Q    And so can we assume from this that you sent
22   No. 178 to Michele Power at 4:12 in the afternoon?
23   A    Yes.
24   Q    How do you send a fax at Allstate?
25   A    In this case, at this point I had my Word

Page 111

1    program set up so that I could -- I don't remember how
2    to do it now -- but send a fax right directly from the
3    program.
4    Q    Okay. So if we assume, say, sometime around
5    4:12 you wanted to send this letter, which is No. 178,
6    what would you actually do?
7    A    Once I completed the letter, if I remember, I
8    would just be there in the Word program, click on
9    "file," go down, I think it says "send to," and then
10   it says "mail" or "mail as attachment," something like
11   that. And I had it set up so I could just click there
12   and pick who I was sending it to and it would fax it.
13   Q    Now, we've been struggling with this, and
14   maybe you can explain it to me. Looking about sightly
15   more than halfway down the page, it says time 7:09
16   p.m. Do you know why it says that?
17   A    My best guess is that maybe that is home
18   office time, Chicago time.
19   Q    That's what I was going to ask. Do you think
20   your computer is somehow keeping home office time?
21   A    Generally the little clock on the computer
22   has Anchorage time, but I don't know, when you're
23   using a program like this, if it might. Although I
24   don't know why then it would say "posted at 4:12 p,m,"
25   which would be Alaska time. So that's just a guess.

ALLSTATE v. HERRON

KATHY BERRY - VOLUME II
3/14/2006

Page 112

1    Q   Okay. But --
2    A   I know I wasn't at the office at 7:00 that
3    night.
4    Q   That's what I was going to ask. You don't
5    have to be able to explain this, I was just wondering
6    whether you could explain why it says 7:09 p.m. on
7    this, and that's your best guess?
8    A   Yes.
9    Q   Okay. When mail was opened, like this letter
10   from Mr. Johnson, what was the process at the
11   Anchorage MCO for getting letters from the mailroom to
12   your attention?
13   A   It would go from the receptionist, who does
14   the mail, and then we have a bank of mailboxes out in
15   a hallway area. And it would be put into my mailbox.
16   Q   Okay. And would the receptionist do that
17   every day?
18   A   I think so.
19   Q   So if Mr. Johnson's letter was received on
20   May the 30th, can we assume that it would have hit
21   your mailbox on May the 30th?
22   A   I don't know that we can assume that. Our
23   mail goes out at 3 -- or we have to have it to the
24   person who does the postage and stuff by 3, and it
25   gets picked up sometime after that. So I don't know

Page 113

1    if it would come up to me that day or not.
2    Q   Okay. Well, looking at the next page in our
3    sequence, No. 177, we see an envelope from
4    Mr. Johnson's law firm, showing a May 30th, 2003
5    received stamp, correct?
6    A   Right.
7    Q   So if that letter was received at Allstate on
8    Tudor Road on May the 30th, 2003, should it have hit
9    your mailbox that day?
10   A   I don't know if it would have hit my mailbox
11   that day or the next workday. I don't know what the
12   timeframe is from what they get date stamped to when
13   they come to our mailbox.
14   Q   In any event, would this letter -- would a
15   letter like Mr. Johnson's get routed to someone else
16   in between the receptionist and your mailbox?
17   A   I know that Craig looks at some of the mail
18   now, but I don't know that he was at this time. I
19   don't know that answer.
20   Q   Is there any way, you're aware of, that we
21   can tell whether or not Allstate had Mr. Johnson's
22   letter prior to 4:12 p.m. on May 30th, 2003?
23   A   No.
24   Q   Would you agree that from the received stamp
25   on the envelope and the received stamp on the letter,

Page 114

1    that Allstate had Mr. Johnson's letter on May 30th,
2    2003?
3    A   Yes.
4    Q   And whether or not Allstate had Mr. Johnson's
5    letter before 4:12 depends on when the mail showed up
6    that day?
7    A   And when someone worked the mail.
8    Q   In any event, your recollection is that you
9    had not seen Mr. Johnson's letter before you sent your
10   letter to Ms. Power, correct?
11   A   Right.
12   Q   From who did you receive authority to make
13   the offer that's set out on May 30th, 2003?
14   A   I don't know. I don't know if that was Lori
15   or Karen.
16   Q   Is this a form letter?
17   A   The one that I sent out?
18   Q   Right.
19       MR. WILKERSON:  178?
20       MR. SANDBERG:  178, I'm sorry.
21   A   No, it's not a form letter. It's the style I
22   generally use, but it's not a form letter.
23   BY MR. SANDBERG:
24   Q   Right. I mean, somewhere I've been provided
25   with a series of stock Allstate letters used for

Page 115

1    various purposes. This is not one of them, correct?
2    A   No. It's not a fill-in-the-blank type of
3    letter.
4    Q   The second paragraph says: "At this time we
5    are prepared to offer the $100,000 face value of the
6    Herron's auto policy, plus Rule 82 attorney fees of
7    $12,500, for a total of $112,500 as full and final
8    settlement of Ms. Trailov's bodily injury claim."
9       First of all, have I correctly read that
10   sentence?
11   A   Yes.
12   Q   Does full and final settlement of
13   Ms. Trailov's bodily injury claim include her ability
14   to make a UIM claim?
15   A   No.
16   Q   Does this letter say that somewhere?
17   A   It says "of her bodily injury claim," but no,
18   it doesn't address her UIM claim.
19   Q   Is her UIM claim not for bodily injury?
20   A   It is. But in my mind, it's a different
21   thing. It would say, if I was saying that, I would
22   say "and her underinsured motorist claim."
23   Q   Well, let me ask the converse. Does this
24   letter somewhere say that Angelina Trailov could still
25   bring a UIM claim?

14 (Pages 112 to 115)

Page 116

1    A   No.
2    Q   Or that Allstate had consented to Angelina
3  Trailov settling and pursuing UIM?
4    A   No.
5    Q   As of May 30th, 2003, had you opened a U
6  claim?
7    A   I apparently did not, looking back on it.
8    Q   On May 30th, 2003, if this had been accepted,
9  was it your intention to hunker down and see if they
10 ever made a U claim?
11   A   I assumed they would make a U claim if they
12 took this money. I assumed they would take the money
13 in the first place.
14   Q   Can you point me to any piece of
15 correspondence or any conversation between you and
16 Michele Power on or before May 30th, 2003 that refers
17 to UIM benefits?
18   A   No.
19   Q   To continue down our stack of documents here,
20 then, if you would, we come to 173.
21   A   Okay.
22   Q   This is a letter from you to Mr. Herron?
23   A   Right.
24   Q   And it says: "Enclosed is a copy of a letter
25 we have received from the Law Offices of Dennis M.

Page 117

1  Mestas and our response to it."
2        And then do we see the response to it as the
3  next document there, 170?
4    A   Yes.
5    Q   Okay. So what Mr. Herron would have received
6  is 173 plus 170?
7    A   Yes. And a copy of the letter from
8  Mr. Mestas's office.
9    Q   Okay. Once again we don't see Mr. Valcarce
10 among the people being copied, do we?
11   A   Right.
12   Q   Why not?
13   A   I think I just did not have it in my brain
14 that the insured was represented.
15   Q   Would you, once again, agree that that was a
16 mistake?
17   A   Yes.
18   Q   And the same question for 170, since we don't
19 see Mr. Valcarce carbon-copied on that as well?
20   A   Right.
21   Q   And then at 174 we're looking at another
22 letter from you to Michele Power, correct?
23   A   Yes.
24   Q   June 4th, 2003, asking whether Mr. Johnson is
25 in fact co-counsel?

Page 118

1    A   Yes.
2    Q   And did Ms. Power give you a response?
3    A   I believe that she did, but I don't see it
4  here.
5    Q   You're right and you're right. She did and
6  it's not here.
7    A   Thank you.
8    Q   The next thing that is here is a letter from
9  Mr. Wilkerson's office on June 18th, 2003?
10   A   Yes.
11   Q   Did you hire Mr. Wilkerson's office?
12   A   I called Mark about the case, yeah.
13   Q   And is that documented in the claim file?
14   A   I don't see it in what I have here, but this
15 ends on 6/4/03.
16       MR. WILKERSON: I'll represent to you, Mark,
17 it would have been redacted as attorney-client.
18       MR. SANDBERG: Okay.
19 BY MR. SANDBERG:
20   Q   Did you hire the Wilkerson law firm?
21   A   Allstate did.
22   Q   And whose lawyer did Allstate hire the
23 Wilkerson law firm to be?
24   A   I don't know that there was a discussion
25 about whose lawyer he was going to be. I don't

Page 119

1  remember.
2    Q   Was he to be the lawyer for Mr. Herron or was
3  he to be the lawyer for Allstate?
4    A   I don't know the conversation. I remember I
5  called Mark to --
6        MR. WILKERSON: Don't reveal conversations we
7  had.
8        THE WITNESS: Thank you.
9  BY MR. SANDBERG:
10   Q   As we sit here today, can you tell me whose
11 lawyer Allstate hired Mr. Wilkerson to represent?
12   A   I can't. I don't know.
13   Q   I think I cabollixed that question because
14 it's getting late in the day.
15       As you sit here today, can you tell me who
16 Mr. Wilkerson was hired to represent, is what I should
17 have asked.
18   A   I don't recall the conversation about that.
19   Q   After Mr. Wilkerson was hired, can you
20 describe for me generally what your involvement with
21 Angelina's claim was? I mean, we're kind of coming to
22 the end here, so maybe you can just summarize for me
23 what happened after Mr. Wilkerson was hired.
24   A   Mr. Valcarce called me and he was going to be
25 CHI counsel for Mr. Herron, I believe.

15 (Pages 116 to 119)

ALLSTATE v. HERRON

Page 120

1    Q    Now, he was actually hired by Tina Watts, I
2   believe?
3    A    I think there's a letter from Tina, but
4   generally I would be on vacation at the time that she
5   wrote that. I think that's why she did it.
6    Q    That's what I was about to ask, is why Tina
7   and not you.
8    A    Yeah.
9    Q    Is simply because you didn't happen to be
10  there that day, in all probability?
11   A    Right.
12   Q    And we could dig out the letters if we need
13  to, but essentially Mr. Valcarce asked Allstate to
14  either settle the case or assure Mr. Herron that it
15  would pay any judgment, correct?
16   A    Correct.
17   Q    And what, if anything, other than talking to
18  Mr. Wilkerson, did you do in response to those
19  letters?
20   A    I don't know that I did anything. I mean, I
21  didn't send any letters or anything.
22   Q    Now, the only correspondence I see from you
23  at this point to the end, is simply sending
24  Mr. Valcarce a copy of the declarations page. Is that
25  consistent with your recollection?

Page 121

1    A    Yeah. I think he wanted it for maybe some
2   other policies. I think there was a homeowners or a
3   motorcycle or something.
4    Q    I think we're ready, then, to move to our
5   last stack here. Oh, I'm sorry. On the very top of
6   that other stack is a document that I don't recognize,
7   and so I was just going to ask if you do. 163, what
8   is this, if you know?
9    A    I don't know. It's not mine.
10   Q    Is it a form that you recognize?
11   A    No.
12   Q    Is any of the handwriting on it yours?
13   A    No.
14   Q    Okay. Then I'll ask somebody else.
15       Let's go, then, to our last stack, which are
16  documents that have been produced since our last time
17  together.
18       First of all, looking at -- all these
19  documents begin now with a 7, so I'm going to skip
20  that part and just say, looking at 4343, what are we
21  looking at?
22   A    This is a snapshot of the 09 screen.
23   Q    And the 09 screen is what we talked about
24  before?
25   A    Right.

Page 122

1    Q    And just what is, just to refresh my
2   recollection, the 09 screen?
3    A    It is the screen that I would go to put in my
4   authority request, and whoever was giving me the
5   authority would put in whatever they were granting.
6    Q    Can you tell the date of this evaluation
7   review?
8    A    Yes.
9    Q    Where do I see that?
10   A    Where it says "claim handler recommendation,"
11  right under that, that date, that would be the date
12  that the request was put in, the next lower date would
13  be when the authority was granted.
14   Q    Okay. Now, the date that the claim -- the
15  claim handler recommendation is dated 5/30/03?
16   A    Right.
17   Q    And would you be the claim handler?
18   A    Yes.
19   Q    So from this can we infer that you made your
20  claim handler recommendation on May 30th, 2003?
21   A    In this particular case, I was filling in the
22  screens that needed to be filled in, because the claim
23  handler recommendation would normally be before it
24  even goes to the evaluation consultant. But in this
25  case, since I was just asking for her opinion, I

Page 123

1   didn't put anything in that screen until we have the
2   authority.
3    Q    So is it your testimony that you actually
4   made a recommendation before May 30th, 2003?
5    A    I didn't make a recommendation. I gave the
6   file to Lori, who then gave it to Karen for their
7   opinion.
8    Q    So here, where it says claim handler
9   recommendation, and then it says amount 112.5, that's
10  not really a claim handler recommendation?
11   A    Right.
12   Q    You just have to fill in something in order
13  to keep going?
14   A    Right. I mean, there has to be some sort of
15  authority request in there.
16   Q    Okay. So returning to a question I asked you
17  a little while ago, are you aware of anything,
18  anywhere, in any claim file, that would tell us when
19  you actually evaluated Angelina Trailov's claim?
20   A    No.
21   Q    Looking down here, then, it says evaluation
22  consultant recommendation, and it still has the same
23  date, May 30th, 2003, correct?
24   A    Right.
25   Q    Would you have entered the information under

Page 124

1   it, which is, once again, amount high, 112.5, and
2   amount 112.5 low?
3       A   No.
4       Q   That would be Lori?
5       A   Probably.
6       Q   And then if there are comments, we don't
7   appear to have them?
8       A   They're on the next page.
9       Q   Oh, okay.  Got it.
10       So are these your comments that we're looking
11  at?
12      A   No.  These are Lori's comments.
13      Q   Starting near the top, I'd kind of like you
14  to translate for me, if we may.
15      A   Okay.
16      Q   First of all, ALB, would that be Lori Barra?
17      A   Yes.
18      Q   And 7:41 p.m., can we assume that's probably
19  Chicago time?
20      A   I'm guessing.  I can't say for sure.
21      Q   Okay.  Now, that's roughly the same time as
22  the fax on May 30th that we saw, correct, where it
23  said 7-something as well?
24      A   Yeah.  I think it said 7:09.
25      Q   Okay.  In any event, here it says:  "Reviewed

Page 125

1   file for authority"?
2       A   Uh-huh, right.
3       Q   And then:  "Routed file to FPE to review."I
4   knew once, but I've forgotten.  What's an FPE?
5       A   I think it's a front-line performance expert,
6   maybe.
7       Q   Do you know who is the FPE?
8       A   That would be Karen Petersen.
9       Q   And then it says:  "Based on FPE 5/29
10  comments," which I think we can find -- can we find
11  the FPE 529 comments in the claim log?
12      A   I think so.
13      Q   Okay.  So based on Karen's comments in the
14  claim log, authority of 112.5 was granted on AA04.
15  And 04 is Angelina, correct?
16      A   Right.
17      Q   So can we tell from this, is Lori actually
18  the person who granted the 112.5 authority?
19      A   I would say that she is.
20      Q   And can we tell from this, as to this and
21  Karen Petersen's prior entry, when Lori first got
22  involved in the evaluation process?
23      A   We can't tell from this.
24      Q   Do we have any way in the claim file to tell
25  whether it was before May 29th, 2003?

Page 126

1       A   No.  I don't think so, no.
2       Q   Looking about three-fourths of the way down
3   here, it says:  "At this point, claimant's attorney
4   has not given notice of intent to pursue a UIM."
5       Do you know whether or not that's information
6   that Lori received from you?
7       A   I don't know.
8       Q   Is there any other way you can think of that
9   Lori would have learned that except from you?
10      A   Well, she read the claim file.
11      Q   Okay.  So she could have simply come to her
12  own conclusion that nobody had asked for a UIM yet?
13      A   Yes.
14      Q   That there was nothing in the claim file
15  regarding UIM?
16      A   Yes.
17      Q   And then the final part down there, it says:
18  "Attempted to access PF8."
19      What's a PF8?
20      A   I'm not sure if she's talking about this
21  screen.  I'm not sure.
22      Q   Okay.  And then it says:  "Unable to without
23  entering value into the SU."
24      SU, I believe, is the U coverage?
25      A   Right.

Page 127

1       Q   "As the SU was opened subsequent to the
2   5/30/03 review of the AA claim."
3       The AA claim is the bodily injury claim?
4       A   Yes.
5       Q   "Therefore, entered zero at this time only to
6   access."
7       Let's keep going through these documents, if
8   we may, Kathy, in the time I have left with you.
9       4618 is something that's been produced to us
10  since your prior deposition.  Can you tell me what it
11  is?
12      A   It looks like an excess letter.
13      Q   Is this a form that you use for sending out
14  excess letters?
15      A   It looks like it.  The typeface is different,
16  and that's throwing me off a little bit.  But yeah, it
17  does.
18      Q   Okay.  And in Angelina Trailov's claim, did
19  you ever send Mr. Herron an excess letter like this --
20  I'm sorry.  Strike the "like this."  Did you ever send
21  Mr. Herron an excess letter?
22      A   I don't think so.
23      Q   Let's continue, then, if we may.  4624 is
24  what, if you can tell me?
25      A   If I can tell.  I don't know.  It's one of

17 (Pages 124 to 127)

ALLSTATE v. HERRON

KATHY BERRY - VOLUME II
3/14/2006

Page 128

1   our screens. I guess it's the PF8-- it's the 09,
2   evaluation consultant screen, PF8 portion.
3       Q   Okay. So this would be essentially the
4   screen -- the format in which we should find comments
5   by people, for example, like Lori Barra?
6       A   Right.
7       Q   Okay. 4625, can you tell me what screen
8   we're looking at here?
9       A   Uh-huh. This is a screen that shows -- it
10  lists dates and then demands and offers.
11      Q   Was there a screen like this in 2003?
12      A   I think so.
13      Q   Was the demand of February 14th, 2003 entered
14  into the system in a way that should have appeared on
15  a screen like this?
16      A   I don't remember. I don't know.
17      Q   Let's go to the next one, then. What's 4626?
18      A   A screen where we list out what factors would
19  be favorable to our case, what the plaintiff's
20  attorney is arguing, and then what our response to
21  that might be. And then this screen tells, again,
22  what the actually conversations were.
23          MR. SANDBERG: Let's go off record for a
24  second.
25          (Off the record.)

Page 129

1           MR. SANDBERG: Back on record.
2   BY MR. SANDBERG:
3       Q   Let's continue then, if we may. 4634, can
4   you identify that for me? I see your name on it.
5       A   Yeah.
6       Q   This appears to say that your BI perhaps
7   is -- I believe this relates to your level of BI
8   authority?
9       A   It looks like that's what it is, but I
10  haven't seen anything like this before.
11      Q   I see. And the second entry in there, what
12  appears to say BI/file, is $20,000. Would you agree?
13      A   Well, it's really hard to read, but it looks
14  like it says BI/file up here is 40,000, up at the top.
15      Q   Okay. Is this perhaps tracking you over
16  time?
17      A   I have no idea.
18      Q   Did your BI authority go from 20 to 40 at
19  some point?
20      A   I don't think so, but I don't know.
21      Q   The next, 4635, relates -- you may have to
22  trust me on this one, but it appears to relate to
23  Karen Petersen and shows her authority at $300,000?
24      A   That's what it looks like, but I can't really
25  comment on it.

Page 130

1       Q   In May of 2003, would you have understood
2   that Karen Petersen possessed at least 112.5 of BI
3   authority?
4       A   Yes.
5       Q   So if you had wanted authority to make an
6   offer on Angelina Trailov's claim, could you have gone
7   to Karen seeking authority?
8       A   Yes.
9       Q   The next page, 4636, we've got Gary Davis,
10  who is probably disappointed to know that his
11  authority appears to be zero, but it appears there was
12  a time it was $200,000.
13      A   I don't think he's disappointed at all, since
14  he's retired.
15          MR. WILKERSON: Hence the zero.
16          MR. SANDBERG: Hence the zero, okay.
17  BY MR. SANDBERG:
18      Q   When the case first got assigned to you, we
19  saw Mr. Davis, and that was, in fact, I think, his
20  only appearance in this file.
21      A   Yes.
22      Q   Can you tell from this when his authority
23  would have gone from $200,000 to zero?
24      A   No.
25      Q   Can you tell whether or not that was before

Page 131

1   or after May of 2003?
2       A   I don't know.
3       Q   Do you have a recollection as we sit here as
4   to whether or not Gary was retired by May of 2003?
5       A   I don't remember when he retired.
6       Q   4637 relates to Mr. Elkins. And once again
7   we see he has BI per injury of 115, and BI per file of
8   $300,000, correct?
9       A   Right. That's what it looks like, at least.
10      Q   Okay. In May of 2003 -- and in fact the date
11  on this, it says "Date: 5/28/02" in the upper
12  right-hand corner. So in May of 2003 would you have
13  understood that Mr. Elkins possessed at least 112.5 in
14  authority?
15      A   I don't know what his authority was.
16      Q   In May of 2003 would you have understood
17  Mr. Elkins to be a person to whom you could have gone
18  seeking authority to make an offer to Angelina?
19      A   I don't know.
20      Q   Let's see. The next one appears to relate to
21  Scott Millar and Renee, so I'll skip those two. And
22  let's keep going down to a command alert conference
23  log, which is 4589. And since all the claim numbers
24  have been redacted except one, which appears at 4590,
25  I'm going to assume that the one in the middle of that

18 (Pages 128 to 131)

ALLSTATE v. HERRON

Page 132

1   page is the Trailov case?
2       A   It looks like it matches with these other
3   records.
4       Q   It appears that's the right claim number?
5       A   Yeah.
6       Q   And then looking at that, it says this is the
7   demand alert conference log for the month of February
8   2003, correct?
9       A   Yeah.
10      Q   And then it says "EC Barra," correct?
11      A   Yeah.
12      Q   Do you know whether or not we're looking at a
13  log that was kept by Lori Barra?
14      A   I've never seen this before.
15      Q   Do you recognize Lori's writing?
16      A   No.
17      Q   Do you recognize Craig's writing?
18      A   I can't really say who wrote it.
19      Q   If Craig had written it, would you recognize
20  Craig's writing?
21      A   Possibly.
22      Q   Does this look like Craig's writing?
23      A   Well, some of it does, but not all of it
24  does, so I don't know who filled it out.
25      Q   Okay.  Looking to the right of the claim

Page 133

1   number, we see A004.  That would be the bodily injury
2   claim for Angelina?
3       A   Yeah.
4       Q   And then we see AKB.  That's you?
5       A   Right.
6       Q   And then it says:  "Demand received 2/18/03"?
7       A   Right.
8       Q   And response due, "none"?
9       A   Right.
10      Q   Do you recognize the writing on the "none"?
11      A   No.  I can't say for sure who wrote that.
12      Q   Then can you read to me what's in the next
13  block?
14      A   I have no idea what that says.
15      Q   Me either.  And then continuing --
16          MR. WILKERSON:  What are you looking at?  I'm
17  sorry, Mark.  I'll try and help.
18          MR. SANDBERG:  Sure.
19          MR. WILKERSON:  After it says "none"?
20          MR. SANDBERG:  Yes.
21          MR. WILKERSON:  I think it says "Bethel
22  case."
23          MR. SANDBERG:  Oh.
24          MR. WILKERSON:  I'm just doing my best to
25  interpret it, but it looks like that to me.

Page 134

1           MR. SANDBERG:  I think you may be right.  I
2   was thinking it looked like it said 3ETW or something,
3   but I think you're right, I think it says "Bethel
4   case."
5   BY MR. SANDBERG:
6       Q   Do you recognize that writing?
7       A   No.
8       Q   It's not yours?
9       A   No.
10      Q   And then coming across, the next space is
11  blank, and then it says -- it appears to me to say
12  "FPL notice"?
13      A   I think that's what it says.
14      Q   What's an FPL?
15      A   That's Craig's position.
16      Q   Okay.  And 3/3/03.  So does that mean Craig
17  received notice on 3/3/03?
18      A   I don't know if that's what it means.  I
19  would have to guess.
20      Q   Okay.  What is your best guess?
21      A   I'm guessing that's what it means, but I
22  don't know that.
23      Q   All right.  To the best of your knowledge,
24  was Allstate's demands alert log ever updated to
25  reflect the April 10th letter from Ms. Power?

Page 135

1       A   I don't know.
2       Q   I asked you whether you brought that letter
3   to Mr. Elkins attention, and I believe you told me no?
4       A   I don't recall bringing it to him.
5       Q   Do you recall bringing it to anyone else's
6   attention, besides Mr. Elkins?
7       A   No.  I don't think so.
8       Q   Other than whoever opened the mail, and you,
9   can you tell me the name of any other person working
10  at Allstate who have seen the April 10th letter before
11  May 16th, 2003?
12      A   I don't know if anyone else would have seen
13  it.
14      Q   Flip to 4591, then, if we may.  Do you
15  recognize what this is?
16      A   I have no idea what it is.
17      Q   Continue, then, if we can, to 4361.  What are
18  we looking at here, at 4361?
19      A   Well, it appears to be some sort of
20  PowerPoint screen or something having to do with good
21  faith claim handling.
22      Q   I'll represent to you that this was produced
23  by Allstate in this case.  And actually you can see,
24  on the left-hand side, it appears to come from some
25  kind of a spiral notebook.  Is that spiral notebook

19 (Pages 132 to 135)

ALLSTATE v. HERRON

KATHY BERRY - VOLUME II
3/14/2006

Page 136

1  something that you recognize?  Is there, for example,
2  a claim manual of some kind that looks like this?
3      **A   I don't recognize this.**
4      Q    Looking near the bottom, it says:  "Conduct
5  alert conference upon receipt of time limit demand."
6      Do you know what an alert conference is?
7      **A   I believe it's the form that I attach to the**
8  **demand and give to Craig.**
9      MR. SANDBERG:  Let's go off record for a
10  second.
11      (Off the record.)
12      MR. SANDBERG:  Back on record.
13  BY MR. SANDBERG:
14      Q    What I've handed you was produced to us since
15  your prior deposition.  And at 4357 we're looking at
16  what appears to be a cover page for something called
17  the Third-Party Good Claims Faith Handling Best
18  Practices.  And so now let me ask you, do you
19  recognize this thing?
20      **A   No.**
21      Q    Have you ever, to your recollection, been
22  trained regarding a manual that called itself
23  Third-Party Good Faith Claim Handling Best Practices?
24      **A   I don't remember a manual like this.**
25      Q    Okay.  Now go a few pages down to 4361, is

Page 137

1  where we were at.
2      **A   Okay.**
3      Q    I believe you had told me before we broke
4  that conduct alert conference, you thought, meant tell
5  Craig that a demand had been received?
6      **A   Right.**
7      Q    Then at 4362 we see something called Alert
8  Conference Requirements.  Are these something you
9  recognize?
10      **A   These particular points laid out, no.**
11      Q    Would you agree with me that this manual
12  appears to be contemplating an actual conference would
13  take place?
14      **A   Yes.**
15      Q    Was an actual alert conference held on
16  Angelina's file, to your recollection?
17      **A   I don't recall, but a lot of that would be**
18  **less formal than what this lays out.**
19      Q    To your recollection, was something that
20  called itself an alert conference conducted on
21  Angelina's file?
22      **A   Nothing called, quote/unquote, an alert**
23  **conference, not as far as I remember.**
24      Q    Okay.  And then this says:  "FPL and adjuster
25  participation required."

Page 138

1      On Angelina's case, that would be Craig and
2  you?
3      **A   Right.**
4      Q    And then it says:  "FPE and EC involved
5  recommended."
6      My ability to speak acronym is not good.
7  What's an FPE?
8      **A   Front-line performance expert, I think.**
9      Q    And that would be Ms. Petersen on this case?
10      **A   Right.**
11      Q    And EC would be Lori Barra on this case?
12      **A   Yes.**
13      Q    Do you recall any kind of a conference where
14  you and Craig, with or without Ms. Petersen or
15  Ms. Barra, reviewed the claim investigation remaining
16  in the time lines for completion, after receipt of the
17  demand?
18      **A   I don't remember any formal meeting about**
19  **that.**
20      Q    Then it says:  "FPL to document action plans
21  in CDS 03."
22      And I realize FPL is Mr. Elkins, but do you
23  know what that means?
24      **A   It means generally -- and what he does with**
25  **demands now, I don't remember if he did in this**

Page 139

1  **case -- is that he will say demand received, make sure**
2  **we have records or, you know, whatever it is that he's**
3  **telling me to do with it.**
4      Q    And what's a CDS 03?
5      **A   That's the -- this claim development summary,**
6  **I think, this diary type thing that we're looking at.**
7      Q    The log that we were looking at, which was
8  Nos. from 1 to about 86?
9      **A   Right.**
10      Q    And it says:  "Consider FPL/FPE dual
11  suspense," and then it says, "required in policy
12  limits cases."
13      Do you know anyone who calendared the letter
14  of April 10th, 2003?
15      **A   I may have, but I don't know if anyone else**
16  **did.**
17      Q    Do you know whether you did?
18      **A   I don't know.  I knew that I knew the date,**
19  **May 16th, 2003, but I don't know how I knew that.**
20      MR. SANDBERG:  Let's go off record for a
21  second.  We're just about done.
22      (Off the record.)
23      MR. SANDBERG:  Back on record.
24  BY MR. SANDBERG:
25      Q    Let me give you two more that appear to

20 (Pages 136 to 139)

ALLSTATE v. HERRON

KATHY BERRY - VOLUME II
3/14/2006

Page 140

1  relate to what we're looking at here, the good faith
2  claim handling best practices. This is a memo dated
3  February 19th, 2001 from someone named Eva Kennedy.
4  Do you know anyone named Eva Kennedy?
5     **A   I think she's in home office.**
6     Q    And after February 19th, 2001, do you ever
7  recall receiving training regarding use of the good
8  faith claim handling best practices?
9     **A   I don't remember specific training, but**
10    **there's training all the time.**
11    Q    Well, do you recall receiving training
12 regarding this little booklet we've been looking at?
13    **A   I don't remember that booklet.**
14       MR. MESTAS:  You'd better wrap it up, Mark.
15       MR. SANDBERG:  Yes.
16 BY MR. SANDBERG:
17    Q    I have a conference with a judge in just a
18 minute, so let me ask, 4366, go back to that. Do you
19 recognize the criterion we're looking at here?  In
20 other words, is this something that was carried
21 forward?
22    **A   I don't recognize this with regard to an**
23 **alert conference type of thing.**
24    Q    Looking quickly at 4368 and the forms that
25 follow, do you recognize those?

Page 141

1     **A   I don't, but I tend not to use a lot of the**
2  **letters that are in our system.  I have letters that**
3  **maybe attorneys wrote for us at some point or**
4  **something like that, that I generally use.**
5     Q    Okay.  4374 is a good faith claim handling
6  best practice checklist.  Do you recognize that?
7     **A   No.**
8     Q    And the final thing in our little packet here
9  is 4376.  Do you recognize that?  It says Good Faith
10 Claim Handling Letters.  It's sort of a spreadsheet
11 about which and when and why.
12    **A   No.**
13       MR. SANDBERG:  Okay.  Then, Ms. Berry, I
14 believe we're done.  Thank you.
15       THE WITNESS:  Thank you.
16       (Proceedings concluded at 3:58 P.M.)
17       (Signature reserved.)
18             -o0o-
19
20
21
22
23
24
25

PACIFIC RIM REPORTING   907-272-4383
www.courtreportersalaska.com

ALLSTATE v. HERRON

KATHY BERRY - VOLUME II
3/14/2006

Page 142

1                        CERTIFICATE

2

3           I, LISA L. SHAFFER, Certified Shorthand

4     Reporter, and Notary Public in and for the State of

5     Alaska, do hereby certify that the witness in the

6     foregoing proceedings was duly sworn; that the

7     proceedings were then taken before me at the time

8     and place herein set forth; that the testimony

9     and proceedings were reported stenographically by

10    me and later transcribed by computer transcription;

11    that the foregoing is a true record of the

12    testimony and proceedings taken at that time;

13    and that I am not a party to nor have I any

14    interest in the outcome of the action herein

15    contained.

16           IN WITNESS WHEREOF, I have hereunto set

17    my hand and affixed my seal this _____ day

18    of _____ 2006.

19

20

21           _____

                LISA L. SHAFFER, CSR
22              My Commission Expires 8/29/06

23

24

25