Page 33

```
 1    A    I don't remember.

 2    Q    Do you have any knowledge generally about how much you are

 3         claiming for lost income that you relate to the accident?

 4    A    No.

 5    Q    Is there any job you could have taken in Bethel that

 6         would have paid you the same as your job prior to the

 7         accident?

 8    A    No.  Well, yes, if I were looking.

 9    Q    So it was your choice to take the job at the Bureau of

10         Land Management as opposed to looking for something that

11         was comparable in salary to what you made before the

12         accident?

13    A    At the time there was no positions available at a GS-12

14         level.

15    Q    Since that time have there been positions available at GS-

16         12?

17    A    Not in Bethel.

18    Q    Any other employment in Bethel outside of working for the

19         federal government that would pay the same as what you

20         were making prior to the accident that you're aware of?

21    A    There are positions that I would not be eligible for

22         because they're -- they would be different fields.

23    Q    Do you have any intention of seeking any counseling in the

24         future, any psychiatric treatment or anything along those

25         lines?
```

MARY KENICK                    2/21/2006              ALLSTATE INS. v. HERRON
Vol. 1                                               A04-0043 Civil

Page 34

1   A    No.

2   Q    Also in the April 2003 letter your lawyer told us that you

3        had experienced some personality changes following the

4        accident.  Can you tell me what those changes were?

5   A    He had ment -- I had mentioned to you earlier when I was

6        under a lot of stress it was very difficult also at home.

7        I was -- because of the stress I was a lot more irritable.

8        I didn't like to be bothered.

9   Q    Has that changed at all over time?

10  A    Yes.

11  Q    Are you back to your normal self, do you believe?

12  A    No.

13  Q    No.  How has it changed over time?

14  A    I think I'm a lot more patient than I was during -- during

15       the stressful times.

16  Q    How do you think you're different now from when you were

17       before the accident?

18  A    I think I worry a lot more.  I -- I -- when Gina was home

19       every time I heard the sirens I'd want to go to the

20       hospital.  So when she was out I wouldn't sleep very much.

21  Q    Bless you.

22       UNIDENTIFIED VOICE:  Excuse me.

23  Q    In that same letter you're also -- your lawyer also stated

24       that long time friends would testify about the changes in

25       you.  Who are those long time friends?

MARY KENICK                           2/21/2006              ALLSTATE INS. v. HERRON
Vol. I                                                       A04-0043 Civil

Page 35

1    A    Changes in me or in Gina?

2    Q    Changes in you.

3    A    Changes in me, I guess I thought they were -- would

4         primarily be changes in Gina.  I think my husband would be

5         one.

6    Q    Anyone else?

7    A    My brother.

8    Q    What's your brother's name?

9    A    Walter.

10   Q    Does he live in Bethel?

11   A    Yes.

12   Q    And is -- his last name is Jim?

13   A    Uh-huh.  (Affirmative)

14   Q    Okay, just checking.

15   A    Yes.

16        MS. HOZUBIN:  We've been going about an hour.  Do you want

17   to take a break?

18        MR. MESTAS:  Sure.

19        MS. HOZUBIN:  Go off record.

20        (Off record)

21        (On record)

22   Q    Okay.  When we left we were talking about the April 2003

23        letter your lawyer had sent to Allstate.  In that letter

24        there was a deadline of May 16th, 2003, to respond to your

25        settlement offer to Allstate.  Did you choose that

MARY KENICK                        2/21/2006                ALLSTATE INS. v. HERRON
Vol. 1                                                          A04-0043 Civil

Page 36

```
 1        deadline?

 2   A    Yes.

 3   Q    And why did you choose that particular deadline?

 4   A    Because the amount of time that lapsed from the time of

 5        the accident.  I think I -- I didn't choose the date but I

 6        -- I felt 30 days was sufficient.

 7   Q    So there was no significance to May 16th other than it was

 8        about -- approximately 30 days from the date that the

 9        letter was being sent?

10   A    Yes.

11   Q    Okay.  Was your daughter scheduled to undergo any

12        medical treatments between the date that the April

13        letter was sent and the May 16th deadline?

14   A    I don't remember.

15   Q    Do you remember if she was scheduled to undergo any

16        medical treatments between May 16th and May 30th?

17   A    No.

18   Q    Was it your decision not to accept the policy limit

19        settlement for your daughter at the end of May from

20        Allstate?

21        MR. MESTAS:  Objection, again, don't relate any

22   conversations with your attorney.  If you can answer that

23   without relating conversations with your attorney, fine.  If --

24   if you have to relate a conversation of your attorney, then

25   don't.
```

Page 37

```
 1   Q   Can you answer that question without relating anything
 2       from your attorney?
 3   A   No.
 4   Q   What further injuries or damages did you or your daughter
 5       suffer as a result -- or suffer from May 16th to May 30th,
 6       2003?
 7   A   Injuries that me and my daughter occurred -- incurred you
 8       mean?
 9   Q   Injuries or damages.
10       MR. MESTAS:  Could -- could you refine the question?  I
11   think she might be confused about whether you're talking about
12   a new accident or a new.....
13   Q   Oh, okay.  I'm talking about any continuing damages that
14       you relate to the accident that you incurred between May
15       16th and May 30th, 2003.
16       MR. MESTAS:  If you understand the question, answer it
17   if.....
18   A   I -- I don't understand the question.
19   Q   Okay.  Did you have any additional damages from the
20       timeframe May 16th to May 30th that you attribute to the
21       accident?
22   A   No.
23   Q   I understand that your daughter also suffered a back
24       injury as a result of the accident?
25   A   Yes, she did.
```

Page 38

```
 1   Q   Can you tell me about that?

 2   A   I quit asking her to do certain chores at home because

 3       like doing dishes because standing in one position for a

 4       long time would -- she'd start getting backaches.  Even

 5       just a few minutes, like doing dishes.

 6   Q   Was that immediately following the accident?

 7   A   Yes.

 8   Q   How long did her back injuries last?

 9   A   She still -- I still don't ask her to do dishes.

10   Q   Is she still complaining of pain in her back?

11   A   Yes, she get backaches.

12   Q   How often does she complain of it to you?

13   A   She really tries not to do -- complain until I pry.

14   Q   How often.....

15   A   I can see -- when I see pain in her face.

16   Q   How often do you pry?

17   A   When I see pain in her face.1

18   Q   How often is that?

19   A   Often.  She tires.  You can tell just by looking at her.

20   Q   Is she living in Anchorage now?

21   A   Yes, she is.

22   Q   How -- how often do you get to see her?

23   A   I saw her a couple weeks ago.  And prior to that a few

24       weeks.  So -- so far it's been every few weeks.

25   Q   And the times that you have seen her is it every time
```

Page 39

```
 1        that you see her that she has complaints of back

 2        pain?

 3    A   Headaches.

 4    Q   Headaches.  How often does she complain of back pain when

 5        you see her every few weeks?

 6    A   The number of times, I can't say.  Just often.

 7    Q   And tell me about these headaches.  What is her complaint

 8        about the headaches?

 9    A   They're painful.

10    Q   Does she ever describe the headaches to you?

11    A   No.  But she -- I can see the pain in her face.

12    Q   Does she tell you how often she experiences these

13        headaches?

14    A   They're frequent.

15    Q   Does she ever put a number on the frequency.....

16    A   No.

17    Q   .....if she has them every day, every week?  Do you know

18        if she has any treatment planned for the future for her

19        back or her headaches?

20    A   I did tell her this morning I need to make an appointment

21        for her because of her -- the headaches and the dizziness

22        that she's experiencing.

23    Q   How often is she experiencing dizziness?

24    A   She said yesterday that she started getting dizzy --

25        dizziness a couple weeks ago.
```

MARY KENICK                          2/21/2006                    ALLSTATE INS. v. HERRON
Vol. 1                                                            A04-0043 Civil

Page 40

1    Q    Prior to a couple weeks ago when was the last time she

2         experienced dizziness?

3    A    Shortly after the accident.  She had dizziness for about a

4         month after we were home.

5    Q    Did anything happen to her a couple weeks ago that would

6         have caused the dizziness to come back?

7    A    No.

8    Q    Has she had any complications or problems with her lungs

9         since she was released from the hospital?

10   A    No.

11   Q    Do you know if she requires any future treatment for her

12        lungs?

13   A    I can't foresee the future.  So I don't know.

14   Q    Has any doctor told you that she will require any future

15        treatment for her lung injury?

16   A    No.

17   Q    Tell me about your daughter's head injury.  How has it

18        affected her?

19        MR. MESTAS:  Could I get -- clarify, Counsel, do you mean

20   from the very beginning?  Do you mean now?  Do you mean the

21   whole course of time from the accident to now or what?

22   Q    The whole course of time.  Would you like me to break it

23        down into time segments?  Would that be easier?

24   A    I -- I could go -- I could try to do it in segments.  Do

25        my response in segments.

Page 41

```
 1   Q   Well, why don't we -- why don't we do this, why don't you

 2       tell me what -- how if affected her in the first three

 3       months after the accident.

 4   A   She had to learn to walk.  She couldn't walk straight.

 5       She still has that problem when she's tired.  She tires

 6       easily.  She would fall over when she was extremely tired.

 7       It causes headaches to this day.

 8   Q   Did ANMC -- was she able to walk when she was discharged

 9       from the hospital?

10   A   No.  From ANMC?

11   Q   Yes.

12   A   Yes.  They wouldn't discharge her until she learned to

13       walk.

14   Q   In 2003 did her symptoms change at all from her head

15       injury?

16   A   Worse or better?

17   Q   Either way.

18   A   She's improved her walking.  She's not walking sideways

19       often -- as often.

20   Q   Did her headaches improve in 2003?

21   A   No.

22   Q   Did she have any difficulties in school?

23   A   Yes.

24   Q   Tell me about those?

25   A   She -- her personality changed a lot.  She became a
```

MARY KENICK
Vol. 1
2/21/2006
ALLSTATE INS. v. HERRON
A04-0043 Civil

Page 42

| 1 | | different person. |
|---|---|---|
| 2 | Q | Describe her personality..... |
| 3 | | MR. MESTAS:  Wait a minute.  I'm not sure she was..... |
| 4 | Q | I'm sorry. |
| 5 | | MR. MESTAS:  I don't think she was done. |
| 6 | A | I wasn't done. |
| 7 | Q | Sorry. |
| 8 | A | Trying to get you to see from Gina prior to her accident |
| 9 | | was a very -- she was a very pleasant person.  After the |
| 10 | | accident and during recovery within the year I noticed she |
| 11 | | was irritable.  She didn't respond the way she used to. |
| 12 | | She lost friends.  She lost interest in a lot of things |
| 13 | | that she was interested in.  And if -- I -- I think it had |
| 14 | | -- it affected her -- her studies, where she had to study |
| 15 | | a lot more, a lot harder.  She wasn't as attentive. |
| 16 | Q | Did her grades suffer as a result of that? |
| 17 | A | On paper it's hard to see.  It took her a lot -- I noticed |
| 18 | | a lot more effort.  She had to do a lot of retakes to |
| 19 | | bring her grades up.  It's because the school -- being -- |
| 20 | | having been a cheerleader in high school they would notify |
| 21 | | me when her grade level was where she couldn't participate |
| 22 | | as a cheerleader. |
| 23 | Q | Was she a cheerleader after the accident? |
| 24 | A | Yeah.  First she started.  Then she quit within a couple |
| 25 | | weeks.  Then her senior year she tried out and -- as a |

Computer Matrix, LLC
310 K Street, Suite 200
Phone - 907-243-0668
Fax    907-243-1473
jpk@gci.net
sahile@gci.net

Page 43

```
 1        varsity cheerleader.

 2   Q    You said she lost interest in a lot of things after the

 3        accident.  What sorts of things did she lose interest in?

 4   A    Art.  She's getting that back into her activities again.

 5        Athletics, which she -- she's getting back into again,

 6        running.

 7   Q    Anything else?

 8   A    She -- from being an extrovert, she became an introvert

 9        where she would spend most of her time by herself.  And

10        prior to that she was -- she was always a socialite and it

11        -- it bothered me because of her -- the loss -- her lost

12        interest in being with friends.

13   Q    Is that getting better now?

14   A    I think so.

15   Q    Were you with your daughter when she went to see Dr.

16        Craig?

17   A    Yes.

18   Q    And do you recall what Dr. Craig told you and your

19        daughter about her injuries?

20   A    Can I answer that?

21        MR. MESTAS:  Sure.

22   A    He went over the types of tests that he -- he gave her the

23        results of the tests that she -- her results of the tests

24        he took.

25   Q    Did he have any recommendations for her?
```

Page 44

```
 1    A    I don't remember.  I did start reading the report a couple

 2         nights ago and I couldn't finish it.

 3    Q    Boring?

 4    A    No.  There was a lot of things that I just couldn't read

 5         again because of the possibility of so many things that

 6         could occur with her head -- head injuries.

 7         MS. POWER:  I think she's thinking of the wrong

 8    report.....

 9    A    Oh.....

10         MS. POWER:  .....Dr. Pirello (ph) is the report you were

11    reading.

12    A    Oh, I was reading Dr. Pirello's.  Okay, yeah.

13    Q    Okay.

14    A    That's -- that's the report.  Thanks, Michele.

15    Q    With respect to Dr. Craig, after your daughter met with

16         him did she seek out any kind of speech therapy or any

17         other cognitive counseling treatments?

18    A    No.  They're not available in Bethel.

19    Q    Since she's moved to Anchorage has she sought any out?

20    A    No.

21    Q    When did she move to Anchorage?

22    A    She got here in January after -- the day after spring

23         semester classes started.

24    Q    Is she attending classes at UAA?

25    A    Yes.
```

MARY KENICK
Vol. 1

2/21/2006

ALLSTATE INS. v. HERRON
A04-0043 Civil

Page 45

```
 1   Q   Is she enjoying it?

 2   A   Yeah.

 3   Q   Do you know if your daughter was under the influence of

 4       any alcohol or drugs at the time of the accident?

 5   A   Yes.

 6   Q   And what do you know?

 7   A   That she -- my understanding was that she drank -- she had

 8       one drink but I understand the test results were higher

 9       than having -- an individual having more than one drink.

10   Q   Had you ever known your daughter to drink prior to this

11       accident?

12   A   No.

13   Q   Have you known your daughter to ever consume alcohol after

14       this accident?

15   A   Yes.

16   Q   How many occasions have you known her to consume alcohol

17       since the accident?

18   A   I don't know.  It started after -- I noticed behavioral

19       changes last year.  She was -- she started getting

20       involved with other kids that liked to party.  She started

21       showing signs of being -- becoming a delinquent.  I talked

22       to her of what could -- alcohol could do to a person, that

23       she didn't need to ruin her life.  I -- I think she was

24       using it as an escape.  She lost a boyfriend because of

25       her irritability.  He noticed a lot of changes in her.
```

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

Page 46

1    And after that failed relationship then I noticed where

2    she started drinking for maybe a period of a couple months

3    before I spoke to her.  After I realized -- I started

4    noticing -- it seemed it was becoming more frequent --

5    frequent.  I didn't -- I know she was drinking.  I -- but

6    I never saw her.  But she -- as far as I -- I know, she's

7    not drinking now.

8  Q  The timeframe that she was drinking do you attribute that

9     to her accident?

10 A  Her irritability, yes.

11 Q  So you attribute her drinking to her irritability; and the

12    irritability to the accident?

13 A  Her failed relationship.....

14 Q  Okay.

15 A  .....and -- and her drinking to that failed relationship.

16 Q  Okay.  And the failed relationship due to the

17    irritability, due to the accident?

18 A  Yes.

19 Q  Okay.  Are you the only Mary Kenick in Bethel?

20 A  Yes.

21 Q  And were you treasurer of the Bethel Native Corporation in

22    2004?

23 A  Yes.

24 Q  When were you appoint -- were you elected or appointed to

25    that position?

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

Page 47

```
 1   A    I was appointed.

 2   Q    And do you recall when you were appointed to that

 3        position?

 4   A    In December 2004, I think it was.

 5   Q    And how did you become appointed to that position?

 6   A    There was a vacancy on the board.  I applied.  I was

 7        selected by the board to fill in the vacancy.  There was

 8        -- I'm smiling because I can't think of it -- I ran for a

 9        seat in May.  I was elected and now I'm the vice -- vice-

10        chair for the board.

11   Q    That was last year in May?

12   A    Yes.

13   Q    Okay.  Why did you apply to become secretary?

14   A    I didn't apply for secretary.

15   Q    Oh, I thought in 2004 you applied to be the secretary of

16        the.....

17   A    I -- I applied to -- for the vacancy.....

18   Q    Oh, okay.

19   A    .....on the board.

20   Q    How long did you hold the secretary position?

21   A    I was never a secretary.

22   Q    You were never a secretary?

23   A    No.

24   Q    Oh, I'm sorry, treasurer.

25   A    Treasurer.
```

MARY KENICK                        2/21/2006                    ALLSTATE INS. v. HERRON
Vol. 1                                                         A04-0043 Civil

Page 48

1   Q    Back up, treasurer.   How long were you a treasurer?

2   A    Until I was elected to the board.

3   Q    And why did you want to become the treasurer?

4   A    I was nominated.

5   Q    Okay.   What sorts of duties as treasurer did you have?

6   A    Chairman of the finance committee.

7   Q    What sorts of things would you do as chairman of the

8        finance committee?

9   A    Hold the committee meetings, make recommendations to the

10       full board.

11  Q    On average how much time in a month did your duties as

12       treasurer take?

13  A    An hour.

14  Q    And was treasurer a paid position?

15  A    Stipend, yes.

16  Q    And how much was the stipend?

17  A    Twenty-five dollars a month.

18  Q    A lot of money.

19  A    Yeah.

20  Q    All right.   And then when you were elected as vice-

21       chairman of the board of directors of the corporation

22       what were your -- what are your duties?   Are you

23       still the vice-chair?

24  A    Yes.

25  Q    Okay.   What are your duties as vice-chairman?

Page 49

```
 1   A    When the chairman is not available to hold the board

 2        meetings then I fill in.

 3   Q    How often do you -- are there board meetings?

 4   A    We meet once a month.

 5   Q    And when the chairman is available you still attend

 6        as.....

 7   A    Yes.

 8   Q    .....a board.....

 9   A    A board member.

10   Q    .....member?  Board member.  And what sorts of things do

11        you do other than attend meetings in your capacity as

12        vice-chairman or board member?

13   A    Sign legal documents for the corporation.

14   Q    How much time on a monthly basis does this take for you?

15   A    Our meetings last anywhere from one to three hours.  So

16        that's about how much time it consumes.

17   Q    Okay.  Is there any preparation time, anything else that

18        you have to do other than attending the meetings that

19        would require more of your time during the month?

20   A    Reading the material that we're going to be discussing.

21        That takes about an hour.

22   Q    And does that position also have a stipend?

23   A    Yes.

24   Q    Is it also $25?

25   A    Seventy-five.
```

MARY KENICK
Vol. 1

2/21/2006

ALLSTATE INS. v. HERRON
A04-0043 Civil

Page 50

```
 1   Q   Moving up in the world, okay.  And you were elected to the
 2       position?
 3   A   Yes.
 4   Q   Did you have to run a campaign or anything to get it?
 5   A   No.
 6   Q   No.  Were you also elected to the Bethel City Council
 7       in 2005?
 8   A   Yes.
 9   Q   You're a busy woman.  Why did you run for that position?
10   A   I thought I could help make a difference in the way this
11       city is run.
12   Q   What sorts of things do you do as a council member?
13   A   I'm the vice mayor for the City of Bethel.  In that
14       capacity, if the mayor is not available to attend the
15       meetings, then I fill in as the mayor.
16   Q   How often do you have to do that?
17   A   The first three meetings I was the mayor for the City of
18       Bethel.
19   Q   You have an absentee mayor, okay.  And are you -- what
20       sort of role do you have in making policies and laws in
21       Bethel in your capacity?
22   A   I am -- I was appointed to the parks and recreation
23       committee.  I'm the council representative for that
24       committee.  So far I've attended only one meeting.  Any
25       time there's issues I get a lot of phone calls from
```

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax   907-243-1473

jpk@gci.net
sahile@gci.net

Page 51

```
1        residents from Bethel.  Then I bring it up to the

2        appropriate council representative for whatever committee

3        could address it or I contact the city manager on issues.

4    Q   And how long of a period of time is your council

5        membership?

6    A   It's a three year term.

7    Q   So you'll be on the council until 2008?

8    A   Eight.

9    Q   And did you have to become elected vice mayor or did that

10       just come along with your council position?

11   A   I had to be elected by the council.

12   Q   I also noticed that you became a board member of Bethel

13       Services Corporation in 2005?

14   A   It's a subsidiary of the Bethel Native Corporation.

15   Q   And are your duties any different than those of -- of your

16       director position at the Bethel Native Corporation?

17   A   In a way because it is a separate business, a subsidiary

18       of.  They're also -- recommendations are made to the full

19       board for decision.

20   Q   Are the Bethel Services Corporation's board of directors'

21       meetings held at the same time as the Bethel Native

22       Corporation's?

23   A   No.

24   Q   No.  How often do you meet for the Bethel Services

25       Corporation board?
```

MARY KENICK                        2/21/2006              ALLSTATE INS. v. HERRON
Vol. 1                                                           A04-0043 Civil

Page 52

1   A    Once a month.

2   Q    How often does the Bethel -- Bethel city council meet?

3   A    Every two weeks.

4   Q    And how long do those meetings last?

5   A    Anywhere from four to six hours.

6   Q    Are they open to the public like they are.....

7   A    Yes.....

8   Q    .....are.....

9   A    .....they are.

10  Q    .....here in Anchorage?  They are.  What sorts of things

11       do you do on the board of the Bethel Services Corporation?

12  A    Hold the meetings.

13  Q    Is there any research you have to do.....

14  A    No.

15  Q    .....any -- no.

16  A    Because the management takes care of -- care -- takes care

17       of all of the issues that need to be addressed and

18       decisions that need to be made prior to the meetings.

19  Q    Okay.  So they just provide you with that information and

20       then you meet with the other directors?

21  A    Yes.

22  Q    And are you also a board member of BNC Contracting?

23  A    Yes.

24  Q    And is that also a subsidiary of the corporation?

25  A    Yes, it is.

Page 53

1   Q   Okay.  Are those also separate meetings?

2   A   Yes, they are.

3   Q   Same sorts of meetings as.....

4   A   The committees.

5   Q   .....the committees?

6   A   Uh-huh.  (Affirmative)

7   Q   Okay.

8   A   And they meet quarterly -- I'm sorry, can I go back?

9   Q   Sure.

10  A   The -- they don't meet monthly.  The committee meetings

11      are quarterly.

12  Q   And when you say the committee meetings, are you talking

13      about....

14  A   Bethel Services.

15  Q   .....the city council?  Oh, the services, okay.

16  A   Bethel Services.

17  Q   Those are quarterly.  Okay.  And BN -- BNC is also

18      quarterly?

19  A   Bethel -- the corporation is once a month.

20  Q   Once a month, okay.

21  A   Uh-huh.  (Affirmative)

22  Q   And what committees are you on for BNC?

23  A   I'm the chairman for the land committee.  So far that

24      meets just once a year or call of the chair.

25  Q   Are you on any other committees?

Page 54

1   A     No.

2   Q     With respect to all of the positions you've held with the

3         corporations and with your council member position as well

4         as your vice mayor position, have you discussed or

5         revealed with any people within those organizations the

6         emotional issues you've been experiencing since -- since

7         the accident?

8   A     No.

9   Q     Has anyone in any of those organizations ever raised

10        with you any concerns that they have about your

11        inability to do those positions?

12  A     No.  Actually I got involved after I started getting a

13        handle on my -- the stresses.

14  Q     So when you got involved as the treasurer in 2004 you were

15        -- you were having a handle on your stresses at that time?

16  A     Yes.

17        MS. HOZUBIN:  I have a little bit more than five minutes.

18  So why don't we go ahead and change the tape.

19        REPORTER:  This concludes the first videotape in the

20  videotape deposition of Mary Kenick.  The time is 11:42.  The

21  date is the 21st of February 2006.

22        (Off record)

23        (On record)

24        REPORTER:  This is the second videotape in the videotape

25  deposition of Mary Kenick.  The time is 11:44.  The date is

Page 55

```
1   2/21/06.  Counsel, you may continue.

2          MS. HOZUBIN:  Thank you.

3   Q   Prior to the accident did you know Charles Herron or his

4       family?

5   A   Yes.

6   Q   How did you know them?

7   A   Bob -- I dealt with Bob as the city manager for Bethel.

8       And Margaret, his wife, is from Bethel and so I -- I grew

9       up knowing who she was.

10  Q   On April 4th, 2004, you entered into a consent judgment

11      arrangement with Mr. Herron.  In that consent judgment you

12      personally claimed damages of $150,000.  Did you come up

13      with that number?

14  A   No.

15         MR. MESTAS:  You can answer that question without relating

16  any conversations with counsel.

17  A   No.

18  Q   Okay.  And in that same consent judgment your daughter has

19      a claim for damages of 1.4 million dollars.  Without

20      discussing any discussions you may have had with your

21      counsel, did you come up with that number of 1.4 million

22      dollars?

23  A   No.

24  Q   Did your daughter?

25  A   No.
```

Page 56

```
 1   Q    Prior to entering into that consent judgment with Mr.

 2        Herron did you understand that it was possible that you

 3        and your daughter might never receive any money for your

 4        claims from the accident?

 5   A    Yes.

 6   Q    When did you personally first begin thinking about

 7        entering into this agreement with Mr. Herron?

 8        MR. MESTAS:  Again, please don't relate any conversations

 9   with counsel.

10   A    Okay.  I think it was after Allstate missed their

11        deadline.

12   Q    Did you begin thinking about it between -- after the May

13        16th deadline or did you begin thinking about it after

14        Allstate's contact on May 30th?

15   A    Actually it started after -- shortly after I started

16        receiving medical bills and there was -- it didn't seem

17        like there was going to be no effort made by the insurance

18        company -- company to make any payment.

19   Q    So you were familiar with what a consent judgment was

20        before the May 16th deadline?

21   A    Kind of.

22   Q    And without relating any conversations you had with your

23        counsel, and let me know if you can't answer this

24        question, how were you familiar with the consent judgment

25        prior to May 16th, 2003?
```

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

MARY KENICK                           2/21/2006                    ALLSTATE INS. v. HERRON
Vol. 1                                                            A04-0043 Civil

Page 57

1    A    Just by legal research with the jobs I've held.

2    Q    I'm sorry, legal research with what?

3    A    The jobs I've had.

4    Q    And within that legal research -- let me start over.  So

5         it was as soon as you started receiving medical bills that

6         you thought about entering into a consent judgment?

7    A    Uh-huh.   (Affirmative)

8    Q    Did you discuss this consent judgment at that time with

9         the Herron's?

10   A    No.  Actually, no, that's not true.  I think I answered

11        incorrectly.  I'm thinking of something else.  I thought

12        of not -- I was not thinking of consent shortly after when

13        it was evident the insurance company was making no effort

14        to pay -- make a payment.  I did know I wanted the -- the

15        -- that there was a possibility of this lawsuit against

16        the insurance company.

17   Q    Okay.  So when you.....

18   A    But not into consent -- not with consent with the

19        Herron's.

20   Q    Okay.  So you started thinking about the possibility of a

21        lawsuit when you started receiving the medical bills?

22   A    Yes.

23   Q    And when was the first time you personally thought of the

24        possibility of entering into a consent judgment?

25   A    Just after the insurance company missed their deadline and

Page 58

1          left the Herron's open for suit.

2     Q    So immediately after May 16th you began thinking

3          about it?

4     A    Uh-huh.  (Affirmative)

5     Q    Did you ever discuss the consent judgment with Charles

6          Herron or his parents?

7     A    No.  Because I can't.  They had legal counsel.

8     Q    Did you discuss it with anyone other than your lawyers?

9     A    No.

10    Q    Did you discuss it with your daughter?

11    A    No.

12    Q    Paragraph four of your complaint states that Allstate

13         engaged in a wrongful scheme and conspiracy directed at

14         Herron.  Can you tell me what this wrongful scheme and

15         conspiracy is in your mind, absent any discussions you may

16         have had with your attorneys?

17    A    There was -- it just seemed there was no intention of the

18         insurance agency covering the insured.  The -- the

19         protection wasn't there for -- from the insurance company.

20    Q    Even after Allstate agreed to settle with your

21         daughter for policy limits at the end of May 2003?

22    A    That was after the deadline.

23    Q    Paragraph 13 of your complaint states that Allstate and

24         its agents owed a duty to disclose medal -- medical

25         coverage to your attorney.  In the course of this, in

Page 59

```
 1        either 2002 or 2003, did you ever receive a copy of the

 2        Allstate policy and declarations?

 3   A    Never.

 4   Q    Are you aware if your attorney received the same?

 5   A    No.

 6   Q    When did you first become aware that Allstate was

 7        paying a portion of your daughter's medical bills?

 8   A    I -- I don't want to guess but it was I think six months

 9        after the accident it was made.

10   Q    When did you hire Ms. Power following the accident?

11   A    Within days of the accident.

12   Q    Why?

13   A    Because my daughter was injured in an accident.

14   Q    When did you hire Mr. Mestas?

15   A    It was after the insurance company missed their deadline.

16   Q    And why did you hire Mr. Mestas?

17   A    Because of his experience dealing with insurance

18        companies.

19   Q    Do you own your home?

20   A    Yes.  Or I'm purchasing it.

21   Q    Do you have homeowner's insurance?

22   A    Yes.

23   Q    And who is it with?

24   A    Omiliak (ph).  I'm not sure if it's pronounced correctly.

25   Q    And have you ever made a claim on your homeowner's
```

Page 60

```
 1        insurance?

 2   A    Yes.

 3   Q    And what was that claim for?

 4   A    The radiators.

 5   Q    You had a problem with your radiators?

 6   A    Yeah, they froze.

 7   Q    Did they burst?

 8   A    No.

 9   Q    No.  When was this claim?

10   A    I think it was in '99 but I could be -- I'm guessing.

11   Q    How did that claim resolve?

12   A    They paid within a very short time period.

13   Q    When you say a very short time period, are you talking

14        weeks, a month, two months?

15   A    I would say couple weeks.

16   Q    Did you hire an attorney to assist you with that?

17   A    No.  There was no injury involved.

18   Q    Have you ever had a claim made against you?

19   A    No.

20   Q    Do you currently own a vehicle?

21   A    Yes.

22   Q    And do you have auto insurance?

23   A    Yes.

24   Q    And who is that with?

25   A    It's not with Allstate.  Geico.
```

MARY KENICK                              2/21/2006                    ALLSTATE INS. v. HERRON
Vol. 1                                                                A04-0043 Civil

Page 61

1    Q    And have you ever had a claim on your automobile

2         insurance?

3    A    Not with Geico.

4    Q    You've had a claim with somebody else?

5    A    When I was with Nationwide Insurance.

6    Q    And when was that?

7    A    This was about -- maybe in 2000.

8    Q    And what was that claim for?

9    A    I started the vehicle and it was in gear.  I thought it

10        was in neutral and the car burst forward and broke the

11        posts on my steps and put a dent in my car.

12   Q    And was your claim with Nationwide resolved?

13   A    Yes.

14   Q    Were you satisfied with the resolution?

15   A    Yes.

16   Q    Did you ever hire an attorney to assist you with that

17        claim?

18   A    No, because there was no injury involved with that

19        accident.

20   Q    And how long did it take you to resolve that claim with

21        Nationwide?

22   A    Just days.

23   Q    Have you ever had any other insurance claims?

24   A    No.

25   Q    Have you ever had any insurance claims made against you?

Page 62

```
 1   A    No.

 2   Q    Have you ever been arrested?

 3   A    No.

 4   Q    Do you believe that every parent whose child is injured

 5        should be compensated for their worry?

 6        MR. MESTAS:  Form.

 7   Q    If you can answer it.

 8   A    I won't answer that.

 9   Q    You won't answer that.....

10   A    No.

11   Q    .....or you can't?

12   A    I don't think I should answer that.

13        MR. MESTAS:  What was the question again?

14        MS. HOZUBIN:  Whether she believes every parent whose

15   child is injured should be compensated for their worry.

16        MR. MESTAS:  Form and foundation.

17   Q    So you won't answer that?

18   A    No.  I would say it would depend on the circumstances

19        because it's kind of a broad question, unanswerable broad

20        question.

21   Q    You said your stress affected your marriage.  How did it

22        affect your marriage?

23   A    We quit talking, having conversations.  There was a lot of

24        argument, quit sleeping in the same bed and I was -- it

25        just -- I just could not deal -- you know, I was very
```

Page 63

```
 1          irritable.

 2    Q     How long did you.....

 3    A     And my husband had to.....

 4    Q     Oh, sorry.

 5    A     .....live with that.

 6    Q     How long did you sleep in separate rooms?

 7    A     Probably for about a year.  Thank you.

 8    Q     Is your husband currently employed?

 9    A     No.  He's retired.

10    Q     When did he retire?

11    A     Two or three years ago.

12    Q     Where was he working before he retired?

13    A     He worked for AVCP.

14    Q     Okay.  And that's where you worked after.....

15    A     USDA.

16    Q     .....USDA?

17    A     Yes.

18    Q     Did he assist you in getting your job there?

19    A     No.

20    Q     Did you work in the same area?

21    A     It's different departments.

22    Q     Earlier when you were talking you said in the course of

23          your employment that you have done legal research?

24    A     Uh-huh.  (Affirmative)

25    Q     What sorts of legal research have you done?
```

MARY KENICK                    2/21/2006              ALLSTATE INS. v. HERRON
Vol. 1                                                A04-0043 Civil

Page 64

```
 1    A    Different law cases related to land issues.

 2    Q    Have you ever been involved in any sorts of

 3         litigation.....

 4    A    No.

 5    Q    .....before?

 6    A    No.

 7    Q    Have you ever sat on a jury before?

 8    A    Yes.

 9    Q    And was that jury in Bethel?

10    A    Yes.

11    Q    What sort of case was it for?

12    A    There was -- majority of the cases that I sat in on were

13         child sexual abuse.

14    Q    So they were criminal?

15    A    Uh-huh.  (Affirmative)

16    Q    You ever sat on a civil jury?

17    A    No.

18         MS. HOZUBIN:  That's all the questions I have.

19    A    Thank you.

20         MR. SANDBERG:  I have none.

21         REPORTER:  Then this concludes the videotape deposition of

22    Mary Kenick at 12:00 o'clock on the 21st of February 2006.

23         (Off record)

24         (On record)

25    Q    Ms. Kenick, we had asked you to bring some records with
```

Page 65

```
 1        you here today?

 2   A    Uh-huh.  (Affirmative)

 3   Q    And did you bring those records with you?

 4   A    Yes.

 5   Q    And what records did you bring with you?

 6   A    2002, '03, and '04 income tax returns.  I also have copies

 7        of my pay stubs when I worked for AVCP.

 8   Q    Okay.  And are these those records?

 9   A    Yes.

10   Q    Okay.

11   A    There are also three pay stubs with my current job.  Since

12        I'm not eligible for a pay increase except for the annual

13        increase made by the president for cost of living, I

14        printed out the first pay stub, pay stub after January

15        2005 and the pay stub after January 2006.

16   Q    And that would encompass the entire year?

17   A    Yes.

18   Q    Okay.  We'll go ahead and -- I'm sorry, I interrupted

19        again.

20   A    Let me see -- let me make sure that's everything there.

21        Yeah.

22        MS. HOZUBIN:  We'll go ahead and make this Exhibit A to

23   the deposition.

24                             (Deposition Exhibit A marked)

25   Q    And did you also bring some documents of your daughter's
```

Page 66

1          that you were able to locate?

2     A    Her progress reports from -- there's 2001 -- February 9,

3          2001; February 5, 2002; the fourth quarter progress report

4          2002.  Progress reports for September 20, 2003.  And for

5          December 2, 2001.

6     Q    Okay.  And these are.....

7     A    These were all the records that I had of her progress

8          reports for school.

9     Q    Okay.

10         MS. HOZUBIN:  And we'll go ahead and mark that as Exhibit

11    B to your deposition since you brought those for her.

12                              (Deposition Exhibit B marked)

13         MS. HOZUBIN:  Now we can go off record.

14         REPORTER:  Off record at 12:04.

15    (Off record)

16                       (END OF PROCEEDINGS)

17

18

19

20

21

22

23

24

25

Page 67

1                    C E R T I F I C A T E

2    UNITED STATES OF AMERICA          )

                                       )ss

3    STATE OF ALASKA                   )

4        I, Joseph P. Kolasinski, Notary Public in and for the

5    state of Alaska, residing in Anchorage in said state, do hereby

6    certify that the deponent in the foregoing matter was duly

7    sworn to testify to the truth, and nothing but the truth;

8        That said testimony was taken at the time and place

9    therein stated;

10       That the testimony of said witness was recorded

11   electronically and thereafter transcribed under my direction

12   and reduced to print;

13       That the foregoing is a full, complete, and true record of

14   said testimony.

15       I further certify that I am not a relative, nor employee,

16   nor attorney, nor of counsel of any of the parties to the

17   foregoing matter, nor in any way interested in the outcome of

18   the matter therein named.

19       IN WITNESS WHEREOF I have hereunto set my hand and affixed

20   my seal this 6th day of March 2006.

21

22

       Joseph P. Kolasinski, Notary Public

23     in and for the State of Alaska.

       My Commission Expires:  03/12/2008

24

25

MARY KENICK                         2/21/2006                    ALLSTATE INS. v. HERRON
Vol. 1                                                          A04-0043 Civil

Page 68

1                        WITNESS CERTIFICATE

2    RE:              ALLSTATE v.HERRON

     CASE NUMBER:     A04-0043 Civil

3    DEPOSITION OF:   Mary Kenick

     DATE TAKEN:      February 21, 2006

4

          I hereby certify that I have read the foregoing deposition

5    and accept it as true and correct, with the following

     exceptions:

6

     Page     Line                        Description

7

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

     If additional paper is needed, please sign and date each sheet.

23

24                        _Mary Kenick_      4/6/06

                          MARY KENICK        DATE

25