Rebecca J. Hozubin, Esq.
Wilkerson Hozubin
310 K Street, Suite 405
Phone: 907 276-5297
Fax: 907 276-5291
E-mail: Rebecca@Wilkersonlaw.net
AK Bar # 9806016

Attorneys for Plaintiff Allstate Insurance Companies

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ALLSTATE INSURANCE COMPANIES, )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>CHARLES HERRON, )<br>)<br>Defendant. )<br>_____ ) | Case No. A04-0043 CV (TMB) |

## OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

### I.     INTRODUCTION

Herron's motion is nothing more than an untimely motion to reconsider the court's July 12, 2004 Order[1] and October 29, 2004 Order[2] denying Herron's motions to decline jurisdiction because those motions unsuccessfully argued, among other things, that Herron had valid claims to assign.  Herron now submits his third attempt at the same motion.

_____

[1] Docket 20.
[2] Docket 34.

This court made it plain in its two prior Orders addressing the same argument for rejecting jurisdiction by Herron, that: 1) this is a dispute between Herron and Allstate and the question is "whether" Allstate and/or Herron committed a total breach of the contract, and if so, who breached first? 2) This court properly has and will maintain jurisdiction over this matter until the above question is resolved. 3) This case is governed by the plain law in Alaska as set forth by Jackson,[3] Sauer,[4] and C.P..[5] And, 4) Trailov and Kenick are not parties here and only the validity and reasonableness of Herron's confession and assignment is at issue.

Herron's latest motion presents no new evidence that would overcome the questions of fact the court found when it denied Allstate's Motion for Summary Judgment.[6] These questions of fact include, but are not limited to: (1) whether not sending Herron an excess letter is evidence of bad faith;[7] (2) whether Allstate acted in good faith in making its settlement offer;[8] and, (3) did the length of time Allstate took in investigating the matter constitute bad faith?[9] These are questions of material fact appropriate for the trier of fact, not for summary judgment. Clearly, there should be no summary judgment in favor of Herron.

Herron's argument that because Allstate did not get summary judgment warrants summary judgment in favor of Herron is nonsense. This court previously found that

---

[3] Jackson v. Am. Equity Ins. Co., 90 P.3d 136 (Alaska 2004).
[4] Sauer v. Home Indem. Co., 841 P.2d 176 (Alaska 1992).
[5] C.P. v. Allstate Ins. Co., 996 P.2d 1216 (Alaska 2000).
[6] Docket 79.
[7] Docket 79 at 8, n.6.
[8] Docket 79 at 8.
[9] Docket 79 at 9.

questions of fact exist as to whether Allstate engaged in a total breach. This does not lead to summary judgment for Herron, but rather underscores that questions of fact remain.

The question for the court now, since the undisputed facts have been better fleshed out, is whether immaterial, non-prejudicial, alleged breaches could, in the mind of a reasonable fact finder, amount to total breach by Allstate. On this point, reasonable minds could not differ. As two experts retained by Allstate concluded, there was no material breach, much less a total breach. And, in fact, there was no negligence by any individual adjuster. As a matter of law, Allstate met the standard set forth by the court. Thus, Herron is not entitled to summary judgment.

## II.    HERRON'S CHRONOLOGY OF EVENTS IS INACCURATE AND MISLEADING.

A careful review of Herron's chronology of events demonstrates that his recitation of the facts is not only misleading, but plainly inaccurate.[10] What follows are the undisputed facts supported directly with admissible evidence attached hereto.

---

[10] For example, on September 21, 2002, Herron claims that Allstate already "demonstrated a concern that the damages of Trailov were bigger than Herron's liability coverage." Herron's Motion at 14. There simply is no evidence of this. Reserves were set at $25,000 and there was absolutely no discussion or concern of an excess liability claim. Next, Herron argues that the requirement that Allstate complete its investigation in 30 days or notify Power as to the reasons why the investigation is not complete is violated on November 5, 2002. Herron's Motion at 15. This disregards Berry's October 18, 2002 letter to Power requesting a release and names of providers or medical records and bills; clearly the investigation was not complete and Berry stated why. Herron also alleges Power's February 14, 2003 letter to Berry enclosed medical records and bills evidencing over $34,000 in charges. Herron's Motion at 17-18. The evidence demonstrates bills received by Allstate and stamped received on March 17, 2003 were not attached to the February 14, 2003 letter. And the examples just continue.

### September 14, 2002

On September 14, 2002, Angelina Trailov was a passenger in a pickup truck driven by Charles Herron when Herron was involved in a single-car accident in Bethel, Alaska. At the time, Herron was an insured under his parents' Allstate policy, Policy No. 020469309 ("the policy").[11] The policy provides for $100,000 per person/$300,000 per accident bodily injury liability coverage and underinsured motorist coverage.[12] The policy also requires Herron to cooperate with Allstate in evaluating, defending, and settling any claims.[13]

### September 16, 2002

Herron recognizes that Allstate was informed of the automobile accident that occurred two days prior. What also happened that day was that Allstate contacted the insured and disclosed all coverage available for all the parties.[14] In particular, Renee Vanzant of Allstate informed Margaret Herron[15] of the amount of coverage available, what types of coverages were available, and who would be covered.[16] She informed her that Charles and his passengers would all be covered under the medical payments

---

[11] Exhibit 1.

[12] <u>Id</u>.

[13] <u>Id</u>.

[14] Exhibit 2 and Exhibit 3, Affidavit of Renee Vanzant.

[15] At this point, it was not possible for Allstate to speak with Charles Herron, as he was represented by attorney Jim Valcarce within two days of the accident due to pending criminal charges. Exhibit 4. Therefore, Allstate spoke with his mother, the named insured under the policy. This was normal conduct in this case, as Charles Herron's parents remained actively involved in their son's cases, both criminal and civil.

[16] Exhibit 3.

provision of the policy.[17]  During this conversation, Margaret Herron told Vanzant that she was in communication with Kenick and would provide her with this information.[18]

### September 17, 2002

Vanzant went to the hospital where Trailov was being treated.  She was not allowed to visit Trailov, and Kenick was not at the hospital; Vanzant therefore left her business card for Kenick to call her to discuss the claim and available coverages.[19]  Kenick never called Renee Vanzant to learn about the available coverages firsthand.

### September 18, 2002

Herron claims Allstate undertook a UIM investigation at this point.  However, there was no UIM investigation at this point.  There was instead a "company requirement or task that [Craig Elkins] secure the selection/rejection form or ensure the insured had an opportunity on the UM/UIM endorsements."[20]

> Q.    Okay.  Was it in every claim file?
>
> A.    The ones that I was tasked to look at were more the objective injuries in the insured's car, as a passenger.  And that's what I am doing here.
>
> Q.    But it would be – I mean, was it in cases where there was potentially U exposure?
>
> A.    It was in all – essentially, I was spot-checking and tasking on these type of cases here where we had an injured party in an insured auto.  And as part of my job [sic] was to go in and request to the claim representative just to ensure that was on file.

---

[17] Id.
[18] Id.
[19] Exhibit 5, Deposition of Vanzant at 20-21.
[20] Exhibit 6, Deposition of Craig Elkins at 42, lines 15-18.

Q.      Okay.  But if there was no realistic U exposure, would you still have made this request?

A.      In my spot checks, I was tasked to do that.

Q.      In every file where a passenger was injured?

A.      The – on this type of file here, I was asking for this type of request in my spot checks of the claims reps.

Q.      Okay.  But by this date, had you determined there was at least potentially a U exposure?

A.      No, not with the information I had on hand here.[21]

Elkins' request that the selection/rejection form be secured was a task to be accomplished in cases in which a passenger was injured in an insured auto.  It was a "spot check," a procedure to secure a document that could become important in the future.  It was not an investigation of "every case that could be bigger than the available liability insurance" as claimed by Herron.

## September 19, 2002

Michelle Power, attorney for Trailov and Kenick, sent a letter to Jim Valcarce, then criminal attorney for Herron, requesting that the letter be sent to the Herrons' insurer.[22]  This was despite the card that was left for Kenick by Vanzant at the hospital two days prior.[23]  The letter stated that Power represented "Mary Kenick on behalf of her minor child, Angelina Trailov."  There was no mention that Power was representing

---

[21] Id. at 43, lines 3-24.
[22] Exhibit 7.
[23] Exhibit 5, Deposition of Vanzant at 20-21.

Kenick for negligent infliction of emotional distress ("NIED").  In fact, there was no mention of any injuries to Kenick at all in the letter.

### September 21, 2002

Vanzant lists Herron as 100% liable for the accident.  This resolves the liability investigation, but does not resolve the damages investigation which was nowhere near conclusion.

> Q.   So by either 9/21 or 9/25, was the liability investigation effectively concluded?
>
> A.   Based on the initial report that had come in with the insured driver losing control into the pole, there was reasonable assumption that [sic] responsible for the accident.
>
> Q.   And so was there any more liability investigation after this?  I mean, this is the end of it isn't it?  At this point, we move on to the damages investigation?
>
> A.   It appears based on what I am seeing at that point in time, she does not go any further on liability.[24]

The record fails to support Herron's argument that at this point Allstate "had demonstrated a concern that the damages of Trailov were bigger than Herron's liability coverage."  At this point, Allstate had no medical records, no medical bills, and there was no evidence that the claim was more than the liability limits.  Further, by September 25, 2002, Allstate had set reserves at $25,000, one quarter of the liability limits.[25]

---

[24] Exhibit 6, Deposition of Craig Elkins at 46, lines 12-24.
[25] Exhibit 8.

**September 23, 2002**

Four days after having received Power's letter of representation and requesting that it be forwarded to Allstate, Valcarce mails it to Robert Herron, Herron's father.[26]

**September 25, 2002**

Despite Herron's representations that Allstate was doing little to nothing in this file, there was much activity he fails to recognize. Allstate requested the accident report from the Bethel Police Department by letter.[27] Allstate also sent letters to Margaret Herron and Charles Herron,[28] introductions by Renee Vanzant advising the insureds that Allstate is working on the claim.[29] Robert Herron, Herron's father, then faxed this letter to Valcarce on October 7, 2002.[30] That same afternoon, Valcarce faxed the same letter to Michele Power.[31]

Also on this date, the insured (it is unclear if it was Margaret Herron or her husband) called and left a message with Allstate that Trailov had an attorney.[32] Lastly, on this date, Allstate requested a certified declarations page.[33]

---

[26] Exhibit 9.
[27] Exhibit 10.
[28] Exhibit 11.
[29] Exhibit 12.
[30] Id.
[31] Exhibit 13. In this exhibit, the fax header is from Hedland, Brennan, Heideman & Cooke at the top of the page, date stamped 10/7/03 at 13:37. This document came from Power's file that was produced pursuant to subpoena at her deposition.
[32] Exhibit 14.
[33] Exhibit 15.

### September 26, 2002

Karen Petersen requests that Kathy Berry send a letter to Herron advising him that the policy does not cover punitive damages.  This was not done until later in the case, because as of September 26, 2002 it was not clear punitive damages were being alleged.[34]  Thus, at this stage there is no requirement that a letter regarding punitive damages be sent.

### October 4, 2002

Kenick signs a "Lien Against Proceeds of Recovery/ Reimbursement Agreement" for her health insurer in which she reveals that she is pursuing a claim with Allstate and that Renee R. Vanzant is the adjuster on the file.[35]  This information likely came from the business card Vanzant left at the hospital for Kenick when she tried to meet with her on September 17, 2002.  The other source of this information could have been when Margaret Herron called Kenick to report the coverages available, as she said she would on September 16, 2002.  This could not have come from Vanzant's letter to Margaret Herron dated September 25, 2002, because that letter was not faxed by Robert Herron to Valcarce until October 7, and subsequently faxed to Power on that same date.[36]

### October 8, 2002

Herron alleges this is the date by which Berry had to comply with the requirement that she reveal herself as the adjuster (10 business days).  The file was transferred to

---

[34] Exhibit 16, Deposition of Kathy Berry at 13, lines 15-19, at 14, lines 16-24, and at 15, lines 4-8, and Exhibit 16.
[35] Exhibit 17.
[36] Exhibits 12 and 13.

Berry on 9/25/02 or 9/26/02, 10 business days later would be 10/9/02 or 10/10/02.
However, Power and Kenick both already knew the claim number, knew Vanzant was
involved in the file, knew how to contact Vanzant and could have easily been transferred
to Berry if they contacted Allstate at any time, which they did not.

### October 18, 2002

On October 18, 2002, Berry sends a letter to Power identifying an ongoing
investigation and requesting (1) a complete description of injuries; (2) names and
addresses of treating physicians; (3) to know if Trailov is still treating; and (4)a signed
release or in the alternative all medical records and bills as Power received them.[37]

### October 30, 2002

Allstate receives a copy of the police report it requested 35 days earlier.[38]

### November 5, 2002

Herron alleges that the requirement that Allstate finish the investigation within 30
days was violated as of this date. However, the letter to Power on October 18, 2002
negates this allegation. The October 18, 2002 letter clearly identifies an ongoing
investigation with Berry's request for more information so that she may assess the
claim.[39]

3 AAC 26.050(b) provides that the 30-day deadline is not applicable if the
"investigation cannot reasonably be completed using due diligence." In this case, on this
date, Allstate has yet to receive any medical records or bills from Trailov, has not yet

_____

[37] Exhibit 18.
[38] Exhibit 19.
[39] Exhibit 18.

received any notification of an NIED claim being made by Kenick, and received the police report only five days earlier.  It is readily apparent from Berry's October 18, 2002 letter that the investigation is ongoing and much more information is necessary before it can be completed.  There was no violation of any regulation on this date.

### November 7, 2002

On this date, Elkins asks Berry if she sent the letter and medical authorization to Power.[40]  Berry confirms the letter did go out to Power on October 18, 2002, as discussed above.  However, Berry realizes the authorization was not enclosed, and promptly sends one out.[41]  Berry never received any notification from Power that the authorization was not enclosed with her letter, despite the letter being sent 27 days earlier and clearly stating that an authorization was enclosed.  Further, Berry never had any direct contact from Power at all during this time.

Also on this day, Dr. Werner and Dr. Stephens of the Alaska Native Medical Center submit their bills for treatment to Kenick's health insurer.[42]  These same bills were not received by Allstate until March 17, 2003.[43]  As of this date, Power has not supplied Allstate or Berry with any of Trailov's medical bills or records.

---

[40] Exhibit 20.
[41] Exhibit 21.
[42] Exhibit 22.
[43] Id.

## November 8, 2002

The Alaska Native Medical Center sends its bill to Power and to Kenick's health insurer for Trailov's medical treatment.[44]  This bill was not received by Allstate until March 17, 2003.  Power still had not supplied Allstate or Berry with any of Trailov's medical bills or records, nor had she identified Kenick's claim for NIED.

## November 11, 2002

Denali Anesthesia submits its bill to Mary Kenick for services rendered to Trailov.[45]  This bill was not received by Allstate until March 17, 2003.  The bill indicates it had been sent to Kenick earlier on October 15, 2002 and on October 16, 2002.  Again, Power had not supplied Allstate or Berry with any of Trailov's medical bills or records.

## November 13, 2002

Dr. Kiesling of the Alaska Native Medical Center submits his bill for treatment for September 14, 2002.[46]  This bill was not received by Allstate until March 17, 2003.  And again, Power still had not supplied Allstate or Berry with any of Trailov's medical bills or records, despite Berry's October 18, 2002 request for the same.

## November 14, 2002

Berry double checks the reserves on this file and increases the reserves based on the venue of the claim, not the value of the claim.[47]  What is even more important is that

---

[44] Id.
[45] Id.
[46] Id.
[47] Exhibit 21.

the reserves were set at this point at $75,000, almost $40,000 below the policy limits.

Berry did not believe this was a policy limits case.

Finally, on this day, the Alaska Native Medical Center submits its bill to Power

and to Kenick's health insurer for treatment from September 14, 2002.[48]  This bill was

not received by Allstate until March 17, 2003.

### November 25, 2002

Allstate receives the signed medical release back from Trailov.  The release is

signed by Kenick on behalf of Trailov and lists a social security number that is not

Trailov's.[49]  Trailov's is ▮▮▮▮▮▮, as listed on all of her medical records, and the

release states ▮▮▮▮▮▮.

Further, Power fails to provide any of the information requested by Berry:

Please provide me with a complete description of the injuries sustained by
your client in this accident.  Please include the names and addresses of your
client's treating physicians.  Please advise if your client is still receiving
treatment for the injuries sustained in this accident.[50]

Also on this date, the Alaska Native Tribal Health Consortium (Alaska Native

Medical Center) first records its medical lien for Angelina Trailov for $10,416.23.[51]  This

was approximately two and a half months after the accident.

### December 9, 2002

Kenick's health insurer sends her a letter stating:

---

[48] Exhibit 22.
[49] Exhibit 23.
[50] Exhibit 18.
[51] Exhibit 24.

> Our records show the patient has primary insurance for these services
> through an automobile insurance company.  As a secondary payor, we need
> a copy of the front and back of the "Explanation of Benefits" (EOB) for the
> charges above.  An EOB is the form you receive from the auto carrier
> showing how they paid the claim.  If the claim was denied or benefits have
> been exhausted, we will need a letter from the auto carrier to confirm that
> benefits were not paid.  We will then be able to determine what portion of
> the remaining balance we can pay.[52]

This letter is not received by Allstate until March 17, 2003.

On December 10, 2002, Power sends a letter to Berry stating that Trailov was to be examined by a neuropsychologist and requesting a copy of the insurance policy at Berry's earliest convenience.[53]  The letter fails to provide the name of the neuoropsychologist.  Further, as of December 10, 2002, Power still had not responded to Berry's October 18, 2002 request for further information and had not provided Allstate or Berry with any medical records or medical bills.[54]

### December 17, 2002

Alaska Imaging Associates submits its bill to Kenick for Trailov's treatment from September 14-16, 2002.[55]  This bill was not received by Allstate until March 17, 2003. Power still has not supplied Allstate or Berry with any of Trailov's medical bills, records, or the names of any of the health care providers.

### December 30, 2002

Despite Power's representation that a demand would be forthcoming following the December 17, 2002, neuropsychological examination, here it is two weeks later with no

---

[52] Exhibit 22.
[53] Exhibit 25.
[54] Exhibit 18.
[55] Exhibit 22.

demand, no medical records, and no medical bills.  This is the same amount of time as between Berry's request for additional time to complete her review of Trailov's and Kenick's demands, and the date the policy limits offer was made.  Power did not send her demand letter until six weeks later, on February 14, 2003.

## January 17, 2003

One month after Trailov had her appointment with the neuropsychologist, Power still has not made her demand despite her representations that it would be forthcoming shortly after the examination.  Further, Power has not provided any medical records or bills despite the fact that we know at least the medical bills were being directed to Power and Kenick in November.

Berry sends a letter to Power advising her of the status of the investigation, requesting a specific release for ANMC medical records, and enclosing "the certified declarations page detailing the coverages."[56]  At this precise moment, Power, Kenick and Trailov should all have been aware of all of the coverages that existed under the policy, including medical payments coverage, U/UIM coverage, and the amount of liability coverage.[57]  Power says she did not know of medical payments coverage prior to March 2003, despite having the declarations page listing the medical payments coverage in January 2003.[58]  Further, she says she did not know that medical payments coverage was separate from liability coverage.[59]

---

[56] Exhibits 1 and 26.
[57] Id.
[58] Exhibit 27, Deposition of Michelle Power at 17-18.
[59] Exhibit 27, Deposition of Michelle Power at 25.

## **February 6, 2003**

On this date, Power sends the ANMC release back to Berry with a brief note referencing only the release that Kenick had signed 10 days prior.[60]  The release was received by Allstate four days later, on February 10, 2003.  Power still does not respond to Berry's October 18, 2002 request for information about injuries, medical care providers, or future medical care.  Finally, Power does not give any indication when the demand packet she promised in her December 10, 2002 letter would be provided.

## **February 14, 2003**

On this day, Power finally makes a demand, two months after she said she would.[61]  The demand was received by Allstate on February 18, 2003.  The letter actually contains two demands, one for Trailov and one for Kenick.  This was the first time Power revealed that she would be making a demand for Kenick for NIED.  This was also the first time Power revealed the extent of Trailov's injuries; the first time Power revealed the amount of the medical expenses involved.  In fact, since the accident in September 2002, this was the very first substantive communication by Power to Allstate.

Despite the communication being the most substantive to date, it was far from complete.[62]  The letter enclosed certain documents, but it did not enclose all of the

---

[60] Exhibit 28.

[61] Exhibit 29.

[62] Herron claims that the February 14, 2003 "letter enclosed medical records and bills of over $34,000."  This statement is entirely unsupported.  The letter reflects that it enclosed Exhibits 1-3 but does not list the contents of those exhibits.  A review of Power's file that she produced as part of her deposition reveals the letter in correspondence without the exhibits, and there appear to be no documents in her file labeled Exhibits 1-3. Herron's statement is unsupported.

medical records, all of the medical bills, the neuropsychological report by the still-unnamed doctor, or any evidence of lost income for Kenick related to her claim for NIED.[63]  In short, the communication was woefully lacking tangible evidence of the injuries and claims.

Finally, while the letter set forth Trailov's and Kenick's demands, it did not provide a deadline for Allstate's response.[64]

### March 3, 2003

Even without full documentation of this alleged brain injury, on March 3, 2003 Craig Elkins, after having reviewed the demand letter from Power, takes her representations on faith and suggests raising the reserves on Trailov's claim.[65]

That same day, Berry follows up on Power's demand, and requests medical records from Alaska Native Medical Center.[66]  These records were not enclosed in Power's February 14 demand.[67]

---

[63] There is evidence that the February 14, 2003 (Exhibit 29), demand letter did not contain all of the medical records, bills, or evidence of Kenick's lost income. Throughout the file, the medical bills in Allstate's possession are stamped received on March 17, 2003.  *See* Exhibit 22.  Further on March 17, 2003, Berry requested additional information from Power, in particular medical records that were not enclosed with the February 14 demand.  Exhibit 30.  This was confirmed by Berry in her deposition. Exhibit 16, Deposition of Kathy Berry at 41-42.

[64] Id.

[65] Exhibit 31.  Reserves are set by the adjuster on the file, and are within the adjuster's discretion.  If, after a review, an adjuster feels raising the reserves is appropriate, the adjuster may do so. If the adjuster feels a raise in the reserves is not necessary, one is not made.  Exhibit 6, Deposition of Craig Elkins at 61-62.

[66] Exhibit 32.

[67] Exhibit 16, Deposition of Kathy Berry at 41-42.

## **March 17, 2003**

On this date, Allstate receives a number of Trailov's medical bills.[68]  At the same time, Berry requests additional documentation that would support Trailov's claim and Kenick's new claim for NIED.  In particular Berry requested additional medical records not previously provided, information about continuing treatment, Trailov's school transcripts, and any evidence of treatment for Kenick's NIED injuries.[69]

That same day, Berry requests all of Trailov's records and bills from ANMC, because Power did not provide a complete set.[70]

## **March 18, 2003**

On March 18, 2003, Berry sends a separate letter to ANMC requesting all of the billing records for Trailov.[71]  Berry then sends a letter to Herron enclosing the demand, requesting information about the status of the DWI charge, advising him of coverage and defense, and advising him that punitive damages are not covered under the policy.[72]

That same day, Berry opens a claim for Kenick and set the reserves at $5,000.[73] She reviews the reserves for Trailov and believes that based on the information she possessed at that time, $75,000 was still enough.[74]  Thus, Herron's argument that this was not an excess letter was accurate.  The reserves on this case were set well within the policy limits, and Berry did not believe there was excess exposure for Herron.  There was

---

[68] Exhibit 22.
[69] Exhibit 30.  This letter was faxed and mailed to Power.
[70] Exhibit 32.
[71] Exhibit 22 at page 12.
[72] Exhibit 33.
[73] Exhibit 34.
[74] Id.

no indication in the record that there was excess exposure.  Further, the demands for settlement were within the policy limits.

## March 26, 2003

Valcarce writes to Berry confirming that Herron pled not guilty to the DWI charge, and it was still pending trial.[75]  This directly contradicts Power's February 14 demand wherein she states that Herron was already convicted of the charge.[76]   Valcarce acknowledges receipt of the settlement demand from Power and that any punitive damages would not be covered.  Valcarce points out that the case could involve excess exposure to punitive damages, and then "insists" that Allstate settle the case within the policy limits.  He does not demand that the policy limits offers be accepted.  He does not agree that the claims are worth policy limits.

On this same day, Allstate receives Berry's request for records from ANMC back, stamped "REQUESTS FOR INFORMATION TAKE 3-5 BUSINESS DAYS TO BE PROCESSED."[77]  Herron's argument that, "With the exception of few Y-K records provided on April 14, 2003 by Angstman Law Office regarding Trailov's treatment after returning to Bethel, Allstate has all the medical records it will ever possess," is false.  As of this date, Power still has not provided the neuropsychological report, or even the name of the neuropsychologist, despite Berry's request for a list of providers in October 2002.

---

[75] Exhibit 35.
[76] Exhibit 29.
[77] Exhibit 32.  It is unclear if the medical records accompanied this document or arrived at a later date.  Exhibit 16, Deposition of Kathy Berry at 47.

**April 10, 2003**

Power sends Berry a letter and for the first time articulates the damages Kenick is alleging for NIED.[78]  The letter is received by Allstate on April 14, 2003.  Power fails to provide any evidence of the lost income Kenick is claiming. Power does state, "Long time friends of Ms. Kenick will testify to the changes which have occurred as a result of the September 14, 2002, incident."  However, Power does not provide any names or contact information for Allstate to verify Kenick's alleged change in personality.

Power further relates that the impact of Trailov's head injury may not be known for years, but again does not enclose any neuropsychological records.  At the same time, Power admits that any damages from a head injury are not reflected in Trailov's high school transcript, but again, does not enclose the same.  Power does enclose the additional records from Y-K Delta Regional Hospital that Berry had requested 23 days before on March 17, 2003.  Finally, Power asks Berry to respond to the policy limits demands by May 16, "unless there is some discussion regarding pre-filing resolution."[79] Power states that "Ms. Kenick is anxious to resolve both claims and I cannot let this case languish."  Power does not provide any explanation for her almost month-long delay in providing the Y-K records and the unsubstantiated information regarding Kenick's alleged lost income, or her two-month delay in originally sending Allstate the demand packet.

---

[78] Exhibit 36.
[79] Id.  By the time the letter was received by Allstate, April 14, 2003, Berry had 30 days to respond.  This was virtually the same amount of time it took Power to provide Allstate with records in her possession.

**May 9, 2003**

Berry sends Power a letter acknowledging receipt of the April 10, 2003 letter and the additional medical records it conveyed.[80]  Berry, continuing settlement discussions, states: "We are in the process of completing our evaluation of Angelina Trailov's claim and anticipate responding to your demand by your May 16, 2003 deadline."  This certainly qualifies as "some discussion regarding pre-filing resolution."

Further, Berry again requests documentation to support Kenick's claim for lost income and "any documentation that will support Ms. Kenick's claim for negligent infliction of emotional distress."  This request is based on Power's April 10, 2003 letter confirming that Kenick has not sought counseling "to date," but that she may.  To date, Power has provided no evidence to support either the lost income or the NIED claim despite Berry's request for the same 52 days prior.[81]

**May 16, 2003**

Power waits until almost noon of the day of her so-called "deadline" to partially respond to Berry's request for more information.[82]  Power provides pay stubs from Kenick's old job and new job showing a decrease in salary, but nothing to support why she changed jobs other than Power's representations.  Power provides no other documentation, and fails to state whether Kenick began any counseling as referenced in Power's April 10, 2003 letter.

---

[80] Exhibit 37.
[81] According to Herron, there was no languishing on Power's part.
[82] Exhibit 38.

Power has delayed providing information and has allowed the file to languish in her office.  Berry requests an additional two weeks worth of time to complete the review of this matter and obtain settlement authority.[83]  Within three hours of receiving Power's inadequate additional information, Berry faxes Power and tells her she requires additional confirmation from Power of Kenick's claim for lost income, and whether treatment records exist for Kenick's claim for NIED.[84]  She further informs Power that she has not completed the review of Trailov's claim but intends to have it completed by the end of the month (two weeks), hopefully sooner.

There was no response or objection to Allstate's letter that fifteen additional days were needed to respond to Trailov's demand.  There was no phone call, no letter, and no facsimile from Trailov and Kenick that they did not consider Allstate's continuing correspondence "discussions in furtherance of pre-filing resolution" as satisfying the requirements of her April 10, 2003 letter.[85]

### May 30, 2003

On May 30, 2003, within the timeframe Allstate stated that it would complete its evaluation, Allstate faxed a full policy limits settlement offer to Trailov.[86]  Allstate also

---

[83] Exhibit 39.
[84] Id.
[85] Silence from Trailov and Kenick was normal throughout the course of this matter. Many times they would not respond, or it would take a lengthy period of time for them to respond.
[86] Exhibit 40.

made a $10,000 offer to Kenick, noting that it still did not have the requested documentation to fully evaluate Kenick's claim with regard to changing employment, and that Allstate would reevaluate this claim if documentation was provided.[87]  On the same day, unbeknownst to Allstate, Power faxed the letter to Douglas G. Johnson, "Faxed 5/30 to D.J."[88]  It is beyond dispute that Allstate was still engaged in active "discussions regarding pre-filing resolution."

Late on May 30, 2003, Allstate received a letter dated May 29, 2003, from attorney Douglas G. Johnson with the Law Offices of Dennis M. Mestas, P.C., purporting to be co-counsel for Trailov and Kenick and suggesting that the policy limits offers lapsed on May 16, 2003.[89]  Prior to this letter, Allstate had never received any notification from Trailov, Kenick, or Power that Mestas or Johnson were authorized to act on their behalf.  At all times, Allstate had been dealing with Power pursuant to the letter of representation sent to Herron and Allstate in September 2002.[90]

Berry did not receive this letter before she sent her letter to Power.[91]  Berry had no knowledge that Johnson was involved in the case, and had received no information from Power regarding the same.[92]  Berry made every effort to bring the case to resolution, but to no avail.[93]

---

[87] Id.
[88] Exhibit 41.
[89] Exhibit 42.
[90] See e.g., Exhibit 7.
[91] Exhibit 43, Deposition of K. Berry at 110.
[92] Exhibit 27, Deposition of M. Power at 32-33.
[93] Exhibit 44.

**June 4, 2003**

Berry continues to attempt to resolve the claims. She sends letters to Mestas/Johnson and Power, and also sends copies of the letters to Herron and requests contact.[94]

**June 10, 2003**

Valcarce telephones Berry and tells her he believes Kenick and Trailov may try and hold Trailov's claim hostage to try to obtain a higher settlement for Kenick's NIED claim.[95]

## III.    HERRON HAS NO VALID CLAIMS TO ASSIGN; HERRON CLEARLY BREACHED THE DUTY TO COOPERATE IN DEFENSE OF CLAIMS

Herron argues that because Judge Singleton denied Allstate's Motion for Summary Judgment, this court must grant his. This argument fails in many respects. First, it fails to demonstrate that Herron has any cognizable claims to be assigned. Second, it ignores the fact that the court already concluded that there were disputed issues of material fact preventing resolution by summary judgment. Finally, it ignores the law specifically cited by the court: "Under Alaska law, determinations of whether an insurer is acting in good faith is normally a factual issue, making summary judgment improper."[96]

---

[94] Exhibit 45 and 46.

[95] Exhibit 47.

[96] Docket 79 at 7, *citing* Jackson v. Am. Equity Ins. Co., 90 P.3d 136, 141-44 (Alaska 2004); Grace v. Ins. Co. of N. America, 944 P.2d 460, 467-68 (Alaska 1997); and State Farm Mut. Auto Ins. Co. v. Weiford, 831 P.2d 1264, 1267-69 (Alaska 1992).

The insurance policy contains an express assistance and cooperation clause which mandates cooperation in settlements and lawsuits.[97]  The policy further expressly provides that Allstate cannot be obligated for actions an insured person takes except as specified in the policy.[98]  Additionally, the policy provides that no insured person may sue Allstate unless there is full compliance with all of the policy terms.[99]  In addition to these express provisions, as recently confirmed by the Alaska Supreme Court in Jackson, there is implied in every insurance contract the covenant of good faith and fair dealing.[100] The insured's actions are also subject to the covenant of good faith and fair dealing in every insurance contract.

The covenant of good faith and fair dealing is implicit within every insurance contract; it requires "that neither party will do anything which will injure the right of the other to receive the benefits of the agreement."[101]  By confessing judgment and assigning any claims, Herron unquestionably breached his express and implied contractual obligations.  Herron took matters into his own hands, depriving Allstate of the contractual right to manage the litigation.

This is not a case where the insurer refused to defend the insured.  Herron was being defended by an attorney of his own choosing and a lawyer that had represented him since the day of the accident.  Herron will argue that he was not provided with a full

---

[97] Exhibit 1, at pages 35 and 36.
[98] Id.
[99] Id. at page 36.
[100] Jackson v. Am. Equity Ins. Co., 90 P.3d 136, 141 (Alaska 2004).
[101] Jackson, *quoting* Guin v. Ha, 591 P.2d 1281, 1291 (Alaska 1979).

defense because Allstate would not provide him assurances that if there was an excess

verdict Allstate would pay the entire amount of the verdict regardless of the policy limits.

As a matter of law, Allstate had no obligation to provide Herron with an assurance

letter or promise to pay any judgment against him in excess of the policy limits.

> [T]he covenant of good faith does not broadly require an insurer to give its
> insured pre-trial assurances that it will cover an excess judgment against the
> insured if the insurer fails to accept a plaintiff's policy limits demand.
> [This] theory would translate into a general duty to issue a pre-trial waiver
> of policy limits, and there is no such broad duty.[102]

"The insured defendant...both fulfills his contractual duty and protects his own

interest by cooperating fully with his insurer."[103]  "'Ordinarily, an insured's breach of [a]

cooperation clause relieves a prejudiced insurer of liability

under the policy.'"[104] Confessing judgment constitutes such a breach.

Herron breached his obligations to Allstate by confessing judgment and assigning

claims against Allstate.  On April 2, 2004, <u>after</u> Allstate had specifically asked Herron

not to do so and <u>after</u> this action had been filed to declare the rights and obligations of the

parties, Herron signed a confession of judgment in favor of Trailov and Kenick in the

amount of $1,937,500, an amount well in excess of the policy limits.[105]  At the same

time, Herron also assigned any claims he may have had against Allstate to Kenick in

return for a covenant from her and Trailov not to execute the confessed judgment against

---

[102] <u>Jackson v. American Equity Ins. Co.</u>, 90 P.3d 136, 141 (Alaska April 2, 2004)
[103] <u>Guin</u>, 591 P.2d at 1290.
[104] <u>Grace v. Insurance Co. of North America</u>, 944 P.2d 460, 464 (Alaska 1997) (quoting
<u>Arizona Property & Cas. Ins. Guar. Fund v. Helme</u>, 735 P.2d 451, 458-59 (1987)).  *See
also*, <u>Great Divide Ins. Co. v. Carpenter ex rel. Reed</u>, 79 P.3d 599, 610 (Alaska 2003)
(acknowledging an insured's confession of judgment as breach of the cooperation clause).
[105] Exhibit 48.

his assets.[106]  Herron's actions were a clear breach of his obligations under the policy.

This is undisputed.

Herron's breach also materially prejudiced Allstate.  The confessed judgment

vastly exceeds the policy limits for bodily injury coverage under the policy.[107]  There are

no genuine issues of material fact regarding the prejudicial effects of Herron's confession

of judgment and assignment of claims.

> The purpose of a cooperation clause is to protect the insurer in its defense of
> suits by obligating the insured not to intentionally and deliberately take any
> action which would substantially affect adversely the insurer's defense,
> settlement, or other handling of the claim.[108]

Herron's confession of judgment completely stripped Allstate of its ability to

defend, settle, or otherwise handle the underlying civil action, thus materially prejudicing

Allstate by denying it the ability to take any further action.  Herron's assignment of

claims resulted in a third lawsuit; this time directly against Allstate and its adjuster Kathy

Berry, which Allstate must now expend additional time and money to defend.[109]

While it is well established in Alaska law that an insured's breach of his

contractual obligations is excused by a prior material breach of the contract by the

insurer, Herron's breach in this matter is not excused by Allstate's prior actions.[110]

Allstate fulfilled its contractual obligations to Herron and acted in good faith by timely

---

[106] Id.

[107] *See* Grace v. Ins. Co. of N. America, 944 P.2d 460, 464 (Alaska 1997).

[108] American Policyholder's Ins. Co. v. Baker, 119 N.H. 958, (N.H. 1979).

[109] The first lawsuit is the personal injury action Trailov and Kenick brought against Herron. The second lawsuit is this declaratory judgment action.  The third lawsuit is the action Kenick brought against Allstate and Berry in Bethel based on the assignment from Herron that is currently stayed pending the outcome of this action.

[110] *See* Grace, 944 P.2d at 464-65 (Alaska 1997) (citing cases).

attempting to settle Trailov's claims for policy limits and Kenick's claims within policy limits; and specifically by complying with Kenick's and Trailov's deadline for "some discussion regarding pre-litigation resolution."[111]

    A.    <u>Allstate Properly Investigated and Evaluated This Claim.</u>[112]

On October 18, 2002, Berry sent a letter to Power identifying herself as the adjuster on this matter, advising of the ongoing investigation, requesting more information, and asking that a release be signed:

> Please provide me with a complete description of the injuries sustained by your client in this accident.  Please include the names and addresses of your client's treating physicians.  Please advise if your client is still receiving treatment for the injuries sustained in this accident.
>
> I am enclosing a Medical and Wage Authorization form. Please have it signed by your client and return it to me so that I can secure medical records and other information needed to properly evaluate this claim.  If requested, I will provide you with copies of all reports acquired through use of this authorization.  If you do not intend on providing this authorization, please forward all medical bills and medical reports as you receive them. This will assist me in my organization of the claim.  We will review all medical bills to ensure that the charges incurred are reasonable and that the treatment, service, and products rendered are necessary.
> I am hopeful that through our joint efforts, we will be able to bring this manner (sic) to a prompt resolution. I look forward to working with you toward that goal.[113]

---

[111] Exhibit 36.

[112] Herron once again relies on the actions of Scott Millar, the Allstate adjuster assigned to Trailov's first-party medical payments claim, to further allege a failure to investigate. However, as discussed in a separate motion, Millar was the medical payment adjuster. Herron has no standing to try to bootstrap Trailov's first-party medical payments allegations onto his claim.

[113] Exhibit 18.

Plaintiff argues that there was a delay in Berry identifying herself as an adjuster on this file. Even if there was an alleged delay in identifying herself, what was the harm? On September 16, 2002, Vanzant informed Margaret Herron of the available coverages under the policy, and Mrs. Herron said that she would pass the information along to Kenick. On September 17, 2002, Vanzant attempted to call Kenick, but could not reach her. She then went to the hospital to speak with Kenick, who was not there. Vanzant was not allowed to speak to Trailov because she was a minor. As such, Vanzant left her business card with the claim number on it at the nurses' station. The nurses confirmed that they would provide the same to Kenick. Kenick never called Vanzant. Instead, Kenick retained Power on September 19, 2002, and then used the information Vanzant provided to fill out a form for her health insurer on October 4, 2002. Neither Power nor Kenick ever called Allstate despite Vanzant's attempts to contact Kenick.

Herron may argue that the delay in resolving the case was the harm. The repeated delays on Power's and Kenick's side were far lengthier. Despite being sent medical bills and records in October and November 2002, Power did not supply the medical records to Allstate until February 2003. Power did not supply the medical bills until March 17, 2003. Some of these bills were already _five_ months old. Power _never_ responded to Berry's October 18, 2002 request for a list of medical care providers or information about continued treatment. After Berry's October 18, 2002 letter, Power did not send a letter to Berry until almost two months later, December 10, 2002, wherein she stated that Trailov would be going to a neuropsychologist, without providing the name of whom, and finally,

that a settlement demand would be forthcoming.  After that, there was no further

substantive contact from Power until the February 14, 2003 letter, 66 days from her prior

last contact.

Power then delayed for almost a month in providing the Y-K records and the

unsubstantiated information regarding Kenick's alleged lost income she attributes to the

NIED claim.  Finally, and most importantly, she waited until mid-day on the date of the

alleged deadline, May 16, 2003, to provide copies of Kenick's paycheck stubs to Allstate.

Any argument by Herron that a possible minor delay in Berry announcing herself

as the new adjuster on the file is overshadowed by Power allowing the case to languish

and not responding to Allstate's numerous requests for information in a timely fashion.

Further, it is abundantly clear that the investigation could not have been completed in the

month of October, as neither Kenick nor Power provided any information to Allstate

about Trailov's claim, and Power never revealed Kenick's claim for NIED until February

2003.  Throughout the investigation, Berry kept Power informed about the information

she needed and made the appropriate requests; Power did not.

Herron next argues that Berry violated 3 AAC 26.040 by waiting two months to

send out a release.  Berry sent a letter referencing the medical release on October 2003

but inadvertently left the release out of the fax.  Power never informed Berry that she did

not receive a release with the fax.[114]  When Berry realized her mistake, she promptly

---

[114] If Kenick and Power were in such a hurry to resolve the claim, when they realized
there was no release with the letter, they could have chosen to comply with the alternative
request and provide the bills and records.  Instead, they remained silent.

faxed the medical records release to Power.  Power returned the release, but <u>never</u> provided a list of the medical care providers or other information as requested.

Herron is quick to condemn Allstate for not moving forward fast enough but he ignores Power's and Kenick's lackadaisical attitude, lengthy delays in responding to requests for information or providing information, not providing the names of treating physicians, hiding the name of the neuropsychologist, not providing all of the medical records or bills in their possession, and finally providing no evidentiary support for their broad allegations of damages.  While Allstate's investigation and adjusting of this claim may not have been picture perfect, Allstate worked hard to gather the necessary information, evaluate the claim, and bring the matter to resolution.  Allstate did not breach any duties to investigate.

     B.     <u>Allstate Appropriately Kept Its Insured Advised</u>.

On March 18, 2003, Berry sent a letter to Herron that advised him of the settlement demand and informed him that Allstate did not have enough information to evaluate the claim yet.[115]  Such further necessary information included medical records from Y-K, additional medical bills, and any evidentiary support for Kenick's NIED claim.[116]  Eight days later, Valcarce responded and asked Allstate to settle the claims within policy limits, and confirmed that Power misrepresented the status of Herron's criminal charges in her February 14, 2003 letter.

_____

[115] Exhibit 33.

[116] Only the day before had Allstate received the first medical bills in the case and they were not complete.

As for Herron's allegations that he was never informed of the May 16, 2003 alleged "deadline" and the possibility that Allstate might not be done with its evaluation by then, those allegations are flat out false.  On May 9, 2003, Berry sent a letter to Power stating, "We are in the process of completing our evaluation of Angelina Trailov's claim and anticipate responding to your demand by your May 16, 2003 deadline."[117]  A copy of this letter was sent to Herron by Berry.[118]

    C.   <u>There Was No Substantial Likelihood of An Excess Verdict</u>.

Herron tries to make hay with the fact that Allstate never sent him an "excess" letter, a letter stating that there is a risk that a judgment would be more than his policy limits and he would be liable for that amount above the insurance limits.

"When a plaintiff makes a policy limits demand, the covenant of good faith and fair dealing places a duty on an insurer to tender maximum policy limits to settle a plaintiff's demand when there is a substantial likelihood of an excess verdict against the insured."[119]  What does "substantial likelihood of an excess verdict" mean?  Herron argues that it means merely "possible."[120]  Herron is wrong.  "Substantial likelihood of an excess verdict" means a "great risk of recovery beyond the policy limits."[121]  This is a fact-based analysis in which the trier must ascertain (1) the reasonable value of the claim,

---

[117] Exhibit 37.

[118] <u>Id</u>.

[119] <u>Jackson v. American Equity Ins. Co.</u>, 90 P.3d 136, 142 (Alaska 2004), *citing* <u>Schultz v. Travelers Indem. Co.</u>, 754 P.2d 265, 266-67 (Alaska 1988).

[120] *See* Herron's Motion for Summary Judgment at 32.

[121] <u>Jackson</u>, 90 P.3d at 142, *quoting* <u>Crisci v. Sec. Ins. Co.</u>, 426 P.2d 173, 176 (Cal. 1967).

and (2) whether there was a substantial risk of an excess verdict.  Neither may

appropriately be decided on a motion for summary judgment.

Review of the record demonstrates that at no time prior to May 30, 2003 was there

any risk of recovery beyond the policy limits.  When Allstate was first notified of

Trailov's claim and her injuries, reserves were set at $25,000.[122]  At that point in time,

Allstate had no medical records and no medical bills.  Allstate knew only that Trailov

was being treated in Anchorage.[123]  Approximately one month later, Allstate learned

Trailov may have suffered a basal skull fracture and had fluid in her lung as a result of

the accident.  Based on this information and the venue, Allstate raised the reserves on

Trailov's claim to $75,000.[124]  At this point, Allstate still did not have any medical

records and bills.

When Power sent her February 14, 2003 demand, she requested the following:

Based on the above, Mary Kenick authorized me to make a policy limits
demand plus attorney's fees, costs and interest on behalf of her daughter's
claim and a policy limits demand plus attorney's fees, costs and interest to
settle her claim.  Please convey this to your client and advise of his
response.[125]

Power did not allege damages in excess of the policy limits.  Allstate did not have all of

the medical records.  No bills were received by Allstate until March 17, 2003, and even

then it was not all of the bills.  Allstate had no documentation supporting Kenick's claim

for NIED.  Based on the information available as of the date of the settlement demand,

---

[122] Exhibit 2.
[123] Id.
[124] Exhibit 21.
[125] Exhibit 29.

one cannot conclude that there was any substantial likelihood of an excess verdict at that time.

On March 18, 2003, one month after Allstate received the initial settlement demand letter, and one day after it received a portion of the medical bills, the reserves were reviewed once more. It was determined that based on the information in its possession to date that the reserves were fine at $75,000.[126]  Allstate continued its process of gathering the missing medical records and bills that Power, Kenick and Trailov failed to provide despite their own receipt of the same several months prior.

Berry then sent a letter to Herron advising him that Allstate did "not have enough information to complete our evaluation of this claim," and further advising him that punitive damages were not covered under the policy. The letter was not an excess letter because such a letter was not necessary.[127]  Berry "never felt like this claim was in excess of the policy," and therefore did not send an excess letter.[128]  In fact, Berry clearly testified that it is appropriate to send an excess letter when "there's a high probability it's in excess of policy limits."[129]  There was not a substantial likelihood of excess exposure based on medical treatment and bills. Trailov incurred about $34,000 in medical and airlift bills. Allstate's medical payments coverage paid for at least $25,000 of those

---

[126] Exhibit 34.
[127] Exhibit 16, Deposition of Kathy Berry at 57.
[128] Id. at 57.
[129] Id. at 58.

bills.[130]  This left Trailov with less than $11,000 in medical bills – certainly this is not an amount that would threaten to reach a $112,500 policy limit.[131]

In Power's April 10, 2003 "some discussion regarding pre-filing resolution" letter, neither Trailov nor Kenick alleged any damages in excess of the policy limits.[132]  They continued to maintain that they would settle for the policy limits.  There still was no threat of excess exposure.  Further, at this point, Kenick had provided zero evidence of her claim of lost income she alleged resulted from her NIED damages.[133]  Even when Kenick did respond and attempt to support her claim, the evidence she produced was woefully inadequate.[134]

When the evaluation was completed in late May 2003, the reserves for Trailov were set at $112,500, the policy limit, because Allstate was going to accept the policy limits demand from Trailov.[135]  Only when Petersen reviewed the now completed investigation did she conclude that the Bethel venue justified the bodily injury limit.  Thus, only as of May 29, 2003, one day before Berry offered the policy limit, could one argue that Allstate foresaw a risk of excess exposure.  Both Berry and Barra disagreed with Petersen, but accepted her assessment and Berry immediately offered the policy limit.

---

[130] Exhibit 52.  More if Power had negotiated the liens.
[131] Exhibit 22.
[132] Exhibit 36.
[133] Exhibit 37.
[134] Exhibit 38.
[135] Exhibit 49.

Even if one assumed a substantial likelihood of excess exposure much earlier, Allstate had no obligation to send an excess letter.  An excess letter informs the insured of potential excess exposure and advises that he may retain independent counsel, at his own expense, to advise him regarding that exposure.  Here, as noted by Allstate's claims expert, Herron had independent counsel, Valcarce, from the day of the accident.  After receiving the demand from Power, Valcarce wrote Allstate on March 26, 2003, noting his view that there could be excess exposure to punitive damages.  He demanded settlement within limits or an assurance to pay any excess.  Plainly, Herron was advised of possible excess exposure and had independent counsel to advise him about it.  A letter from Allstate advising Herron of possible excess exposure that Allstate did not believe existed, and advising Herron he could hire independent counsel to advise him, would have been an insulting redundancy.  Herron's independent counsel already advised Herron and wrote to Allstate with demands.

Kenick's claim was evaluated, and at that point in time it was not clear it was even a valid NIED claim.[136]  Lacking any further information from Kenick or Power, the claim was valued at $10,000, and the same was counter-offered for settlement.[137]  There was no substantial likelihood of an excess verdict.

Herron also tries to argue that Allstate opened a UIM investigation in September 2002, days after the accident, and therefore an excess letter should have been sent at that time.  As previously noted, no UIM investigation was opened in September 2002.  There

---

[136] Exhibit 50.
[137] Exhibit 51.

was instead a "company requirement or task that [Craig Elkins] secure the selection/rejection form or ensure the insured had an opportunity on the UM/UIM endorsements."[138]  Elkins' request that the selection/rejection form be secured was a task to be accomplished in cases in which a passenger was injured in an insured auto.  It was a "spot check."  It was not an investigation into UIM exposure.  Indeed, it is undisputed that UIM coverage was not opened or reserved until after the May 2003 tender of bodily injury limits.[139]

Herron's expert argues that Allstate did not inform Herron he might be liable for AS 09.60.070 attorney fees.  First, such fees are punitive in nature and therefore Berry's letter was sufficient.[140]  Further, at that point in time, Herron was represented by Valcarce.  It would have been inappropriate and highly unusual for Valcarce not to inform his client of this risk in considering a plea agreement.  There was a "great risk of recovery beyond the policy limits."  When Allstate recognized any risk, although there was a difference of opinion among the adjusters involved, Allstate offered the fully policy limits.  Moreover, Herron was advised and independently represented regarding any possibility of an excess or uncovered exposure.

D.     Allstate Tendered Limits to Trailov, There Was No Breach.

Importantly, Trailov and Kenick did not demand that Allstate accept their offers by May 16, 2003.  On the contrary, Trailov and Kenick stated they would revoke their

---

[138] Exhibit 6, Deposition of Craig Elkins at 42, lines 15-18 and at 43, lines 3-24.
[139] Exhibit 49.
[140] See March 25, 1991, notes re changes to HB 100 from the House Committee on Health, Education and Social Services specifically discussing punishing perpetrators.

offers <u>only</u> if Allstate did not continue discussions aimed at resolution of their claims.[141]

This is a crucial fact recognized by Allstate's experts although not Herron's.[142]  Power's

letter was a demand to continue settlement discussions, not a "drop-dead" deadline.[143]

 Allstate continued its discussions with Trailov and Kenick to resolve their claims.

On May 9, 2003, Allstate informed Trailov and Kenick that it was in the process of

evaluating Trailov's claims for settlement and anticipated completion by May 16, 2003.[144]

As to Kenick's claims, Allstate did not have enough information to fully evaluate her

damages claims and requested additional documentation of her loss of income claim due

to changing employment.[145]  Allstate also again requested additional documentation

regarding Kenick's negligent infliction of emotional distress claim.[146]

 On May 16, 2003, Allstate again informed Trailov and Kenick of the status of

their claims and again requested additional information to support Kenick's claim,[147]

Allstate also informed Trailov and Kenick that it needed an additional 15 days to

complete its evaluation and respond to their settlement demands due to the complexity of

Trailov's claims and injuries.[148]  Trailov had earlier acknowledged the complexities of her

---

[141] Exhibit 36.

[142] *See* Charles Bean's and Robert A. Lohr's reports, Exhibits 53 and 54, respectively.

[143] <u>Id</u>.

[144] Exhibit 37.

[145] <u>Id</u>.

[146] <u>Id</u>.

[147] Exhibit 39.

[148] <u>Id</u>.

injuries, noting that the impact of her moderately traumatic brain injury was not obvious and may not be known for years.[149]

At all times Allstate worked toward pre-filing resolution of the claims.  Trailov and Kenick did not object or respond to Allstate's letter.  In fact, as of May 16, 2003, Kenick was still providing documentation of her claims.[150]

At no time did Trailov or Kenick inform Allstate that they did not consider the correspondence between themselves and Allstate "discussion regarding pre-filing resolution of their claims."  At all relevant times, Allstate kept the dialogue and discussions open with information flowing in both directions.  Allstate continued to keep Trailov and Kenick informed of the status of its evaluation of their claims, including asking for and receiving additional information.

Allstate undisputedly fulfilled the condition precedent to keeping the February 14, 2003 offers open by discussing resolution of the claims.  The facts are undisputed.  As a matter of law, the deadline did not lapse prior to Allstate's May 30, 2003 response.

---

[149] Exhibit 36.

[150] Exhibit 38. Herron will undoubtedly argue that Allstate was no longer receiving any information about Trailov at that point in time and therefore could have settled Trailov's claim on May 16, 2003.  There is no guarantee Trailov and Kenick would have been willing to settle one claim without the other.  In fact, Herron's own attorney admitted that he believed Trailov was not willing to settle her claim in hopes of bolstering Kenick's claim.  Exhibit 47.

Allstate did not breach its contractual obligations. Its May 30, 2003 offer to pay policy limits to Ms. Trailov for her liability claim and its separate offer of $10,000 to Ms. Kenick for her NIED claim were made in good faith, following a thorough investigation of the claims. No deadline for an offer to settle the claims was breached because no deadline to settle had been missed by the time of Allstate's offer to settle.

In my opinion, the exchange of letters between Allstate and Ms. Power clearly met Ms. Power's requirement for 'some discussion regarding pre-filing resolution' in a timely manner. Information directly relevant to the claims was exchanged to advance the understanding of the value of claims.[151]

Separately, and in the alternative, Allstate substantially complied with the deadline by responding with policy limits authority within 14 days, and within the timeframe Allstate had promised to respond.[152] The May 16, 2003 "deadline" was arbitrary in any event. There was no reason that Trailov and Kenick had to have a response to their policy limits demands by May 16, 2003.[153] The statute of limitations to file a civil action based on a September 14, 2002 injury had over a year left to run.[154] There were no impending financial crises. There was no impending surgery or medical treatment. In fact, Kenick had just provided Allstate with pay stubs on May 16, 2003 to support her claim for loss of income due to changing jobs.[155]

Finally, Judge Singleton already ruled that that there was a question of fact as to whether there was a breach or if Allstate was in good faith with its May 30, 2003 tender

---

[151] Exhibit 54, Expert Report of Robert A. Lohr at 500044.

[152] Exhibit 40.

[153] Exhibit 55, Deposition of M. Kenick at 35-36.

[154] *See* AS 09.10.070(a).

[155] Exhibit 38.

letter.[156]  Herron does not and cannot cite to any new facts that would change this ruling, because there are no facts that rebut this exchange of written letters.  There was a question of fact on May 14, 2005, and there remains a question of fact now.

     E.      <u>Herron's Unsupported Accusation of Racial Discrimination</u>.

Herron next tries to sway this court with outrageous, defamatory accusations at pages 34-35 of his Motion.  He accuses Allstate of trying to get out of paying the medical payments coverage to Trailov because she is Native.  This is not only inflammatory and outrageous, but flat out false.  Power, Kenick and Trailov never submitted any medical bills to Allstate until March 17, 2003, and at that point they did not provide the complete bills.  This is despite the fact that many of these bills had been in Kenick's possession for several months.  Allstate then tendered the full medical payments coverage, $25,000, to Power to distribute to medical care providers as Kenick and Trailov wanted. Additionally, Power had the policy declarations in January 2003 which revealed the $25,000 in medical payments coverage, yet she never made a request for it.  Further, Vanzant explained the coverages to Margaret Herron, who told her that she was in contact with Kenick and would pass along the medical payments information.  This occurred on September 16, 2002.[157]  Finally, these accusations are completely unrelated to Herron's own claims against Allstate.  Once again, Herron fails to focus on the third-party claim, but instead inappropriately directs the court to Trailov's and the other

---

[156] Docket 79 at 8.

[157] And, it is clear the information was flowing between the Herrons and Kenick vis-à-vis their attorneys.  When Margaret Herron received Allstate's September 2002 letter, Robert Herron immediately faxed it to Valcarce, who then faxed it to Power, Kenick's attorney.

passenger Faulkner's first-party claims for medical payments and underinsured motorist coverage.[158]

F.    Herron Possesses No Valid Claim for Negligence.

Herron claims that the investigation should have been accomplished sooner. He argues that, because liability was determined in September 2003 the damages should have been investigated and resolved shortly thereafter. In effect, what Herron is suggesting is that Allstate should have just paid policy limits regardless of the value of the claims.[159]

The documents and records referenced and the arguments made above clearly reflect that Allstate promptly undertook its investigation. Therefore, Allstate incorporates all prior arguments in this opposition in support of the fact that frankly, there was just no negligence. The former Director of the Division of Insurance agrees that there was no negligence:

> In my review of Allstate's claim file and depositions, I did not detect substantive violation of the regulations or the act. I found one occasion where Allstate was one week late in communicating the name and contact information for the new adjuster, Kathy Berry, assigned to the third-party liability claim. In any case the average time to respond to letters relate to the claims communications was under 14 working days, under the regulatory specification of 15 working days. It is simply not credible to argue that prejudice occurred when Ms. Power had the name and contact information for Ms. Vanzant and Ms. Power had established such a relaxed approach to handling the claim.[160]

---

[158] Allstate refers the court to its Motion to Establish Law of the Case [Docket 127], and incorporates that herein.

[159] Kenick never even asserted a claim until February 14, 2003; therefore her claim could not have been resolved before then.

[160] Exhibit 54, Expert report of Robert A. Lohr at 500046-47.

Mr. Lohr continued: "Specifically, Allstate's handling of coverage under Policy #020469309 was reasonable. Allstate did not place its interests ahead of those of its insured." [161]

Herron then suggests that any technical violation of a regulation constitutes negligence, without consideration for whether it is material. Allstate's experts disagree - technical minor violations do not constitute negligence.[162]

There was no negligence. But, even assuming negligent adjusting, a cause of action for which an insurer cannot be liable in Alaska,[163] such negligence as a matter of law is not a total breach of the contract such as would excuse the insured confessing judgment.[164]

## IV.    CONCLUSION

What is not in dispute is that Herron breached his express and implied contractual obligations under the insurance policy by confessing judgment for an amount well in excess of the bodily injury coverage policy limits and assigning rights against Allstate. Herron's breach materially prejudiced Allstate's ability to defend, settle, or otherwise manage Trailov's and Kenick's claims and was not excused by any prior conduct on Allstate's part. What is disputed is whether Allstate "committed a total breach of the

---

[161] Id. at 500049.

[162] *See* Expert reports of Chuck Bean and Robert A. Lohr, Exhibits 53 and 54.

[163] *See* C.P. v. Allstate, *supra*.

[164] *See* Court's Order at Docket 34, p. 3 n.2. "...[T]he focal point in this case will be whether Allstate and/or Herron committed a total breach of the contract, and if so, who breached first."

contract."  Allstate respectfully requests that this court deny Herron's third motion on this

topic.

DATED this 26th day of June 2006.

WILKERSON HOZUBIN

By: s/Rebecca J. Hozubin
310 K Street, Suite 405
Phone: 907 276-5297
Fax: 907 276-5291
E-mail: Rebecca@Wilkersonlaw.net
Attorneys for Plaintiff Allstate
AK Bar No. 9806016

CERTIFICATE OF SERVICE
I hereby certify that on the
26th day of June, 2006, I
mailed a true and correct copy
of the foregoing document was
electronically served on the
following counsel/parties of record:

Mark A. Sandberg, Esq.
Sandberg, Wuestenfeld & Corey
701 West 8th Avenue, Suite 1100
Anchorage, AK  99501

WILKERSON HOZUBIN

By: s/Rebecca J. Hozubin
1000/788/plead/Dec Act/Opp MSJ-Final2