Page 1

1            IN THE UNITED STATES DISTRICT COURT
2                  FOR THE STATE OF ALASKA
3
  ALLSTATE INSURANCE            )
4 COMPANIES,                    )
                                )                COPY
5              Plaintiff,       )
                                )
6        vs.                    )
                                )
7  CHARLES HERRON,              )
                                )
8              Defendant.       )
                                )
9  Case No. A04-0043 CV (JKS)
10
11
                  DEPOSITION OF RENEE VANZANT
12
13
                       Pages 1 - 24
14               Thursday, March 16, 2006
                       9:02 A.M.
15
             Taken by Counsel for Defendant
16                         at
             SANDBERG, WUESTENFELD & COREY
17       701 West Eighth Avenue, Suite 1100
                  Anchorage, Alaska
18
19
20
21
22
23
24
25

```
                                                              Page 2
 1                     A-P-P-E-A-R-A-N-C-E-S
 2
    For Plaintiff:
 3     Mark E. Wilkerson
       WILKERSON HOZUBIN
 4     310 K Street, Suite 405
       Anchorage, Alaska 99501
 5     907/276-5297
 6
    For Defendant:
 7     Mark A. Sandberg
       SANDBERG, WUESTENFELD & COREY
 8     701 West Eighth Avenue, Suite 1100
       Anchorage, Alaska 99501
 9     907/276-6363
10
    Court Reporter:
11     Lisa L. Shaffer
       PACIFIC RIM REPORTING
12     711 M Street, Suite 4
       Anchorage, Alaska 99501
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                                    Page 3
 1                          I-N-D-E-X

 2
     EXAMINATION BY                                           PAGE
 3
        Mr. Sandberg                                          4, 22
 4
        Mr. Wilkerson                                         20
 5

 6

 7
     EXHIBITS
 8
        (NONE MARKED)
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

1  ANCHORAGE, ALASKA; THURSDAY, MARCH 16, 2006
2              9:02 A.M.
3              -o0o-
4          RENEE VANZANT,
5    deponent herein, being sworn on oath,
6    was examined and testified as follows:
7              EXAMINATION
8  BY MR. SANDBERG:
9    Q   May I call you Renee?
10   A   Yes, that's fine.
11   Q   Thank you.
12       Where do you work, Renee?
13   A   Allstate claims.
14   Q   What's your job?
15   A   I'm a casualty claims adjuster.
16   Q   Do you have a specific job title?
17   A   Basically that is it, casualty claims
18 adjuster.
19   Q   As I understand it, you work in the
20 unrepresented unit?
21   A   That's correct.
22   Q   What does that mean?
23   A   My primary dealing is with claimants who are
24 not represented by counsel.
25   Q   Typically, if an injured person got a lawyer,

Page 5

1  would their file then be transferred to a different
2  unit?
3    A   That's correct.
4    Q   And what is that unit called?
5    A   The represented unit or the rep unit.
6    Q   Who is your supervisor?
7    A   Craig Elkins.
8    Q   And Mr. Elkins has a title that he told me,
9  but I can no longer remember, that had a bunch of
10 letters in it. Do you happen to recall? FP
11 something?
12   A   Yes. FPL. I forget. They just switched
13 over to those titles. Basically he's a leader, he's a
14 front-line performance leader.
15   Q   In any event, there is no layer of
16 supervision between you and Mr. Elkins?
17   A   No.
18   Q   Do you supervise anyone?
19   A   No.
20   Q   So you are what I would think of as a
21 front-line hands-on adjuster?
22   A   Correct, primarily.
23   Q   Doing the technical as opposed to
24 administrative work?
25   A   Correct.

Page 6

1    Q   Okay. I'd like to talk, if I may -- well,
2  first of all, before we go on to my specific case, how
3  long have you worked at Allstate?
4    A   23 years.
5    Q   Do you have experience working for any other
6  insurance company?
7    A   No.
8    Q   And what jobs have you held during your time
9  at Allstate?
10   A   Basically the same. You know, handling
11 personal lines and bodily injury claims.
12   Q   Okay. Let's then go to Mr. Herron's case. I
13 represent Charles Herron, and I've put in front of you
14 the claim log for the accident out in Bethel. You
15 were involved in adjusting that loss, correct?
16   A   Correct.
17   Q   Okay. And so the loss occurred on September
18 the 14th, 2002. If I'm reading this right, it looks
19 like the first time we see you in the file is the
20 16th?
21   A   Yes.
22   Q   And we see that on page 1 of our document
23 there?
24   A   Yes.
25   Q   I'd like to go through that entry, if we may,

Page 7

1  and have you translate it for me.
2        First of all, whose entry is this? Can you
3  tell who made this entry?
4    A   It's a computerized entry. No one
5  specifically input it. It's designed to show, based
6  on the fact that there's an injury involved in the
7  insured's vehicle.
8    Q   Okay. But, for example, if we go down to
9  page 2, we see it looks like "Statement employee name:
10 Renee R. Vanzant."
11       Would page 2 be information that you actually
12 entered yourself?
13   A   That's correct.
14   Q   Okay. But there is no corresponding person
15 entering page 1 for us?
16   A   No.
17   Q   Looking at page 1 here, it says -- well, read
18 me the part under the word "analysis" and translate
19 for me as we go, if you would be so kind.
20   A   It was an injury split assigned to our
21 Anchorage claims office, and it's September 23rd,
22 2002.
23   Q   May I stop you as we go? What does "injury
24 split" mean?
25   A   It simply means that there were parties

Page 8

1  injured in the insured's vehicle.
2    Q   Okay. I'm sorry, let's go back, then. It
3  says, on 9/23: "PIP/med pay was assigned to employee
4  KWTQ." Is that you?
5    A   Yes.
6    Q   Okay. Do you adjust med pay losses as well
7  as bodily injury liability claims?
8    A   No, not at the time. Basically the computer
9  would have simply assigned it under my ID because the
10 overall file was under my handling at that time.
11   Q   Okay. Were you in fact ever involved in
12 adjusting the med pay loss on this case?
13   A   No.
14   Q   That was Mr. Millar?
15   A   Correct.
16   Q   And then these various other entries I'm
17 looking at here are simply computer generated on 9/25
18 and 10/1?
19   A   The 9/25, the split was then transferred to
20 Scott to handle the med pay.
21   Q   I see. Okay. Then let's go down to the
22 first entry that is actually yours, which looks like
23 it comes at page 2. This again bears the date 9/16;
24 is that correct?
25   A   Correct.

Page 9

1    Q   And it says: "Insured will let me know
2  outcome of charges against OP."
3        Would OP be Mr. Herron?
4    A   That would be the operator of the vehicle.
5    Q   Okay. And then it says: "Limited info on
6  claimant passengers" -- perhaps?
7    A   Correct.
8    Q   -- "other than medevac'd to Alaska Regional"?
9    A   That's correct.
10   Q   Am I translating this right?
11   A   Yes.
12   Q   Okay. And then it says: "Insured says they
13 are not supposed to have any contact with passengers"?
14   A   That's correct.
15   Q   Had you asked them not to have any contact
16 with passengers, or was that simply something they
17 told you?
18   A   That's what she told me.
19   Q   And can we tell who you're talking to here?
20 Is that Margaret Herron?
21   A   That's correct.
22   Q   And then at 3, is this a continuation of the
23 same entry?
24   A   Actually, the beginning of the entry is on 3,
25 and 2 is the continuation of 3, actually.

Page 10

1    Q   Okay.
2    A   They're just out of order.
3    Q   All right. So looking here at 3, then, this
4  is where the entry for 9/16/02 would actually begin?
5    A   That's correct.
6    Q   And under Analysis, it says: "Insured
7  operator is 17 years old. Had been driving prior. He
8  lost control of the vehicle while turning around
9  corner, lost control and hit a pole."
10       Have I translated that correctly?
11   A   That's correct.
12   Q   And then below it says: "Passenger in right
13 rear seat had minor skull fracture and fluid in lungs.
14 She was medevac'd to Anchorage to either Alaska
15 Regional, but will be transferred back to Alaska
16 Native Hospital."
17       Once again, have I translated that one
18 correct?
19   A   Correct.
20   Q   Was this information that Margaret Herron
21 provided to you?
22   A   Yes.
23   Q   Look at, then, page 5. Under Analysis --
24 we're still on 9/16 -- is this a continuous entry or
25 is this another entry?

Page 11

1    A   It's a separate entry.
2    Q   It says: "Request review and authority to
3  waive insured recorded statement," perhaps?
4    A   Yes.
5    Q   Okay. Request review of what by whom?
6    A   To Craig Elkins, my manager.
7    Q   Are there criteria for which cases get
8  reviewed by Mr. Elkins?
9    A   Certain cases, yes, he'd like to be involved
10 in.
11   Q   Okay. Why was this one requested review by
12 Mr. Elkins?
13   A   Because of the injury that was involved.
14   Q   What does that mean?
15   A   Because the passenger had a fracture.
16   Q   So because it was a potentially significant
17 injury?
18   A   Correct.
19   Q   And how about the authority to waive insured
20 recorded statement, are you supposed to obtain an
21 insured recorded statement ordinarily?
22   A   In certain cases, depending on the liability,
23 yes.
24   Q   Okay. Well, let me ask the question I should
25 have asked, then. Why did you need to ask authority

Page 12

1  to waive the insured's recorded statement?
2     A  It's just part of regular investigation, and
3  part of that is to take recorded statements. And if
4  we don't feel that a recorded statement is going to be
5  necessary to the case, then we request to have it
6  waived.
7     Q  Okay. And why did you feel a recorded
8  statement would not be necessary to this case?
9     A  Because we knew what the facts of the
10 accident were, there were no other parties that -- in
11 other words, if there are other insurance companies
12 involved, sometimes we will take recorded statements
13 for arbitration.
14    Q  Okay. Then at 6 it appears we can see
15 Mr. Elkins' responding to you?
16    A  That's correct.
17    Q  And he did that on 9/17, and it says: "Renee
18 forward this file to me for review today. Thank
19 you -- C."
20       I assume that would be Craig?
21    A  Yes.
22    Q  At 9/17 we see your entry, on page 7, I
23 believe.
24    A  Yes.
25    Q  It says: "Called Alaska Native Hospital.

Page 13

1  Claimant has been moved to a room."
2       Is this a call you made, or is this something
3  Margaret Herron is relating to you?
4     A  No. It's a call that I made.
5     Q  And: "Spoke with nurse." That would be you
6  speaking with the nurse?
7     A  Correct.
8     Q  Then at page 8 we see more instructions from
9  Mr. Elkins to you?
10    A  That's correct.
11    Q  And September 18th, 2002, that appears to
12 say: "Renee ensure that you have claim ack" --
13 A-C-K -- "letter to all involved parties."
14       What is a "claim ack" letter?
15    A  I think he's referring to an acknowledgement
16 letter.
17    Q  Okay. And "doc this today means" he wants
18 you to send out some letters and document it to the
19 file that you've done it?
20    A  Correct.
21    Q  Then he asks: "Who is advising insured not
22 to talk to anyone on this matter?"
23       Did you follow up on that, if you recall?
24    A  I think I had already known that.
25    Q  And who was it, then, advising the insured

Page 14

1  not to talk to anyone?
2     A  I believe, according to the prior entry, it
3  was the police, the police officer.
4     Q  And that would be because there were
5  potentially criminal charges pending?
6        MR. WILKERSON: Speculation.
7  BY MR. SANDBERG:
8     Q  If you know.
9     A  I don't know.
10    Q  Okay. Then: "Inquire of claimant's parents
11 if any other medical collateral source. Secure P/R."
12       What's a P/R?
13    A  Police report.
14    Q  Okay. Then: "Follow up on matrix
15 requirements."
16       I believe I've been provided now a copy of a
17 matrix, and I can dig it out if it's important here,
18 but I guess for the moment my question is, would you
19 ordinarily work from a matrix or a checklist on
20 handling a claim like this one?
21    A  Sometimes.
22    Q  Are you at least provided a matrix or a
23 checklist?
24    A  For overall handling, yes.
25    Q  And so here, where it says "follow up on

Page 15

1  matrix requirements," essentially what he's telling
2  you is to make sure that you've covered the
3  requirements on the checklist for the unrepresented
4  unit?
5     A  Yes.
6     Q  Then under that, it says: "Secure certified
7  dec and agent application -- waiver issue."
8        What does that mean?
9     A  He just wanted a copy of the certified dec
10 page and the initial application, the insured's
11 initial application.
12    Q  And where it says waiver issue, what does
13 that mean?
14    A  I'm not sure what he was referring to there.
15    Q  Was that perhaps related to what I'm going
16 call the failure-to-offer issue?
17    A  I have no idea. It may have been at that
18 time. I don't know.
19    Q  Do you recall if it was related to UIM
20 coverage?
21    A  I don't know. I really don't know at that
22 time, yeah.
23    Q  You don't have to know. It's just, if you do
24 recall, this is my chance to ask you questions.
25       So your response at this point is you simply

Page 16

1  don't remember?
2  A  I don't remember.
3  Q  Continue forward with me, then. At page 9
4  apparently you received a notice on 9/23/02 that
5  Angelina Trailov was represented?
6  A  That's correct.
7  Q  And then so we don't get out of order again,
8  let me go to the bottom of that page, which is at 10.
9  It just says "Analysis: attorney rep." Does that mean
10 attorney represented?
11 A  Yes.
12 Q  Okay. So on September 23 you've been on the
13 case for about a week, and now Allstate receives a
14 representation letter from the Angstman Law Firm,
15 correct?
16 A  Yes. I believe that may have been the firm.
17 Q  And it appears that you've been talking once
18 again with Margaret Herron, who has told you that the
19 claimant has an attorney?
20 A  That's correct.
21 Q  Okay. Now let go back up to 9, which appears
22 to be, once again, somewhat out of order. And it
23 looks like you've requested the declarations page?
24 A  Correct.
25 Q  And then you are documenting to the file that

Page 17

1  Malone & Company, who I assume is the broker, does not
2  have a copy of the original application?
3  A  That's correct.
4  Q  Then if we flip to page 12, we have more
5  detail about receiving a letter from the Angstman Law
6  Office?
7  A  Yes.
8  Q  Now go, if you would, back to page 81. Well,
9  first of all, what am I looking at at page 81?
10 A  It's an electronic diary.
11 Q  And under the date 9/25/02, I see an entry
12 that begins: "ID01 percent NEG entered."
13    Would you translate that entry for me?
14 A  That has to do with liability being
15 established.
16 Q  Okay. And so would you translate for me what
17 it says, beginning at the ID01?
18 A  "ID01 percent negligence injured as 100
19 percent by ID: DPH3."
20 Q  And who is DPH3?
21 A  I am DPH3.
22    "MCO: 332," which is our office.
23 Q  So MCO: 332 is simply the Anchorage claims
24 office?
25 A  Correct.

Page 18

1  Q  Okay. Continue, please.
2  A  "Percent negligence updated from 100 percent;
3  name: Renee Vanzant."
4  Q  So it is this documenting to the file that by
5  9/25 Allstate had determined that my client,
6  Mr. Herron, was 100 percent responsible for this
7  accident?
8  A  Yes.
9  Q  Return, then, to page 14, if you could. We
10 see an entry for 9/26 now, and it is from Karen
11 Petersen to Kathy Berry, it appears. And are we here
12 looking at the transfer of the file regarding Angelina
13 Trailov from you to Kathy Berry because Ms. Trailov is
14 now represented?
15 A  Correct.
16    MR. SANDBERG: Let's go off record for a
17 second.
18    (Off the record.)
19    MR. SANDBERG: Back on record.
20 BY MR. SANDBERG:
21 Q  Ms. Vanzant, reviewing the file here, it
22 appears that after 9/26 you continued to be involved
23 in adjusting this loss as to Tracy Faulkner, for
24 example, correct?
25 A  Yes.

Page 19

1  Q  But as to Angelina Trailov or her mother, do
2  you have any further involvement in adjusting this
3  loss on behalf of Allstate after 9/26/02?
4  A  No. My handling was ended.
5  Q  Were you involved at all in adjusting the med
6  pay loss after 9/26/02?
7  A  No.
8  Q  Were you involved at all, to your
9  recollection, involving and adjusting the BI loss for
10 Angelina or her mother after 9/26/02?
11 A  No.
12 Q  Were you involved at all in the settlement
13 offer that Allstate made in May of '03 for the BI loss
14 for Angelina or her mother?
15 A  No.
16 Q  Were you involved at all in the events with
17 Mr. Valcarce that led to a consent judgment in 2003
18 regarding Angelina and her mother?
19 A  No.
20    MR. SANDBERG: Then I believe we're done.
21    MR. WILKERSON: Actually, I want to follow
22 up, if we can.
23    MR. SANDBERG: Of course.
24 ///
25 ///

Page 20

```
 1              EXAMINATION
 2  BY MR. WILKERSON:
 3    Q   I'm looking back at what's numbered 07,
 4  Renee.
 5    A   Okay.
 6    Q   There's a reference there to a phone call,
 7  "Called Alaska Native Hospital." I take it that's
 8  something you did?
 9    A   Correct.
10    Q   Tell us about your communications or efforts
11  to communicate with Ms. Trailov and/or her mother.
12    A   Well, we had been given her name, I had her
13  name.
14    Q   Whose?
15    A   Angelina Trailov's, from Mrs. Herron.
16  However, I didn't have a contact, a way to contact her
17  mother, because I'd been told she was in Anchorage and
18  staying --
19    Q   When you say "she," do you mean the mother?
20    A   The mother had come to Anchorage and was
21  staying with maybe other relatives. However, I had no
22  way to contact. We had no mailing address for the
23  Trailovs.
24        So basically what I did, I knew she was over
25  at the hospital, so I went by the hospital and left my
```

Page 21

```
 1  card with her mother -- well, her mother was not
 2  there, and so I simply left a card with the nursing
 3  staff to give to her mother when she came back.
 4    Q   Did you see Ms. Trailov herself?
 5    A   She was in a room. But her mother wasn't
 6  there, so I just left a card with the nursing staff.
 7    Q   Did you have any communications with the
 8  nursing staff and/or Ms. Trailov or her mother?
 9    A   Well, the nursing staff called and said they
10  had the card. I guess the nursing supervisor.
11  Because when I got back to the office, they called me
12  later and said they have the card.
13        But since she was a minor and no contact was
14  supposed to be made with her, then basically I said I
15  made no contact with her, I simply left a card for her
16  mother to call me back with the information, you know,
17  so that I could give her, you know, whatever
18  information was necessary for her daughter.
19        But I never -- her mother never called me
20  back. And a few days later we got notice that they
21  were already represented.
22    Q   Okay. And as you've discussed, that was
23  really the end of your involvement?
24    A   Correct.
25        MR. WILKERSON: Thank you. I just wanted to
```

Page 22

```
 1  make sure we understood that. Thank you.
 2              FURTHER EXAMINATION
 3  BY MR. SANDBERG:
 4    Q   And then that leads me to really one more
 5  question, which is: After 9/26/02 were you at all
 6  involved in evaluating Angelina Trailov's claim?
 7    A   No.
 8        MR. SANDBERG: That's it, then. Thank you.
 9        THE WITNESS: All right.
10        (Proceedings concluded at 9:34 A.M.)
11        (Signature reserved.)
12                   -o0o-
```

Page 23

1     CERTIFICATE

2

3     I, LISA L. SHAFFER, Certified Shorthand
4  Reporter, and Notary Public in and for the State of
5  Alaska, do hereby certify that the witness in the
6  foregoing proceedings was duly sworn; that the
7  proceedings were then taken before me at the time
8  and place herein set forth; that the testimony
9  and proceedings were reported stenographically by
10 me and later transcribed by computer transcription;
11 that the foregoing is a true record of the
12 testimony and proceedings taken at that time;
13 and that I am not a party to nor have I any
14 interest in the outcome of the action herein
15 contained.
16     IN WITNESS WHEREOF, I have hereunto set
17 my hand and affixed my seal this _____ day
18 of _____ 2006.
19
20
21                          _____
                            LISA L. SHAFFER, CSR
22                          My Commission Expires 8/29/06
23
24
25