IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

ALLSTATE INSURANCE COMPANIES,

    Plaintiff,

vs.

CHARLES HERRON,

    Defendant.
_____)

NO: A04-0043 CV (JKS)

DEPOSITION OF CRAIG ELKINS

Friday, September 30, 2005, 9:10 a.m.

Anchorage, Alaska

**Alaska Stenotype Reporters**
511 West Ninth Avenue
Anchorage AK 99501-3520
*Serving Alaska Since 1953*

Rick D. McWilliams, RPR, Ret.
Fred M. Getty, RPR, Ret.

Telephone 907.276.1680
Email AkSteno@aol.com
Fax 907.276.3016



Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF ALASKA

 3

 4   ALLSTATE INSURANCE COMPANIES,

 5              Plaintiff,

 6   vs.

 7   CHARLES HERRON,

 8              Defendant.
     _____)
 9
     NO: A04-0043 CV (JKS)
10

11

12

13

14           DEPOSITION OF CRAIG ELKINS, taken on behalf

15   of Defendant, Pursuant to Notice, at SANDBERG,

16   WUESTENFELD & COREY, 701 West Eighth Avenue, Suite

17   1100, Anchorage, Alaska, before Susan Campbell,

18   Certified Shorthand Reporter for Alaska Stenotype

19   Reporters and Notary Public for the State of Alaska.

20

21

22

23

24

25
```

```
 1                    A-P-P-E-A-R-A-N-C-E-S

 2

 3   For Plaintiff:      WILKERSON, HOZUBIN & BURKE
                         BY:  MARK E. WILKERSON
 4                       310 K Street
                         Suite 405
 5                       Anchorage, AK  99501

 6   For Defendant:      SANDBERG, WUESTENFELD & COREY
                         BY:  MARK A. SANDBERG
 7                       701 West Eight Avenue
                         Suite 1100
 8                       Anchorage, AK  99501

 9   Also present:       Dennis Mestas

10   Reported By:        Susan Campbell
                         Certified Shorthand Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
1                         I N D E X

2    EXAMINATION BY:                              PAGE

3        Mr. Sandberg                              5

4

5                       E X H I B I T S

6    NUMBER                                       PAGE

7      14   Profile:  Represented Claim            6
            Unit - 1 page
8
       15   Casualty Development Summary -        18
9           10 pages

10     16   Printout of screens - 1 page          49

11     17   Printout of screens - 1 page          60

12     18   Printout of screens - 1 page          87

13     19   Printout of screens - 1 page         121

14

15

16

17

18

19

20

21

22

23

24

25
```

**Page 5**

1  Anchorage, AK, Friday, September 30, 2005, 9:10 a.m.
2              CRAIG ELKINS,
3      called as a witness on behalf of the
4      Defendant, having been duly sworn upon
5      oath by Susan Campbell, Notary Public,
6      was examined and testified as follows:
7              EXAMINATION
8  BY MR. SANDBERG:
9  Q.     Would you state your name?
10 A.     Craig Elkins.
11 Q.     Where do you work, Mr. Elkins?
12 A.     I work for Allstate Insurance.
13 Q.     How long have you worked for Allstate
14 Insurance?
15 A.     Oh, approximately 21 years.
16 Q.     What is your job title?
17 A.     My job title is Frontline Performance
18 Leader.
19 Q.     I believe Ms. Petersen told me that the
20 acronym is FPL.
21 A.     FPL is the acronym, yes.
22 Q.     How many FPLs are there in the Anchorage
23 office?
24 A.     Well, we have four, I believe.
25 Q.     And what are their areas of responsibility?

**Page 6**

1      I'm sorry. Let me back up a little bit.
2  Who are they?
3  A.     Oh, who are they?
4  Q.     Yes.
5  A.     We have Dan Mayfield. He's an FPL in the
6  property segment. We have Tina Watts. She's an
7  FPL in the personal lines segment, subrogation. Kevin
8  McNamara, he is FPL of our auto group. And then
9  myself. That would be four.
10 Q.     And what is your group?
11 A.     My group?
12 Q.     Yes.
13 A.     Is the casualty group.
14 Q.     Represented casualty claims or all casualty
15 claims?
16 A.     It has both the unrepresented and the
17 represented, yes.
18         (Exhibit 14 was marked.)
19         MR. SANDBERG: I'll hand you what we've
20 marked as number 14.
21         MR. WILKERSON: Can I keep this one?
22         MR. MESTAS: Yes.
23 BY MR. SANDBERG:
24 Q.     Mr. Elkins, I've handed you something that
25 says "Profile: Represented Claim Unit" across the top

**Page 7**

1  of it. And we've marked it as Exhibit number 14. Is
2  this a document you recognize?
3  A.     Did this come out of an Allstate training
4  manual, do you know?
5  Q.     (Counsel nods head.)
6  A.     Do you know what the date on this,
7  publication date on this particular document is?
8         MR. MESTAS: 1995.
9         THE WITNESS: 1995.
10 BY MR. SANDBERG:
11 Q.     You don't have to recognize it. I'm just --
12 this is background.
13 A.     Yeah. If it's represented coming out of a
14 1995 training document, I most likely looked at it at
15 some point in time then.
16 Q.     Whether you recognize the particular piece
17 of paper or not, I'd like to just talk about if these
18 are the things that the represented claim unit -- if
19 this accurately describes the unit.
20         And I'm going to have to put on my dime
21 store cheaters to read this little tiny stuff.
22         First of all, let's take a look at the
23 "Objectives," if you would. It says "To provide
24 customer service to attorney-represented claimants
25 through fair and complete investigation, evaluation,

**Page 8**

1  negotiation and settlement."
2         Would you agree with me that that is an
3  objective of the represented claim unit?
4  A.     That incorporates our duties and
5  responsibilities, yes.
6  Q.     Okay. And then it says "To ensure that BI
7  severity is maintained at appropriate levels." What's
8  that mean, if you know?
9  A.     The document that this came out of, I'm not
10 sure what level this was -- beyond the information you
11 have, is that --
12 Q.     Let me back up a little bit. I'm sorry.
13 Because that's an accidentally compound question.
14 What does BI severity mean?
15 A.     The BI severity would be an average severity
16 on an injury coverage.
17 Q.     So in other words, to ensure that Allstate
18 is paying what it's supposed to be paying? That's
19 really my question. What does BI severity mean?
20 A.     BI severity would be -- it's an industry
21 measure on a specific injury. I think that's in
22 the -- as far as the industry has, they do measure on
23 an injury severity among different coverages.
24 Q.     I guess --
25 A.     I'm not sure if this document here is on old

Craig Elkins      Deposition      September 30, 2005

Page 9

1  material that --
2  Q.  Let me back up a little bit. Is BI severity
3  a term that you recognize?
4  A.  Yes.
5  Q.  Okay. And can you explain the term to me?
6  A.  BI severity. Bodily injury severity, would
7  be the average bodily injury payouts over a given
8  period of time.
9  Q.  Okay. Then let's continue on down.
10 "Primary activities: Rapid, effective contact, and
11 front-end handling with involved party." Is that
12 certainly one of the objectives or goals of the
13 represented claim unit?
14 A.  That would be a goal, yes.
15 Q.  Okay. "Focussed claim investigation" and
16 "file documentation," that certainly would be a goal
17 of the represented claims unit, correct?
18 A.  That would be correct.
19 Q.  And "Communicate and negotiate with
20 attorneys" and "negotiators," that would certainly be
21 one, correct?
22 A.  That's correct.
23 Q.  Then it says "Direction of litigation and
24 coordination with staff counsel." When it's necessary
25 to direct lawyers, that's certainly something the

Page 10

1  represented claim unit does as well, correct?
2  A.  They do that, yes.
3  Q.  And then it says "Primary performance
4  measures: Compliance with procedures." What
5  procedures -- what are the procedures with which the
6  represented claim unit is supposed to be complying?
7  A.  Specifically?
8  Q.  Yes, generically. Like the claims manual,
9  the regulations, whatever -- what are we describing?
10 A.  Would be the coverage investigation when a
11 claim does come in, damage evaluation, liability,
12 securing the information, properly evaluating it and
13 negotiating the claim file.
14 Q.  I was thinking more in terms of here where
15 it says the primary performance measures include
16 compliance with procedures, what sort of procedures
17 might this be describing? For example, is there a
18 claims manual that the represented claim unit is
19 supposed to be -- with which it's supposed to be
20 complying?
21 A.  We have -- as far as a claims manual, we
22 have a CCPR manual. I believe this is what was pulled
23 out of that manual.
24 Q.  And are your adjusters in the represented
25 claim unit supposed to be complying with the CCPR?

Page 11

1  A.  With the CCPR, yes.
2  Q.  Okay. And how about the Unfair Claims regs,
3  are the adjusters in the represented claims unit
4  supposed to be complying with the Unfair Claims regs?
5  A.  Yes, that's part of the industry standard.
6  Q.  It is certainly -- I mean, an adjuster
7  doesn't really have any choice except to comply with
8  the Unfair Claims regs, do they?
9  A.  That's the law in Alaska, yes.
10 Q.  Okay. And --
11 (Discussion off the record.)
12 BY MR. SANDBERG:
13 Q.  What is the C triple P manual?
14 A.  It's a claim policy and procedure manual.
15 Q.  And how does that differ from the CCPR?
16 A.  It's more for a -- more from a management
17 application. Covers a lot of different areas as far
18 as security type issues and --
19 Q.  To the extent it is applicable, is it also a
20 procedure with which the represented claim unit should
21 be complying?
22 A.  Some of those issues are incorporated in
23 what are -- would be requiring on their desk with a
24 CCPR.
25 Q.  But if the -- boy, I get twisted in these

Page 12

1  acronyms. If the CPPP is -- to the extent it's
2  applicable, would you agree the represented claims
3  unit should be complying with it?
4  A.  I would agree, yes, with it.
5  Q.  Now, is -- I'm sorry. I've been losing my
6  voice for two days now. I hope I last till the end of
7  the day.
8  Is your job supervisory or are you a
9  hands-on frontline adjuster or both?
10 A.  Well, my job is more supervisory. I do a
11 lot of administrative in addition to working with
12 people. Do I adjust any files? No. That's --
13 Q.  So you are not the adjuster assigned to any
14 particular file --
15 A.  No.
16 Q.  -- all by yourself. How many people do you
17 supervise presently?
18 A.  It's close to 11 to 12.
19 Q.  And what are they called? What is their job
20 title?
21 A.  I have -- I have the represented adjusters.
22 I have the unrepresented adjusters. I have three unit
23 processors. I have a staff support person.
24 Q.  We met Mr. -- it looked like Millar, but he
25 pronounced it Millar yesterday.

6 (Pages 9 to 12)

### Page 13

1  A.   Right.
2  Q.   Do you supervise Mr. Millar?
3  A.   Yes.
4  Q.   And then we will be meeting Ms. VanZant. Do
5  you supervise Miss VanZant?
6  A.   Yes, I do.
7  Q.   And we will be meeting Ms. Berry. Do you
8  supervise Ms. Berry?
9  A.   Yes.
10 Q.   To whom do you report?
11 A.   To Don Dasenbrock. He's the market claim
12 manager.
13 Q.   And he's the top of the local pyramid, the
14 top of the local claims office?
15 A.   He -- he is for the Alaska market. I also
16 report to Karen Petersen. She's the FPE for the
17 casualty operation.
18 Q.   And how is that -- how is her job different
19 from what you do? And let me stop there.
20 A.   The role of the FPE is Frontline -- or
21 Performance Expert. They have a higher level
22 understanding of different areas of the market,
23 litigation issues. They -- that position requires a
24 lot of analytical skills and number analysis and trend
25 analysis, that sort of thing.

### Page 14

1  Q.   So do you also, for example, evaluate the
2  performance of the claims department or the people for
3  whom you're supervising?
4  A.   For the individuals, yes.
5  Q.   So how does -- and just generally, how does
6  what Ms. Petersen does to evaluate the performance of
7  those people differ from what you do?
8  A.   She would provide me feedback on whatever
9  spot check review she may be doing, on top of what my
10 normal oversight may be.
11 Q.   Okay. But she's also looking at larger
12 trends within the office?
13 A.   Within the Anchorage market or the Alaska
14 market.
15 Q.   Okay. And you don't have that
16 responsibility; that's her? Or do you?
17 A.   My -- the focus of where my job is is I'm
18 the immediate staff in the market claim office.
19 Q.   Getting the claims handled and managing your
20 staff?
21 A.   Getting -- making sure there's equity in the
22 claim distribution and dealing with the personnel
23 issues.
24 Q.   Okay. Is there a description of what an FPL
25 is and does somewhere, to your knowledge?

### Page 15

1  A.   Yes.
2  Q.   And where would we find one of those?
3  A.   I would have a description at my desk as
4  roles and descriptions of the FPL.
5  Q.   What does that description come from?
6  A.   What does it come from?
7  Q.   Right.
8  A.   It's on a piece of paper that I have. Was
9  provided to me at some point in time.
10 Q.   Do you maintain a list of the files that are
11 presently handled by the people you're supervising?
12 A.   We have a weekly, if not daily, if we would
13 like, printout of all the pending claims in the claim
14 office.
15 Q.   Okay. And on that weekly printout, are you
16 able to tell which claims are being handled by the
17 people you're supervising?
18 A.   They're broken out by desk location.
19 Q.   How do you use that weekly printout to
20 supervise, say, a frontline adjuster? I mean, do you
21 use it like a diary or do you have a separate diary
22 system? I'm just trying to understand how a guy who's
23 an FPL does his job.
24 A.   Right. Well, there are pending lists that
25 come out on each desk location. And it has that

### Page 16

1  broken into sometimes different categories. And I use
2  that as a method to gauge how much individual pendings
3  on any one desk, also the age of the pending. And I
4  look at the reserving on the pending, what item
5  claimants may be open that we should be dealing with.
6  Incorporates both the bodily injury and auto claims
7  come out on those.
8  Q.   So once a week, you'd get this list of
9  pending and that would give you the ability to review
10 what's happening with files, how old they're getting,
11 how they're being handled, how many any individual
12 adjuster may have?
13 A.   It gives me the ability to do that.
14 Q.   Okay. Do you have another system, a tickler
15 system or a diary system of any kind?
16 A.   Well, what you have here -- you have some
17 documents here of diary.
18 Q.   I'm thinking that -- I agree that says
19 "diary" on it, but that is like a log maintained on
20 each individual claim, correct?
21 A.   Are you talking a suspense system?
22 Q.   Yes. I'm just trying to understand.
23 Suppose nothing's happened on a file for six months or
24 a year, how would that come to your attention? How
25 would that fact come to your attention? Do you have a

Page 17

1  tickler system that says review files monthly,
2  quarterly, annually?
3  A.     The company's introduced a new -- recently
4  introduced a system that will mechanically -- or
5  through our system bring up claim files on specific
6  intervals to be reviewed. That's a recent enhancement
7  to our computer systems, to our resource base.
8  Q.     So in 2002 and 2003, was there a system to
9  regularly bring out files to the supervisor for
10 review?
11 A.     Not -- not in that method, no.
12 Q.     In some other method?
13 A.     Yeah. If I had it set on a follow-up, it
14 would come up on one of my task follow-up lists.
15 Q.     What does that mean, if I had it set
16 up on -- or set on follow-up?
17 A.     I diaried something to look for 90 days out,
18 100 days how.
19 Q.     How did you diary something, on the computer
20 or just write it on a calendar or on a note card?
21 A.     Some cases I may use a calendar. Some cases
22 I may use a computer task to-do. Some of our other
23 lists that come out are more in a 30, 60, 90-day type
24 for the unrepresented group to where we're really
25 active in the front-end type claim.

Page 18

1       MR. SANDBERG: Let's go off record for a
2  second.
3       (Brief recess.)
4       MR. SANDBERG: Let's mark this 15.
5       (Exhibit 15 was marked.)
6  BY MR. SANDBERG:
7  Q.     Do you recognize the documents that we've
8  just marked as Exhibit number 15?
9  A.     They appear to incorporate the Casualty
10 Development System.
11 Q.     What is the Casualty Development System?
12 A.     CDS. It's a reporting system within our
13 computer database.
14 Q.     And is this the new system you just
15 described to me or is it something else?
16 A.     The -- what I mentioned earlier is an
17 enhancement that overlays on this here, our current
18 CDS.
19 Q.     I see. So how long has the CDS program been
20 around, to your knowledge, if you know?
21 A.     Yes. I don't recall a specific date on
22 that, when it went live.
23 Q.     Has it been around at least since 2002?
24 A.     Yes.
25 Q.     So the file that we're looking at here, the

Page 19

1  one that I have given you the claims diary for, is
2  that, in fact, in this CDS format?
3  A.     Right. That would be under the different
4  IDs with -- where the adjuster would put their log
5  notes and diary their activity.
6  Q.     Can you explain to me when I look at that
7  log how come the entries start as though we're taking
8  a statement?
9  A.     Let's see.
10 Q.     It's not what each adjuster enters. It
11 appears to be the standard format.
12 A.     Okay. I'm not sure if I know what you're --
13 Q.     Well, let's see. Take a look at page -- at
14 page 13, if you would. Thirteen and 14 are together.
15 A.     Okay.
16 Q.     Actually, at the top of 14, it says "Desk:
17 AKB," which I believe is Kathy Berry. And then it
18 says "Involved Person Statement," "1 of 1." I'm just
19 wondering why it prints that out all the time, if you
20 know.
21 A.     That's the way the computer screen's
22 formatted on the -- for it. Under the "Statement
23 Types," there's different headers you can put in there
24 to identify different entries.
25 Q.     But it doesn't really mean we're taking a

Page 20

1  statement from an involved person every time that
2  prints out?
3  A.     No, no. It's the method to capture what
4  claim activity for a specific item claimant.
5  Q.     Now, if you go back to Exhibit number 15 and
6  look at page three --
7  A.     Fifteen?
8  Q.     Fifteen. I'm sorry. The one with the blue
9  sticker on it.
10 A.     All right.
11 Q.     It says there are "Summary screens available
12 for review and use by evaluation consultant." Let me
13 take that in smaller parts. Do the words "evaluation
14 consultant" describe an FPL or is that describing
15 something else?
16 A.     The evaluation consultant is another
17 position within the company.
18 Q.     And a lady named Lori Barra is an EC?
19 A.     That's correct.
20 Q.     And what is the summary screen within the
21 system, if you know, that the evaluation consultant
22 has for review and use?
23 A.     Let's see. They may -- may be under CDS 08
24 item claimant identifier for a summary screen in which
25 a claim representative would put a summary in their

**Page 21**

1  view on a case file for the EC to review.
2  Q.    Then a little farther down, it says
3  "'Normal' diary entry can be replaced." Do you know
4  what the normal diary entry is in the CDS system?
5  A.    The normal diary entry would be this,
6  something here (indicating).
7  Q.    That a person -- that an adjuster has
8  entered?
9  A.    Right. However, that's write-protected.
10 You can't replace that.
11 Q.    That's what I was about to ask. What does
12 it mean to say that it can be replaced?
13 A.    On the CDS 08 screens there are an offer
14 history bullets which allow an individual to capture
15 the different negotiation figures throughout the
16 course of the claim. And those are live fields that
17 can be updated. You can put a new number in there.
18 Q.    So that means at least those things a person
19 can reenter the system and change the previous entry?
20 A.    However, that previous entry would be
21 documented on another screen, so it is memorialized.
22 Q.    What other screen would that appear on?
23 A.    It's an offer history screen.
24 Q.    As a supervisor or an -- as an FPL, are you
25 evaluated based upon your supervisory skills?

**Page 22**

1  A.    Yes.
2  Q.    Okay. And who does that?
3  A.    That would be -- who's writing my
4  performance evaluation is Don Dasenbrock.
5  Q.    And what criteria does he use for evaluating
6  your supervision?
7  A.    There's a number of measurements that come
8  into play.
9  Q.    Where would I find those if I wanted to see
10 what they are?
11 A.    That would be on my yearly performance
12 evaluation.
13 Q.    Okay. But is he evaluating you according to
14 a set of goals and objectives that you have that are
15 shared with you?
16 A.    Yes. Some of the goals are on there that
17 I'm rated on, yes.
18 Q.    Okay. I'm struggling with this. But what
19 I'm really trying to get at is you have a job
20 description, correct?
21 A.    Yes.
22 Q.    And the job description includes claim file
23 supervision, correct?
24 A.    Uh-huh.
25 Q.    And does the job description also then

**Page 23**

1  include your goals and the guidelines for supervising
2  claims?
3  A.    Yes, there are -- it would come into -- yes,
4  there are goals in there.
5  Q.    Well, let me ask it a different way then:
6  How does Don know how to evaluate you except by --
7  evaluate your supervision? I don't care about your
8  personal hygiene or something else. I'm talking about
9  just your -- how to evaluate your claim supervision
10 except by reference to your job description?
11 A.    Right. Well, there's a number of
12 categories. One category, the number of complaints
13 that may come in out of my work group from people out
14 in the local market. That's one area. Another area
15 is a yearly employee survey. That shows up on an
16 evaluation. The -- how we manage our current pending,
17 our current book of business is a measurement, as
18 examples.
19 Q.    Are there guidelines for how often you are
20 supposed to be reviewing the files that you are
21 supervising?
22 A.    I'm thinking here to drill down on the --
23 not coming up with a specific number to give you on --
24 to be in the claim file. In the unrepresented
25 segment, in that group there that's primarily not

**Page 24**

1  attorney driven, I'm in those files a lot more than in
2  the attorney segment, in which typically we have the
3  claim reps there working with the attorneys. And
4  those are typically not turning over as fast as I have
5  in my unrepresented group.
6  Q.    Okay. But let's take a file within the
7  represented claim unit. Suppose you hadn't looked at
8  it in a year or two years. Would Don show up and say
9  that's too long? The guidelines say you are to be
10 reviewing these quarterly or --
11 A.    Right.
12 Q.    -- or annually or something?
13 A.    Yes, that's true.
14 Q.    What guidelines would he be looking at when
15 he said that?
16 A.    I've having a hard time putting my --
17 putting a number on that.
18 Q.    I don't mean what they are. What document
19 would he be looking at to say how often you should be
20 reviewing claims within the represented unit?
21 A.    Right. Currently -- current tickler is
22 around 120 days unless otherwise required is a
23 suspense that we've put out there. And other things
24 would trigger it to perhaps come up sooner.
25 Q.    How does the 120-day tickler work? In other

Page 25

1 words, what happens after 120 days?
2 A.    Well, nothing from the system at this point
3 in time would tell me to be in a specific claim file,
4 but only have been what I may have put out on a task
5 list to look at.
6 Q.    So when you say "this point in time," you're
7 describing 2002 --
8 A.    Right.
9 Q.    -- for our claim here.
10 A.   Yeah.
11 Q.   So how about the existing system, after 120
12 days what would happen?
13 A.   The current company's put what we call a --
14 called a reminder bank. And it's -- what it does, it
15 enables -- it brings up a reminder in our task list
16 that this file needs to be looked at for a specific
17 reason. And it goes to either a claim representative
18 or to their manager. And there's different timelines
19 on those. And that's a recent enhancement to our
20 system to --
21 Q.   Is there a document that describes the
22 timelines that you just told me about?
23 A.   Yes.
24 Q.   And what's it called?
25 A.   It's a reminder bank job aid.

Page 26

1 Q.    And the 120 days is sort of the overall
2 reminder. But you said there are -- there are certain
3 files that receive more frequent supervision?
4 A.    There can be, yes.
5 Q.    And what kind of -- what triggers more
6 frequent supervision?
7 A.    Well, there could be a number of things.
8 One example I can use is relating to an auto, physical
9 damage, third party claimant. And typically, if we
10 have that in our book of pending and it gets out after
11 certain period of time, I want to know why we're not
12 looking at it.
13 Q.   And --
14 A.   That would be one example.
15 Q.   Does the document you told me about about
16 this task bank or whatever it was, does that set --
17 establish criteria for how often claims should be
18 reviewed by a supervisor?
19 A.   On this new enhancement?
20 Q.   Yes.
21 A.   It has when the system updates to keep
22 cycling through, because it regenerates. Or it has
23 the capability to do that.
24 Q.   Okay. But, for example, suppose you had a
25 quadriplegic case on a $100,000 policy, would that get

Page 27

1 reviewed more often than a case in which there was no
2 realistic excess exposure?
3 A.    That would have a probability, yes.
4 Q.    Okay. And how would the system identify
5 that case and make sure that it was getting
6 supervision?
7 A.    The -- assuming -- for that particular in
8 the new enhanced process would be if it was reserved
9 at the facial limit, you would populate that yes, we
10 do have coverage that's reserved at this limit and
11 wanting someone in a supervisory capacity to go in and
12 look at why is that.
13 Q.   And how often would that claim then be
14 triggered or pulled up for supervision by the existing
15 system?
16 A.   The systems knew where you can forward pend
17 it, if you want to pend it in your task list to do
18 that. And then you can pick your own date to do that.
19 It's a tool that the company's put out there to assist
20 both the claim representatives and the supervisors as
21 an additional tool to help manage their book of
22 pending.
23 Q.   I see. So if the -- returning to our
24 quadriplegic case on the $100,000 policy, if you said
25 I want to see this case every two weeks, you could

Page 28

1 diary it yourself within the system for that?
2 A.    I believe you can, yes.
3 Q.    Okay. Well, let's take five, because I
4 think we're -- we will soon be -- I'm sorry. Let's
5 take -- let's continue for just a minute, because I
6 think we'll be shifting gears soon.
7       Are there events that trigger supervision?
8 In other words, say, for example, does the filing of a
9 lawsuit -- well, the filing of a lawsuit will trigger
10 a transfer, won't it? So that's a bad example.
11      A demand letter. Would a demand letter
12 trigger automatic supervision?
13 A.    The demand letter would require that the
14 claim rep and the -- notifies me of the letter and
15 then for the claim representative to respond
16 appropriately to that.
17 Q.    Let's close that loop then. If a demand
18 comes in, the claim rep is required to consult you?
19 A.    I -- yeah. Well, required -- I'm required
20 to see those, yes, when they come in.
21 Q.    And then to formulate a response, are there
22 other people in the loop, like the EC?
23 A.    Depending on the specific example, there --
24 the EC perhaps, depending on who the representative
25 would consult with.

Page 29

1  Q.  Is it required that the EC be involved to
2  formulate a counteroffer?
3  A.  On the counteroffer?
4  Q.  That's right. In other words, if we wanted
5  to follow my little loop around, you get a demand. It
6  comes to the claim rep. The claim rep consults with
7  you. The EC may or may not be involved initially to
8  evaluate the demand. But suppose you want then to
9  make an offer, do we have to get the EC involved?
10 A.  Yes. That's -- yes, you would.
11 Q.  Okay. Anybody else?
12 A.  Well, depending on the case, you may get the
13 FPE involved or seek some advice from elsewhere.
14 Q.  And that would be Ms. Petersen in your
15 office?
16 A.  Yes.
17 Q.  Does whether the demand is or is not a
18 policy limits demand make any difference in the
19 scenario you've just described to me?
20 A.  As to involving the EC?
21 Q.  Yes. How many people are involved. I'm
22 just trying to understand the process.
23 A.  If the -- one example, if a demand comes in
24 with no supporting documentation for the demand and no
25 time limit on it, we'd respond that we need the

Page 30

1  supports in order to properly evaluate and respond to
2  the demand, example such as that.
3  Q.  And you'd expect a claim rep to write that
4  letter, correct?
5  A.  Yes.
6  Q.  Would the demand still come to your
7  attention?
8  A.  In that case, yes.
9  Q.  Anybody else's?
10 A.  I don't believe so.
11 Q.  If a letter -- if a demand letter comes in
12 with a deadline attached, are those calendared?
13 A.  They are.
14 Q.  How?
15 A.  The claim representative calendars for
16 response on those. Attempts to meet that or get an
17 extension.
18 Q.  And under the present system, how does that
19 happen? How does it get calendared?
20 A.  The -- we have a demand log, which we log
21 that in and whether or not there's a response date due
22 on it or not.
23 Q.  Is the demand log computerized?
24 A.  Yes.
25 Q.  So there's a -- if the -- does the Anchorage

Page 31

1  office maintain a central computerized demand log for
2  all files? I'm just trying to understand how it's
3  organized.
4  A.  Yes. And FPE would have access to that if
5  they wished or -- yes.
6  Q.  Okay. And what -- now in 2002, what was the
7  system like for calendering demands with deadlines
8  attached?
9  A.  Right. The 2002, I don't recall if it was
10 computerized or a manual log.
11 Q.  But there was a demand log maintained within
12 the office?
13 A.  I believe so, yes.
14 Q.  And -- well, let's -- without regard to when
15 the transition was, how did the prior -- the manual
16 log work? Was there a book somewhere, a thing
17 somewhere? How did things get entered on it and who
18 did it?
19 A.  Right. The -- it was a spreadsheet. And it
20 would come in. And at that point in time, I believe I
21 was writing in the claim number, the item claimant,
22 the claim representative, whether or not it was a time
23 limit demand or facial demand, whatever.
24 Q.  Okay. And then did someone on your staff
25 then calendar those demands for you under this manual

Page 32

1  system? In other words, how did you know other than
2  looking at the demand log every day which demands were
3  expiring?
4  A.  Yes.
5      No. There would not have been in my -- I
6  did not have a support person doing that for me.
7  Q.  Did the office?
8  A.  I don't recall. I don't -- I don't recall
9  if we did or not.
10 Q.  As the supervisor, was the expiration of
11 demands called to your attention under the previous
12 system somehow by a tickler, by a note, by anything?
13 A.  I would try and look to see what the status
14 was, if we'd responded in time and got an extension or
15 communicated with the attorney.
16 Q.  Was it part of your job to review the demand
17 log periodically then?
18 A.  Yes.
19 Q.  So once a week, once a day? How often?
20 A.  Once a day, no. Perhaps once a week.
21 Q.  So at least once a week, you should know
22 what demands are expiring within the claims being
23 handled by the people you're supervising.
24 A.  Yes.
25 Q.  And the system you're just describing, would

Page 33

```
 1  it have -- I mean, once a week -- let me back up a
 2  little. Withdraw that.
 3       At least once a week would you have known
 4  what demands were expiring within the claims being
 5  handled by the people you were supervising in 2002 and
 6  2003?
 7  A.   Assuming I was looking at the log, I would
 8  have.
 9  Q.   Okay. Let's take our break, because I think
10  we're going to shift gears from generic to discussing
11  this claim soon.
12       Oh, yes. Last question -- I'm sorry --
13  before we go. What is your present settlement
14  authority?
15  A.   Recently changed the settlement authority.
16  And I'm not just certain what it is at this point
17  here.
18  Q.   What was it before the recent change?
19  A.   I believe on gross file may have been
20  300,000.
21  Q.   And how much -- what was your settlement
22  authority in 2002?
23  A.   That may have been -- I would need to go
24  back and look at my -- the daily table or the log back
25  then.
```

Page 34

```
 1  Q.   I believe Ms. Petersen told us that in 2002
 2  and 2003, the office authority was 150. Does that
 3  sound right?
 4  A.   Well, there's --
 5       MR. WILKERSON: Per person or per gross
 6  file? I think he distinguishes those.
 7  BY MR. SANDBERG:
 8  Q.   I'm sorry.
 9  A.   There's per person and gross file authority.
10  Q.   Gross file would be the PD, the U,
11  everything for one event?
12  A.   Under an A coverage, it's 150 individual,
13  300 aggregate.
14  Q.   And that be would be the office limit?
15       MR. MESTAS: Or was?
16  BY MR. SANDBERG:
17  Q.   I'm confusing you, because I'm confused.
18  What is the present office authority for a single BI
19  claim?
20  A.   I believe it's 150.
21  Q.   And what is your personal present authority
22  for a single BI claim?
23  A.   I'll need to recheck. I know we've recently
24  been doing some changes on those.
25  Q.   In 2002 and 2003, what was the office
```

Page 35

```
 1  authority for a single BI claim?
 2  A.   I believe 150.
 3  Q.   And in 2002 and 2003, what was your personal
 4  authority for a single BI claim?
 5  A.   For a single, I don't believe it would have
 6  been more than 150, I think. But I would need to go
 7  back and look at that document.
 8  Q.   Do you believe that in the spring of 2003,
 9  you had authority to go to 150 on a single BI claim?
10  A.   I would need to relook back then to see what
11  the authority level was. I just don't recall.
12  Q.   Do you know if in the spring of 2003 you
13  had -- you possessed a hundred twelve five of
14  authority on a single BI claim?
15  A.   I believe, yes. Yes.
16  Q.   And if we wanted to find out, what would we
17  look at?
18  A.   The name of the list, I don't have it on the
19  top of my head. There's a daily list that comes out
20  with the different authority levels for the -- all the
21  different claim representatives and agents within the
22  market.
23  Q.   Okay. And your personnel file would
24  certainly identify your authority levels over time?
25  A.   If not that, the computerized list would.
```

Page 36

```
 1       MR. SANDBERG: Okay. Let's take our first
 2  break. I promised it three times. Let's really do
 3  it.
 4       (Brief recess.)
 5  BY MR. SANDBERG:
 6  Q.   Okay. Back on record. Now, Mr. Elkins, I'd
 7  like to shift gears from discussing the things, the
 8  generic things we've been discussing to discussing our
 9  file and how it was handled in 2002, 2003. And I
10  believe I've already shown you essentially what is a
11  portion of the claim file that's in front of you.
12       And as we move through this, what I'd like
13  to do is we'll refer to Bates numbers inside that
14  document. And then we'll pick up, if necessary, if
15  there's any gaps or anything that you need to consult
16  anything, I think we can do it. We have a second
17  round of production here. And then we have a third
18  sitting across the table from you. And if you need
19  to, don't hesitate to tell me, if you want to see
20  what's in a gap or in a space.
21       Now, in 2002, you were still an FPL?
22  A.   Yes.
23  Q.   Okay. As an FPL in 2002, how many claims
24  would you have been supervising?
25  A.   Could have been anywhere from 750 claims,
```

Page 37

1  perhaps.
2  Q.    Would that include unrepresented and
3  represented claims?
4  A.    Well, then in addition, some medical pending
5  claims also. So that number would probably be
6  enhanced.
7  Q.    Is that the number that would be open at any
8  given time --
9  A.    Yes.
10 Q.    -- typically? And then within the 750,
11 roughly, can you break out how many would be within
12 the represented unit?
13 A.    I could.
14 Q.    What would it be?
15 A.    Oh, I could go back and find that.
16 Q.    I mean, as we sit here, can you ballpark it
17 for me?
18 A.    Could be between two to 300 pending claims.
19 Q.    Looking at the accident involving Charles
20 Herron, who is my client -- I represent Mr. Herron.
21 Looking at the accident involving Mr. Herron in the
22 file you have in front of you, it appears you were the
23 supervisor on this file from its inception, correct?
24 A.    Appears I was, yes.
25 Q.    Okay. I see you on the file within two days

Page 38

1  of the accident.
2  A.    Yes, or thereabouts.
3  Q.    In any event, very soon after the accident,
4  correct?
5  A.    Yes.
6  Q.    Would you take a look at three and four? Do
7  you have your copy of that? I'll tell you what. I'm
8  sorry. Let's go off record for a second. I have
9  another complete copy of that exhibit. We'll use this
10 one. Never mind.
11       (Brief pause.)
12 BY MR. SANDBERG:
13 Q.    Back on record. First of all, this claim
14 involved an accident in Bethel. Does the fact it
15 happened in Bethel have any significance in terms of
16 claims handling?
17 A.    Well, we're always concerned with a Bethel
18 venue.
19 Q.    Bethel is a dangerous place for handling
20 accident cases, isn't it?
21 A.    I think any case we want to be aware of
22 and --
23 Q.    But would you agree with me that Bethel is a
24 dangerous or high dollar venue?
25 A.    Appears to be a unique market in Bethel.

Page 39

1  Q.    Unique because many big awards come out of
2  Bethel?
3  A.    That may be.
4  Q.    Well, you are aware of that, aren't you,
5  sir?
6  A.    They tend -- that is true, yes.
7  Q.    Okay. Now, let's see. On three and four,
8  we're looking at an entry from Renee VanZant where it
9  appears within -- by September the 16th, she's already
10 identified the fact that Ms. Trailov had a skull
11 fracture and fluid in her lungs, correct?
12 A.    Right. She had a scratch on the arm and,
13 right, a minor skull fracture.
14 Q.    And fluid in her lungs?
15 A.    Uh-huh.
16 Q.    And she's been medevaced to the Alaska
17 Regional?
18 A.    Yes.
19 Q.    Okay. But to be transferred to the Alaska
20 Native Hospital, correct?
21 A.    Correct.
22 Q.    And then the next day, which is at six, I
23 believe, we see a note from you saying forward --
24 actually, at the top of five, it says notify used on
25 and then sent to DJ1F. Is DJ1F you?

Page 40

1  A.    That would be the -- yes.
2  Q.    Okay. And then the following day, we see an
3  entry by you that says forward this file to me for
4  review today, correct?
5  A.    Yes.
6  Q.    Okay. What does "notify used" mean?
7  A.    That's the date the electronic message was
8  sent from Renee to myself.
9  Q.    So Renee is sending you this previous
10 message, is that what that means?
11 A.    The one on six?
12 Q.    Yes. Or the one on five. I'm sorry.
13 A.    Right. Up there, yes.
14 Q.    And your response is forward this file to me
15 for review today?
16       MR. WILKERSON: That's on six.
17       THE WITNESS: That's on -- yes.
18 BY MR. SANDBERG:
19 Q.    When you -- when a notify is sent to you,
20 what do you get? I mean, do you get the whole
21 computer diary as it exists at that time or what
22 happens? What does it mean to say notify used?
23 A.    On our computer, Allstate system, on the
24 screen I work in within the CDS compartment, there's a
25 light that will highlight a line that says you have a

Page 41

1 notice pending or someone has sent you a computerized
2 e-mail. And that's the notify.
3 Q.    So you would not automatically then have
4 received any portion of the file at that point. All
5 you get is something telling you you have a notify
6 pending.
7 A.    Right. I go in. It says claim number and
8 who from. Then I click on it. And it can take me
9 into the claim diary.
10 Q.    And then the next day, at page eight, it
11 appears you were providing instructions to Renee?
12 A.    Yes.
13 Q.    And so the sequence has been she's sent you
14 the notify, you've received the file for review and
15 now you're providing her instructions?
16 A.    Yes.
17 Q.    And the instructions include something
18 saying follow up on matrix requirement. What's that
19 mean?
20 A.    Well, that would be securing a police
21 report, interviewing the involved party.
22 Q.    Is Renee working from a matrix?
23 A.    From a matrix? It's a task list of things
24 that she's supposed to be doing. And so I'm just
25 telling her to make sure she followed those.

Page 42

1 Q.    I see. And that would include normally
2 investigating liability, assembling medical records,
3 the normal things involved in processing an auto
4 claim?
5 A.    Yes.
6 Q.    Which is still at this point unrepresented,
7 which is why Renee is there, correct?
8 A.    She got that on an unrepresented desk.
9 Q.    Renee, I think we've established before, is
10 part of the unrepresented unit.
11 A.    Yes.
12 Q.    And then the next thing it says is secure
13 certified dec and agent application waiver issue.
14 What is the waiver issue?
15 A.    This is a -- was a company requirement or
16 task that I secure the selection/rejection form or
17 ensure the insured had an opportunity on the UM/UIM
18 endorsements.
19 Q.    Did this relate to what I'm going to call
20 failure to offer litigation?
21 A.    That may have stemmed out as a by-product of
22 that, yes.
23 Q.    And so you -- I believe Ms. Petersen told us
24 there was a memo that came out regarding this waiver
25 issue. Is that correct, to your knowledge?

Page 43

1 A.    There was a task request that we identify
2 and look for those claim files.
3 Q.    Okay. Was it in every claim file?
4 A.    The ones that I was tasked to look at were
5 more the objective injuries in the insured's car, as a
6 passenger. And that's what I was doing here.
7 Q.    But it would be -- I mean, was it in cases
8 where there was potentially U exposure?
9 A.    It was in all -- essentially, I was spot
10 checking and tasking on these type of cases here where
11 we had an injured party in an insured auto. And as
12 part of my job was to go in and request to the claim
13 representative just to ensure that was on file.
14 Q.    Okay. But if there was no realistic U
15 exposure, would you still have made this request?
16 A.    In my spot checks, I was tasked to do that.
17 Q.    In every file where a passenger was injured?
18 A.    The -- on this type of file here, I was
19 asking for this type of request on my spot checks of
20 the claim reps.
21 Q.    Okay. But by this date, had you determined
22 there was at least potentially a U exposure?
23 A.    No, not with the information I had on hand
24 here.
25 Q.    We knew we had an injured person who had

Page 44

1 been medevaced, correct? And we had a claim in
2 Bethel. So have you -- were you able to determine at
3 least that there was potentially a claim that could
4 get to the U level?
5 A.    At this point in time, I hadn't formulated
6 any -- any thoughts on that line.
7 Q.    Well, suppose nobody had been injured at
8 all, you wouldn't have made this request, would you?
9 A.    If no one would have been injured, Renee
10 would not have got this claim file.
11 Q.    Okay. Suppose we had nothing but minor
12 injuries, would you have made this request, if
13 everybody said we feel fine, but might go to the
14 chiropractor?
15 A.    Yeah. At that point in time, I was being
16 asked to in my spot checks ask for that documentation.
17 Q.    Was there -- how were you being asked? Was
18 there a memo, a guideline, a directive? Who was
19 telling you and what were they telling you?
20 A.    It was in a memo. And trying to recall the
21 exact verbiage on it. But the bottom line, that was
22 part of my job accountability was to look at that and
23 request the claim rep to follow up and report back on
24 it.
25       MR. SANDBERG: And Mr. Wilkerson, I don't

Page 45

1  suppose we have that memo that Ms. Petersen talked
2  about yesterday.
3       MR. WILKERSON:  I don't.  I can try and get
4  it.
5       MR. SANDBERG:  Maybe at the next break, if
6  it's available.  That would be great.  Because then we
7  wouldn't need to ask Mr. Elkins to guess so much about
8  what it says.
9       MR. WILKERSON:  I'll try.
10 BY MR. SANDBERG:
11 Q.   In any event, you were complying with a
12 directive that had come to you to obtain this
13 information in certain types of cases?
14 A.   Yes.
15 Q.   Okay.  Now, go to page 81, if you would.  If
16 you look at way up there, there's an entry that says
17 ID O1 percent neg entered as.  And it goes on from
18 there.  Can you translate that entry for me?
19 A.   Yes.  Renee had entered in a computerized
20 field 100 percent negligence as to the insured.
21 Q.   That would be Charles Herron, my client?
22 A.   That would be the insured driver, yes.
23 Q.   And the date on that is 9/25.  So is it safe
24 to say that by 9/25 the liability investigation was
25 over?

Page 46

1  A.   She entered that in on 9/25 based on the
2  report of the accident, the car hitting a light pole.
3  Q.   And so --
4  A.   And she also requested a police report at
5  that point.
6  Q.   If you go back to 80, we can actually see on
7  9/21, we have the date that it appears Renee actually
8  entered -- made the entry.
9  A.   Let's see.
10 Q.   If you look at 9/21.
11 A.   Yes.  It appears that.
12 Q.   So by either 9/21 or 9/25, was the liability
13 investigation effectively concluded?
14 A.   Based on the initial report that had come in
15 with the insured driver losing control into the pole,
16 there was reasonable assumption that responsible for
17 the accident.
18 Q.   And so was there any more liability
19 investigation after this?  I mean, this is the end of
20 it, isn't it?  At this point, we move on to a damages
21 investigation?
22 A.   It appears based on what I'm seeing at that
23 point in time, she did not go any further on the
24 liability.
25 Q.   Now return, if you would, to -- or go -- I'm

Page 47

1  sorry -- farther back to page 240.
2  A.   Okay.
3  Q.   What are we looking at at page 240?
4  A.   Page 240 was Renee's transfer assignment to
5  the represented unit.
6  Q.   And it's signed by Mr. Davis?
7  A.   By Gary Davis, yes.
8  Q.   Do you know why this would have come to
9  Mr. Davis instead of you?
10 A.   The -- at that point in time, I may have
11 been out of the office that day.  Gary may have been a
12 backup and assigned the claim file to the represented
13 adjuster.
14 Q.   Okay.  Because at least this is the only
15 time I see Mr. Davis in the file.  So let me ask, what
16 was Mr. Davis' job in September 2002, if you know?
17 A.   He was transitioning roles, I believe, to
18 personal line manager at that point.  We had another
19 manager retiring.
20 Q.   And on this form, we see it says liability
21 investigation complete and the box yes is checked.
22 A.   That it is.
23 Q.   Now, I'm going to ask you to flip back to
24 page 14.
25 A.   Okay.

Page 48

1  Q.   At page 14 on 9/26, we see an entry made by
2  Karen Petersen.
3  A.   Yes.
4  Q.   And it is assigning this claim to Kathy
5  Berry, it appears.
6  A.   Okay.
7  Q.   Does that -- I mean, I'm not testifying.
8  I'm trying to ask a question of you.  Does that seem
9  right?
10 A.   Right.  It looks like Karen was in the claim
11 file and gave Kathy the -- transferred over.
12 Q.   Do you know why Ms. Petersen enters the
13 claim file at this point?
14 A.   It appears Gary may have transferred the
15 file to her to get some review on it prior to going to
16 Kathy.
17 Q.   Would it be customary for a file to be
18 referred to Ms. Petersen when it's transferred out of
19 the unrepresented unit?
20 A.   At one point, it would have been.
21 Q.   Do you know if it was at this point?
22 A.   I need to look at our staffing chart back in
23 2002.  We had some personnel changes and -- with Gary
24 retiring and some other activity.
25 Q.   Kathy told me that she was an FPE at this --

Page 49

1  in September of 2002.
2  A.     That would have been Karen Petersen?
3  Q.     I'm sorry. Karen. Karen told me that, told
4  me that she was an FPE in September of 2002. Assuming
5  that's correct, did a file need to come to the FPE
6  upon transfer?
7  A.     If I had been out of the office during that
8  time period, it may have flowed through. If Gary was
9  acting on a backup for me, it may have gone through
10 Karen.
11 Q.     So the fact that we see Gary and then Karen
12 in the file here may tell us nothing other than you
13 were out those two days?
14 A.     That it was flowing through a transfer
15 process.
16        MR. SANDBERG: Okay. Then let's see. I
17 think I may have marked this previously. And if I
18 have, we'll have it duplicate. But I have an
19 unredacted copy of these pages that we'll mark as
20 Exhibit number 16.
21        (Exhibit 16 was marked.)
22 BY MR. SANDBERG:
23 Q.     Let's start at the top of Exhibit number 16.
24 We have Karen's note of 9/26. It says "Kathy, New
25 transfer. May need to split file back if contact

Page 50

1  needed with other passengers." A split file refers to
2  the fact that some of it may be still handled by the
3  unrepresented unit?
4  A.     Yes.
5  Q.     And it says "Need to determine extent of 04
6  injuries." That would be Ms. Trailov in this case?
7  A.     ID 04 would be Miss Trailov, yes.
8  Q.     And it says "Review reserves. Currently at
9  25K" and it goes on from there. "Plus CC coverage
10 available." CC is med pay?
11 A.     That would be the med pay, yes.
12 Q.     Okay. At this point -- let's see. As a
13 passenger in the car, Angelina Trailov is an insured
14 for med pay, correct?
15 A.     Yes, she is.
16 Q.     And how would you expect her to learn that?
17 A.     That -- several ways. One would be through
18 conversation with the claim representative. One may
19 be through their conversation with the attorney if
20 they're represented. Another way would be through
21 written correspondence.
22 Q.     Would it be normal practice or procedure to
23 write a letter to each insured in an accident like
24 this identifying what coverages are available?
25 A.     Yes.

Page 51

1  Q.     And it says "Need letter to insured driver,"
2  slash, "owner re no coverage for punitives." Do you
3  know why such a letter would be sent out?
4  A.     The allegations of the drinking.
5  Q.     Okay. And so this would be simply to notify
6  the insured that there was a possibility of an
7  uncovered claim?
8  A.     Yes.
9  Q.     In the ordinary course of events, how
10 promptly would you expect Kathy Berry to follow up on
11 that directive from Ms. Petersen?
12 A.     I would expect within a reasonable time
13 period to do that.
14 Q.     A week? A month?
15 A.     The noticing of the coverages would -- yeah,
16 within a reasonable amount of time as far as a letter
17 on that. The punitive letter is at the discretion of
18 Kathy when -- if any of those are ever alleged further
19 down the line. So that's at her discretion.
20 Q.     Let me break that into smaller bites. You
21 would expect a letter to go out fairly promptly to
22 each insured identifying the coverages available,
23 correct?
24 A.     That would be an expectation, yes.
25 Q.     And then this letter regarding no coverage

Page 52

1  for punitives that would be going to my client, you
2  would expect that whenever Karen decided it was
3  appropriate?
4  A.     Or if the issue was raised during the course
5  of the claim.
6  Q.     Now, the first part of that, within a week,
7  a month? When would you expect this letter to go out
8  to each insured identifying the coverages available?
9  A.     Within ten working days would have been
10 acknowledgment of the claim.
11 Q.     Okay. In fact, that is what the Unfair
12 Claim regs provide, right?
13 A.     Yes.
14 Q.     And then the letter regarding no coverage
15 for punitives would -- that would be at Kathy's
16 discretion based on what happened in the development
17 of the claim?
18 A.     Could be. As the case developed, we had
19 allegations of driver drinking. At that point there,
20 I don't think it was proven. So it was a suggestion
21 by, appears to be Ms. Petersen, that Kathy do that at
22 some point.
23 Q.     Suppose, say, the police report comes in and
24 it shows there's been driver drinking, then would you
25 expect such a letter to go out?

Page 53

1  A.   If there were the allegations of any
2  punitives, yes, that would --
3  Q.   Go back to page one now of our claim system.
4  At page one of the claim system -- maybe I have this
5  wrong. I'm sorry. Oh, no. I'm sorry. There we are.
6  10/1. It says the med pay was assigned to Scott
7  Millar on October the 1st.
8  A.   Under pay on number one?
9  Q.   Yes, page one at the very bottom.
10 A.   10/1, there was an assignment made to Scott.
11 Q.   And we discussed Scott works for you,
12 correct?
13 A.   Yes.
14 Q.   You supervise Scott's work?
15 A.   I do.
16 Q.   Okay. And upon assignment of the med pay
17 claim to Scott, would you expect Scott to contact each
18 insured eligible for med pay benefits and disclose the
19 existence of coverage if that hadn't happened yet?
20 A.   That would have been part of his duty and
21 responsibility.
22 Q.   And would you expect Scott then to start
23 sending out medical authorizations?
24 A.   In the -- with the correct address, yes, I
25 would -- would expect that.

Page 54

1  Q.   And if he didn't have a correct address,
2  would you expect Scott to get one?
3  A.   Well, we would want him to try and secure
4  that, yes. That or work through the client's attorney
5  to secure that.
6  Q.   Okay. And if the insured had an attorney,
7  then you'd expect him to send the medical release to
8  the attorney, correct?
9  A.   That would be one option, yes.
10 Q.   That is part of the med pay job is to gather
11 up medical records, right?
12 A.   That is part of a med pay job.
13 Q.   Is the med pay file available to the
14 liability claims adjuster? In other words, suppose
15 Scott gathers up a pile of medicals, can somebody like
16 Kathy Berry or Renee VanZant go look at them?
17 A.   In the context that we have here, you would
18 want to make sure you had the proper releases
19 between -- you can't share that information across
20 the -- with the other insureds' attorney.
21 Q.   Okay. How about within -- within Allstate?
22 I mean, for example, suppose Scott gathered up a bunch
23 of medicals on Ms. Trailov. Could Kathy Berry access
24 those medical records when she's trying to adjust the
25 liability claim?

Page 55

1  A.   She would need a release to secure those
2  from Scott.
3  Q.   And who would sign that release?
4  A.   Well, that would come through the attorney.
5  If Kathy was working with an attorney, communicating
6  with an attorney for that injured party, send a
7  release to Kathy that she could secure the first party
8  medicals in order -- assuming Scott had those.
9  Q.   Right. So if Scott is adjusting the med pay
10 claim for Ms. Trailov and he has a bunch of medicals
11 and Kathy Berry wants to look at them, then you'd
12 expect Kathy to contact Angelina's lawyer and ask for
13 a letter or something saying it's okay to go look at
14 them?
15 A.   We would want to do that.
16 Q.   And that would be the normal procedure for
17 accessing them if Kathy wants them?
18 A.   If Kathy wanted that from the first party
19 side, yes, just to get permission to share the
20 records.
21 Q.   Sure. And that permission is normally
22 granted, isn't it?
23 A.   In some cases, the plaintiff attorney
24 withhold all the records and billings until later on
25 in the development of the file.

Page 56

1  Q.   Even if the med pay already has them? I
2  mean, I'm just asking. I've written a ton of those
3  letters myself saying, sure, go look at the file.
4  A.   Yeah. Could you restate the question? I
5  must have misunderstood.
6  Q.   Sure. Is it customary for a plaintiff
7  attorney to grant the liability adjuster permission to
8  go look at the med pay file?
9  A.   In most cases, yes.
10 Q.   Okay. I probably should have asked Scott
11 yesterday, but I wasn't smart enough. Roughly, if you
12 can tell me, how many open files would Scott have had
13 in the fall of 2002?
14 A.   I'm thinking anywhere from 280, 290 to the
15 low 300s. I would have to go back and look at a
16 report.
17 Q.   Sure. I'm just asking for a sense of it.
18 How about as long as we're here, let's ask for the
19 other people. How about Renee?
20 A.   Renee may have had between 70 and 100
21 pending claim files.
22 Q.   And how about Kathy Berry?
23 A.   One twenty-five, perhaps. I'm just taking
24 an average of --
25 Q.   Sure. But that at least gives me a sense of

Page 57

1  what their pending list is going to look like for each
2  of them.
3       Come forward to page 19 for me then, if you
4  would.
5  A.   Okay.
6  Q.   Once again, on page 19, we see you in the
7  file again. It's November the 7th, '02, correct?
8  A.   Yes, it is.
9  Q.   And you're providing instructions to Kathy?
10 A.   Yeah.
11 Q.   It says please review that letter to 04
12 attorney did go out. What letter, if you know, would
13 that refer to?
14 A.   I'd have to see if that was in response to
15 an attorney notice letter that may have come in. Do
16 we have any prior --
17 Q.   Actually, there was an attorney by
18 this time. And -- oh, I'm sorry. I skipped one.
19 Go to 157, if you would. I skipped over one thing
20 in our chronology. I've been trying to keep it
21 straight. Because straight chronologically is the
22 only way I can --
23 A.   What number again?
24 Q.   157.
25 A.   Is that the Bethel police report?

Page 58

1  Q.   Yes. It appears Allstate received the
2  Bethel police report by the end of October 2002?
3  A.   Okay.
4  Q.   Well, the date stamp at the top says
5  October 30th. Is that an Allstate stamp, if you can
6  tell?
7  A.   That would appear to be our date stamp.
8  Q.   Okay. And the -- you can take a second to
9  read it, if you want to. But the police report fairly
10 clearly identifies Mr. Herron had, in fact, been
11 drinking?
12 A.   Okay.
13 Q.   Should the letter concerning punitive
14 exposure have gone out at this point?
15 A.   At that point there, I don't believe any
16 punitive was alleged.
17 Q.   There wasn't a lawsuit yet.
18 A.   No. That may have been a good time for that
19 to have gone out. Kathy apparently using her
20 discretion in sending it out later.
21 Q.   The police report does show that my client
22 was arrested and charged with assault based upon this
23 accident --
24 A.   Oh, yes.
25 Q.   -- if you look at 162?

Page 59

1  A.   Okay.
2  Q.   So do you think it's an appropriate exercise
3  in discretion not to send it out at this point when
4  he's been charged with assault?
5  A.   Yeah. I don't have a good answer for you on
6  that.
7  Q.   Would you agree with me that there was
8  clearly some punitive exposure documented to the file
9  by the end of October?
10 A.   Appears to be, yeah, by virtue of the police
11 report.
12 Q.   If you look at 160, it shows a BA of -- it
13 says the test results on the Data Master obtained a
14 test result of .146. That would certainly be
15 indicative of at least some punitive exposure,
16 wouldn't it?
17 A.   Maybe. I know Kathy elected to send the
18 letter out later.
19 Q.   Let's go to 20 -- I'm sorry. Go to 19 where
20 we just were before I doubled back.
21 A.   Okay.
22 Q.   We were looking at your instructions of
23 November the 7th. And toward the bottom of it says,
24 ensure MAWA secured. What's a MAWA?
25 A.   I was just wanting her to double check to

Page 60

1  make sure we had the medical authorization for
2  Angelina.
3  Q.   So you're telling Kathy to make sure that an
4  Allstate -- that Allstate has a medical authorization
5  that will allow it to assemble Angelina's medical
6  records?
7  A.   That she's actively pursuing that, yes.
8  Q.   And if Angelina has a lawyer, you'd expect
9  that request to be routed to the lawyer --
10 A.   Yes.
11 Q.   -- for medical authorization?
12 A.   Representing Angelina, yes.
13 Q.   And we will encounter medical authorizations
14 in the records as we move through the file. But to
15 your knowledge, did the Angstman law firm ever decline
16 to provide any release that Allstate ever requested?
17 A.   I'm not aware.
18      MR. SANDBERG: Let's mark the next exhibit
19 here as number 17.
20      (Exhibit 17 was marked.)
21 BY MR. SANDBERG:
22 Q.   This is merely an unredacted portion of the
23 claims diary. We're moving forward chronologically.
24 At this point, we see that Kathy's entering the fact
25 that the blood alcohol was .146, correct?