Page 61

1  A.   Uh-huh.
2  Q.   And then it says "Reserves – severity of
3  injuries and length of hospitalization for 04 is
4  unknown. However, we know of skull fracture, puctured
5  lung and rib fracture." And "Given the venue I have
6  increased reserves to $75,000."
7       First of all, have I translated that
8  correctly?
9  A.   That appear to be her diary entries, yes.
10 Q.   Okay. Would Kathy be able to change the
11 reserve herself or would she come to you for that?
12 A.   No. She would have been able to change that
13 reserve herself.
14 Q.   Would you receive notice that it was
15 changed?
16 A.   No.
17 Q.   So that doesn't trigger any particular
18 review by a supervisor, just a reserve change all by
19 itself?
20 A.   Her case review of the file at that point,
21 that's what she felt was appropriate.
22 Q.   Okay. But the fact that it changes from 25
23 to 75 doesn't automatically route the file by you
24 again?
25 A.   No.

Page 62

1  Q.   Is there any limit on Kathy other than the
2  policy limit itself on Kathy's ability to increase
3  reserves? I mean, I understand they're supposed to be
4  appropriate. But I'm just wondering whether there's a
5  point where her ability to change them stops. That's
6  all.
7  A.   As new information comes in, part of their
8  job is to analyze and adjust reserves as appropriate.
9  Q.   Right. But I mean, does Kathy -- is $75,000
10 where Kathy's ability to change it stops and above
11 that, it's got to be you? Or could she change it all
12 the way up to a hundred here?
13 A.   She could have changed that to a hundred.
14 Q.   Then it says "Letter in file to plaintiff
15 attorney was faxed... but hard copy was not sent,
16 apparently because I was going to enclose MAWA.
17 Printing MAWA and sending with hard copy today."
18      So it appears that now it's November the
19 14th, and Kathy is sending a medical authorization; is
20 that correct?
21 A.   Based on her entry here, that appears
22 correct.
23 Q.   Okay. And we're now two months
24 post-accident, correct?
25 A.   That is two months.

Page 63

1  Q.   Okay. This is I believe the first time
2  anyone at Allstate is sending a medical authorization
3  concerning Angelina. Does that seem -- does two
4  months post-accident seem soon, long? How does that
5  strike you?
6  A.   Well, with -- I believe Angelina's address
7  may have been unknown. We had -- when did the
8  attorney rep letter come in? Do you have that in your
9  notes?
10 Q.   I do.
11 A.   The attorney rep letter?
12 Q.   I do.
13 A.   Appears she had meant to send that on 10/18,
14 but had overlooked it and sent it out on 11/14. And
15 she acknowledged that here in her diary entry.
16 Q.   The attorney rep notice -- if you look at
17 page nine, the attorney rep notice came in on 9/23.
18 A.   Okay. And apparently, Kathy acknowledged
19 that on letter to the plaintiff attorney on 10/18,
20 based on her notes here, faxed that but did not fax
21 the MAWA. Saw what she had not done and tried to
22 remedy the fact.
23 Q.   Does taking two months to get out a medical
24 authorization comply with Allstate practices and
25 procedures for an adjuster doing Kathy's job at this

Page 64

1  point?
2  A.   Specific to this item claimant?
3  Q.   That's right. Just this item.
4  A.   The -- I believe the fact that this
5  individual had -- was represented and we did not have
6  a good address for the -- for Angelina prior to that
7  delayed her getting out that medical authorization.
8  Q.   But from September 23rd, you knew who her
9  lawyer was, right? Allstate did. Not you personally,
10 necessarily. But from September 23rd, Allstate knew
11 who her lawyer was, correct?
12 A.   On the transfer, yes.
13 Q.   And from September 23rd, Allstate knew the
14 address of her lawyer.
15 A.   Yes. Yes, it would have been preferable to
16 get that out sooner.
17 Q.   Okay. Now, when this release goes out in
18 November -- well, I guess what I'm trying to get at is
19 how the different people in this file are expected to
20 interact. For example, when the release goes out in
21 November, you have Scott adjusting the med pay claim,
22 correct?
23 A.   Uh-huh.
24 Q.   And you have Kathy adjusting the liability
25 claim concerning Angelina, correct?

Page 65

1  A.   Yes.
2  Q.   And I asked you about meds that Scott would
3  work on. Let me ask you going the other direction.
4  Suppose Kathy uses the release to get medicals
5  concerning Angelina, can Scott pay the med pay off her
6  file, I mean, off records she's assembling? Or do you
7  expect him to assemble his own?
8  A.   He would be expected to assemble his own.
9  Q.   And so would Scott normally access the
10 liability file to look for medical records?
11 A.   He would have known -- if they would have
12 come to him, he would have --
13 Q.   But what if they came to Kathy and they go
14 in the liability claim file?
15 A.   He would know they would have arrived.
16 Q.   Scott maintains his own med pay claim file,
17 correct?
18 A.   Right.
19 Q.   And it doesn't have all the stuff like a
20 police report or whatever in it that the liability
21 file is going to have, right?
22 A.   Right.
23 Q.   It just has the bills that come to Scott's
24 attention, correct, and the records?
25 A.   And the records, yes.

Page 66

1  Q.   So in doing his job normally, as his
2  supervisor, would you expect Scott to access the
3  liability file?
4  A.   I would have expected him to contact Kathy
5  to see if anything had come in that he may be able to
6  secure an authorization to get those.
7  Q.   Okay. And once again, the authorization
8  you'd expect would be that -- you'd expect Scott to
9  write to Angelina's attorney and ask if it was okay
10 for him to go look at the liability file just like --
11 A.   Yes.
12 Q.   -- the converse of what we talked about
13 before?
14 A.   If that's where they'd submitted all the
15 medical records.
16 Q.   Okay. But how about the process? Assuming
17 Kathy has a pile of medical bills and records and
18 Scott would like to look at them, would you expect
19 Scott to contact the plaintiff attorney and request
20 permission?
21 A.   If he has a medical authorization to access
22 those and they can do that.
23 Q.   If he has a medical authorization -- if he
24 possesses a medical authorization, can he go look at
25 the file that Kathy's assembled?

Page 67

1  A.   Only as to the medical, if he has the
2  authorization to do that.
3  Q.   Right. Okay. So he doesn't --
4  A.   That would be his interest.
5  Q.   He doesn't need to return to the plaintiff
6  attorney if he already has a medical authorization to
7  look at the medical records in the liability claim?
8  A.   To secure those from the third party file.
9  Q.   Okay. And what would securing those from
10 the third party file look like? Would they be copied
11 and put in his med pay file?
12 A.   Well, they would -- the bills -- billings
13 would be entered into our medical management system.
14 So he would have access to the computer to see what
15 had been incurred and what would have been posted.
16 Q.   Okay. And then would he also get a paper
17 copy for his med pay file?
18 A.   He could do that, yes.
19 Q.   Okay. Now, throughout the course of his
20 adjustment of the med pay file, Scott never sent
21 Angelina or her lawyers a medical authorization
22 request. If you assume I'm right about that and
23 that's what Scott said yesterday, does that comply
24 with the way you expect him to be doing his job as a
25 supervisor?

Page 68

1  A.   I would have liked to have had him been more
2  aggressive in pursuing that.
3  Q.   You expect him to send -- you expect him to
4  show up and identify himself to the insureds entitled
5  to medical pay coverage, correct?
6  A.   I would have liked to have seen that, yes.
7  Q.   And you would expect him to tell the
8  insureds entitled to medical pay coverage how much
9  coverage there is, right?
10 A.   Yes.
11 Q.   Okay. Because it's not mandatory coverage,
12 right?
13 A.   No.
14 Q.   Some policies have it and some don't.
15 A.   It's an elective coverage on different
16 levels.
17 Q.   And for somebody like Angelina, there's no
18 way for her to know unless somebody tells her,
19 correct? I mean, my client could tell her, I suppose.
20 But somebody's got to tell her, right?
21 A.   There should be -- communication to that
22 injured party would have been appropriate, yes.
23 Q.   And for the first party coverages, like med
24 pay, Angelina, as a passenger in the car, would be an
25 insured, correct?

Page 69

1  A.   She is.
2  Q.   Okay. And so you would expect the existence
3  and amount of med pay coverage to be disclosed to her
4  or her attorneys, correct?
5  A.   I would expect that, yes.
6  Q.   Okay. And would you expect Scott to do that
7  in the course of adjusting the med pay claim?
8  A.   I would, yes.
9  Q.   And you would expect Scott to send the
10 medical authorization even if Kathy had also sent one
11 on the liability file?
12 A.   I would have liked to have seen that, yes.
13 Q.   Well, in the course of doing his job as an
14 adjuster you're supervising, that would be something
15 you would expect him to do, wouldn't it?
16 A.   Yes.
17 Q.   Have you ever asked Scott why he never sent
18 an authorization on this file?
19 A.   I have.
20 Q.   And what did he tell you?
21 A.   He just didn't do it.
22 Q.   Did you tell him not to?
23 A.   We -- tell him not to send a medical
24 authorization?
25 Q.   Right. I'm just trying to understand why a

Page 70

1  guy wouldn't do that. One possibility would be that,
2  I suppose, if your boss told you not to. Did you tell
3  him not to?
4  A.   No. He was never told not to send any
5  correspondence. He apparently overlooked not getting
6  the letter out.
7  Q.   Okay. So to your knowledge, neither you nor
8  anybody else at Allstate told Scott don't send out a
9  medical authorization.
10 A.   No. He -- no one told him that.
11 Q.   To your knowledge, did you or anyone else at
12 Allstate tell Scott don't show up and identify
13 yourself as the med pay adjuster?
14 A.   No. No one told him not to do that.
15 Q.   To your knowledge, did you or anyone else
16 tell Scott don't contact the Angstman Law Office and
17 tell them that there's med pay coverage here and
18 Angelina may be entitled to some?
19 A.   No one told him not to do that. I know in
20 his handling of the claim, he was looking to maximize
21 the benefit to Angelina. And --
22 Q.   Let's talk about that for a second. If we
23 look, there are entries in the file. We can -- I
24 guess we can look at some of them. Like take a look
25 at 438. I got to go get --

Page 71

1       MR. WILKERSON: Can I take a short bathroom
2  break?
3       MR. SANDBERG: Yes. That would be fine.
4       (Brief recess.)
5  BY MR. SANDBERG:
6  Q.   Back on record. Mr. Elkins, I asked you
7  before the break to go to claim file page 438. Are
8  you there?
9  A.   Yes.
10 Q.   And we're looking at a letter from Alaska
11 Regional to Mary Kenick, who is Angelina's mother,
12 about the patient being Angelina Trailov, correct?
13 A.   Okay.
14 Q.   And this is dated November the 8th, '02?
15 A.   Uh-huh.
16 Q.   And this is the sort of a letter that a
17 hospital sends when their bills aren't being paid,
18 correct?
19 A.   Appears to be an account balance.
20 Q.   Of $19,000?
21 A.   Okay.
22 Q.   Correct?
23 A.   Yes.
24 Q.   So at this point in November the 8th, '02,
25 Alaska Regional is writing Mary and saying we need to

Page 72

1  hear from you within the next two weeks, correct,
2  about this unpaid balance?
3  A.   Right. They are requesting they call their
4  insurance carrier, to check with the employer to
5  determine why your insurance is not paid.
6  Q.   Right. But then it continues we need to
7  hear from you or your insurance company within the
8  next two weeks, correct?
9  A.   That's correct.
10 Q.   So now returning to where we just were, we
11 can agree Scott never contacted the Angstman Law
12 Office or Ms. Trailov and identified himself as the
13 med pay adjuster, right? Correct?
14 A.   That's correct.
15 Q.   Scott never wrote them a letter and
16 identified the existence of med pay coverage, correct?
17 A.   I don't see a letter.
18 Q.   And Scott never sent them a medical
19 authorization, correct?
20      MR. WILKERSON: That's asked and answered.
21 BY MR. SANDBERG:
22 Q.   This is prelude to the next question, which
23 is is it your position that Scott was doing all those
24 things for Angelina's good somehow?
25 A.   I know the letter didn't go out. And he was

Page 73

1    attempting to get that money into Angelina's hands
2    before any liens came into the Allstate Insurance
3    policy. The letter should have gone out.
4    Q.    Scott wasn't -- Scott didn't spend the fall
5    of 2002 not doing his job for Angelina's own good, did
6    he? I mean, that's not what's happening, right?
7         MR. WILKERSON: Argumentative.
8    BY MR. SANDBERG:
9    Q.    I'll withdraw the question.
10        Is it your position that Scott's actions
11   were undertaken -- the ones I just described were
12   undertaken because they were in Angelina's interests
13   somehow?
14   A.    The letters did not go out to the law firm
15   to request the medical authorization.
16   Q.    I'd like to continue chronologically forward
17   into '03, if we may, Mr. Elkins. Go to 197 and 198.
18   A.    Okay.
19   Q.    At 197 and 198, we're looking at a demand
20   letter, correct?
21   A.    Appears to be a demand plus attorney fees,
22   yes.
23   Q.    Okay. Now, the last entry I was asking you
24   about was November the 14th where there's an exchange
25   between you and Kathy Berry about this medical

Page 74

1    authorization. I don't see you in this file again
2    until March, actually. But would you take a look at
3    the claim log and tell me if I'm wrong about that?
4    A.    Where would that --
5    Q.    That diary in the front.
6    A.    There's a March 3rd entry, yes.
7    Q.    Okay. But I see no evidence of you in the
8    file, at least -- I see no evidence of you in the file
9    between November and March. Am I wrong about that?
10   A.    That would have appear to be the case.
11   Q.    Okay. So in December, January, February,
12   March. Does it comply with Allstate practices and
13   procedures for a file like this one to have no
14   supervision for three or four months?
15   A.    Kathy handles a number of files that she has
16   demonstrated ability on to handle those. And I wasn't
17   in this claim file for that time period.
18   Q.    And my question was, does that comply --
19   it -- does the absence of supervision on a file like
20   this one for three or four months comply with Allstate
21   practices and procedures?
22   A.    As far as having a supervisor enter the
23   claim file?
24   Q.    Yes.
25   A.    Trying to drill down on the response. I

Page 75

1    don't believe that by not being in there, I was in any
2    violation of any company practices or procedures.
3    Q.    If we wanted to determine that, what would
4    we look at? Are there guidelines for how often the
5    supervisor should be in particular -- involved in
6    particular types of files?
7    A.    As far as guidelines --
8    Q.    Pick any word you want, guidelines,
9    standards, whatever your word is.
10   A.    I don't recall any specifically at this
11   point.
12   Q.    And if we wanted to know -- or what would we
13   look at? In other words, is there a manual by which
14   you're supposed to be doing your job?
15   A.    As far as a manual, I haven't seen one.
16   Q.    How about the -- I keep getting the acronyms
17   backwards, the Claims Core -- the CCR, whatever?
18   A.    CCPR?
19   Q.    Do those contain guidelines or standards for
20   providing supervision for liability files?
21   A.    You know, I need to see the document on
22   which one you're referring to.
23   Q.    I'm asking. Do you know? Do they?
24   A.    I -- I don't recall right at this point now.
25   Q.    In any event, do you believe it's

Page 76

1    appropriate for a file like this one to have no
2    supervision for three or four months?
3    A.    Kathy had demonstrated reasonable ability to
4    handle these types of claims in the past. And I
5    didn't see a reason to be in the claim file during
6    that time period.
7    Q.    At least with Angelina, we had one
8    potentially serious injury, correct?
9    A.    We had notice of an objective injury, yes.
10   Q.    And we had a Bethel venue, correct?
11   A.    That's correct.
12   Q.    And a drunken driver, correct?
13   A.    That's correct.
14   Q.    Would you agree with me -- and I'm sorry.
15   And we had $100,000 per person, 300 per accident
16   policy limits, correct?
17   A.    That's correct.
18   Q.    Okay. So would you agree with me that at
19   least upon -- by the end of '02, there was potentially
20   a verdict in Bethel in excess of the policy limits?
21   A.    I can't speculate to that. I don't know.
22   Q.    I'm not asking you to agree it was going to
23   happen or that it was preordained. That was at least
24   something that potentially could have happened.
25   Anybody looking at this file would recognize that by

Page 77

1  the end of '02, wouldn't they?
2        MR. WILKERSON: Speculation. Argumentative.
3  BY MR. SANDBERG:
4  Q.    Wouldn't they?
5  A.    Some people's opinion may be so.
6  Q.    Well, let me ask it differently. Did you --
7  before the end of 2002, did you review this file to
8  determine whether there was a potential that it would
9  exceed the $100,000 in liability coverage available?
10 A.    I don't appear to have reviewed the claim
11 file by the end of 2002.
12 Q.    By the end of 2002, should you have reviewed
13 the claim file to determine whether Angelina's claim
14 was potentially in excess of the $100,000 BI limit?
15 A.    Could you ask that again, please?
16 Q.    Yes. By the end of 2002, should you have
17 reviewed the claim file to determine whether there was
18 potentially an excess exposure for Angelina's claim?
19 A.    I would have liked to have reviewed a lot of
20 Kathy's files by year end 2002. I wasn't able to look
21 at this one.
22 Q.    What's an excess letter?
23 A.    The excess letter?
24 Q.    Yes.
25 A.    That would be -- as an example, on the

Page 78

1  punitive award that you're talking about or --
2  Q.    If I asked you what is an excess letter,
3  what would you say?
4  A.    Well, that would be a letter that goes out
5  to the insured that the claim may be in excess of
6  their limits.
7  Q.    And does Allstate have forms for such a
8  thing?
9  A.    I believe so, yes.
10 Q.    And when are they used?
11 A.    Those would be used in circumstances where
12 there may be a likelihood for that.
13 Q.    Is it that there's a likelihood or is it
14 that there's a potential?
15 A.    Well, appears to be that there may be a
16 likelihood that that could develop when it would go
17 out, potential.
18 Q.    I'm sorry. I'm confused. Are there
19 standards -- does Allstate have guidelines or
20 standards for when an excess letter should go out?
21 A.    We do. And case where it may be that they
22 are not available -- doesn't appear to be able to
23 settlement within the available limits, then that
24 letter would go out.
25 Q.    Okay. Well, where would I go if I wanted to

Page 79

1  see the Allstate guidelines or standards for when an
2  excess letter should go out?
3  A.    I'll have to look to see where that
4  documentation is.
5  Q.    Would we find it in the CCPRs?
6  A.    That may be in there. I'll need to review
7  that.
8  Q.    So as we sit here, do you know?
9  A.    As far as the written --
10 Q.    That's right, as to when an excess letter
11 should go out.
12 A.    You know, I'm just not recalling the
13 specific on that. I'm sorry.
14 Q.    Okay. So is your testimony that an excess
15 letter goes out when it's likely that the claim will
16 exceed the policy limit or when it's possible that the
17 claim will exceed the policy limit?
18 A.    If it doesn't appear the claim will be able
19 to settle within the available limits.
20 Q.    Okay. So your belief is that when it
21 doesn't appear that the claim can be settled is when
22 an excess letter should go out?
23 A.    That may be a time to send that out, yes.
24 Q.    Well, whatever the standard is, did anybody
25 at Allstate ever send out an excess letter in this

Page 80

1  file?
2  A.    I -- I will have to look.
3  Q.    Are you aware of one?
4  A.    At this point here, I'm not.
5  Q.    Certainly, at some point in the sequence of
6  handling this claim, an excess letter should have gone
7  out, shouldn't it?
8  A.    I'll need to review the claim documents here
9  to see if one did go out. I just don't recall if one
10 went out or not.
11 Q.    Well, I haven't been able to find one.
12       MR. WILKERSON: Object to the
13 mischaracterization of the evidence.
14       MR. SANDBERG: Have you got one?
15       MR. WILKERSON: Sure.
16       MR. SANDBERG: Where?
17       MR. WILKERSON: I don't have a date.
18       MR. SANDBERG: When?
19       MR. WILKERSON: I can tell you the letter
20 went out to the lawyer, to Michele Power, from Kathy
21 Berry describing the exposure to punitives, copying
22 them with a demand letter that asked for excess -- or
23 said they were going to get more than the policy
24 limits, attaching that to the demand letter.
25       MR. SANDBERG: Are you talking about the

Page 81

```
 1  March letter?
 2       MR. WILKERSON: I'm telling you -- I don't
 3  have the date. I'm describing the letter.
 4       MR. SANDBERG: Let's take a look at that.
 5  Because I don't want to be unfair to the witness. If
 6  an excess letter went out, let's look at it.
 7       193, I believe is what Mr. Wilkerson may be
 8  talking about. Take a second, Mr. Elkins, and read
 9  that letter, if you would. You might want to share it
10  with your counsel.
11       MR. WILKERSON: Are you done reading it?
12  Okay. He's read it.
13       MR. SANDBERG: Now, I realize this isn't
14  your deposition, Mark. But is this the letter you're
15  talking about?
16       MR. WILKERSON: It looks like it. I'm not
17  saying there's not something else, but I think that's
18  the one I recall.
19  BY MR. SANDBERG:
20  Q.   Okay. Mr. Elkins, have you read that letter
21  now?
22  A.   I've reviewed it.
23  Q.   Is that an excess letter?
24  A.   Appears to address the punitive and
25  exemplary damages.
```

Page 82

```
 1  Q.   Right. The subject line says punitive
 2  damages exclusion, correct?
 3  A.   Uh-huh.
 4  Q.   And you told me Allstate has a form excess
 5  letter?
 6  A.   I believe we may have had one.
 7  Q.   And this isn't it, is it?
 8  A.   I'll need to see if we have -- are using
 9  another one in addition to this.
10  Q.   Okay. I'm sorry. Earlier, you told me you
11  believed Allstate had a form excess letter, correct?
12  A.   In the context of some of our hard coverage
13  damages, yes.
14  Q.   And "in the context of some of our hard
15  coverage damages," what's that mean?
16  A.   Well, in our property damage liability
17  limits.
18  Q.   Okay. But you've got -- let's return to
19  what an excess letter is. An excess letter is a
20  letter that you write to the insured to say, hey,
21  look, you've only got X dollars of liability coverage
22  and this claim may well exceed that, correct? And
23  advising them to take whatever precautions they
24  believe are necessary in order to protect themselves
25  as the insureds, correct?
```

Page 83

```
 1  A.   That would --
 2  Q.   That's what an excess letter is, right?
 3  A.   Would incorporate the excess letter
 4  language, yes.
 5  Q.   You've written excess letters, haven't you?
 6  A.   Personally?
 7  Q.   Yes.
 8  A.   Personally, I haven't.
 9  Q.   Well, You've had them in files that you
10  supervised certainly plenty of times, haven't you?
11  A.   Yes.
12  Q.   Now, this isn't an excess letter, is it?
13  This is a letter advising my client that there's a
14  punitive damages exclusion.
15  A.   Right. Yes.
16  Q.   Okay. So now returning to my question of a
17  moment ago, would you agree with me that whatever the
18  standard, at some point in this sequence of adjusting
19  this claim, an excess letter should have gone out?
20  A.   I don't know if the claim value had been
21  evaluated in excess of the facial limit.
22  Q.   Well, you don't need to wait until the claim
23  value gets evaluated to send out an excess letter, do
24  you? Isn't it the fact that the plaintiff may claim
25  more money what triggers an excess letter?
```

Page 84

```
 1  A.   You're always attempting to settle that
 2  within your insured's limits.
 3  Q.   But suppose the Angstman law firm sent a
 4  demand for a million dollars. You'd send out a letter
 5  saying million dollars is more coverage than you got,
 6  Mr. Herron, wouldn't you?
 7  A.   They would be notified of what the demand
 8  would have been.
 9  Q.   And they'd be notified that the demand
10  exceeded the policy limits, correct?
11  A.   They would have.
12  Q.   And that would happen whether you'd
13  evaluated the claim or not, right?
14  A.   I'm not -- that is true.
15  Q.   So returning to my question, would you agree
16  with me that an excess letter should have gone out
17  somewhere in the sequence of adjusting this claim?
18  A.   I don't know.
19  Q.   Would you take a look at 197 in the claim
20  file?
21  A.   Okay.
22  Q.   Have you seen this exhibit before?
23  A.   I believe I have, yes.
24  Q.   It's a demand letter from the Angstman Law
25  Office to Kathy Berry about Angelina Trailov, correct?
```

Page 85

1  A.  It is.
2  Q.  It's dated February 14th, 2003, correct?
3  A.  It's dated February 14th, 2003, yes.
4  Q.  And it appears to have been received by
5  Allstate on February 18th, 2003?
6  A.  Yes.
7  Q.  At page 199, we can see this is the policy
8  limits demand, correct?
9  A.  Yes.
10 Q.  Actually, there's several policy limits
11 demands, actually. There's one on behalf of Angelina
12 and one on behalf of her mother, correct, because her
13 mother was bringing an NIED claim?
14 A.  Okay. Yes.
15 Q.  Okay. We talked about a demand log. Should
16 this demand have been logged in?
17 A.  It should have been, yes.
18 Q.  And so at page 200, we see something called
19 demand.
20 A.  Okay.
21 Q.  Is that -- what's that?
22 A.  That is the cover sheet that is placed on
23 top of the claim file when a demand comes in.
24 Q.  Okay. Is it also somehow transmitted so
25 that demands end up in the log?

Page 86

1  A.  Yes. I believe Kathy referred that to me
2  for review.
3  Q.  It says 3/3/03 AKB. That's Kathy Berry?
4  A.  Yes.
5  Q.  So on March the 3rd is when she refers it to
6  you? Is that what that means up there?
7  A.  That was, yes.
8  Q.  And then we saw you went back on March the
9  3rd, as I recall, correct? We saw you in the claim
10 file on March the 3rd, correct?
11 A.  I believe I was, correct.
12 Q.  Does it comply with Allstate practice and
13 procedure to go from February 18th to March the 3rd
14 with a policy limits demand before notifying one's
15 supervisor?
16 A.  I would have liked to have seen that sooner.
17 Q.  Is there a normal practice or procedure?
18 A.  I try to log those in when we receive them.
19 Q.  So would you normally have expected the
20 demand -- the policy limits demand like this to have
21 been called to your attention within a day or two of
22 receipt?
23 A.  At least within the week, yes.
24 Q.  Look at 203, if you would. That's a couple
25 of further pages back.

Page 87

1  A.  Okay.
2      (Discussion off the record.)
3  BY MR. SANDBERG:
4  Q.  203 in the claim file is a letter to Kathy
5  from Michele Power back in December of 2002, correct?
6  A.  Yes.
7  Q.  And it's received in December of 2002,
8  December 11th, by Allstate?
9  A.  Yes.
10 Q.  And it's notifying Ms. Berry that Angelina
11 Trailov will be examined by a neuropsychologist on
12 December 14th, 2002 -- December 17th, 2002?
13 A.  Okay.
14 Q.  Would you as her supervisor expect Ms. Berry
15 to follow up and attain records -- first of all,
16 determine whether or not that actually happened and
17 secondly, to obtain records if it did?
18 A.  I would.
19     MR. SANDBERG: Let's return then to the
20 claim log and look at 32, which I believe I may have
21 made an unredacted copy of. So we'll mark that,
22 actually.
23     (Exhibit 18 was marked.)
24 BY MR. SANDBERG:
25 Q.  Exhibit 18 appears to be an unredacted copy

Page 88

1  of a portion of the claims diary, correct?
2  A.  Yes, it is.
3  Q.  Now, the first entry at the top is from you.
4  And it's dated 3/3/2003, correct?
5  A.  Yes.
6  Q.  And as we've previously seen, the file had
7  come to your attention on that day, right?
8  A.  Yes.
9  Q.  Now, it says Kathy, thank you for demand
10 review on the 2/18/03 notice. What's a demand review?
11 A.  She had noticed me the demand had come in.
12 Q.  Is there any kind of a review -- I mean, is
13 a demand review a thing? Is it a form? Does she fill
14 out something evaluating a demand?
15 A.  No. It was -- that cover sheet there,
16 the --
17 Q.  Page 200 that we looked at before?
18 A.  I believe so, yes.
19 Q.  Okay. So this demand review that we're
20 discussing here is page 200 of the claim -- of the
21 claim file?
22 A.  Well, the demand would have been attached to
23 it.
24 Q.  Okay. That's what I was -- that would be my
25 next question is what's she do? Does she bring you

Page 89

1 the claim file?
2 A. No. I think it was just whatever had come
3 through the mail that -- date stamped on that.
4 Q. Let me back up then, because I'm confusing
5 myself again. You've got page 200 in front of you,
6 correct?
7 A. Yes.
8 Q. And as we've seen, it contains the notation
9 3/3/03 at the top, correct?
10 A. Yes.
11 Q. And you've told me that's the date that
12 would -- that the file would have been referred to you
13 for supervision and review, correct?
14 A. That's when the demand letter was forwarded,
15 I believe.
16 Q. Okay. Would you have received anything
17 other than the demand letter?
18 A. On this specific file, I don't recall if
19 there was more than just the demand letter attached or
20 not.
21 Q. What -- I mean, what physically happens?
22 Does Kathy walk to your desk and put something on your
23 chair? I mean, what's -- what would you normally
24 expect when a demand letter and page 200 have been
25 generated and you're supposed to do something? What

Page 90

1 comes to you and how does it get to you?
2 A. She may have, working through her mail, came
3 across a demand letter and sent it over just to notice
4 me so that I could make note that that had come in.
5 Q. Do you have any reason to believe you have
6 anything other than Michele Power's demand letter that
7 we looked at a few moments ago in front of you when
8 you're doing your review?
9 A. I believe I just reviewed the letter. I
10 don't recall looking at the file.
11 Q. Okay. And it says "Please prepare and send
12 HO referral on mandatory referral." What's that mean?
13 A. I believe in the letter we had, there was an
14 alleged brain injury.
15 Q. Yes.
16 A. And that was part of our serious injury
17 referral.
18 Q. It's cut off in the middle. It continues
19 "given alleged brain injury."
20 A. Right. So I believe that may have been in
21 the letter. And had asked Kathy to just notify our
22 home office analysts that we had an alleged brain
23 injury and for a serious injury referral.
24 Q. Are there guidelines for when a claim
25 becomes a home office referral?

Page 91

1 A. There are.
2 Q. And if I wanted to look at those, what would
3 I look at?
4 A. Those are part of our CPPP Manual.
5 Q. And is alleged brain damage one of the
6 criteria?
7 A. There is, yes.
8 Q. Is claim exceeds office authority one of the
9 criteria?
10 A. That would be one. Amputation, blindness,
11 fatality accident.
12 Q. This is Exhibit 11. And it's about the
13 fourth page of Exhibit 11 that I'm showing the
14 witness. And it's something called Home Office
15 Referral Template, which is the referral, when it
16 actually finally goes in this case, correct?
17 A. Okay.
18 Q. And the stated "Reason for Referral" is
19 "Damages exceed office authority" on that? Is that
20 correct?
21 A. That's what she has on the referral line.
22 Q. Okay. And is that a criteria for home
23 office referral?
24 A. As being one of them?
25 Q. Yes. Not "the," but "a."

Page 92

1 A. As being one of the categories, yes.
2 Q. Is there a timeliness requirement for a home
3 office referral?
4 A. As far as when the referral goes out?
5 Q. That's right. Once a claim has been
6 identified as needing home office referral, is there a
7 timeliness requirement?
8 A. Once we identify that, we'd like to have it
9 out within 14 days.
10 Q. And that's what the home office referral
11 guidelines call for, correct?
12 A. That's a request they have, yes.
13 Q. And we can see that, actually, in this
14 exhibit. It's in the other one. I'm handing the
15 witness what we marked as Exhibit number 3 and showing
16 him Section 5, 1.0 where it states "Casualty files are
17 to be referred from the Market Claim Office to Home
18 Office within 14 days after the file qualifies for
19 referral."
20 Is that the home office guideline you were
21 discussing a moment ago?
22 A. That's their -- I have a serious injury
23 referral guideline that is sort of an addendum to this
24 that I use.
25 Q. It's still the same 14-day standard, though?

Page 93

1  A.  It's a 14-day.
2  Q.  Okay. Now, on March the 3rd, 2003, you are
3  instructing Kathy to send the file to home office
4  referral on mandatory referral, correct?
5  A.  Let's see. That's on Exhibit --
6      MR. WILKERSON: Eighteen.
7  BY MR. SANDBERG:
8  Q.  Eighteen.
9  A.  Okay. Just had that.
10     MR. WILKERSON: It's a long piece of paper.
11     THE WITNESS: Yeah. I did instruct her to
12 do that.
13 BY MR. SANDBERG:
14 Q.  So your expectation on March the 3rd would
15 be that Kathy do that within 14 days, correct?
16 A.  I would have liked to have had her sent that
17 out, yes.
18 Q.  Kathy had sent out other files for mandatory
19 referral before, hadn't she?
20 A.  She's been good about getting those out,
21 yes.
22 Q.  But I mean, she'd run through this process
23 previously, correct?
24 A.  Yes.
25 Q.  When you said send the file for home office

Page 94

1  referral, she would know what that meant, wouldn't
2  she?
3  A.  She would.
4  Q.  She would know what the procedure was,
5  correct?
6  A.  Yes.
7  Q.  And she'd know that that was supposed to
8  happen within 14 days, wouldn't she?
9  A.  That would be the requested timeline, yes.
10 Q.  And as her supervisor, you'd expect that she
11 was going to do it within 14 days, wouldn't you?
12 A.  I would have liked to have seen that, yes.
13 Q.  And you would expect her to follow the
14 guidelines, as her supervisor, wouldn't you?
15 A.  As far as getting the referral out, yes.
16 Q.  In this case, the home office referral
17 actually didn't happen until the middle of May.
18 A.  Referral went out in May.
19 Q.  Have you ever asked Kathy why the referral
20 didn't go out for two and a half months after you told
21 her to do it?
22 A.  She didn't do it. I didn't have it on my
23 suspense to follow up that it get done. And came up
24 on a tickler and she had apparently overlooked it.
25 Q.  Okay. And let me return to my question and

Page 95

1  make sure that we're tracking. Have you ever asked
2  Kathy why she didn't do it for two and a half months?
3  A.  I'm trying to recall the specific
4  conversation, but I'm just not recalling the specific
5  conversation as to that.
6  Q.  Do you believe you asked Kathy? You're a
7  supervisor, right?
8  A.  As of that time period, I don't recall what
9  the conversation was relative to the home office
10 referral, other than it didn't go out in the time
11 period that I would have liked to have had it gone
12 out.
13 Q.  Well, do you ever recall receiving an
14 explanation from Kathy about why it took two and a
15 half months?
16 A.  I know -- I know we talked about it. I just
17 don't recall what the specific explanation was.
18 Q.  When a file is sent -- I'm sorry. When you
19 identify a file for mandatory home office referral, do
20 you tickle the file?
21 A.  I try to. I set my suspense not to 14-day,
22 but apparently had a 60-day follow-up on it.
23 Q.  And 60 days would still take you to early
24 May, correct?
25 A.  Yes.

Page 96

1  Q.  Okay. So do we see you in the file again
2  following up on this home office referral in early
3  May?
4  A.  I believe, yes, just about at 60 days.
5  Q.  All right. So your belief is that you
6  tickled this item for 60-day action. And then we'll
7  see you in the file again in about 60 days on this
8  issue; is that correct?
9  A.  Can you restate that again, please?
10 Q.  Yes. Is it your belief, as we sit here
11 today, that you tickled this item for 60 days?
12 A.  Apparently, when I set my suspense, I set it
13 not to 14, but 60 days out.
14 Q.  Should it have been set for 14?
15 A.  I must have made a mistake and hit 60
16 instead of 14.
17 Q.  Well, would you agree with me it should have
18 been 14?
19 A.  I would have liked to have been in that file
20 14 days after that diary entry, yes.
21 Q.  Should you have been in that file 14 days
22 after that diary entry as the supervisor on this file?
23 A.  I should have been, yes.
24 Q.  What are your responsibilities as the
25 supervisor once a claim gets designated for home

Page 97

1  office referral? Do they change?
2  A.   As far as?
3  Q.   Any -- when the referral -- I'm sorry. When
4  there is a home office referral, do your
5  responsibilities change? And this one actually went,
6  what, September 20th, maybe -- September -- I'm
7  sorry -- May 20th? Does your job look different after
8  the claim has gone off on referral?
9  A.   Does my job look different?
10 Q.   That's right.
11 A.   No. Those are one-shot referrals, a lot of
12 these, that I do send out. And then I put those in
13 the normal -- attempt to put those in the normal
14 course of my follow-ups to ensure they are being dealt
15 with.
16 Q.   When a claim goes off to home office
17 referral, do you still possess authority to settle it?
18 A.   Do I possess authority --
19 Q.   Right.
20 A.   -- or is that a local --
21 Q.   If it's within your authority level.
22 A.   Yes. Depends on -- yes. I should clarify,
23 depends on the nature of the referral, though.
24 Q.   If it was a coverage referral, for example,
25 it might look different?

Page 98

1  A.   Yeah.
2  Q.   There wasn't a coverage question in this
3  case, right?
4  A.   No. It was a serious injury referral.
5  Q.   Okay. And on a serious injury referral,
6  assuming a demand came in that was within your
7  authority level, would you still possess authority to
8  settle the case even though it was on home office
9  referral?
10 A.   We'd notify them what we're doing.
11 Q.   All right. But your authority doesn't
12 disappear just because the claim gets referred off,
13 right?
14 A.   No.
15      (Discussion off the record.)
16 BY MR. SANDBERG:
17 Q.   As the supervisor on the claim, once there
18 is a home office referral, is there something you were
19 supposed to be doing?
20      I mean, how are you involved in the home
21 office referral? Let me ask that. Because I just
22 want to understand your role in this process.
23 A.   Right.
24 Q.   Because actually, I don't even think we see
25 you in that pack of documents. It goes from Kathy to

Page 99

1  Karen to home office, I think.
2  A.   There are a number of people copied on the
3  referral when it does go back. I'm one of them as
4  being part of the -- manager of that work group. And
5  some that go back are requests, which we do need home
6  office authority, when we close files on fatality-type
7  accidents where we have no liability. We need to seek
8  home office approval to do that, as an example.
9       So I set those up in a suspense to where I
10 spot check those on a basis, see how the file's
11 developing, assure the claim rep is keeping our
12 analyst up to date of what's going and active in the
13 claim file.
14 Q.   When you identified this particular claim
15 for home office referral, what did you expect -- or
16 where did you expect Kathy would be receiving her
17 direction from after the referral was made, from you,
18 from the home office or both?
19 A.   It's a collaborative affair.
20 Q.   So it might be either or both?
21 A.   Could be. And as the case develops and you
22 evaluate the claim, you get your evaluation consultant
23 involved in it. And perhaps the FPE would get
24 involved in it and try and evaluate the claim.
25 Q.   But when the file eventually was referred

Page 100

1  off in May, you remained the supervisor, correct?
2  A.   Yes.
3  Q.   Okay. I mean, this still remained a file
4  under your supervision after May 20th even though
5  there had been a home office referral.
6  A.   Yes.
7  Q.   Okay. Once you have identified this as a
8  file for home office review on March the 3rd, 2003,
9  are there procedures you're supposed -- are there
10 written procedures somewhere that you're supposed to
11 be following to make sure that the referral actually
12 happens?
13 A.   The -- are there written procedures?
14 Q.   Yes.
15 A.   Well, we have the template here that is to
16 go out. And that's the document and what the context
17 of the one shot's to incorporate.
18 Q.   Right. But how about your role in making
19 sure that the referral actually goes off, is that
20 written down somewhere?
21 A.   I believe as to where the FPL or the FPE
22 should have that on a dual suspense basis and follow
23 the referral.
24 Q.   Okay. So would we find that in the CC- --
25 A.   The CPPP or the CCPR.

Page 101

1  Q.     Either the CPPP or the CCPR, should we find
2  that, describing how the home office referral process
3  is to be done and what your role in it is?
4  A.     I don't know if that manual drills down to
5  the actual desktop on a -- as far as that
6  task-specific.
7  Q.     And by "dual suspension," you mean two
8  people are supposed to have it on suspense?
9  A.     Well, preferably the claim rep would have
10 it.
11 Q.     That's right. So the dual suspense is you
12 and Kathy, at minimum, correct?
13 A.     At minimum. And possibly Karen Petersen,
14 the FPE.
15 Q.     Okay. Do you know -- you told me you set
16 yours for 60 days, correct?
17 A.     Apparently, in this case it hit 60. Punched
18 it out too far.
19 Q.     Do you know what Kathy set hers for?
20 A.     I don't.
21 Q.     Do you know if Kathy set hers for 60 as
22 well?
23 A.     I don't know what Kathy's task was on that.
24 Q.     Because I don't think we see this home
25 office referral issue resurface until May. Do you

Page 102

1  know if Kathy set hers at all?
2  A.     I don't know.
3  Q.     Do you ever recall discussing that with
4  Kathy?
5  A.     As far as on her suspense system?
6  Q.     Right.
7  A.     No.
8         MR. WILKERSON: Mark, if this is going to go
9  much longer, I'm going to want a lunch break for my
10 sake and the witnesses' sake.
11        MR. SANDBERG: Actually, well, I'm thinking
12 that we'll finish this witness probably by 1:00 if we
13 just keep going future. But if you want to take a
14 break now -- let's go off record.
15        (Discussion off the record.)
16 BY MR. SANDBERG:
17 Q.     Come forward with me chronologically then to
18 597 in our claim file.
19 A.     597?
20 Q.     597.
21 A.     Okay.
22 Q.     Okay? At 597, we're looking at Allstate's
23 request to the Alaska Native Medical Center for
24 medical records, correct?
25 A.     Okay.

Page 103

1  Q.     And then it bears a response -- I mean, it
2  bears an Alaska Native Medical Center received stamp
3  of March 19th, 2003, correct?
4  A.     All right.
5  Q.     Then at the bottom, we see the claims
6  department stamp again, which is March 26, 2003,
7  correct?
8  A.     Okay.
9  Q.     So does it appear that by March 26th, 2003,
10 Allstate has the Alaska Native Medical Center records?
11 A.     It would appear we had a response from
12 Alaska Native Medical Center on that date or this
13 letter was returned then.
14 Q.     If we look at 83 in our claim manual, you
15 can actually see -- from the list of documents, we can
16 see the letter going out to the Native Medical Center
17 on 3/17/03 from Kathy Berry?
18 A.     That's on 83?
19 Q.     Yes, 83.
20 A.     Okay.
21 Q.     Is that correct?
22 A.     Yes. We have --
23 Q.     What's it shows?
24 A.     -- a letter entry here of a letter going on
25 3/18.

Page 104

1  Q.     And 3/17 up there, it shows --
2         MR. WILKERSON: What's the question?
3  BY MR. SANDBERG:
4  Q.     Well, do we see the letter? Actually, it
5  appears maybe under both. Or is it two letters, do
6  you know? Can we tell?
7  A.     Looks like both are the --
8  Q.     They are both --
9  A.     They are both letters to medical records
10 department for ID 04.
11 Q.     Okay. And then there was a letter -- we see
12 a letter going to Transcare Medical Services on the
13 20th?
14 A.     Uh-huh.
15 Q.     Okay. And then if we look at 95 in our
16 claims file, can you tell me what we're looking at
17 here at 95?
18 A.     That appears to be medical bill loss history
19 with the date received of the different providers.
20 Q.     Okay. So is this from the liability file or
21 the med pay file or can you tell?
22 A.     Appears to be Kathy Berry, because her name
23 is on the contact person.
24 Q.     Okay. Then above where it says total loss
25 paid 25,000, is that the med pay?

Page 105

1   A.   That could be the med pay. That would be
2   transaction history for the med pay.
3   Q.   But where it says contact person, Kathy
4   Berry, that would indicate that this is from the
5   liability file?
6   A.   That was generated from the liability file.
7   Q.   And then in the left-hand column, we can see
8   the date that these various bills are received by
9   Allstate, at least, or is that received in the
10  liability file?
11  A.   Right. It appears that on 3/17 is the first
12  log entry we have there.
13  Q.   And then the -- we can see that except
14  for one bill totalling 300 and some dollars that
15  by May the 12th, '03 Allstate has all the medical
16  bills?
17  A.   I don't know if there are all them.
18  Q.   All of them disclosed on this sheet.
19  A.   On that sheet.
20  Q.   You're right. I suppose there could be
21  others in the universe. But certainly everything on
22  this sheet has come in by May the 12th except for one
23  bill for 300 bucks; is that correct?
24       MR. WILKERSON: 381, is that what you're
25  saying?

Page 106

1   BY MR. SANDBERG:
2   Q.   $381. I just want to make sure I understand
3   the form. Because like most insurance documents, it
4   reads from the bottom up instead of the top down.
5       MR. WILKERSON: Do you understand his
6   question?
7       THE WITNESS: No. The --
8       MR. WILKERSON: He'll ask it again, I think.
9   BY MR. SANDBERG:
10  Q.   Yes, I will. This indicates that by May the
11  12th, except for one bill for $381, all the remaining
12  billed amounts from all the various medical providers
13  identified on this sheet had been received by
14  Allstate, correct?
15  A.   It appears the -- at least 25,000 had been
16  received by that date, yes.
17  Q.   Well, substantially more than 25,000 had
18  been received. Let's see. It's more like maybe
19  35,000, isn't it?
20      MR. WILKERSON: He's adding these columns.
21  BY MR. SANDBERG:
22  Q.   Am I reading the form correctly?
23  A.   These would have been the input dates that
24  they would have come in, yes.
25  Q.   Okay. So on this, we can tell that from the

Page 107

1   accident date of 9/14/02 until 3/17/03, Allstate has
2   exactly zero medical bills concerning Angelina
3   Trailov, correct?
4   A.   This document here, it appears so.
5   Q.   And then below where it says date paid
6   5/12/03, is that the med pay goes out? We can consult
7   the claim log if we need to.
8   A.   That -- there should be a transaction
9   history that would show when the medical payments came
10  out on our -- on a payment screen. That date paid may
11  be reflective of what you'll see on that.
12  Q.   Let's just take a look at the claim diary.
13  And on 5/12/03 at 84 and 85, we're going to see Scott
14  sending $25,000 to the Angstman law firm, I believe.
15  Take a look at 84 and 85. Is that correct? That's
16  the same date, May the 12th, '03.
17  A.   Right. And that's under Scott's ID there,
18  yes.
19  Q.   So where it says date paid 5/12/03, what
20  we're seeing is Scott paying the med pay, right?
21  A.   That appears to be when the med pay money
22  was released, yes.
23  Q.   So from 9/14/02 to 3/17/03, it appears that
24  Allstate had no medical bills concerning Angelina
25  Trailov; is that correct?

Page 108

1   A.   Or if we did, they didn't make it into the
2   first party side for input.
3   Q.   Well, is this a first party or a third party
4   document that we're looking at here?
5       MR. WILKERSON: Sorry. We flipped the page.
6   You got to tell him the page so he can look.
7   BY MR. SANDBERG:
8   Q.   Oh, 95. This is the one that we looked at
9   that identified Kathy Berry as the contact person.
10  A.   Yeah. It says duplicate on it. So I don't
11  know if -- Scott would have had something similar to
12  this also that would show his payout history. This is
13  when the bills would have been input.
14  Q.   As an Allstate claims supervisor, is it in
15  accordance with Allstate's practices and procedures in
16  a case like this to have no medical bills for six
17  months after the accident?
18  A.   In rare cases. We do have those on occasion
19  where they're not being forwarded.
20  Q.   To your knowledge, had anything ever been
21  requested of the Angstman law firm that they'd refused
22  to forward?
23  A.   Not to my knowledge.
24  Q.   So as an Allstate supervisor, should
25  Allstate have had some medical bills within the first

Page 109

1  six months of this claim?
2  A.  From the first party side, that would have
3  been nice, yes.
4  Q.  Scott never got any medical bills, did he?
5      MR. WILKERSON:  Asked and answered.
6  BY MR. SANDBERG:
7  Q.  How about from the third party side?
8  A.  I believe everything was sent to the third
9  party side, if I recall, which Scott was able to
10 secure from Kathy.
11 Q.  Okay.
12 A.  I believe that may be how the bills matched
13 up in the records.
14 Q.  And between the two of them, the first
15 medical bill concerning Angelina Trailov that Allstate
16 obtained is March 17th, '03, according to this form,
17 correct?
18 A.  Appears to be when the first input would
19 have been, yes.
20 Q.  And so as an Allstate supervisor, does it
21 comport with Allstate practices and procedures to have
22 no medical bills on an injury like Angelina Trailov's
23 for six months after the accident?
24 A.  In some cases, we do see that to where the
25 bills aren't presented till far down the line.

Page 110

1  Q.  If Kathy Berry is doing her job, there
2  should be medical bills within the first six months on
3  this file, shouldn't there?
4  A.  If Kathy had requested the medical
5  authorization and that had been returned from the law
6  firm, they would have been available to secure the
7  medical records and billings.
8  Q.  If Kathy Berry is doing her job the way you,
9  her supervisor, expect her to do it, she's going to
10 get medical authorizations, correct?
11 A.  She would be -- that's part of her job, yes.
12 Q.  And if Kathy Berry is doing her job the way
13 you as her supervisor expect her to do it, she's going
14 to use those medical authorizations, correct?
15 A.  To secure the billings and medical records,
16 yes.
17 Q.  So unless somebody is refusing to give her
18 something, if Kathy Berry is doing her job the way you
19 as her supervisor expect her to be doing it, there
20 should be medical bills in the file in less than six
21 months, shouldn't there?
22 A.  If Kathy would have had the authorization,
23 the properly signed authorizations back and those had
24 been made available to her with the known providers,
25 then yes, we would have wanted to secure that

Page 111

1  information.
2  Q.  And you'd expect it to hit the file in less
3  than six months, wouldn't you?
4  A.  Depending on the time when the
5  authorizations came in and the requests went out and
6  material came back.
7  Q.  You'd expect her to ask -- to send out the
8  authorizations in less than six months, right?
9  A.  If those were in the claim file, yes.
10 Q.  And if she had them, you'd expect her to use
11 them, correct?
12 A.  I would.
13 Q.  Mr. Elkins, as we've already seen, this case
14 was identified within a week or so as being a hundred
15 percent liability file, correct?
16 A.  The liability initially was -- was accepted
17 as responsibility of the Herrons.
18 Q.  So Kathy's job is to assemble the damages
19 documentation and evaluate the claim, correct?
20 A.  That's correct.  That's part of her job
21 requirements.
22 Q.  Damages is all she's got to evaluate on
23 Angelina Trailov, correct?
24 A.  That's correct.
25 Q.  Once an adjuster has a signed medical

Page 112

1  authorization, how long should it take to send it out?
2  A.  Well, once that comes in and is identified
3  and processed, it should go out within a reasonable
4  amount of time.
5  Q.  What's that?  If Kathy Berry gets a medical
6  authorization in a claim like Angelina Trailov's, how
7  promptly should she send it out?
8  A.  I think on one like that, within one to two
9  weeks would be a fair turnaround.
10 Q.  I promised we'd get you out of here by 1:00.
11 We're actually going to move on and try.
12     Take a look at page 40, if you would, of our
13 claim log.  If you look at page 40, we can see it's
14 now May the 2nd, 2003.  And what we see is you
15 extending authority to Scott to pay the 25,000 med
16 pay.
17 A.  Okay.
18 Q.  Is that correct?
19 A.  Yes.
20 Q.  Okay.  Would you have looked at the
21 liability side of the file at this point?
22 A.  I don't recall on this specific date.  This
23 task here was focused on the med pay.  I can't give
24 you a sound answer on that.
25 Q.  Go to 187, if you would.  Take a second to

Page 113

1  read that letter.
2  A.     Okay.
3  Q.     Okay? This is a letter dated May the 9th,
4  2003. I believe we may have already marked it as
5  Exhibit number 12, if I'm guessing right. It's an
6  exhibit, as well. But it's a letter from Kathy Berry
7  to Michele Power, dated May 9th, 2003, correct?
8  A.     It's attention Michele Power, yes.
9  Q.     Okay. And it says, "Thank you for your
10 letter dated April 10..." Then it goes on to say "We
11 are in the process of completing our evaluation of
12 Angelina Trailov's claim and anticipate responding to
13 your demand by your May 16th, 2003 deadline."
14        First of all, have I read that sentence
15 correctly?
16 A.     "We are in the process of completing our
17 evaluation of Angelina's Trailov's claim," yes.
18 Q.     Okay. Was the fact that there was a
19 May 16th, 2003 deadline brought to your attention?
20 A.     I don't recall.
21 Q.     Do you see any evidence in the claims diary
22 that the fact there was a May 16, 2003 deadline was
23 brought to your attention?
24 A.     No.
25 Q.     Do you have any independent or other

Page 114

1  recollection that the May 16th, 2003 deadline was
2  brought to your attention?
3  A.     On May 9th, no.
4  Q.     Or any other time before May 16th, 2003.
5  A.     May -- as May -- May 16th is -- what letter
6  does that refer to? No, no.
7  Q.     You discussed for me demand log and how that
8  was maintained. If there was a May 16th, 2003
9  deadline on a demand, should you -- should that have
10 been brought to your attention at least once a week?
11 A.     That I should have reviewed.
12 Q.     But it should have been -- that's right.
13 You told me that you reviewed the demand deadline --
14 or the demand log. I'm sorry.
15 A.     I think initially there was no time demand
16 on the first letter.
17 Q.     Right. That's right.
18 A.     I don't know if I -- I don't recall if I saw
19 the subsequent demand letter come in or not with the
20 time limit.
21 Q.     Well, if everything is working the way it's
22 supposed to be working and there is a May 16th, 2003
23 deadline, that fact should somehow be entered in the
24 demand log, correct?
25 A.     If I was aware of it, yes.

Page 115

1  Q.     Who actually makes entries in the demand
2  log? Would it be you or Kathy?
3  A.     Well, that would have been me.
4  Q.     So if you didn't know about a demand, a
5  May 16th, 2003 deadline, obviously then you couldn't
6  enter it into the demand log, correct?
7  A.     I don't recall the May 16th deadline.
8  Q.     And if we go by the file at least, we have
9  no reason to believe you were actually told anything
10 about a May 16th, 2003 deadline, do we?
11 A.     From the claim file, no.
12 Q.     At the bottom of this exhibit at 187, we see
13 it goes to Margaret Herron and Charles Herron,
14 correct? We see cc's to them?
15 A.     Okay.
16 Q.     Mr. Valcarce was representing Charles
17 Herron. We can see that. If we need to, we can look
18 at 191. He's representing Mr. Herron for at least
19 several months by this point. If we assume there was
20 a lawyer for Mr. Herron, should this have been copied
21 to that lawyer?
22 A.     If we were copying Charles Herron, we should
23 have copied his lawyer instead.
24 Q.     Can you tell me why this letter would go to
25 Charles Herron instead of his lawyer?

Page 116

1  A.     You'll have to ask Kathy on that. I don't
2  know her thought process.
3  Q.     That's fine. Just if you know. You don't
4  have to know.
5         (Discussion off the record.)
6  BY MR. SANDBERG:
7  Q.     Take a look at 181, if you would. 181 is a
8  letter from Kathy Berry to Michele Power, dated
9  May 16th, 2003, correct?
10 A.     Yes.
11 Q.     Okay. Now, in the previous letter, we saw
12 reference to responding to your demand by your
13 May 16th, 2003 deadline. Other than this letter, are
14 you aware of any other response?
15 A.     From Angstman Law Office?
16 Q.     To Angstman Law Office in response -- in
17 other words, the last letter says we "anticipate
18 responding to your demand by your May 16, 2003
19 deadline." I mean, I read that sentence again. I'll
20 read the whole thing. It says "We are in the process
21 of completing our evaluation of Angelina Trailov's
22 claim and anticipate responding to your demand by your
23 May 16, 2003 deadline." Okay?
24        And then if you look at the claim log, which
25 is going to be back at -- back in the 40s, is there

**Page 117**

1  any indication that Kathy Berry actually did anything
2  between May 9th, 2003 and May 16th, 2003?
3  A.    In the CDS log?
4  Q.    That's right. Take a look at it wherever it
5  is upfront. It should be in the 40s.
6  A.    The log here may not reflect what she would
7  physically be doing on her desk.
8  Q.    Okay. But a person handling a claim like
9  this should be documenting their actions to the claim
10 file, right?
11 A.    They should.
12 Q.    That's right. I mean, both Allstate's
13 guidelines and the Alaska regulations require that,
14 don't they?
15 A.    Yes.
16 Q.    Okay. And so when we look to see what
17 Kathy documented to the claim file during the
18 week between May 9th, 2003 and May 16th, 2003,
19 we don't see that Kathy actually did anything, do
20 we?
21 A.    What document do we have on the letters that
22 went out to the providers? Was there any --
23 Q.    Yes. You want to look at -- the letters to
24 the providers were at 95.
25       MR. MESTAS: Start 81.

**Page 118**

1  BY MR. SANDBERG:
2  Q.    Starting at 81.
3  A.    I'm just refreshing. So the dates in
4  question again that you're referring to?
5  Q.    Yes. Between May the 9th when Kathy writes
6  and says we're in the process of completing our
7  evaluation --
8  A.    And May 16.
9  Q.    -- and anticipate responding to your demand
10 by your May 16, 2003 deadline and May 16th, there's no
11 evidence in the claim file that Kathy Berry actually
12 did anything, is there?
13 A.    Typically, if she would have been reviewing
14 the medical records, she wouldn't have documented that
15 as such. That would be work product on her desk. And
16 I believe in here she's stating her evaluation wasn't
17 complete.
18 Q.    But in the claim file between May 9th and
19 May 16th, 2003, there's no indication in the claim
20 file that Kathy Berry actually did anything, is there?
21 A.    If -- memorialized, no.
22 Q.    Do you independently know that Kathy Berry
23 did anything between May 9th and May 16th, 2003?
24 A.    I couldn't answer that for Kathy.
25 Q.    Okay. And so on May the 9th, 2003, we've

**Page 119**

1  got Kathy has in her possession a policy limits demand
2  for Angelina Trailov to settle Angelina Trailov's
3  claim, correct?
4  A.    Okay. On what date?
5  Q.    On May the 9th.
6  A.    Okay.
7  Q.    We can see that at page 187. We can tell
8  that -- because on May the 9th, she says we're in the
9  process of completing our evaluation and will respond
10 to your demand.
11 A.    Okay.
12 Q.    So on May 9th, she's got a demand, right?
13 Correct?
14 A.    Appears to be she does, right.
15 Q.    And she's got a deadline of May 16th.
16 That's what she says. If she's complying with
17 Allstate practices and procedures, should she do
18 nothing for the next week?
19 A.    I can't say what she was doing during that
20 time period.
21 Q.    I'm asking what should she be doing during
22 that time period.
23 A.    Well, one would think with the information
24 at hand, moving that forward.
25 Q.    A policy limits demand in a case that might

**Page 120**

1  be bigger than the policy limits is a fairly serious,
2  thing, isn't it?
3  A.    Yes.
4  Q.    It should be handled very carefully,
5  correct? It should be -- Allstate should be
6  handling -- Allstate should be responding carefully
7  when it is in possession of a policy limits demand in
8  a case that may exceed the limits, correct?
9  A.    Appears there was communication between
10 Kathy and the Angstman Law Office via fax material
11 during that time period.
12 Q.    I'm not asking you to tell me Kathy wasn't
13 careful. I'm asking whether you agree that Allstate
14 should be careful in responding to a policy limits
15 demand.
16 A.    In any policy limits demand, yes.
17 Q.    Okay. And when Allstate says it will -- it
18 is working to complete its evaluation prior to a
19 deadline, should Allstate be careful to make sure that
20 actually happens?
21 A.    Yes.
22       MR. SANDBERG: Let's come forward then,
23 because we're actually nearing the end here. It is
24 1:00 o'clock and I told you we'd finish around 1:00.
25       Look at 48 and 49. And I think I have a

## Page 121

```
 1  copy here that we'll mark. I may have marked this
 2  before. I'm getting too old to remember.
 3         (Exhibit 19 was marked.)
 4  BY MR. SANDBERG:
 5  Q.     Nineteen is pages 48 through 50 in the claim
 6  diary in an unredacted fashion. And we can see this
 7  is a long entry, it appears, made by Karen Petersen,
 8  correct?
 9  A.     Appears to be Karen Petersen's log notes,
10  yes.
11  Q.     Okay. And Ms. Petersen is reviewing
12  Angelina Trailov's claim and discussing it in these
13  notes, correct?
14  A.     Yes.
15  Q.     Okay. About two thirds of the way down
16  page 48, it says "I agree 04 would probably receive
17  the 100K liability limits in Bethel venue, likely the
18  100K SU limits also." SU would refer to the UIM
19  limits?
20  A.     That would be the underinsured limits, yes.
21  Q.     So Ms. Petersen here is saying it appears
22  probable to her that Angelina would recover the
23  $100,000 BI limits, plus likely the 100,000 UIM limits
24  also?
25  A.     Her log notes indicate what you've stated.
```

## Page 122

```
 1  Q.     Okay. Do you know how long it took her to
 2  arrive at that conclusion?
 3  A.     I don't know.
 4  Q.     Do you have any reason to believe she'd seen
 5  the claim file for more than one day?
 6  A.     I don't know how long Karen had had the
 7  claim file when she reviewed it.
 8  Q.     Well, when we had the opportunity to ask her
 9  yesterday, I think she told me not more than one day.
10  Would that surprise you? Would she be capable of
11  coming to this conclusion -- this sort of a conclusion
12  in one day if the file was adequately documented?
13  A.     If Karen said one day, then she represented
14  one day.
15  Q.     Okay. And if this is -- if Angelina, in
16  fact, had a case where the $100,000 limits, liability
17  limits plus substantially more would probably be
18  recovered, then would you agree with me that Allstate
19  should tender the $100,000 liability limits as fast as
20  it possibly can?
21  A.     Could you restate that for me, please?
22  Q.     Sure. If Angelina had a claim -- if
23  Allstate determined that Angelina had a claim that
24  substantially exceeded the BI limits, then would you
25  agree Allstate should be tendering those limits as
```

## Page 123

```
 1  fast as it possibly can?
 2  A.     With the supported documentation, if it went
 3  through evaluation process --
 4  Q.     Yes.
 5  A.     -- and worked its way to that point, then
 6  yes.
 7  Q.     Yes. Okay. Now, when Karen Petersen came
 8  to this conclusion, do you know if she was looking at
 9  anything that Allstate hadn't had at least on May the
10  12th, 2003?
11  A.     I don't -- I couldn't answer that for her.
12  I don't know.
13  Q.     Well, we looked at that billing history and
14  we saw that everything except one bill for $300 had
15  been received by May the 12th, correct? Correct?
16  A.     From that log, yes.
17  Q.     Okay. So if Kathy Berry had called to your
18  attention the fact that there was a May 16th deadline
19  and asked you to review the file, you could have done
20  it, couldn't you?
21  A.     Our current process, I'm not in that --
22  putting the money on the -- would go to a Lori Barra,
23  evaluation consultant, is where the evaluation comes
24  on to second look the claim rep's analysis of the
25  claim file.
```

## Page 124

```
 1  Q.     Well, if Kathy -- if on May the 9th, 2003
 2  Kathy Berry had requested that someone give her
 3  authority to offer the BI policy limits, who would she
 4  have gone to?
 5  A.     We would have worked that through our
 6  evaluation process. That would be Lori Barra. And if
 7  she had any questions and needed to -- feel she needed
 8  to consult with anyone else, she'd have went most
 9  likely to Karen Petersen.
10  Q.     So you would not actually be involved in
11  that process as her supervisor?
12  A.     I may or may not.
13  Q.     But it wouldn't be mandatory, in any event,
14  that you be involved?
15  A.     No. The evaluation consultant is -- works
16  in conjunction with the claim reps. And they have a
17  lot of authority in settling the cases.
18  Q.     So on May the 9th, if Kathy Berry wants to
19  get -- first of all, on May 9th, 2003, would Kathy
20  Berry personally have had a hundred twelve five in
21  authority to pay on one BI file?
22  A.     I need to look at what her specific limits
23  are. She would have needed to have gone through the
24  evaluation process and made sure she got the money
25  authorized to put on the file in order to extend the
```

Page 125

1  limits.
2  Q.    If Kathy Berry on May the 9th, 2003 wanted
3  to engage in that evaluation process, she'd go to Lori
4  Barra?
5  A.    She would prepare the file and submit it for
6  review with our evaluation consultant, yes.
7  Q.    And as we look at the file between May the
8  9th and May the 16th, 2003, we see no indication that
9  Kathy Berry did that, correct?
10 A.    The claim notes don't appear to indicate
11 there was conversation on that.
12       MR. WILKERSON:  Can I have a restroom break?
13 Be right back.
14       MR. SANDBERG:  Okay.
15       (Brief recess.)
16 BY MR. SANDBERG:
17 Q.    Let's go back on the record.  Mr. Elkins,
18 prior to this deposition, did you have an opportunity
19 to review the claim file?
20 A.    The -- I reviewed the claim file.
21 Q.    Okay.  As we've discussed, there was a
22 policy limits demand for Angelina's claim on
23 February -- or made February 4th, '03, correct?
24 A.    Yes.
25 Q.    And received by Allstate February 18th, '03,

Page 126

1  correct?
2  A.    I believe that's the correct date.
3  Q.    Okay.  Based on the file that you have
4  reviewed both as a supervisor and in preparation for
5  this deposition, are you aware of any reason Allstate
6  could not have evaluated Angelina Trailov's claim,
7  say, by the end of March?
8  A.    I would need to talk with Kathy to see if
9  there were any nuances on her desk that would have
10 prevented her from moving that forward from March.
11 Q.    Well, subject to that, are you aware of any
12 reason Allstate couldn't have evaluated Angelina
13 Trailov's claim by the end of March 2003?
14 A.    By the end of March with the proper
15 documentation in the claim file would have been ready
16 to move forward.
17 Q.    So are you -- on the file that you reviewed
18 both as a supervisor and in preparation for this
19 deposition, are you aware of any reason Allstate could
20 not have evaluated Angelina Trailov's claim by the end
21 of March?
22 A.    If we'd have had all the proper material in
23 in March and it was available for Kathy to review, the
24 file would have been ready to move forward for
25 evaluation.

Page 127

1  Q.    Okay.  When you say if we had all the proper
2  material in, you had all the -- all the medical
3  records had arrived by March 26th, correct?  That's
4  when the last medical records come in?
5  A.    If we had all the medical records on that
6  during that time period, that would have positioned
7  the file for evaluation.
8  Q.    Okay.  And so if all the medical records had
9  come in by March 26th, 2003, are you aware of any
10 reason Allstate could not have been in a position to
11 evaluate Angelina Trailov's claim by the end of March?
12 A.    Given the material that had been in, if it
13 was sufficient to move the evaluation forward, we
14 could have began the process to put the evaluation on
15 it.  It's not to say there wouldn't have been
16 questions that come up during the course of that
17 evaluation that would have led us to continue on.
18 Q.    We saw what actually happened, which is
19 Karen Petersen evaluated it as being substantially
20 bigger than the BI limits at the end of May, correct?
21 A.    Her diary notes indicate that, yes.
22 Q.    And I believe she told us it took her one
23 day to do that, correct?
24 A.    She got the completed file and presented for
25 the case evaluation.  That's what she took to evaluate

Page 128

1  it.
2  Q.    Okay.  And now what I'm asking is, are you,
3  as the person who supervised this file and having read
4  it on your -- in preparation for your deposition,
5  aware of any reason Allstate could not have evaluated
6  Angelina Trailov's claim by the end of March 2003?
7  A.    With -- assuming we had the material that
8  Karen had on her evaluation, then that could have
9  moved through to an evaluation at that point.
10       MR. SANDBERG:  Anything else, Chief?
11       MR. MESTAS:  No.
12       MR. SANDBERG:  We're done, unless
13 Mr. Wilkerson has some, wants to prolong this for you.
14       MR. WILKERSON:  Stated that way, how could
15 I?  But no, I don't have any questions.
16       MR. SANDBERG:  Thank you, Mr. Elkin.
17       (Whereupon, the deposition was
18       concluded at 1:21 p.m.)

1                     REPORTER'S CERTIFICATE

2

3              I, Susan Campbell, Certified Shorthand

4    Reporter, hereby certify:

5              That I am a Certified Shorthand Reporter and

6    Notary Public for the State of Alaska; that the

7    foregoing proceedings were taken by me in stenographic

8    shorthand and thereafter transcribed by me; that the

9    transcript constitutes a full, true and correct record

10   of said proceedings taken on the date and the time

11   indicated there.  Further, that I am a disinterested

12   person to said action.

13             IN WITNESS WHEREOF, I have hereunto

14   subscribed my hand and affixed my official seal this

15   12th day of October 2005.

16

17

18

19                         _____
                           SUSAN CAMPBELL, CSR
20                         NOTARY PUBLIC, State of Alaska

21

22

23   My Commission Expires April 26, 2008.

24

25

```
 1                    WITNESS CERTIFICATE
 2     WITNESS:  Craig Elkins      Taken:  September 30, 2005
 3     Case:  Allstate vs. Herron
 4     I hereby certify that I have read the foregoing
       deposition and accept it as true and correct, with the
 5     exceptions:
 6     ===========================================================
       Page   Line                Description
 7     ===========================================================
 8     P6      6         property Segment
 9     ___    ___        _____
10     ___    ___        _____
11     ___    ___        _____
12     ___    ___        _____
13     ___    ___        _____
14     ___    ___        _____
15     ___    ___        _____
16     ___    ___        _____
17     ___    ___        _____
18     ___    ___        _____
19     Reason for these changes:
20     P 6-6 Because it should be Segment not Settlement
21     _____
22     _____
23     10/21/2005    [signature]
       Date Read     Witness Signature
24
       (Use additional paper to note corrections as needed,
25     dating and signing each one.)
```

Page 130