2/13/2006

Page 24

```
 1   A   Possibly, possibly.  You'll -- you'll find as you go
 2       through the file you'll see things that came in from
 3       insurance companies.  And it's possible.
 4   Q   And your memory, although I know it's not precise on this,
 5       would -- would -- is it your recollection that this was
 6       about Ms. Trailov or about Ms. Kenick?
 7   A   I believe Ms. Trailov because it was on behalf of -- did I
 8       say Ms. Trailov?  I'm sorry, Ms. Kenick, because she was
 9       acting on behalf of Ms. Trailov.
10   Q   So the person that would express the concern over the
11       bills when -- when talking with you, that was the
12       mother.....
13   A   The mother, correct.
14   Q   .....that was Ms. Kenick?
15   A   Who was responsible for the bills.
16   Q   And I take it that what you were conveying is that Ms.
17       Kenick expressed that concern prior to the receipt of the
18       med pay in May of '03?
19   A   Correct.
20   Q   Okay.  And then some relief at receiving that?
21   A   I'm sure.
22   Q   And did she bring it up subsequent to that; like is there
23       anymore, that sort of a thing?
24   A   I think there remained a concern that they be -- that they
25       be paid and that only a part of the bills were paid and so
```

Phone - 907-243-0668
Fax   907-243-1473          jpk@gci.net
sahile@gci.net

Page 25

```
 1        I -- you know, I don't have an independent memory of that
 2        but I -- I can assure you that she was very concerned
 3        about the bills.  So if only half were paid, we can
 4        presume that she wondered when the remainder was going to
 5        be.....
 6        MR. MESTAS:   I want to caution the witness about observing
 7   attorney/client privileges for specific statements.
 8  Q     Let's back up to when you first referenced this concern.
 9        Did you do anything when you were informed of this concern
10        about are these going to get paid?  I mean did you do
11        anything with Allstate, with Mr. Valcarce, with anyone to
12        see if you could sort that out?
13  A     All the letters that you have are the communications from
14        me to Allstate.  And in February when I made the policy
15        limits offer that was one concern was that -- that nothing
16        was happening in the case and so I made the policy limits
17        offer.  Later on I gave the deadline and all of that was
18        in part due to the -- the medical bills that were unpaid.
19  Q     How about with respect to med pay coverage as opposed to
20        your demand for the liability coverage?
21  A     I did not realize that med pay coverage was separate.
22  Q     How long had you been practicing by that point?
23  A     I'd been practicing probably six years at that point.
24  Q     Okay.
25  A     Seven -- seven years possibly.  I started in '95.
```

Page 26

```
 1        Most of my practice to begin with was criminal law

 2        with some PI and some family law and a multitude of

 3        other things that came through the door.

 4   Q    How new were you to the -- the PI aspect of the practice

 5        in May of '03?

 6   A    I had always done a little bit of PI from the beginning

 7        but I would say most of -- we had another lawyer, Bruce

 8        Anders, who was doing the majority of the PI stuff during

 9        that time.  And I was doing most of the criminal stuff.

10        But that's not to say that I didn't have my hand in it.

11        Had never really dealt much with insurance coverage.

12   Q    Did you consult with anyone in your office about the

13        -- her concerns, Ms. Kenick's concerns, about the med

14        bills, talk to Mr. Angstman or anyone -- anything --

15        is there anything we can do about this?

16   A    You know, I'm -- I don't know that I did.  I might have.

17        I mean certainly there was concern that Allstate wasn't

18        responding and this was a serious injury and they -- we're

19        not getting responses.  Whether it was specific to med

20        pay, I can't tell you.  And, you know, it's one of those

21        questions when you don't know that it exists, you don't

22        ask that question obviously.  So I wouldn't have gone into

23        him and -- and questioned him about med pay.

24   Q    Did you -- strike that.  Oh, I know, you -- you mentioned

25        that the correspondence reflects your communications with
```

Page 27

```
 1        Allstate.  Now you also mentioned that you had a phone

 2        call that you recall from Mr. Millar.

 3    A   In about May, yeah, just -- I think it was almost

 4        contemporaneous with the payment, within about a day.  I

 5        mean I think it was just, hello, I'm Scott Millar, and we

 6        have this money, this 25,000 in med pay, and I'm ready to

 7        release that.  Really, didn't know it existed.  Wonderful.

 8    Q   Okay.  Did you speak with anyone else at Allstate during

 9        the entire course of this or was it all written other than

10        that phone call?

11    A   I don't know the answer to that.  You know, all that I

12        have here is -- is the written correspondence.  It would

13        not be untypical to have a phone call but I can't tell you

14        whether I did or didn't.

15    Q   And our source for trying to figure that out is going to

16        be the phone log and your timesheets?

17    A   Correct.

18    Q   The next topic I want to ask you some general

19        questions about is your ultimately becoming, I take

20        it, co-counsel with Mr. Mestas' office.  And when I

21        say Mr. Mestas' office, at the time it was Mr. Mestas

22        and he had a gentleman named Doug Johnson with him.

23        And when I say Mr. Mestas' office I'm referring to

24        both of those.

25    A   Okay.
```

MICHELE L. POWER                    2/13/2006                    ALLSTATE INS. v. HERRON
Vol. 1                                                          A04-0043 Civil

Page 28

```
 1   Q   Mr. Johnson I don't think is any longer part of that firm.

 2       But you got me, so when I say Mestas' office I mean them

 3       both?

 4   A   Okay.

 5   Q   Okay.  When did you become co-counsel with Mr. Mestas'

 6       office with respect to Ms. Trailov and Ms. Kenick?

 7   A   I think my first communication was May 16th, the day

 8       that it was becoming clear that -- that Allstate was

 9       not responding.  And I believe I -- I believe I spoke

10       with Doug Johnson that day.  And then within a couple

11       weeks probably we signed a fee agreement.

12   Q   Is that contained in the file?

13   A   I believe it is.

14   Q   Who instigated the phone call, you or Mr. Johnson?

15   A   I think it was probably me, me or Myron.  You know, at

16       that point it might have been Myron's first call knowing

17       that we were where we were, that Allstate was not

18       responding.  I think Myron may have called Doug Johnson

19       first or I may have.  I -- I don't know which one of us

20       called first.

21   Q   But you.....

22   A   But it would have been -- it would have been from us.

23   Q   And your recollection is that was on the 16th of May?

24   A   I believe so.

25   Q   So either you or Myron or both made this phone call
```

Page 29

1       and reached Doug Johnson?

2    A  Correct.

3    Q  Had there been any prior communications with Mr. Johnson

4       or Mr. Mestas?

5    A  Not to my recollection.

6    Q  Do you know whether Myron had had such communications?

7    A  I couldn't speak for him but I -- I don't believe so.

8    Q  Had you....

9    A  I mean it really all happened -- you know, the 16th was

10      there and -- and we were not getting anything from

11      Allstate and it was just time to do something.

12   Q  Had you worked with Mr. Mestas' office on other cases?

13   A  Not -- not that I recall and certainly not Mr. Mestas.  I

14      don't think I ever worked with Doug Johnson before then,

15      not -- not that I -- you know, I have subsequent to that

16      and that's why subsequently I -- I worked with him in a

17      couple other cases again.

18   Q  When you say him, do you mean Mr. Johnson?

19   A  Mr. Johnson, yes.  So -- but I don't believe so prior to

20      that.

21   Q  How about Mr. Mestas?

22   A  No, didn't know him.  He must have been.....

23   Q  None before and none after?

24   A  See -- what's your question again?

25   Q  You were talking about communicate -- or cases you'd

MICHELE L. POWER                    2/13/2006                    ALLSTATE INS. v. HERRON
Vol. 1                                                          A04-0043 Civil

Page 30

```
 1        worked with Mr. Johnson on subsequent to that.  And I was

 2        asking the same question about Mr. Mestas.

 3   A    None prior to it.  I think an additional case with Mr.

 4        Mestas subsequent to that.

 5   Q    So when you made this communication do you have a

 6        recollection of what was communicated during the phone

 7        call?

 8   A    Only in general terms.  It was a long time ago but in.....

 9        MR. MESTAS:  Excuse me, what's the -- what conversation

10   are we talking about?

11        MR. WILKERSON:  This conversation between her office and

12   Mr. Johnson that occurred on the 16th.

13        MR. MESTAS:  Yeah, and I'll caution the witness here for a

14   work product objection and an attorney/client objection be

15   asserted.

16        MR. WILKERSON:  You're telling her not to answer the

17   question?

18        MR. MESTAS:  Yeah.

19        MR. WILKERSON:  Just so I'm clear.

20   Q    Was there any exchange of writing following that phone

21        call within that day, to start with?

22   A    There may have been.  Certainly there was the fee

23        agreement at some point that got signed.

24        MR. MESTAS:  And I'm not sure she's correct about that

25   that it's in the file.  I thought it was removed.
```

Page 31

```
 1    A    Oh, okay.

 2         MR. MESTAS:  But we can look.

 3         MR. WILKERSON:  Are you asserting a privilege as to the

 4    fee agreement?

 5         MR. MESTAS:  Yeah, of course.  I don't know why you'd be

 6    entitled to that, Mark.

 7         MR. WILKERSON:  I'm not going to -- I don't want to argue

 8    with you, Dennis.  I just was asking if you were asserting the

 9    privilege.

10         MR. MESTAS:  Yes.

11         MR. WILKERSON:  Okay, thank you.

12         MR. MESTAS:  She may be able to give you the approximate

13    date, if that's what you're interested in.

14    Q    Yeah, I'd like to take as much information I can get.  If

15         you can give me the approximate date, sure.

16    A    I think it was probably a couple weeks later, just

17         shy of maybe a couple weeks later.  It was the end of

18         May.

19    Q    Did you reach an agreement on the 16th and just not commit

20         it to writing?  In other words were they co-counsel on the

21         16th but just not yet put in writing or were they not yet

22         co-counsel?

23    A    I would say not yet co-counsel.

24    Q    Did they become co-counsel on the day that the fee

25         agreement was signed?
```

Page 32

```
 1    A    Yeah, that would -- I mean I presume that was the purpose.

 2    Q    Okay.  That's your interpretation.....

 3    A    That's.....

 4    Q    .....of the events?

 5    A    .....my interpretation.

 6    Q    All right.  When did you disclose to Allstate that you

 7         were either considering or had teamed up with co-counsel?

 8    A    I believe there's a letter to Allstate that indicates that

 9         Doug Johnson was co-counsel.  I think there is some letter

10         referencing that and.....

11    Q    I acknowledge that there's a letter from Doug Johnson

12         saying that.  My question was when did you communicate to

13         Allstate that you were getting co-counsel or that indeed

14         anyone than you was authorized to act on behalf of Ms.

15         Kenick and Ms. Trailov?

16    A    Well, if I -- I don't know that I did.  And it certainly

17         wouldn't have been until after we finalized that and that

18         would have been after the end of May.  But I -- I don't

19         know whether I communicated that by writing.  I -- I don't

20         -- I think I presumed that Doug Johnson's letter was

21         adequate, that that was all the information they needed.

22    Q    You wrote a letter to Mr. Valcarce saying I represent

23         these people; please forward this information to the

24         insurance company, right?

25    A    Correct.
```

MICHELE L. POWER                    2/13/2006              ALLSTATE INS. v. HERRON
Vol. 1                                                          A04-0043 Civil

Page 33

```
 1    Q    And you're aware that he did do that because you

 2         received a letter very shortly after that from

 3         Allstate saying we're Allstate; we acknowledge

 4         receipt of your letter of representation of Ms.

 5         Kenick and Ms. Trailov?

 6    A    It wasn't very shortly after, about a month later, yes.

 7    Q    Okay.  You did get that letter?

 8    A    I did.

 9    Q    Was it clear to you that they understood you were the

10         legal counsel for Ms. Trailov and Ms. Kenick, your firm,

11         Angstman Law Firm, and not any other firm?

12    A    No other firm was.

13    Q    So you sent a letter of representation; they acknowledged

14         it.  Did you do anything similar to that to say, hey,

15         we've got co-counsel now; I want you to know because I'm

16         the person you can communicate with; I'm her legal

17         representative; so I'm telling you we've got co-counsel

18         now; did you ever do that?

19    A    I don't believe so.  But certainly up to May -- the end of

20         May there was no co-counsel.  So after that they'd already

21         breached -- they had not accepted the policy limits offer.

22         We were in a different mode at that time.

23    Q    Did you upon Allstate's request that you confirm whether

24         or not Mr. Doug Johnson was your co-counsel respond to

25         them and -- and tell them that he was?
```

Page 34

```
 1    A    Did they ask me?

 2    Q    Yes, they did.

 3    A    Okay.  Well, I'd like to see that letter.  I don't know

 4         whether I did or didn't.

 5    Q    I may have it here to go through but I'll -- I'll

 6         represent to you that you sent them a short letter to say,

 7         yes, Doug Johnson.....

 8    A    Oh, okay.

 9    Q    .....is co-counsel and that happened sometime.....

10    A    All right.

11    Q    .....in June.

12    A    Thank you.  I won't dispute that then.

13    Q    If it's important, I can find it for you.

14         MR. MESTAS:  Sure, why don't you show it to the witness,

15    if you've got it.  I don't see it, a letter like that.

16         MR. WILKERSON:  You can go off record while we look for

17    it.

18         (Off record)

19         (On record)

20    Q    While we were off record you were able to locate the

21         letters that we were discussing?

22    A    I was.  And I -- I did indicate to Kathy Berry on June

23         11th that indeed Mr. Johnson was co-counsel.

24    Q    Okay.  I would like to move now to looking at some of the

25         correspondence and you have your notebook in front of you,
```

MICHELE L. POWER
Vol. 1

2/13/2006

ALLSTATE INS. v. HERRON
A04-0043 Civil

Page 35

```
 1      I see.

 2      MR. WILKERSON:  We can mark that as the first exhibit.

 3                                  (Deposition Exhibit 1 marked)

 4      MR. WILKERSON:  The court reporter is pretty a circled

 5   number on the bottom in lieu of the stickers, which she at the

 6   moment can't get her hands on.  But she will take care of that

 7   later.

 8   Q    So that's Exhibit 1.

 9   A    Okay.

10   Q    Is that a letter you authored?

11   A    It is.

12   Q    Did you have any assistance in writing that letter?

13   A    No, I don't believe so.  And when I say don't believe so,

14        Myron might have looked at it.  But it appears to be my

15        letter.

16   Q    Is there anything in the file, whether it has been

17        redacted or not, that would reflect whether Mr. Angstman

18        had any involvement in the letter?

19   A    No.  And nor would there ever be.  I mean that would

20        not -- it would not be something that -- it would be

21        verbal.

22   Q    So if he'd had involvement, it would have been you ran a

23        letter by him, he spoke with you about it?

24   A    Yeah, what do you think of this; shall we add this; shall

25        we do this.
```

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

Page 36

1    Q    All right.

2    A    That kind of question.

3    Q    Would his timesheets reflect that?

4    A    It's doubtful.

5    Q    And I take it because his timesheets are not kept as

6         meticulously as perhaps yours?

7    A    Correct.

8    Q    I want to focus on the -- the last paragraph of that

9         letter.  Really it's the last sentence of it.  It says

10        while the offer dated February 14, 2002, remains open --

11        and just so we're clear, that was a letter that you had

12        earlier sent saying we want the policy limits?

13   A    Correct.

14   Q    Okay.  And that's contained within the correspondence

15        file that's in front of you and we can get that after

16        we've copied your file, right?

17   A    Right.

18   Q    Okay.  Okay.  It says while that offer remains open

19        it will be revoked on May 16, 2003, and a complaint

20        will be filed, unless there is some discussion

21        regarding pre-filing resolution.  I look forward to

22        hearing from you.  Best regards, Michele Power.

23        Accurate?

24   A    Yes.

25   Q    Now in your mind when you wrote that letter if you had

Page 37

1    received a phone call, let's say on May 15, and in that

2    phone call there was a discussion regarding settlement,

3    right, the person that you sent this letter to called on

4    the phone and said I want to further discuss resolution of

5    this case; would that have satisfied that last sentence of

6    the letter?

7  A   No.  In -- in my mind, I said it will be revoked on May

8    16th, that really is what I meant.  That -- that was a

9    deadline, a hard and fast deadline unless we settled it.

10   And unless there's some discussion regarding pre-filing

11   resolution, I meant resolution.  I didn't mean -- I didn't

12   mean, gee, we can just talk about this forever.  This case

13   had gone on and on and on with very little response from

14   Allstate.  But at -- and so at this point I mean that --

15   that was the whole purpose of giving the deadline was, you

16   know, it is a deadline.  And unless we resolve it, and I

17   meant resolution, and in my mind it was always a May 16th

18   deadline.

19  Q   Okay.  And now I understand what was in your mind, what

20   about what the letter says?  It does say some discussion

21   pre-filing resolution, correct?

22  A   Well, there was never a discussion of pre-filing

23   resolution.  There never was.  No one ever said we're

24   going to get you some money before May 16th.  Nobody ever

25   said here's a counter offer.  Nobody said anything about a

MICHELE L. POWER                    2/13/2006                    ALLSTATE INS. v. HERRON
Vol. 1                                                           A04-0043 Civil

Page 38

```
 1          pre-filing resolution.  It was -- it was always we need

 2          another document or we need this or what about that.  It

 3          was never, okay, we're going to talk settlement.  That

 4          never happened.

 5    Q     Let's assume that that did happen, that you got a phone

 6          call and they said we want to talk about settlement; would

 7          that have satisfied the letter of -- your letter?

 8    A     No, no.  It had to be -- we could have engaged in

 9          that but we had to have a settlement by May 16th.

10    Q     Do you agree with me that that is contrary to what the

11          last sentence of the letter says, your interpretation is?

12    A     Well, it will be revoked on May 16th, 2003.  And that

13          was my intention and.....

14    Q     I'd agree with you if it.....

15    A     Yeah.

16    Q     .....stopped there and you put a period there but you

17          didn't.

18    A     I think unless there's some discussion regarding pre-

19          filing resolution, resolution means done.  And May 16th

20          was the deadline for that reso -- before -- you know, we

21          could have discussed it and that wouldn't have extended

22          it.  I guess that's what I'm trying to say is we could

23          have discussed settlement but it wouldn't have extended

24          the deadline.  We had to have it resolved by May 16th.

25    Q     So even if literally you had had discussion regarding
```

Page 39

```
 1          pre-filing resolution, you still would have revoked?

 2     A    Had there not been a resolution.  There had to have

 3          been a resolution.  That was the whole point of that

 4          deadline.  That was the point, was let's do this.

 5     Q    Not a discussion regarding resolution but a resolution?

 6     A    Correct.

 7     Q    Do you agree with me that a fair reading of the

 8          letter is that it -- some discussion means some

 9          discussion?

10     A    Well, May 16th, 2003, is the -- is the deadline.  A

11          complaint will be filed beyond -- after that.  So it

12          says unless there's some discussion regarding pre-

13          filing resolution, does not suggest that it's got to

14          be before May 16th because this complaint was going

15          to be filed right after that.  So do you see what I'm

16          saying, in order for the.....

17     Q    I do not, I'm sorry.

18     A    Well, I'm not going to try to convince you but that's --

19          that's my position.

20     Q    Okay.  Do it one more time for me.

21     A    Okay.  May 16th was the deadline.  Beyond that deadline

22          the complaint was going to be filed immediately.

23          That.....

24     Q    Unless?

25     A    Unless it was resolved.  Pre-filing resolution, do
```

MICHELE L. POWER
Vol. 1

2/13/2006

ALLSTATE INS. v. HERRON
A04-0043 Civil

Page 40

```
 1        you see what that means?  Pre-filing resolution means

 2        pre-filing of the complaint.  So it has to be done,

 3        resolved, before May 16th.

 4   Q    I would agree that -- if that's what it said, I

 5        wouldn't dispute with you and I don't want to be

 6        argumentative.  I -- I just -- it appears to me that

 7        you're deleting the words some discussion regarding.

 8        MR. SANDBERG:  Well, I mean.....

 9   A    But -- but again, pre-filing resolution.

10        MR. SANDBERG:  May I object only because you've become

11   argumentative at some point, Mark.  I mean if you want to talk

12   about what -- what's that last phrase modify, how much of the

13   sentence.  I mean I suppose we could all parse it out but you

14   asked -- you've asked her a lot of questions but now you've --

15   you're testifying or arguing.

16   Q    Well, let's try it a different way.  If there had been a

17        phone call, and there was not only some discussion but in

18        fact there was, let's resolve it; but it was a phone call,

19        not a letter, would that have satisfied your deadline?

20   A    Only if it had -- only if we had settled it before May

21        16th.  It had to be resolved before May 16th in order for

22        it to be a pre-filing resolution.

23   Q    Would a phone call have sufficed?

24   A    If they -- if there had been an offer to settle it?

25   Q    Right.
```

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

Page 41

```
 1   A   Yeah, I mean I would assume then that there'd be a

 2       confirmatory letter thereafter but had there been a

 3       phone call indicating that offer, sure.

 4   Q   Okay.  And in other words you weren't going to be saying

 5       only if I have the check in my hand?

 6   A   No.

 7   Q   It was -- a phone call would have done it if it had

 8       just been enough to satisfy your interpretation.....

 9   A   A phone call with a follow up of a confirmatory

10       letter.  You know, I would have insisted that -- that

11       if there was an offer, that -- that it be put in

12       writing and that deadline was May 16th and get me the

13       letter before the end of the day.

14   Q   All right.  And I assume that if a letter had done the

15       same thing, that would be -- instead of a phone call it

16       was just a letter, that would have been fine too?

17   A   Certainly.

18   Q   All right.

19       MR. WILKERSON:   Exhibit 2.

20                               (Deposition Exhibit 2 marked)

21   Q   I'm not sure I have extra copies of this one but it is

22       dated May 9, 2003.  It's from Allstate to you.

23   A   Okay.

24   Q   You have it in front of you?

25   A   I have it.
```

MICHELE L. POWER                    2/13/2006                    ALLSTATE INS. v. HERRON
Vol. 1                                                                  A04-0043 Civil

Page 42

```
 1   Q   Okay.  And it's maintained in your file?

 2   A   It is.

 3   Q   And your -- briefly your interpretation of this letter?

 4   A   Acknowledgement of the May 16th, 2003, deadline.

 5   Q   Anything else?

 6   A   Again asking for more information, which was consistent

 7       with all the other letters that I got, always wanting

 8       something more.

 9   Q   Okay.  When this discusses the -- we are in the process of

10       completing our evaluation and anticipate responding to

11       your demand by your May 16, 2003, deadline; do you

12       consider that a discussion regarding pre-filing

13       resolution?

14   A   No.  You know, this is just way too general to have

15       any meaning in terms of settlement.

16       MR. WILKERSON:  I think that's three.

17                               (Deposition Exhibit 3 marked)

18   Q   The next letter is one from you on May 15, 2003.

19   A   Okay.

20       MR. MESTAS:  This is Exhibit number 3?

21       MR. WILKERSON:  Yes.

22   Q   So you did write and actually wrote and faxed this letter

23       to Allstate?

24   A   Yes.

25   Q   And you've got a fax coversheet there?
```

Page 43

1   A   A fax coversheet that shows it went out on the 16th.

2   Q   All right.  So although you had it dated the 15th of May

3       it may have taken you until the next day to put it in the

4       fax machine.....

5   A   Well.....

6   Q   .....for whatever reason?

7   A   Right.  And actually it would have been secretarial, but,

8       yes.

9   Q   So this is actually being faxed on the day of your -- as

10      you interpret it, your hard and fast deadline?

11  A   Correct.

12  Q   Does it make any reference to the imminent lapse of

13      the hard and fast deadline?

14  A   No, it doesn't.  Nor did I think it needed to.

15  Q   All right.  Was there any fax along this same timeframe

16      that said, hey, deadline, today.....

17  A   No.

18  Q   .....anything like that?

19  A   No.  And, you know, I sent a letter on February 14th and

20      no real response to it.  I sent a letter then giving the

21      deadline of May 16th to remind them it's coming up.  How

22      many reminders did they need?

23  Q   Did this letter, Exhibit 3, go out before or after your

24      phone communications with Mr. Mestas' office of the 16th?

25  A   I'm certain before.

Page 44

```
 1                              (Deposition Exhibit 4 marked)

 2   Q   This is a letter dated May 16, 2003, from Ms. Berry to

 3       you.  Do you have that?

 4   A   I do.

 5   Q   It starts.....

 6       MR. MESTAS:  Exhibit number 4?

 7       MR. WILKERSON:  Yeah.

 8   Q   It starts by thanking you for the information you'd faxed

 9       that same day?

10   A   Correct.

11   Q   Which is the letter we just went over, Exhibit 3,

12       correct?

13   A   Correct.

14   Q   It asks for documentation about a job for Ms. Kenick,

15       right?

16   A   Correct.

17   Q   And then it says with regard to Angelina's claim

18       unfortunately our evaluation is not completed as

19       expected and.....

20   A   Correct.

21   Q   .....did you interpret that to be referring to the letter

22       that had been sent some days later saying that we

23       anticipate responding by your May 16.....

24       MR. MESTAS:  You mean days earlier?

25   A   Days earlier.
```

MICHELE L. POWER                    2/13/2006                    ALLSTATE INS. v. HERRON
Vol. 1                                                           A04-0043 Civil

Page 45

1   Q   Days earlier, I'm sorry, yeah.

2   A   Yeah.

3   Q   Okay.

4   A   That they were not going to meet the deadline.

5   Q   And it goes on.....

6   A   And asking for more information, as I recall here.  Let me

7       look.  Please provide any documentation.  Again, another

8       request for information.  Please provide any documentation

9       there may be relating in terms of Mary's job.  I mean it

10      was just yet again.....

11  Q   That's about Mary Kenick?

12  A   Correct.

13  Q   How about the paragraph about Angelina; does it ask for

14      more information?

15  A   No, it just says that after all that time they still

16      haven't done an evaluation.

17  Q   Okay.  So it says our -- our evaluation will be completed

18      by the end of the month and I'm hoping to respond to your

19      demand sooner than that.

20  A   Yeah.

21  Q   And then it says.....

22  A   Missed the deadline.

23  Q   .....if you have any questions, please call me and gives a

24      phone number.

25  A   And why would I?  She had blown me off yet again.  I mean