## INTRODUCTION

I began my insurance career in 1987 in Anchorage at Alaska National Insurance Company where I worked as an Adjuster, Senior Liability Adjuster and then Vice President of Claims. In addition to supervisory duties, during my time at Alaska National I continued to actively handle claim files.

In August 2004 my wife and I relocated to Indiana. I currently work for Great West Casualty Company as a Senior Liability Adjuster. I maintain an average case load of 70 claim files along the east coast.

During my career I have either directly handled, or reviewed, thousands of claim files with specific focus on investigations, assessment of liability exposure, establishing appropriate reserves, and settlement of the claim. I have strived to maintain compliance of available standards for those files I personally handle, as well as those that I review in a supervisory capacity. I have experience with various attorneys in many areas of Alaska.

## COMPLAINT

Allstate Insurance Company alleges their insured, Charles Herron, breached the cooperation clause of the insurance contract by confessing judgment and assigning his rights to Trailov and Kenick. Counsel representing Trailov and Kenick allege that Herron was released from any policy obligation to Allstate since Allstate allegedly acted in bad faith in their overall handling of the claim investigation.

## TASK

I reviewed all the pleadings, discovery with produced records, affidavits and depositions taken in this case. This included a review of the complete Allstate claim file as produced in discovery.

## TIMELINE OF EVENTS

**September 14, 2002**

- Date of loss

**September 16, 2002**

- Allstate received first notice of the claim - assigned to adjuster Renee Vanzant (Vanzant).
- Vanzant spoke with Mrs. Herron and obtained facts pertaining to the accident. The insured advised Vanzant that one of the passengers was transported via medivac to Anchorage with minor skull fracture and fluid in lungs. [1]
- Status notes confirm Vanzant informed Mrs. Herron of available coverage.[2] Mrs. Herron indicated she was in contact with the claimant's family and would pass along information to Ms. Kenick.[3]

**September 17, 2002**

- Vanzant's supervisor, Craig Elkins (Elkins), asked for file to be forwarded to him for review.
- Vanzant called Alaska Native Hospital but was unable to speak with the passenger's mother.

[1] Bates 701160
[2] Bates 703950
[3] Vanzant Affidavit



- Vanzant called and visited ANMC. She was unable to see the injured claimant. The claimant's mother was not there. Vanzant left her card and upon returning to her office received a call from the nursing staff confirming receipt of the card.

**September 18, 2002**

- Elkins asked that Vanzant complete preliminary claim activity including securing certified declarations, the agent application and any selection/rejection form.

**September 19, 2002**

- Alaska Regional sends their invoice to Mary Kenick indicating that no amount was due.[4]
- Letter from Michele Power (Power) to Jim Valcarce (Valcarce) advising that she represents Angelina Trailov (Trailov) and requests that Valcarce refer the matter to Herron's insurance company.[5]

**September 21, 2002**

- Allstate completes their liability investigation and determines their insured is negligent.

**September 23, 2002**

- Margaret Herron advises Allstate that claimant (Trailov) has an attorney.
- Letter from Valcarce to Bob Herron providing copy of the Power letter dated September 19, 2002. Valcarce asked that his client forward a copy of the Power letter to his insurance company asking them to contact Power.[6]

---

[4] Bates 703835
[5] Bates 702953
[6] Bates 702951

**September 25, 2002**

- Allstate requests Bethel Police report.[7]
- Allstate reserves set at $25,000 and file is transferred to Kathy Berry (Berry).[8]

**September 26, 2002**

- Karen Petersen (Petersen) sends note to Berry asking to determine extent of injuries to Trailov, review reserves, and to send a letter to the insured advising that no coverage existed for punitives.

**October 1, 2002**

- Power's office sends medical authorization and request for records to Alaska Regional for September 14, 2002.[9]
- Medical payments file assigned to Scott Millar.
- Medical authorization signed for Power to secure records from ANMC.[10]
- Power's office sends medical authorizations to YKHC.[11]

**October 10, 2002**

- ANMC records copied.[12]

**October 15, 2002**

- Subrogation letter from Kenick's health insurer sent direct to Vanzant at Allstate with claim information filled in by Kenick.[13]
- Power receives ANMC records.[14]

---

7 Bates 702646
8 Bates 701412
9 Bates 703719 & 703727
10 Bates 703724
11 Bates 703725
12 Bates 703721
13 Bates 703886 - 703889
14 Bates 701538

**October 18, 2002**

- Letter from Allstate to Herron providing contact information and status.[15]
- Letter faxed from Berry to Power seeking additional information. [16]

**October 30, 2002**

- Bethel Police report received by Allstate.[17]

**November 14, 2002**

- Status notes reflect that witnesses indicated all parties were drinking and that severity of injuries to Trailov are unknown. Reserves for Trailov were increased to $75,000 based on what injury information is known and venue.[18]

**November 25, 2002**

- Allstate receives signed medical authorization from Power with social security number that does not match Trailov's.[19]
- Alaska Native Medical Center records Health Provider Lien for $10,416.23.[20]

**December 9, 2002**

- Allstate settles the Faulkner injury claim for $1,000.

**December 10, 2002**

- Letter from Power to Berry at Allstate advising Trailov will be seen by neuropsychologist on December 17, 2002. Power requests copy of Allstate's policy and indicates a settlement offer will be forthcoming.[21]

---

15 Bates 702946
16 Bates 703607
17 Bates 701329
18 Bates 703970 & 703971
19 Bates 703605
20 Bates 703880

**December 12, 2002**

- Letter from ANMC to Power regarding recorded medical lien.[22]

**January 17, 2003**

- Letter from Berry to Power providing the ANMC medical release and providing the policy declarations.[23]
- Berry requests YKHC records.

**January 27, 2003**

- Kenick signs ANMC release for Allstate.[24]

**February 10, 2003**

- Allstate receives the signed ANMC authorization from Power.[25]

**February 18, 2003**

- Allstate receives policy limit demand letter from Power dated February 14, 2003.[26]

**March 3, 2003**

- Elkins asks that Berry send Home Office referral.

**March 17, 2003**

- Letter from Allstate to ANMC requesting records.[27]
- Allstate receives treatment invoices from ANMC, Alaska Regional, Alaska Imaging, Denali Anesthesia and City of Bethel.[28]

---

[21] Bates 702944
[22] Bates 703884
[23] Bates 702942
[24] Bates 703604
[25] Bates 703603
[26] Bates 702939 - 702941
[27] Bates 703807
[28] Bates 703834 - 703844



Exhibit 53
Page 6 of 19
500008

- Letter from Berry to Power acknowledging demand letter asking for clarification on treatment and for support of Mary Kenick's NIED claim.[29]

**March 18, 2003**

- Letter from Berry to ANMC requesting itemized statement of billing.[30]
- Letter from Berry to Herron providing copy of policy limit demand and advising of punitive exclusion.[31]
- Allstate status note indicates reserve for Kenick established at $5,000.00, evaluation of current reserve for Trailov and documenting request for treatment records after September 16, 2003.[32]

**March 26, 2003**

- Letter from Valcarce to Berry providing status of criminal case and requesting that Allstate settle within the policy limits.[33]
- Allstate receives records from ANMC.[34]

**April 10, 2003**

- Letter from Power to Berry advising that settlement will be revoked on May 16, 2003 "unless there is some discussion regarding pre-filing resolution."

**May 9, 2003**

- Letter from Berry to Power requesting additional information on NIED claim and advising of anticipation of meeting May 16 deadline.[35]

---

[29] Bates 702936 & 703984
[30] Bates 703845
[31] Bates 701365
[32] Bates 703985
[33] Bates702932
[34] Bates 701768
[35] Bates 702928



Exhibit 53
Page 7 of 19

**May 12, 2003**

- Letter from Allstate to Power advising that MPC limit exhausted.[36]

**May 16, 2003**

- Letter faxed from Power to Berry dated May 15 providing two pay stubs for Kenick.[37]
- Letter from Berry faxed to Power requesting additional information on NIED and advising that evaluation will be completed by the end of the month.[38]
- Berry sends to Petersen for Home Office referral.[39]

**May 28, 2003**

- Berry calls Valcarce and learns of outcome regarding criminal charges against Herron and advises that Allstate intends to respond to Power by the end of the month. Valcarce feels that Trailov's case is worth policy limit but does not think Kenick's NIED claim is a good case for plaintiff.

**May 29, 2003**

- Berry status note indicates limits should be authorized for Trailov and $10,000 for Kenick's NIED claim.[40]

**May 30, 2003**

- Berry sends letter to Power via facsimile offering policy limits to Trailov and $10,000 to Kenick.
- Allstate receives letter from Doug Johnson dated May 29, 2003.[41]

---

[36] Bates 703906
[37] Bates 702924 - 702927
[38] Bates 702922
[39] Bates 703522 - 703525
[40] Bates 703999 - 7034002
[41] Bates 702917 - 702918

**ANALYSIS**

Allstate received their first notice of the loss on September 16, 2002. On this same date adjuster Rene Vanzant (Vanzant) contacted the Allstate named insured, Margaret Herron and learned that a passenger, Angelina Trailov (Trailov), was injured and taken to Anchorage. Vanzant spoke with Margaret Herron on September 16 and informed her of the available coverages and limits available for driver Charles Herron as well as the passengers. Mrs. Herron advised Vanzant that she would pass along the information to Ms. Kenick. From that point Allstate began to develop their investigation.

Vanzant contacted the hospital the following day, on September 17, in an attempt to obtain information on the condition of Trailov, but was unable to speak with any family member. Vanzant was notified by hospital personnel that Trailov's mother was not at the hospital, but staying with a relative in the local area. Later that same day Vanzant traveled to ANMC in an attempt to contact Ms. Kenick. Vanzant learned Ms. Kenick had not returned to the hospital and contact with the minor age claimant was not permissible. Vanzant left her card with contact information at the nursing station. Later, when Vanzant returned to her office, the nursing staff contacted her to confirm receipt of Vanzant's card.

Two days later Michele Power (Power) advises Jim Valcarce (Valcarce) of her representation of Trailov. Allstate learns of Power's involvement 1 week later. Direct contact is no longer permitted between Allstate and Trailov as the claimant is now represented by legal counsel.





Valcarce was retained by Margaret Herron on the date of the accident to represent her son, Charles, who was cited for driving under the influence of alcohol. Valcarce continued to represent Herron as independent counsel throughout the entire claim process.

Counsel for Herron, as well as his expert witness, makes numerous allegations of the failure of Allstate to provide timely communication as required by Alaska Statute. Specifically counsel for Herron asserts that Allstate acted in bad faith by not sending a "10-day letter" to Kenick/Trailov as prescribed in 3 AAC 26.040(b). Such a letter was not necessary as Trailov was represented by counsel who presumably would assure her interests were protected. Allstate was not required to send such a letter to the attorney representing a third-party claimant.

After being unable to contact Ms. Kenick by phone on September 16, Vanzant traveled to the hospital on September 17 in a second attempt to contact the claimant. Vanzant leaves her business card. Vanzant's contact information was received and forwarded to Power as reflected in the insurance form signed by Ms. Kenick on October 4, 2002.[42] Also, Vanzant's September 25, 2002 letter to Margaret Herron was forwarded to Bob Herron who then faxed the letter to Valcarce on October 7, 2002. Valcarce then forwarded the letter to Power's office the same date via facsimile.[43] Finally, Berry's letter dated October 18, 2002 to Margaret Herron informs the insured of the change in adjusters now that Trailov is

[42] Bates 703886-703889
[43] Valcarce's file



Exhibit 53
Page 10 of 19

500012

represented by counsel.[44] Clearly these communications were timely and in accordance with the applicable statutes.

Furthermore, Allstate is alleged to have acted in bad faith by not providing Trailov notice of the $25,000 medical payments coverage. Again, Trailov was represented by legal counsel and the Allstate adjuster was not required to send notice of coverage as this topic is either discussed in a phone conversation or claimant's counsel will request a copy of the policy (Power did request a copy of the policy declarations in December and was provided same).

Allstate comes to the conclusion through their investigation their insured is responsible for the accident. This brings the first phase of claim handling activity to a conclusion. Allstate has opened their claim file, verified coverage, contacted their named insured and attempted to obtain the injury status of the passenger in their insured's vehicle. The Trailov injury file is transferred to adjuster Kathy Berry, who proceeds with attempts to secure medical records for Trailov.

Herron asserts that after Allstate determined their insured was at fault that Allstate sought to avoid or ignore a potential UIM claim. Herron's expert witness suggests that Allstate's "actions indicate that it had assessed likely damages for Angelina Trailov to be well beyond the $100,000 of liability coverage."[45]

---

[44] Bates 702946

[45] Wainscott Affidavit, page7, para 24



Exhibit 53
Page 11 of 19
500013

Claims supervisor Craig Elkins directed Vanzant to secure the Herron policy and secure the selection/rejection form. Counsel for Herron asserts this request revealed that Allstate was concerned about the potential underinsured motorist (UIM) exposure from the inception of the claim process. I disagree with this assertion. First, typically an adjuster handling the initial investigation is not tasked with evaluating the potential UIM exposure. Certainly the understanding Allstate had of Trailov's injuries was that she had been airlifted to Anchorage, suggesting a serious injury, but ultimately the medical records would reveal the extent of the injuries. Often companies will ask their claims department to secure the selection/rejection form in the course of securing other underwriting documents. This request is made from an operational standpoint to use the opportunity while the claims staff is requesting underwriting information from the agent to also request the selection/rejection form to assure it had been signed by the insured. Companies will also request this document to preserve the form from destruction in case the claim eventually is evaluated as approaching or exceeding policy limits. Allstate's request for this document is not an indication that the claim involved a UIM exposure. Allstate was simply attempting to confirm the form had been signed and to preserve the form in the event a UIM claim was pursued in the future. Allstate had no basis to determine if there was a UIM exposure without reviewing the medical records and evaluating the condition of the claimant's injuries.

Allstate needed the medical records to determine the extent of injuries and the potential settlement exposure. On October 18, 2002 Allstate personnel





understood that Trailov suffered a skull fracture.[46] This indicated a potential serious injury, but the injury evaluation could not be completed without securing medical records that would outline the treatment and prognosis.

Herron's counsel alleges that Allstate was negligent in not advising Trailov within the 30-day time frame of the medical payments coverage. Although this issue was not the focus of my review; i.e. the MPC issue did not involve Herron, I do not believe that Allstate was acting in bad faith by not sending such a notification to Trailov's counsel. On September 16 Vanzant told Mrs. Herron about the available coverages and limits and Mrs. Herron indicated she would forward this information on to Ms. Kenick. The lien signed by Ms. Kenick on October 4, 2002 indicates Allstate as the insurance contact. This confirms that Ms. Kenick knew of Allstate's involvement.

It appears that Power sends signed medical authorization to Alaska Regional on October 1.[47] The Alaska Regional records are copied on October 10 and forwarded to Power a few days later. Also additional medical authorizations are forwarded from Power to Kenick on October 1.[48] Allstate continues with their efforts to secure records and by January 17, 2003 they have managed to secure a medical authorization for Yukon Kuskokwim Regional Hospital, but a specific authorization is required to secure records from the Alaska Native Medical Center. Such a release is provided to Power on January 17, 2003. Ms. Kenick signs the ANMC release on January 27, 2003 and the release is mailed on February 6 and received by Allstate on February 10, 2003.

---

[46] Bates 703966
[47] Bates 703719
[48] Bates703723

Power sends her letter dated February 14, 2003 to Allstate with two demands. A policy limit demand for the Trailov injury claim and a second policy limit demand for Kenick's NIED claim. We see from Berry's letter dated March 17, 2003 to Power that Allstate was not provided copies of the ANMC records, but Allstate may have received some records from the initial treatment provider (Alaska Regional)[49]. It is important to note that Power did not provide any records she obtained until February, 2003. It is clear that Power was not forthcoming with providing records to Allstate in a timely manner. Allstate requests additional information from Power pertaining to both the Trailov injury as well as the Kenick NIED claim. The first reference to the Kenick NIED claim is the February 14, 2003 policy limit demand. In response Allstate inquires if Kenick received any medical treatment and, if so, for such records to be provided for review.

Allstate provided a copy of the demand letter dated February 14, 2003 from Power to the named insured, Herron, on March 18 and advised that their settlement evaluation was incomplete. Herron alleges that Allstate acted in bad faith by not advising their insured of the potential excess exposure. Valcarce, counsel for Herron, received a copy of the letter and writes to Allstate on March 26, 2003 advising that Herron will cooperate in the defense of the claim. Valcarce makes a specific reference to excess exposure and asked that Allstate settle the claims within the policy limit to avoid such exposure.[50] Valcarce's letter to Allstate clearly indicates that Allstate did not act in bad faith and that Herron's rights were never prejudiced. What good would have come from Allstate writing to Herron

---

[49] Bates 702936

[50] Bates 701363

advising that he may want to secure independent counsel to advise him of a potential excess exposure? Herron was clearly represented by Valcarce who had discussed this issue with his client.

Allstate is notified on April 10 via letter from Power the policy limit demand will be revoked on May 16 "unless there is some discussion regarding pre-filing resolution." Power is asking Allstate to let her know if they have additional questions or if they need additional information, and if so the May 16 date appears to be a flexible one. Power does not say the demand is rescinded on May 16 whether or not Allstate has everything they need to complete their evaluation. On May 9 Berry requests additional information on the NIED claim, and adds that Allstate anticipates responding by May 16. Power responds to Allstate with her letter dated May 15 which includes two pay stubs for Kenick. This letter however is not faxed to Allstate until the following day on May 16. This letter is silent as to any pending deadline. This further suggests that Allstate had every reason to believe that Power continued to want to proceed toward settlement of the claim.

Most interestingly Berry writes to Power again on May 16 and sends the letter via facsimile prior to the end of the business day (approximately 4 p.m.). Counsel for Herron suggests the letter was possibly sent after office hours. Regardless, Power would have seen the letter the following morning. Berry's May 16 letter indicates that Allstate's evaluation "will be completed by the end of the month." Allstate advised Power they needed additional time. It is obvious that Allstate was not simply avoiding this file or the demand, but they were diligently completing their evaluation. Allstate's





letter closes by asking Power to call if she had any questions.[51] Power did not call or write.

On May 12, 2003 Allstate adjuster Millar advises Power the medical payments coverage for Trailov has been exhausted. There is no mention in the file that Power was asking for the limit to be paid. It is clear that Allstate provided Power with a copy of the declarations page on January 17, 2003. Power's deposition testimony suggests she had no experience with claims involving Medical Payments coverage and failed to read or understand the declarations page. Nonetheless, Allstate offered and then paid the MPC limit to Power providing her the benefit to negotiate with the various treatment providers to obtain a greater value of the $25,000 coverage for her client. Herron alleges that Allstate was negligent by not paying the MPC limit sooner. There is nothing in my review to indicate prejudice to Trailov, Kenick or Herron. The fact remains the policy limit was paid with full benefit to Power to determine how best to utilitize the proceeds.

Valcarce advised Allstate on May 16, 2003 the Trailov case is likely valued at the policy limit amount, but Valcarce does not ask Allstate to pay the policy limit for the Kenick NIED. Instead he advises this particular claim is not a good one for plaintiff to pursue.

Power ignores Berry's May 16 letter asking for additional support for the Kenick NIED claim. Power ignores Berry's comments that the evaluation will be completed by the end of the month, or within 14 days. Finally, Power ignores Berry's invitation to contact her if she has any questions. I

[51] Bates 701353

find no indication that Valcarce contacts Allstate advising of his concern that Allstate was acting in bad faith by asking for an additional two weeks. Berry's May 9 and May 16 letters to Power certainly appear to satisfy the criteria from Power for "some discussion regarding pre-filing resolution."

The sequence of events from this point forward tend to suggest that Power's "bad faith stopwatch" signaled the deadline and Allstate was essentially ignored from this point forward. From this point it appears that Power is more interested in pursuing a claim against Allstate rather than accepting the policy limit settlement offer extended by Allstate two weeks later. It appears Power wanted policy limit settlements for both Trailov and Kenick and was not willing to accept the policy limit for Trailov and acknowledge Kenick's claim was worth less. Allstate did what they told Power they planned to do – they completed their evaluation by the end of the month and offered their policy limit for settlement of the Trailov claim.

One additional observation regarding Herron's allegation that Allstate was attempting to settle both the bodily injury claims and the UIM claims with their May 30, 2003 offer. This allegation is absurd. There was no release document included in Berry's May 30 letter. Berry's May 30 letter never mentions settlement of a UIM claim, which was not yet viable. Instead, the letter is specific to a bodily injury settlement. Clearly this means settlement of the claims by Trailov against Herron.

Allstate met the condition of Power's deadline for discussion of pre-filing resolution. Allstate gave Power every indication their review continued and a specific time period they would respond. Power did not contact Allstate to

state the offer was off the table despite the continued communication between Allstate and Power, and Allstate's specific request for contact in its May 16 letter.

**SUMMARY**

Trailov's counsel would suggest that every claim file is perfect, or it is in bad faith; that all investigations are completed within a short time span; that all medical records are received in only a few days and policy limits are paid in short order. This is simply not how the adjustment process works. Trailov's counsel would suggest that every conversation and thought is documented in the status notes, but again, this is not reality in the real world of claims adjusting. Any claim file that is reviewed has some type of shortcoming. But Allstate's shortcomings with regard to this file did not prejudice Herron in any way. Herron's insurer evaluated the file, confirmed the settlement exposure and proceeded to offer the policy limits.

This case is based on an allegation of bad faith breach of contract. Allstate's actions should not be characterized as negligent toward their insured much less as bad faith. Allstate continued with their efforts to secure records, complete their evaluation and offer their policy limit. Their actions do not rise to the level negligence or bad faith.

Did Allstate act reasonably? They did. Did they do everything perfectly? No, they did not. As previously indicated there is no perfect claim file with the benefit of hindsight. Herron was not prejudiced or harmed in any way by the actions of Allstate.





There was no breach of any contractual obligation or breach of any covenant of good faith and fair dealing by any Allstate claims adjuster. Herron was not prejudiced by Allstate's action and Allstate's claim handling activities do not constitute negligent claim handling. I reserve the right to supplement this report if additional information is provided, and/or to respond to allegations that may be made by Herron's experts.

Respectively Submitted on June 2, 2006.

Charles E. Bean



Exhibit 53
Page 19 of 19