IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

ALLSTATE INSURANCE COMPANIES )
)
                              Plaintiff,    )
)
vs.                                         )
)
)
CHARLES HERRON,                             )
)
                              Defendant.    )
_____ )    Case No. A04-0043 CV (JKS)

## EXPERT REPORT OF ROBERT A. LOHR

I, ROBERT A. LOHR, respectfully submit this expert witness report.

1. I have personal knowledge of the following facts unless otherwise indicated, and I am in all other ways competent to offer these opinions.

2. Attorney Mark Wilkerson retained me on behalf of Allstate Insurance Companies to offer my expert opinions on questions arising in the litigation of <u>Allstate Insurance Companies v. Herron,</u> Case No. A04-0043 CV (JKS). In accordance with Federal Civil Rule 26 my qualifications are set out as Appendix A (Resume) and Appendix B (Qualifications).

3. From 1999 until 2003, I served as the Director of the Alaska Division of Insurance (ADOI or "Division"). As the highest officer in the ADOI, I was responsible for regulating the insurance industry in Alaska to protect insurance consumers in Alaska. The Division's mission is to develop, interpret, and enforce the insurance statutes and

Exhibit _54_
Page _1_ of _14_
500036          1

regulations, protect and educate the consumer, and to enhance the insurance business environment.

4. In this capacity, my responsibilities included handling, enforcing and overseeing consumer protection, fraud investigation, market conduct examinations, financial examinations and rate & form filings for the Division.

5. While Director, I served as a member of the National Association of Insurance Commissioners ("NAIC"), an organization responsible for formulating national insurance policy. I was an active member of the NAIC, where I served as a member of the Executive Committee and Vice Chair and Acting Chair of the 14-state Western Zone. I also served as a member of the Internal Administration subcommittee responsible for overseeing NAIC operations, and as a member of the International Committee. I taught seminars on insurance regulation in Japan, India, Jordan, Croatia, Romania and Bulgaria.

6. Prior to my tenure as Director of the ADOI, I served as Executive Director of the Alaska Public Utilities Commission, which regulated the rates, services and practices of public utilities and pipeline carriers. I advised the Commission on a wide range of regulatory matters and supervised the consumer protection section, among others.

7. I earned a Master's Degree in Public Administration from Harvard University's Kennedy School of Government in 1987-88 and a Bachelor of Arts Degree in International Relations and Economics in 1970 from Swarthmore College.

8. The Division has both the statutory authority and the duty to administer and enforce the Alaska Insurance Code, Alaska Statutes, Title 21, and is authorized to invoke legal, equitable and other remedies to obtain compliance. My enforcement responsibilities included the Unfair Claim Settlement Practices Act (UCSPA), AS

Exhibit 54
Page 2 of 14
500037          2

21.36.125. I testified in support of successful legislative amendments that strengthened this Act and used that statute to enforce compliance with the UCSPA.

9. I have been retained and offered opinions on uninsured motorist/underinsured motorist ("UM/UIM") issues, including matters which ultimately went to the Alaska Supreme Court on the approval of forms reviewed by the Division for compliance with AS 21.89.020.

### Factual Summary and Analysis

10. I reviewed the following categories of documents in reaching my opinions:

- Pleadings
- Discovery materials
- Exchanges between the parties
- All depositions taken and affidavits offered
- Claims file as produced.

11. Robert and Margaret Herron applied for automobile insurance from Allstate Insurance Co. through the Malone & Company agency. Allstate issued Policy #020469309, in force from June 16, 2002 through December 16, 2002. It provided liability coverage of $100,000/$300,000, medical payments of $25,000, and UM/UIM of $100,000/300,000.

12. On September 14, 2002, Angelina Trailov, a passenger in an auto driven by Allstate insured Charles Herron, was injured in a single vehicle accident. Herron was insured under the policy referenced above. Allstate was notified of the accident on the 16th of September and assigned Claim #3322751094. (10002-04)

Exhibit 54
Page 3 of 14

500038  3

13. On September 16, 2002, Allstate Claims Adjuster Renee Vanzant advised Allstate's insured, Margaret Herron, by telephone of the coverages available and the policy limits, including $100,000 in liability and $25,000 in medical payments. She states that Ms. Herron agreed to pass this information on to Ms. Kenick. Ms. Vanzant telephoned and visited the Alaska Native Medical Center the next day. She was unable to visit Ms. Trailov, a minor, because Ms. Kenick was not at the hospital. However, Ms. Vanzant left her business card with the nurses with the request that it be provided to Ms. Kenick.

14. On September 18, 2002, Allstate's Craig Elkins instructed Renee Vanzant to secure the UIM selection/rejection form. Herron's counsel argues that this demonstrates that Allstate already knew that policy limits for liability coverage would be exhausted. This misconstrues the facts. Mr. Elkins was instructed to routinely secure the signed form in any claim involving reported objective injuries. This had nothing to do with the value of a liability claim or opening UIM coverage. (Elkins Affidavit, page 1) At this point in the investigation it would have been impossible to determine the value of the liability claim.

15. By September 21, 2002, Allstate's Renee Vanzant had determined that Mr. Charles Herron was 100% liable. (100080 and Kathy Berry deposition, page 11)[1]

16. On September 25, 2002, Renee Vanzant wrote to Ms. Herron to advise that she was working on the claim. She invited Ms. Herron to call Ms. Vanzant with any

---

[1] The citations are provided as examples of the locations where the point is discussed, not to suggest that it is the only relevant citation.

Exhibit 54
Page 4 of 14
500039   4

questions or concerns, especially if there was any concern about the progress of her claim, and promised a prompt reply.

17.  On October 18, 2002, Kathy Berry, a Staff Claim Service Adjuster for Allstate, wrote to attorney Michelle Power of the Angstman Law Office.  She explained that the file had been transferred to her, acknowledged the claim, and requested authorization to obtain medical records related to the claim.  The enclosure was not sent with the letter but was forwarded to Ms. Power on November 14, 2002.  The signed authorization form was returned and received by Allstate on November 25, 2002.  The October 18, 2002 letter plainly set forth what Allstate needed to process the claim:

> Please provide me with a complete description of the injuries sustained by your client in this accident.  Please include the names and addresses of your client's treating physicians.  Please advise if your client is still receiving treatment for the injuries sustained in this accident....
>
> I am hopeful that through our joint efforts, we will be able to bring this matter to a prompt resolution.  I look forward to working with you toward that goal...

This letter, in my opinion, substantially satisfied the requirement in the regulations for the adjuster to send a letter within 30 working days of notification of the accident explaining why additional time would be required to resolve the claim.

18.  Allstate received the police report on October 30, 2002 (100157).

19.  Within one week of the accident, Ms. Trailov was represented by counsel.

20.  On February 14, 2003, Michelle Power, attorney for Ms. Trailov and Ms. Kenick, made demands for policy limits on behalf of Ms. Trailov and a separate NIED claim for Ms. Kenick.  She did not set a deadline for responding (1000197).

Exhibit ___54___
Page __5__ of _14_
500040 5

21. On March 3, 2003, Allstate's Craig Elkins directed Ms. Berry to make a
Home Office referral, given the allegations of brain damage to Ms. Trailov, to increase
reserves for the bodily injury claim from $75,000, and to update the MBRS entry for her.
(Berry deposition, page 51)

22. On March 17, 2003, Ms. Berry acknowledged receipt of the documents
provided.  She requested additional information and records.  She concluded:

> Once all of the necessary information has been received, we will complete our
> evaluation of the claim and respond to your demand.
>
> (100195)

23. On March 18, 2003, Ms. Berry wrote to Charles Herron to provide a copy of
Ms. Power's February 14, 2003 letter, to reconfirm the liability coverage, and to advise
that punitive damages were not covered under the policy (100193-194).

24. On March 26, 2003, Jim Valcarce wrote to Ms. Berry to urge that the case be
settled within policy limits and to respond to Ms. Berry's questions (100191-192 and
Berry deposition, page 63).

25. On April 10, 2003, Ms. Power for the first time set a revocation date for her
offer:

> "While the offer dated February 14, 2003 remains open, it will be revoked on
> May 16, 2003 and a complaint filed, **unless there is some discussion
> regarding pre-filing resolution**."
>
> I look forward to hearing from you.

(100188-190; emphasis added.)

Exhibit  54

Page  6  of  14

500041  6

In essence, Ms. Power established a deadline for commencing some discussion toward resolution of the claims. Other than the date, Ms. Power did not change the terms of her demand. It required "some discussion regarding pre-filing resolution" in order to meet the deadline.

26. On May 9, 2003, Ms. Berry of Allstate advised Ms. Power that it was evaluating Ms. Trailov's claims and that it anticipated the evaluation would be complete by the May 16 deadline. She requested documentation of Ms. Kenick's claim. (100187)

27. On May 16, 2003, Ms. Power faxed a letter dated May 15 to Allstate's Ms. Berry providing additional documentation to support Ms. Kenick's Negligent Infliction of Emotional Distress claim of lost income (100183). This was the same day as the "deadline", yet Ms. Power did not mention the "deadline" in this letter.

28. On May 16, 2003, Ms. Berry of Allstate faxed a letter to Ms. Power acknowledging receipt of the supporting documents on Ms. Kenick's claim and requesting further documentation regarding the reason for her job change. Regarding Ms. Trailov, Ms. Berry explained:

> With regard to Angelina's claim, unfortunately our evaluation is not completed today as expected. Obviously, this is a claim that needs a thorough review and the policy limits that you have demanded comprise a significant amount of money. Our evaluation will be completed by the end of the month, and I am hoping to respond to your demand sooner than that.
>
> If you have any questions please call me at (907) 269-6174.
>
> (100181)

29. In my opinion, the letters from Ms. Berry and Ms. Power's replies met the timing requirements of Ms. Power's April 10, 2003 letter. There were timely discussions

Exhibit 54
Page 7 of 14
500042 7

regarding pre-filing resolution, which advanced the claim toward resolution. Also, the

fact that Ms. Power did not contact Ms. Berry in response to her suggestion to call if there

were any questions, is strong support for the conclusion that such discussions would

continue.

30. On May 21, 2003, Ms. Berry e-mailed the Home Office referral to Joe

Grazulis with Allstate's Field Support Services.

31. On May 30, 2003 Ms. Berry faxed Ms. Power a policy limits settlement offer

of $112,500 for Ms. Trailov and a separate $10,000 offer for Ms. Kenick to settle her

NIED claim and stated that she would re-evaluate the NIED claim if additional

documentation was received. She pointed out that the $25,000 medical payments

coverage had already been paid. (100178)

32. On May 30, 2003, Allstate received a letter from Douglas G. Johnson of

Dennis Mestas' law office dated May 29, 2003 asserting that the policy limits offer lapsed

on May 16. Mr. Johnson argued that Allstate never made an offer to settle either Ms.

Trailov's or Ms. Kenick's claims.

33. Mr. Johnson set a 20-day deadline for Allstate to negotiate a settlement for

damages "far in excess of policy limits" or a lawsuit would be filed immediately.

(100175)

34. Ms. Berry did not receive Mr. Johnson's letter until after she sent Allstate's

policy limits offer to Ms. Trailov (Berry deposition, page 10).

Exhibit  54
Page  8  of  14
500043  8

35. In my opinion, Mr. Johnson's letter attempts to distort the deadline set by Ms. Power for a very different and far more preliminary purpose. It attempts to rewrite the April 10, 2003 deadline to be something it was not: his May 29 letter transforms the deadline into a setup. No explanation was given for the deadline. There were no events that occurred during this two-week period to suggest any prejudice to Ms. Trailov or Ms. Kenick by virtue of Allstate's unopposed extension of the deadline until May 30. Ms. Power certainly did not object.

36. In my opinion, Allstate did not breach its contractual obligations. Its May 30, 2003 offer to pay policy limits to Ms. Trailov for her liability claim and its separate offer of $10,000 to Ms. Kenick for her NIED claim were made in good faith, following a thorough investigation of the claims. No deadline for an offer to settle the claims was breached because no deadline to settle had been missed by the time of Allstate's offer to settle.

37. In my opinion, the exchange of letters between Allstate and Ms. Power clearly met Ms. Power's requirement for "some discussion regarding pre-filing resolution" in a timely manner. Information directly relevant to the claims was exchanged to advance the understanding of the value of claims.

38. Allstate did not breach its duty of good faith and fair dealing. Certainly there was no material breach of its duties.

Exhibit___54___
Page___9___of___14___
500044 9

39. Mr. James Valcarce states in his deposition that he was not aware of the May 16, 2003 deadline. However, it is apparent that he was well aware of the potential for an excess judgment issue long before this.

40. On April 2, 2004, Charles Herron confessed judgment in favor of Ms. Trailov and Ms. Kenick for $1,937,500 and assigned any claims he might possess against Allstate in return for a covenant from Ms. Trailov and Ms. Kenick not to execute against his assets. However, Mr. Herron stated in his deposition that he knew nothing about this confession of judgment.

41. Mr. Herron materially breached his duty to cooperate under his insurance contract with Allstate. The cooperation clause of his policy required Mr. Herron to cooperate with Allstate in evaluating, defending and settling the claim.

42. Since there had been no previous material breach of Allstate's duties to Mr. Herron, Mr. Herron's breach was not excused.

43. In his affidavit Mr. Robert Wainscott has made repeated allegations of bad faith or breach of the duty of good faith. He also repeatedly alleges negligence on the part of Allstate, but fails to distinguish first-party duties owed to Ms. Trailov and Ms. Kenick from third–party duties owed to Mr. Herron and he fails to distinguish alleged negligence from alleged bad faith. I disagree with Mr. Wainscott.[2] Allstate did not act in bad faith toward Mr. Herron. Allstate's Adjuster Kathy Berry was not negligent.

---

[2] Mr. Wainscott also cites incorrect first-party provisions of the Insurance Trade Practices regulations, 3 AAC 26.010-300 as if they applied to third-party claims. They do not. Wainscott Affidavit, paragraph 35, page 11.

Exhibit 54
Page 10 of 14
500045
10

44. On April 28, 2006, attorney Mark Sandberg filed a Memorandum in support of his client's motion for summary judgment. He asserted that Allstate's claims handlers made mistakes in handling this case. In some instances his assertion is correct, but in others it is not.

45. Perfection may be a worthy goal, but it is not an attainable standard for humans. For example, I note that Mr. Sandberg misstates the name of his co-counsel. (page 24). He also incorrectly cites at least three cases that he believes support his contentions about an insurer's legal obligations.[3] I do not point out these errors to cast aspersions. Conceivably, comparable errors appear in this report, although I have taken due care to avoid them. Professionals in a variety of fields use quality control to reduce errors, but they still creep in.

46. Mr. Sandberg also asserts multiple violations of the UCSPA. In my review of Allstate's claim file and depositions, I did not detect substantive violations of the regulations or the act. I found one occasion where Allstate was one week late in communicating the name and contact information for the new adjuster, Kathy Berry, assigned to the third-party liability claim. In any case the average time to respond to letters related to the claims communications was under 14 working days, under the regulatory specification of 15 working days.    It is simply not credible to argue that prejudice occurred when Ms. Power had the name and contact information for Ms.

---

[3] The citation given on page 27 of Mr. Sandberg's Memorandum in Support of Motion for Summary Judgment of April 26, 2006 to C.P. v. Allstate is actually to Alaska Pacific Assur. Co. v. Collins. The correct citation for C.P. v. Allstate is 996 P.2d 1216 (Alaska 2000). On page 27 Jackson v. American Equity Ins. Co. misses by eight pages and the citation to Carpenter v. Great Divide Ins. Co. actually leads to a 1938 Oklahoma case involving a promissory note.

Exhibit 54
Page 11 of 14
500046 11

Vanzant and Ms. Power had established such a relaxed approach to handling the claim. For example, she held medical records for months before forwarding them to Ms. Berry.

47. Also, in concluding that dates were missed, Mr. Sandberg uses the wrong measure. There are no 30 calendar-day deadlines in the Unfair Claims regulations, as Mr. Sandberg asserts in his MSJ memorandum at page 29. The deadline is 30 "working" days. Beyond this, it is important to understand how the Division typically enforces this Act. The primary purpose of the UCSPA is to protect the unrepresented claimant.

48. First, only the Division is authorized to enforce this act. AS 21.36.125(b) provides: "The provisions of this act do not create or imply a cause of action for a violation of this section." The Division measures insurer compliance with this act and enforces it using a combination of market conduct examinations and enforcement orders as required. A market conduct examination of an insurer uses a statistically significant sample of claims files to measure claims handling performance. The minimum passing score for claims is 93%, as established by the National Association of Insurance Commissioners. A failing score is normally based on Division examiners' reviews of dozens of files and typically results in a recommendation for corrective action by the insurer. If an insurer refuses to implement the recommendations in a published market conduct examination, the Director has the option to take enforcement action.

49. Communications between and among represented parties in an auto claim frequently occur at a more sophisticated level than those between an insurer and unrepresented claimants. Thus, although the regulations are written generally ("Any person transacting a business of insurance..."), Division enforcement of the procedural

Exhibit  54
Page  12 of  14

500047  12

timing requirements of the UCSPA focuses on protecting the interests of the unrepresented claimant. An attorney will, of course, zealously represent those interests in a claim where he/she is involved.

50. The bulk of the Insurance Trade Practices regulations, 3 AAC 26.010-300, address first-party claims and do not apply to the liability issues in this case. The third-party provisions are intermixed and do apply.

51. The regulations recognize that the correspondence deadlines are inapplicable when the matter goes into arbitration, litigation or other proceedings. 3 AAC 26.050.

52. Also, the Division employs Consumer Complaint Specialists "to investigate complaints, gather and evaluate data, research insurance laws, and take appropriate action to bring the complaint to a proper resolution." (Annual Report, page 21) As of May 31, 2006, I was not able to identify any consumer complaints filed with the Division concerning the issues in this case.

53. The settlement release referred to in Ms. Berry's policy limits bodily injury ("BI") offer on May 30, 2003 has been attacked as some sort of underhanded attempt by Allstate to avoid paying a UIM claim. Any person with knowledge of claims would understand "BI" to be a reference to a third-party liability claim.

54. In my opinion, Allstate's claims investigation in this matter was conducted in good faith. It was thorough, diligent, timely and well documented. There was a reasonable basis for each of the actions taken.

Exhibit ___54___
Page _13_ of _14_

500048    13

55.  Specifically, Allstate's handling of coverage under Policy #020469309 was reasonable.  Allstate did not place its interests ahead of those of its insured.

56.  Judge Singleton's Order of July 12, 2004 framed the key issue this way:

> Thus, the focal point in this case will be whether Allstate and/or Charles Herron committed a total breach of the contract, and, if so, who breached first.  It is possible that the facts are not in dispute and that this issue may be resolved on summary judgment.

(FN 2, pages 3-4)

57.  I will supplement this report if additional facts or issues come to light, consistent with applicable court rules, and I reserve the right to supplement my opinions in response to the opinions of other experts.

DATED at Anchorage, Alaska, this 5th day of June, 2006.

Robert A. Lohr

Exhibit    54
Page  14 of 14
500049  14