MARY KENICK
Vol. 1

2/21/2006

ALLSTATE INS. v. HERRON
A04-0043 Civil

```
 1                 IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF ALASKA
 2
     ALLSTATE INSURANCE COMPANIES,    )
 3                                    )
                       Plaintiffs,    )
 4                                    )
     v.                               )
 5                                    )
     CHARLES HERRON,                  )
 6                                    )
                       Defendant.     )
 7   _____)
                                      )
 8   Case No. A04-0043 Civil

 9                 VIDEOTAPED DEPOSITION OF MARY KENICK
                          February 21, 2006
10   APPEARANCES:

11        FOR THE PLAINTIFF:          MS. REBECCA J. HOZUBIN
                                      Wilkerson, Hozubin & Burke
12                                    Attorneys at Law
                                      310 K Street, Suite 405
13                                    Anchorage, Alaska  99501
                                      907-276-5297
14
          FOR THE DEFENDANT:          MR. MARK A. SANDBERG
15                                    Sandberg, Wuestenfeld &
                                      Corey
16                                    Attorneys at Law
                                      701 West Eighth Avenue
17                                    Suite 1100
                                      Anchorage, Alaska  99501
18                                    907-276-6363
19        FOR THE DEPONENT:           MR. DENNIS M. MESTAS
                                      Attorney at Law
20                                    745 West Fourth Avenue
                                      Suite 306
21                                    Anchorage, Alaska  99501
                                      907-277-9496
22
                                      MS. MICHELE POWER
23                                    Power & Brown
                                      Attorneys at Law
24                                    P.O. Box 1809
                                      Bethel, Alaska  99559
25                                    907-543-4700
```

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

EXHIBIT 55

Page 2

1                           TABLE OF CONTENTS

2              Direct Examination by Ms. Hozubin              3

3     EXHIBITS MARKED:

4     A - Pay Stubs and Income Tax Returns                   65

5     B - Ms. Trailov's School Records                       66

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1                      P R O C E E D I N G S

2                (Anchorage, Alaska - 2/21/2006)

3          REPORTER:  My name is Joseph Kolasinski, Notary Public in

4    and for the state of Alaska and court reporter for Computer

5    Matrix Court Reporters whose business address is 310 K Street,

6    Suite 200, Anchorage, Alaska.  This is the first tape in the

7    videotape deposition of Mary Kenick taken pursuant to notice by

8    the plaintiffs, I believe.  The case is in the district court

9    -- United  States district court for the district of Alaska,

10   Allstate Insurance Companies, versus, Charles Herron, case

11   number A04-0043 civil.  It is the 21st day of February 2006.

12   The time is 10:02 a.m.  We're at the offices of Computer Matrix

13   Court Reporters, 310 K Street, Suite 200, Anchorage, Alaska.

14   Counsel, if you'll please identify yourself for the record

15   stating your representation starting with the plaintiff's

16   attorney.

17          MS. HOZUBIN:  Rebecca Hozubin for Allstate Insurance.

18          MR. SANDBERG:  And Mark Sandberg here for Mr. Herron.

19          MS. POWER:  Michele Power here for Mary Kenick.

20          MR. MESTAS:  And Dennis Mestas for Mary Kenick.

21          REPORTER:  Thank you.  Ma'am, if you'll raise your right

22   hand, I'll swear you in.

23          (Oath administered)

24          MS. KENICK:  I do.

25                             MARY KENICK

Page 4

1    having first been duly sworn under oath, testified as follows

2    on:

3                    DIRECT EXAMINATION

4        REPORTER:  Thank you.  Would you state your full name for

5    the record and spell your last name, please?

6    A    Mary Kenick, K-E-N-I-C-K.

7        REPORTER:  And a mailing address, please?

8    A    P.O. Box 11, Bethel, Alaska, 99559.

9        REPORTER:  And a daytime phone or a message phone, please?

10   A    Daytime is 907-543-2061.

11       REPORTER:  Thank you.  Counsel, if there are no

12   stipulations, you may begin.

13   BY MS. HOZUBIN:

14   Q    Mrs. Kenick, am I pronouncing your name properly?

15   A    Yes.

16   Q    Okay, thank you.  Would you please tell me your date of

17        birth?

18   A    9/30/1961.

19   Q    And your social security number?

20   A    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.

21   Q    Have you ever gone by any other names?

22   A    My maiden name is Mary Jim.  My first married name was

23        Mary Trailov and I'm Mary Jim -- Mary -- Mary Kenick now.

24   Q    And what is your middle name?

25   A    Olga.

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax   907-243-1473

jpk@gci.net
sahile@gci.net

MARY KENICK
Vol. 1

2/21/2006

ALLSTATE INS. v. HERRON
A04-0043 Civil

Page 5

```
 1   Q    Have you ever been confused with somebody else by the same

 2        name?

 3   A    No.

 4   Q    Did you review any documentation to prepare for this

 5        deposition?

 6   A    Yes.

 7   Q    What did you review?

 8   A    The past history of the lawsuit against Allstate.

 9   Q    And when you say the past history, are you talking about

10        the complaint and the answer and.....

11   A    All the documents requested by Allstate, the information

12        that was sent by Michele Power.

13   Q    To Allstate?

14   A    Yes.

15   Q    You're currently married?

16   A    Yes.

17   Q    And to whom are you married?

18   A    Ray Kenick.

19   Q    How many years have you been married to him?

20   A    Seven years.

21   Q    Do you have children?

22   A    Yes.

23   Q    How many?

24   A    Three.

25   Q    And what are their ages?
```

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

Page 6

1   A   18, 6 and 5.

2   Q   And can you give me a brief synopsis of your educational

3       background?

4   A   I graduated from Mt. Edgecumbe in 1980.  I went to Alaska

5       Pacific University for a couple years, '81 and '82.

6   Q   What sorts of courses were you taking in '81 and '82?

7   A   Primarily business courses.

8   Q   Any plans to go back to finish your degree?

9   A   No.

10  Q   What is your current occupation?

11  A   I -- land transfer liaison specialist for the Bureau of

12      Land Management.

13  Q   What does that mean?

14  A   I -- like a problem solver for the adjudicators, I gather

15      information, meet with the village corporations, resolve

16      any land issues prior to the adjudicators actually working

17      on the case files.

18  Q   And how long have you held that position?

19  A   In August this year it will be two years.

20  Q   So since August of 2004?

21  A   Yes.

22  Q   And are you paid salary or hourly?

23  A   Salary.

24  Q   And what is your annual salary?

25  A   With the cost of living allowance I think it goes up to

2/21/2006

Page 7

```
 1        about 75,000 a year.

 2   Q    And who is your current supervisor?

 3   A    Johanna Munsen.  She's the branch chief for preparation

 4        resolution.

 5   Q    Okay.  Prior to taking the job with the Bureau of Land

 6        Management who were you working for?

 7   A    The Association of Village Council Presidents.

 8   Q    And how long did you work for them?

 9   A    One year, approximately.

10   Q    And what were you duties then?

11   A    I worked with pending Native allotments.

12   Q    And who was your supervisor?

13   A    Theresa Jacobssen.

14   Q    What was your -- were you paid hourly or salary?

15   A    Salary.

16   Q    And what was your salary then?

17   A    It varied.  I think about 51,000.  I could be wrong.

18   Q    Did that include cost of living allowance?

19   A    No.

20   Q    No.  How much is your cost of living allowance now with

21        the bureau?

22   A    Twenty-five percent of my salary.

23   Q    And how long were you -- were you with the association?

24   A    About a year.

25   Q    About -- oh, I'm sorry, I already asked you that question.
```

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax   907-243-1473

jpk@gci.net
sahile@gci.net

Page 8

```
 1            Prior to that where did you work?

 2      A     For the U.S. Department of Agriculture, rural development.

 3      Q     And what did you do for them?

 4      A     I was a rural development manager.

 5      Q     And what sort of work did that entail?

 6      A     Rural development is primarily a lending agency.  So I

 7            worked on grants and loans.

 8      Q     How long did you hold that job?

 9      A     Seven years.

10      Q     Were you salary or.....

11      A     Salary.

12      Q     Okay.  And what was your salary?

13      A     With the cost of living allowance it was about 65,000.

14      Q     And cost of living was also 25 percent then?

15      A     Correct.

16      Q     Who was your supervisor there?

17      A     Frank Muncy.

18      Q     Why did you leave the association job?

19      A     A number of reasons, primarily -- the primary reason I

20            left was the challenge for the position I'm holding and

21            increase in salary.

22      Q     When you say challenge for the position you're holding,

23            what do you mean by that?

24      A     I -- it's taken the federal government over 30 years to

25            finish the conveyances for the land owners in the state of
```

Page 9

```
 1        Alaska.  I -- having worked with allotments for over 10

 2        years, I know the challenges that the bureau faces and

 3        wanted to be able to help with that process on getting it

 4        closed out for the region.

 5    Q   And why did you leave the USDA job?

 6    A   Just primarily stress related, why I left.

 7    Q   Tell me about that.

 8    A   From the time of my -- my -- when -- from the time my

 9        daughter was in her accident to the time I submitted my

10        resignation I was under a lot of stress.  Where -- I was

11        just under a lot of stress and the agency -- working for

12        the agency was -- is a stressful job and my -- the

13        stresses that I had in my personal life just was -- just a

14        little bit too much for me.

15    Q   And to what do you -- to what did you attribute the stress

16        in your personal life at that time?

17    A   My daughter's accident.

18    Q   When did you submit your resignation?

19    A   January '04.

20    Q   And did you continue to work for them at all after you

21        submitted your resignation?

22    A   Two weeks.

23    Q   Two weeks.  And how long was it before you took the job

24        with the association?

25    A   My last day with rural development was a Friday.  I
```

2/21/2006

```
 1        started working on Monday.

 2   Q    Tell me what sorts of stress you had with the USDA that

 3        were different from the job you took with the association?

 4   A    The responsibilities with the association weren't as

 5        demanding as they were with rural development.

 6   Q    Why not?

 7   A    Rural development being primarily a lender, once an

 8        application is taken there's a timeline that the

 9        application has to be finished and certain

10        responsibilities have to be met prior to making a decision

11        whether to approve or decline the application.

12   Q    And that was the primary source of stress with you at the

13        USDA or.....

14   A    With the stresses that I had in my personal life it was I

15        felt a lot harder for me to meet those goals.

16   Q    So you had a harder time meeting deadlines at your job?

17   A    After the accident or prior to leaving my job.

18   Q    Were you ever reprimanded at your job for not meeting

19        deadlines?

20   A    No.

21   Q    When you tendered your resignation what grounds did

22        you give them?

23   A    I didn't give them any grounds.  That -- I just told them

24        that I was submitting my resignation.

25   Q    Did you submit a written resignation?
```

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

Page 11

```
 1    A    Yes.

 2    Q    And what did that written resignation say?

 3    A    I gave them the date my last day of employment would be

 4         with the department.

 5    Q    Did you make the association aware of your personal stress

 6         problems before you began that job?

 7    A    No.

 8    Q    How long did your personal stress problems last following

 9         the accident?

10    A    I would say about two years, two and a half years.

11    Q    Was the stress consistent throughout those two, two and a

12         half years, or did it go up and down, did it decrease over

13         time?

14    A    After -- last year I think was when I started feeling I

15         had a handle.  I think religion had a lot to do with my

16         ability to handle the stress.

17    Q    Has religion always been a part of your life?

18    A    No.

19    Q    When did religion become a part of your life?

20    A    After -- after my daughter's accident.

21    Q    Let's talk a little bit about your knowledge of your

22         daughter's accident.  You weren't there at the time of the

23         accident, correct?

24    A    I was not there, no.

25    Q    Okay.  And you never saw your daughter at the scene of the
```

Page 12

```
 1        accident?

 2   A    No.

 3   Q    Tell me your understanding of what occurred in the

 4        accident?

 5   A    She was in the back seat, the driver's side of the

 6        Herron's pickup.  Charles was driving.  Tracey was in the

 7        front, I believe, or next to her.  I'm not sure.  They

 8        pulled out of the sand pit.  Charles made a left.  Tracey

 9        told him to take her home.  So he swerved the other

10        direction and lost control of the vehicle.  They hit a

11        power pole and the impact was where my daughter was

12        sitting.  The impact was so strong that she broke the

13        window out.

14   Q    Okay.  Do you know if she was wearing her seatbelt?

15   A    No.

16   Q    You don't know or.....

17   A    I don't know.

18   Q    Okay.  How did you find out about the accident?

19   A    Her -- a friend of hers came to my home and woke me up.

20   Q    Who was her friend?

21   A    I can't think of her name right now.

22   Q    That's okay.  If at any time you don't remember something,

23        I would prefer you have me -- prefer you tell me you don't

24        remember something instead of guessing.

25   A    Oh, I remember now.  Alicia Cox.
```

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

Page 13

```
 1    Q    Okay.

 2    A    Her name is Alicia Cox.

 3    Q    Okay.  Do you recall what time she came to your

 4         house?

 5    A    It was about 3:00 o'clock in the morning.

 6    Q    And when she came to your house did she ring a doorbell,

 7         knock on the door, how did she awake.....

 8    A    She came into my -- I -- she came into my daughter's room

 9         where I was sleeping and turned the light on.

10    Q    Why were you sleeping in your daughter's room?

11    A    Because I wanted to wake up when she came home.

12    Q    Was she supposed to be home earlier than she was?

13    A    No.

14    Q    Why did you want to wake up when she came home?

15    A    I wanted to know what time it was when she arrived.

16    Q    Why?

17    A    Just the motherly instinct.

18    Q    What did Alicia tell you when she woke you up?

19    A    She said it's Gina and that's when I got startled because

20         of the expression on her face and the tone in her voice.

21    Q    What was the expression on her face?

22    A    Shock.

23    Q    What was the tone in her voice?

24    A    Fear.

25    Q    Did she say anything other than it's Gina?
```

Page 14

1    A    She said she's -- after a minute or two she said she's at

2         the hospital.

3    Q    Did she say anything else?

4    A    When I asked her what happened she said she was in a car

5         accident.

6    Q    Did she tell you anything else?

7    A    She told me another friend of theirs called -- called her

8         to let her know that Gina was in an accident.  She was in

9         the emergency.  Alicia went to the hospital, didn't see me

10        there, and then inquired of the doc -- asked the doctor if

11        they called me and -- and because I wasn't there she came

12        to my house and woke me up.

13   Q    After you finished your conversation with Alicia what

14        did you do next?

15   A    I started running out the door and realized I was in my

16        pajamas on the porch.  I ran back in the house.  There I

17        realized I also hadn't woke my husband up.  I think I

18        froze in the hallway -- sorry.

19   Q    That's okay.

20   A    So I couldn't -- I couldn't think.  I started running

21        towards the bedroom and I stopped and I started running

22        towards my laundry room to get some clothes on.  I was

23        hyperventilating.

24   Q    Did you wake up your husband?

25   A    Yes.

Page 15

```
 1   Q   Did you tell him what was going on?

 2   A   I just said Gina was in an auto accident.  She's in

 3       emergency and asked if -- I said I don't think I could

 4       drive; could you drive me to the hospital.

 5   Q   Did Alicia tell you anything about your daughter's

 6       injuries when she was speaking to you?

 7   A   No.

 8   Q   Did you change your clothes before you left the house?

 9   A   Yes.

10   Q   Did your husband change his clothes?

11   A   He put his clothes on.

12   Q   Okay.  And how far did you live from the hospital at that

13       time?

14   A   We live about maybe 10 minutes away from the hospital.

15   Q   And did your husband drive you there?

16   A   Yes.

17   Q   Did you make any stops along the way or stop to make any

18       phone calls before you left?

19   A   No.

20   Q   Were there any other people in the house?

21   A   My uncle.  I woke him up to let him know Gina was in an

22       accident and we're going to the hospital and asked if he

23       could watch the boys because they were still sleeping.

24   Q   And what is your uncle's name?

25   A   John Kinegak.  He's no longer alive.
```

MARY KENICK
Vol. 1

2/21/2006

ALLSTATE INS. v. HERRON
A04-0043 Civil

Page 16

1   Q   Oh, I'm sorry.  Tell me what happened as soon as you got

2       to the hospital.

3   A   There was a lot of my daughter's friends in the waiting

4       area.  I went through the secured door.  She was screaming

5       and I could hear her as soon as I got into the emergency

6       area.

7   Q   Did anyone from the hospital talk to you before you went

8       to see your daughter?

9   A   No.

10  Q   Did any police officer talk to you before you went to

11      see your daughter?

12  A   No.

13  Q   Did anyone talk to you before you went to your daughter?

14  A   I went to find the doctor that was -- the on-call doctor

15      in emergency.

16  Q   Did you find him?

17  A   I found her.

18  Q   Tell me what you saw when you found her.

19  A   She was in the emergency room.  She was on the bed.  There

20      was I think four nurses that were around her trying to

21      restrain her.

22  Q   Did you see any doctors in the vicinity?

23  A   She was at the doctor's station talking to a medical

24      doctor at ANMC.

25  Q   When you found your daughter how close did you get to her?

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

MARY KENICK                      2/21/2006                ALLSTATE INS. v. HERRON
Vol. 1                                                          A04-0043 Civil

Page 17

```
 1   A    I was just closer than I'm -- I am sitting to you, next to

 2        you.

 3   Q    Were the nurses able to restrain your daughter?

 4   A    They had to sedate her.

 5   Q    How long after you arrived did they sedate her?

 6   A    Within 10 minutes after I arrived.

 7   Q    And what was her behavior after they sedated her?

 8   A    She was in a controlled coma.

 9   Q    At that point in time did you have any discussions with

10        the doctor?

11   A    After she spoke to the doctor here, the doctor was -- they

12        were trying to determine whether they needed to Medivac

13        her.  Her greatest concern was there was blood coming out

14        of her ear so she suspected a frac -- a basal fracture.

15   Q    And this is what she told you when you spoke with her?

16   A    Yes.

17   Q    How long was it before the decision to Medivac her was

18        made?

19   A    From the time I arrived at the hospital?

20   Q    Sure.

21   A    Within half an hour.

22   Q    Did you have any other conversations with any other

23        persons at the hospital.....

24   A    No.

25   Q    .....during that time?  No.  Where was your husband during
```

Page 18

```
 1        all this?

 2    A   He was in the hallway.

 3    Q   Could he see any of what was going on?

 4    A   Yes.

 5    Q   Was he involved in your conversation with the doctor?

 6    A   No.  He was kind of at a distance.

 7    Q   Once the decision was made to Medivac your daughter how

 8        long was it before she was Medivac'd?

 9    A   She -- we were in Anchorage in -- within a couple hours

10        from the time because the jet takes about 50 minutes to

11        get to Bethel from here.

12    Q   In between the time that the decision was made to Medivac

13        your daughter and your daughter was actually placed on the

14        plane, what did you do?

15    A   I went home and I packed some of her clothing and some of

16        my clothing.  Then I -- I went back to the hospital and

17        waited.

18    Q   Did you have any discussions with anybody?

19    A   My husband.

20    Q   And what did you tell your husband?

21    A   I don't remember.  I don't remember because I -- I was

22        hysterical.

23    Q   At any time did any of the medical personnel at the

24        hospital offer you medical assistance?

25    A   No.
```

Page 19

1   Q    Did you ask for medical assistance?

2   A    No, I didn't.  My concern was my daughter, not me.

3   Q    When you say hysterical, what do you mean by that?

4   A    I wasn't self controlled.  I was crying.  I couldn't think

5        straight.

6   Q    At any point in time prior to your daughter being

7        Medivac'd while you were at the hospital did any doctor or

8        nurse tell you that they thought your daughter might die?

9   A    No.

10  Q    Did you have any reason to believe that your daughter

11       might die?

12  A    Yes.

13  Q    And what did you base that reason on?

14  A    The blood coming out of her ears.

15  Q    Did you at any point in time ask the doctors or nurses if

16       there's a possibility that your daughter might die?

17  A    No.

18  Q    During the course of the Medivac flight did you have

19       opportunity to speak to any of the people who were taking

20       care of your daughter on the flight?

21  A    Yes.

22  Q    And what was the crux of those conversations?

23  A    The seriousness of her injuries.

24  Q    What did they tell you?

25  A    That they were real concerned because of the possibility

Page 20

```
 1          of a serious head injury.

 2    Q     While your daughter was still at the hospital in Bethel

 3          did the -- any nurse or doctor ask you for a history of

 4          your daughter?

 5    A     I don't remember.

 6    Q     Did the Medivac personnel ask you the history of your

 7          daughter, the medical history of your daughter?

 8    A     Yes, I think they did.

 9    Q     And do you recall what you told them?

10    A     No, I don't.

11    Q     At any point during the -- tell me your demeanor during

12          the Medi -- the Medivac flight; how were you then?

13    A     I was in shock.

14    Q     When you say in shock, what do you mean?

15    A     I felt like I -- it was -- I wasn't -- it wasn't reality,

16          that I was -- I was hoping I would wake up.  Disbelief

17          that this was actually happening.

18    Q     At any time during the course of that flight did the

19          Medivac personnel offer you any medical assistance?

20    A     No.

21    Q     Did you ask for any?

22    A     No.

23    Q     What happened once the flight landed?

24    A     There was an ambulance that met the plane.

25    Q     And did you ride in the ambulance with your daughter?
```

Computer Matrix, LLC
310 K Street, Suite 200                    Phone - 907-243-0668
                                           Fax    907-243-1473                    jpk@gci.net
                                                                                  sahile@gci.net

MARY KENICK                    2/21/2006              ALLSTATE INS. v. HERRON
Vol. 1                                                        A04-0043 Civil

Page 21

1    A    Yes.

2    Q    And where did the ambulance take you?

3    A    To Alaska Native Medical Center.

4    Q    And what happened once you got there?

5    A    She was taken directly to emergency where there was a room

6         full of doctors waiting for her -- her arrival.

7    Q    And where did you go?

8    A    I tried going into the same room they brought her in but

9         they said I wasn't allowed in there.  Within a few minutes

10        they brought her over and had her I think X-rayed.

11   Q    Did you see her go up to X-ray; were you with her?

12   A    They wouldn't let me go with her.

13   Q    Did any doctors come out and talk to you at that point?

14   A    After her X-rays were done.

15   Q    What did they tell you?

16   A    That she needed to be transferred over to Alaska Regional

17        Hospital because of fracture in her lungs and surgery

18        needed to take place immediately.

19   Q    And did they tell you at that point in time the risks of

20        the problems with her lungs?

21   A    Yes.

22   Q    And what were those risks?

23   A    That they were -- they were going to have to take part of

24        her lung off.

25   Q    Is that what they ultimately wound up doing?

MARY KENICK                    2/21/2006              ALLSTATE INS. v. HERRON
Vol. 1                                                        A04-0043 Civil

Page 22

1    A    No.

2    Q    So worst case scenario, they were going to have to take

3         part of her lung?

4    A    Yes.

5    Q    And about how much time had passed in between your

6         arriving at ANMC and you being told that your daughter

7         needed to be transferred to Alaska Regional?

8    A    Within minutes.

9    Q    And did they have the ambulance ready to go.....

10   A    Yes.

11   Q    .....after they talked to you?

12   A    Uh-huh.  (Affirmative)

13   Q    And did they take you straight to Alaska Regional?

14   A    Yes, they did.

15   Q    And what happened once you got there?

16   A    She was taken directly into pre-op.

17   Q    And where were you when she was in pre-op?

18   A    I had to wait in the waiting area.

19   Q    Did anyone come out to talk to you?

20   A    The -- a doctor and a nurse before she was taken.

21   Q    Before she was taken into pre-op?

22   A    Uh-huh.  (Affirmative)

23   Q    And what did they tell you?

24   A    Approximately how long the surgery would take.

25   Q    And how long did they say it would take?

MARY KENICK                    2/21/2006              ALLSTATE INS. v. HERRON
Vol. 1                                                A04-0043 Civil

Page 23

1   A    Four to six hours.

2   Q    How long did it actually take -- wind up taking?

3   A    She didn't go into surgery.  I -- I'm guessing it was a

4        couple hours after she was taken in there they determined

5        she didn't need surgery.

6   Q    Do you know why she didn't need the surgery?

7   A    No.  There wasn't a puncture.  They thought there was in

8        her lungs.

9   Q    Did you feel some relief at that point?

10  A    Yes.

11  Q    After they came out and told you that they did not

12       have to do surgery what happened next?

13  A    They brought her to the acute care section.

14  Q    Did you get to see her then?

15  A    I stayed with her.

16  Q    And how long was she in acute care?

17  A    For a couple days.

18  Q    While she was in acute care was she still in an induced

19       coma?

20  A    Yes.

21  Q    What did the doctors tell you while she was in acute care

22       about her injuries?

23  A    The doctor said very little to me during that whole time.

24  Q    Did he explain her injuries to you at all?

25  A    He said very little to me during the whole time she was in

MARY KENICK               2/21/2006            ALLSTATE INS. v. HERRON
Vol. 1                                              A04-0043 Civil

Page 24

```
 1        acute care.
 2   Q    Did you have discussions with the nurses about how she
 3        was?
 4   A    No.
 5   Q    Were you displeased with that doctor because he wasn't
 6        discussing it with you?
 7   A    No, I wasn't.
 8   Q    How were you personally while she was in acute care?
 9   A    I was worried.
10   Q    Were you able to care for yourself, change clothes,
11        shower, that sort of thing, while you were there?
12   A    I didn't -- I didn't do that for two days.
13   Q    Would you have been able to during those two days?
14   A    Yes, if I had left her room or left the hospital.
15   Q    You said she was in acute care for two days, I believe?
16   A    Yeah.
17   Q    After she was done with acute care where did she go then?
18   A    I'm trying to remember, I think she was transferred back
19        to Alaska Native Medical Center.
20   Q    When was she taken out of the medically induced coma?
21   A    I don't remember.
22   Q    It's okay if you don't remember.
23   A    I don't remember.
24   Q    Okay.  Were you there when she was taken out of the coma?
25   A    We had to wake her.  It took -- it was -- it took awhile
```

Page 25

```
 1          to wake her up because -- take her out of being sedated

 2          and they don't just take you out.  You have to wake up

 3          yourself.

 4    Q     And did the doctors explain to you that it was going to

 5          take a little bit of time for her to wake up?

 6    A     A nurse did.

 7    Q     Were you there when she woke up?

 8    A     Uh-huh.  (Affirmative)

 9    Q     Tell me about when she woke up.  Did she -- what did she

10          say?

11    A     She didn't know where she was at.  She asked where she

12          was.  Then she asked what happened.

13    Q     When they woke her up was she at ANMC or was she at Alaska

14          Regional?

15    A     Alaska Regional.  That's when the doctor finally talked to

16          me.

17    Q     And what did he tell you?

18    A     That she was very lucky to be alive.

19    Q     Did he say anything else?

20    A     He was -- I don't remember exactly what he said.  But he

21          was relieved that she lived through that experience.  I

22          think he didn't speak to me because he was worried that

23          she might die.

24    Q     Did he tell you which of her injuries he thought might

25          have caused her to die?
```

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

Page 26

```
 1    A    Her head and her lungs.

 2    Q    Once she was transferred back to ANMC how long did she

 3         stay there?

 4    A    For the remainder of the week.

 5    Q    Did you stay with her at the hospital?

 6    A    Yes.

 7    Q    Did you ever leave the hospital?

 8    A    Yes.

 9    Q    What sorts of things did you leave the hospital for?

10    A    I would go to my relative's house and shower.

11    Q    And what are the names of your relatives that you were

12         using their house?

13    A    Trisha Drake.

14    Q    Is she still here in Anchorage?

15    A    Yes.

16    Q    Once your daughter was transferred back to ANMC how were

17         you doing?

18    A    I was still shaky.

19    Q    Okay.  You say you were shaky, were you having any other

20         emotions; what was going through your mind at that time?

21    A    There was a lot of emotions.

22    Q    Did you get angry at your daughter?

23    A    No.

24    Q    No.  When your daughter was released from the hospital

25         what were her care instructions?
```

MARY KENICK                    2/21/2006                    ALLSTATE INS. v. HERRON
Vol. 1                                                      A04-0043 Civil

Page 27

```
 1   A   She needed to follow up within a number of days for -- for

 2       -- to have the doctor look at her -- the rib that broke,

 3       first rib, and the fracture at the back of her head.

 4   Q   Did she need to follow up here in town or could she follow

 5       up at home?

 6   A   In Bethel.

 7   Q   After she was released from ANMC how long was it before

 8       you left for Bethel?

 9   A   I -- I don't remember.

10   Q   Do you remember if you stayed in Anchorage at all

11       overnight?

12   A   I don't remember.

13   Q   That's okay.

14   A   It's possible but I don't remember.

15   Q   When you and your daughter made claims to Allstate you

16       asserted a claim for what's called negligent infliction of

17       emotional distress.  When did you first decide to assert

18       that claim?

19   A   I don't remember.

20   Q   Why did you decide to assert that claim?

21       MR. MESTAS:  I'll object and instruct the witness not to

22   relate anything about any conversations with your attorney.

23   She's not allowed to ask you about conversations between you

24   and your attorney.  Okay?

25   A   Okay.
```

Page 28

```
 1   Q    And I don't want to know anything about what went on

 2        between you and your attorney.  I just want to know

 3        personally, you, your thoughts on why you wanted to make

 4        the claim for negligent infliction of emotional distress.

 5        MR. MESTAS:  If you can answer that without expressing

 6   what your conversations were with the attorney.

 7   A    I don't know if you understand exactly how much emotion is

 8        involved when you're under so much stress.  I couldn't

 9        function at home.  It affected my marriage.  It affected

10        the two little ones.  I would go out of the shower, look

11        back and see -- I probably lost more hair than what you

12        have on your head.  That was -- that added on.  I was

13        afraid that I was going to lose every hair because I've

14        seen some people who underwent so much stress that they

15        don't have any hair on their body.  I was really afraid of

16        that.  And when that -- I was used to being successful.  I

17        didn't like the feeling of not being successful with my

18        job, feeling like I was failing there, feeling like I was

19        failing at home.  I started doubting whether -- doubting

20        myself.  It leads to depression.  I -- after we got home

21        was when I think everything hit me.  It's like somebody

22        losing a loved one.  And when all the family is gone and

23        not there realizing exactly what you lost.  Same -- that's

24        exactly what -- the same type of emotion that I felt when

25        we got home.  I broke down.  It was harder for me to deal
```

MARY KENICK                    2/21/2006              ALLSTATE INS. v. HERRON
Vol. 1                                               A04-0043 Civil

Page 29

1        with the stresses that I started seeing.  Then receiving

2        the medical expenses and getting -- seeing -- I -- I would

3        check the district recorder site and it was when there was

4        liens.  That even add -- added on more.  There was no

5        effort made by the insurance company and I felt that we

6        were just being ignored.  And that's when -- I think it

7        was after I saw my -- the lien placed on me by the medical

8        comp -- the hospital that I made a decision I didn't want

9        -- I wanted to go be reimbursed for the emotional distress

10       that I endured.

11   Q   The lien was placed on you.....

12   A   Yes.

13   Q   .....on behalf of your daughter?

14   A   Yes.

15   Q   Did you ever seek any psychiatric treatment or counseling?

16   A   I made an inquiry but I never did follow through.

17   Q   Why not?

18   A   For a lot of reasons.

19   Q   Why?

20   A   I think it might be the same reason why you would -- if

21       you asked an alcoholic why they didn't go and get -- go to

22       treatment, for those same reasons.  I'm not sure exactly

23       how to convey that -- that feeling that I've -- that I

24       felt like a failure.

25   Q   Earlier we were talking about religion and how religion

Page 30

```
 1        became a part of your life after the accident.  What

 2        timeframe did religion become a part of your life?

 3   A    That same year.

 4   Q    So in 2002?

 5   A    Uh-huh.  (Affirmative)

 6   Q    And did you ever seek any counseling with any religious

 7        leaders?

 8   A    My pastor.

 9   Q    And how often did you seek help from your pastor?

10   A    We talked almost every day.  We became very -- or we got a

11        close relationship.

12   Q    You talked almost every day in 2002 after the accident?

13   A    We still talk.

14   Q    Almost every day?

15   A    Uh-huh.  (Affirmative)

16   Q    Do you know if there are any records of your conversation

17        of his counseling of you following the accident?

18   A    No.

19   Q    You were talking about medical bills.  Were you aware that

20        Allstate paid for some of your daughter's medical bills?

21   A    I believe it was after -- after the liens were placed that

22        Allstate made an effort to make -- make a payment.

23   Q    In April of 2003 your lawyer sent us a letter and said

24        that you personally incurred $34,000 in medical expenses,

25        travel costs and lost wages and that you would incur these
```

Page 31

```
 1        sorts of things into the future as well.  How much in

 2        medical bills had you paid for your daughter at that time;

 3        do you know?

 4    A   No, I don't.

 5    Q   Were you personally paying out of pocket for her medical

 6        bills?

 7    A   My insurance company.

 8    Q   And you, yourself, had no medical bills as a result of the

 9        accident; is that right?

10    A   I was receiving medical bills.

11    Q   They were for your daughter's treatment though?

12    A   Yes.

13    Q   Not for your treatment?

14    A   Not for my treatment.

15    Q   And what sorts of travel costs had you incurred?

16    A   We live in Bethel and the -- the treatment was here in

17        Anchorage.

18    Q   So it would it be your -- your flight back from Anchorage

19        to Bethel?

20    A   Uh-huh.  (Affirmative)

21    Q   Did you have any other travel expenses?

22    A   Yes.

23    Q   And what were they?

24    A   We saw a neuro -- neuropsychologist in -- in California.

25    Q   And how much were your travel expenses from that?
```

Page 32

```
 1   A    I don't know.

 2   Q    Did you pay for those travel expenses; was that money

 3        out of your pocket.....

 4   A    No.

 5   Q    .....personally?  Okay.  Did you incur any other travel

 6        expenses?

 7   A    No.

 8   Q    Let's talk about your lost wages.  As of April of 2003 do

 9        you know how much you had for lost wages?

10   A    I've had a decrease in my salary.

11   Q    Since you took your latest job with the Bureau of Land

12        Management has your salary gone back to what it was before

13        the accident?

14   A    It's -- it's a decrease in pay and the job class that I

15        have.  I was a GS-12 with the USDA.  I'm now a GS-11.

16   Q    And what does -- what does that equate to monetarily?

17   A    I am not eligible for any step increases as long as I hold

18        my job.  The only increases that I can get are those given

19        by the president at the beginning of each year.

20   Q    Do you expect to have any travel expenses or your own

21        personal medical expenses related to your daughter's

22        accident in the future?

23   A    She -- yes, if we need to see a specialist.

24   Q    When was the last time your daughter saw a doctor for her

25        injuries related to the accident?
```