Kenick and Trailov vs. Allstate and Kathy Berry

Expert Witness Report of Robert N. Wainscott

In June of 2003 I was asked to review insurance issues in an automobile
loss for plaintiff counsel on behalf of claimants Trailov and Kenick. I was
advised that Trailov and Kenick had automobile liability injury claims
against Mr. Herron, an Allstate insured. After reviewing some initial
documents I agreed to be retained on behalf of the claimants.

Prior to preparing this report I reviewed the documents listed as
attachment 1. In preparing my report I relied upon the documents, my
37 years of claims adjusting and supervisory experience, and applicable
Alaska statutes and Supreme Court decisions.

Also attached to this report is my C.V., a list of the cases in which I have
testified over the past four years and my rate schedule.

FACTS OF THE ACCIDENT

On September 13, 2002, between 7:00 and 8:00 P.M., a group of young
people began to gather in a sand pit near the Bethel airport to "party".
Sometime between midnight and 1:00 A.M., Angelina Trailov and Tracy
Faulkner decided to leave the party and asked Charles Herron to drive
them home. Mr. Herron agreed. The threesome was joined by Angelina's
cousin, Russell Pollack.

Charles Herron was driving a 1985 Subaru owned by Charles' father,
Robert E. Herron. Russell took the front passenger seat, Angelina the
left rear, Tracy the right rear and Charles was in the driver's seat. The
occupants had all been drinking at the party; none of them were old
enough to legally consume alcohol.

At deposition, Charles testified he turned to look at or talk to Angelina as
they were leaving the sand pit and lost control of the vehicle. The left
rear of the Subaru struck a utility pole in close proximity to Angelina.
The Subaru was a total loss and was inoperable after the impact.

Everyone in the vehicle was injured. Angelina was the only occupant
whose injuries were life threatening. Due to her position in the vehicle,
relative to the point of impact, she sustained extensive injuries including
a loss of consciousness, a broken rib, a punctured and partially
collapsed lung, a basal fracture of the skull, abrasions and lacerations to
her arm and an injury to her back.


Exhibit A
Page 1 of 20

1

Angelina stopped breathing on two separate occasions at the accident scene. Charles Herron administered C.P.R. on both occasions, in all probability saving her life. Some time shortly after the impact, a vehicle driven by Nathaniel David left the party, came upon the accident scene and drove Angelina, Charles and Russell to the Y-K hospital.

Angelina's mother, Mary Kenick, was immediately notified of the accident by one of Angelina's friends. She arrived at the hospital and found Angelina bleeding and hysterical. Angelina received treatment at the Bethel facility, then, because her injuries were so severe, she was quickly medivaced by jet to Anchorage. She was placed in an induced coma before being transported to ANMC, accompanied by her mother.

Due to the nature of her injuries she was transferred from ANMC to Alaska Regional Hospital. Ms. Kenick remained with her daughter 24 hours a day. At Alaska Regional Ms. Kenick was advised Angelina's condition could necessitate a six hour surgical procedure if she did not improve.

Angelina's condition improved, the surgery was not required, and, after two days, she was transferred back to ANMC. She was discharged approximately one week later. A few days after her release from ANMC she returned to Bethel where she was plagued with headaches, back pain, memory loss, personality changes, fatigue, visual problems, and irritability as a result of the injuries sustained in the accident.

Mr. Herron was arrested and charged with a DWI and assault. His recorded blood alcohol level was measured at .146.

APPLICABLE COVERAGES INVOLVED

The Herron vehicle was insured under Allstate Policy number 0-20-469309-12/16. The coverage policy period was 6/16/02 through 12/16/02. Four vehicles were listed on the policy, including the 1985 Subaru involved in the accident.

The VIN# for the Subaru is JF1AF21BXFA115695. Coverage are listed on the policy declaration page as BI $100/$300,000, PD $50,000, MP $25,000. "Uninsured Motorists Insurance Coverage for Bodily Injury" is reflected as $100,000/$300,000.

Neither the Declarations page of the policy nor the policy language indicates any coverage for Underinsured Motorist Coverage or UIM.



Equally significant is the absence of a signed waiver, (acceptance or rejection) by the insured for optional U limits.

## ALLSTATE'S INITIAL HANDLING OF THE CLAIM

The accident was reported to Allstate on September 16, 2002. The case was assigned to Renee Vanzant. Ms. Vanzant contacted the insured on the 16th and documented her file to reflect that the insured would advise her of the outcome of the criminal charges pending against him.

Ms. Vanzant did not take a recorded interview of the insured. She testified in deposition, at page 12, that she requested permission to forgo a recorded statement of the 17 year old driver, Mr. Herron. She testified that a statement was unnecessary because only one vehicle was involved in the accident.

It is my opinion that Ms. Vanzant made the correct decision when she elected not to take Mr. Herron's statement, although I suspect that the reason she gave for not taking the statement may not be the full story. With criminal charges pending related to the consumption of alcohol, and the insured's tender age, the statement could well have proved to be detrimental to his interests, as well as those of Allstate. It also indicates that Allstate, from the outset of the claim, was aware of the tremendous exposure confronting their insured, Mr. Herron.

Ms Vanzant continued her investigation of the accident by placing a call to ANMC, where she spoke to a nurse then documented her file to record Angelina had been moved to a room. Contact with all claimants, inquiry on the availability of additional insurance, and actions taken to secure the police report are all documented. Ms. Vanzant was following what has been referred to as a Matrix, or check list of actions to take for an accident of this nature.

In deposition, at page 15, Ms. Vanzant related that the instructions included securing the agent's certified declaration page and the agent's application with regard to the waiver of UM issues.

The inclusion of this instruction demonstrates Allstate's concern that Ms. Trailov's injury could exhaust the $100,000 Bodily Injury Liability limit and then penetrate past the $100,000 UIM limits. (While the declarations page of the policy does not reflect the existence of UIM coverage, statutory language provides for coverage, that absent a waiver, must, at a minimum, mirror the limits of the Liability coverage. Without a waiver the insured could argue that limits of $1,000,000/$2,000,000. are available for claims against the policy. AS21.89.020(c) – (c-2)). The agent was unable to produce a signed waiver.

Exhibit A
Page 3 of 20

3

Ms. Vanzant went to ANMC and left her card with a nurse along with instructions to give the card to Ms. Kenick and ask Ms. Kenick to call Ms. Vanzant.

On September 23, 2002, Ms. Vanzant was advised that Mary Kenick and Angelina Trailov were represented by counsel. On September 25, 2002, the claim file documentation recorded the Allstate evaluation of Mr. Herron's liability for the accident at 100%.

When Allstate learned that Ms. Kenick and Ms.Trailov were represented the claim file was separated and transferred from Ms. Vanzant to other Allstate adjusters. On September 26, 2002, the Medical Payments coverage was reassigned to Scott Millar and the remaining exposures for Ms. Trailov's injuries were transferred to Kathy Berry. Ms. Vanzant retained control of the claims for Tracy Faulkner, but had no further input in the Kenick and Trailov claims.

By September 26, 2002, the claims of Trailov, and Kenick as the parent of a minor, had received intense scrutiny by Allstate. Ms. Berry, who had more experience with claims in suit than Ms. Vanzant, was assigned as the primary adjuster. Craig Elkins, (Ms. Berry's direct supervisor), Karen Peterson (who controlled claims authority in the office), and Claims Manager, Gary Davis, were aware of Ms. Trailov's claims. The serious nature of Ms. Trailov's injuries and exposure to Mr. Herron were clearly known by Allstate.

MEDICAL PAYMENTS CLAIM ASSIGNED TO SCOTT MILLAR

Scott Millar was assigned to handle the Medical Payments portion of the claim two weeks after the accident. Ms. Trailov's injuries were documented as a basal fracture of the skull, loss of consciousness, a fractured rib, a punctured lung, fluid on the lungs, and a back injury when he received the file. The information that she had stopped breathing at the scene of the accident on two separate occasions, and required CPR to resuscitate her, was available.

Information regarding her treatment at Y-K, the medivac, treatment at ANMC, her transfer to the critical care unit at Alaska Regional, and her transfer back to ANMC was available by the time Mr. Millar assumed control of the file. Clearly Ms. Trailov's medical expenses exceeded the $25,000 medical payment limits available under the policy when Mr. Millar began to adjust the claim.

Allstate's procedures, found in their claims manual, outline the adjuster's responsibilities to insured parties for Medical Payments

coverage. The claims manual states "Insured parties who have protection under first party coverage, including medical payments, P.I.P, UM should be advised in person or by telephone of the nature and availability of these benefits." Mr. Millar failed to follow the procedures outlined in the manual and the Alaska Administrative Code regarding communication of available coverage, 3AAC26.060.1

There was no documentation in the file of medical payments notification when Mr. Millar received the file. In his deposition, Mr. Millar, an adjuster with a considerable education and claims handling experience, excused his failure to comply with the standards set by the manual by saying, "Normally, when the file comes to me, that should has already been disclosed."

Mr. Millar apparently felt he had no obligation to review his new assignment to see what had been done, and what needed to be done, to properly adjust the claim according to Allstate requirements. He was negligent in making those assumptions; his decision not to do anything with the file after it was assigned to him was an intentional failure to act, and in my opinion goes beyond simple negligence. Whether it was Mr. Millar, or another Allstate staff member who was responsible for the failure to follow the guidelines of the claims manual and the standards of fair claims practices, is irrelevant. The point is that no one contacted Ms. Trailov, Ms. Kenick or their attorney regarding the available first party coverage of medical payments.

From the time the file was assigned to him in September of 2002, until the spring of May of 2003, Mr. Millar did nothing. Based upon the initial reports he knew or should have known that the medical bills would be substantial. Despite his awareness of the magnitude of Ms. Trailov's injury and the certainty of economic hardship that accompanies large medical bills, Mr. Millar violated Allstate procedure and state statutes governing fair claims handling. He made no contact with the insured or her attorney, he did not send out the Medical Payments packet, he did not send out a medical authorization form.

In an astonishing attempt to justify his negligence, Mr. Millar testified in his deposition, in cross examination by Mark Wilkerson, that his failure to act benefited Ms. Trailov. According to Mr. Millar (page 86-88 of his deposition), by making no contact for seven months, he gave Ms. Trailov the benefit of leveraging the available funds among lien holders. Documentation of this tactic is not reflected in the file. More to the point, if that was his strategy, he could have accomplished the same objective by paying the $25,000 to Ms. Kenick on behalf of Ms. Trailov in October of 2002. By October, the medical costs exceeded the policy limits. Negotiation of medical billings would surely be more effective if

the claimant had control of the funds and the negotiations were conducted before liens were imposed.

It is my opinion that Scott Millar's negligence contributed to Allstate's breach of duty to Mr. Herron. Mr. Millar owed a duty to comply with the standards and regulations. If he had obtained a medical authorization and the medical bills within a reasonable time, Allstate would have had documentation available to more accurately assess their exposure for the bodily injury claim of Ms. Trailov and settle the claim when the policy limits offer was made. Allstate coordinates the medical payments benefits with bodily injury exposures, as confirmed by document 100019-100020. In these November 7, 2002, supervisory notes, Mr. Elkins directed Ms. Berry to coordinate with the medical payments on billings.

By withholding the funds, Mr. Millar allowed Ms. Kenick to accrue liens, endure harassment from creditors, and become emotionally distraught over the inability to pay the medical bills which had accumulated. The negligence in the handling of the Medical Payments claim, including the failure to disclose the coverage and pay the bills within a reasonable time frame, increased the value of the NIED claim being brought by Kenick.

Mr. Millar's negligence and intentional failure to act led to the mishandling of the medical payment claim. The failure of the supervisory staff to note and correct the condition compounded Mr. Millar's negligence, adversely affecting the pending liability claim against Mr. Herron.


BODILY INJURY CLAIMS ASSIGNED TO MS. BERRY

When Kathy Berry was assigned to the Liability BI claim of Ms. Trailov, the claim was known to be one with a closed head injury. Reasonable inquiry would have confirmed that Ms. Trailov's medical care included hospitalization with a stay in the Critical Care Unit at Alaska Regional Hospital. The involvement by Ms. Peterson at this point, suggests the reported injuries triggered oversight under Good Faith Claim Handling and Recognition of Serious Injuries, document 704366.

When the file was assigned to Ms. Berry, it was clear that Mr. Herron had exposure to liability that the policy provisions did not cover. Mr. Herron had been drinking prior to the accident and tests had revealed that he had an elevated blood alcohol level. DWI and assault charges were pending. The Allstate policy excluded coverage for punitive damage charges which were likely under these circumstances. Mr. Herron's problems were compounded by existing Alaska law that allowed full attorney fees to be assessed in claims that arise from accidents where

the responsible party is found to be guilty of DWI and the clear possibility of the value of Ms. Trailov's claim exceeding the policy limits.

On September 26, 2002, Ms. Peterson gave instructions for a letter to be sent to Mr. Herron to advise him that the Allstate policy would not provide coverage for punitive damages that might arise from a DWI related claim. Missing from her instructions is notification to Mr. Herron that AS 09.60.070 allowed assessment of actual attorney fees for claims involving DWI and that, as a matter of law, the policy would not respond to the additional fees. There were no instructions to send Mr. Herron an "Excess Letter". Given the nature of the injuries and the pending criminal charges, it is my opinion that both of these items should have been addressed immediately. Inexplicably, it would be six months before Ms. Berry acted upon the instructions she received from Ms. Peterson.

Ms. Peterson also directed Ms. Berry to "Determine extent of 04 injuries". 04 is identified as Angelina Trailov. Again Ms. Berry did not act. For reasons which are unexplained Ms. Peterson does not continue to provide oversight on the case, as I would have expected. Instead the file goes off of her diary until it is brought to her attention after the policy limits offer expired on May 16, 2003.

When Ms. Berry assumed control of the bodily injury claims, she knew Ms. Trailov had sustained significant injury. She knew or should have known that the medical costs would be substantial. She knew that Allstate had assessed the liability to be 100% the responsibility of Mr. Herron. Amazingly she, like Mr. Millar, did nothing.

Ms. Berry did nothing to investigate the injury and damages; she did nothing to evaluate the claim. She did nothing to attempt to negotiate a settlement to protect Mr. Herron. She did nothing to advise Mr. Herron that his policy did not provide coverage for punitive damages, (despite instructions from her Ms. Peterson to do so). or cover any attorney fees above the standard Rule 82 provision. She did not send an "Excess Letter", (required by the Allstate Claim manual), to inform him that the value of Ms. Trailov's injuries would probably exceed the limits of his policy protection. The Alaska Supreme Court has weighed in on the obligation of a carrier to advise an insured of a possible excess claim in Jackson vs. American Equity and O.K. Lumber vs. Providence Washington Insurance.

Ms. Berry was aware, or should have been aware, that due to Mr. Herron's intoxication at the time of the accident, a judgment in excess of the policy limits would not be discharged by filing for bankruptcy. Ms. Berry's file contained a police report that confirmed that Mr. Herron's blood alcohol level was .146. Ms. Berry testified that she was working in

the Allstate office when the Supreme Court opinion that addresses this topic, <u>Bohna vs. Allstate</u>, came down.   See page 5 of Volume 1 of her deposition.

On November 07, 2002, her supervisor Mr. Elkins reminded her to secure a wage and medical release.  He directed her to co-ordinate any pending medical bill issues with the Medical Payments Adjuster.

Ms. Berry's authority was limited to $20,000.  By November 14, 2002, she had raised the reserves from $25,000 to $75,000. (Elkins Deposition at 61).  According to Mr. Elkins the increase in the reserve would not have generated an alert to any of the supervisory staff. The records I reviewed did not contain an evaluation form.  That is not what I would consider industry standard for the supervision of claims adjusters. Reserve increases signal a change in the status of the claim and it has been my experience that the direct supervisor would receive notification of the increase via computer print out the following day if the increase put the reserve above the adjuster's authority.  Alternatively the supervisor would be required to sign off before the increase was processed.

Without the evaluation form, there is no way to determine what Ms. Berry knew about either the medical condition of Ms. Trailov or the dollar value of her accrued medical bills.

On November 15, 2002, two months after the date of the accident, Ms. Berry finally sent out a medical authorization.  The authorization was returned on November 25, 2002, but it was January 17, 2003, before she acknowledges use of the authorization to obtain records from the Y-K hospital in Bethel, although there is some dispute that she ordered those records in January.   She did nothing further with the release.  She did not obtain records from the physicians, from ANMC, or from Alaska Regional Hospital.

She did not contact Ms. Powers for an interview with her clients to assist her in obtaining the information she needed to complete her investigation and determine the value of the claim.

On December 10, 2002, Ms. Berry was advised by plaintiff attorney, Michele Powers, that Ms. Trailov had been scheduled for a neuropsychological evaluation to be conducted by Dr. Craig on December 17, 2002.  Ms. Berry did not make arrangements for the examination to be attended by a representative from Allstate or a medical expert of her choosing.

Ms. Berry never requested a copy of Dr. Craig's findings or scheduled an IME. She continued to do nothing to protect Mr. Herron. Ms. Berry was put on notice of the exam. She had a medical authorization to obtain medical information. While Dr. Craig did not issue his report until February, she could have talked to him at any time after the exam and obtained the information from his assessment. It was the result of this exam that elevated this claim to a Mandatory Home Office Referral. A letter relating to Mandatory Home Office Referrals, directs that, as of November 30, 1998, a claim in Alaska with a brain injury had to be submitted to the Allstate Home office within 14 days. (See Document 70436)

On December 10, 2002, plaintiff attorney Michelle Powers asked Allstate for a copy of Mr. Herron's policy. On January 17, 2003, Allstate provided Ms. Powers with a letter that stated, in part, that they were including a copy of the declarations page with the letter. Ms. Powers denied any knowledge of receiving the declaration sheet and it is unclear if a copy was ever located in her file.

It is my opinion that whether or not she received a declaration sheet with the January 17, 2003, letter is irrelevant for a number of reasons. First, sending a copy of the declarations page of the policy to the plaintiff attorney does not satisfy the requirement outlined in the Allstate claim manual that the adjusters meet with, or explain on the phone, the coverage available under the policy. The explaination, in one of these two prescribed manners, is then to be followed up with a letter documenting the conversation. Those procedures were not followed.

Second, the Unfair Claims Practices Act at 3 AAC 26.060 (1) requires that a first party claimant receive disclosure of all relevant benefits under which a claim may be covered within ten days. The UIM coverage was not disclosed to either the claimants or their counsel.

And finally, and most significant, providing the declaration sheet, or even the policy for that matter, without a meeting to discuss the coverage available would have been misleading because the declaration sheet, and the policy language, do not reveal coverage for UIM. The declaration sheet and the policy language reference "uninsured motorist coverage" only. There is no language in the policy which provides a grant of coverage for Underinsured Motorist Coverage. The coverage is available because of statutory extension.

As I have testified numerous times in the past, the adjuster is required to look for coverage in the policy, in the statutes and in Supreme Court decisions. In my opinion, Allstate's failure to incorporate statutory requirements into their policy language placed an increased burden on

Allstate to fully explain the coverage available under the policy to anyone who is insured by the policy terms. Ms. Trailov was an insured for UM (and therefore UIM) under the state statutes. It was incumbent upon Ms. Berry to advise Ms. Powers that the Allstate policy provided coverage beyond the $100,000 bodily injury liability limit reflected in the declaration sheet.

On February 18, 2003, Ms. Berry received a policy limits demand, dated February 14, from attorney Powers for Ms. Trailov's injury and a separate policy limits demand for Ms. Kenick's claim. She advised her supervisor of the demand, but failed to either record the receipt of the demand or send the file to Allstate's Home Office as required by their procedures for claims involving brain injury and directed by her supervisor, Mr. Elkins.

On March 18, 2003, a full month after the policy limits demands, Ms. Berry advised Mr. Herron of the demand. For the first time she advised him that punitive damages would not be covered under the policy terms. Ms. Berry did not send out an excess letter to advise him that the claim of Ms. Trailov could exceed the limits of his policy. She did not advise him that attorney fees under AS 09.60.070 would not be covered under the policy as a matter of law.

At deposition Ms. Berry's testified at page 57 and 58 regarding her opinion on when it was appropriate to send an excess letter. Her example was a claim where the medical bills exceed $200,000, the claimant has multiple fractures, the policy limits are $50,000 and the liability evaluation is 100% against the insured. It is my opinion that this is not a rational interpretation of the excess letter requirement for an adjuster with 18 years of experience. An excess letter is required as soon as a carrier becomes aware that there is a reasonable possibility a claim will exceed the policy limit or where a demand is made for or in excess of the policy limit. It is equally illogical that as of six months post accident, neither she nor anyone else at Allstate had tried to evaluate the total exposure to Mr. Herron.

On March 18, 2003, she utilized the medical release to obtain medical records from Alaska Native Medical Center. It appears that Ms. Powers had previously provided her with records from the Alaska Regional Hospital

On March 18, 2003, Ms. Berry wrote to Ms. Powers asking her for information on medical treatment, Ms. Kenick's NIED claim, and information on Ms. Trailov's school performance before and after the accident. Having waited a month to reply to the demand, Ms. Berry still does basically nothing. Six months post accident she still had not asked