for an interview with Kenick or Trailov to obtain information to allow her to conduct her own investigation on damages. While the claimant must perfect their own claim, industry standards would dictate that the adjuster conduct an independent investigation to adequately protect the interests of the policyholder. With a release, Ms. Berry could have asked for the records directly from the source, insuring that she was protecting Mr. Herron by obtaining all of the records uncensored.

Facing pending criminal charges, Mr. Herron secured the services of Mr. Valcarce to act as his personal attorney. On March 26, 2003, Mr. Valcarce became aware of the policy limits demand which was made by Ms. Trailov's attorney on February 18, 2003. Mr. Valcarce, acting in the best interests of his client Mr. Herron, demanded that Allstate accept the offer to settle the claim for policy limits or, in the alternative, provide Mr. Herron with assurance that Allstate would pay any adverse verdict in excess of the bodily injury liability coverage provided by his policy. Ms. Berry's testimony in her deposition at page 65, that she did not believe the letter from Mr. Valcarce required a response is not believable. The Allstate requirements (Section 3: Guiding Principles Relating to Automobile Insurance Claims 1.0) calls for prompt response to communication.

Having received no response to the February policy limits demand, on April 10, 2003, Ms. Powers advised Ms. Berry that her February offer would remain open until May 16, 2003, but would be withdrawn at that time. Despite having knowledge that Mr. Valcarce represented Mr. Herron, Ms. Berry did not notify him of the May 16, 2003 deadline.

The communication Ms. Berry received from Ms. Powers has specific meaning in the insurance world. This type of letter provides the insurer with one final opportunity to evaluate the offer and decide if they are willing to risk company assets above the policy limits if the decision is not reasonable. Insurance carriers typically log in these demands and notify their home office because the stakes can be high; particularly when the insured has a policy with modest limits and a claim with significant injury is being made against that policy. Allstate had such a policy as outlined in their Good Faith Claim Handling Best Practices found at 704361 and 62.

It's difficult for me to understand how this case could have slipped under the radar of Ms. Berry and every level of the Allstate supervisory staff. It's the classic case that requires close scrutiny within the designated time frame to avoid exposing the insured to excess verdicts and judgments for compensatory and punitive damages. It's the classic case that leads to bad faith claims against insurers because, absent court

decisions, carriers would go unchecked as they sacrificed the insured's interest for that of the carrier.

The "last chance" extension was written on April 10, 2003, and received on April 14, of 2003. Ms. Berry and Allstate still had an opportunity to correct all of the errors that had been made in the earlier handling of the case if they had any interest in protecting Mr. Herron. Continuing an all too familiar pattern in the handling of the claims against Mr. Herron, Allstate and Ms. Berry did nothing.

Ms. Berry did not disclose what additional information she needed to evaluate the Trailov claim. Neither she nor Ms. Powers (in deposition) know whether or not there would have been an extension granted because Ms. Berry never bothered to ask for one.

It is my opinion that Ms. Berry should not have needed an extension. She had adequate time and the necessary releases to obtain whatever she needed to evaluate the claim of Ms. Trailov months before the May deadline. As an adjuster with considerable experience she should have realized that a reasonable evaluation of the injuries would have placed the value of the claim well in excess of the policy limits available to protect Mr. Herron. And, in fact, she demonstrated her knowledge by increasing the reserves to the policy limits prior to the expiration of the offer to settle.

Mr. Elkins, after directing Ms. Berry to send the file to Home Office in early March, apparently did not track the claim to ensure that his directions had been followed. On May 6, 2003, he discovered that the file had not yet been referred.

Ms. Berry having done no independent investigation from the time of the original offer to settle in February, wrote a letter to Ms. Powers on May 9, 2003, advising her that Allstate needed additional time to evaluate the claim of Mary Kenick. In her letter of May 9, 2003, Ms. Berry stated that she expected to be able to "respond before the May 16 deadline".

Prior to May 16, 2003, Ms. Berry acknowledges that she increased the reserve from $75,000 to policy limits of $112,500 on the Trailov claim. (Berry Deposition at 87 and 88)

The policy limits demand for Ms. Trailov's claim was not contingent upon Allstate agreeing to the policy limits demand for Ms. Kenick. Ms. Berry could have accepted the settlement offer for Ms. Trailov. There is no explanation for her failure to protect Mr. Herron by taking that action when the claim had been acknowledged as having that potential by the

Exhibit A
Page 12 of 20    12

liability evaluation and, by the end of the deadline on May 16, 2003, the case reserves.

Equally puzzling is her failure to acknowledge Mr. Valcarce's letter of March 26, 2003 and her failure to advise Mr. Valcarce of the letter of April 10, 2003, with a deadline of May 16. Mr. Herron had no opportunity to participate in the negotiations or attempt to settle the claims from his own assets.

On May 12, 2003, Mr. Millar, after seven months of doing nothing, tendered the medical payments limits of $25,000 to Ms. Powers.

Ms. Berry received the wage information she requested from Ms. Powers for documentation of Ms. Kenick's NIED claim on May 15, 2003.

On May 16, 2003, Ms. Berry wrote and faxed a letter to Michele Powers to advise her that the "evaluation" of Angelina's claim was not complete, she stated "Our evaluation will be completed by the end of the month and I am hoping to respond to your demand sooner than that." In deposition, she acknowledged at page 85 that she had completed the evaluation of the claim prior to the May 16, 2003, deadline. She did not request an extension of time. Prior to May 16, the file contained no documentation of an evaluation but the reserves were at policy limits. Ms. Berry had not advised any other Allstate staff member of the April 10, 2003, "Deadline Letter". She had $20,000 in settlement authority and had not requested the necessary authority to settle the claim.

On May 20, 2003, Ms. Berry finally made a Home Office Referral. The response was that they had nothing to add until Ms. Berry evaluated the claim.

The file was then sent to Karen Peterson through supervisory channels. On May 29, 2003, Ms. Peterson determined that the value of the claim not only penetrated beyond the $100,000 in bodily injury liability limits, but it would probably also penetrate the $100,000 of UIM coverage that Allstate acknowledged. (Peterson deposition at page 83) There was no change in Ms. Trailov's medical condition between March and May of 2003. Everything that Karen Peterson utilized to evaluate the claim was available to Ms. Berry in March of 2003. Ms. Peterson's notes reflect that she is aware that a UIM exposure existed for Ms. Trailov and that under Alaska law Mary Kenick's NIED liability claim needed serious attention.

Ms. Peterson's notes also contain two serious errors. Her first error was concluding that Mary Kenick was not an insured for a NIED claim under Mr. Herron's UIM policy coverage. She is wrong. Kenick is an UMBI insured under the statute (AS 21.89.020) and under the Allstate policy

Exhibit A
Page 13 of 20

13

language.(Page 15 of the policy at Part V, Uninsured Motorist. Persons insured include (3) any other person who is legally entitled to recover because of bodily injury to you, a resident relative, or an <u>occupant of your insured auto</u>.)

Allstate acknowledged this exposure under UIM coverage as reflected in document 704347, entitled Alaska UM/UIM Claims Handling. Ms. Trailov's brain injury was a serious claim under Allstate's procedures. The Alaska UM/UIM Claims Handling document states, in part, "Serious injury referrals will continue to be sent to Process Mastery per 1998 guidelines. Alert conferences should be conducted to comply with Good Faith Claim Handling for serious injuries. Consideration should be given to claims for negligent infliction of emotional distress on all serious injuries (this is a separate cause of action and subject to an individual per policy limit.)"

Ms. Peterson's second error was assuming that Allstate should wait for the attorney to make a claim for UIM. Allstate was obligated to advise Ms. Powers that the UIM coverage was available to her clients, something they had never done.

On May 30, 2003, a letter was directed to Ms. Powers offering to settle the Trailov claim for "policy limits" of $112,500 and offering $10,000 for the NIED claim of Ms. Kenick.

In my opinion, Ms. Berry's actions were inexcusable. Failing to meet the deadline and thereby subjecting Mr. Herron to unlimited liability was outrageous and undoubtedly the most serious offense. But her appalling continuing failure to advise Ms. Powers of the UIM coverage under the policy compounded her shocking behavior. By trying to minimize the loss to Allstate by ignoring the UIM coverage, she put the interests of the Company above those of Mr. Herron. Ms. Berry's explanation at page 115 of her deposition (that the wording was not intended to eliminate any UIM claims) is not believable. Ms. Berry knew about the exposure under the UIM, failed to advise Ms. Powers of the exposure and tried to extinguish all of Ms. Trailov's BI claims against Allstate by accepting the offer made by Ms. Powers in March of 2003. If she did not intend the offer to extinguish the UIM coverage, she is required to disclose that information. The coverage would have been fresh in her mind given Ms. Peterson's evaluation the day before the letter was written.

On May 29, 2003, attorney Douglas Johnson, from the office of Dennis Mestas, advised Allstate that the deadline for accepting the offer had expired and was withdrawn. On May 30, 2003, there were no offers open to extinguish any part of the Trailov or Kenick claims.

POST REJECTION DEADLINE

When Allstate failed to settle the claim under the terms of the offer, suit was filed against Mr. Herron by Mary Kenick and Angelina Trailov. Allstate sent the suit to Mark Wilkerson to provide a defense for Mr. Herron. On June 11, 2003, Mr. Wilkerson wrote to Mr. Herron advising him that Allstate had assigned Wilkerson to represent Mr. Herron.

Mr. Wilkerson asked Mr. Valcarce to assist in the defense. Mr. Wilkerson stated reasons for asking Mr. Valcarce to participate in the defense was Mr. Valcarce's local presence (he practiced law in Bethel) and Mr. Valcarce's familiarity with the case. Mr. Valcarce represented Mr. Herron in defending the criminal charges that resulted from the accident.

Mr. Valcarce agreed to assist Mr. Wilkerson in representing Mr. Herron to the best of his ability and assured Mr. Wilkerson of Mr. Herron's cooperation. Mr. Valcarce asked Allstate to provide Mr. Herron with assurances that Allstate would pay any costs and attorney fees, punitive damages and adverse verdicts above the policy limits. Mr. Valcarce reasoned that Allstate had the opportunity to extinguish all claims against Mr. Herron within the policy limits, and having failed to do so, should accept the consequences of their decision not to act.

Mr. Valcarce made his request for assurances repeatedly over a period of almost a year. Each time Mr. Wilkerson, who supposedly had been retained by Allstate to represent Mr. Herron, replied that Allstate would deny the request for that assurance.

After a period of several months, Mr. Wilkerson withdrew as Mr. Herron's attorney and became the attorney for Allstate. Nothing in the records I reviewed reflects that Allstate or Mr. Wilkerson followed the procedures outlined in their manual at 2-3-3 (document F901679) regarding the withdrawal of counsel. Mr. Wilkerson was specifically required to contact Mr. Herron and explain why he was withdrawing.

Mr. Wilkerson continued to stone wall any attempt by Mr. Valcarce to obtain Allstate's guarantee to absorb any monetary award beyond policy limits. It is difficult to believe that Mr. Wilkerson was ever acting as Mr. Herron's attorney because his position on the subject never considered the best interests of Mr. Herron. If he was Mr. Herron's attorney and was acting in the best interests of Allstate and not Mr. Herron, it would appear he had a conflict of interest.

Unable to receive the assurances he needed to protect Mr. Herron in the suit by Ms. Kenick and Ms. Trailov, Mr. Valcarce advised Allstate that he

Exhibit A
Page 15 of 20

15

would protect his client by seeking a confession of judgment through separate counsel. In the face of this full disclosure regarding the choices Mr. Valcarce and his client had made to protect Mr. Herron's interest, Allstate continued to resist their request for assurances from Allstate.

Allstate had no legal obligation to accept the proposition made by Valcarce, but Allstate was afforded the opportunity to correct their earlier missteps by doing so. Allstate would have risked nothing by making the assurance. The assurance would guarantee the continuing cooperation of their insured and eliminate what was clearly stacking up to be Bad Faith allegations. By leaving Mr. Herron unprotected by reason of their unreasonable failure to accept the policy limits demand, Allstate breached their duty of good faith and fair dealings with their insured and set the stage for Mr. Herron to go forward with the only remedy left for him to eliminate uninsured exposure; a confession of judgment. It is my opinion that under the test set by <u>WIGA vs. Ramsey</u> the consent judgment was a reasonable course of action for Mr. Herron to pursue.

Allstate owed Mr. Herron the duty of investigation, evaluation, and settlement. Even before the offer by Ms. Power to settle the liability claim with payment of policy limits in February of 2003, Allstate should have made the offer to settle the claim for that amount. Instead they did nothing to protect his interests, allowing the claim to languish when they should have aggressively pursued a resolution on his behalf. If Ms. Powers had been reluctant to accept the BI limits to release Mr. Herron, Allstate could have leveraged the probability of acceptance of the offer with discussions reminding Ms. Powers that the UIM limits would not be triggered until the BI claim was settled.

If Allstate had acted with the intention of protecting their insured, numerous scenarios, initiated by Allstate, could have helped them to resolve the liability claim. Prompt payment of the Medical Payments would have established trust and eliminated part of the emotional distress claim of Ms. Kenick. The remainder of the medical bills could have been paid through a Payment in Advance, the purpose of which is stated in the Claim Manual as "PIA enables Allstate to demonstrate good faith in handling third party injury claims" and "The intent of PIA is to relieve the claimant of the usual financial burdens that follow an accident and serious injury, if the liability warrants...."

If the value of the claim was determined to exceed both the BI and UIM stated limits, Allstate should have disclosed that the UIM coverage did not contain a waiver.

Allstate questioned the exposure and value of the NIED claim being made by Ms. Kenick. After the May 2003 deadline they received an offer to

Exhibit A
Page 16 of 20    16

settle that claim for $50,000. The offer was rejected by a counter offer of $25,000.

With the increase in reserves to policy limits before the offer expired, Allstate lost any argument regarding the reasonableness of their position in failing to accept the offer to settle the Trailov claim. With regard to the Kenick claim, Allstate had the opportunity to stop Mr. Herron from moving to protect his interests with a confession by testing the conviction of their evaluation of Ms Kenick's loss. They could have provided the assurances requested by Mr. Valcarce. The confession did not take Allstate by surprise. They were given a choice.

Every claim has to be evaluated individually. Allstate's evaluation needed to include all of the risks that Mr. Herron faced if Ms. Kenick's claim went to trial. The value of Ms. Kenick's claim for NIED. incorporates the risks attendant to trying a case in Bethel, Ms. Kenick's stature in the community, the broadening of the interpretation of NIED claims under Tommy's Elbow Room, and the pending criminal charges of DWI and assault.

The risks to Mr. Herron's future as a result of this automobile accident were substantial. With a clear case of liability and at least one claim whose value clearly exceed the $100,000 in liability protection, this claim should have been settled the moment the offer was extended to do so. There were no substantial changes that would impact the decision to offer policy limits in this case after December of 2002. The information that Allstate needed to make that determination was all available to Allstate for the asking. Their decision not to act placed their insured in harms way.

Many of the exposures to Mr. Herron would not have been covered by the policy language. While allegations that fall outside the policy language are not part of Allstate's duty to Mr. Herron, it does increase the stakes when they have the opportunity to settle those claims, as well as those covered under the policy, by accepting an offer that falls within the policy limits. (WIGA vs. Ramsey)

The number of missteps in the handling of this claim by Allstate is mind boggling. Taken individually they might be considered simple error; together they paint a picture not only of negligence but of reckless, malicious and outrageous behavior. They had multiple opportunities to review and eliminate the exposure to their insured. Allstate refused those opportunities, continuing to place their own interests above those of Mr. Herron. Having placed their interests first, Allstate must be held accountable for the results of abandoning their insured.

## CONCLUSION

The Alaska Statutes and Alaska Administrative codes govern the insurance carriers' obligations for proper, competent, and good faith handling of insurance claims.

The standards and practices set by Allstate and other insurers are generally outlined in claims manuals and communications to claims staff. The standards are designed to protect the insured and relate to investigation, evaluation, timeliness, reserves, reports, diaries and reviews, documentation of the claim file, disclosing coverage and coverage limitations, advising the insured regarding excess exposures, advising their insured about settlement status, making settlement offers, responding to settlement offers, and the timely settlement or attempted settlement of such claims.

In reviewing the information provided in Allstate's Manuals and communications with regard to standards and procedures, I found that they generally covered all the industry standards and practices for proper, competent, and good faith supervision and management of liability and UIM claims.

If the Allstate standards had been followed, Allstate and Mr. Herron would not find themselves where they are today because the liability claims would have been settled by Allstate within Mr. Herron's policy limits.

There are several plausible explanations for Allstate's actions or lack of actions. One is that for eight months every system Allstate had in place to insure compliance with industry and Allstate standards and the Alaska State statutes broke down through negligence. A second is that none of their adjusters or supervisors had been trained or made aware of the Allstate procedures or standards set by the Alaska Administrative Code. A third is that despite the written procedures, these staff members were operating in a corporate environment that encouraged or tolerated employees protecting the assets and interests of Allstate with little or no consideration for the interests of their insured.

Whatever the cause, this incredibly experienced staff's combined failure to comply with almost every standard set by their own claims manual for good faith claims handling was negligent, unreasonable, outrageous, and includes acts done with malice or bad motives and demonstrates reckless indifference for the interests of Mr. Herron.

In reviewing the actions of the combined Allstate staff between September 16, 2002, and May 30, 2003, it is almost impossible to find

Exhibit A
Page 18 of 20

18

anything they did right to protect Mr. Herron. As I outlined above, they failed to investigate the claim on a timely basis, failed to evaluate the loss on a timely basis, failed to document their file, failed to set realistic reserves, failed to disclose coverage, failed to advise the insured of coverage limitations related to excess judgments and DWI attorney fees, failed to advise him of coverage limitations for punitive damages until six months after the loss, failed to advise the insured regarding settlement status, failed to make timely settlement offers, failed to respond to settlement offers, failed to respond in a timely basis to a "deadline" offer to settle, consistently failed to respond promptly to communications, failed to provide adequate supervision to ensure compliance with corporate standards and Alaska State law.

Allstate had repeated opportunities to eliminate the impact of their failures upon their insured by accepting the policy limits claims made by Ms. Powers. Once again they failed; they failed to protect Mr. Herron.

In Alaska, the standard for a finding of bad faith is a preponderance of evidence. For the insured to prevail there must a finding of more likely than not, or better than fifty percent chance. In my opinion there is no question that Allstate's handling of this claim is bad faith.

The standard for a finding for punitive damages is much higher. The standard for a finding of punitive damages is that it must be supported by "clear and convincing evidence".

The tort reform statute of 1997 essentially codified judicial decisions to prior statutes on punitive damages.

In its 2003 decision in Great Divide vs. Carpenter the court said:

"Since the advent of tort reform in 1986, punitive damages have been governed by statute. They may be awarded only on proof by clear and convincing evidence that a defendant's conduct was either outrageous, including acts done with malice or bad motives, or evidenced reckless indifference to the interests of others."

It is my opinion that Allstate's conduct with regard to their obligation to Mr. Herron rose to the level of "a gross breach of accepted standards of conduct which might be characterized as outrageous or malicious." As discussed by the Supreme Court in Weiford vs. State Farm.

In Weiford vs. State Farm, the court, relying upon Providence Washington vs. City of Valdez, said punitive damages have a two-fold purpose:

Exhibit A
Page 19 of 20

19

"to punish the wrongdoer and deter the wrongdoer and others like him from repeating the offense"

There is clear and convincing evidence that virtually every Allstate employee who handled the file relating to this accident acted with reckless indifference to the rights of the insured under the policy. The failures by Allstate staff all benefited Allstate. If it is not a corporate culture that encouraged their acts of malice or bad motives, then it was clearly a corporate culture that tolerated their defiance of their own standards.

Allstate, the Alaska statutes, and Alaska Supreme Court decisions have set certain standards in the adjustment of insurance claims. If providing manuals for good faith handling of claims and the training and supervision of their staff in these areas have not provided a climate that works to protect the interests of the insured by following those standards, then it is my opinion that it is necessary for Allstate to be punished to deter Allstate and other carriers from repeating the list of offensive actions outlined above. It is my opinion that an award of punitive damages is appropriate in this case.

*[signature]* 6/5/06
Robert N. Wainscott

Exhibit A
Page 20 of 20

20