IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

ALLSTATE INSURANCE COMPANIES,

    Plaintiff,

vs.

CHARLES HERRON,

    Defendant.
_____)

NO: A04-0043 CV (JKS)

DEPOSITION OF CRAIG ELKINS

Friday, September 30, 2005, 9:10 a.m.

Anchorage, Alaska

## Alaska Stenotype Reporters
511 West Ninth Avenue
Anchorage AK 99501-3520
*Serving Alaska Since 1953*

Rick D. McWilliams, RPR, Ret.
Fred M. Getty, RPR, Ret.

Telephone 907.276.1680
Email AkSteno@aol.com
Fax 907.276.8016



EXHIBIT 2

Page 1 of 2

Page 41

1  notice pending or someone has sent you a computerized
2  e-mail. And that's the notify.
3  Q.    So you would not automatically then have
4  received any portion of the file at that point. All
5  you get is something telling you you have a notify
6  pending.
7  A.    Right. I go in. It says claim number and
8  who from. Then I click on it. And it can take me
9  into the claim diary.
10 Q.    And then the next day, at page eight, it
11 appears you were providing instructions to Renee?
12 A.    Yes.
13 Q.    And so the sequence has been she's sent you
14 the notify, you've received the file for review and
15 now you're providing her instructions?
16 A.    Yes.
17 Q.    And the instructions include something
18 saying follow up on matrix requirement. What's that
19 mean?
20 A.    Well, that would be securing a police
21 report, interviewing the involved party.
22 Q.    Is Renee working from a matrix?
23 A.    From a matrix? It's a task list of things
24 that she's supposed to be doing. And so I'm just
25 telling her to make sure she followed those.

Page 42

1  Q.    I see. And that would include normally
2  investigating liability, assembling medical records,
3  the normal things involved in processing an auto
4  claim?
5  A.    Yes.
6  Q.    Which is still at this point unrepresented,
7  which is why Renee is there, correct?
8  A.    She got that on an unrepresented desk.
9  Q.    Renee, I think we've established before, is
10 part of the unrepresented unit.
11 A.    Yes.
12 Q.    And then the next thing it says is secure
13 certified dec and agent application waiver issue.
14 What is the waiver issue?
15 A.    This is a -- was a company requirement or
16 task that I secure the selection/rejection form or
17 ensure the insured had an opportunity on the UM/UIM
18 endorsements.
19 Q.    Did this relate to what I'm going to call
20 failure to offer litigation?
21 A.    That may have stemmed out as a by-product of
22 that, yes.
23 Q.    And so you -- I believe Ms. Petersen told us
24 there was a memo that came out regarding this waiver
25 issue. Is that correct, to your knowledge?

Page 43

1  A.    There was a task request that we identify
2  and look for those claim files.
3  Q.    Okay. Was it in every claim file?
4  A.    The ones that I was tasked to look at were
5  more the objective injuries in the insured's car, as a
6  passenger. And that's what I was doing here.
7  Q.    But it would be -- I mean, was it in cases
8  where there was potentially U exposure?
9  A.    It was in all -- essentially, I was spot
10 checking and tasking on these type of cases here where
11 we had an injured party in an insured auto. And as
12 part of my job was to go in and request to the claim
13 representative just to ensure that was on file.
14 Q.    Okay. But if there was no realistic U
15 exposure, would you still have made this request?
16 A.    In my spot checks, I was tasked to do that.
17 Q.    In every file where a passenger was injured?
18 A.    The -- on this type of file here, I was
19 asking for this type of request on my spot checks of
20 the claim reps.
21 Q.    Okay. But by this date, had you determined
22 there was at least potentially a U exposure?
23 A.    No, not with the information I had on hand
24 here.
25 Q.    We knew we had an injured person who had

Page 44

1  been medevaced, correct? And we had a claim in
2  Bethel. So have you -- were you able to determine at
3  least that there was potentially a claim that could
4  get to the U level?
5  A.    At this point in time, I hadn't formulated
6  any -- any thoughts on that line.
7  Q.    Well, suppose nobody had been injured at
8  all, you wouldn't have made this request, would you?
9  A.    If no one would have been injured, Renee
10 would not have got this claim file.
11 Q.    Okay. Suppose we had nothing but minor
12 injuries, would you have made this request, if
13 everybody said we feel fine, but might go to the
14 chiropractor?
15 A.    Yeah. At that point in time, I was being
16 asked to in my spot checks ask for that documentation.
17 Q.    Was there -- how were you being asked? Was
18 there a memo, a guideline, a directive? Who was
19 telling you and what were they telling you?
20 A.    It was in a memo. And trying to recall the
21 exact verbiage on it. But the bottom line, that was
22 part of my job accountability was to look at that and
23 request the claim rep to follow up and report back on
24 it.
25        MR. SANDBERG: And Mr. Wilkerson, I don't