IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

ALLSTATE INSURANCE COMPANIES,

    Plaintiff,

vs.

CHARLES HERRON,

    Defendant.
)

NO: A04-0043 CV (JKS)

DEPOSITION OF KAREN PETERSEN

Thursday, September 29, 2005, 11:46 a.m.

Anchorage, Alaska

### Alaska Stenotype Reporters
511 West Ninth Avenue
Anchorage AK 99501-3520
*Serving Alaska Since 1953*

Rick D. McWilliams, RPR, Ret.
Fred M. Getty, RPR, Ret.

Telephone 907.276.1680
Email AkSteno@aol.com
Fax 907.276.8016



EXHIBIT 1

Page 1

Page 41

1  A.    Depending on her anticipation of what might
2  happen with the file.
3  Q.    What's that mean?
4  A.    When I looked at the file, I saw that it was
5  a punitive exclusion policy. I saw that there were
6  allegations of DUI. So I brought that to Kathy's
7  attention. If Kathy didn't feel it was imperative to
8  send that letter at that point in time, she has that
9  discretion.
10 Q.    Were you evaluating Kathy at this point?
11 A.    No.
12 Q.    Who would have been evaluating Kathy at this
13 point?
14 A.    Craig Elkins.
15 Q.    Would Mr. Elkins have been evaluating Kathy
16 in part based upon whether or not she had complied
17 with your directives?
18 A.    You'd have to ask Mr. Elkins.
19 Q.    Would complying with instructions be part of
20 the evaluation you were describing before about
21 compliance with Allstate processes?
22 A.    That's a difficult answer specifically yes
23 or no. Because if Craig also didn't feel that that
24 letter was necessary at that point in time, he
25 wouldn't expect her to comply with it.

Page 42

1  Q.    Do you know what, if anything, Kathy Berry
2  did in response to this direction from you?
3  A.    No, I don't know.
4  Q.    Are there home office referral processes
5  where a claim has a punitive exposure?
6  A.    No.
7  Q.    Or practices, procedures, whatever word we
8  should be looking for?
9  A.    No. I don't believe that punitive exposure
10 is part of the home office guidelines.
11 Q.    Okay. What kind of claims do get home
12 office referral?
13 A.    Serious injury claims, claims that appear to
14 be excess exposure, claims that would exceed our
15 office authorization.
16 Q.    And what was the authorization in the fall
17 of 2002?
18 A.    For the office?
19 Q.    Yes.
20 A.    150,000 per individual injury.
21 Q.    And the home office referral guidelines are
22 a written thing?
23 A.    Yes.
24 Q.    They exist somewhere in the Anchorage
25 office?

Page 43

1  A.    They would be in the Claims Policies and
2  Procedures -- Policy, Practices and Procedures Manual.
3  Q.    And that's the one --
4  A.    CPPP, yes.
5  Q.    That's what we looked at as Exhibit number 3
6  previously?
7  A.    Correct.
8  Q.    That was a portion of that? And if we look
9  at the last page of that document, we see that
10 "Casualty files are to be" returned -- or "referred
11 from the Market Claim Office to Home Office within 14
12 days after the file qualifies for referral," correct?
13 A.    That's what this paper says.
14 Q.    Do you know whether that would have been the
15 standard in the fall of 2002?
16 A.    I can't tell you for certain yes or no.
17 Q.    Do you have a reason to believe it was
18 different than 14 days in the fall of 2002?
19 A.    No.
20 Q.    And whose job is it to make the
21 determination of when a file qualifies for referral?
22 A.    The claim representative.
23 Q.    So in this case, it would be Kathy Berry?
24 A.    Yes.
25 Q.    And that would be part of your job --

Page 44

1  A.    Yes.
2  Q.    -- would be to determine whether or not a
3  claim was -- or whether a claim qualified for home
4  office referral?
5  A.    Yes.
6  Q.    And Kathy was being supervised, I believe
7  you told me, by Mr. Elkins at this point?
8  A.    Yes.
9  Q.    What would Kathy's job title have been in
10 the fall of 2002?
11 A.    She was a claim representative. I don't
12 know what level of claim representative.
13 Q.    She was part of the represented claim unit?
14 A.    Yes.
15 Q.    I asked you some -- let's see. Before we
16 move on out of these initial areas where we just were
17 looking at Mr. Davis and then your entry the following
18 day in this not reserving the med pay, I asked you
19 some questions earlier about med pay. And you told me
20 there are med pay claim standards, correct?
21 A.    I believe there are med -- there's a med pay
22 CCPR book out there.
23 Q.    Do you know what, if anything, it says about
24 timeliness?
25 A.    No, I don't.

Page 89

1  A.  Right.
2     MR. SANDBERG: Okay.
3     (Discussion off the record.)
4  BY MR. SANDBERG:
5  Q.  And why you rather than Mr. Elkins?
6  A.  If -- I'm the one that's supposed to review
7  these. If I'm not available, she would send it to
8  Craig.
9     MR. SANDBERG: Okay. And then the next --
10    (Discussion off the record.)
11 BY MR. SANDBERG:
12 Q.  Were you told that the -- that there was an
13 existing policy limits offer with a deadline of
14 May 16th?
15 A.  I don't know if I was told that. I don't
16 know if there's reference to it. I don't immediately
17 see anything that indicates that.
18 Q.  Do you recall any particular sense of
19 urgency on this referral?
20 A.  No.
21    MR. SANDBERG: Would you take a look
22 at -- actually, we're going to mark it as
23 Exhibit 12.
24    (Exhibit 12 was marked.)
25    THE WITNESS: Okay.

Page 90

1  BY MR. SANDBERG:
2  Q.  Exhibit 12 is a letter from Ms. Berry to
3  Mr. Angstman's law office. And it says "We are in the
4  process of completing our evaluation of Angelina
5  Trailov's claim and anticipate responding to your
6  demand by your May 16th, 2003 deadline." This is what
7  the middle paragraph says.
8     Did Kathy Berry tell you there was a
9  May 16th, 2003 deadline?
10 A.  I don't recall.
11 Q.  Do you see any discussion in this e-mail
12 about a May 16th, 2003 deadline?
13 A.  No.
14    MR. WILKERSON: For the record, I'll object
15 to the characterization.
16    MR. SANDBERG: Of what?
17    MR. WILKERSON: It's an incomplete record.
18 This is presenting the witness with an incomplete
19 record and asking her to assume that it's the record.
20    MR. SANDBERG: You mean Exhibit 11?
21    MR. WILKERSON: Twelve.
22 BY MR. SANDBERG:
23 Q.  At the end of May 2003 -- or actually, I'm
24 sorry. On May 16th, 2003, what, if anything, did you
25 know about the May 16th, 2003 deadline?

Page 91

1  A.  I didn't know anything other than I'm
2  reading a home office referral that Kathy sent. Or I
3  read it shortly after May 16th. Obviously, Kathy sent
4  me the referral on the 16th of May.
5  Q.  Now, if Kathy sent you the referral on the
6  16th of May, was there any way, in fact, she could
7  have responded to the demand by the May 16th, 2003
8  deadline?
9  A.  I don't know.
10 Q.  Is there -- could you get a one-day
11 turnaround on a home office referral?
12 A.  The home office referral doesn't necessarily
13 go hand in hand with the demand. So I'm not quite
14 following what you're asking.
15 Q.  Okay. You told me that authority is
16 different than reserves, correct?
17 A.  Correct.
18 Q.  And is there a place we can go to see how
19 much authority Kathy had at any given point?
20 A.  Our office would have had 150,000 authority
21 before we would have to ask home office to give beyond
22 that.
23 Q.  And Kathy would have had 150,000?
24 A.  No, I would have.
25 Q.  So if Kathy wanted 150 -- if Kathy wanted a

Page 92

1  hundred twelve five, would she come to you for
2  authority?
3  A.  At that point in time, yes.
4  Q.  And so prior to May 16th, 2003, had Kathy
5  asked you for a hundred twelve five authority?
6  A.  Not that I'm aware of.
7  Q.  Do you see anything in the file? Take your
8  time and look at that --
9  A.  In the exhibits that have been given to me,
10 no, I don't see anything.
11 Q.  And as far as you're aware, you knew nothing
12 about a May 16th, 2003 deadline on May 16th?
13 A.  I don't believe that was -- that that was in
14 my knowledge, no.
15 Q.  You told me when there's a home office
16 referral there, the local office still possesses
17 authority with limitations, I believe was your word.
18 Can you explain that to me?
19 A.  Up to the $150,000 value.
20 Q.  You still possess that even when there's a
21 home office authority?
22 A.  Yes.
23 Q.  I mean home office referral?
24 A.  Referral.
25 Q.  So on May the 16th if Kathy Berry had come

## Page 97

1  records she had, whether she had additional
2  conversation with Mr. Elkins or not.
3  Q.      Okay. But here it says, please prepare and
4  send home office referral on mandatory referral. And
5  that entry is on March the 3rd, correct?
6  A.      Correct.
7  Q.      And when she actually initiates the process
8  by sending it to you, it's May the 16th, correct?
9  A.      Correct.
10 Q.      Does taking from March the 3rd to May the
11 16th to follow Mr. Elkins' direction to prepare the --
12 let's see. Rather than guessing, let's go back to the
13 one we had, which is Exhibit number 3, the last page.
14         These timeliness guidelines say "When a new
15 claim file qualifies for referral, there must be no
16 delay," et cetera. Then it goes on to say, "Casualty
17 files are to be referred from the Market Claim Office
18 to Home Office within 14 days after the file qualifies
19 for referral."
20 A.      Correct.
21 Q.      So does taking two months plus comply with
22 this standard?
23 A.      Two months is obviously a lot longer than 14
24 days. No. But I don't know what happened in the
25 interim, if there was any other discussion.

## Page 98

1  Q.      When the authority to settle this claim --
2  to settle the Trailov claim was finally granted, where
3  did the authority come from? Did it come from you or
4  did it come from the home office?
5  A.      I believe I gave authority to settle the
6  liability portion of the claim.
7  Q.      And looking at the claim diary, can you tell
8  when you did that?
9  A.      That would have been part of this 5/29/03.
10 Q.      Does -- let's see.
11 A.      I don't have the balance of the file to
12 reflect if home office sent an authorization, but this
13 would be within my authorization to extend that.
14 Q.      But do you know if you did, in fact -- if
15 you were the source of the authority to settle or if
16 the home office was?
17 A.      I don't know that by looking at this
18 information, no, not specifically.
19 Q.      Should we be able to tell somewhere from the
20 claim file?
21 A.      There may be an e-mail from the home office.
22 But at this point in time, I had agreed the liability
23 limits on 04 were there.
24 Q.      Were there, meaning Kathy Berry had
25 authority?

## Page 99

1  A.      Right. But I clearly requested that she
2  make a recommendation to home office.
3  Q.      Did Kathy Berry possess authority on
4  May 29th, 2003 to offer a hundred twelve five?
5  A.      It's not clear in my notes and I don't
6  recall specifically our conversation. I did ask her
7  to make a recommendation to home office and have --
8  and for Lori to put information in the screens.
9  Q.      The granting of authority should be
10 documented in the claim file somewhere, shouldn't it?
11 A.      Yes.
12 Q.      That would be a mandatory thing to document,
13 correct, the amount of authority granted to an
14 adjuster to settle a claim, at least if it's in excess
15 of that person's everyday walking around authority?
16 A.      Right.
17 Q.      Okay. Well, take just a second then and
18 review the entries around May 29th. And just tell me
19 if you can figure out where Kathy got authority.
20 A.      Well, I clearly agreed on offering the
21 amount. Is there an e-mail from home office at all at
22 that point in time?
23 Q.      I don't know. I think that's it. Those are
24 the only e-mails we've got.
25 A.      Do we have the evaluation consultant

## Page 100

1  screens?
2  Q.      In other words, the screen of Lori's
3  evaluation?
4  A.      Yes.
5  Q.      I have never seen that. The only -- I have
6  seen one single entry referring to Lori.
7  A.      I don't see that offhand.
8          MR. WILKERSON: What's he looking for,
9  the --
10         THE WITNESS: Lori's entry.
11         MR. WILKERSON: Can you direct her to Lori's
12 entry?
13 BY MR. SANDBERG:
14 Q.      Yes. I'm sorry. I need to go grab it. Oh,
15 here it is, right here.
16 A.      That's my entry. Do you have her entry
17 marked somewhere? That's my entry that you routed me
18 to.
19 Q.      No, then I may not have any. Because that's
20 where I found Lori in the file. We have Colussus
21 assessment. Is that what that would refer to?
22 A.      No.
23         It would be entirely supposition on my part
24 as to what happened at this point in time. I can
25 clearly tell you, I made an entry here that I agreed