Page 89

1  the claim file?
2  A.    No. I think it was just whatever had come
3  through the mail that -- date stamped on that.
4  Q.    Let me back up then, because I'm confusing
5  myself again. You've got page 200 in front of you,
6  correct?
7  A.    Yes.
8  Q.    And as we've seen, it contains the notation
9  3/3/03 at the top, correct?
10 A.    Yes.
11 Q.    And you've told me that's the date that
12 would -- that the file would have been referred to you
13 for supervision and review, correct?
14 A.    That's when the demand letter was forwarded,
15 I believe.
16 Q.    Okay. Would you have received anything
17 other than the demand letter?
18 A.    On this specific file, I don't recall if
19 there was more than just the demand letter attached or
20 not.
21 Q.    What -- I mean, what physically happens?
22 Does Kathy walk to your desk and put something on your
23 chair? I mean, what's -- what would you normally
24 expect when a demand letter and page 200 have been
25 generated and you're supposed to do something? What

Page 90

1  comes to you and how does it get to you?
2  A.    She may have, working through her mail, came
3  across a demand letter and sent it over just to notice
4  me so that I could make note that that had come in.
5  Q.    Do you have any reason to believe you have
6  anything other than Michele Power's demand letter that
7  we looked at a few moments ago in front of you when
8  you're doing your review?
9  A.    I believe I just reviewed the letter. I
10 don't recall looking at the file.
11 Q.    Okay. And it says "Please prepare and send
12 HO referral on mandatory referral." What's that mean?
13 A.    I believe in the letter we had, there was an
14 alleged brain injury.
15 Q.    Yes.
16 A.    And that was part of our serious injury
17 referral.
18 Q.    It's cut off in the middle. It continues
19 "given alleged brain injury."
20 A.    Right. So I believe that may have been in
21 the letter. And had asked Kathy to just notify our
22 home office analysts that we had an alleged brain
23 injury and for a serious injury referral.
24 Q.    Are there guidelines for when a claim
25 becomes a home office referral?

Page 91

1  A.    There are.
2  Q.    And if I wanted to look at those, what would
3  I look at?
4  A.    Those are part of our CPPP Manual.
5  Q.    And is alleged brain damage one of the
6  criteria?
7  A.    There is, yes.
8  Q.    Is claim exceeds office authority one of the
9  criteria?
10 A.    That would be one. Amputation, blindness,
11 fatality accident.
12 Q.    This is Exhibit 11. And it's about the
13 fourth page of Exhibit 11 that I'm showing the
14 witness. And it's something called Home Office
15 Referral Template, which is the referral, when it
16 actually finally goes in this case, correct?
17 A.    Okay.
18 Q.    And the stated "Reason for Referral" is
19 "Damages exceed office authority" on that? Is that
20 correct?
21 A.    That's what she has on the referral line.
22 Q.    Okay. And is that a criteria for home
23 office referral?
24 A.    As being one of them?
25 Q.    Yes. Not "the," but "a."

Page 92

1  A.    As being one of the categories, yes.
2  Q.    Is there a timeliness requirement for a home
3  office referral?
4  A.    As far as when the referral goes out?
5  Q.    That's right. Once a claim has been
6  identified as needing home office referral, is there a
7  timeliness requirement?
8  A.    Once we identify that, we'd like to have it
9  out within 14 days.
10 Q.    And that's what the home office referral
11 guidelines call for, correct?
12 A.    That's a request they have, yes.
13 Q.    And we can see that, actually, in this
14 exhibit. It's in the other one. I'm handing the
15 witness what we marked as Exhibit number 3 and showing
16 him Section 5, 1.0 where it states "Casualty files are
17 to be referred from the Market Claim Office to Home
18 Office within 14 days after the file qualifies for
19 referral."
20       Is that the home office guideline you were
21 discussing a moment ago?
22 A.    That's their -- I have a serious injury
23 referral guideline that is sort of an addendum to this
24 that I use.
25 Q.    It's still the same 14-day standard, though?

Page 29

1  Q.     Is it required that the EC be involved to
2  formulate a counteroffer?
3  A.     On the counteroffer?
4  Q.     That's right. In other words, if we wanted
5  to follow my little loop around, you get a demand. It
6  comes to the claim rep. The claim rep consults with
7  you. The EC may or may not be involved initially to
8  evaluate the demand. But suppose you want then to
9  make an offer, do we have to get the EC involved?
10 A.     Yes. That's -- yes, you would.
11 Q.     Okay. Anybody else?
12 A.     Well, depending on the case, you may get the
13 FPE involved or seek some advice from elsewhere.
14 Q.     And that would be Ms. Petersen in your
15 office?
16 A.     Yes.
17 Q.     Does whether the demand is or is not a
18 policy limits demand make any difference in the
19 scenario you've just described to me?
20 A.     As to involving the EC?
21 Q.     Yes. How many people are involved. I'm
22 just trying to understand the process.
23 A.     If the -- one example, if a demand comes in
24 with no supporting documentation for the demand and no
25 time limit on it, we'd respond that we need the

Page 30

1  supports in order to properly evaluate and respond to
2  the demand, example such as that.
3  Q.     And you'd expect a claim rep to write that
4  letter, correct?
5  A.     Yes.
6  Q.     Would the demand still come to your
7  attention?
8  A.     In that case, yes.
9  Q.     Anybody else's?
10 A.     I don't believe so.
11 Q.     If a letter -- if a demand letter comes in
12 with a deadline attached, are those calendared?
13 A.     They are.
14 Q.     How?
15 A.     The claim representative calendars for
16 response on those. Attempts to meet that or get an
17 extension.
18 Q.     And under the present system, how does that
19 happen? How does it get calendared?
20 A.     The -- we have a demand log, which we log
21 that in and whether or not there's a response date due
22 on it or not.
23 Q.     Is the demand log computerized?
24 A.     Yes.
25 Q.     So there's a -- if the -- does the Anchorage

Page 31

1  office maintain a central computerized demand log for
2  all files? I'm just trying to understand how it's
3  organized.
4  A.     Yes. And FPE would have access to that if
5  they wished or -- yes.
6  Q.     Okay. And what -- now in 2002, what was the
7  system like for calendering demands with deadlines
8  attached?
9  A.     Right. The 2002, I don't recall if it was
10 computerized or a manual log.
11 Q.     But there was a demand log maintained within
12 the office?
13 A.     I believe so, yes.
14 Q.     And -- well, let's -- without regard to when
15 the transition was, how did the prior -- the manual
16 log work? Was there a book somewhere, a thing
17 somewhere? How did things get entered on it and who
18 did it?
19 A.     Right. The -- it was a spreadsheet. And it
20 would come in. And at that point in time, I believe I
21 was writing in the claim number, the item claimant,
22 the claim representative, whether or not it was a time
23 limit demand or facial demand, whatever.
24 Q.     Okay. And then did someone on your staff
25 then calendar those demands for you under this manual

Page 32

1  system? In other words, how did you know other than
2  looking at the demand log every day which demands were
3  expiring?
4  A.     Yes.
5         No. There would not have been in my -- I
6  did not have a support person doing that for me.
7  Q.     Did the office?
8  A.     I don't recall. I don't -- I don't recall
9  if we did or not.
10 Q.     As the supervisor, was the expiration of
11 demands called to your attention under the previous
12 system somehow by a tickler, by a note, by anything?
13 A.     I would try and look to see what the status
14 was, if we'd responded in time and got an extension or
15 communicated with the attorney.
16 Q.     Was it part of your job to review the demand
17 log periodically then?
18 A.     Yes.
19 Q.     So once a week, once a day? How often?
20 A.     Once a day, no. Perhaps once a week.
21 Q.     So at least once a week, you should know
22 what demands are expiring within the claims being
23 handled by the people you're supervising.
24 A.     Yes.
25 Q.     And the system you're just describing, would