Karen Petersen                         Deposition                    September 29, 2005

---

**Page 81**

1  Q.      So somewhere there should be an 09-PF8
2  screen with Lori's thought process on it?
3  A.      Yes.
4  Q.      Then it says, "Please note there are several
5  lien notices. The ANS lien has been recorded in
6  court. We need to assure this is paid with liability
7  settlement." How come?
8  A.      Because they had recorded a lien against the
9  liability settlement.
10  Q.      Would -- in an instance like this, would
11  Allstate effectively subrogate? In other words, would
12  Allstate reduce the payout to Angelina Trailov on the
13  liability side based upon the fact she'd already
14  gotten $25,000 in med pay?
15  A.      There would be an offset for that 25,000.
16  Q.      And is that, in fact, what happened, do you
17  know?
18  A.      I don't know.
19  Q.      But there should be an offset subtracting
20  the 25 -- recovering the $25,000 --
21  A.      No.
22  Q.      -- out of the --
23  A.      No, no. It's not a recovery process.
24  Q.      Just another -- just a reduction in damages,
25  in other words, a credit for the 25 that already was

---

**Page 82**

1  paid.
2  A.      A credit for the 25,000 that was already
3  paid under the med pay.
4  Q.      But an insured like Angelina Trailov would
5  collect both the med pay and the 112,000 if her claim
6  was worth it.
7  A.      Correct.
8  Q.      Okay. And so the reason we need to assure
9  this is paid with the liability settlement was simply
10  to make sure that Allstate didn't end up with a
11  problem where it had to pay more, again because it
12  knew about the recorded lien?
13  A.      To properly protect our insured, we know
14  we've got this recorded lien out there. So my notice
15  is put here so that this is part of the resolution of
16  the claim. If ANS needs to be named on the final
17  check, then that's what happens. But typically,
18  there's a discussion with plaintiff counsel.
19  Q.      Okay. Now, it says "Attorney has
20  demanded pol lim." Is that policy limits for 04?
21  A.      Yes.
22  Q.      So the attorney has demanded policy limits
23  for Angelina Trailov.
24  A.      Correct.
25  Q.      And it says "and for NIED claim for her

---

**Page 83**

1  mother." Then go to the next line. It says, "I agree
2  04 would probably receive the 100K liability limits in
3  Bethel venue, likely the 100K SU limits also."
4  The 100K SU limits would be the UIM
5  coverage?
6  A.      Yes.
7  Q.      So you agreed that Angelina Trailov would
8  probably receive the $100,000 in liability limits in
9  Bethel, plus likely the $100,000 in UIM coverage as
10  well.
11  A.      I agreed that she would likely receive the
12  100K liability limits. And then I'm indicating it's
13  likely she would also receive the UIM limits also.
14  That's not part of my agreement with anyone, that
15  second portion.
16  Q.      Okay. I see. So someone had asked you
17  whether or not you agreed that she would get the
18  100,000 liability limits in Bethel. And you said yes,
19  she'd also get the UIM limits probably, too.
20  A.      That's how I interpret what I wrote.
21  Q.      Okay. How long did it take you to come to
22  this conclusion?
23  A.      After I reviewed the file.
24  Q.      Yes.
25  A.      At the time that I reviewed the file, I came

---

**Page 84**

1  to this conclusion.
2  Q.      Okay. Would that be something that happened
3  on May 29th, 2003?
4  A.      Probably May 29th or May 28th. I can't tell
5  you what day I would have reviewed the file. But it
6  was probably right in that time frame.
7  Q.      Okay. So within a day or two, at least, of
8  reviewing the file, you were able to come to this
9  conclusion?
10  A.      Yes.
11  Q.      Do you know whether you were reviewing any
12  medical records that Allstate hadn't had since at
13  least the first of May?
14  A.      That I don't know.
15  Q.      Do you know if you were reviewing any
16  medical records that Allstate hadn't had since
17  March 23rd?
18  A.      I don't know.
19  Q.      If you had been asked back in March to
20  review the medical records, are you aware of any
21  reason you couldn't have come to the same conclusion
22  then?
23  A.      I don't know what was in the file at that
24  point.
25  Q.      Well, if we assume that it was -- after

---

Alaska Stenotype Reporters

Exhibit 3
Page 1 of 2

Page 85

1 March 26th, 2003 it was the same records, are you
2 aware of any reason you couldn't have come to this
3 conclusion then?
4 A.     I don't know. I -- I only know the file
5 that I looked at at this point in time led me to this
6 conclusion.
7 Q.     And this conclusion was based upon your
8 review of the medical information that was available
9 to you?
10 A.     Of all of the file documents that were
11 available to me.
12 Q.     And on a 100 percent liability claim, other
13 than the medical information, do you know what else
14 you looked at?
15 A.     I would have looked at the liability aspects
16 of the file. I would have looked at any contribution
17 aspects. I would have looked at the medical
18 information that was available.
19 Q.     And this has been -- as we've seen, I think,
20 this has been determined as 100 percent liability file
21 for Mr. Herron within a week of the accident or ten
22 days, right?
23 A.     There was a determination in the file, yes.
24 Q.     Okay. And so that determination had been
25 made. And there was no possibility for contribution

Page 86

1 noted in the file, was there?
2 A.     I don't know that.
3 Q.     If the records that you reviewed had
4 been obtained, say, by December of 2002, is there
5 any reason you couldn't have come to this conclusion
6 then?
7 A.     That -- if everything was the same as it was
8 on this specific date, May 29th, 2003 --
9 Q.     Yes.
10 A.     -- I likely would have come to the same
11 conclusion. I don't know what existed on the date
12 that you're saying.
13 Q.     Okay. In any event, so -- yes, that's
14 really my question, is if you had seen this same
15 information earlier, you would presumably have come to
16 the same conclusion earlier, correct?
17 A.     Presumably.
18 Q.     Okay. In one or two days, presumably.
19 A.     Of reviewing the information, yes.
20 Q.     Okay. Let's continue with this analysis
21 then. It says I do not -- it says I suggest we
22 discuss case value and NIED claim with local counsel
23 prior to making recommendation to home office.
24        On May 29th, this case had been referred to
25 the home office, correct?

Page 87

1 A.     I believe it had previously been referred.
2 Q.     We can actually look up the date, if you
3 want. But it's -- hum.
4        (Discussion off the record.)
5 BY MR. SANDBERG:
6 Q.     In any event, when a case becomes a home
7 office referral, does Allstate still possess authority
8 to settle it?
9 A.     Yes, but we have limitations.
10        MR. SANDBERG: Let's mark this next.
11        (Brief pause.)
12        MR. SANDBERG: We're back on record. What
13 exhibit number did we mark that as, 11?
14        THE REPORTER: Eleven.
15 BY MR. SANDBERG:
16 Q.     Exhibit 11, I believe, is a collection of
17 items relating to the home office referral. And so
18 rather than me discussing it so generically, let's go
19 through, if we may. The first is an e-mail from Kathy
20 Berry to you regarding a new home office referral.
21        MR. WILKERSON: Mark, you may want to mark a
22 different one. I think the one that's been marked
23 seems to have maybe Dennis' notes on it. I don't
24 think you want that probably.
25        MR. SANDBERG: I'll trade you.

Page 88

1        MR. WILKERSON: I have no objection if you
2 mark mine. I don't think mine has writing on it.
3        MR. MESTAS: That's a better one, anyway.
4        (Exhibit 11 was marked.)
5 BY MR. SANDBERG:
6 Q.     Now, the first page is an e-mail from Kathy
7 Berry to you?
8 A.     Yes.
9 Q.     And it says "Here is a new referral on a
10 Bethel claim."
11 A.     Yes.
12 Q.     Is this the home office referral when it
13 says "New H.O. referral"?
14 A.     This would be the home office referral that
15 she's sending to me to review before it's forwarded.
16 Q.     And she's writing to you on May the 16th?
17 A.     Yes.
18 Q.     And why would she write this to you? I
19 mean, where are you in this process?
20 A.     Because she's supposed to forward it to me
21 for review before it's sent to home office.
22 Q.     Okay. So that would be part of your job --
23 A.     Yes.
24 Q.     -- would be to review the submission before
25 it went?

25 (Pages 85 to 88)

Exhibit 3

Page 2 of 2