IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANIES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. A04-0043 CV (JKS) |
| | ) | |
| CHARLES HERRON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### AFFIDAVIT OF ROBERT WAINSCOTT

| | |
|---|---|
| STATE OF ALASKA | ) |
| | ) ss. |
| THIRD JUDICIAL DISTRICT | ) |

ROBERT WAINSCOTT, being sworn upon oath, deposes and states as follows:

1. I was employed for 37 years in the business of insurance claims handling. I was employed by INA, its affiliate Alaska Pacific Assurance Company, and successor insurer Cigna Corporation.

2. I held numerous claims handling positions in Alaska, including adjuster, claims supervisor, Director of Liability Claims, Liability Claims Manager, and Liability Claims Specialist.

3. I have handled, supervised, and managed all types of claims under all lines of coverage, except for worker's compensation. I have reviewed thousands of

-1-

EXHIBIT 5
Page 1 of 37

**EXHIBIT 63**

Alaska claims files for the purpose of supervision and assuring compliance with proper, competent, and good faith claims handling standards and practices.

4.   I am familiar with the insurance industry standards and practices for proper, competent, and good faith handling of motor vehicle insurance liability coverage claims in Alaska, so as to protect the insured, including in relation to: investigation, evaluation, timeliness, reserves, reports, diaries and reviews, documentation of the claims file, disclosing coverage and coverage limitations, advising insureds about settlement status, making settlement offers, responding to settlement offers, and the timely settlement or attempted settlement of such claims.

5.   I am familiar with the insurance industry standards and practices for proper, competent, and good faith handling of uninsured and underinsured motorist coverage (UM/UIM) claims in Alaska, including: investigation, evaluation, timeliness, reserves, reports, diaries and review, documentation of the claims file, disclosure of UM/UIM coverages and potential UM/UIM claims to the UM/UIM insured, communicating with the insured, making settlement offers, responding to settlement offers and the timely settlement or attempted settlement of such claims.

6.   I am familiar with the insurance industry standards and practices for proper, competent, and good faith handling of medical payments coverage claims in Alaska, including: investigation, evaluation, timeliness, reports, diaries and

-2-

EXHIBIT 5
Page 2 of 37

review, documentation of the claims file, disclosing medical payments coverage, communicating with the insured, and timely payment of medical bills.

7.   I am familiar with the insurance industry standards and practices for proper, competent, and good faith handling of very large bodily injury liability claims, sometimes known as large loss claims, or critical claims, that must be promptly reported to the insurer's Home Office to assure Home Office involvement in the proper, timely, and supervised claims handling of potentially very large claims in excess of the liability coverage that endanger the insured.

8.   I am familiar with the industry standards and practices for proper, competent and good faith supervision and management of liability coverage claims, UM/UIM coverage claims, and medical payments coverage claims, including: training and managing adjusters, reviewing adjusters' performance, reviewing claims files, familiarity with and enforcement of the insurer's internal claims procedures, identifying and correcting mishandling, and supervising individual claims, including very large bodily injury claims that may exceed policy limits.

9.   I am familiar with UM/UIM coverage in Alaska, including an insurer's potential liability in excess of the stated limits of UM/UIM coverage for an insurer's failure to follow AS 21.89.020(c)-(c)(2). This statute requires that insurers initially, and upon renewal, offer UM/UIM limits equal to liability limits, and greater UM/UIM limits up to $1,000,000/$2,000,000. Depending on the

-3-

EXHIBIT __5__
Page _3_ of _32_

circumstances, UM/UIM coverage limits may legally be higher than the written limits, such as when the limits of the UM/UIM coverage are less than the limits of the liability coverage and no written waiver exists. The UM/UIM limits may be as high as $1,000,000/$2,000,000 for failure to comply with the statute. Potential tort liability up to and in excess of $1,000,000/$2,000,000 can also occur under the *Peter v. Progressive* case. I am aware that Allstate was involved in *Dayton v. Allstate*, a large class action in U.S. District Court on this UM/UIM issue in relation to allegedly defective offers of UM/UIM, as well as a number of other individual cases in state court.

10.    I have been retained to give my professional opinion on the claims handling conduct of Allstate and Allstate adjuster, Kathy Berry, in relation to the claims of Angelina Trailov and her mother, Mary Kenick, arising out an automobile crash in Bethel, Alaska, on September 14, 2002.

11.    I have reviewed the redacted partial Allstate claims file # 3322751094 that was produced by the Law Offices of Mark Wilkerson to attorney James Valcarce with a Privilege Log. That claim file only included the period of time from September 16, 2002, to September of 2003. Numerous redactions were made from and including on September 16, 2002, to August 22, 2003. The redactions in the partial claims file include redactions of all case evaluations and all reserves evaluations, so that I was unable to determine any Allstate claim evaluation

-4-

EXHIBIT 5
Page 4 of 37

amount or claim reserve evaluation amount other than the initial reserve of $25,000 set on September 25, 2002.

12.    I have reviewed the correspondence between Mr. Valcarce and the Law Offices of Mark Wilkerson before and after August 22, 2003, as well as the correspondence relating to Allstate's rejection of the offer and counter-offer to settle Mary Kenick's claims that occurred in March of 2004.

13.    I have reviewed Allstate's Claims Policy Practices and Procedures Manual (CPPPM).

14.    I have reviewed Exhibits 1 through 61 that I understand will be filed on behalf of Charles Herron in this matter.  These include Allstate documents from other Alaska claims files contemporaneous to the claims file # 3322751094 involved in this matter that reflect Allstate documentation that is not in the documentation in Allstate file # 3322751094.  The exhibits referred to herein are the exhibits attached to defendant Herron's Opposition To Allstate's Motion For Summary Judgment.

15.    The partial redacted claims file documentation and correspondence reveals the claims handling in this matter.  Numerous acts of negligence and bad faith occurred, as set forth below.

16.    On September 16, 2002, Allstate was notified by Margaret Herron of the crash near Bethel involving her son, Charles Herron, that occurred on September 14, 2002.  Allstate opened its claims file # 3322751094.  Allstate was told by Mrs.

-5-

EXHIBIT  5
Page 5 of 37

Herron that Charles Herron was driving while intoxicated when he lost control and hit a pole. Allstate was told there were several passengers, including a female passenger who had a fractured skull, fluid in her lungs, and had been evacuated to Anchorage. Allstate was told she was taken to Alaska Regional, but would eventually be sent back to Alaska Native Medical Center.  This female passenger was 15-year-old Angelina Trailov.  It was noted that she would have medical bills from the medical evacuation and hospital expense.  (Exhibit 2.)

17.    On September 16, 2002, Rene Vanzant was assigned as the first adjuster. After speaking with Mrs. Herron, Vanzant immediately requested review of the claim by claims supervisor Craig Elkins. On September 17, 2002, Mr. Elkins ordered that review to take place.  Angelina Trailov was assigned the identifier "04". (Exhibit 2.)

18.    The Herrons' Allstate policy had liability coverage of $100,000 (AA); medical payment coverage (CC) that extended to passengers of $25,000; UM/UIM (SU) coverage that extended to passengers of $100,000/$300,000. (Exhibit 5.)

19.    On September 18, 2002, Mr. Elkins ordered that the Herrons' policy certified Declaration Pages be secured and that the insurance application taken by Herrons' Allstate agent be secured.  This was stated as necessary, due to the "Waiver Issue". (Exhibit 6.)  When received, these documents included 2002 UM/UIM Reoffer forms.  (Exhibit 18.)  No selection/rejection form was received. From a contemporaneous claims file, it is known that Allstate had set up a storage

-6-

EXHIBIT   5
Page  6  of  37

system and data base for "UM/UIM Offer and Reoffer" documents and the available documents could be accessed and listed on an adjuster's computer screen as they were in another case.  (Exhibit 7.)

20.   On September 21, 2002, Vanzant and Allstate acknowledged that the liability of Mr. Herron was 100%.  (Exhibit 9.)

21.   On September 23, 2003, Vanzant is assigned to be the medical payments adjuster.  (Exhibit 4.)

22.   On September 23, 2002, Allstate was told that the Allstate agent did not have the original application, as the file had been transferred from a different agent. It further determined that UM/UIM Reoffer documents had been stored for the 2000 UM/UIM Reoffer.  (Exhibit 11.)  Allstate was also told that Angelina Trailov was represented by an attorney.  (Exhibit 10.)

23.   Only a handwritten note contains this UM/UIM Reoffer information in file # 3322751094 that relates to Angelina Trailov and Mary Kenick.  (Exhibit 11.) The printout available, as reflected in Exhibit 7, in a contemporaneous Alaska file, is not in this file.

24.   Thus, by September 23, 2002, Allstate had assessed 100% liability of Charles Herron, and its actions indicate that it had assessed likely damages for Angelina Trailov to be well beyond  the $100,000 of liability coverage.  Its actions indicate that Allstate was concerned its exposure for UIM was so large that it was beyond the $100,000 of UIM coverage that covered Angelina Trailov and it went

-7-

EXHIBIT  5
Page  7  of  37

looking to see what kind of documents it had for a defense to a "failure to offer UIM" claim.

25.   "UM/UIM Reoffer" documents would only relate to a "failure to offer" UIM claim for breach of AS 21.89.020(c)-(c)(2).  They would bear no relation whatsoever to the liability claim.  Further, the written UM/UIM limits were already equal to the liability limits, so the UM/UIM Reoffer documents would not relate to a *Burton v. State Farm* "UM/UIM limits equal to liability limits claim".  Thus, an insurer would only investigate such documents if it was concerned the damages were larger than the total of $100,000 of available liability coverage and $100,000 UIM coverage, or larger than $200,000.  (See, Exhibits 7, 9, and 11.)

26.   However, Allstate did not notify Mr. Herron at this time, or remarkably, at any time later, that he was exposed to a judgment in excess of the liability limits.

27.   On September 25, 2002 , Allstate had received an attorney representation letter from Ms. Michele Power of the Angstman Law Office in Bethel.  On this date, Mr. Gary Davis, an Allstate claims manager, reviewed the file and determined that liability investigation was complete.  A number of Allstate's Colossus damage evaluation screens (CDS) were noted as complete.  Colossus is a computer program Allstate uses to establish the value of a claim, but these Colossus entries and information were not produced.  Examples from another contemporaneous claims file are in Exhibit 13.  (Exhibits 12 and 13.)

-8-

EXHIBIT 5
Page 8 of 37

28.   On September 25, 2002, a $25,000 reserve was set for the liability claim (AA04) by Mr. Davis.  A reserve is supposed to reflect the fair insurer's view of the fair value of a claim at the time it is set.  The basis of this reserve is not stated in the claims file and it does not reflect Allstate's demonstrated concern that Ms. Trailov's damages were in excess of the liability limits and UIM limits. Moreover, no medical payments reserve (CC04) was set.  No basis for this is stated in the claims file and this is contrary to what was known and documented in the file, as Allstate documented that Angelina Trailov would have considerable medical bills from the hospital in Bethel, the medical evacuation and the hospitals in Anchorage.  (See, Exhibits 4 and 12).

29.   By September 25, 2002, adjuster Vanzant had been assigned to the med pay claim.  She had been on this claim since September 16, 2002, and was assigned to be the med pay adjuster on September 23, 2002.  She knew it was a very serious claim and that liability was 100%.  She knew the Angstman law office represented Ms. Trailov and Mary Kenick.  (Exhibits 2, 9.)

30.   On September 26, 2002, Allstate adjuster Kathy Berry was assigned to the claim, as well as yet another claims supervisor, Karen Petersen.  Ms. Petersen reviewed the file and told Ms. Berry that she needed to notify Mr. Herron there was no coverage for punitive damages under the Allstate policy.  Ms. Berry was further directed to determine the extent of Angelina Trailov's injuries (04).  Ms. Petersen informed Ms. Berry there was 100,000/300,000 of liability coverage, plus

-9-

EXHIBIT ___5___
Page __9__ of __37__

medical payments coverage (CC).    (Exhibit15.)  Ms. Petersen did not advise, as she

should have, that under AS 09.60.070, a DWI constitutes grounds for assessment of

actual attorney fees that also would not be covered under the policy as a matter of

law.

31.    Thus, by September 26, 2002, adjuster Vanzant, adjuster Berry, claims

supervisor Craig Elkins, claims supervisor Karen Petersen, and claims manager Gary

Davis are were involved in this claim.  It is inconceivable that two adjusters and

three claims supervisory personnel are all involved in a claim that is supposedly a

$25,000 reserve liability claim and a zero medical payments reserve claim.  The

presence of all of these claims personnel again indicates that Allstate is well aware

that this is a very large and dangerous claim.

32.    On September 26, 2002, in spite of the nature of this claim, adjuster

Kathy Berry did <u>not</u> immediately announce her presence to the Angstman Law

Office. By law, this was supposed to be done within 10 working days after notice of

the claim, according to 3 AAC 26.040(b).  (Exhibit 14.)  She could have and should

have immediately sent out medical records releases to the Angstman Law Office,

as well.   She should have sought information on Ms. Trailov's injuries from the

Angstman Law Office.  Parental claims for loss of consortium and NIED are common

when minors are seriously injured.  These claims of Ms. Kenick should have been

considered, investigated and evaluated.

EXHIBIT 5
Page 10 of 37

33.    By law, the investigation of the damages should have been completed within 30 working days, unless more time is needed and reasons are given.  See, 3 AAC 26.050.  (Exhibit 14.)  Liability was already assessed at 100%.  It was incumbent for adjuster Berry to move quickly on this large claim or to inform the Angstman Law Office that she needed more time and why.  She should have requested the help, aid, and assistance of the plaintiffs' attorney.

34.    On October 1, 2002, adjuster Scott Millar was assigned to the med pay claim, taking Vanzant's place.  Between September 25, 2002, and October 1, 2002, Vanzant did not recognize the med pay claim.  She did not notify the Angstman Law Office of her presence, or disclose the med pay coverage to that office.  She did not send out medical records releases to that office, as she should have immediately done.

35.    By law, Scott Millar also should have immediately notified the Angstman Law Office of the med pay coverage and the presence of Mr. Millar as the med pay adjuster.  A med pay adjuster is required to identify himself within 10 working days, according to 3 AAC 26.040(a).  (Exhibit 14.)   His investigation was required by law to be complete within 30 days unless he requested more time and gave reasons.  3 AAC 26.050 (Exhibit 14.)  Mr. Millar also should have sought med pay releases.  As will be seen below, Scott Millar never sent out any medical releases and he did not disclose his presence as the assigned med pay adjuster and

-11-

did not disclose the med pay coverage or complete his investigation for nearly eight months.

36. On October 18, 2002, three weeks after she was assigned, adjuster Berry announced her presence as the liability adjuster. There is no legitimate reason for this delay on a large claim like this. Further, she did not send out a medical records authorization, though her letter said it was attached. (Exhibit 19.)

37. By October 30, 2002, more than 30 working days had passed. Both Allstate adjusters should have and could have easily secured medical records releases and interviews of Ms. Kenick and Ms. Trailov from the Angstman Law Office. The medical bills should have been secured and paid by this time. The damages investigation should have been complete. Damages could easily have been confirmed for Trailov's claim as in excess of the liability coverage, as indeed, Allstate's early actions indicate was Allstate's immediate assessment. Medical bills should have been paid.

38. By October 30, 2002, the liability limits of $100,000, plus Rule 82, should have been offered on Ms. Trailov's claim. A settlement of Ms. Kenick's claims should have been offered, as well, as an investigation would easily have revealed Ms. Kenick was at the hospital and in the evacuation aircraft and observed Angelina in extremis. Given the liability facts and venue, she had serious claims.

-12-

EXHIBIT____5____
Page _12_ of _37_

39.   By October 30, 2002, Mr. Herron should not only have been told that punitive damages were not covered by the policy, as supervisor Petersen ordered on September 26, 2002, but Herron also should have been informed he was exposed to an excess judgment by this date, including a judgment that could include uncovered actual attorney fees under AS 09.60.070.  Allstate was well aware of its own exposure to not only a UIM claim, but also a potential "failure to offer UIM" claim, and it took steps to investigate and inform itself of its UIM exposure, but it did not do likewise for Mr. Herron.

40.   Adjuster Berry and Allstate were inexcusably negligent in not promptly investigating, and evaluating the claims relating to Angelina Trailov and Mary Kenick by October 30, 2002.  Allstate and its adjusters knew how to promptly secure medical records and bills.  Allstate had been aware of this claim since September 16, 2002, and yet, between that date and October 30, 2002, Allstate did absolutely nothing to interview Kenick or Trailov or to secure medical records and medical bills, though it had two adjusters assigned to this task and two claims supervisors supposedly supervising them.  Berry had the assignment to investigate damages by September 26, 2002, and she did nothing but send a letter. This conduct is well below the industry standards.  (See, Exhibits 14, 17.)

41.   Allstate and Berry  were negligent in not informing Mr. Herron of his excess exposure to compensatory damages, punitive damages, and AS 09.60.070 exposure.  They were negligent for not offering the liability limits on Angelina

-13-

EXHIBIT  5

Page 13 of 37

Trailov by October 30, 2002.  Liability was assessed at 100% on September 21, 2002.  This was a simple claim to evaluate in excess of $100,000 of bodily injury coverage, and the likelihood of an excess judgment was easily determined.  A 15-year-old girl with a basal skull fracture, lung and back injuries, and a drunk driver in Bethel, Alaska, could easily equate to an excess judgment.  This conduct was below industry standards, and especially so for what was identified very early on as a likely large excess claim, in excess of the liability and UIM coverages.  A substantial offer should have been made on Mary Kenick's claims.  This could have also assisted settling Trailov's claim.

42.  On November 14, 2002, nearly 60 days after Allstate was aware of this claim, adjuster Berry finally sent out a medical records release after a review by supervisor Elkins occurred on November 7, 2002.  He ordered her to coordinate with med pay adjuster Scott Millar.  (Exhibit 19.)

43.  On November 25, 2002, the medical records release was returned.  Thus, once requested, Allstate and Berry got a medical records release within 10 days.  However, adjuster Berry did not promptly send out the medical release.  Med pay adjuster Scott Millar similarly continued to do absolutely nothing and remained silent and invisible.  With this release, Berry and Millar could have easily gotten the lion's share of the medical records and bills from Alaska Regional within a few days.  As set forth below, Allstate and Berry later claimed they needed a special release for Alaska Native Medical Center, but did not send one.  (Exhibit 20.)

EXHIBIT___5___
Page _14_ of _37_

44.   On December 12, 2002, Ms. Power informed adjuster Berry that Ms. Trailov was going to be examined by neuropsychologist Dr. Paul Craig for a brain injury on December 17, 2002.  (Exhibit 21.)

45.   By December 31, 2002, adjuster Berry, adjuster Millar, and Allstate had still done nothing to secure the medical records and bills. They had not requested medical records from the Angstman Law Office or the help of that office in getting medical records.  They made no effort to contact Dr. Paul Craig to secure his opinion on Ms. Trailov's brain injury, his records or his bill with the medical release they had.  They had done nothing to contact the Angstman Law Office for an interview of Angelina Trailov and Mary Kenick or any of the physicians involved. Allstate and Berry had made no attempt to evaluate the full damages of Angelina Trailov or Mary Kenick.  A parent of a injured minor child obviously may have potential loss of consortium and NIED claims.  Investigation would have shown Mary Kenick promptly went to the Bethel hospital when she was informed Angelina was there, that she perceived Angelina's potentially life-threatening injuries, and that she was with Angelina when she was evacuated to Anchorage.   Dr. Craig's report enhanced the value of Mary Kenick's claims a great deal.  Brain damage was known to have occurred, and this increased the likelihood of an excess verdict for Mary Kenick.

46.   By December 31, 2002, two claims supervisors and a claims manager had been on this claim with the two adjusters for three months.  No supervisor

-15-

EXHIBIT  5
Page 15 of 32

expressed any concern with the lack of investigation and lack of evaluation by Berry and Millar. None of the supervisors expressed any concern with failure to advise Mr. Herron of his punitive damages exposure or his exposure to excess liability. None expressed any concern that an offer of liability limits should be made to protect Herron. No effort is documented that any effort was made by supervisors to expedite the investigation or to correct the situation. No effort was made by supervisors to require the med pay adjuster Scott Millar to announce himself, secure medical records and bills, and pay the medical bills that Allstate knew existed.

47.    Under industry standards, timeliness is very important to adjusters and supervisors. Supervisors are responsible for assuring timeliness. Frequent regular progress updates would have been required of Ms. Berry and Mr. Millar. Medical bills would be normally secured and paid no later than 30 days after the medical bills were known to exist. The supervisors would normally have diaried regular reviews of the claim file, and in this case, I would have expected numerous reviews by the supervisors from September 16, 2002, to December 31, 2002. Yet, over a period of three months, the only supervisory action by supervisor Elkins to adjuster Berry was to direct that the medical release be secured. This was a release that Berry later claimed was insufficient. Supervisor Petersen did nothing to follow up on her orders that damages be investigated and Mr. Herron be informed of no punitive damages coverage. The supervisors ignored clear breaches

-16-

EXHIBIT 5
Page 16 of 37

of the Unfair Claims Practices regulations by Berry and Millar. They ignored the complete lack of investigation and evaluation of the damages. Given Allstate's initial recognition of potentially very large damages, there should have been close, regular supervision. (Exhibit 19.)

48.    By December 31, 2002, it is clear that Berry is grossly negligent and that Allstate is acting in bad faith toward Mr. Herron. Allstate's clear concern over its UIM exposure created a conflict of interest with Mr. Herron's interest in being protected from an excess judgment. Allstate did not disclose this conflict of interest — *i.e.*, if Allstate pays the liability policy limits and secures a release to protect Mr. Herron, they will have triggered the UIM coverage, which may well extend to $1,000,000/$2,000,000, rather than the $100,000/$300,000.

49.    From September 26, 2002, to December 31, 2002, Allstate and Berry were "slow-rolling" the liability claims by not properly investigating, evaluating and offering the liability limits. Allstate's major purpose was to avoid paying the liability limits, as this would trigger the UIM coverage. All of its actions were consistent with protecting its UIM interests at the expense of Mr. Herron, by not paying the obvious liability limits claim. Further evidence of this intent to protect Allstate's interests at the expense of Mr. Herron is that Allstate was not disclosing the med pay coverage or paying the med pay claim and Mr. Millar was invisible, although assigned to adjust that claim. This is consistent with trying to not pay the med pay coverage and trying to bring financial pressure on the injured victim's

-17-

EXHIBIT 5
Page 17 of 37

family, and thus, perhaps induce a less than liability limits settlement. Further, although Allstate itself recognized UIM exposure and investigated its UIM offer documents, it never disclosed UIM coverage to the Angstman Law Office at any time.

50.    In my opinion, it is clear that by no later than December 31, 2002, Allstate was acting in bad faith, as it had put its interests in seeking to avoid UIM liability and seeking to not pay med pay coverage far above the interests of Mr. Herron.  Allstate should have quantified and offered its full liability limits for the claims of both Angelina Trailov and Mary Kenick by this date and there is no legitimate excuse for not doing so in the record.  There was a substantial risk that those claims in Bethel would exceed the liability limits of $100,000 for Angelina and the $100,000 for Mary.  Further, by this date, Mr. Herron should have been advised of his excess exposure in relation to compensatory damages covered by the policy, as well as the punitive damages and AS 09.60.070 attorney fees not covered by the policy.

51.    On January 17, 2003, adjuster Berry asked for a second medical release. Nearly four months after she was assigned to this claim, she "discovered" that Alaska Native Medical Center required its own release.  I find this to be not credible, to say the least, considering many Alaska Native people are involved in automobile crashes and are treated at ANMC.  Berry, Millar, Elkins and Petersen

-18-

EXHIBIT 5
Page 18 of 37

were all no doubt well aware of ANMC requirements. This was more bad faith "slow roll". (Exhibit 22.)

52. By January 17, 2003, adjuster Berry had a release by which she could have easily gotten the Alaska Regional records and bills. She did not do so. She claimed to have gotten the Y-K hospital records, but there is no record she did so that I could see.

53. On February 6, 2003, Dr. Craig faxed his neuropsychological report to the Angstman Law Office. It was available to Allstate with the release it had secured on November 25, 2002. Allstate never contacted Dr. Craig's office for his report. (Exhibit 23.)

54. On February 10, 2003, Allstate received the ANMC medical release from the Angstman Law Office. (Exhibit 24.)

55. On February 18, 2003, Allstate received a demand from the Angstman Law Office. On behalf of Angelina Trailov, that office offered to settle Angelina Trailov's claims for the liability limits. The Angstman Law Office also offered to settle the NIED claims of Mary Kenick for an additional liability limit. Allstate had not previously considered the potential claims of Mary Kenick, though an NIED claim is well recognized in Alaska and is very foreseeable for the parent of a brain-injured minor. A parent's loss of consortium claim is also foreseeable. Both should have been investigated and evaluated long before February 18, 2003.

-19-

EXHIBIT  5
Page  19  of  37

Medical bills totaling over $30,000 were attached.  Medical records from Alaska

Regional and ANMC were attached.  (Exhibit 25.)

56.  A policy limits demand is a red flag in the insurance claims industry.

Adjuster Berry should have recognized the need to immediately address this

demand. She should have recognized that the demand was an opportunity to

protect Mr. Herron.  It was also an opportunity for Berry, Elkins, Petersen, Davis,

and Allstate to correct the negligence and bad faith that had occurred.

57.  The claims file reflects no activity from January 17, 2003, to March 3,

2003.  Receipt of the very important policy limits offer is not even noted in the

claims file.  (Exhibit  27.)

58.  On  March 3, 2003, supervisor Elkins designated the file as a

"Mandatory Home Office Referral" file due to "brain damage". This was belatedly

the official recognition that this file must be referred to the Home Office for its

guidance, as the damages are very likely in excess of the policy limits.  This excess

exposure was recognized in September, 2002, and a Home Office Referral should

have occurred then.  It must be noted that it took Allstate's receipt of the medical

records and medical bills from the Angstman Law Office on February 18, 2003, to

force Elkins to recognize the likely excess claim 13 days later. Allstate had the

claim for five and one-half months and had still not gotten the medical records and

medical bills. (Exhibits 25, 27.)

-20-

EXHIBIT  5
Page 20 of 37

59.  The Allstate Home Office Referral procedure mandated that a report and information on the claim be sent to the Home Office within no more than 14 days. This "Large Loss" or "Critical Claim" procedure is typical of insurers faced with a very large damages claim that endangers the liability insured.  Insurers want to have their most experienced and senior claims personnel supervising such claims, so as to assure that things are done properly.  In this case, the Home Office claims personnel were required to be informed and consulted for direction.  Until that was done, Kathy Berry and the Allstate personnel in Anchorage could not settle the claims of Angelina Trailov and Mary Kenick, as Home Office approval of any course of action was required.  (Exhibit 28.)

60.  March 17, 2003, came and went without the mandatory Home Office Referral report.  This was two weeks after the Home Office reporting designation. This was not rocket science.  It was mandatory that the claim facts and the state of the file be reported to the Home Office within 14 days, per Allstate's own procedures.  An example of an Allstate Home Office referral is attached as Exhibit 29.  Berry negligently failed to follow Allstate's mandatory Home Office Referral procedure and as a consequence, the policy limits offer cannot be accepted according to that same procedure until such a referral is completed.  (Exhibits 28, 29.)

61.  On March 17, 2003, adjuster Berry wrote to the Angstman Law Office and acknowledged the policy limits offer received nearly one month earlier.  This

-21-

EXHIBIT 5
Page 21 of 37

is far too long to acknowledge such an offer.  Whereas adjuster Berry indicated in

January that she needed another medical release, she now claims to not have

enough medical records on the claims that she has now been on for six months.

She requests records for Angelina's treatment after she returned to Bethel.  She

does not request Dr. Craig's report and she does not ask Dr. Craig for that report.

Nor does she ask for an IME to evaluate Dr. Craig's report.  (Exhibit 30.)

62.  On March 17, 2003, for the first time, adjuster Berry finally requests

medical records from ANMC.  No similar request is in the file for Alaska Regional

records or Y-K records and it appears Berry and Allstate never did request records

from them.  Requesting medical records six months after a liability claim file is

opened is very negligent, and far beyond acceptable industry standards.  (Exhibit

31.)

63.  On March 18, 2003, for the first time, adjuster Berry requests a medical

bill from ANMC.  (Exhibit 31.)  It is very negligent and far beyond industry

standards to finally be requesting a medical bill six months after a liability and

medical payments claim is opened.

64.  On March 18, 2003, adjuster Berry also writes to Charles Herron for the

first time.  She informs him of the policy limits offer and falsely claims to not have

enough information to evaluate the claims.  Of course, she does not disclose

Allstate's continuous refusal to secure  medical records.  Almost the entire two-

page letter finally informs him that Allstate will not pay punitive damages, though

-22-

EXHIBIT 5
Page 22 of 37

supervisor Petersen directed her to do this almost six months earlier. Berry and Allstate do not inform Herron that he is exposed to an excess judgment or that he is exposed to actual attorney fees not covered by Allstate's insurance due to AS 09.60.070. She does not tell him that her failure to comply with the Home Office Referral procedure prevents acceptance of the offer which would extinguish any exposure to Mr. Herron. (Exhibits 15, 32.)

65.  Given Allstate's previous conduct, given the obvious nature of these claims, and given the known excess exposure to Mr. Herron, by no later than March 18, 2003, Allstate and Berry should have completed the mandatory Home Office referral process, secured authority to accept the policy limits offers, and accepted those offers as to both Angelina Trailov and Mary Kenick. Supervisor Elkins absolutely should have diaried March 18, 2003, as the date for completion of the referral and, given the state of this file, he should have made sure that referral was done and authority received from the Home Office well before March 18. It was negligence not to do so.

66.  Further, it was bad faith not to accept the policy limits offers. It is clear that Berry and Allstate continued with the "slow roll", falsely claiming not to have enough medical records. They continued not to disclose the medical payments coverage. They continued to conceal the true facts as to the lack of investigation. They continued to conceal Allstate's agenda of seeking not to pay UIM and medical payments coverage at the risk of an excess judgment to Herron.

-23-

EXHIBIT 5
Page 23 of 37

It is notable that after the policy limits demand, Allstate and Berry made no attempt whatsoever to interview Angelina, Mary or Dr. Craig. They did not ask for an IME (Independent Medical Exam) or a medical review of Dr. Craig's report, or either, though this is the commonly accepted procedure in the claims industry if an adjuster has doubts about a claimant's injuries. This was bad faith, as Allstate continued to put its interests before the interests of Herron, continued to pretend to be unable to evaluate these claims, and to not make disclosures to him, including as to his excess exposure.

67.    Having placed a roadblock to settlement by failure to comply with the Home Office Referral procedure, Allstate did not secure a definite time period for the policy limits offers to remain open. There was no guarantee the Angstman Law Office would not revoke that offer, and Elkins and Berry should have asked for a definite guaranteed time for the offer to be open. Berry and Allstate were both negligent in this regard.

68.    On March 26, 2003, Allstate received the ANMC records, less than 10 days after they were requested. (Exhibit 33.) On this date, Mr. James Valcarce appears as the attorney for Charles Herron and tells Allstate that it should settle for policy limits and that if it does not, it will be liable for any excess judgment, including punitive damages. Astonishingly, Allstate never replies to this letter to acknowledge Mr. Valcarce and it does not make any disclosures to him. (Exhibit 34.)

EXHIBIT 5
Page 24 of 37

69.  On April 14, 2003, a letter dated April 10, 2003, is received from the Angstman Law Office that informs Berry and Allstate that the policy limits offers will be revoked on May 16, 2003.  The letter informs them that Mary Kenick's claims for emotional distress are real and substantial.  The impact of Angelina's brain injury on Mary is outlined, and documents are attached, verifying that Mary had to leave her job for a less stressful and less paying job in order to cope with that emotional distress.  (Exhibit 35.)

70.  On May 6, 2003, supervisor Elkins finally notices that adjuster Berry has not complied with his direction of March 3, 2003, to undertake a Home Office Referral and he asks her to advise him as to the status.  This is incredibly negligent supervision.  The Home Office Referral procedure required completion within 14 days.  It stated that "...there must be no delay in transmitting the information to the Home Office."  Mr. Elkins or Ms. Petersen were required to undertake "an in-depth file review of the file handling and content — as to timeliness and adequacy of investigation and reserves, liability analysis, further action planned, etc."  He/she were required to prepare a cover memorandum as to whether he agreed with the file handler and as to the file development.  The failure to do any of these in a timely manner, and to see that the Home Office Referral was complete in no less than 14 days, was very negligent.  As a part of the Home Office Referral process, Berry and Elkins or Petersen were required to seek settlement authority

EXHIBIT 5
Page 25 of 37

from the Home Office if they wished to make a settlement offer or accept one. (Exhibits 36, 28.)

71.    On May 9, 2003, Berry finally acknowledges the April 10, 2003, letter. She states that Allstate recognizes that May 16, 2003, is a deadline and that Allstate intends to respond as to Angelina Trailov, but once again, the old "slow roll" occurs as to Mary Kenick. Ms. Berry says she needs more documentation to prove Mary Kenick's emotional distress.  She does not seek to interview Mary, however.  A mother's emotional distress as to her minor daughter's injuries on the night of September 14, 2002, and thereafter is not something that needs paper to prove it.  An interview is required to evaluate such damages if one has any doubts. (Exhibit 37.)

72.    The May 9, 2003, letter did not disclose the May 16, 2003, deadline to attorney Valcarce, because Berry did not send him a copy of her letter, nor did she send him a copy of the April 10, 2003, from the Angstman Law Office.  This is shocking conduct.  Valcarce had already expressed his concern over settling the case within policy limits and yet, he is not told there is a deadline.  Berry does not expressly advise Herron of the deadline, nor does she send him a copy of the April 10, 2003, letter, but rather, only sends Herron a copy of Berry's letter of May 16, 2003. Once again, this is terribly negligent conduct.  (Exhibit 37.)

73.    By May 9, 2003, Allstate had not yet submitted the Home Office Referral. This is shocking, given that it was due March 18, 2003, and yet no effort

-26-

EXHIBIT  5
Page 26 of 37

was made to expedite the mandatory referral, even though Berry is claiming Allstate intends to comply at least as to Angelina. Berry and Elkins could have easily called or e-mailed the Home Office and faxed documents. The Home Office Referral procedure makes it clear that speed of information is the most important element, not completion of paperwork. Given later events, this appears to me to have been more deceptive bad faith conduct where Allstate is trying to appear as if it is acting appropriately when it knows it has not and will not act in good faith.

74.   On May 12, 2003, for the first time, medical payments adjuster Scott Millar (SSM) appears and pays the entire $25,000 of medical payments coverage. In the previous eight months, neither adjuster Vanzant or Millar had disclosed this coverage, recognized a med pay claim, sought a medical records release, or paid any medical bills. Supervisor Elkins never criticized either adjuster or ordered them to comply with their duties. Millar literally drops out of the sky with two checks for $25,000. This was clearly first-party bad faith as to Angelina Trailov and Mary Kenick. However, it also indicates Allstate's bad faith toward Herron. Millar's only job was to secure medical records and medical bills. Yet, if he did his job, Allstate could not perform the "slow roll" and claim it did not have medical bills and records to evaluate the liability claim. If it investigated those claims, it would be obvious on paper that they were in excess of the liability limits. That would trigger the UIM claim that Allstate wanted to conceal and avoid. There is no possibility that Millar was not part of an intentional, coordinated, and bad faith

-27-

EXHIBIT 5
Page 27 of 37

effort to not investigate these claims. He withheld and did not pay the med pay coverage and this caused financial distress to Mary Kenick. This enhanced the possibility of forcing Kenick to settle for less than the liability limits. It appears that Allstate only finally paid the medical payments coverage because it recognized it was in a very precarious position, with a deadline approaching, and it needed to try to look as if it was acting in good faith. (Exhibit 38.)

75. On May 15, 2003, the Angstman Law Office sent more of Kenick's wage records to Berry. (Exhibit 39.)

76. On May 16, 2003, adjuster Berry's letter to the Angstman Law Office announced that Allstate had not completed its evaluation of Angelina's claim, that it should complete that evaluation by the end of the month and that a response may occur before that time. Thus, the deadline was allowed to lapse without any notice to attorney Valcarce and Herron that this was going to occur. (Exhibit 40.)

77. It was negligent of Berry and Allstate not to have completed an evaluation of these claims eight months after notice of the crash. It was negligent not to have completed the Home Office Referral procedure, so as to secure authority to accept the policy limits offers.

78. It was bad faith for Allstate to not notify Valcarce and Herron, before the deadline lapsed, as to Allstate's intent to let it lapse without accepting the policy limits offers. It was bad faith to not notify Valcarce and Herron of Herron's exposure to an excess judgment by allowing the deadline to lapse. By not

-28-

EXHIBIT __5__
Page _28_ of _37_

notifying Valcarce and Herron, Allstate deprived Herron of the opportunity to settle these claims himself. Herron's family had resources and could possibly have settled one or both of these claims. It was bad faith not to investigate, evaluate and accept the policy limits offers by May 16, 2003.

79.    On May 20, 2003, Berry and Allstate finally e-mail the mandatory Home Office Referral to Mr. Joe Grazulis of the Home Office. The referral form is not in the claims file. Only the transmittal e-mail is in the file. The required memorandum by Elkins or Petersen is not in the file. An example of a Home Office Referral by an adjuster from another file is attached as Exhibit 29. Thus, over two and one-half months after Elkins ordered the mandatory Home Office Referral due to "brain damage", it was finally made. (Exhibit 41.)

80.    On May 20, 2003, Grazulis replies by e-mail to the Home Office Referral. He stated he had reviewed a summary and CDS screens. These are not in the claims file produced by Allstate to Mr. Valcarce. It is clear that Grazulis is not happy with the belated Referral. He indicates that there still has been no evaluation and he reserves judgment pending a damages evaluation from the Anchorage Office. (Exhibit 41.)

81.    On May 28, 2003, adjuster Berry returns a call to attorney Valcarce. This is the first time she has spoken to him. She does not advise him of the May 16, 2003, deadline or that Allstate blew it. Instead, she says "We are to respond to the attorney by the end of the month." According to her note, Valcarce felt

-29-

EXHIBIT 5
Page 29 of 37

Angelina's claim was worth limits and mom's was not, according to what he knows. Nothing is indicated as to "what he knows." (Exhibit 42.)

82.   On May 29, 2003, claims supervisor Karen Petersen appears, and the first thing she does is tell Kathy Berry and "Lori" that Allstate needs to open the SU (UIM) coverage. In other words, Petersen recognized Angelina has a UIM claim and she orders that the coverage be opened. A UIM reserve was required to be established, but none is reflected in the file. She states medical bills are over $39,000 and there is a significant objective injury. She orders that authority to settle be sought from the Home Office with "EC recommendations in 09-PF8 screen". The EC was Elkins or Davis. These are not in the claims file. Numerous redactions are in this note by Petersen and part of it is missing altogether. (Exhibit 43.)

83.   Petersen goes on to consider Kenick's NIED claim not only as a liability claim, but also as a UIM claim. She opines that Kenick would not be covered under UIM, a position that is clearly incorrect. The Allstate policy stated that persons with claims due to the injuries to another Allstate UIM insured were also considered to be UIM insureds. However, the very fact she is considering UIM coverage is evidence Petersen considered that Kenick's claim could be in excess of the liability limits. An attorney's view of the NIED claim passing legal muster is also referred to, but the attorney is not identified. The long note by Petersen clearly reflects that further investigation needs to be done to determine when

-30-

EXHIBIT 5
Page 30 of 37

Mary got to the hospital and how she was affected. In eight months, Allstate had not attempted to get this information. The note is cut off at the part where Petersen is relating that further investigation is needed or anticipated. (Exhibit 43.)

84.    In summary, on May 28, 2003, without any more information than Allstate had on February 18, 2003, Petersen recognizes Angelina's claim is in excess of the liability coverage, that Mary's claim could be in excess of the liability coverage, that Allstate has UIM exposure in relation to both Angelina and Mary, that UIM coverage must be opened for Angelina's UIM claim, and she opines that Mary is not a UIM insured — but is incorrect in that regard — and that Mary's claim needs more investigation before it can be finally evaluated. (Exhibit 43).

85.    On May 29, 2003, attorney Doug Johnson of the Mestas Law Office sent a letter to Allstate. The letter noted that Allstate had eight months to investigate and settle the claims against Mr. Herron and that a time-limited offer that lapsed on the May 16, 2003, deadline had not been accepted. It informed Allstate that no further policy limits offers for the claims against Mr. Herron would be made or accepted. It offered to settle the claims for their value. (Exhibit 44.)

86.    On May 30, 2003, Allstate faxed a letter to the Angstman Law Office. The very broad and vague letter states it is "in regard to your interest in settling Angelina Trailov's bodily injury claim and Mary Kenick's NIED claim". It does not refer anywhere to the previous February 14, 2003, and April 10, 2003, offers by the

-31-

EXHIBIT  5
Page 31 of 37

Angstman Law Office to settle the claims against Mr. Herron. It does not characterize or state an offer to settle the claims against Mr. Herron. It does not say an offer is being made on behalf of Mr. Herron. It does not characterize the offer as a liability limits offer, nor does it refer anywhere to liability claims or liability coverage. Moreover there is no disclosure of UIM coverage or a UIM claim, though on May 28, 2003, Allstate had clearly opened this coverage in relation to Angelina Trailov and considered UIM coverage in relation to Mary Kenick, but found no coverage. (Exhibit 45.)

87. Of course, Allstate owed a duty to immediately disclose the UIM coverage, Angelina's UIM claim, and Allstate's decision to deny UIM coverage status to Mary Kenick. The May 30, 2003, letter (Exhibit 45) was an opportunity for Allstate to do this and act in good faith on the UIM issue. It did none of these and it acted in bad faith as to Trailov and Kenick by concealing these UIM coverages and UIM claims.

88. Instead, the May 30, 2003, letter makes an offer to pay $112,500 "as full and final settlement of Ms. Trailov's bodily injury claim". Of course, this very broad language includes Trailov's undisclosed UIM claim and possible "failure to offer UIM" claim. The letter further states: "With regard to Mary Kenick, we are prepared to offer $10,000 inclusive as full and final settlement NIED claim expeditiously." This language would also include any UIM claim by Mary Kenick, including a "failure to offer UIM claim". The letter indicates that if this is not

-32-

EXHIBIT 5
Page 32 of 37

satisfactory, Allstate will require yet more documentation regarding a wage loss. No release was attached. (Exhibit 45.)

89.  This May 30, 2003, letter was not a good faith offer to settle the liability claims to protect Mr. Herron.  Coupled with it was the concealment of the UIM coverage, concealment of Angelina's UIM claim, concealment of a possible "failure to offer UIM" claim, concealment of Mary Kenick's possible UIM claim and possible "failure to offer UIM" claim, and concealment of Allstate's decision to deny UIM coverage status to Mary Kenick.

90.  Allstate adjusters and supervisors know how to clearly identify coverages that are being offered, whether they are liability coverages, med pay coverages or UIM coverages.  They know how to disclose UIM coverage and claims. An adjuster is expected to clearly identify the coverage that is being offered, and nothing in the May 30, 2003, letter does that.  It appears that Allstate was trying to create a position that, if the offer was accepted, it had settled the undisclosed UIM claims along with the liability claims and without paying anything for such claims.  In relation to Mr. Herron, it was not a good faith attempt to protect Mr. Herron, but rather, an attempt to protect Allstate itself with no regard to the exposure it was creating for Mr. Herron.

91.  By May 16, 2003, Allstate had engaged in numerous breaches of the duty of good faith and fair dealing in relation to Mr. Herron, including: acting to protect its own interests rather than Mr. Herron's due to Allstate's concern over its

EXHIBIT  5
Page 33 of 37

UIM exposure, its failure to disclose Allstate's concern to protect its UIM interests and med pay interests, its failure to timely investigate and evaluate the damages of Angelina Trailov and Mary Kenick, its failure to advise Mr. Herron of his exposure to an excess judgment on both claims, its failure to advise of Herron's exposure to AS 09.60.070 attorney fees not covered by the policy, its misrepresentation that it was unable to evaluate the claims, its failure to timely quantify and offer the liability limits on both claims, its failure to accept the offer to settle both claims for the liability limits before May 16, 2003, its failure to disclose the May 16, 2003, deadline to Herron and Valcarce, its failure to disclose that Allstate's failure to follow its Home Office Referral procedures was preventing a settlement, its failure to disclose Allstate's intention to not comply with the deadline to Valcarce and Herron, its failure to advise Herron and Valcarce of the potential excess liability consequences of doing that, and its failure to allow Herron the opportunity to protect himself by settlement of one or both claims before the May 16, 2003, deadline passed.

92.    These bad faith actions prior to and on May 16, 2003, prevented both claims from being settled on or before May 16, 2003.  Prior to and on May 16, 2003, Allstate repeatedly and unreasonably squandered clear opportunities to settle these claims within the liability limits.  The actions of Berry and all the other Allstate personnel were repeatedly unreasonable, and clearly all were motivated by Allstate's interests to not place a value on the liability claims that would trigger

EXHIBIT __5__
Page _34_ of _37_

UIM coverage, to resist investigating that value and the medical records and bills as long as possible, and to resist revealing or paying medical payments coverage that would have resulted in Allstate having to investigate the medical records and bills. Allstate and its personnel then were trapped by their non-compliance with Allstate's own internal Home Office Referral procedure, but no disclosure of this trap of Allstate's making was ever made to Valcarce or Herron. Allstate sacrificed Mr. Herron to protect its own interests. The Allstate offer of May 30, 2003, was also a bad faith offer, as noted above.

93.    After May 30, 2003, litigation ensued. I cannot tell exactly what occurred in May - August, 2003, in relation to Allstate, to Mr. Wilkerson or other attorney actions, as the record is incomplete. I would question any attorney advising an insurer as to the insurer's own liability and/or in relation to the insurer's claims handling actions and then allowing himself to be appointed to be the insured's counsel without disclosing the conflict of interest, but I cannot tell if that occurred. Certainly, the Privilege Log and claims file reflect an attorney representing Allstate was involved before Mr. Wilkerson announced he had been appointed as Herron's lawyer, and no other lawyer has been revealed.

94.    I am also unable to tell what Allstate was thinking and doing after May 30, 2003, as the claims file has been withheld, except for a few cryptic entries. I have reviewed the correspondence relating to the offer to settle Mary Kenick's claim that occurred in March of 2004. According to a letter from the Law Office of

-35-

EXHIBIT 5
Page 35 of 37

Mark Wilkerson dated March 11, 2004, and a letter from the Angstman Law Office dated March 25, 2004, an offer was made by the Angstman Law Office to settle all claims of Mary Kenick for $50,000. Allstate, thus, had an additional nine months to investigate and evaluate those claims. Allstate did not reveal to Mr. Valcarce what its intentions were in relation to responding to this offer. Allstate merely indicated it had given mediator James Hansen authority to respond. Instead of accepting this more than reasonable offer, Allstate rejected this offer and counter-offered with $25,000. (Exhibits 60, 61.)

95.    Again, it appears that by March 25, 2004, Allstate again breached the duty of good faith and fair dealing by not informing Valcarce and Herron of Allstate's intentions before the offer was rejected. Herron was thus deprived of the opportunity to protect himself from Mary Kenick's claim that included not only compensatory damages for loss of consortium and NIED, but also punitive damages and liability for actual attorney's not covered by the policy under AS 09.60.070.

96.    For the reasons stated above, it is my opinion that Allstate and Berry repeatedly breached their duties Mr. Herron. The claims handling demonstrated in this claims file reflects reckless indifference and/or intentional disregard in relation to the interests of Mr. Herron.

-36-

EXHIBIT 5
Page 36 of 37

DATED this 29th day of November, 2004.

ROBERT WAINSCOTT

SUBSCRIBED AND SWORN TO before me this 29th day of November, 2004.



Notary Public in and for Alaska
My Commission Expires:    03/19/06

-37-

EXHIBIT 5
Page 37 of 37