## Kenick and Trailov vs. Allstate and Kathy Berry

### Expert Witness Report of Robert N. Wainscott

In June of 2003 I was asked to review insurance issues in an automobile loss for plaintiff counsel on behalf of claimants Trailov and Kenick. I was advised that Trailov and Kenick had automobile liability injury claims against Mr. Herron, an Allstate insured. After reviewing some initial documents I agreed to be retained on behalf of the claimants.

Prior to preparing this report I reviewed the documents listed as attachment 1. In preparing my report I relied upon the documents, my 37 years of claims adjusting and supervisory experience, and applicable Alaska statutes and Supreme Court decisions.

Also attached to this report is my C.V., a list of the cases in which I have testified over the past four years and my rate schedule.

### FACTS OF THE ACCIDENT

On September 13, 2002, between 7:00 and 8:00 P.M., a group of young people began to gather in a sand pit near the Bethel airport to "party". Sometime between midnight and 1:00 A.M., Angelina Trailov and Tracy Faulkner decided to leave the party and asked Charles Herron to drive them home. Mr. Herron agreed. The threesome was joined by Angelina's cousin, Russell Pollack.

Charles Herron was driving a 1985 Subaru owned by Charles' father, Robert E. Herron. Russell took the front passenger seat, Angelina the left rear, Tracy the right rear and Charles was in the driver's seat. The occupants had all been drinking at the party; none of them were old enough to legally consume alcohol.

At deposition, Charles testified he turned to look at or talk to Angelina as they were leaving the sand pit and lost control of the vehicle. The left rear of the Subaru struck a utility pole in close proximity to Angelina. The Subaru was a total loss and was inoperable after the impact.

Everyone in the vehicle was injured. Angelina was the only occupant whose injuries were life threatening. Due to her position in the vehicle, relative to the point of impact, she sustained extensive injuries including a loss of consciousness, a broken rib, a punctured and partially collapsed lung, a basal fracture of the skull, abrasions and lacerations to her arm and an injury to her back.

Exhibit 6
Page 1 of 20

1
600007

Angelina stopped breathing on two separate occasions at the accident scene. Charles Herron administered C.P.R. on both occasions, in all probability saving her life. Some time shortly after the impact, a vehicle driven by Nathaniel David left the party, came upon the accident scene and drove Angelina, Charles and Russell to the Y-K hospital.

Angelina's mother, Mary Kenick, was immediately notified of the accident by one of Angelina's friends. She arrived at the hospital and found Angelina bleeding and hysterical. Angelina received treatment at the Bethel facility, then, because her injuries were so severe, she was quickly medivaced by jet to Anchorage. She was placed in an induced coma before being transported to ANMC, accompanied by her mother.

Due to the nature of her injuries she was transferred from ANMC to Alaska Regional Hospital. Ms. Kenick remained with her daughter 24 hours a day. At Alaska Regional Ms. Kenick was advised Angelina's condition could necessitate a six hour surgical procedure if she did not improve.

Angelina's condition improved, the surgery was not required, and, after two days, she was transferred back to ANMC. She was discharged approximately one week later. A few days after her release from ANMC she returned to Bethel where she was plagued with headaches, back pain, memory loss, personality changes, fatigue, visual problems, and irritability as a result of the injuries sustained in the accident.

Mr. Herron was arrested and charged with a DWI and assault. His recorded blood alcohol level was measured at .146.

APPLICABLE COVERAGES INVOLVED

The Herron vehicle was insured under Allstate Policy number 0-20-469309-12/16. The coverage policy period was 6/16/02 through 12/16/02. Four vehicles were listed on the policy, including the 1985 Subaru involved in the accident.

The VIN# for the Subaru is JF1AF21BXFA115695. Coverage are listed on the policy declaration page as BI $100/$300,000, PD $50,000, MP $25,000. "Uninsured Motorists Insurance Coverage for Bodily Injury" is reflected as $100,000/$300,000.

Neither the Declarations page of the policy nor the policy language indicates any coverage for Underinsured Motorist Coverage or UIM.

Exhibit 6
Page 2 of 20

Equally significant is the absence of a signed waiver, (acceptance or rejection) by the insured for optional U limits.

ALLSTATE'S INITIAL HANDLING OF THE CLAIM

The accident was reported to Allstate on September 16, 2002. The case was assigned to Renee Vanzant. Ms. Vanzant contacted the insured on the 16th and documented her file to reflect that the insured would advise her of the outcome of the criminal charges pending against him.

Ms. Vanzant did not take a recorded interview of the insured. She testified in deposition, at page 12, that she requested permission to forgo a recorded statement of the 17 year old driver, Mr. Herron. She testified that a statement was unnecessary because only one vehicle was involved in the accident.

It is my opinion that Ms. Vanzant made the correct decision when she elected not to take Mr. Herron's statement, although I suspect that the reason she gave for not taking the statement may not be the full story. With criminal charges pending related to the consumption of alcohol, and the insured's tender age, the statement could well have proved to be detrimental to his interests, as well as those of Allstate. It also indicates that Allstate, from the outset of the claim, was aware of the tremendous exposure confronting their insured, Mr. Herron.

Ms Vanzant continued her investigation of the accident by placing a call to ANMC, where she spoke to a nurse then documented her file to record Angelina had been moved to a room. Contact with all claimants, inquiry on the availability of additional insurance, and actions taken to secure the police report are all documented. Ms. Vanzant was following what has been referred to as a Matrix, or check list of actions to take for an accident of this nature.

In deposition, at page 15, Ms. Vanzant related that the instructions included securing the agent's certified declaration page and the agent's application with regard to the waiver of UM issues.

The inclusion of this instruction demonstrates Allstate's concern that Ms. Trailov's injury could exhaust the $100,000 Bodily Injury Liability limit and then penetrate past the $100,000 UIM limits. (While the declarations page of the policy does not reflect the existence of UIM coverage, statutory language provides for coverage, that absent a waiver, must, at a minimum, mirror the limits of the Liability coverage. Without a waiver the insured could argue that limits of $1,000,000/$2,000,000. are available for claims against the policy. AS21.89.020(c) – (c-2)). The agent was unable to produce a signed waiver.

Page 3 of 20

3
600009

Ms. Vanzant went to ANMC and left her card with a nurse along with instructions to give the card to Ms. Kenick and ask Ms. Kenick to call Ms. Vanzant.

On September 23, 2002, Ms. Vanzant was advised that Mary Kenick and Angelina Trailov were represented by counsel. On September 25, 2002, the claim file documentation recorded the Allstate evaluation of Mr. Herron's liability for the accident at 100%.

When Allstate learned that Ms. Kenick and Ms. Trailov were represented the claim file was separated and transferred from Ms. Vanzant to other Allstate adjusters. On September 26, 2002, the Medical Payments coverage was reassigned to Scott Millar and the remaining exposures for Ms. Trailov's injuries were transferred to Kathy Berry. Ms. Vanzant retained control of the claims for Tracy Faulkner, but had no further input in the Kenick and Trailov claims.

By September 26, 2002, the claims of Trailov, and Kenick as the parent of a minor, had received intense scrutiny by Allstate. Ms. Berry, who had more experience with claims in suit than Ms. Vanzant, was assigned as the primary adjuster. Craig Elkins, (Ms. Berry's direct supervisor), Karen Peterson (who controlled claims authority in the office), and Claims Manager, Gary Davis, were aware of Ms. Trailov's claims. The serious nature of Ms. Trailov's injuries and exposure to Mr. Herron were clearly known by Allstate.

MEDICAL PAYMENTS CLAIM ASSIGNED TO SCOTT MILLAR

Scott Millar was assigned to handle the Medical Payments portion of the claim two weeks after the accident. Ms. Trailov's injuries were documented as a basal fracture of the skull, loss of consciousness, a fractured rib, a punctured lung, fluid on the lungs, and a back injury when he received the file. The information that she had stopped breathing at the scene of the accident on two separate occasions, and required CPR to resuscitate her, was available.

Information regarding her treatment at Y-K, the medivac, treatment at ANMC, her transfer to the critical care unit at Alaska Regional, and her transfer back to ANMC was available by the time Mr. Millar assumed control of the file. Clearly Ms. Trailov's medical expenses exceeded the $25,000 medical payment limits available under the policy when Mr. Millar began to adjust the claim.

Allstate's procedures, found in their claims manual, outline the adjuster's responsibilities to insured parties for Medical Payments



4

600010

coverage. The claims manual states "Insured parties who have protection under first party coverage, including medical payments, P.I.P, UM should be advised in person or by telephone of the nature and availability of these benefits." Mr. Millar failed to follow the procedures outlined in the manual and the Alaska Administrative Code regarding communication of available coverage, 3AAC26.060.1

There was no documentation in the file of medical payments notification when Mr. Millar received the file. In his deposition, Mr. Millar, an adjuster with a considerable education and claims handling experience, excused his failure to comply with the standards set by the manual by saying, "Normally, when the file comes to me, that should has already been disclosed."

Mr. Millar apparently felt he had no obligation to review his new assignment to see what had been done, and what needed to be done, to properly adjust the claim according to Allstate requirements. He was negligent in making those assumptions; his decision not to do anything with the file after it was assigned to him was an intentional failure to act, and in my opinion goes beyond simple negligence. Whether it was Mr. Millar, or another Allstate staff member who was responsible for the failure to follow the guidelines of the claims manual and the standards of fair claims practices, is irrelevant. The point is that no one contacted Ms. Trailov, Ms. Kenick or their attorney regarding the available first party coverage of medical payments.

From the time the file was assigned to him in September of 2002, until the spring of May of 2003, Mr. Millar did nothing. Based upon the initial reports he knew or should have known that the medical bills would be substantial. Despite his awareness of the magnitude of Ms. Trailov's injury and the certainty of economic hardship that accompanies large medical bills, Mr. Millar violated Allstate procedure and state statutes governing fair claims handling. He made no contact with the insured or her attorney, he did not send out the Medical Payments packet, he did not send out a medical authorization form.

In an astonishing attempt to justify his negligence, Mr. Millar testified in his deposition, in cross examination by Mark Wilkerson, that his failure to act benefited Ms. Trailov. According to Mr. Millar (page 86-88 of his deposition), by making no contact for seven months, he gave Ms. Trailov the benefit of leveraging the available funds among lien holders. Documentation of this tactic is not reflected in the file. More to the point, if that was his strategy, he could have accomplished the same objective by paying the $25,000 to Ms. Kenick on behalf of Ms. Trailov in October of 2002. By October, the medical costs exceeded the policy limits. Negotiation of medical billings would surely be more effective if

Exhibit 6
Page 5 of 20

600011

the claimant had control of the funds and the negotiations were conducted before liens were imposed.

It is my opinion that Scott Millar's negligence contributed to Allstate's breach of duty to Mr. Herron. Mr. Millar owed a duty to comply with the standards and regulations. If he had obtained a medical authorization and the medical bills within a reasonable time, Allstate would have had documentation available to more accurately assess their exposure for the bodily injury claim of Ms. Trailov and settle the claim when the policy limits offer was made. Allstate coordinates the medical payments benefits with bodily injury exposures, as confirmed by document 100019-100020. In these November 7, 2002, supervisory notes, Mr. Elkins directed Ms. Berry to coordinate with the medical payments on billings.

By withholding the funds, Mr. Millar allowed Ms. Kenick to accrue liens, endure harassment from creditors, and become emotionally distraught over the inability to pay the medical bills which had accumulated. The negligence in the handling of the Medical Payments claim, including the failure to disclose the coverage and pay the bills within a reasonable time frame, increased the value of the NIED claim being brought by Kenick.

Mr. Millar's negligence and intentional failure to act led to the mishandling of the medical payment claim. The failure of the supervisory staff to note and correct the condition compounded Mr. Millar's negligence, adversely affecting the pending liability claim against Mr. Herron.

BODILY INJURY CLAIMS ASSIGNED TO MS. BERRY

When Kathy Berry was assigned to the Liability BI claim of Ms. Trailov, the claim was known to be one with a closed head injury. Reasonable inquiry would have confirmed that Ms. Trailov's medical care included hospitalization with a stay in the Critical Care Unit at Alaska Regional Hospital. The involvement by Ms. Peterson at this point, suggests the reported injuries triggered oversight under Good Faith Claim Handling and Recognition of Serious Injuries, document 704366.

When the file was assigned to Ms. Berry, it was clear that Mr. Herron had exposure to liability that the policy provisions did not cover. Mr. Herron had been drinking prior to the accident and tests had revealed that he had an elevated blood alcohol level. DWI and assault charges were pending. The Allstate policy excluded coverage for punitive damage charges which were likely under these circumstances. Mr. Herron's problems were compounded by existing Alaska law that allowed full attorney fees to be assessed in claims that arise from accidents where

the responsible party is found to be guilty of DWI and the clear possibility of the value of Ms. Trailov's claim exceeding the policy limits.

On September 26, 2002, Ms. Peterson gave instructions for a letter to be sent to Mr. Herron to advise him that the Allstate policy would not provide coverage for punitive damages that might arise from a DWI related claim. Missing from her instructions is notification to Mr. Herron that AS 09.60.070 allowed assessment of actual attorney fees for claims involving DWI and that, as a matter of law, the policy would not respond to the additional fees. There were no instructions to send Mr. Herron an "Excess Letter". Given the nature of the injuries and the pending criminal charges, it is my opinion that both of these items should have been addressed immediately. Inexplicably, it would be six months before Ms. Berry acted upon the instructions she received from Ms. Peterson.

Ms. Peterson also directed Ms. Berry to "Determine extent of 04 injuries". 04 is identified as Angelina Trailov. Again Ms. Berry did not act. For reasons which are unexplained Ms. Peterson does not continue to provide oversight on the case, as I would have expected. Instead the file goes off of her diary until it is brought to her attention after the policy limits offer expired on May 16, 2003.

When Ms. Berry assumed control of the bodily injury claims, she knew Ms. Trailov had sustained significant injury. She knew or should have known that the medical costs would be substantial. She knew that Allstate had assessed the liability to be 100% the responsibility of Mr. Herron. Amazingly she, like Mr. Millar, did nothing.

Ms. Berry did nothing to investigate the injury and damages; she did nothing to evaluate the claim. She did nothing to attempt to negotiate a settlement to protect Mr. Herron. She did nothing to advise Mr. Herron that his policy did not provide coverage for punitive damages, (despite instructions from her Ms. Peterson to do so), or cover any attorney fees above the standard Rule 82 provision. She did not send an "Excess Letter", (required by the Allstate Claim manual), to inform him that the value of Ms. Trailov's injuries would probably exceed the limits of his policy protection. The Alaska Supreme Court has weighed in on the obligation of a carrier to advise an insured of a possible excess claim in <u>Jackson vs. American Equity</u> and <u>O.K. Lumber vs. Providence Washington Insurance.</u>

Ms. Berry was aware, or should have been aware, that due to Mr. Herron's intoxication at the time of the accident, a judgment in excess of the policy limits would not be discharged by filing for bankruptcy. Ms. Berry's file contained a police report that confirmed that Mr. Herron's blood alcohol level was .146. Ms. Berry testified that she was working in

Exhibit 6
Page 7 of 20

7

the Allstate office when the Supreme Court opinion that addresses this topic, Bohna vs. Allstate, came down. See page 5 of Volume 1 of her deposition.

On November 07, 2002, her supervisor Mr. Elkins reminded her to secure a wage and medical release. He directed her to co-ordinate any pending medical bill issues with the Medical Payments Adjuster.

Ms. Berry's authority was limited to $20,000. By November 14, 2002, she had raised the reserves from $25,000 to $75,000. (Elkins Deposition at 61). According to Mr. Elkins the increase in the reserve would not have generated an alert to any of the supervisory staff. The records I reviewed did not contain an evaluation form. That is not what I would consider industry standard for the supervision of claims adjusters. Reserve increases signal a change in the status of the claim and it has been my experience that the direct supervisor would receive notification of the increase via computer print out the following day if the increase put the reserve above the adjuster's authority. Alternatively the supervisor would be required to sign off before the increase was processed.

Without the evaluation form, there is no way to determine what Ms. Berry knew about either the medical condition of Ms. Trailov or the dollar value of her accrued medical bills.

On November 15, 2002, two months after the date of the accident, Ms. Berry finally sent out a medical authorization. The authorization was returned on November 25, 2002, but it was January 17, 2003, before she acknowledges use of the authorization to obtain records from the Y-K hospital in Bethel, although there is some dispute that she ordered those records in January. She did nothing further with the release. She did not obtain records from the physicians, from ANMC, or from Alaska Regional Hospital.

She did not contact Ms. Powers for an interview with her clients to assist her in obtaining the information she needed to complete her investigation and determine the value of the claim.

On December 10, 2002, Ms. Berry was advised by plaintiff attorney, Michele Powers, that Ms. Trailov had been scheduled for a neuropsychological evaluation to be conducted by Dr. Craig on December 17, 2002. Ms. Berry did not make arrangements for the examination to be attended by a representative from Allstate or a medical expert of her choosing.

Exhibit 6
Page 8 of 20

8
600014

Ms. Berry never requested a copy of Dr. Craig's findings or scheduled an IME. She continued to do nothing to protect Mr. Herron. Ms. Berry was put on notice of the exam. She had a medical authorization to obtain medical information. While Dr. Craig did not issue his report until February, she could have talked to him at any time after the exam and obtained the information from his assessment. It was the result of this exam that elevated this claim to a Mandatory Home Office Referral. A letter relating to Mandatory Home Office Referrals, directs that, as of November 30, 1998, a claim in Alaska with a brain injury had to be submitted to the Allstate Home office within 14 days. (See Document 70436)

On December 10, 2002, plaintiff attorney Michelle Powers asked Allstate for a copy of Mr. Herron's policy. On January 17, 2003, Allstate provided Ms. Powers with a letter that stated, in part, that they were including a copy of the declarations page with the letter. Ms. Powers denied any knowledge of receiving the declaration sheet and it is unclear if a copy was ever located in her file.

It is my opinion that whether or not she received a declaration sheet with the January 17, 2003, letter is irrelevant for a number of reasons. First, sending a copy of the declarations page of the policy to the plaintiff attorney does not satisfy the requirement outlined in the Allstate claim manual that the adjusters meet with, or explain on the phone, the coverage available under the policy. The explaination, in one of these two prescribed manners, is then to be followed up with a letter documenting the conversation. Those procedures were not followed.

Second, the Unfair Claims Practices Act at 3 AAC 26.060 (1) requires that a first party claimant receive disclosure of all relevant benefits under which a claim may be covered within ten days. The UIM coverage was not disclosed to either the claimants or their counsel.

And finally, and most significant, providing the declaration sheet, or even the policy for that matter, without a meeting to discuss the coverage available would have been misleading because the declaration sheet, and the policy language, do not reveal coverage for UIM. The declaration sheet and the policy language reference "uninsured motorist coverage" only. There is no language in the policy which provides a grant of coverage for Underinsured Motorist Coverage. The coverage is available because of statutory extension.

As I have testified numerous times in the past, the adjuster is required to look for coverage in the policy, in the statutes and in Supreme Court decisions. In my opinion, Allstate's failure to incorporate statutory requirements into their policy language placed an increased burden on

9

600015

Case 3:04-cv-00043-TMB   Document 214-13   Filed 04/01/2008   Page 10 of 20

Allstate to fully explain the coverage available under the policy to anyone who is insured by the policy terms. Ms. Trailov was an insured for UM (and therefore UIM) under the state statutes. It was incumbent upon Ms. Berry to advise Ms. Powers that the Allstate policy provided coverage beyond the $100,000 bodily injury liability limit reflected in the declaration sheet.

On February 18, 2003, Ms. Berry received a policy limits demand, dated February 14, from attorney Powers for Ms. Trailov's injury and a separate policy limits demand for NIED claims for Ms. Kenick's claim. She advised her supervisor of the demand, but failed to either record the receipt of the demand or send the file to Allstate's Home Office as required by their procedures for claims involving brain injury and directed by her supervisor, Mr. Elkins.

On March 18, 2003, a full month after the policy limits demands, Ms. Berry advised Mr. Herron of the demand. For the first time she advised him that punitive damages would not be covered under the policy terms. Ms. Berry did not send out an excess letter to advise him that the claim of Ms. Trailov could exceed the limits of his policy. She did not advise him that attorney fees under AS 09.60.070 would not be covered under the policy as a matter of law.

At deposition Ms. Berry's testified at page 57 and 58 regarding her opinion on when it was appropriate to send an excess letter. Her example was a claim where the medical bills exceed $200,000, the claimant has multiple fractures, the policy limits are $50,000 and the liability evaluation is 100% against the insured. It is my opinion that this is not a rational interpretation of the excess letter requirement for an adjuster with 18 years of experience. An excess letter is required as soon as a carrier becomes aware that there is a reasonable possibility a claim will exceed the policy limit or where a demand is made for or in excess of the policy limit. It is equally illogical that as of six months post accident, neither she nor anyone else at Allstate had tried to evaluate the total exposure to Mr. Herron.

On March 18, 2003, she utilized the medical release to obtain medical records from Alaska Native Medical Center. It appears that Ms. Powers had previously provided her with records from the Alaska Regional Hospital

On March 18, 2003, Ms. Berry wrote to Ms. Powers asking her for information on medical treatment, Ms. Kenick's NIED claim, and information on Ms. Trailov's school performance before and after the accident. Having waited a month to reply to the demand, Ms. Berry still does basically nothing. Six months post accident she still had not asked

for an interview with Kenick or Trailov to obtain information to allow her to conduct her own investigation on damages. While the claimant must perfect their own claim, industry standards would dictate that the adjuster conduct an independent investigation to adequately protect the interests of the policyholder. With a release, Ms. Berry could have asked for the records directly from the source, insuring that she was protecting Mr. Herron by obtaining all of the records uncensored.

Facing pending criminal charges, Mr. Herron secured the services of Mr. Valcarce to act as his personal attorney. On March 26, 2003, Mr. Valcarce became aware of the policy limits demand which was made by Ms. Trailov's attorney on February 18, 2003. Mr. Valcarce, acting in the best interests of his client Mr. Herron, demanded that Allstate accept the offer to settle the claim for policy limits or, in the alternative, provide Mr. Herron with assurance that Allstate would pay any adverse verdict in excess of the bodily injury liability coverage provided by his policy. Ms. Berry's testimony in her deposition at page 65, that she did not believe the letter from Mr. Valcarce required a response is not believable. The Allstate requirements (Section 3: Guiding Principles Relating to Automobile Insurance Claims 1.0) calls for prompt response to communication.

Having received no response to the February policy limits demand, on April 10, 2003, Ms. Powers advised Ms. Berry that her February offer would remain open until May 16, 2003, but would be withdrawn at that time. Despite having knowledge that Mr. Valcarce represented Mr. Herron, Ms. Berry did not notify him of the May 16, 2003 deadline.

The communication Ms. Berry received from Ms. Powers has specific meaning in the insurance world. This type of letter provides the insurer with one final opportunity to evaluate the offer and decide if they are willing to risk company assets above the policy limits if the decision is not reasonable. Insurance carriers typically log in these demands and notify their home office because the stakes can be high; particularly when the insured has a policy with modest limits and a claim with significant injury is being made against that policy. Allstate had such a policy as outlined in their Good Faith Claim Handling Best Practices found at 704361 and 62.

It's difficult for me to understand how this case could have slipped under the radar of Ms. Berry and every level of the Allstate supervisory staff. It's the classic case that requires close scrutiny within the designated time frame to avoid exposing the insured to excess verdicts and judgments for compensatory and punitive damages. It's the classic case that leads to bad faith claims against insurers because, absent court

Exhibit 6
Page 11 of 20

decisions, carriers would go unchecked as they sacrificed the insured's interest for that of the carrier.

The "last chance" extension was written on April 10, 2003, and received on April 14, of 2003. Ms. Berry and Allstate still had an opportunity to correct all of the errors that had been made in the earlier handling of the case if they had any interest in protecting Mr. Herron. Continuing an all too familiar pattern in the handling of the claims against Mr. Herron, Allstate and Ms. Berry did nothing.

Ms. Berry did not disclose what additional information she needed to evaluate the Trailov claim. Neither she nor Ms. Powers (in deposition) know whether or not there would have been an extension granted because Ms. Berry never bothered to ask for one.

It is my opinion that Ms. Berry should not have needed an extension. She had adequate time and the necessary releases to obtain whatever she needed to evaluate the claim of Ms. Trailov months before the May deadline. As an adjuster with considerable experience she should have realized that a reasonable evaluation of the injuries would have placed the value of the claim well in excess of the policy limits available to protect Mr. Herron. And, in fact, she demonstrated her knowledge by increasing the reserves to the policy limits prior to the expiration of the offer to settle.

Mr. Elkins, after directing Ms. Berry to send the file to Home Office in early March, apparently did not track the claim to ensure that his directions had been followed. On May 6, 2003, he discovered that the file had not yet been referred.

Ms. Berry having done no independent investigation from the time of the original offer to settle in February, wrote a letter to Ms. Powers on May 9, 2003, advising her that Allstate needed additional time to evaluate the claim of Mary Kenick. In her letter of May 9, 2003, Ms. Berry stated that she expected to be able to "respond before the May 16 deadline".

Prior to May 16, 2003, Ms. Berry acknowledges that she increased the reserve from $75,000 to policy limits of $112,500 on the Trailov claim. (Berry Deposition at 87 and 88)

The policy limits demand for Ms. Trailov's claim was not contingent upon Allstate agreeing to the policy limits demand for Ms. Kenick. Ms. Berry could have accepted the settlement offer for Ms. Trailov. There is no explaination for her failure to protect Mr. Herron by taking that action when the claim had been acknowledged as having that potential by the

Exhibit 6
Page 12 of 20

12
600018

liability evaluation and, by the end of the deadline on May 16, 2003, the case reserves.

Equally puzzling is her failure to acknowledge Mr. Valcarce's letter of March 26, 2003 and her failure to advise Mr. Valcarce of the letter of April 10, 2003, with a deadline of May 16. Mr. Herron had no opportunity to participate in the negotiations or attempt to settle the claims from his own assets.

On May 12, 2003, Mr. Millar, after seven months of doing nothing, tendered the medical payments limits of $25,000 to Ms. Powers.

Ms. Berry received the wage information she requested from Ms. Powers for documentation of Ms. Kenick's NIED claim on May 15, 2003.

On May 16, 2003, Ms. Berry wrote and faxed a letter to Michele Powers to advise her that the "evaluation" of Angelina's claim was not complete, she stated "Our evaluation will be completed by the end of the month and I am hoping to respond to your demand sooner than that." In deposition, she acknowledged at page 85 that she had completed the evaluation of the claim prior to the May 16, 2003, deadline. She did not request an extension of time. Prior to May 16, the file contained no documentation of an evaluation but the reserves were at policy limits. Ms. Berry had not advised any other Allstate staff member of the April 10, 2003, "Deadline Letter". She had $20,000 in settlement authority and had not requested the necessary authority to settle the claim.

On May 20, 2003, Ms. Berry finally made a Home Office Referral. The response was that they had nothing to add until Ms. Berry evaluated the claim.

The file was then sent to Karen Peterson through supervisory channels. On May 29, 2003, Ms. Peterson determined that the value of the claim not only penetrated beyond the $100,000 in bodily injury liability limits, but it would probably also penetrate the $100,000 of UIM coverage that Allstate acknowledged. (Peterson deposition at page 83) There was no change in Ms. Trailov's medical condition between March and May of 2003. Everything that Karen Peterson utilized to evaluate the claim was available to Ms. Berry in March of 2003. Ms. Peterson's notes reflect that she is aware that a UIM exposure existed for Ms. Trailov and that under Alaska law Mary Kenick's NIED liability claim needed serious attention.

Ms. Peterson's notes also contain two serious errors. Her first error was concluding that Mary Kenick was not an insured for a NIED claim under Mr. Herron's UIM policy coverage. She is wrong. Kenick is an UMBI insured under the statute (AS 21.89.020) and under the Allstate policy

13

600019

language.(Page 15 of the policy at Part V, Uninsured Motorist. Persons insured include (3) any other person who is legally entitled to recover because of bodily injury to you, a resident relative, or an <u>occupant of your insured auto</u>.)

Allstate acknowledged this exposure under UIM coverage as reflected in document 704347, entitled Alaska UM/UIM Claims Handling. Ms. Trailov's brain injury was a serious claim under Allstate's procedures. The Alaska UM/UIM Claims Handling document states, in part, "Serious injury referrals will continue to be sent to Process Mastery per 1998 guidelines. Alert conferences should be conducted to comply with Good Faith Claim Handling for serious injuries. Consideration should be given to claims for negligent infliction of emotional distress on all serious injuries (this is a separate cause of action and subject to an individual per policy limit.)"

Ms. Peterson's second error was assuming that Allstate should wait for the attorney to make a claim for UIM. Allstate was obligated to advise Ms. Powers that the UIM coverage was available to her clients, something they had never done.

On May 30, 2003, a letter was directed to Ms. Powers offering to settle the Trailov claim for "policy limits" of $112,500 and offering $10,000 for the NIED claim of Ms. Kenick.

In my opinion, Ms. Berry's actions were inexcusable. Failing to meet the deadline and thereby subjecting Mr. Herron to unlimited liability was outrageous and undoubtedly the most serious offense. But her appalling continuing failure to advise Ms. Powers of the UIM coverage under the policy compounded her shocking behavior. By trying to minimize the loss to Allstate by ignoring the UIM coverage, she put the interests of the Company above those of Mr. Herron. Ms. Berry's explaination at page 115 of her deposition (that the wording was not intended to eliminate any UIM claims) is not believable. Ms. Berry knew about the exposure under the UIM, failed to advise Ms. Powers of the exposure and tried to extinguish all of Ms. Trailov's BI claims against Allstate by accepting the offer made by Ms. Powers in March of 2003. If she did not intend the offer to extinguish the UIM coverage, she is required to disclose that information. The coverage would have been fresh in her mind given Ms. Peterson's evaluation the day before the letter was written.

On May 29, 2003, attorney Douglas Johnson, from the office of Dennis Mestas, advised Allstate that the deadline for accepting the offer had expired and was withdrawn. On May 30, 2003, there were no offers open to extinguish any part of the Trailov or Kenick claims.

POST REJECTION DEADLINE

When Allstate failed to settle the claim under the terms of the offer, suit was filed against Mr. Herron by Mary Kenick and Angelina Trailov. Allstate sent the suit to Mark Wilkerson to provide a defense for Mr. Herron. On June 11, 2003, Mr. Wilkerson wrote to Mr. Herron advising him that Allstate had assigned Wilkerson to represent Mr. Herron.

Mr. Wilkerson asked Mr. Valcarce to assist in the defense. Mr. Wilkerson stated reasons for asking Mr. Valcarce to participate in the defense was Mr. Valcarce's local presence (he practiced law in Bethel) and Mr. Valcarce's familiarity with the case. Mr. Valcarce represented Mr. Herron in defending the criminal charges that resulted from the accident.

Mr. Valcarce agreed to assist Mr. Wilkerson in representing Mr. Herron to the best of his ability and assured Mr. Wilkerson of Mr. Herron's cooperation. Mr. Valcarce asked Allstate to provide Mr. Herron with assurances that Allstate would pay any costs and attorney fees, punitive damages and adverse verdicts above the policy limits. Mr. Valcarce reasoned that Allstate had the opportunity to extinguish all claims against Mr. Herron within the policy limits, and having failed to do so, should accept the consequences of their decision not to act.

Mr. Valcarce made his request for assurances repeatedly over a period of almost a year. Each time Mr. Wilkerson, who supposedly had been retained by Allstate to represent Mr. Herron, replied that Allstate would deny the request for that assurance.

After a period of several months, Mr. Wilkerson withdrew as Mr. Herron's attorney and became the attorney for Allstate. Nothing in the records I reviewed reflects that Allstate or Mr. Wilkerson followed the procedures outlined in their manual at 2-3-3 (document F901679) regarding the withdrawal of counsel. Mr. Wilkerson was specifically required to contact Mr. Herron and explain why he was withdrawing.

Mr. Wilkerson continued to stone wall any attempt by Mr. Valcarce to obtain Allstate's guarantee to absorb any monetary award beyond policy limits. It is difficult to believe that Mr. Wilkerson was ever acting as Mr. Herron's attorney because his position on the subject never considered the best interests of Mr. Herron. If he was Mr. Herron's attorney and was acting in the best interests of Allstate and not Mr. Herron, it would appear he had a conflict of interest.

Unable to receive the assurances he needed to protect Mr. Herron in the suit by Ms. Kenick and Ms. Trailov, Mr. Valcarce advised Allstate that he



Exhibit 6
Page 15 of 20

15

600021

would protect his client by seeking a confession of judgment through separate counsel. In the face of this full disclosure regarding the choices Mr. Valcarce and his client had made to protect Mr. Herron's interest, Allstate continued to resist their request for assurances from Allstate.

Allstate had no legal obligation to accept the proposition made by Valcarce, but Allstate was afforded the opportunity to correct their earlier missteps by doing so. Allstate would have risked nothing by making the assurance. The assurance would guarantee the continuing cooperation of their insured and eliminate what was clearly stacking up to be Bad Faith allegations. By leaving Mr. Herron unprotected by reason of their unreasonable failure to accept the policy limits demand, Allstate breached their duty of good faith and fair dealings with their insured and set the stage for Mr. Herron to go forward with the only remedy left for him to eliminate uninsured exposure; a confession of judgment. It is my opinion that under the test set by <u>WIGA vs. Ramsey</u> the consent judgment was a reasonable course of action for Mr. Herron to pursue.

Allstate owed Mr. Herron the duty of investigation, evaluation, and settlement. Even before the offer by Ms. Power to settle the liability claim with payment of policy limits in February of 2003, Allstate should have made the offer to settle the claim for that amount. Instead they did nothing to protect his interests, allowing the claim to languish when they should have aggressively pursued a resolution on his behalf. If Ms. Powers had been reluctant to accept the BI limits to release Mr. Herron, Allstate could have leveraged the probability of acceptance of the offer with discussions reminding Ms. Powers that the UIM limits would not be triggered until the BI claim was settled.

If Allstate had acted with the intention of protecting their insured, numerous scenarios, initiated by Allstate, could have helped them to resolve the liability claim. Prompt payment of the Medical Payments would have established trust and eliminated part of the emotional distress claim of Ms. Kenick. The remainder of the medical bills could have been paid through a Payment in Advance, the purpose of which is stated in the Claim Manual as "PIA enables Allstate to demonstrate good faith in handling third party injury claims" and "The intent of PIA is to relieve the claimant of the usual financial burdens that follow an accident and serious injury, if the liability warrants...."

If the value of the claim was determined to exceed both the BI and UIM stated limits, Allstate should have disclosed that the UIM coverage did not contain a waiver.

Allstate questioned the exposure and value of the NIED claim being made by Ms. Kenick. After the May 2003 deadline they received an offer to

Exhibit 6
Page 16 of 26

16
600022

settle that claim for $50,000. The offer was rejected by a counter offer of $25,000.

With the increase in reserves to policy limits before the offer expired, Allstate lost any argument regarding the reasonableness of their position in failing to accept the offer to settle the Trailov claim. With regard to the Kenick claim, Allstate had the opportunity to stop Mr. Herron from moving to protect his interests with a confession by testing the conviction of their evaluation of Ms Kenick's loss. They could have provided the assurances requested by Mr. Valcarce. The confession did not take Allstate by surprise. They were given a choice.

Every claim has to be evaluated individually. Allstate's evaluation needed to include all of the risks that Mr. Herron faced if Ms. Kenick's claim went to trial. The value of Ms. Kenick's claim for NIED incorporates the risks attendant to trying a case in Bethel, Ms. Kenick's stature in the community, the broadening of the interpretation of NIED claims under Tommy's Elbow Room, and the pending criminal charges of DWI and assault.

The risks to Mr. Herron's future as a result of this automobile accident were substantial. With a clear case of liability and at least one claim whose value clearly exceed the $100,000 in liability protection, this claim should have been settled the moment the offer was extended to do so. There were no substantial changes that would impact the decision to offer policy limits in this case after December of 2002. The information that Allstate needed to make that determination was all available to Allstate for the asking. Their decision not to act placed their insured in harms way.

Many of the exposures to Mr. Herron would not have been covered by the policy language. While allegations that fall outside the policy language are not part of Allstate's duty to Mr. Herron, it does increase the stakes when they have the opportunity to settle those claims, as well as those covered under the policy, by accepting an offer that falls within the policy limits. (WIGA vs. Ramsey)

The number of missteps in the handling of this claim by Allstate is mind boggling. Taken individually they might be considered simple error; together they paint a picture not only of negligence but of reckless, malicious and outrageous behavior. They had multiple opportunities to review and eliminate the exposure to their insured. Allstate refused those opportunities, continuing to place their own interests above those of Mr. Herron. Having placed their interests first, Allstate must be held accountable for the results of abandoning their insured.

CONCLUSION

The Alaska Statutes and Alaska Administrative codes govern the insurance carriers' obligations for proper, competent, and good faith handling of insurance claims.

The standards and practices set by Allstate and other insurers are generally outlined in claims manuals and communications to claims staff. The standards are designed to protect the insured and relate to investigation, evaluation, timeliness, reserves, reports, diaries and reviews, documentation of the claim file, disclosing coverage and coverage limitations, advising the insured regarding excess exposures, advising their insured about settlement status, making settlement offers, responding to settlement offers, and the timely settlement or attempted settlement of such claims.

In reviewing the information provided in Allstate's Manuals and communications with regard to standards and procedures, I found that they generally covered all the industry standards and practices for proper, competent, and good faith supervision and management of liability and UIM claims.

If the Allstate standards had been followed, Allstate and Mr. Herron would not find themselves where they are today because the liability claims would have been settled by Allstate within Mr. Herron's policy limits.

There are several plausible explanations for Allstate's actions or lack of actions. One is that for eight months every system Allstate had in place to insure compliance with industry and Allstate standards and the Alaska State statutes broke down through negligence. A second is that none of their adjusters or supervisors had been trained or made aware of the Allstate procedures or standards set by the Alaska Administrative Code. A third is that despite the written procedures, these staff members were operating in a corporate environment that encouraged or tolerated employees protecting the assets and interests of Allstate with little or no consideration for the interests of their insured.

Whatever the cause, this incredibly experienced staff's combined failure to comply with almost every standard set by their own claims manual for good faith claims handling was negligent, unreasonable, outrageous, and includes acts done with malice or bad motives and demonstrates reckless indifference for the interests of Mr. Herron.

In reviewing the actions of the combined Allstate staff between September 16, 2002, and May 30, 2003, it is almost impossible to find

Exhibit 6
Page 18 of 20

18
600024

anything they did right to protect Mr. Herron. As I outlined above, they failed to investigate the claim on a timely basis, failed to evaluate the loss on a timely basis, failed to document their file, failed to set realistic reserves, failed to disclose coverage, failed to advise the insured of coverage limitations related to excess judgments and DWI attorney fees, failed to advise him of coverage limitations for punitive damages until six months after the loss, failed to advise the insured regarding settlement status, failed to make timely settlement offers, failed to respond to settlement offers, failed to respond in a timely basis to a "deadline" offer to settle, consistently failed to respond promptly to communications, failed to provide adequate supervision to ensure compliance with corporate standards and Alaska State law.

Allstate had repeated opportunities to eliminate the impact of their failures upon their insured by accepting the policy limits claims made by Ms. Powers. Once again they failed; they failed to protect Mr. Herron.

In Alaska, the standard for a finding of bad faith is a preponderance of evidence. For the insured to prevail there must a finding of more likely than not, or better than fifty percent chance. In my opinion there is no question that Allstate's handling of this claim is bad faith.

The standard for a finding for punitive damages is much higher. The standard for a finding of punitive damages is that it must be supported by "clear and convincing evidence".

The tort reform statute of 1997 essentially codified judicial decisions to prior statutes on punitive damages.

In its 2003 decision in Great Divide vs. Carpenter the court said:

"Since the advent of tort reform in 1986, punitive damages have been governed by statute. They may be awarded only on proof by clear and convincing evidence that a defendant's conduct was either outrageous, including acts done with malice or bad motives, or evidenced reckless indifference to the interests of others."

It is my opinion that Allstate's conduct with regard to their obligation to Mr. Herron rose to the level of "a gross breach of accepted standards of conduct which might be characterized as outrageous or malicious." As discussed by the Supreme Court in Weiford vs. State Farm.

In Weiford vs. State Farm, the court, relying upon Providence Washington vs. City of Valdez, said punitive damages have a two-fold purpose:

Exhibit 6
Page 19 of 20

19
600025

"to punish the wrongdoer and deter the wrongdoer and others like him from repeating the offense"

There is clear and convincing evidence that virtually every Allstate employee who handled the file relating to this accident acted with reckless indifference to the rights of the insured under the policy. The failures by Allstate staff all benefited Allstate. If it is not a corporate culture that encouraged their acts of malice or bad motives, then it was clearly a corporate culture that tolerated their defiance of their own standards.

Allstate, the Alaska statutes, and Alaska Supreme Court decisions have set certain standards in the adjustment of insurance claims. If providing manuals for good faith handling of claims and the training and supervision of their staff in these areas have not provided a climate that works to protect the interests of the insured by following those standards, then it is my opinion that it is necessary for Allstate to be punished to deter Allstate and other carriers from repeating the list of offensive actions outlined above. It is my opinion that an award of punitive damages is appropriate in this case.

*[Signature]*   6/5/06

Robert N. Wainscott

Exhibit 6
Page 20 of 20